# EXHIBIT B

![Department of Justice Seal]

# Department of Justice

January 17, 2021

MEMORANDUM FOR THE CIVIL RIGHTS DIVISION

FROM: ACTING ASSISTANT ATTORNEY GENERAL JOHN B. DAUKAS

SUBJECT: Application of *Bostock v. Clayton County*

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, makes it an "unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of, *inter alia*, such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). On June 15, 2020, the Supreme Court held that this provision prohibits covered employers from firing an individual "simply for being homosexual or transgender." *Bostock v. Clayton County*, 590 U.S. __, __, 140 S. Ct. 1731, 1737 (2020).

Perhaps unsurprisingly, questions have been raised about the consequences of the decision in *Bostock* for other applications and provisions of Title VII, as well as for other statutes. No one in 1964—whether the Member of Congress voting on the statute or the average person on the street—would have understood Title VII the way that the Supreme Court interpreted it in *Bostock*. The Court did not contend otherwise, acknowledging that its interpretation of Title VII "reaches 'beyond the principal evil' legislators may have intended or expected to address," but asserting that "many, maybe most, applications of Title VII's sex provision were 'unanticipated' at the time of the law's adoption." *Bostock*, 140 S. Ct. at 1749, 1752. It is thus unsurprising that questions would be raised about the unintended consequences of the *Bostock* decision. The Supreme Court acknowledged, but expressly reserved, such questions. *Id.* at 1753 ("Whether other policies and practices might or might not qualify as unlawful discrimination . . . are questions for future cases, not these.").

Because the federal government is tasked with enforcing many civil rights protections that could be implicated by *Bostock*, this memorandum provides guidance for Civil Rights Division Attorneys and staff on this subject, recognizing that many additional questions will need to be addressed individually as they arise.[1] Specifically, the memorandum first addresses whether

---

[1] Some have criticized the *Bostock* majority's literal and context-free interpretation of Title VII, and suggested such an approach dooms race-based affirmative action under Title VI, Title VII, and the Equal Protection Clause of the United States Constitution, if applied in those contexts. *See, e.g.*, Nelson Lund, *Unleashed and Unbound: Living Textualism in* Bostock v. Clayton County, 21 Federalist Soc. Rev. 158 (Aug. 6, 2020); Jason Mazzone, Bostock: *Were the Liberal Justices*

*Bostock* must lead to change in the Department's own employment practices. It then addresses federal law protections for religious liberty. Finally, it analyzes *Bostock*'s implications with regard to other statutory provisions, including provisions of Title VII not at issue in *Bostock*, DOJ's enforcement responsibilities under Title VII, Title IX, the Fair Housing Act, the Equal Credit Opportunity Act, the Justice System Improvement Act of 1979, and the Constitution.

As explained with greater detail in the attached analysis, I conclude as follows:

- The Department of Justice does not need to change its employment practices to comply with *Bostock*. The Department does not discriminate on the basis of sexual orientation or gender identity in its employment decisions.

- The Department, like any other entity subject to federal prohibitions on sex discrimination, may continue to maintain sex-specific facilities and policies, including bathrooms, locker rooms, dress codes, and physical fitness standards, where physiological differences between the sexes are relevant.

- The Department may hire individuals based on biological sex where sex is a bona fide occupational qualification for the position.

- The Civil Rights Division will apply *Bostock*'s reasoning to federal statutory provisions where the reasoning logically applies, but will not extend it to distinguishable contexts or language. Under that approach, the reasoning of *Bostock* likely applies to prohibit discrimination based on homosexual or transgender status as unlawful "sex" discrimination under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a), Title IX of the Educational Amendments Act, 20 U.S.C. § 1681, the Fair Housing Act, 42 U.S.C. §§ 3604(a), (b), (d), 3605, 3606, the Equal Credit Opportunity Act, 15 U.S.C. § 1691(a)(1), and the Justice System Improvement Act of 1979, 34 U.S.C. § 10228(c). The reasoning of *Bostock* also severely erodes the doctrinal underpinnings of Supreme Court decisions that allow employers to maintain affirmative action policies despite Title VII's prohibition on race discrimination. The reasoning does not necessarily, however, affect the interpretation of the Constitution; statutes that incorporate constitutional standards, *see, e.g.*, 42 U.S.C. 2000c-6; disparate impact liability under Title VII, 42 U.S.C. § 2000e-2(a)(2), or the Fair Housing Act, 42 U.S.C. § 3604(a); or other distinguishable statutory or regulatory language.

- The Civil Rights Division will continue to abide by, and provide guidance on, the multiple statutory and constitutional protections that may exempt religious employers and educational institutions from the rule announced in *Bostock*, or applications of *Bostock*'s reasoning to other statutes.

---

*Namudnoed?*, Balkanization (July 6, 2020). Others suggest *Bostock* was result driven, and the Court will not apply the same mode of analysis in other cases where the result would be to rein in applications of federal statutes. For the purposes of this memorandum, we take the Court at its word and seek to analyze what impact a fair reading of *Bostock* has on various statutes enforced by the Civil Rights Division. We will not, however, address in-depth broader questions about whether the reasoning of *Bostock* requires an end to all forms of race discrimination—including affirmative action—in employment, higher education, and other areas of society.

- Given the sea change effected by *Bostock*, the Civil Rights Division will exercise civil and criminal enforcement discretion relating to conduct predating *Bostock*.

## Implementation

After studying the decision, I have advised leadership that the Department of Justice does not need to change its employment practices to comply with *Bostock*. A provision of Title VII not at issue in *Bostock* applies to the federal government, 42 U.S.C. § 2000e-16, but regardless of whether the reasoning in *Bostock* would apply to that provision, the Department has already committed itself to ensuring that "no applicant for employment or employee of our Department will be denied equal employment opportunity because of race, color, religion, national origin, sex, age, sexual orientation, disability (physical or mental), gender identity, protected genetic information, pregnancy, status as a parent, marital status, political affiliation, or any other nonmerit-based factor." DOJ EEO Statement. The Department may and should continue to adhere to this commitment, as well as to its commitment to equal justice and equal opportunity more broadly.

The Department likewise may and should continue its commitment to take "swift and appropriate corrective and/or disciplinary action when employees are found to have engaged in discrimination, retaliation, or harassment, including sexual harassment." DOJ EEO Statement. Although Justice Alito's dissent in *Bostock* suggests that the majority's logic might preclude a covered Title VII employer from refusing to hire an applicant with a history of sexual harassment, *Bostock*, 140 S. Ct. at 1761 (Alito, J. dissenting), and presumably from firing an employee who engages in such conduct, the Department need not read Title VII in that manner. The Supreme Court has held that "sexual harassment so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment violates Title VII," *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998) (cleaned up), and the Department need not read the *Bostock* decision to undermine its ability as an employer to prevent or address such harassment.

The Department has long expected all of its employees to behave professionally and respectfully toward each other. To be clear, Title VII does not impose a "general civility code," *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998), nor reach "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, [or] occasional teasing," *Faragher*, 524 U.S. at 788. "The prohibition of harassment on the basis of sex . . . forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment." *Oncale*, 523 U.S. at 81. But the Department has long recognized that respectful and professional behavior amongst its diverse workforce is important to the Department's ability to carry out its mission of ensuring fair and impartial administration of justice for all Americans. Thus, the Department may and should continue to respect its employees' right to express traditional views regarding marriage and gender identity, "view[s] long . . . held . . . in good faith by reasonable and sincere people here and throughout the world," *Obergefell v. Hodges*, __ U.S. __, __, 135 S. Ct. 2584, 2594 (2015), just as it continues to respect its employees' right to express contrary views.

3

*Bostock* does not require any changes to the Department's sex-specific facilities or policies. Although the Court refrained from opining on the validity of "sex-segregated bathrooms, locker rooms, and dress codes," 140 S. Ct. at 1753, its reasoning confirms that such practices do not run afoul of Title VII so long as they do not treat an individual "worse than others who are similarly situated," *id.* at 1740. That is because "discrimination"—as used in the statute—requires this type of difference in treatment between similarly situated individuals. *Id.* And men and women are not similarly situated where physiological differences are relevant. *See Jespersen v. Harrah's Operating Co.*, 444 F.3d 1104, 1109-10 (9th Cir. 2006) ("Grooming standards that appropriately differentiate between the genders are not facially discriminatory."); *Gerdom v. Continental Airlines, Inc.*, 692 F.2d 602, 606 (9th Cir. 1982) (en banc), *cert. denied*, 460 U.S. 1074 (1983) (recognizing that "physiologically based policies which set a higher maximum weight for men than for women of the same height" would not be problematic where "no significantly greater burden of compliance was imposed on either sex").

The physiological differences between men and women are relevant for physical fitness standards, bathrooms, locker rooms, and dress codes. These practices do not, like the odious practice of maintaining race-segregated bathrooms or locker rooms, treat similarly situated people differently. Rather, they treat *differently*-situated people differently—men and women are simply not similarly situated for policies under which physiological differences are relevant. Indeed, in effectively requiring Virginia Military Institute (VMI) to admit women, the Supreme Court stated that "[a]dmitting women to VMI would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements, and to adjust aspects of the physical training programs." *United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996); *id.* (noting that, when the service academies admitted women, Congress specified that standards for women "shall be the same as those required for male individuals, except for those minimum essential adjustments in such standards required because of physiological differences between male and female individuals"). Although *Virginia* involved a claim under the Equal Protection Clause, rather than Title VII, the Supreme Court's implicit approval of policies that ensure privacy of the sexes from each other and that take into account the physiological differences between men and women for physical training purposes suggests that such policies are not inherently discriminatory.

It is thus no surprise that courts have repeatedly rejected challenges to sex-specific policies and facilities where physiological differences are relevant. For example, courts have held that the FBI does not violate Title VII when it "utilizes physical fitness standards that distinguish between the sexes on the basis of their physiological differences but impose an equal burden of compliance on both men and women." *Bauer v. Lynch,* 812 F.3d 340, 351 (4th Cir. 2016), *cert. denied*, 137 S. Ct. 372 (2016) (discussing cases). Courts have also held that "regulations promulgated by employers which require male employees to conform to different grooming and dress standards than female employees is not sex discrimination within the meaning of Title VII." *Fountain v. Safeway Stores, Inc.*, 555 F.2d 753, 755 (9th Cir. 1977) (collecting cases). And for the more than 50 years that Title VII has been in place, no court has held that Title VII requires the *elimination* of sex-segregated bathrooms or locker rooms, even as some courts have struggled with the application of bathroom policies to transgender individuals in various stages of transition. Indeed,

some courts have suggested that failure to have sex-specific bathrooms and locker rooms could, in some circumstances, itself create liability under Title VII. *See, e.g.*, *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 118 (2d Cir. 2010) (concluding that evidence that "there was an attempt to force female employees to use restrooms that had no locks" could support a hostile work environment claim); *DeClue v. Central Illinois Light Co.*, 223 F.3d 434, 437 (7th Cir. 2000) (suggesting that failure to offer "toilet facilities sufficiently private to meet [a female] plaintiff's needs . . . may have been a perfectly good claim of sex discrimination"); *James v. Nat'l R.R. Passenger Corp.*, No. 02-civ-3915, 2005 WL 6182322, at *5 (S.D.N.Y. Mar. 28, 2005) (holding that a jury could reasonably conclude that a policy of offering only unisex bathrooms and changing rooms could have a disparate impact on women in violation of Title VII). *Bostock* did not disturb this body of case law.

To the contrary, *Bostock* made clear that special treatment for homosexual or transgender persons would itself constitute sex discrimination in some circumstances. The Court explained, for example, that "[a]n individual's homosexuality or transgender status *is not relevant* to employment decisions." 140 S. Ct. at 1741. That means that no one should be given either a preference or a demerit in hiring and firing decisions based on the person's sexual orientation or transgender status. It also means that exceptions for homosexual or transgender persons from sex-specific policies and facilities where physiological differences are relevant may themselves constitute unlawful sex discrimination. The Court said that "discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex; the first cannot happen without the second." *Id.* at 1747.

With respect to its enforcement responsibilities under Title VII, the Division will exercise enforcement discretion with respect to the pursuit of retroactive relief under *Bostock*. The Supreme Court has recognized that "Title VII does not require a district court to grant any retroactive relief. A court that finds unlawful discrimination 'may enjoin [the discrimination] . . . and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement . . . with or without back pay . . . or any other equitable relief as the court deems appropriate.'" *City of Los Angeles, Dept of Water & Power v. Manhart*, 435 U.S. 702, 718 (quoting 42 U.S.C. § 2000e-5(g)). "To the point of redundancy, the statute stresses that retroactive relief 'may' be awarded if it is appropriate." *Id.* In *Manhart*, although the Court had "no doubt about the application of the statute," it reversed an award of retroactive relief. *Id.* at 719. In doing so, it "recognize[d] that conscientious and intelligent administrators of pension funds, who did not have the benefit of the extensive briefs and arguments presented to [the Court], may well have assumed that a program like the Department's was entirely lawful," noting that "[t]he courts had been silent on the question and the administrative agencies had conflicting views." *Id.* at 719-20. The Court further noted that the rule announced in *Manhart* represented a "marked departure from past practice" and that it could have significant potential impact on the economy. *Id.* at 721-23.

Although *Bostock* did not arise out of the pension context at issue in *Manhart*, much of *Manhart*'s reasoning counsels against retroactive relief under *Bostock*. Specifically, many conscientious and intelligent employers may have assumed that discrimination based on sexual orientation or transgender status did not run afoul of Title VII's prohibition on discrimination

based on sex. As Justice Alito noted in his dissent in *Bostock*, "until 2017, every single Court of Appeals to consider the question interpreted Title VII's prohibition against sex discrimination to mean discrimination on the basis of biological sex." 140 S. Ct. at 1757 (Alito, J. dissenting). Indeed, "[s]ome 30 federal judges" to consider whether Title VII prohibited discrimination based on sexual orientation "said no, based on the text of the statute. 30 out of 30." *Id.* at 1824 (Kavanaugh, J., dissenting). For its part, the EEOC did not hold that Title VII prohibited discrimination based on transgender status and sexual orientation until 2012 and 2015 respectively. *Id.* at 1757-58 & n.7 (Alito, J. dissenting). Thus, "for the first 48 years after Title VII became law," the Commission "[d]ay in and day out" enforced Title VII under an interpretation contrary to the one announced by the Supreme Court in *Bostock*. *Id.* at 1575-58. Likewise, with the exception of a brief period from 2014 to 2017, the Department consistently interpreted the plain text of Title VII not to prohibit discrimination on the basis of transgender status or sexual orientation, and it vigorously argued that position to the Supreme Court. *See* Br. of the United States, *R.G. & G.R. Harris Funeral Homes, Inc. v. EEOC*, No. 18-107, Br. of the United States, *Bostock v. Clayton County, Ga.*, Nos. 17-1618, 17-1623. *Bostock* thus represents at least as equally significant a break in past practice as *Manhart*. Under these circumstances, the Civil Rights Division will exercise its enforcement discretion in individual cases not to seek back pay for conduct predating *Bostock* unless particular facts suggest that such relief is necessary and appropriate. *Cf. Manhart*, 435 U.S. at 720; *Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2355 n.12 (2020) (plurality op.).

**Protections for Religious Employers**

The Department of Justice does not have primary responsibility for the enforcement of Title VII against private employers, but it has promulgated guidance on the federal protections for religious liberty, including those that may affect Title VII enforcement. *See* Memorandum for All Executive Departments and Agencies, 82 Fed. Reg. 49,668 (Oct. 26, 2017). The *Bostock* decision identified three such protections for religious liberty that may limit the reach of its decision: the "express statutory exception for religious organizations" in Title VII itself, the Religious Freedom Restoration Act, and the First Amendment's protection of "the employment relationship between a religious institution and its ministers." 140 S. Ct. at 1754. This memorandum addresses each of these protections, along with additional statutory protections in Title VII and the First Amendment. The expression of these protections should not be taken as a suggestion that they are the exclusive protections for religious liberty that may apply in any given case.

First, the Court acknowledged in *Bostock* that its decision does not disturb Title VII's exemption for religious organizations in 42 U.S.C. § 2000e-1(a), which states that Title VII "shall not apply to . . . a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." This provision protects the right of religious employers to "choose to employ only persons whose beliefs and conduct are consistent with the organizations' religious precepts." *See* 82 Fed. Reg. at 49,670, 49,677. As explained at greater length in the Memorandum regarding Federal Protections for Religious Liberty, that protection is not limited "to organizations that carry on only religious

activities, or to organizations established by a church or formally affiliated therewith." 82 Fed. Reg. 49,677. Instead, it applies broadly to organizations that are organized for religious purposes and engage in activity consistent with, and in furtherance of, such purposes. *Id.* Thus, for example, a religious charity that meets this test and holds traditional Christian views on marriage could choose to employ only those individuals who share those beliefs and conduct themselves accordingly.

And, although not expressly mentioned in *Bostock*, Title VII contains two additional protections for the hiring decisions of religious organizations. Specifically, Title VII makes clear that "it shall not be an unlawful employment practice for a school, college, university, or other educational institution or institution of learning to hire and employ employees of a particular religion if such school, college, university or other educational institution or institution of learning is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school, college, university, or other educational institution or institution of learning is directed toward the propagation of a particular religion." 42 U.S.C. § 2000e-2(e). Nor shall it be "an unlawful employment practice for an employer to hire and employ employees . . . on the basis of his religion . . . in those certain instances where religion . . . is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." *Id.* "Because Title VII defines 'religion' broadly to include 'all aspects of religious observance and practice, as well as belief,' 42 U.S.C. 2000e(j), these exemptions include decisions to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts." *See* 82 Fed. Reg. 49,677 (internal quotation marks omitted).

Second, as the Supreme Court noted in *Bostock*, employers that do not qualify for any of the Title VII religious exemptions may nevertheless qualify for an exemption under the Religious Freedom Restoration Act of 1993. *Cf. Bostock*, 140 S. Ct. at 1754 ("Because RFRA operates as a kind of super statute, displacing the normal operation of other federal laws, it might supersede Title VII's commands in appropriate cases."). RFRA prohibits the federal government from imposing a substantial burden on the religious exercise of an employer unless doing so is the least restrictive means of achieving a compelling governmental interest. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 705 (2014). Title VII may impose such a burden if it compels an act inconsistent with an adherent's religious observance or practice—as it would if, for example, an employer sincerely believes that employing someone who is publicly undergoing a gender transition would render the employer complicit in conduct that the employer's religion forecloses. *See* 82 Fed. Reg. 49,674 (describing the substantial burden test). The Civil Rights Division does not anticipate that there would be many employers who would face such a substantial burden, in light of the express Title VII exceptions for religious organizations described above, §§ 2000e-1(a), 2000e-2(e), and the general exception for employers with fewer than 15 employees, § 2000e(b).

Under RFRA, government may impose such a burden only if "application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened"—is the least restrictive means of furthering a compelling governmental

interest. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-31 (2006) (quoting 42 U.S.C. § 2000bb-1(b)). In other words, as relevant here, RFRA requires the government to show that the "marginal interest in" substantially burdening a particular covered entity or person's religious exercise is sufficiently compelling to withstand strict scrutiny. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 727 (2014). For example, in *O Centro*, the fact that a particular controlled substance, dimethyltryptamine (DMT), was "exceptionally dangerous" could "not provide a categorical answer that relieves the Government of the obligation to shoulder its burden under RFRA" to justify its refusal to allow a particular church to use a sacramental tea (hoasca) containing that drug. 546 U.S. at 432. Rather, the Court explained any application of RFRA must "look[] beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." *Id.* at 431. As the Court observed, "there is no indication that Congress, in classifying DMT, considered the harms posed by the particular use at issue here— the circumscribed, sacramental use of *hoasca* by the [church]." *Id.* at 432.

Although any application of RFRA will depend on the applicable facts, it is unlikely that the government would be able to justify imposing a substantial burden in this context. As the Supreme Court said "in *Sherbert v. Verner*, 374 U.S. 398 (1963), the decision that provides the foundation for the rule codified in RFRA, . . . only the gravest abuses, endangering paramount interest could give occasion for a permissible limitation on the free exercise of religion." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2392 (2020) (Alito, J., joined by Gorsuch, J., concurring) (internal quotation marks omitted). As an initial matter, "Congress' determination that" sex "should be listed" as a protected characteristic in Title VII "simply does not provide a categorical answer that relieves the Government of its obligation to shoulder its burden under RFRA." *O Centro*, 546 U.S. at 432. As in *O Centro*, "there is no indication that Congress," in prohibiting covered employers from firing employees because of their sex, "considered the harms posed" by firing employees because of their sexual orientation or transgender status, much less concluded that the government had a compelling interest in forcing employers to violate their faith to prevent such harms. 546 U.S. at 432; *see supra* XX; *see also Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. at 2392 (Alito, J., joined by Gorsuch, J., concurring) ("We can answer the compelling interest question simply by asking whether *Congress* has treated the provision of free contraceptives to all women as a compelling interest."). And unlike racial discrimination, the Supreme Court has never held that a religious employer's decision not to hire homosexual or transgender persons "violates deeply and widely accepted views of elementary justice" or that the government has a "compelling" interest in the eradication of such conduct. *Cf. Bob Jones Univ. v. United States*, 461 U.S. 574, 592, 604 (1983). To the contrary, the Court has held that a government's interest in "ensur[ing] by statute [that] gays and lesbians desiring to make use of public accommodations . . . will not be turned away merely on the proprietor's exercise of personal preference" could not justify compelled modification of speech. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 578 (1995) (applying heightened scrutiny). It likewise has held that the "state interests embodied in" a public "accommodations law" prohibiting discrimination on the basis of sexual orientation could "not justify" compelling the Boy Scouts to retain a gay man as an assistant scoutmaster in conflict with their expressive activity. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 659 (2000)

(applying heightened scrutiny). In light of these precedents, and in the absence of a legislative judgment about the interests served by this application of Title VII, it is difficult to see how the government could show that any "marginal interest in enforcing" this unexpected construction of Title VII could be so compelling as to justify forcing certain employers to violate their faith. *Hobby Lobby*, 573 U.S. at 727.

The difficulty in establishing a compelling interest here may be heightened by the many employers not covered by the rule announced in *Bostock*. As described above, Congress expressly allowed religious organizations and educational institutions owned, supported, controlled, or managed in whole or in substantial part by a particular religion to hire only those employees whose beliefs and conduct are consistent with the employer's precepts. 42 U.S.C. §§ 2000e-1(a), 2000e-2(e). Congress also included an exemption for hiring on the basis of religion or sex where either characteristic is a bona fide occupational qualification. § 2000e-2(e). And Congress exempted all employers with fewer than 15 employees from Title VII's reach, § 2000e-2(b)—a category that, according to one recent estimate, covers 85 percent of U.S. employers, Reply Br. for the Resp. at 22-23 & n.90, *Altitude Express, Inc. v. Zarda*, No. 17-1623, *aff'd sub nom. Bostock v. Clayton County*, 2019 WL 4464222. These exemptions only further support the conclusion that it is hard to see how the government could demonstrate that it has a compelling interest in forcing certain employers to contravene their religious convictions in this particular context. *See O Centro*, 546 U.S. at 433 (quoting *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 547 (1993) (counseling that "a law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited")).

Notably, RFRA controls whether an employer faces a lawsuit from a government actor or a private party. RFRA expressly "applies to all federal law, and the implementation of that law, whether statutory or otherwise," 42 U.S.C. § 2000bb–3(a), and broadly defines "government" to "include[]" every "branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States," *id.* § 2000bb–2(1). That language covers actions by private plaintiffs seeking to enforce federal statutes such as Title VII: the federal judiciary is a "branch … of the United States" and its application of Title VII in a private lawsuit constitutes "implementation" of federal law. *Cf. New York Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964) (applying First Amendment because "[a]lthough this is a civil lawsuit between private parties, the Alabama courts have applied a state rule of law which petitioners claim to impose invalid restrictions on their constitutional freedoms of speech and press"). RFRA also directs that "[a] person whose religious exercise has been burdened" by the government "may assert" the Act's protection as a "defense in a judicial proceeding," *id.* § 2000bb–1(c), and nothing in that provision limits that defense to suits brought by a government actor. Accordingly, "RFRA's language surely seems broad enough" to reach "an action by a private party seeking relief under a federal statute against another private party who claims that the federal statute substantially burdens his or her exercise of religion." *Hankins v. Lyght*, 441 F.3d 96, 103 (2d Cir. 2006). This reading also fits with RFRA's codified "declaration of purposes," one of which was "to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205 (1972), and to guarantee its application in all cases where free exercise of religion is substantially burdened." 42 U.S.C. § 2000bb(b). The pre-*Smith* compelling interest regime that RFRA was designed to restore applied to suits among private parties, *see, e.g.*, *McDaniel v. Paty*, 435 U.S. 618 (1978), and limiting RFRA's scope to litigation involving government actors does

not guarantee the Act's application "in all cases" where religious exercise is substantially burdened. *Cf. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 705-06, 709-10, 714-15 (2014) (relying on pre-*Smith* cases to conclude that RFRA covered for-profit corporations).

That RFRA requires the "[g]overnment" to "demonstrate[]" that substantially burdening a person's religious exercise survives strict scrutiny, 42 U.S.C. § 2000bb–1(b), does not mean, as some courts have concluded, that the Act's protections vanish in suits bought by private parties, *see Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731, 736–37 (7th Cir. 2015); *General Conference Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 410–12 (6th Cir. 2010); *see also Hankins*, 441 F.3d at 114–15 (Sotomayor, J., dissenting). To the contrary, RFRA's strict-scrutiny provision is an "exception" to RFRA's "general" rule that "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." *Compare* 42 U.S.C. § 2000bb–1(a), *with id.* § 2000bb–1(b). Reading that exception to give the government *carte blanche* to substantially burden religious exercise so long as it did so through private rights of action would turn RFRA's strict-scrutiny provision on its head. Instead, private parties must carry the government's burden when they seek to use federal law (and federal courts) to substantially burden another person's religious exercise. That is akin to how courts approached private suits involving the Free Exercise Clause under the pre-*Smith* regime. *See, e.g. Paul v. Watchtower Bible & Tract Soc. of New York*, Inc., 819 F.2d 875, 883 (9th Cir. 1987); *cf. Florida Star v. B.J.F.*, 491 U.S. 524, 537 (1989) (requiring private party invoking statute to impose liability on newspaper to show that the statute's application "serves 'a need to further a state interest of the highest order'" under the First Amendment).[2]

Third, *Bostock*, a statutory decision, cannot intrude upon the First Amendment's protections for religious autonomy, including in ecclesiastical and internal governance matters. The Free Exercise Clause and Establishment Clause prevent governmental intrusion into the autonomy of religious institutions "with respect to internal management decisions that are essential to the institution's central mission," including "the selection of the individuals who play certain key roles" for carrying out their missions. *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020). For example, "[j]udicial review of the way in which religious schools discharge those responsibilities would undermine the independence of religious institutions in a way that the First Amendment does not tolerate." *Id.* at 2055. In identifying which employees are covered by this protection, the Supreme Court has explained that "a variety of factors may be important," but "[w]hat matters, at bottom, is what an employee does." *Id.* at 2063, 2064. Employees whose "work lie[s] at the core of the[] mission" of a religious institution are covered by the ministerial exception. *Id.* at 2055. And because, "[i]n a country with the religious

---

[2] Similarly, RFRA's directive that anyone "whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief *against a government*," does not, as some courts have assumed, narrow the unqualified right to assert a RFRA "defense in a judicial proceeding." 42 U.S.C. § 2000bb–1(c) (emphasis added); *see, e.g., Listecki*, 780 F.3d at 737. Rather, the relevant clause broadens the rights of a party asserting RFRA. "The narrowing interpretation—permitting the assertion of the RFRA as a defense only when relief is also sought against a governmental party—involves a convoluted drawing of a hardly inevitable negative implication." *Hankins*, 441 F.3d at 103.

diversity of the United States, judges cannot be expected to have a complete understanding and appreciation of the role played by every person who performs a particular role in every religious tradition," "[a] religious institution's explanation of the role of such employees in the life of the religion in question is important" to this analysis. *Id.* at 2066. Neither Title VII in general, nor *Bostock* in particular, can overcome the First Amendment's protection for a religious institution's selection or supervision of these employees.

Fourth, although not mentioned in *Bostock*, "religious and secular groups alike" may claim a right to freedom of association under the First Amendment. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 189 (2012). That right applies to any group engaged in public or private expressive activity—even if not associated primarily for that purpose. *Boy Scouts of America*, 530 U.S. at 648. And it generally protects such groups from being forced to accept members if the presence of such members would "affect[] in a significant way the group's ability to advocate public or private viewpoints." *Id.* The Supreme Court has described this right as "crucial in preventing the majority from imposing its views on groups that would rather express other, perhaps unpopular, ideas." *Id.* at 647-48; *Masterpiece Cakeshop*, 138 S. Ct. at 1737 (Gorsuch, J., concurring) ("Popular religious views are easy enough to defend. It is in protecting unpopular religious beliefs that we prove this country's commitment to serving as a refuge for religious freedom."). Thus, the Supreme Court held in *Boy Scouts of America* that the Boy Scouts, which at that time "believe[d] that homosexual conduct is inconsistent with the values it seeks to instill in its youth members," could not be forced to accept a gay scoutmaster. *Boy Scouts*, 530 U.S. at 654-56. By comparison, in *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984), the Court had allowed the forced inclusion of women because "the Jaycees had failed to demonstrate . . . any serious burdens on the male members' freedom of expressive association." *Boy Scouts*, 530 U.S. at 657-58. Employers who are able to show that they are engaged in expressive activity whose message would be significantly affected by application of the *Bostock* rule may be exempt from it.

**Implications for other statutes**

<u>Provisions of Title VII not addressed by Bostock</u>

*Bostock* will have consequences for the interpretation of Title VII beyond those addressed by the decision itself. The provision at issue in *Bostock* declares it an unlawful employment practice for an employer "(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court reasoned in *Bostock* that the words "because of" in the disparate treatment provision "incorporate the simple and traditional standard of but-for causation," which is "established whenever a particular outcome would not have happened 'but for' the purported cause." *Bostock*, 140 S. Ct. at 1739 (internal quotation marks omitted). The Court further reasoned that this provision focuses on the employer's treatment of individuals, rather than groups, *id.* at 1740-41, and that, because "homosexuality and transgender status are inextricably bound up with sex," any "discriminat[ion] on those grounds requires an employer to intentionally treat individual employees differently because of their sex," *id.* at 1742.

The reasoning of *Bostock* raises significant concerns about the vitality of Supreme Court precedent permitting covered employers to adopt affirmative action policies. In *United Steelworkers of America v. Weber*, 443 U.S. 193 (1979), the Supreme Court held that § 2000e-2(a)(1), the same provision at issue in *Bostock*, did not outlaw such policies. *Id.* at 197; *see also Johnson v. Transportation Agency*, 480 U.S. 616 (1987) (permitting sex-based affirmative action policies under *Weber*). The *Weber* Court took the position that although a prohibition on affirmative action policies was "within the letter of the statute"—as a policy that "discriminate[s] against white employees solely because they are white" plainly constitutes "discriminat[ion] because of race"—it was "not within its spirit nor within the intention of its makers." 443 U.S. at 201 (quoting 42 U.S.C. § 2000e-2(a)(1) and *Holy Trinity Church v. United States*, 143 U.S. 457, 459 (1892)) (ellipses omitted). Based on an examination of "legislative history" and "historical context," the *Weber* Court concluded that an interpretation of Title VII "that forbade all race-conscious affirmative action would 'bring about an end completely at variance with the purpose of the statute'"—*i.e.*, to "open employment opportunities" for African Americans—and therefore "must be rejected." *Id.* at 201-02 (citation omitted).

*Bostock* squarely rejected that method of interpreting Title VII. In the Court's view, it was irrelevant whether its interpretation of § 2000e-2(a)(1) conflicted with "the legislature's purpose in enacting Title VII or certain expectations about its operations." *Bostock*, 140 S. Ct. at 1745; *see id.* at 1749-54. As the Court explained: "When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law." *Id.* at 1737. There is no way to reconcile that analysis with the one in *Weber*—*i.e.*, that even if the express terms of § 2000e-2(a)(1) prohibit affirmative action policies, Congress in 1964 neither intended nor expected that result. In addition, *Bostock* concluded that § 2000e-2(a)(1)'s use of the term "individual" mandated that the judicial focus of that provision "be on individuals, not groups" and thus that Title VII did not permit inquiring as to "how a policy affects one sex as a whole versus the other as a whole." *Id.* at 1740-41. That reasoning also cannot be squared with *Weber*'s conclusion that discrimination against an individual because of his race is permissible so long as it benefits another racial group.

Accordingly, while employers presently may rely on *Weber* to adopt affirmative action policies, they should be on notice that its "doctrinal underpinnings" have been significantly "eroded" by *Bostock*. *Kimble v. Marvel Entm't, LLC*, 576 U.S. 446, 458 (2015). And that is important because the Supreme Court has observed that "'the primary reason' for overruling statutory precedent" is that "subsequent legal developments . . . have removed the basis for a decision." *Id.* (citation omitted); *see also Patterson v. McLean Credit Union*, 491 U.S. 164, 173 (1989) ("[W]here the later law has rendered the decision irreconcilable with competing legal doctrines or policies, the Court has not hesitated to overrule an earlier decision.") (internal citations omitted). In addition, when, as here, civil-rights statutes are involved, the Supreme Court has often declined to "place on the shoulders of Congress the burden of the Court's own error." *Monell v. Department of Social Servs.*, 436 U.S. 658, 695 (1978) (citation omitted); *see Johnson*, 480 U.S. at 672-73 (Scalia, J., dissenting). Covered employers therefore should not be surprised if the Supreme Court eventually overrules *Weber* and holds that 42 U.S.C. § 2000e-2(a)(1) prohibits affirmative action policies in the workplace.

*Bostock* also likely affects the traditional interpretation of the second general prohibition in Title VII. Under § 2000e-2(a)(2), it is an unlawful employment practice "to limit, segregate, or classify . . . employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(2). The Supreme Court has interpreted this provision to prevent both intentional discrimination and disparate impact. *Griggs v. Duke Power Co.*, 401 U.S. 424, 429-30 (1971). The *Bostock* reasoning may make a claim of intentional discrimination arising out of sexual orientation or transgender status discrimination cognizable under this provision, although it would not support a claim for disparate impact based on either group.

With respect to intentional discrimination, *Bostock* appears to contemplate that certain employer actions taken to limit, segregate, or classify employees based on sexual orientation or transgender status may run afoul of the prohibition on doing so "because of such individual's . . . sex," § 2000e-2(a)(2). Specifically, the Supreme Court discussed a hypothetical case in which "an employer asked homosexual or transgender applicants to tick a box on its application form" and concluded that even such a box implicates sex discrimination because "[t]here is no way for an applicant to decide whether to check the homosexual or transgender box without considering sex." *Bostock*, 140 S. Ct. at 1746. In the Court's view, the employer that decides not to hire anyone who checks the hypothetical homosexual or transgender box "intentionally refuses to hire applicants in part because of the affected individuals' sex, even if it never learns any applicant's sex." *Id.* Thus, a policy that limits, segregates, or classifies employees based on sexual orientation or transgender status may support a claim of intentional discrimination because of sex under § 2000e-2(a)(2) although such claim remains subject to the statutory requirement that, to be actionable, the limitation, segregation, or classification "deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee," § 2000e-2(a)(2). *See infra* p.14 (discussing this limitation).

The reasoning of *Bostock*, however, does not support a disparate impact claim based on a policy's effect on homosexual or transgender persons as such. Disparate impact may occur even when the employer has "good intent or absence of discriminatory intent," *see Griggs*, 401 U.S. at 432, and focuses on the effect of a policy on a particular group, *see id.* at 431 (considering an employment practice that operated to exclude African American employees from promotions or transfers to other jobs). The relevant group for purposes of the provision's reference to "sex" is men and women. *See Nashville Gas Co. v. Satty*, 434 U.S. 135, 141-42 (1977); *see also Bostock*, 140 S. Ct. at 1739 (proceeding on the assumption that sex in 1964 "[r]eferr[ed] only to biological distinctions between male and female"). A policy targeted at homosexual or transgender status in general is not one targeted to either men or women and thus does not necessarily "cause[] a disparate impact on the basis of . . . sex," § 2000e-2(k).

To the extent that a policy had a disparate impact on a subset of men or women based on sexual orientation or transgender status—for example, biological men who identify as women—a disparate impact claim might be cognizable based on sex. *See Nashville Gas Co.*, 434 U.S. at 141 (finding liability based on disparate impact based on policy that deprived employees returning

from pregnancy leave of accumulated seniority). But that claim would have to satisfy the various limitations that Title VII imposes on disparate impact liability. Most notably, the disparate impact must be one that "deprive[s] or tend[s] to deprive any individual of employment opportunities or otherwise adversely affect[s] his status as an employee," § 2000e-2(a)(2). Moreover, the challenged policy must actually deprive or tend to deprive an individual of employment opportunities or otherwise adversely affect his status as an employee. *See Nashville Gas Co.*, 434 U.S. at 143; *E.E.O.C. v. AutoZone, Inc.*, 860 F.3d 564, 570 (7th Cir. 2017) (lateral job transfer that entailed no loss in pay, benefits, or job responsibilities did not adversely affect employment opportunity or status). Mere discomfort in a work place would not meet that standard. *See Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1487-89 (9th Cir. 1993), *cert denied*, 512 U.S. 1228 (1994) (rejecting claim by Spanish-speaking employees that an "English-only policy … deprives them of a privilege given by the employer to native-English speakers: the ability to converse on the job in the language with which they feel most comfortable" because "there is no disparate impact with respect to a privilege of employment if the rule is one that the affected employee can readily observe and nonobservance is a matter of individual preference"). And in all events, the complaining party would need to meet the special burden of proof set forth in statute for Title VII disparate impact claims. 42 U.S.C. § 2000e-2.

*Bostock* also does not mean that employers cannot "hire or employ employees. . . on the basis of [employees'] . . . sex . . . in those certain instances where . . . sex . . . is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." § 2000e-2(e)(1). *Bostock* proceeded on the assumption that, as used in Title VII, "'sex . . . referr[ed] only to biological distinctions between male and female." 140 S. Ct. at 1739. And the bona fide occupational qualification provision rests on the understanding that an employee's biological sex may, in some narrow circumstances, interfere with the employee's ability to perform the job. *See International Union, United Auto., Aerospace & Agri. Implement Workers of Am. v. Johnson Controls*, 499 U.S. 187, 204 (1991); *see also Dothard v. Rawlinson*, 433 U.S. 321, 335-36 (1977) (recognizing that male sex was a bona fide occupational qualification "for the job of correctional counselor in a 'contact' position in an Alabama male maximum-security penitentiary"); *Wilson v. Chertoff*, 699 F. Supp. 2d 364 (D. Mass. 2010) (recognizing that female sex is a bona fide occupational qualification for a TSA employee hired "to conduct pat-down searches of female passengers"). In these cases, employers may hire or employ employees based on their biological sex.

Other Statutes

*Bostock* is not directly relevant to the interpretation of statutes outside of Title VII. The Court in *Bostock* emphasized that its holding was rooted in a conclusion about "the ordinary public meaning" of Title VII in 1964. 140 S. Ct. at 1738.[3] Because the Court cautioned that "only the words on the page constitute the law adopted by Congress and approved by the President," *id.*, we must hesitate to apply the reasoning of *Bostock* to different texts, adopted at different times, in different contexts. As the Court noted, any attempt to "add to, remodel, update, or detract from

---

[3] Though the majority's assertion was vigorously contested by the dissent. 140 S. Ct at 1755 ("The Court tries to convince readers that it is merely enforcing the terms of the statute, but that is preposterous.")(Alito, J dissenting).

old statutory terms" would "deny the people the right to continue relying on the original meaning of the law they have counted on to settle their rights and obligations." *Id.* Although more than "100 federal statutes prohibit discrimination because of sex," *see Bostock*, 140 S. Ct. at 1778 & Appendix C (Alito, J., dissenting), this memorandum of necessity addresses only four for which the Civil Rights Division has some enforcement authority.

<em>Title IX</em>

The application of *Bostock*'s reasoning to Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681 *et seq.*, requires due care. Both Title VII and Title IX relate to discrimination based on sex, and both use sex in its ordinary, binary meaning. Indeed, if there were any doubt on that point, Title IX includes express references to "one sex" and "the other sex," as well as to "both sexes," usage that confirms the ordinary, binary meaning of the term. § 1681(a)(2), (8). But Title VII is also "a vastly different statute from Title IX" in both text and context. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005). Title IX provides, subject to a number of express exemptions, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681. It does not authorize disparate impact liability, nor does it use precisely the same "because of such individual's . . . sex" language that the Court relied upon in *Bostock*. *Compare* 42 U.S.C. § 2000e-2 *with* 20 U.S.C. § 1681. And while Title VII imposes a regulatory prohibition on covered employers, Title IX acts as a condition on the receipt of certain federal funding. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 275, 286-87 (1998). The Supreme Court has explained that, when Congress acts pursuant to its power under the Spending Clause, a "central concern . . . [is] ensuring that the receiving entity of federal funds [had] notice" of its prospective liability. *Id.*

Nevertheless, the similarities in language between Title VII and Title IX suggest that the *Bostock* reasoning may carry over in some respects. Justice Thomas has, for example, reasoned that the phrases "on the basis of sex" and "because of such individual's . . . sex" have been used by Congress "interchangeably." *Jackson*, 544 U.S. at 185-86 (Thomas, J., dissenting); *see also Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1016 (2020) ("When it first inferred a private cause of action under § 1981, this Court described it as 'afford[ing] a federal remedy against discrimination . . . *on the basis of* race,' language (again) strongly suggestive of a but-for causation standard."). If that is the case, then it seems to follow from the Supreme Court's reasoning in *Bostock* that an individual who is, on the basis of sexual orientation or transgender status, "excluded from participation in, . . . denied the benefits of, or . . . subjected to discrimination under any education program or activity receiving Federal financial assistance" may be able to make out a claim of intentional discrimination on the basis of sex in violation of Title IX. *See Bostock*, 140 S. Ct. at 1741. Like Title VII, Title IX recognizes that an individual's sex is "not relevant" to many, if not most, aspects of education programs or activities.

But where the physiological differences of the sexes *are* relevant to education programs or activities, sex may be taken into account. Several indicia from the statute establish this proposition, three of which are discussed here. First, Congress expressly provided that "notwithstanding anything to the contrary contained in this chapter, nothing contained herein shall be construed to

prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. The fact that this provision is phrased as a rule of construction, rather than an exemption, is a textual indicator that Congress did not believe that its general prohibition on sex discrimination must be read to cover different living facilities. That makes sense, as separate-sex living facilities do not generally exclude anyone from participation in education programs or activities, nor deny them the benefits thereof. Nor do separate-sex living facilities subject any person to discrimination, because discrimination requires treating an "individual worse than others who are similarly situated," *Bostock*, 140 S. Ct. at 1740, and men and women are not similarly situated for these purposes. Rather, the physiological differences between men and women may justify the additional privacy and security that can only be guaranteed by such separate facilities. This provision supports the conclusion that Title IX's prohibition on sex discrimination does not prohibit different treatment of the sexes where the physiological differences of the sexes are relevant.

Second, Congress expressly exempted certain single-sex activities from Title IX's reach where it is not clear that physiological differences are relevant. For example, Congress expressly exempted from Title IX the "membership practices of" sororities and fraternities, 20 U.S.C. § 1681(6)(A), or "voluntary youth service organization" that traditionally serve minors of a single sex, § 1681(6)(B); programs and activities undertaken in connection with Boys State, Boys Nation, Girls State, and Girls Nation, § 1681(7); and "father-son or mother-daughter activities at an educational institution," so long as "reasonably comparable activities [are] provided for students of the other sex," § 1681(8). The justification for the single-sex practices of these activities cannot be that men or women are particularly ill suited to partake of the activities given that parallel organizations or activities are available to men and women. Rather, the apparent justification is that the exempted activities have unique value as single-sex activities. Namely, because men and women are not fungible, they may gain unique perspectives and experiences from participating in these activities with only members of their own sex. *See United States v. Virginia*, 518 U.S. 515, 533, 535 (1996) (recognizing the "reality" that "[s]ingle-sex education affords pedagogical benefits to at least some students"). But Congress's decision to exempt these activities, rather than construe them as not covered by Title IX, confirms that Congress understood its prohibition on sex discrimination in the ordinary sense—as prohibiting discrimination based on sex only where men and women were similarly situated.

Third, Congress has long hailed the rise of women's athletics as one of the crowning achievements of Title IX. Although athletics was not expressly discussed in the text of Title IX, Congress tasked the Executive Branch with issuing regulations on the subject. *See* Pub. L. 93-380, § 844, 88 Stat. 484 (Aug. 21, 1974) ("The Secretary shall prepare and publish … proposed regulations implementing the provisions of Title IX of the Education Amendments of 1972 relating to the prohibition of sex discrimination in federally assisted education programs, which shall include with respect to intercollegiate athletic activities reasonable provisions considering the nature of particular sports."). These Title IX regulations have, from the very beginning, authorized schools to offer separate-sex teams "where selection for such teams is based upon competitive skill or the activity involved is a contact sport" and required recipients to "provide equal athletic opportunity for members of both sexes." 34 C.F.R. 106.41. Congress extensively studied and

held hearings on these regulations before ultimately leaving them in place. *See North Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 531-33 (1982). And agencies across the federal government have incorporated them into their implementing regulations. *See* 65 Fed. Reg. 52,857 (common rule for 21 federal agencies). Women's sports teams have accordingly flourished, allowing women to compete against other women, including in sports for which a school does not offer a men's team. Such separate teams would only be permissible under Title IX if the text prohibits differential treatment of the sexes only where the physiological differences between the sexes are irrelevant.

The Civil Rights Division will not lightly assume that Title IX should be interpreted in a way that "would frustrate the purposes" of that law, *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 285 (1998). It would frustrate Title IX's purpose to read its text as prohibiting the single-sex teams that have ensured women equal opportunity in athletics for nearly 50 years. It would likewise frustrate those purposes to read Title IX to prohibit sex-specific facilities that allow men and women privacy from the other sex, particularly given that many boys and girls will be undergoing physiological changes associated with their biological sex at the same time that they are participating in, or attempting to participate in, education programs and activities. And it would frustrate the purposes of Title IX's express statutory and regulatory exemptions for single-sex activities to require such activities to admit members of the opposite sex in accordance with gender identity. A formerly single-sex activity that admits members of the opposite sex based on gender identity is by definition no longer single sex. And allowing admission of members of the opposite sex to a single-sex activity based on gender identity would actually end up discriminating on the very basis that it would be attempting to accommodate: A girls' volunteer organization that accepts all females and all males who identify as females *excludes* males who identify as males. But if the benefits from the single-sex nature of the activity were not a reason to exclude transgender members of the opposite sex from the group, it is hard to understand the reason for excluding non-transgender members of the opposite sex. At a bare minimum, no statute should be read to require or permit giving transgender individuals special—as opposed to equal—treatment. Discrimination in favor of transgender status is still discrimination on the basis of gender identity and, under the reasoning of *Bostock*, on the basis of sex.

To sum up, after *Bostock*, it would behoove recipients to ensure that they do not discriminate on the basis of sexual orientation or transgender status. In most cases, sex (and therefore sexual orientation and transgender status) are not relevant in decisions relating to admissions, employment, or grading. Homosexual or transgender persons should thus not be treated either more or less favorably than other persons. *Bostock* does not prevent recipients from adopting sex-specific policies and facilities when the physiological differences of the sexes *are* relevant, including with respect to living assignments, bathrooms, locker rooms, and competitive sports teams. Men and women are not "materially identical in all respects," *Bostock*, 140 S. Ct. at 1741, and nothing in *Bostock* requires recipients to treat them as if they are. With respect to such policies, however, *Bostock*'s reasoning forecloses special preferences based on homosexual or transgender status. Thus, for example, a women's volleyball team, ice hockey team, weightlifting team, or rugby team may not allow men who identify as women to play on the team if other men are not allowed to, because doing so would discriminate against non-transgender men and in favor of transgender men based on sex, which is unlawful under *Bostock*. Sex is relevant to the team

assignment policy; transgender status is not, and transgender individuals may have no more and no less opportunity than non-transgender individuals.[4]

As with Title VII, it is worth noting the religious exemptions that may be applicable to Title IX recipients. The statute expressly provides that its prohibition "shall not apply to an educational institution which is controlled by a religious organization if the application of [the prohibition] would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)(3); *see also* § 1687 (defining "program or activity" to exclude "any operation of an entity which is controlled by a religious organization if the application of section 1681 . . . would not be consistent with the religious tenets of such organization"). Although under existing regulations "eligible institutions may 'claim the exemption' in advance by 'submitting in writing to the Assistant Secretary a statement by the highest ranking official of the institution, identifying the provisions . . . [that] conflict with a specific tenet of the religious organization,' 34 CFR § 106.12(b), they are not required to do so to have the benefit of it." 82 Fed. Reg. at 49,679. Organizations that do not qualify for that exemption may still be able to claim the protection of RFRA, *id.*, as well as the constitutional protections described *supra*.

### Fair Housing Act

The reasoning of *Bostock* is also applicable to some provisions of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* Like Title VII, the Fair Housing Act imposes a series of prohibitions, rather than conditions on federal funding. And like Title VII, the Act uses the phrase "because of," which the Supreme Court interpreted in *Bostock* to require but-for causation. *Bostock*, 140 S. Ct. at 1739 For example, as made applicable, and subject to some exemptions, § 3604(a) makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of . . . sex." § 3604(a).[5] This language incorporates the legal test of but-for causation. *Cf. Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 350 (2013). And under the reasoning of *Bostock*, but-for causation is established in the case of discrimination because of homosexuality or transgender status "because to discriminate on those grounds requires an employer to treat individual[s] . . . differently because of their sex." *Bostock*, 140 S. Ct. at 1742. Thus, after *Bostock*,

---

[4] *Bostock* addressed "transgender status" only in the binary, *see, e.g.*, 140 S. Ct. at 1741, and, as noted above, did not define "sex" to include "gender identity," *id.* at 1739. It is unclear how some of the sex-specific provisions of Title IX could even operate if "sex" were defined to include "gender identity," given that these provisions presuppose a binary view of sex and according to the American Psychiatric Association, gender identity may include "an individual's identification as . . . some category other than male or female." Diagnostic and Statistical Manual of Mental Disorders Fifth Edition 451 (2013).

[5] The Supreme Court has interpreted the phrase "otherwise makes unavailable" in § 3604(a) to authorize disparate-impact liability as well. *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, __ U.S. __, 135 S. Ct. 2507, 2518 (2015). Because such liability focuses on the effects on groups, rather than individuals, *see supra* at 8, the *Bostock* reasoning does not support liability for disparate impact based on sexual orientation or transgender status under the Fair Housing Act.

a person who refuses to sell or rent a dwelling because of sexual orientation or transgender status may violate this provision.

The same reasoning applies to several other provisions of the Fair Housing Act. It applies, for example, to § 3604(b), which makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin," to § 3604(d), which makes it unlawful "[t]o represent to any person because of . . . sex . . . that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available," and to § 3605, which makes it unlawful "for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of . . . sex." Those provisions use the same "because of . . . sex" language discussed above. In addition, the phrase "discriminate against any person" in § 3604(b) is similar to the phrase "discriminate against any individual" in Title VII, which the Court in *Bostock* interpreted to support its conclusion that to "discriminate" because of homosexuality or transgender status necessarily requires one to discriminate because of sex. 140 S. Ct. at 1741.[6] And a similar conclusion may be reached with respect to § 3606, which provides, that "it shall be unlawful to deny any person access to or membership or participation in any multiple-listing service, real estate brokers' organization or other service, organization, or facility relating to the business of selling or renting dwellings, or to discriminate against him in the terms or conditions of such access, membership, or participation, on account of . . . sex." The language "on account of . . . sex" is not identical to the language in *Bostock*, but it is similar to the "on the basis of" language discussed above that the Supreme Court has used interchangeably with "because of," *see supra* XX, and it shares the focus on the individual that the *Bostock* court relied so heavily upon in its analysis, *see Bostock*, 140 S. Ct. at 1740-41.

This interpretation of the Fair Housing Act will likely come as a surprise to any ordinary reader of the Act, which includes no mention of sexual orientation or transgender status. Indeed, until very recently, all courts to have considered such claims had rejected them. *See, e.g.*, *Lath v. OakBrook Condominium Owners' Ass'n*, 2017 WL 1051001, at *4 n.5 (D. N.H. 2017) (collecting

---

[6] It is less clear how the *Bostock* reasoning applies to § 3604(c) and § 3604(e). Section 3604(c) makes it unlawful to "make, print, or publish, or cause to be made, printed or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination." Section 3604(e) makes it unlawful "[f]or profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular . . . sex." These provisions are not focused on the but-for causation of any act, but rather on the particular language used in advertisements and representations. Because a notice that indicates a preference, limitation, or discrimination on sexual orientation or transgender status does not necessarily indicate "any preference, limitation, or discrimination based on . . . sex," it is unclear how the Supreme Court would apply the *Bostock* reasoning to these provisions.

cases); *Miller v. 270 Empire Realty LLC*, 2012 WL 193798, at *5 (E.D.N.Y. 2012); *Neithamer v. Brenneman Property Services, Inc.*, 81 F. Supp. 2d 1, 4 (D.D.C. 1999). The same, of course, may be said of *Bostock* itself.

But to those concerned about overbroad enforcement, the Civil Rights Division notes that the Act expressly does not apply to "rooms or units in dwellings containing living quarters occupied or intended to be occupied by no more than four families living independently of each other, if the owner actually maintains and occupies one of such living quarters as his residence," § 3603(b)(2), nor to certain sales or rentals of small-scale owners, § 3604(b)(1). It also exempts a "religious organization, association, or society, or any nonprofit institution or organization operated, supervised or controlled by or in conjunction with a religious organization, association, or society, from limiting the sale, rental or occupancy of dwellings which it owns or operates for other than a commercial purpose to persons of the same religion, or from giving preference to such persons, unless membership in such religion is restricted on account of race, color, or national origin." § 3607. In addition, RFRA applies to the Fair Housing Act and may prevent courts from imposing liability under the reasoning of *Bostock*. § 2000bb-3(a) ("This chapter applies to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993.").

The Civil Rights Division will exercise its enforcement discretion, in both civil and criminal matters, in a manner that takes into account the unexpected nature of this interpretation. On the civil side, for many of the same reasons that retroactive liability under Title VII for the rule announced in *Bostock* may not be appropriate, retroactive liability under the Fair Housing Act may also not be appropriate. 42 U.S.C. § 3612(g)(3) (noting that in administrative enforcement proceedings, an administrative law judge "shall promptly issue an order for such relief as may be appropriate, which *may* include actual damages suffered by the aggrieved person and injunctive or other equitable relief" and "may, to vindicate the public interest" include a civil penalty); § 3613(c) (noting that in civil actions by private persons a court "*may* award to plaintiffs actual and punitive damages"); § 3614(d) (noting that in enforcement proceedings by the Attorney General a court "*may* award . . . preventive relief" and "*may* award such other relief as the court deems appropriate, including monetary damages to persons aggrieved"). On the criminal side, *see* 42 U.S.C. § 3631, "the Government retains 'broad discretion' as to whom to prosecute." *Wayte v. United States*, 470 U.S. 598, 607 (1985). It would be a rare case in which prosecution would be appropriate for conduct that appears to violate the Fair Housing Act under the *Bostock* reasoning but predated that decision—indeed there likely is none.

### Equal Credit Opportunity Act

The Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*, declares that it "shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction on the basis of . . . sex," § 1691(a)(1). The Act contains a number of provisions outlining activities that do not constitute discrimination, *id.* § 1691(b), (c), and provides for administrative enforcement, in addition to civil enforcement by private parties, *id.* § 1691e. The Act caps any damages that may be available under the Act to aggrieved individuals. *Id.*

For much the same reason discussed above with respect to the Fair Housing Act, the *Bostock* reasoning is likely applicable to claims that a creditor has discriminated on the basis of sexual orientation or transgender status with respect to any aspect of a credit transaction. To succeed, however, any potential plaintiff would need to make an actual showing of discrimination—that is, treatment of an applicant worse than other applicants similarly situated. § 1691(a). Moreover, the claim must not fall within any applicable statutory or regulatory exclusions. *See, e.g.*, § 1691(b), (c) (setting forth certain exemptions); § 1691(b) (authority to grant regulatory exemptions). The Civil Rights Division again recognizes that this reading of ECOA is unanticipated for many Americans, and it will take notice concerns into account in deciding whether to institute a civil action, including upon referral, for any conduct that appears to violate ECOA under the *Bostock* reasoning but predated that decision.

### Justice System Improvement Act of 1979

The Justice System Improvement Act of 1979, as amended, 34 U.S.C. 10101 *et seq.*, added a nondiscrimination provision to the Omnibus Crime Control and Safe Streets Act of 1968. Specifically, under that provision, "[n]o person in any State shall on the ground of race, color, religion, national origin, or sex be excluded from participation in, be denied the benefits of, or be subjected to discrimination under or denied employment in connection with any programs or activity funded in whole or in part with funds made available under this title." 34 U.S.C. § 10228(c). The language is similar to that of Title IX of the Education Amendments Act of 1972, except that it uses the phrase "on the ground of" instead of "on the basis of" and prohibits not just discrimination on the ground of sex, but on the grounds of race, color, religion, or national origin as well. *Compare* 34 U.S.C. § 10228(c) *with* 20 U.S.C. § 1681. The language also has narrower application, in that it applies to State and local governments receiving federal funds, rather than the many private parties who are subject to Title IX. Finally, the Justice System Improvement Act expressly provides for enforcement by both the Attorney General and, after exhaustion, by private parties. *See* 34 U.S.C. § 10228(c)(3), (4). A violation of this Act may also provide grounds for an enforcement action by the Department under 34 U.S.C. § 12601, which declares it "unlawful for any governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority, to engage in a pattern or practice of conduct by law enforcement officers or by officials or employees of any governmental agency with responsibility for the administration of juvenile justice or the incarceration of juveniles that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States," § 12601(a).

For many of the same reasons discussed above with respect to Title VII and Title IX, the *Bostock* reasoning suggests that this nondiscrimination provision prohibits intentional discrimination on the basis of sexual orientation or transgender status, but does not require law enforcement agencies to alter longstanding sex-specific practices or facilities where physiological differences between the sexes are relevant. *See Curl v. Reavis*, 740 F.2d 1323, 1326, 1331 (4th Cir. 1984) (affirming district court decision treating the discrimination on the basis of sex in violation of Title VII as sufficient also to violate the nondiscrimination provision of the Justice System Improvement Act). As with the other statutes discussed, the Civil Rights Division will

exercise enforcement discretion that takes due account of the unanticipated interpretation of this statutory condition on grants to state and local governments.

**Implications for the Constitution (and statutes that incorporate constitutional standards)**

Finally, *Bostock* has no bearing on the proper interpretation of the Constitution, including on whether classifications based on sexual orientation or transgender status should be treated as sex-based classifications (or otherwise trigger heightened scrutiny). The Supreme Court in *Bostock* interpreted a specific phrase in Title VII—"discriminate against any individual because of such individual's . . . sex." 140 S. Ct. at 1753 (ellipsis omitted). That text does not appear in either the Equal Protection Clause of the Fourteenth Amendment, U.S. Const. amend. XIV, or the Fifth Amendment's Due Process Clause in which the Supreme Court has identified an equal protection principle, *Bolling v. Sharpe*, 347 U.S. 497, 500 (1954). The Supreme Court's assessment that it did not need to consult "historical sources" to interpret the meaning of Title VII does not suggest that it would approach the Constitution in like manner. 140 S. Ct. at 1750. To the contrary, the Court recognized that it had repeatedly "consulted the understandings of the law's drafters" in order to discern "subtle distinctions between literal and ordinary meaning" in the context of older statutes. *Id.* And it has done so likewise in the context of constitutional provisions. *See, e.g.*, *Ramos v. Louisiana*, 140 S. Ct. 1390, 1395 (2020) (Sixth Amendment right to jury trial); *Bucklew v. Precythe*, 139 S. Ct. 1112, 1122-23 (2019) (Eighth Amendment); *Timbs v. Indiana*, 139 S. Ct. 682, 688-89 (2019) (Excessive Fines Clause); *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008) (Second Amendment); *Crawford v. Washington*, 541 U.S. 36, 50 (2004) (Confrontation Clause). In short, there is no indication the Supreme Court will apply its literal and context-free mode of interpretation to the Constitution, as doing so would upend over two centuries of precedent. *Bostock* may simply be an aberration.

Given the very different context of Title VII from the Constitution, it should be no surprise that the Supreme Court has not imported its construction of Title VII into the Constitution. The Court has, for example, refused to import disparate-impact liability from its Title VII precedents to the constitutional context, stressing that "[w]e have never held that the constitutional standard for adjudicating claims of invidious racial discrimination is identical to the standards applicable under Title VII, and we decline to do so today." *Washington v. Davis*, 426 U.S. 229, 239 (1976). Conversely, the Supreme Court has also imposed more stringent limits on affirmative action under the Equal Protection Clause than Title VII. *See Johnson*, 480 U.S. at 627 n.6. The Court has also recognized that "[t]he Equal Protection Clause . . . is essentially a direction that all persons similarly situated should be treated alike," and thus is not limited to the protected categories listed in Title VII. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). But most governmental classifications—including those related to sexual orientation and transgender status—continue to be subject only to rational basis review, and nothing in *Bostock* casts doubt on those precedents. *See Romer v. Evans*, 517 U.S. 620, 632 (1996). In all events, as with Title VII, *Bostock* does not undermine the authority of government to draw distinctions based on sex where, due to physiological differences, the sexes are not similarly situated. *See United States v. Virginia*, 518 U.S. 515, 533 (1996) (recognizing that "[p]hysical differences between men and women . . . are enduring" and that the "two sexes are not fungible").