```
                 IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF TENNESSEE
                      AT KNOXVILLE, TENNESSEE
_____
                                        )
THE STATE OF TENNESSEE, et al.,         )
                                        )
          Plaintiffs,                   )
                                        )
vs.                                     )   Case No. 3:21-CV-308
                                        )
UNITED STATES DEPARTMENT OF             )
EDUCATION, et al.,                      )
                                        )
          Defendants.                   )
                                        )
_____)



                         MOTION HEARING
             BEFORE THE HONORABLE CHARLES E. ATCHLEY, JR.

                       November 3, 2021
                          10:01 a.m.



APPEARANCES:

          ON BEHALF OF THE PLAINTIFFS:

          SARAH K. CAMPBELL
          MATT DANIEL CLOUTIER
          CLARK LASSITER HILDABRAND
          TRAVIS ROYER
          State of Tennessee, Office of Attorney General
          P.O. Box 20207
          Nashville, TN  37202

          ON BEHALF OF THE INTERVENOR PLAINTIFFS:

          JONATHAN SCRUGGS
          RYAN L. BANGERT
          HENRY W. FRAMPTON
          Alliance Defending Freedom (Arizona)
          15100 N. 90th Street
          Scottsdale, AZ  85260
```

ON BEHALF OF THE DEFENDANTS:

CHRISTOPHER HEALY
MARTIN M. TOMLINSON
U.S. Department of Justice, Civil Division
1100 L. Street, NW
Room 12504
Washington, DC  20005

```
 1                    (Proceedings commenced at 10:01 a.m.)

 2            THE COURTROOM DEPUTY:  All rise.  Judge of the United

 3   States District Court.  Hear ye, Hear ye, hear ye, this

 4   honorable court is now open pursuant to adjournment, the

 5   Honorable Charles E. Atchley, Jr. presiding.  Please come to

 6   order and be seated.

 7            THE COURT:  All right.  Good morning.  Ms. Lanister,

 8   will you please call the case?

 9            THE COURTROOM DEPUTY:  Yes, sir.  Civil action

10   3:21-CV-308, State of Tennessee, et al. versus U.S. Department

11   of Education, et al.

12            THE COURT:  All right.  Thank you.  Okay.  First of

13   all, enter an appearance.  Who do we have over here?

14            MR. HEALY:  Christopher Healy for defendants, and I'm

15   here with Martin Tomlinson, my colleague.

16            THE COURT:  Okay.  Yes.  I'm sorry we're in a

17   different courtroom, and I'm used to the plaintiff being over

18   here, but okay.  So we'll just go ahead and finish it.  Let's

19   see.  We have Mr. Healy and Mr. Tomlinson?

20            MR. TOMLINSON:  Yes, Your Honor.

21            THE COURT:  All right.  Thank you.  And on behalf of

22   the plaintiffs?

23            MS. CAMPBELL:  Your Honor, Sarah Campbell on behalf of

24   the plaintiff states, and I have with me Matt Cloutier, Clark

25   Hildabrand, and Travis Royer.
```

1          THE COURT:  Okay.

2              MS. CAMPBELL:  In the order that they're seated.

3              THE COURT:  Okay.  All right.

4              MS. CAMPBELL:  Thank you, Your Honor.

5              THE COURT:  Thank you.  And on behalf of the potential

6    intervening party?

7              MR. SCRUGGS:  Jonathan Scruggs, Your Honor, on behalf

8    of proposed intervenors, and with me is Hal Frampton, and next

9    to him is Ryan Bangert.

10             THE COURT:  Okay.  Thank you so much.  Okay.  All

11   right.  First of all, a little housekeeping.  When you're

12   speaking, you can remove your mask if you want to.  It's totally

13   fine with me.  As a matter of fact, it probably makes it a

14   little easier for me to hear.  If you want to keep it on, that's

15   fine too.

16             All right.  So we have here today, we're here on I

17   guess a motion for a preliminary injunction, and then we have

18   two motions to dismiss and then a motion to intervene.  So I'm

19   open to what, however the parties want to proceed, but what I

20   propose is that we hear the plaintiff on their motions for

21   preliminary injunction, hear a response from the defense on

22   that, and then hear their motions to dismiss, so kind of all

23   wrapped up in one; and then hear your responses on that, and

24   then kind of give a little bit of opportunity if you want to

25   add, and then we'll hear your motion to intervene, and then any

1  responses to that.  Does that, orderly enough?  Okay.  All
 2  right.  All right.
 3          Well, thank you, all.  I appreciate it.  Let's go
 4  ahead and get started, and so I guess, Ms. Campbell, are you
 5  ready?
 6          MS. CAMPBELL:  I am ready.  Would you like me to come
 7  to the podium?
 8          THE COURT:  Yes, please.  Thank you.
 9          MS. CAMPBELL:  Okay.
10          MR. TOMLINSON:  Your Honor, one other bit of
11  housekeeping before we get started.  With the Court's
12  permission, Mr. Healy and I will be splitting up our argument by
13  subject matter.
14          THE COURT:  Yeah.
15          MR. TOMLINSON:  Okay, and we'll cover that.
16          THE COURT:  Yeah.  Absolutely.
17          MR. TOMLINSON:  Okay.  Thank you.
18          THE COURT:  And I assume -- I just started with you
19  'cause you're in the principle seat, but if other people are
20  here to make arguments, other, that's totally fine.
21          MS. CAMPBELL:  Thank you.  I believe I'll be
22  presenting all of our argument unless something goes awry, so.
23          THE COURT:  Whenever you're ready.
24          MS. CAMPBELL:  Thank you, Your Honor.  Good morning,
25  Judge Atchley.  May it please the Court, my name is Sarah

1  Campbell.  I represent the State of Tennessee, and I'm

2  presenting argument on behalf of both Tennessee and the 19 other

3  states that are plaintiffs in this action.

4          Plaintiff states brought this action because the

5  United States Department of Education and the EEOC unilaterally

6  rewrote the federal anti-discrimination laws they enforce, laws

7  that affect employers and schools across the country by issuing

8  guidance documents.  In our constitutional structure, that's not

9  how lawmaking is supposed to work.  The states and Congress have

10  lawmaking authority under our Constitution, and even when

11  Congress delegates its lawmaking authority to administrative

12  agencies, they must exercise that authority consistent with the

13  Administrative Procedure Act.  That didn't happen here, and the

14  states' sovereign authority to enforce its own legal code was

15  directly injured as a result.  This Court should preliminarily

16  enjoin enforcement of the agencies' unlawful guidance and the

17  interpretations contained therein and deny defendants' motion to

18  dismiss.

19          Contrary to defendants' arguments, their guidance does

20  not merely implement the Supreme Court's *Bostock* decision.  The

21  Supreme Court could not have been clearer that its opinion in

22  *Bostock* was limited to the question of whether firing an

23  employee for being homosexual or transgender violates Title VII.

24  The decision did not extend to other statutes such as Title IX

25  and did not address distinct questions such as whether an

employer's bathroom or locker room policies or dress code

policies constitute unlawful discrimination, and the Court's

reasoning in *Bostock* does not compel or even support the

agencies' new interpretation.  The guidance documents are thus

legislative rules that rewrite rather than interpret existing

law.

The administrative and procedure, the Administrative

Procedure Act and the Declaratory Judgment Act give plaintiffs

the right to challenge those unlawful legislative rules now.

Requiring plaintiffs to wait until the agencies have initiated

enforcement actions as defendants would have it would put

plaintiffs in the untenable position of having to choose between

changing their laws and policies or risking significant civil

penalties for the loss of significant federal funding.

Plaintiffs aren't required to wait for the hammer to drop.

Unless the Court would prefer that I focus on specific

questions, I'll begin by addressing jurisdiction and irreparable

harm, then turn to the APA's final agency action and no adequate

remedy requirements, and then briefly address our substantiate,

procedural and substantive APA claims.

THE COURT:  That will be fine.  Focus on jurisdiction.

MS. CAMPBELL:  Sure.  I'd be glad to, Your Honor.

Plaintiffs easily satisfy Article III's jurisdictional

requirements here.  The Court explained in *Lujan* that where the

plaintiff is the object of a challenged government action,

there's ordinarily little question that the action has caused
that party injury and that a judgment preventing the action will
redress it.  That's exactly the situation we have here.
Plaintiff states are targets of the regulation.  We are entities
that are subject to regulation under both Title IX and Title
VII, so we easily satisfy Article III's standing requirements,
especially given the special solicitude that this Court must
afford to states under the Supreme Court's decision in
*Massachusetts versus EPA*.

I'd like to start with the injury and fact requirement
for Article III.  We have satisfied that requirement, but
because of several direct injuries, I want to begin with what we
think are the most direct and concrete injuries here, and those
are the injury to our sovereignty interests.

A long line of cases have allowed states to sue the
federal government based on injuries to their sovereign
interests.  States have a sovereign interest in enacting and
enforcing their own legal code, and here we cited in paragraph
99 of our complaint numerous laws including laws of Tennessee
and many of the other plaintiff states that at least arguably
conflict with the challenged guidance documents, both the
Department of Education's Interpretation and Fact Sheet and the
EEOC technical assistance document.  There's nothing abstract or
speculative about those injuries.  Even if sovereignty may seem
like an abstract concept, in some sense, I mean, this is, this

1  is direct interference with Tennessee and other states' ability
2  to enforce its enacted laws.  You don't get much more concrete
3  than that, Your Honor.

4          I think defendants rely pretty heavily on
5  *Massachusetts vs. Mellon*, but that case is easily
6  distinguishable.  I mean, first of all, I think that case has
7  been limited narrowly over time and where the Court has
8  recognized states' standing to sue to redress sovereignty
9  injuries in a number of cases including *Massachusetts versus EPA*
10 and earlier cases, but *Massachusetts vs. Mellon* also, it didn't
11 involve any sort of direct interference with the state's ability
12 to enforce its law.  The Court said in *Mellon* that the
13 challenged federal law did not require the states to do or to
14 yield anything.  No sovereign rights were actually invaded or
15 threatened.

16         The same cannot be said here.  Paragraph 99 identifies
17 specific laws that plaintiffs will be unable to enforce if the
18 challenged guidance is enforced against them, and really that
19 injury is a present injury.

20         THE COURT:  Is that, does -- for all states?

21         MS. CAMPBELL:  Your Honor, there are -- the complaint
22 I think includes laws for ten states we've cited, laws for a
23 couple more states in our preliminary injunction reply brief.
24 Kentucky also has some laws, so we don't have cited laws for
25 every state; but under the Supreme Court's jurisprudence, when

```
 1  you have a case like this which is just seeking equitable
 2  relief, it's not seeking any sort of individualized damages, the
 3  Court finds it sufficient that one plaintiff has standing and
 4  doesn't evaluate whether each and every plaintiff is able to
 5  independently establish standing.
 6          And you know, a couple of cases that apply that
 7  principle are *Village of Arlington Heights versus Metro* which we
 8  cite in our preliminary injunction reply brief.  That case in
 9  turn -- well, there's a later case that in turn cites *Village of*
10  *Arlington* that's also highly relevant called *Boerne versus*
11  *Flores*, and I think that case is particularly relevant because
12  there it was a, there's a party who is seeking relief from an
13  earlier judgment.  The Court -- because of one, one of the
14  parties that was seeking relief from the judgment had standing,
15  that was sufficient.  The Court didn't evaluate whether the
16  other parties independently were able to satisfy standing, and
17  there was also an argument there that the relief from the
18  earlier judgment should be limited to that particular plaintiff
19  that the Court had said established standing, and the Court
20  rejected that argument because the claim was that the earlier
21  judgment, the earlier district court order was inequitable.  The
22  claim implicated the orders in their entirety and not solely as
23  they ran against that one party, and we think that same
24  principle applies here because the remedy under the APA is that
25  the challenged agency action be set aside and that the
```

1  plaintiffs are all advancing the same arguments for equitable
2  relief against that challenged agency action.

3        So we have concrete sovereignty injuries.  Those are
4  really a present injury.  That doesn't depend on whether the
5  defendants ultimately enforce the challenged action.  That is
6  because we have these, this guidance out there that purports to
7  speak with the force of law, that is already injuring plaintiff
8  states.  That's creating regulatory uncertainty for entities
9  within the state that need to comply with both state law and
10  what the agencies view as the proper interpretation of federal
11  law.

12        I'll just give you a couple of cases that recognize
13  sovereignty injuries and didn't even engage in the analysis as
14  to whether there's a credible threat of enforcement.  It's two
15  Fifth Circuit cases, *Texas versus United States* which was the
16  state's challenge to DAPA.  And there, the Court recognized that
17  because DAPA forced Texas to choose between incurring costs and
18  changing its fee structure for driver's licenses and being
19  pressured to change state law, that constituted an injury, and
20  the Court, you know, didn't engage in any sort of inquiry about
21  whether there was a credible threat of enforcement.

22        And then *Texas versus EEOC* which is a later Fifth
23  Circuit case, 2019, relied on in part on the Texas, earlier
24  *Texas versus United States* case, the guidance -- it was a
25  challenge to an EEOC guidance document, similar to in this case.

1  It imposed a regulatory burden on Texas to comply with the
2  guidance to avoid enforcement actions, and it pressured Texas to
3  abandon its laws and policies.  I think that same thing applies
4  here, but even if the Court needs to engage in an inquiry about
5  whether there's a credible threat of enforcement, that creates
6  an injury, an imminent injury, that standard is met here.

7          The Sixth Circuit in *Online Merchants Guild* discussed
8  several factors that the Court should look at to determine
9  whether there's a credible threat of enforcement, and all of
10 those, several of those here point in favor of finding a
11 credible threat.

12          Most importantly, the defendants have not disavowed
13 any intent to enforce.  Their argument boils down to this, that,
14 well, they haven't brought an enforcement action yet, but it
15 can't be the case that we have to wait until there is a pending
16 enforcement action to challenge the guidance.  I mean, that
17 would defeat the very notion of pre-enforcement review, Your
18 Honor.

19          THE COURT:  Well, have they done anything at all
20 though?  I mean, have they, have they threatened to enforce?
21 Have they communicated or sent a letter or done anything other
22 than just, you know -- I'm not aware of them having done
23 anything to take a step towards enforcement.

24          MS. CAMPBELL:  Well, Your Honor, the guidance itself,
25 if you look at the Department of Educational's Interpretation

1  that was published in the federal register and the letter that
2  was sent to educators, it says that they will fully enforce
3  this, their interpretation of Title IX to prohibit
4  discrimination based on gender identity and sexual orientation.
5  So from their own mouths, they have said they will fully enforce
6  it. They have -- sorry, Your Honor. Go ahead.

7  THE COURT: No. I'm just listening to you and I'm
8  thinking, and I understand that, I do; but I guess what I'm
9  asking is is they haven't yet, so is it ripe?

10  MS. CAMPBELL: We believe it is ripe because there is
11  a credible threat of enforcement. Again, we don't have to wait
12  until there is an actual pending action. They haven't disavowed
13  enforcement. They have taken actions consistent with
14  enforcement. They filed a Statement of Interest in the --

15  THE COURT: What --

16  MS. CAMPBELL: -- action in West Virginia challenging
17  West Virginia's transgender participation in sports law, taking
18  the position that that law violates Title IX, that -- and if you
19  look to similar guidance that was issued during a previous
20  administration, that guidance was enforced. I think that also
21  provides an indication of a present intent to enforce this.

22  THE COURT: So what does the law say about that?

23  MS. CAMPBELL: About -- I'm sorry, Your Honor?

24  THE COURT: About, about whether or not that's enough
25  to make this particular issue ripe for us here today.

1         MS. CAMPBELL:  We believe that it's enough.  I mean,
 2    there are several factors that the Sixth Circuit considers, but
 3    none of those factors is dispositive.  It's really a
 4    multi-factor analysis.  I think that the fact that the
 5    department itself has said it intends to fully enforce and the
 6    EEOC has also, you know, invited complaints to be filed based on
 7    this guidance, I think the fact that you have the agencies
 8    themselves saying they're going to enforce.  We've heard nothing
 9    from defendants --

10         THE COURT:  I'm sorry.  I didn't mean to interrupt
11    you.

12         MS. CAMPBELL:  Go ahead.

13         THE COURT:  Has anyone filed a complaint with the
14    EEOC?

15         MS. CAMPBELL:  Not that I am aware, but I wouldn't
16    necessarily know about all those complaints.

17         THE COURT:  Just because they're confidential.

18         MS. CAMPBELL:  That's correct, Your Honor.  That's
19    correct, so I think that it's highly significant here that
20    defendants have not disavowed enforcement.  All they've said is
21    that there is no pending enforcement action, but the whole point
22    of pre-enforcement and review and the ability to obtain a
23    preliminary injunction is that when there's a credible threat of
24    enforcement, challenging parties should not be put to the choice
25    of either, either, you know, abandoning their laws and complying

1   or facing really significant penalties; and the penalties here
2   are steep, but you know, could include in the Title IX context
3   loss of the state, all the state's federal educational funding
4   which in Tennessee is 20 percent of the state's entire education
5   budget.  I mean, that is, that is significant.

6           And you know, if you look at how these typically play
7   out and we've cited, you know, just a search from the OCR
8   database, you know, looking at what happens when investigations
9   are launched, in almost every case, the regulated entity ends up
10  caving and agreeing to the department's interpretation because
11  what's at stake is so significant.  And I think especially given
12  that, that the agency really uses guidance in a way to force
13  compliance, pre-enforcement review is particularly appropriate
14  here.

15          We have asserted some other injuries, Your Honor.  I
16  think the sovereignty injuries are certainly the most direct.
17  We do have, you know, the potential loss of federal funding is
18  of course a financial, significant financial injury.  Financial
19  harm is concrete, and you know, we also have asserted parens
20  patriae theory of harm to our citizens.  I don't think the Court
21  needs to reach that necessarily.  I think our sovereignty
22  injuries and financial injuries, and the financial injuries also
23  include potential compliance costs.  I think all of that is more
24  than sufficient to satisfy the injury and fact requirement, Your
25  Honor.

1    THE COURT:  So, and I understand what you're saying,
2    and but they don't take the money away immediately, right?  So
3    if they went forward with something, you would have an
4    opportunity then to address it.

5    MS. CAMPBELL:  That's right.

6    THE COURT:  And before the money would be lost.

7    MS. CAMPBELL:  That's correct, Your Honor, but I
8    think, you know, that's also the case in other cases the Court
9    has considered where, like, such as *Sackett*.  I mean, we're now
10   getting into the adequate remedy at law requirement under the
11   APA a little bit, but you know, I think the fact that you could
12   raise this eventually as a defense at any action is not an
13   adequate remedy when, you know, especially in context like this
14   where the very bringing of the enforcement action or launching
15   of an investigation itself has a chilling effect and a coercive
16   effect that, I mean, forces or at least strongly encourages
17   regulated parties to simply cave and change their laws or change
18   their policies and agree with the agencies' interpretation.  And
19   I think when the penalties are so significant, that's what you
20   see, and I think that does make pre-enforcement review here
21   critical, just critically important to enable a meaningful
22   challenge to the guidance.

23   I do want to address since we're here on a preliminary
24   injunction motion, not just the concreteness and imminence of
25   the injuries but also why this is irreparable harm since that is

1  of course is a requirement for getting a preliminary

2  injunction.

3          THE COURT:  Indispensable.

4          MS. CAMPBELL:  Yes, Your Honor, and I do think we've

5  met that requirement here.  Sovereignty injuries are by their

6  nature irreparable harms, and there are several decisions

7  recognizing that.  We've cited some in our briefing.  The *Kansas*

8  *versus United States* is a Tenth Circuit decision that deemed

9  loss of sovereign interests irreparable.  There's also a

10 district court decision out of the Southern District of Georgia

11 that arose and the challenge is to the Waters of the United

12 States rule that granted a preliminary injunction based on the

13 loss of sovereignty in that case being an irreparable harm.  So

14 the same sovereignty interests that give us standing I think

15 also provide or satisfy the irreparable harm requirement.

16          Now defendants have pointed out that, that the threat

17 of irreparable injury also needs to be certain and immediate I

18 think for the same reasons that we can show -- well, let me step

19 back for a second.  I think there are a couple different reasons

20 we satisfy that.  As I explained earlier, the harm to our

21 sovereignty is already occurring.  We are already, you know,

22 facing pressure to change our laws and policies.  There is

23 already regulatory uncertainty being created by the conflict

24 between this federal guidance and what our state laws require.

25 That injury is already occurring, but you know, when you combine

1   that with the enforcement actions that are threatened, even
2   though we can't say precisely when that may happen, we do know
3   that it's imminent, and I think it satisfies that certain and
4   immediate requirement for irreparable harm.  And I think that's,
5   I think it's important just to reiterate the principle that we
6   don't have to wait for the hammer to drop.  I think if we, if
7   there hasn't been any disavowment of enforcement and it's only a
8   matter of when, given what's at stake here, we've satisfied that
9   certain and immediate threat of irreparable harm requirement to
10  obtain preliminary relief.

11          Your Honor mentioned ripeness, and I do just want to
12  note that the prudential ripeness concerns that defendants have
13  argued at points in their brief are just that, they're
14  prudential.  The Sixth Circuit has proceeded to address the
15  merits of cases even when there are prudential ripeness
16  concerns, and the Supreme Court has cast a lot of doubt of
17  course on those prudential ripeness factors, whether the issues
18  are fit for judicial review and whether there's hardship to the
19  parties; but even if the Court were to consider those issues, I
20  think we, this case is ripe, both for Article III purposes and
21  prudentially.

22          The issues here really are legal in nature.  I mean,
23  the defendants have said, well, you know, this, adjudicating
24  these things could require the consideration of specific factual
25  circumstances, but they don't point out really any facts that

1  could change their conclusion on any of these issues, and really

2  that's one of the problems. From our perspective, that's one of

3  the problems with the guidance is that it takes these kind of

4  blanket, hard-line positions when the facts should matter, and

5  the challenge is to what the agencies have said in this

6  guidance. It's not to, you know, ultimately what these

7  particular adjudications will play out. Our challenge is to the

8  fact that the guidance has taken these positions in a way that

9  speaks with the force of law to regulated entities, and so those

10  issues are purely legal. And we satisfy the hardship

11  requirement because we, as I've explained, we face significant

12  financial penalties if we choose not to comply with the

13  guidance.

14      Unless the Court has other questions about

15  jurisdiction --

16      THE COURT: I may come back to it.

17      MS. CAMPBELL: Sure.

18      THE COURT: I am going to come back to it, but please

19  go on.

20      MS. CAMPBELL: Sure. Thank you, Your Honor. I will

21  turn to the APA's finality and no adequate remedy requirements.

22      I don't think there's any dispute here that the first

23  *Bennett* prong for final agency action that it's, the challenged

24  action is the consummation of the agencies' decision-making

25  process is satisfied. I don't read the defendants' briefs to

dispute that at all, so really where the dispute lies is on the
second *Bennett* requirement which is that the challenged action
create rights or obligations for the parties or that legal
consequences will flow from that action.

The Supreme Court and the Sixth Circuit have
emphasized that this is a pragmatic and flexible inquiry, and
the courts have applied it in that way, particularly if you look
to the D.C. Circuit's case law on that second *Bennett* prong.  So
the, that finality requirement is met when an agency announces
its definitive view of the law and warns regulated parties that
they'll face penalties if they fail to comply.  It doesn't
matter what the agency says, how it labels its guidance.  The
inquiry is a pragmatic one that determines, you know, what is
the practical effect on the ground, and we think that that
effect here clearly is to create legal consequences for parties
and to essentially order them to comply or else.

So we believe that final agency action requirement is
met, and we've talked a little bit about what language in the
challenged actions support that view.  I think, again, in the
Interpretation and Fact Sheet, the Interpretation states that,
"OCL will fully enforce Title IX to prohibit discrimination
based on sexual orientation and gender identity and that this
interpretation will guide the department in processing
complaints and conducting investigations."

The EEOC document explains what the *Bostock* decision

means for LGBTQ+ workers and all covered workers and for
employers across the country. That's what the document itself
states, so there are, I think it's clear that what the intent
was here with these documents. You know, other language in the
documents notwithstanding was to, was to speak with the force of
law on this issue.

We've, you know, cited cases in our briefs involving
similar circumstances in which final agency action was
recognized when you had this kind of choice between complying
with the guidance or facing enforcement penalties. That same
situation exists here and we think satisfies that requirement.

On the no adequate legal remedy prong, *Sackett* I think
is our best case there. It makes clear that regulated parties
aren't required for an agency to drop the hammer, so the fact
that a regulated agency may at some point be able to raise a
defense in an enforcement proceeding is tantamount to an
adequate remedy. Sorry, Your Honor. Go ahead.

THE COURT: No. I was just thinking. I was just
trying to remember *Sackett*. You put a lot of cases in there.

MS. CAMPBELL: I did. I'm sorry, Your Honor, so
*Sackett* was a Supreme Court decision involving a decision by the
Army Corps of Engineers, and the, there was an ability for the
regulated party to, if an enforcement proceeding was eventually
brought to raise its arguments in that enforcement proceeding,
but the problem was the regulated party couldn't initiate that

proceeding.  So as the Court put it, you know, they were facing a situation where they had to just wait for the hammer to drop, and you know, we think that's analogous to this situation where the state can't initiate any investigation, or you know, we can't initiate any enforcement proceeding.  We are just faced with having to wait until, until the Department of Education or the EEOC decides to go forward.

So they make two, the defendants make a couple of different arguments, so one relates to the adequate remedy requirement under the EPA, and then they also argue that there was a Congressional intent to preclude judicial review under the APA.  So those are I think two slightly different arguments although I think they get conflated at times, so we think the adequate, no adequate remedy requirement is met here.  We also think that there is absolutely no Congressional intent to preclude review under the APA.

The APA's judicial review provisions must be construed broadly, and the Congressional intent to preclude review under the APA must be fairly discernable from the statute's text structure and purpose.  There is nothing in Title IX's text -- and I should say, they only make this argument with respect to Title IX.  There's nothing in Title IX's text structure or purpose that suggests an intent to preclude judicial review.  They point to this, you know, administrative scheme that exists for terminating federal funding, but if you look at the statute

itself, Title IX itself, the provision that addresses judicial

review, it's § 1683.  It says that, "Any department or agency

action taken pursuant to Section 1682 shall be subject to such

judicial review as may otherwise be provided by law for similar

actions by such department or agency on other grounds."

          If you then go to § 1682, § 1682 covers several

different kinds of agency actions.  It's not just talking about

funding termination decisions.  Section 1682 includes the

issuance of rules and regulations and decisions to terminate

funding.  These administrative procedures that apply to funding

termination decisions are distinct from, you know, any review

that would be provided for the issuance of rules and

regulations, and we cite a couple cases in our -- well, one case

in particular, the *Romeo* case.  That was a district court in

Michigan that considered specifically whether a rule or

regulation promulgated by the Department of, I think it was

Education, Health, and Welfare at the time, but whether that

could be reviewed under the APA, and it held that it could.

That decision was affirmed by the Sixth Circuit, and I think

that analysis in *Romeo* is correct.  It kinds of walks through

these provisions, § 1683 and § 1682, but the judicial review

that is provided for the issuance of rules and regulations is

the APA.  That's what governs there, and this separate

proceeding for the funding termination decisions which really is

set up mostly through regulations and not the statutory text

1 | itself doesn't apply.

 2 | Defendants rely on the *Board of Education of a*
 3 | *Highland Local School District* case, Ohio District Court
 4 | decision for the contrary conclusion. We just think that
 5 | Court's analysis was really flawed there, and so would point the
 6 | Court to the *Romeo* decision.

 7 | There's also a Second Circuit decision that we cite in
 8 | a slightly different context involving Title VI but very similar
 9 | provision where it says, similar judicial review provision to
10 | § 1683. And there, again, when it was an issuance of a rule or
11 | regulation, it was the APA that provided the judicial review
12 | procedures for that action.

13 | So I think that's all I have for now on the APA's
14 | cause of action requirements. I'm happy to address our
15 | procedural and substantive APA claims --

16 | THE COURT: Okay.

17 | MS. CAMPBELL: -- if the Court wishes.

18 | So I want to start with our argument that these
19 | guidance documents fail to comply with the APA's notice and
20 | comment requirements, and in the case of the EEOC, that this
21 | just exceeded the EEOC's statutory authority altogether because
22 | the EEOC lacks authority to issue substantive rules, so those
23 | claims really turn on whether these guidance documents are
24 | interpretive rules or instead legislative rules. Legislative
25 | rules are subject to notice and comment under the APA. We think

1   that these guidance documents are substantive rules.

2          Now the defendants say they're just implementing
3   *Bostock*, they're just interpreting and restating, you know, what
4   the statutes and regulations and binding precedent already say.
5   That's simply not the case. *Bostock* did not address these
6   issues. What *Bostock* said was that when someone, when an
7   employer fires an employee because of the employee's homosexual
8   or transgender status, that is necessarily discrimination based
9   on sex. The Court assumed that sex means biological sex,
10  anatomical differences between men and women; but in that
11  particular case of firing someone because of homosexuality or
12  transgenderism, that is, that is necessarily discrimination
13  based on sex. So the Court did not say that Title VII writ
14  large prohibits discrimination based on sexual orientation and
15  gender identity. It was determining whether a particular fact
16  pattern necessarily entailed discrimination based on sex.

17         So I want to walk through both I guess why the
18  department's Interpretation and Fact Sheet is contrary to Title
19  IX and why the EEOC document is contrary to Title VII. Those
20  are slightly different arguments.

21         With respect to Title IX, *Bostock* of course didn't
22  address Title IX. That wasn't even a statute that was at issue,
23  and as the Sixth Circuit has recognized including recently in
24  the *Meriwether versus Hartop* decision, Title IX and Title VII
25  are different in important respects; and I think the most

1  important respect is that in Title IX itself, Section, the
2  statute itself, § 1686, there is a safe harbor that specifically
3  provides that nothing in Title IX should be construed to
4  prohibit educational institutions from maintaining living
5  facilities that are separated by but based on the different
6  sexes.

7        Now at the -- as we've explained in our briefing, I
8  think at the time that regulation was issued or at the time the
9  statute was issued and then subsequent implicating regulations
10 were issued, what everyone understood sex to mean was biological
11 sex, physiological, you know, differences between men and women,
12 and the Court certainly didn't hold otherwise in *Bostock*.  It
13 proceeded on that assumption that sex in Title VII meant
14 biological sex.

15       So I think in light of that specific statutory
16 authorization for regulated entities to maintain living,
17 separate living facilities for the different sexes, it just
18 doesn't in any way, you know, follow from that that the, that
19 the department's interpretation of Title IX could be correct.
20 It is changing the law, not just interpreting the law.

21       THE COURT:  Well, if Congress means something
22 different, they can change it, right?

23       MS. CAMPBELL:  Congress certainly could change it, but
24 the agency can't.

25       THE COURT:  No, I understand.

MS. CAMPBELL:  Yeah.  Your Honor, Congress certainly
could change it if it wanted to, but it hasn't, and it was well
aware of these issues involving bathrooms and locker rooms and
athletic teams.  It was aware of all of those issues when it
enacted Title IX, and it put in this safe harbor for that
reason, and you know, directed the agency to come up with rules
governing athletic teams.  And one of those regulations that was
promulgated shortly after Title IX's enactment specifically
authorizes regulated entities to maintain athletic teams
separated by sex when it involves competitive skill, to get on
the team or it's a contact sport.

          So that -- those features of Title IX I think make the
department's interpretation, particularly as it applies to
restrooms and lockers rooms and other living facilities and
athletic teams just untenable.  It is a rewriting of the
statute, a substantive change in the law that makes this a
legislative rule, not an interpretive rule; and because of that,
the department, if it was going to do this, it needed to go
through notice and comment.  I mean, we don't think even after
going through notice and comment this would have been valid
because it's so contrary to the statutory text; but at a
minimum, they needed to go through notice and comment
rulemaking, and you know, these issues are incredibly sensitive
issues.  They affect a lot of individuals.  They affect parents
and kids and students, you know, across the country.  This is

exactly the sort of thing that would have benefited from input
from the public through the notice and comment procedures, but
you know, the department didn't do that. They just issued this
unilaterally and expected regulated entities to fall into
compliance.

We also think that the EEOC document is contrary,
sorry, the EEOC technical assistance document also is a
substantive rule, not just an interpretive document. Again,
*Bostock* didn't address this issue of bathrooms and locker rooms.
That was very much on the minds of the justices. If you listen
to the oral arguments in *Bostock*, if you look at the briefs, I
mean, everyone was aware that there was this issue lurking
involving bathrooms and locker rooms, and the Court's very
careful not to address that, and it doesn't kind of logically
follow from the Court's reasoning that transgender individuals
must be required to use the restroom that, or locker room that
corresponds to their gender identity.

Under Title VII, discrimination is treating someone
who's similarly situated worse. It's disadvantaging someone, so
there has to be a disadvantage, and there has to be a
similarly-situated comparator, and I don't think you have either
in the restroom and locker room context. You know, of course
employers have for decades maintained separate facilities. You
know, there are numerous court decisions recognizing that that's
really needed for privacy, that people prefer that even though

1  you are separating people based on sex.  So it's differential
2  treatment based on sex, but it's not discriminatory because
3  you're not disadvantaging anyone.  And even if a particular
4  transgender individual felt that he or she was being
5  disadvantaged by not being able to use the restroom of their
6  choice, to show discrimination, you still have to show that
7  there are similarly situated, they're being treated worse than a
8  similarly-situated individual; but individuals with different
9  anatomy, you know, with a different sex at birth are not
10  similarly situated for purposes of intimate facilities like
11  restrooms and locker rooms.

12         I think what *Bostock* recognized is that they are
13  similarly situated when, you know, you're talking about hiring
14  and firing decisions when there's not any sort of bona fide
15  occupational qualification.  So while they may be similarly
16  situated in that context, this is a different context.

17         THE COURT:  And I understand that.  So --

18         MS. CAMPBELL:  So because this is a, really a change
19  in the law, a substantive change in the law that imposes new
20  obligations on regulated entities, it's a substantive rule.  The
21  EEOC doesn't even have authority to issue substantive rules, so
22  that alone means that this, this technical assistance document
23  should be satisfied.

24         THE COURT:  Well, a board can do it, right?
25         MS. CAMPBELL:  Not even -- the EEOC, even if it's the

1  commission that does it, does not have authority to issue
2  substantive regulations.  Now, by its regulations, if something,
3  I guess there's some daylight where there could be something
4  that is nonsubstantive but still a significant guidance
5  document.  That's the terminology that the EEOC's regulations
6  use, so in that situation, when it's a significant guidance
7  document, that's supposed to have full commission approval, and
8  it's also supposed to be subject to notice, a 30-day notice and
9  comment period.  So even if it's not kind of substantive in the
10  legislative rule sense, we think that it's certainly a
11  significant guidance document that should have, that should have
12  satisfied those requirements, and defendants have never argued
13  that it did.
14          Our, I really think our substantive claims are
15  explained fully in our briefs.  If the Court has questions about
16  those, I'm happy to address them or of course any other
17  questions that the Court may have on our other points.
18          THE COURT:  Not right now, but I guess we'll hear what
19  they have to say.
20          MS. CAMPBELL:  Thank you, Your Honor.
21          THE COURT:  Thank you.
22          MR. HEALY:  Your Honor, I'm prepared to address the
23  merits questions, and Mr. Tomlinson is prepared to address
24  jurisdictional questions.  Do you have a preference in terms of
25  order?

1  THE COURT:  Let's start with the jurisdiction and then
2  go to the merits unless you've got a good reason to go
3  otherwise.

4  MR. HEALY:  The only reason I was maybe suggesting
5  going first is that I do think it is sort of important to
6  understand why the government's position is that the merits of
7  the case are somewhat uncontroversial.  I know it's somewhat
8  unusual to not start with jurisdiction first, but I think it
9  might be helpful --

10  THE COURT:  Sure.

11  MR. HEALY:  -- to clear the air first.

12  THE COURT:  All right.

13  MR. HEALY:  So the reason I suggested starting with
14  the merits first is that I think it's important to understand
15  here what is being challenged in this case and what is not
16  actually being challenged in this case.  This is a challenge to
17  these specific guidance documents that do a specific, narrow
18  thing which is apply the reasoning of *Bostock* which was very
19  clear and defined a specific textual language within Title VII
20  to the Title IX context which is extremely similar.  And so
21  *Bostock* as the Court is I'm sure aware applied the, in the
22  context of Title VII what the phrase "because of sex" means and
23  determined without deciding what the word "sex" means that that
24  phrase "because of sex," the sex discrimination prohibition in
25  Title VII encompassed gender identity and sexual orientation

1 | discrimination.

2 | It should be entirely uncontroversial to apply that
3 | language in extremely similar context in Title IX. The Sixth
4 | Circuit has numerous times as cited in our briefing looked to
5 | Title VII as the application of Title IX, and the reason I
6 | wanted to start with this is because the states' fundamental
7 | argument about why this language should be different is that the
8 | words "because of" and "on the basis of," they purportedly claim
9 | this has some different meaning because of the word "the," and I
10 | think that's just very obviously wrong. The basis doesn't
11 | necessarily mean there's only one basis. One can say the basis
12 | of X, Y, and Z, and it's very clear that that doesn't only
13 | require a singular basis.

14 | THE COURT: They didn't talk about Title IX.

15 | MR. HEALY: It's correct that the Court didn't talk
16 | about Title IX, but this is what we do as lawyers. We have to
17 | apply the reasoning of Supreme Court cases to analogous
18 | situations, and that's exactly what the department has done.
19 | And I think it's a misinterpretation of these documents and this
20 | lawsuit to suggest that this is a challenge to the agency's
21 | interpretation of how this would apply in scenarios regarding
22 | bathrooms or sports teams or living facilities and the like. It
23 | can't be arbitrary and capricious or unlawful for the agencies
24 | to take the narrow view and answer the question of what the sex
25 | discrimination prohibition in Title IX means without answering

1  the more complicated questions down the road of how the facts
2  would apply in those particular circumstances.

3       And the fact remains that these contexts are extremely
4  similar, and there's Sixth Circuit case law as demonstrated in
5  the NOI and in the other documents that Title VII is frequently
6  looked to to determine what Title IX means.  And the Supreme
7  Court itself, the Supreme Court itself in *Bostock* referred to by
8  my count, I may not be exactly right on this, something like 33
9  times they used interchangeably the phrase "on the basis of" and
10 "because of sex."

11      And so I think that's really important for the Court
12 to be aware of as a background before we get into the many
13 jurisdictional reasons why we don't think there's standing or
14 ripeness as Mr. Tomlinson will address.

15      I'd also like to also address --

16      THE COURT:  Real quick.  Didn't the Supreme Court
17 specifically say we do not purport to address bathrooms, locker
18 rooms, or anything else of the kind?

19      MR. HEALY:  Yes.  That's absolutely true, but just
20 because the Supreme Court's holding didn't apply to bathrooms,
21 it doesn't mean that the reasoning wouldn't also apply in a
22 different statute that's otherwise identical in many ways with
23 respect to the narrow question of what sex discrimination means
24 in Title IX.  And with respect to the fact that Title IX has
25 these other provisions of having to do with bathrooms and living

1  facilities and the regulations and in the statute, these
2  documents just don't answer that question.  They don't make that
3  next step about how it would apply in particular factual
4  circumstances.

5          And so that's why I think there is, the suggestion by
6  the states that this amounts to creating new law or rewriting
7  Title IX is just incorrect, and the Supreme Court in the *Dodds*
8  case recognized that there is a, no likelihood of success on the
9  merits of a PI brought by the school board where in large part
10  due to the fact that the Sixth Circuit has expressly recognized
11  that gender nonconforming individuals including transgender
12  individuals can state a Title IX claim, so I just wanted to make
13  that argument at the outset.

14          With respect to the EEOC document, plaintiffs argue
15  that this document is an improper substantive rule, but the
16  guidance on its face expressly disclaims the force and effect of
17  law, and if you actually look at the document --

18          THE COURT:  I know, but just because they say that
19  doesn't mean it's so, right?  I mean, you have to -- I mean --

20          MR. HEALY:  I understand that.  If you actually --

21          THE COURT:  I'm not -- I'm not -- sorry to interrupt
22  you, but I'm not saying that this is what they did, but they
23  could do that just for the purpose to try to offer them some
24  protection when they did want to do that.

25          MR. HEALY:  I understand that, and I agree with you

that labels aren't dispositive here, but if you actually look at the document and see what the document does, the document says we will explain how, what the *Bostock* decision means in Title VII, and the EEOC document has to do with Title VII just as *Bostock* had to do with Title VII; and it explains its prior administrative decisions having to do with gender identity with respect to bathrooms and other context which are old decisions. One is the *Macy* EEOC case from 2012, and one is the case from 2015, the *Lusardi* case. It doesn't create new law, and it certainly isn't creating a substantive rule. So if you actually look at the substance of what the document says, I think you'll see.

THE COURT: I never thought I would get to the point where I thought of a 2012 case as old law.

MR. HEALY: These days, it's suddenly 2021. I don't know how we got here. The courts have routinely found that EEOC's interpretation of substantive provisions of Title VII lack the force of law, and we cited cases to that effect at ECF 49-1 at page 19. For similar reasons, is not significant guidance that would need to be voted on by the entire commission. As I've just described, this doesn't create new law or new policy. It simply states the holding of *Bostock*, explains what it means to the public, and applies these prior administrative decisions, so it is something that was properly promulgated by the chair.

1          THE COURT:  But I guess in their mind, it didn't even
2     rise to the level of the whole commission to vote on it?

3          MR. HEALY:  Well, unless it is significant guidance,
4     it need not be voted on by the whole commission.  I think the
5     reason it wasn't controversial in this way is because of the
6     fact that it does something that is on its face very
7     uncontroversial and that it describes what the *Bostock* decision
8     does and it describes these prior administrative decisions that
9     have already been the view of the EEOC for a number of years.

10         THE COURT:  Is it controversial to get 20 states to
11    sue them?

12         MR. HEALY:  Politically controversial, but legally
13    uncontroversial in our view.

14         I'd like to address some of the arguments with respect
15    to final agency action.  We heard from the states just now about
16    the test from *Bennett versus Spear*.  We agree with the state
17    that this is a consummation of agencies' decision-making
18    process, but we disagree with the states with respect to whether
19    this actually creates rights or obligations.

20         I'd refer Your Honor to the *Center for Auto Safety*
21    case from the D.C. Circuit which we cited in our briefing.  The
22    D.C. Circuit there examined letters that were issued to
23    automakers that prescribe guidelines for how those automakers
24    could issue regional recalls for automobiles, and the letter
25    stated a set of criteria that if the automakers generally follow

that criteria, the agency believed that it would not have legal
consequences.  And the D.C. Circuit said, well, this wasn't
final agency action because it simply stated a set of criteria,
but it only stated what the agency believed the legal effect
would be as a general matter.  It didn't state specifically what
the outcome would be in particular factual circumstances.

And if you look at the Notice of Interpretation, take
that for an example, in the final several paragraphs of that
interpretation, on page 4 of Exhibit 3 to the complaint is a
good place to find that, it makes very clear that it's not, the
interpretation is not stating what the outcome would be in
particular factual circumstances having to do with bathrooms,
for example.  It says specifically, "We will be applying these
in specific factual circumstances, and we do not purport to
determine the outcome through this interpretation."

I think it's legally incorrect to suggest that the
agency need explain its views on every open legal question about
what Title IX sex discrimination means at once in one document.
The primary purpose of this document is to inform the public
about its views about the sex discrimination prohibition portion
of Title IX in § 1681 and not with respect to how that might
interact with the living, living facilities carved out in § 1686
or how that might interact with its regulations.  Those are
questions that are permissibly, you know, left to another day in
this particular set of fact circumstances where it may be very

1  relevant for the purpose of whether or not discrimination

2  occurred, whether for example, you know, what set of individuals

3  are, are the right comparators for the, for discrimination.

4  For example, a child may be required to attend a

5  health class that discusses certain bodily functions in

6  accordance with the particular body that they have rather than

7  their gender identity.  That might be a fact that the agency

8  would consider when determining whether that policy a school had

9  to require this child to attend health class would be

10  permissible or not, and I use that just as a hypothetical

11  example, but you know, the facts of these particular situations

12  are very relevant here.

13  And the *Center for Auto Safety* recognizes that just

14  because there may be some ancillary practical effect of a

15  particular agency guidance document doesn't mean that that

16  actually has a binding legal effect.  In the *Center for Auto*

17  *Safety* case, the Court recognized that the automakers may see

18  this list of criteria and say, well, we certainly should comply

19  with these criteria if this is what the agency believes the law

20  means, but that didn't mean that that, those practical effects

21  of bringing particular auto manufacturers into compliance meant

22  there was actually a binding legal effect.  And here as

23  Mr. Tomlinson will discuss, there were many, will be many

24  opportunities for any of the states that are subject to a Title

25  IX investigation or enforcement action down the road to bring up

1  these issues and discuss them with, in the context of specific
2  facts.

3          So this is not a final agency action.  In contrast,
4  the *Center for Auto Safety* case was a case like *Hawkes* which had
5  to do with --

6          THE COURT:  Hold on.  I think they just went in the
7  wrong courtroom.

8          MR. HEALY:  It seemed like the wrong courtroom.  So in
9  contrast to the *Center for Auto Safety* case with a case like
10  *Hawkes* in which the Supreme Court was looking at whether
11  specific jurisdictional determinations under the Clean Water
12  Act, and the Court noted that these jurisdictional
13  determinations actually narrowed the set of plaintiffs who could
14  be subject to regulations under the Clean Water Act and actually
15  limited the potential liability of these particular entities.

16          Here, these documents are merely stating that as a
17  general matter, sex discrimination prohibition Title IX should
18  match the Supreme Court's reasoning in Title VII which as I
19  mentioned as a legal matter, I think that should be
20  uncontroversial; but it did something very different in the
21  context of these jurisdictional determinations under *Hawkes*
22  because that actually specifically narrowed the discretion of
23  the particular agency as to how it could bring particular suits
24  under the Clean Water Act.

25          Plaintiffs mentioned that they believe that particular

consequences plainly flow from, from these documents and that
they will be coerced to comply.

THE COURT: Well, I mean, that's kind of the purpose,
isn't it, putting this out there and I guess a shot across the
bow?

MR. HEALY: I think I would disagree with that, Your
Honor. I think the primary purpose of these documents is to
inform the public about the agencies' view of the law, and I
don't think that there's enough information in these documents
to credibly determine how particular factual circumstances would
play out. And if there are actual legal consequences to this
document, those legal consequences will be consequences that
flow from Title IX, not from these guidance documents.

In numerous instances in the briefing, they say, well,
the states will have to comply with these guidance documents.
That's not the case. These, the states will have to comply with
Title IX, and to the extent the documents' interpretation of
Title IX is incorrect and they can't actually persuade a court
that this, this interpretation is correct, then there won't be
any legal consequences whatsoever. So again, I think the
important point here is that this needs to actually arise in a
particular circumstance.

You'll notice -- the argumentation on why these are
interpretive rules not subject to notice and comment is quite
similar. You'll notice that in the states' briefing, they

1  consistently attempt to describe the documents as necessarily
2  requiring certain things with respect to bathrooms and sports
3  facilities and the like.  For example, if you look at ECF 58 on
4  page 23, they note that the documents announce the department's
5  position that refusing to allow transgender students to use
6  living facilities or compete on sports team consistent with
7  their gender identity violates Title IX.  Their briefing is
8  replete with statements like these, and every time those
9  statements are made in their briefing, you'll notice it doesn't
10 appear with any citation, and the reason it doesn't appear with
11 any citation is because that's not what these documents actually
12 do.

13         I refer Your Honor to the *First National Bank versus*
14 *Sanders* case on the question of interpretive guidance.  There
15 the Sixth Circuit determined what the definition of the phrase
16 "default date" meant and SBA loans and determined that merely
17 defining this term as it had in the long-standing way did not
18 actually create new procedures or rules, and there you might
19 even imagine that there would be stronger consequences because
20 it actually, the definition of default date would determine what
21 the payout was for SBA loans that, that were in default, but
22 that's not what the Sixth Circuit found.

23         I'd also refer Your Honor to the *Equity in Athletics*
24 case in the Fourth Circuit which had to do with Title IX and had
25 to do with an agency's promulgation of guidance under Title IX

having to do with gender proportionality in athletics. And the
Fourth Circuit there found that it wasn't a legislative rule
because the agency wasn't actually required to promulgate this
guidance, and I think the same thing is true here. The agencies
were not required to issue these guidance documents. They could
have simply proceeded to investigate allegations of gender
identity or sexual orientation discrimination in the Title IX
context, and if necessary, bring enforcement actions, but they
chose to issue these guidance documents as a means of informing
the public of what the agency's interpretations of the law are.
And it's very important to the public interest that, that
agencies be able to do that as a general matter without taking
the specific steps of how the law would apply in particular
instances to get at what the agency's interpretation is.

THE COURT: So we'll, could they have been motivated
to do this to try to get the states to do something that they
did not think legally they could get them to do later on or they
might lose in Title IX lawsuits?

MR. HEALY: Well, certainly that's nowhere on the face
of the documents that that was their purpose, and I have no
reason to think that that was the purpose. I think that would
merely be speculative. I see nothing in the record that that
would suggest that that was the case.

I think that more likely the agencies' purpose was
they had a Supreme Court decision that was precisely analogous

1  and applied it in a, in a nearly exactly analogous circumstance,

2  and I think it's an important point that on this specific,

3  narrow question which is the purpose of this lawsuit which is

4  what does sex discrimination mean in Title IX, the prior

5  administration's interpretation is on the same page.  And if you

6  look at, I believe it's Exhibit 2 to the complaint, you'll see

7  that although that document takes other steps that these

8  documents don't with respect to how it might apply in bathrooms

9  and etcetera and in religious circumstances, they, the prior

10 administration also agreed that the, in the Title IX context,

11 sex discrimination includes, likely includes sexual orientation

12 and gender identity discrimination.

13          I'd like to very quickly address the constitutional

14 claims, the *Pennhurst* issues unless you'd rather I move on.

15          THE COURT:  No.  I think, I think it's a good time to

16 do that.

17          MR. HEALY:  Sure.  Under *Pennhurst*, Congress must put

18 states on notice that funding is conditioned upon compliance

19 with certain standards, and the parameters of those standards

20 can be permissibly set out in guidance or regulation, and we've

21 cited the *Bennett* case for that.  The -- all that's necessary is

22 the existence and the basic nature of the condition, and that is

23 easily met here.  Indeed, any contrary conclusion would, would

24 essentially mean that all interpretation, all prior

25 interpretations of Title IX and Title VII would similarly fail

1   on the notice requirement.

2           For example, the, in the *Jackson* case, the Supreme
3   Court noted that Congress didn't list any particular
4   applications of the sex discrimination prohibition when it wrote
5   Title IX, so its failure to mention discrimination based on
6   sexual orientation or general identity does not create a notice
7   problem.   Certainly the states couldn't be making the argument
8   that *Jackson* which defined sexual discrimination in Title IX to
9   include retaliation, the states I imagine couldn't possibly be
10  arguing that *Jackson* rendered Title IX unconstitutional, but
11  that's essentially what they're asking this Court to conclude in
12  the context of these guidance documents.

13          To hold, to -- in the states' view I think would
14  require that all these developments of sex discrimination in
15  Title IX over time, retaliation, deliberative difference, sex
16  stereotyping, all these different ways that sex discrimination
17  has been interpreted over the years would similarly be
18  unconstitutional for lack of notice if the states'
19  interpretation is correct.

20          I refer Your Honor also to the *Arlington versus Murphy*
21  case having to do with IDEA.   There was a *Pennhurst* violation
22  because the statute did not even hint that expert fees were
23  compensable under the IDEA.   Here, in contrast to the *Arlington*
24  case, there, the statute is ambiguous on its face.   It simply
25  says that there should not be discrimination on the basis of

sex, and for that reason, the Court has interpreted the term
"over time" to mean different things; and the fact that, that
that interpretation includes sexual orientation and gender
identity discrimination doesn't create a *Pennhurst* problem.

Similarly, similar argument, this document does not
impermissibly coerce the states.  They provide no legal support
for the proposition that coercion occurs where an old statutory
condition is interpreted in a new context, and similarly, that
would, that conclusion would require that a case like *Jackson*
would have rendered Title IX unconstitutional because the
statute doesn't say that retaliation is included within sex
discrimination; and yet the Court found that retaliation is in
fact included within sex discrimination, and there was no
impermissible coercion in a case like *Jackson.*

With respect to the First Amendment and
unconstitutional conditions claim, there is no unconstitutional
condition here.  That doctrine doesn't apply to cases between
two sovereigns.  There are two separate circuit courts that now
agree with that, the *Koslow* case from the Third Circuit and the
*Pace versus Bogalusa* case from the Fifth Circuit.

Even if that doctrine did apply, the states haven't
actually identified how there is an actual First Amendment harm
here.  They merely point to the *Meriwether* case for the fact
that a First Amendment claim might be stated on the, on the face
of a complaint, but that was decided by the Sixth Circuit on a

motion to dismiss.  And the negative implication of *Meriwether*

is that under certain circumstances, there may be a conflict

between the First Amendment interests and the government's

interests under Title IX, and at summary judgment, it may not be

that his First Amendment claim would have won out.

Finally, with respect to the separation of powers and

sovereign immunity and Tenth Amendment claims, plaintiffs

provide no reason why there's any more of a separation of powers

problem than there would be in *Jackson*, unless you have

questions about that.

I will turn this over to Mr. Tomlinson unless you have

further questions for me.

THE COURT:  Not at this time.  Thank you.

MR. HEALY:  I will also be handling the intervention

motion later on.

THE COURT:  Okay.  Yes.

MR. TOMLINSON:  Thank you, Your Honor.  May it please

the Court, Martin Mason Tomlinson for the United States.

Your Honor, with, with the Court's indulgence, I'd

like to spend a few minutes talking about this process, how the

process actually plays out when there's a Title IX complaint

that comes into the Department of Education's Office of Civil

Rights against a recipient of federal funding, because

Ms. Campbell repeatedly used this phrase they have to wait for

the hammer to drop, invoking this proverbial hammer.  And I know

1  we did talk about this in our, briefly in our opposition to the
2  motion for PI, but I do think this touches on a lot of these
3  jurisdictional arguments, the Article III, the ripeness,
4  certainly the adequate alternative remedy.  And so I'd like to
5  walk the Court through that briefly, and I know the Court has a
6  lot to get to today.

7              Your Honor, the operative statutory provisions here
8  are 20 U.S.C. § 1682 and 20 U.S.C. § 1683.  Title IX does
9  require the Department of Education to enforce nondiscrimination
10 provisions in the statute through an administrative process, and
11 to do that, the Department of Education has promulgated a number
12 of regulations that set forth these procedures, and that's
13 34 C.F.R. § 100.6 through 34 C.F.R. § 100.11.  The
14 administrative process generally starts by someone who believes
15 they've been discriminated against by a Title IX recipient files
16 a complaint with OCR, and that's governed by 34 C.F.R. § 100.7.

17             OCR then evaluates this complaint mostly initially for
18 the threshold issues.  There are certain regulations about
19 timeliness, to look to whether the, whether there's actually a
20 Title IX recipient involved in the complaint; and so there are,
21 I believe there are certain conditions on if a minor is making
22 the complaint, they have to have parental consent or parental
23 notification, and so they examine it for procedural issues.

24             If they decide to dismiss the claim, they notify the
25 complainant.  If they decide it will, not to dismiss and they'll

1  open for investigation, they then notify both the complainant
2  and the Title IX recipient that they are opening an
3  investigation.  They then request the appropriate information
4  from the school, interview witnesses, and the complainant.  This
5  is still a fact-gathering posture, and then after all this, if
6  OCR gathers this information and comes to the conclusion that
7  this Title IX recipient is violating nondiscrimination
8  provisions, there's then a statutory requirement under 20 U.S.C.
9  § 1682 and 34 C.F.R. § 100.8 that they try to work out some sort
10 of informal or voluntary compliance before taking any further
11 action.

12      If they attempt to do that and are unsuccessful, if it
13 is successful, they then monitor to ensure there's compliance
14 and then provide them with a letter that the issue is closed.
15 If voluntary compliance is unsuccessful, they then have two
16 options.  One, they can either refer it to DOJ to bring an
17 affirmative action or they can initiate administrative
18 enforcement proceedings, and it's at this step of the process
19 that we actually talk about sort of an affirmative enforcement
20 action, and that's governed by 20 U.S.C. § 1682 and
21 34 C.F.R. § 100.8(a).

22      If the administrative proceedings are initiated, the
23 Title IX recipient is then entitled to a hearing before an ALJ,
24 and if there's still an adverse decision there, they're entitled
25 to an administrative appeal of that ALJ.  And they can then --

if it's still an adverse decision after that, they can then seek
a discretionary review by the Secretary of Education.  And if
after all that there's still an agency decision that, a finding
of fact that there's been a violation of a Title IX
anti-discrimination provision, the school then, the school or
Title IX recipient then has the option of complying with that
decision to still receive the funding.

    If they still wish to contest it further, they then
have the right to seek judicial review in an Article III court
under § 1683.  As Ms. Campbell noted, § 1683 actually contains
an implicit reference to the judicial review provision for
similar actions which is withholding a funding which is I
think -- I apologize.  Let me get this.  20 U.S.C. § 1234(g),
1234(g) actually sets forth the judicial, the exact judicial
review provisions, and I believe it, it allows them to seek
review of the final agency action in the Court of Appeals in
which they are located within either -- sorry.  Let me make sure
I get this right.  It's 30 or 60 days.  I apologize for not
having that handy, Your Honor.  I believe it's 60 days.  Yes,
shall within 60 days of that action filed within the United
States Court of Appeals.

    And 20 U.S.C. § 1682, Your Honor, also contains a
specific provision at the end of that statute that says the
Department of Education cannot terminate funding until 30 days
after reporting the final decision of termination to committees

1  of both houses of Congress and waiting 30 days.

2  And so when the plaintiffs, the plaintiffs invoke

3  cases like *Sackett* which involved --

4  THE COURT: What you just walked through was the

5  process when, for challenging the enforcement of a Title IX

6  claim. What about, what about a state that wants to challenge

7  these rules?

8  MR. TOMLINSON: Well, Your Honor --

9  THE COURT: This interpretation of the law that they

10  put forth?

11  MR. TOMLINSON: Your Honor, the process is the same,

12  because it's important for this Court to realize what Title IX

13  is and what Title IX isn't. Title IX is a education funding

14  program, and these anti-discrimination provisions provide

15  conditions and limitations on that funding, and so what we're

16  talking about here is whether or not these recipients get

17  funding. That's what Title IX is about, and so we're not

18  talking about a criminal action or civil penalties, and so the

19  core issue here is, both in the abstract and specifically in

20  this case, will they have the opportunity to present all the

21  arguments they're making here before these decision makers.

22  Will they be able to challenge the validity and the

23  interpretation and challenge the validity of this rule, and they

24  will, and I don't even think they dispute that they won't be

25  able to. They can raise all the arguments, the substantive

1  arguments they're raising here in court before -- they can
2  attempt to raise this as part of a voluntary compliance process,
3  they can attempt to raise this before the ALJ, they can attempt
4  to raise this on the administrative appeal, they can attempt to
5  raise this before the secretary, they can attempt to raise this
6  before either or both of houses of Congress.  And if all that
7  fails, they can attempt to raise their, the problems they have
8  with, again, either specifically in this case or in the
9  abstract, you can raise problems with the interpretation of a
10 Title IX discrimination provision before an Article III court;
11 but the key here is do they have the opportunity for meaningful
12 review.  Does this process provide them with the opportunity for
13 meaningful review.

14            THE COURT:  Do they have to do it that way or can they
15 do it now?

16            MR. TOMLINSON:  They have to do it that way, and if
17 Your Honor wants to jump into the --

18            THE COURT:  I don't want to take you out of order.  I
19 just --

20            MR. TOMLINSON:  And so, Your Honor, thank you for
21 indulging me in walking through, the Court through that, but I
22 do think when I hear the state talk about this hammer dropping
23 and invocation of *Sackett* which is the case where essentially
24 the plaintiffs just got a compliance order saying you owe us X
25 amount of money and penalties are accruing every day, it's very

1  distinguishable from what, here.  This is a very robust process
2  that is provided to them to raise.  Again, the key point is they
3  can raise all of these arguments before multiple decision makers
4  in both the agency and Article III courts, and that's been
5  provided to them by Congress and --

6          THE COURT:  In *Sackett*, the EPA was fining them
7  already, right?  Was it $25,000 a day?

8          MR. TOMLINSON:  Your Honor, I was confused.  It was
9  either $37,500 or there was some talk that it could double to
10  $75,000 a day.

11          THE COURT:  75, whatever it was.  But it, but that was
12  already taking effect.

13          MR. TOMLINSON:  That's correct, Your Honor, and it's
14  important to note the difference between these schemes, because
15  the EPA in that scheme, in that case actually had complete
16  discretion to choose one of two options.  The EPA could either
17  just issue them a compliance order or the EPA could initiate an
18  enforcement action.  The EPA didn't actually have to initiate an
19  enforcement action to assess this penalty, and in that case they
20  didn't.  They just handed them a compliance order, and in fact,
21  the *Sackett*s actually requested a hearing to see if they could
22  talk to the agency about that and it was denied.

23          And so that, that sort of summary process by which the
24  Sacketts in that case had no meaningful opportunity to present
25  their arguments before either the agency or an Article III court

is extremely distinguishable from this case, 'cause as I just
walked the Court through in what I hope was helpful detail,
there are multiple steps along this way set up by the statutes
and regulations here.

Your Honor, Ms. Campbell also said with regard to the
interests here, especially the sovereignty interests, I believe
she said you can't get much more concrete than this.  Your
Honor, you can get a lot more concrete than this, and we know
you can get a lot more concrete than this because we have a lot
of case law showing how this actually plays out in certain other
cases when courts do find that there's standing, and it's worth
distinguishing those from what we have here.

They have not said that they intend to engage in
conduct which violates Title IX or Title VII as they understand
it.  The states have not said that they're currently involved in
any enforcement action in which an agency has found or might
find that they've violated Title IX or Title VII, certainly as
it relates to these guidance documents.  They haven't said that
any agency has specifically notified them or threatened them
with either a loss of funding or an enforcement action, and they
haven't actually said -- they invoke this idea of state
sovereignty, and they talk about it a lot, about how this is
certainly an impending threat to state sovereignty; but for all
this, it seems, the most concrete thing I heard Ms. Campbell say
about what this injury to state sovereignty is now, she said it

1  was already occurring, the two examples she gave was they had,

2  there was public pressure on them to change their laws which

3  seems like it might not even be connected to these guidance

4  documents, and she made a vague claim of regulatory confusion.

5  Those are high level generality, abstract, nonspecific harms

6  that are not sufficient to satisfy Article III, Article III's

7  requirement that there be a certainly impending concrete harm.

8  And we'd note, Your Honor, as Your Honor said, there's 20

9  states --

10            THE COURT:  Well, I'm sorry.  What about the chilling

11  effect that she talked about?  I mean, isn't that, that

12  basically the mere fact that these have come out interferes with

13  the sovereigns, their sovereignty and their ability to enact

14  their own laws; the fact that the, that the Department of

15  Education and the EEOC have come out and basically, their

16  position, legislated a new meaning to these laws and to, that

17  they're now forced to comply with?

18            MR. TOMLINSON:  No, Your Honor, it's not.  I'm not

19  sure -- chilling effect is generally a First Amendment issue

20  which I'm not sure how it arises here.

21            THE COURT:  Maybe I didn't phrase it correctly, but I

22  think you understand what I mean.

23            MR. TOMLINSON:  Yes, Your Honor, and Your Honor, as

24  Your Honor noted, there's 20 states here as plaintiffs.  You've

25  seen the signature blocks.  All these states and all these

54

```
 1    lawyers, they haven't made a single concrete example.  They
 2    could say, well, our state, we were going to do X.  We were --
 3    here's a declaration.  We were going to, you know, we were going
 4    to pass this law, like, we were going to do X.  Our regulatory
 5    bodies were going to do X.  They were all set to do this, but
 6    they couldn't.  They were somehow prevented.  Even that probably
 7    wouldn't be enough because it seems like that's a voluntary
 8    decision they're making in response to this nonbinding document,
 9    but they haven't even done that.  They raise sort of this
10    specter of state sovereignty.  They make these broad arguments
11    that it's somehow harming them without actually providing any
12    sort of specific examples of anything they've been prohibited
13    from doing or restrained from doing or threatened to not doing.
14    There's simply no allegation whatsoever of that.
15              And as I mentioned, in terms of how concrete we can
16    get, I went through examples of things they haven't done.  I
17    think it's worth spending a few minutes talking about the cases
18    they cite in support of their state sovereignty argument because
19    that, that shows what is required to get to the level of
20    standing based on state sovereignty that just is not the case
21    here.
22              First of all, Your Honor, they, they cite to this
23    *Massachusetts versus EPA* case quite a bit.  That was a case
24    that's very distinguishable from this case.  That was a case
25    where the State of Massachusetts sued the EPA over the EPA's
```

1  decision not to regulate auto emissions under the Clear Air Act.
2  The Court held there was an Article III standing, but that case
3  was very unique, and certainly like the Court to review that
4  case closely because the statutory structure there was very
5  different.  Specifically, there was this statute § 7601 by which
6  Congress specifically enlarged Article III standing with regard
7  to those types of petitions under the Clean Air Act, and the
8  Supreme Court itself said that that enlargement of standing was
9  of critical importance to the standing inquiry because it quote
10  allowed Massachusetts to bring a challenge quote "without
11  meeting all the normal standards for redress of ability and
12  immediacy."  And that was the Court, that was where the Court
13  said in that specific circumstance based on that statutory
14  provision, because Massachusetts had shown some possibility that
15  they might change the decision maker's mind, it was sufficient.

16  In their briefs, plaintiffs cite that language as
17  being sort of a, as generally applicable to Article III, but of
18  course it's not.  It was in that specific statutory context, and
19  Your Honor can imagine, if the general standard for Article III
20  standing was if we bring this suit we might change somebody's
21  mind, it would be the exception that completely swallowed up all
22  the Article III rules 'cause anybody could claim that at any
23  time.

24  They also cite the Sixth Circuit decision in *Ohio ex*
25  *rel. Celebrezze.*  I apologize if I -- that case was a long time

ago, so hopefully I didn't mangle anybody's name who will still be offended, but that was a case where the State of Ohio had a statute, a state statute that required anyone transporting nuclear materials through the state to provide them with notice and get approval before doing so. The federal government then passed a statute that says, that essentially preempted the entire field of moving nuclear materials and specifically had a provision that said any state statute that requires notification is hereby preempted. And so there you had a literal federal statute targeting the Ohio statute saying your statute is preempted.

Similarly, the *Wyoming ex rel*. *Crank* case from the Tenth Circuit, that was a case in which the State of Wyoming had a statute that purported to expunge domestic violence convictions under, almost automatically under a lot of circumstances for the purposes of allowing citizens of Wyoming to purchase firearms without violating § 922(g). ATF specifically sent Wyoming a letter saying we don't acknowledge this, we don't recognize this. Expungements under your state statute are null and void for the purposes of § 922(g) which essentially gutted the purpose of the law.

And so those are situations in which state sovereignty can be sufficient for Article III standing, where there's a specific federal action that directly targets a statute or state action, and there's no question that, that the state statute is

1  essentially null and void.

2  What we have here, even in plaintiffs' own language in
3  the briefs, they say, you know, at least arguably conflict.  And
4  they come up with these possible hypothetical scenarios in
5  which, well, if you know, if this happened and then OCR
6  investigated, then this possibly could conflict with our state
7  law.  And they're not -- it's not that they're completely wrong
8  about that, but it's just that we're so early in the process,
9  and this dovetails with the ripeness inquiry as well.  It's two
10 speculative, it's too general, and especially given the fact
11 specific nature of these anti-discrimination investigations,
12 it's simply not appropriate for this Court not to let it play
13 out.

14 I also did just very briefly want to talk -- they cite
15 to the *Susan B. Anthony List* case a lot for the idea that
16 because, that essentially enforcement of an action might be
17 certainly pending.  That was a very different case 'cause that
18 involved a case where the State of Ohio's, the election
19 commission that was charged with enforcing this law had
20 specifically brought an action against Susan B. Anthony List
21 before, and Susan B. Anthony List was saying you're going to do
22 the exact same conduct in future elections.  So it was very
23 clear there was a collision course there, but even, even then,
24 and this language is very important, even then the Court said,
25 explicitly was not deciding whether that alone would be enough.

```
 1  That was a statute that involved possible criminal penalties,
 2  and so Justice Thomas's opinion said, "Although the threat of
 3  commission proceedings is a substantial one, we need not decide
 4  whether that threat standing alone gives rise to an Article III
 5  injury.  The burdensome commission proceedings here are backed
 6  by the additional threat of criminal prosecution.  We conclude
 7  that the combination of those two threats suffices to create as
 8  an Article III injury under the circumstances of this case."

 9        Here, as we just discussed, Article IX or Title IX
10  rather, excuse me, is essentially a funding provision.  We're
11  not talking about criminal actions.  We are not talking about
12  civil penalties.  We're talking about conditions on education
13  funding.

14        Your Honor, they also mention financial harm in the
15  form of lost funding.  As we discussed, there would be plenty of
16  opportunities to them, for them to contest loss of funding.
17  It's certainly not concrete or certainly imminent especially in
18  light of the fact that there's no, no pending investigations or
19  enforcement actions that they can point to and no threat that
20  such actions.

21        On the parens patriae action, Your Honor, plaintiffs
22  conflate two lines of cases.  There's a line of cases generally
23  dealing with the states' parens patriae right to bring suit on
24  behalf of its citizens.  *Massachusetts versus Mellon* is still
25  good law for the principle that a state cannot bring a parens
```

1  patriae action against the federal government, and it makes
2  sense, Your Honor, because citizens of the State of Tennessee
3  are also citizens of the, citizens of the United States, and
4  both entities have an interest and responsibility in looking out
5  for their citizens.

6  Your Honor, on ripeness, as Your Honor knows, the case
7  law says that unquestionably overlaps with the Article III
8  inquiry.  I won't belabor the point because I feel like I've
9  been talking about this for a while unless Your Honor has
10 specific questions.

11 I do know that the Sixth Circuit has spoken about this
12 in the *Warshak* case and I think has, you know, specifically said
13 that answering difficult legal questions before they arise and
14 before the courts know they will arise is not the way we
15 typically handle litigation.  And they also note that is the
16 two-factor test, they -- the two questions they ask is is the
17 claim fit for judicial decision in the sense that it arises in a
18 concrete factual context and concerns of dispute those likely to
19 come to pass, and what is the hardship to the parties of
20 withholding consideration.  And Your Honor, here they've offered
21 some speculative, hypothetical examples of context in which
22 these disputes might come to pass, but it's not concrete, and
23 there's simply not a hardship to them for waiting until a
24 concrete dispute arises.

25 Then also just briefly, cite the Court to the *Sierra*

1   *Club* case which really is similar to this in a lot of respects.
 2   That case involved a lawsuit by the Sierra Club against the
 3   National Forestry Service based on a broad, general plan to open
 4   this national forest up for some cutting.  The Sierra Club
 5   thought it would allow for too much clear cutting so they
 6   brought an action, but the actual regulatory regime that
 7   required the National Forestry Service, before they did
 8   anything, before they took any concrete action to actually come
 9   up with and announce site specific plans for exactly how many
10   trees they were going to allow to cut and at which point the
11   Sierra Club or any other interested party would have a chance to
12   voice an objection.

13           There, because you had this sort of general plan but
14   also the fact specific determinations that were necessary before
15   any actions were taken, the Court held that it wasn't ripe
16   because they'd still have the opportunity to raise those
17   arguments in a fact specific context.

18           Your Honor, briefly on the adequate alternative remedy
19   point, again, we discussed the *Sackett* case.  That seems clearly
20   distinguishable.  They also cited a District of Alaska case in
21   *Furie* which involved a similar procedural situation and arose
22   under the Jones Act, and I think the Department of Homeland
23   Security essentially assessed a fee against this person without
24   giving him an opportunity to contest that fee or seek judicial
25   review.

1  Here this is much closer to the Sixth Circuit decision

2  in *Haines*.  In that, the *Haines* case, this was the case that

3  involved the bus driver who had converted the bus, the passenger

4  compartment or converted the luggage compartment to a passenger

5  compartment and was issued a notice to take that off the road,

6  but because -- and trying to bring a suit under the APA -- but

7  because the statutory regime there which is very similar to the

8  statutory regime here procedurally gave him an opportunity to

9  first contest that decision with the Federal Motor Vehicle

10  Safety Administration, Motor Carrier Administration, and then if

11  that failed to seek review in an Article III court.  The Court

12  held that because, because he had the opportunity for meaningful

13  review both before the agency and before an Article III court,

14  that was sufficient to displace an APA claim.

15  You know, finally, Your Honor, on the jurisdictional

16  stuff, *Thunder Basin*, you know, the key there is whether it's

17  fairly discernable.  The Court listed several factors in that.

18  They really seem to emphasize the final factor which was whether

19  it offered the opportunity for meaningful review, and here

20  given, given the process that I walked the Court through, it

21  seems very clear that there's a, that there's a process that's

22  been created by Congress to adjudicate these Title IX

23  anti-discrimination decisions; and it seems there's certainly a

24  fairly discernable intent by Congress for people to follow those

25  provisions instead of trying to essentially jump the line and

1  seek pre-enforcement review, especially in a situation like this

2  when we're talking in the abstract.

3          THE COURT:  What about with regard to Title VII?

4          MR. TOMLINSON:  So Title VII, Your Honor, Title VII,

5  the, our *Thunder Basin* -- the short answer, Your Honor, is our

6  *Thunder Basin* argument is only with regard to Title IX, that

7  Ms. Campbell said, and we certainly agree with that.  Title VII

8  doesn't have the same applicable sort of statutory framework

9  here, and in fact Title VII, the EEOC cannot bring suits against

10  states, and so that's another reason tying back to the core

11  Article III inquiry that there's no certainly impending harm.

12  They don't have the right to sue states, so but yes.  Yeah.  To

13  clarify, the *Thunder Basin* argument only applies to Title IX and

14  not Title VII.

15          Your Honor, unless you have any other questions on the

16  threshold issues, I just briefly want to talk about the

17  injunctive factors, Your Honor, most particularly irreparable

18  harm or as Your Honor noted, there's case law that irreparable

19  harm is indispensable in any preliminary injunction inquiry.

20  There's also case law showing that the burden for showing

21  irreparable harm is even higher than what is required to

22  establish Article III standing.  So we largely fall back on the

23  Article III arguments we've made, but the, obviously the

24  thresholds are even higher.

25          And you know, as the Court in the *Sumner County School*

1  District Court case held, you know, quote, "If the plaintiff
2  isn't facing an imminent and irreparable injury, there's no need
3  to grant relief now as opposed to the end of the lawsuit."  And
4  here as Ms. Campbell conceded, they're not aware of any
5  investigation.  They filed this PI motion two months ago.  As
6  far as we know, nobody's been able to come forward with any sort
7  of specific concrete action threatening any of the plaintiffs.
8  There's just no imminent and irreparable injury here.

9         And as Your Honor, Your Honor -- I'm sure Your Honor
10  is well aware of this issue because Your Honor decided a case on
11  Friday, the Bilyeu case involving irreparable harm, and this
12  Court wrote, (As read) "Under Sixth Circuit precedent,
13  plaintiffs must demonstrate certain and immediate irreparable
14  harm for the grant, of preliminary injunction to be granted,"
15  and that the Court also noted that for something like, I think
16  it was the loss of health insurance in that case remains only a
17  possibility.  That was not sufficient for irreparable harm.  The
18  Court also discussed under certain circumstances when there was
19  still a final decision to be made that that was too speculative
20  to form the basis of irreparable harm.

21         And also on irreparable harm, Your Honor, because
22  we're talking about essentially a funding statute, it's not
23  clear why, even if this harm -- regardless of how severe this
24  harm would be, why it wouldn't be reparable, especially given
25  the process as I walked the Court through.  A lot of steps have

to happen before there's any loss of funding, and at the end of
that process, there's an opportunity for Article III review
presumably where you could seek some sort of relief, seeking the
restoration of such funding. And as the *Johnson* case said, "The
possibility that adequate compensatory or other corrective
relief will be available at a later date weighs heavily against
an irreparable harm claim."

And then just finally, Your Honor, on the public
interest, balance of equities, because of all these, the
speculative nature of their harm, there's no, there's no real
public interest that they've articulated in resolving this now
as opposed to waiting where there is a strong public interest in
broadly enforcing anti-discrimination laws but also for these,
the EEOC and the Department of Education to provide the public
with notice of how the agency understands anti-discrimination
statutes.

And finally, there's a strong public interest in
actually allowing the agency to see how these play out in
reality to determine how statute and the interpretation of the
statute are actually going to be applied to individual's
circumstances before an Article III court comes in to, to get
involved in those decisions.

And Your Honor, I think that's all I have for you
right now. I'm happy to answer any questions.

THE COURT: So on irreparable harm, states' argument

1    on injury to their sovereign interests, that that's irreparable?

2    MR. TOMLINSON:  Well, again, Your Honor, it's so

3    abstract and theoretical.  It goes back to the sovereignty point

4    on the Article III analysis.  Even assuming that could be

5    sufficient under some circumstances, here when there hasn't been

6    a threat to any statute, there hasn't been a preemption of any

7    statute, there hasn't been some sort of notice provided to them

8    that they have to stop enforcing this statute and they haven't

9    been able to sort of point to any specific action that they've

10   had to take in violation of the statute or they've wanted to

11   take in pursuance of the statute that they haven't been able to

12   take, it's simply insufficient for, as the Court -- as the case

13   law says, there's a higher standard for this, there's a higher

14   standard for irreparable harm than under Article III standing.

15   And to simply be able to sort of wave your hand and say, well,

16   this is a threat to our state sovereignty without actually

17   having to provide some sort of a concrete, imminent threat for

18   why this Court needs to step in now and stop this is simply not

19   sufficient under the law.

20        THE COURT:  Ms. Campbell?

21        MS. CAMPBELL:  Thank you, Your Honor.  I want to begin

22   by addressing defendant's argument that sovereignty interests

23   are just abstract and theoretical.  Your Honor, I can assure you

24   that sovereignty interests are not abstract and theoretical to

25   the state legislatures who enacted the laws that we cite in

1  paragraph 99 of our complaint.  They are not abstract to the
2  state officials that are charged with enforcing and
3  administering those laws.  They're not abstract to the regulated
4  entities that are facing conflicting laws from the state and the
5  federal court.  There's nothing abstract about that, and I think
6  it's really important too to underscore just the contrast
7  between what the agencies are communicating to regulated parties
8  and what you're hearing from defendant's counsel today.

9          You know, we cite in our preliminary injunction reply
10  brief a video that was, you know, put out by the agencies, a
11  Back to School message that in no uncertain terms said
12  preventing a transgender student from using the restroom or
13  competing on a sports team that corresponds to their gender
14  identity is unlawful, and that, you know, they are ready to
15  defend the rights of transgender students.  That is a very
16  different tune from what you're hearing from defendants' counsel
17  today, that, you know, this is all just speculative and it
18  depends on the facts.

19          You know, I've really heard nothing that would
20  indicate that the laws that states have and the policies that
21  many of the plaintiff states have right now with respect to
22  transgender participation in sports, for example, that requires
23  that students be assigned to sports team based on their
24  biological sex, haven't heard anything suggesting that there are
25  factual circumstances, you know, specific facts that would lead

1    the agencies to conclude that such a law is not a violation of
2    Title IX; and in fact, they've taken exactly the opposite
3    position in the West Virginia case in their statement of
4    interest, that that law is a violation of Title IX.  So there's
5    nothing abstract about the conflict here between the states'
6    laws and policies and the guidance, both the, you know, the
7    Department of Education guidance and the EEOC guidance.

8            THE COURT:  Well, has this kept the states from doing
9    anything that they otherwise would have done or made them to do
10   something that they didn't want to do?

11           MS. CAMPBELL:  Your Honor, you know, I'm not able to
12   tell you about the intentions of the individual legislatures or
13   the individual legislatures as to what they would have done in
14   the absence of this guidance.  You know, I can't really speak to
15   that.  You know, I can say that plaintiffs are being put to this
16   untenable choice of, you know, figuring out are we going to keep
17   enforcing our laws, or you know, risk enforcement actions.

18           And I'll note too that in describing this enforcement
19   scheme, administrative enforcement scheme that exists with
20   respect to a funding determination in the Title IX context, you
21   may have noticed that, you know, throughout that description,
22   the focus was on compliance, compliance, compliance.  That is
23   how that whole process is used is to get regulated entities to
24   just comply with what the agency says the law is.  And that is
25   why pre-enforcement review of this sort to the agency's guidance

1 which amounts to a legislative rule is so important, because
2 having to raise that as a defense in these lengthy
3 administrative enforcement proceedings that almost always result
4 in, you know, the entry of a voluntary compliance order is not a
5 meaningful, adequate remedy within the meaning of the APA.

6 So we think that we've satisfied the requirements for,
7 you know, the Article III requirements for bringing this action,
8 we've satisfied the irreparable harm requirement for getting a
9 preliminary injunction, and we've satisfied the APA's
10 requirements for final agency action and no adequate remedy.

11 I do want to respond to a few specific points that
12 were raised. You know, first, with respect to the EEOC
13 document, I think defendant's counsel took the position that
14 this is uncontroversial legally, and that's why the EEOC
15 technical assistance document isn't a legislature rule and it
16 isn't a significant guidance document within the EEOC's
17 regulations. You know, I think numerous courts, judges on the
18 Federal Court of Appeals would be surprised to hear that this is
19 uncontroversial legally. You know, the *Grimm* decision out of
20 the Fourth Circuit which involved Title IX had a strong dissent
21 by Judge Niemeyer. You may know that the Eleventh Circuit in
22 the *Adams* case which also involved Title IX and a restroom
23 policy, that, you know, the Court granted an en banc review in
24 that case. The case is pending before the en banc court. There
25 was a strong dissent at the panel stage, so the Federal Court of

1  Appeals I think certainly don't view that issue as one that is
2  legally uncontroversial.  I think it's quite controversial, you
3  know, setting aside the political controversy which obviously
4  exists, but I think, you know, legally that's a controversial
5  matter as well.

6  The defendants point to the *Center for Auto Safety*
7  case.  They rely heavily on that in their briefs as well, but
8  you know, that case actually supports our position.  The D.C.
9  Circuit said in that case that, "Finality can exist when an
10 agency threatens enforcement of a policy guideline if the
11 guideline is binding on its face or in practice," so again, the
12 focus is on the practical effect.  And here given the, you know,
13 the threat that this will be fully enforced, guidance will be
14 fully enforced.  And again, I've heard nothing from defendant's
15 counsel to disavow enforcement, and all indications are actually
16 to the contrary, that they fully intend to enforce this
17 guidance.

18 You know, another reason why this is, these documents
19 are legislature rules and not interpretive rules is in the Title
20 IX context specifically, they conflict with the agency's
21 existing regulations concerning living facilities and which
22 include bathrooms and locker rooms and athletics, and the Sixth
23 Circuit has held in the *Azar* case that when guidance conflicts
24 with the agency's existing regulations, that guidance is
25 necessarily legislative or that rule is necessarily legislative,

1   so that's another reason why it is legislative.

2          And then another feature of this that is important is
3   that even if the guidance purports not to bind regulated
4   parties, it does bind the agency itself, and that is a
5   significant factor in the administrative law, you know, case
6   law, especially the D.C. Circuit case law; that when something
7   binds the agency itself that that, that legal consequences will
8   flow from that.  And I've heard, again, nothing to the contrary
9   from my friend on the other side as to why this doesn't apply to
10  the agency.

11         Moving to the -- well, just briefly on the, whether
12  there's a threat of enforcement, defendants' counsel pointed to
13  criminal penalties, that *Susan B. Anthony List* that involved
14  criminal penalties, and the Sixth Circuit has made clear that
15  criminal penalties are not required.  And we do not cite this
16  case in our brief, but I will provide it to the Court.  It's
17  *Kiser versus Reitz*, 765 F.3d 601.  It's a 2014 case I believe
18  where the Court specifically said the threat need not stem from
19  a criminal action.

20         And you know, the -- we point to a number of factual
21  distinctions between this case and some of the cases cited in
22  our brief.  You know, there may not be a case on all fours, but
23  what's important in the credible threat of enforcement context,
24  irreparable harm, I mean, all of that, it's a very contextual
25  inquiry.

1  You know, the courts in those cases never indicated
2  that one thing or the other was dispositive, you know, that the
3  fact in some of these cases that the guidance, the challenged
4  federal action, you know, specifically said the state law was
5  preempted, or you know, that there may have been a determination
6  of probable cause or something like that.  That was part of the
7  contextual inquiry, but none of those things were dispositive,
8  and you know, we cite a number of cases in where courts have
9  allowed states to sue the federal government to vindicate their
10 sovereign interests.

11       And you know, again, there's nothing abstract about
12 conflict here.  We're not required to admit that we're violating
13 the law.  Nothing in the case law requires us to do this, and I
14 think Your Honor can understand why maybe we'd be hesitant to
15 say that, but I think that we, our policies and laws are in
16 conflict with what the agencies say the law is.  There's really
17 no way around that, particularly when you look at the athletics
18 laws that require that participation be based on biological sex,
19 and the agencies have taken the position that preventing a
20 transgender student from competing consistent with their gender
21 identity is unlawful discrimination.  I don't see how you
22 reconcile those things.

23       So the fact that the guidance doesn't specifically
24 say, you know, hey, Tennessee, your law violates this or your
25 law is preempted, that's not necessary.  I mean, that is an

1  obvious implication of the agencies' guidance.

2  I'm turning to our substantive APA claims which I
3  didn't really address earlier, but I do want to address the
4  clear notice point at our *Pennhurst* argument.  The defendant's
5  counsel points to the *Jackson* case, you know, which recognized
6  retaliation claims.  I think that's a very different situation
7  where you have a general prohibition on discrimination that, you
8  know, may later be interpreted to include different kinds of
9  discrimination.  I think what's really critical about Title IX
10 in particular is that you have § 1686 which addresses this
11 specific, the specific issue of living facilities, bathrooms,
12 lockers rooms, other things of that sort.  In light of that
13 specific statutory language that, you know, told educational
14 institutions, hey, there is a safe harbor here.  Nothing about
15 this prevents you from maintaining separate living facilities
16 for the different sexes.  You can't say that states would have
17 had clear notice that Title IX would prohibit them from doing
18 that, at least in the instance where you have a transgender
19 student who wants to use the restroom that corresponds to their
20 general identity rather than their biological sex.

21 I think defendants misunderstand our unconstitutional
22 conditions argument a bit.  The cases they cite which involve,
23 you know, the state not being able to assert that against the
24 federal government, those involve situations where the state is
25 saying hey, federal government, you're depriving us of our

constitutional rights. That's different from the situation we
have here. What *South Dakota versus Dole* recognized is that the
federal government cannot condition federal funding on requiring
the states to violate, the states themselves to violate the law,
so it's not about whether the states are giving up their own
constitution rights. It's about the whether the federal
government can force the states as a condition of receiving
funding to themselves violate the law. So that's the principle
that we're invoking here, and that's why I think *Meriwether* is
so important, because *Meriwether* recognizes that at least in
some instances, the guidance's position on pronouns would
present a conflict with the First Amendment and could require
the state to trample on its citizens First Amendment rights in
that respect at least.

On the point about whether, you know, the EEOC has
enforcement authority against the states, you know, it may be
that the EEOC cannot initiate enforcement actions against the
states. It can, however, investigate state entities, state
defendants. It can enter into reconciliation agreements with
state defendants, and you know, also defendants in the suit
include the DOJ officials who can bring suits against the state.

As to whether, you know, the EEOC document is just
interpretive because you have these prior adjudications, and
really only one of the adjudications, *Lusardi*, addresses
bathrooms and pronouns. You know, I think that's a real stretch

1  to say that just because the agency itself has previously
2  reached that conclusion in an administrative adjudication that
3  that somehow means, you know, when it announces that more
4  broadly to bind the agency and to apply to employers across the
5  country, that that's just restating existing law.  No.  All it's
6  stating is the agency's prior case specific conclusion.  You're
7  still -- you know, that doesn't mean that you're just, you're
8  just interpreting the statute, because that decision itself
9  misinterprets Title VII and changes the substantive law.  The
10 guidance is still a substantive rule that was issued in excess
11 at the EEOC's statutory authority.

12         And then I'll end just by addressing the public
13 interest since I didn't discuss that earlier.  I think the
14 public interest would clearly be served by a preliminary
15 injunction in this case.  I'd refer to the regulatory
16 uncertainty that the guidance creates.  You know, it's a little
17 ironic that they say on the one hand that it's helpful for
18 regulative parties to know what the agencies' views are.  In
19 fact, I think issuing this guidance in the way that they did,
20 you know, as purporting to, you know, be the agencies'
21 definitive position on this, I mean, that really creates a lot
22 of regulatory uncertainty for entities that are facing, you
23 know, conflicting state and federal laws, that they have to
24 figure out, you know, how and whether to comply with.
25         So I think putting this on hold while this case

1  proceeds to the merits would have the benefit of giving
2  regulated entities some certainty, and you know, even if the
3  state doesn't have, the states don't have the authority under a
4  parens patriae theory to directly assert the interest of their
5  citizens and students and employees, I think those harms that
6  are at issue here are clearly relevant to the public interest
7  and whether the public interest would be served by a preliminary
8  injunction preventing enforcement of the guidance.

9       So for all of those reasons, we do ask the Court to
10  grant our preliminary injunction motion and deny the motion to
11  dismiss, and I'm glad to answer any other questions the Court
12  has.

13       THE COURT:  Any response?

14       MR. HEALY:  I do have a couple of points in
15  response.

16       MS. CAMPBELL:  Thank you, Your Honor.

17       THE COURT:  Thank you.

18       MR. HEALY:  I have just a few points in response, and
19  I believe Mr. Tomlinson also has one or two.

20       First, with respect to the amicus brief filed in the
21  West Virginia case, I think that essentially makes defendants'
22  point, that this has to apply in a particular factual
23  circumstance.  In that case, there were particular facts having
24  to do with the harms to a particular individual that applied in
25  that circumstance, and so I don't think the fact that the

1  government filed an amicus brief taking a position in that case
2  defeats any arguments in this case.

3      I'd also mention that that case appeared in the,
4  within the Fourth Circuit that has decided these questions
5  already in *Grimm*, so that precedent is relevant with respect to
6  the West Virginia case.

7      Regarding my use of the, my potential overuse of the
8  phrase "uncontroversial" with respect to Title VII, I only meant
9  to say that the question is uncontroversial with respect to the
10  EEOC because *Bostock* decided the question in the context of
11  Title VII which is what the EEOC document refers to and the
12  administrative decisions that, that the EEOC document refers to
13  as well have been decided for a long time.  There's a separate
14  question of even whether they could challenge these old cases
15  from prior years under the APA.  There's an APA statute of
16  limitations for six years, so it's not clear whether they can
17  even bring a challenge to those old interpretations.

18      With respect to whether these documents conflict with
19  existing regulations and whether they bind the agency, I would
20  just repeat the point I made earlier that the question of
21  whether and under what circumstances they would conflict with
22  agency regulations or how the, any potential legal conflict
23  would play out down the road is simply not a question that is
24  addressed in these documents, and it's not unlawful or arbitrary
25  or capricious for the agency to answer the narrow question here

1  without answering the question of how it would, would play out
2  in other legal circumstances or in a particular situation having
3  to do with bathrooms or under § 1686 which is in the statute
4  unlike the bathrooms and athletic facilities.  Those are
5  potentially hard legal questions that the agency need not answer
6  all at once.

7          With respect to whether it binds the agency, I would
8  refer Your Honor, again, to the language of the specific
9  document.  I'll just read it for the record.  The document
10 itself on page 4 says, "While this interpretation will guide the
11 department in processing complaints and in conducting
12 investigations, it does not determine the outcome of any
13 particular case or set of facts.  Where OCR's investigation
14 reveals that one or more individuals has been discriminated
15 against because of their sexual orientation or gender identity,
16 the resolution of such a complaint will address the specific
17 compliance concerns or violations identified in the course of
18 the investigation."

19         So there is an amount of fact finding and legal
20 determinations that would have to occur in the context of an
21 investigation, and disallowing the agency from stating at a high
22 level of generality what they believe the law means would pose a
23 problem.

24         With respect to *Jackson*, the *Jackson* case with respect
25 to *Pennhurst*, counsel mentioned that there's a safe harbor in §

1686.  I agree.  Again, my point is only that this document
doesn't say anything about how and under what circumstances
§ 1686 would or would not conflict with this interpretation, and
there isn't any requirement for the agency to do that.

With respect to unconstitutional conditions, even if
the plaintiffs' reading of *South Dakota versus Dole* is correct,
and I think the *Koslow* case is very clear that, that it's not
correct and that this doesn't apply in cases between two
sovereigns, they haven't actually shown that there would be a
First Amendment violation.  And our point about the *Meriwether*
case which I mentioned earlier, that that determination would
depend on specific facts at summary judgment and the *Meriwether*
case still holds.

And I believe those are all the points I have, so we'd
request that you grant the motion to dismiss and deny the motion
for preliminary injunction.  I'll leave it to Mr. Tomlinson.

MR. TOMLINSON:  Your Honor, just very briefly, and to
reiterate, plaintiffs' counsel said, came back with this
statement that somehow the states were put in an untenable
choice between interpretation of, their interpretation of the
statutes and their own laws versus these guidance documents.

Again, we just refer to the Court back to this process
that simply not -- in terms of being put in an untenable choice
of having to make a decision now or lose funding, that's simply
not the way the process works.  As discussed ad nauseam with

1  Your Honor, there's so many steps along the way where they have

2  an opportunity to present their factual and legal arguments

3  before agency decision makers all way on up to the secretary,

4  over to Congress, and then eventually before an Article III

5  court.  It's simply not an untenable choice.  They have an

6  opportunity to present these arguments at multiple steps along

7  the way, and so that's the only point I wanted to make unless

8  Your Honor has further questions.

9       THE COURT:  No, I understand.  All right.  We -- let's

10  take a break.  I'm sure everybody would like to have a little

11  bit of a break, and then we'll come back and we'll argue the

12  motion to intervene.  I may have some questions, but let's come

13  back at 12:20.  I've got 12:02.  12:20, give everybody an

14  opportunity to stretch their legs.

15       THE COURTROOM DEPUTY:  All rise.  This honorable court

16  is now in recess.

17       (Recess taken.)

18       THE COURTROOM DEPUTY:  All rise.  This honorable court

19  is now in session.  Please come to order and be seated.

20       THE COURT:  Thank you.  I appreciate your patience.

21  All right.  Mr. Scruggs?

22       MR. SCRUGGS:  Thank you, Your Honor, and may it please

23  the Court, as noted my name is Jonathan Scruggs.  I'm here on

24  behalf of proposed intervenors Association of Christian Schools

25  International and three individual female athletes from the

1  State of Arkansas.

2        Your Honor, our motion to intervene and the
3  department's response raise a host of different issues, but
4  we've heard a lot from a lot of different attorneys, a lot of
5  different arguments; so I'm going to try to narrow focus in on
6  what I think is most important, and the way I propose to do that
7  is to identify and then go back and unpack four principles
8  established by the Sixth Circuit's *Grutter* decision that justify
9  intervention here.

10       So first, intervenors do not need standing for
11 intervention.  Second, intervenors have a valid interest in
12 protecting equal opportunity policies that benefit them.  Third,
13 intervenors can show impairment if the litigation might affect
14 those equal opportunity policies, and then fourth, intervenors
15 can show inadequate representation by identifying arguments that
16 we will make that the current parties may not make.

17       Each of these principles apply here, Your Honor, and
18 in fact, I think the argument for intervention is stronger here
19 than in *Grutter*.  In *Grutter*, the intervenors did not have a
20 legal right or a cause of action to argue that the affirmative
21 action policy there should be maintained, but here the
22 intervenors do have a legal right under Title IX and the state's
23 Save Women's Sports Act and a cause of action under those laws
24 to argue that there is a obligation to maintain sex-separated
25 sports.

1     If the future applicants in *Grutter* had a basis to
2   intervene and the advocacy association as well, then we have a
3   basis to intervene here.  In arguing otherwise, I think the
4   department effectively overlooks *Grutter* and tries to change the
5   standards for intervention in the Sixth Circuit which this Court
6   should reject.

7     So let me go back and unpack those four principles
8   that I think are decisive here.  First goes to the point of
9   standing, and I think actually and in an effort to bring
10  consensus, I don't think we and the department dispute much on
11  the general principles.  I don't think they can dispute that the
12  Sixth Circuit has said that intervenors don't need standing if
13  they seek the same scope of relief as the plaintiffs, and we
14  agree that if we sought broader scope, then we will have to
15  establish then, but it's more about the application here.  We
16  think that we have sought the same scope of relief as the
17  states, and in fact, at the end of the day, what are the states
18  seeking to accomplish?  They're seeking to set aside the
19  Interpretation and Fact Sheet which is what we want, but also to
20  maintain their authority to maintain sex-separated sports
21  pursuant to what is now I believe nine states have passed those
22  sex-separated sports law.  Texas recently passed one of these
23  laws just a few weeks ago, so we believe we are seeking the same
24  scope of relief, and just to clarify and streamline the issues,
25  as we noted in our reply, we disclaim seeking broad relief to

1   make things easy.

2          So that focuses really in on the factors for
3   intervention, so let's go through those three, other three
4   points that I noted, and that is, we as intervenors have a
5   substantial interest in maintaining these equal opportunity
6   policies.  That is the message of *Grutter*, that the minority
7   applicants there had a substantial interest in the maintaining
8   and seeking educational opportunity.  Well, our individual
9   athletes and the female athletes of these ACSI schools have a
10  strong basis to obtain equal athletic opportunity under both
11  Title IX of the Save Women's Sports Act, and in fact, Your
12  Honor, I really don't think the department disputes that at a
13  high level.  It's hard to do so when the Sixth Circuit, various
14  other circuits have acknowledged that female athletes have an
15  interest and even a legal right to obtain equal athletic
16  opportunity.

17         What I read, the department's argument is not really
18  about substantial interest.  It's actually about impairment.
19  They dispute that this litigation can possibly impair our
20  client's interests, but it's first useful to know what the
21  standard is, that we don't have to show definite impairment or
22  even probable impairment.  In both *Grutter* and in the *Miller*
23  case, the Court, Sixth Circuit said that merely possible
24  impairment is a basis for intervention, and we have certainly
25  shown that because we are currently benefiting from the Save

1  Women's Sports Act and Title IX.  And if the Fact Sheet and
2  Interpretations stay in place, those benefits go away by
3  definition, so it is taking those benefits away from the
4  intervenors.

5          Now, the department comes back and responds and says,
6  well, this case is not about the Save Women's Sports Act.  Well,
7  that's where we definitely disagree, and I'll go even farther
8  than the states and not just say that those laws arguably
9  conflict with the Interpretation and Fact Sheet, they
10 necessarily do, and it's impossible to find out a way that they
11 don't conflict.  In fact, I think it is useful as we've
12 mentioned before here, a few times before, to look at the actual
13 arguments the department is making in the West Virginia case.
14 Those arguments are not very fact specific.  They are very broad
15 and focus not on the particular facts of that case but the
16 meaning, their interpretation of Title IX, and their belief that
17 if you allow sex-separated sports, that that, and exclude men
18 who identify as women from female sports, that violates Title
19 IX; and that also is resonated in the FAQ, the educator letter,
20 Your Honor.  It mentioned the cheerleader example.  There's not
21 a mention of we need more facts regarding those things.  It just
22 lays out that example.

23         I'd also point the Court to a few other examples that
24 have not been mentioned.  Your Honor, currently we represent
25 numerous female athletes in the State of Connecticut who are

1  challenging a athletic association policy that allows men to

2  compete against women.  Well, those clients filed a Title IX

3  complaint with the department under the previous administration,

4  and under the previous administration, the department said that

5  potentially violated Title IX; but when the administration

6  switched over, they have now withdrawn that opinion.

7       Likewise, in the *Hecox* case which is involving the

8  Save Women's Sports Act in Idaho, the prior administration filed

9  an amicus brief in support of the female athletes there; but

10  when the administration switched, they withdrew that support and

11  that amicus brief because all of it centers around their

12  interpretation of Title IX.  It's not dependent on any facts,

13  and in fact, I think it's very useful, my friend from the

14  department got up here and argued, well, this is essentially an

15  easy application of *Bostock* into Title IX.  And I think from

16  their view, that is what they think, but that is a legal

17  principle; and we dispute that it is uncontroversial or a easy

18  thing, but the point is that if you incorporate Title IX under

19  their -- excuse me.  If you incorporate their view of *Bostock*

20  into Title IX, that it makes sex-separated sports legal and

21  invalidates the sex separated, the Save Women's Sports Act.

22       And to put a point on that, Your Honor, it's not just

23  the holding, but if you even incorporate the logic of

24  essentially their *Bostock* reading into Title IX, it invalidates

25  the sports act.  That's because the whole logic of Title IX is

1  if you take into account gender identity and thereby notice sex,
2  that is discrimination on the basis of sex and it's illegal.

3         Well, Your Honor, if you take that logic and apply it
4  to Title IX, then sex-separated sports are all illegal because
5  by definition you have to notice sex to sex separate sports; and
6  that's exactly why contrary to what my friend said, numerous
7  courts have said that we don't just incorporate Title VII
8  principles into Title IX.

9         I think the Nineth Circuit put it best when they said
10 unlike most employment settings, athletic teams are gender
11 segregated, period.  That's why you cannot possibly incorporate
12 *Bostock* into Title IX, because you would eradicate what I think
13 everyone in this room thinks that shouldn't be eradicated is not
14 eradicated, that is, sex-separated sports.

15        Now that is not an argument to say that *Bostock* should
16 overrule Title IX.  It's an argument to say Bostock's logic,
17 that logic that the department is using, can't be applied to
18 Title IX, and I haven't heard a response why that isn't the
19 case; because again, these things don't turn on the facts.  The
20 argument that is being made in the West Virginia case is that
21 any time you effectively sex separate sports and exclude a male
22 athlete who identifies as female, that is gender identity
23 discrimination and illegal.

24        So to bring that back, I just, in terms of impairment,
25 we again don't need to show that this litigation will impair our

interests or even may impair.  It just might impair, and
certainly given what the department has said in the West
Virginia case and has said in these documents and said
elsewhere, that really the department can't have it both ways.
It can't go around and say this is our interpretation of Title
IX, it's generalized, it applies in all these general ways.  We
should incorporate *Bostock* wholesale in all situations to Title
IX and then come and say, well, we need -- you know, it might
change.

As my, I think my friends in the state said, I haven't
heard a fact that would make a relevant difference.  I welcome
if my friends from the department will come up here and either,
you know, clarify or reject their position in the West Virginia
case or affirm that the same, that the Save Women's Sports Act
are legal under Title IX, I think that would be great.  I just
don't think they're going to do that, and that's because they've
committed themselves to this interpretation.

And Your Honor, again, it's useful to note that under
that *Miller* case that I cited before, it said that the mere
potential stare decisis effects can be a sufficient basis for
impairment that justifies intervention.

So continuing on, I think I've talked about this,
those Save Women's Sports Act, another argument the department
makes is that, well, you can't show impairment because we have
not identified a specific male athlete who identifies as female

that we have competed against. Now my response to that is a few

things. First, I don't think that's exactly true. The ACSI

schools have identified schools in Idaho and in Florida where

they are competing, they have female sports teams. And in those

states, there is current litigation where male athletes who

identify as female are trying to participate in female sports.

That's the first thing.

The second thing is that I think it overlooks the

scholarship, the nationwide scholarship market. There is a

limited amount of scholarships and sports slots available to

women nationwide that effectively people all across the country

are competing for. So if you open up that market to men, that

necessarily hurts the chances of women to obtain that benefit

and obtain the value of those scholarships in other athletic

opportunities; but probably most importantly, Your Honor, I

think *Grutter*, again, is decisive on this. Because in the

*Grutter* case, the Court, and neither the intervenors, the

intervenors did not argue or show that they were competing head

to head against Caucasian applicants for a final slot in the law

school or the university. They didn't show that, that but for

the Affirmative Action policy, they would be admitted, and I

think that's an important point, Your Honor.

And to give an example on it, many of those

intervenors could have had 180 on their LSAT score and a 4.0

GPA. The Affirmative Action policy may not have benefited them

that much. They might have gotten in anyway. Same thing on the other end of the spectrum. There have been maybe many of those intervenors that have failing grades perhaps. We don't know 'cause the Sixth Circuit didn't require it, but the point is, and it didn't require it because what did it say was the interest in the impairment. It said quote, or it said that the decision affects applicant's educational opportunity quote "by diminishing their likelihood of obtaining admission," unquote. And that's the same thing that the *Hecox* case said that involved, again, an intervention attempt by biological females to intervene in that case, and it identified the impairment that the litigation quote may be, that the intervenors quote "may be more likely to have to choose between competing against transgender athletes or not competing at all," unquote.

Again, it's the loss of likelihood of obtaining those equal athletic opportunities, equal educational opportunities, and the Sixth Circuit in the *Hecox* case has said that shows at least the possibility of impairment, and I think that is exactly sufficient here. To require more as the department asks is effectively to require that we show definite impairment or really to show standing, to show an injury in fact or actual causation which, again, we don't have to show.

And lastly, Your Honor, let me point to the fact of inadequate representation. I think you've seen our argument there. We have identified an argument that we will make that

the states have not, not just that Title IX allows sex-separated
sports but it requires it in many instances.  We rely not on a
scholarship or a regulation provision just relating to
scholarships which is I believe the states cite that in passing,
but we rely on a separate regulation that basically lays out
both that you can have what's called an equal treatment claim
and a accommodation claim under that regulation; that that is
what is often brought, for example, when a university eliminates
either male sports or female sports, and athletes often bring
challenges under those claims to say that's taking away our
equal opportunity.  That's essentially our argument there, that
if you open up female sports to men who identify as women, it's
no longer female sports by definition, that it's become
something different.  And by definition, as we've shown, we've
highlighted how generally speaking these males have
physiological advantages over females, that they are con -- they
would win.  They would take away the chance to be champions as I
believe the Second Circuit has said in one case involving Title
IX, and that's just inevitable, Your Honor.

So that highlights that we are bringing a separate
argument.  Again, we don't have to show that inadequate
representation will happen, only that it may happen, and I think
we've shown that.  Again, our argument is even stronger in
*Grutter*, because in *Grutter* at the time of intervention, the
parties didn't have this voluminous, you know, briefing, that

they just simply said, look. Here's an argument that we don't know if the university is going bring or not, but that's sufficient. Well, here we've compared the briefs, and you can see that we have brought an argument that is different than the states' argument.

And Your Honor, I'd also note a second point that, how we differ in arguments, and I think the department even admits this in its response brief is, again, we are not simply arguing that the Save Women's Sports Act arguably violates their interpretation but they definitely do. And the state has good reason not to go as far as we do, because they don't want to as they note kind of admit they violated the law. That puts them even more in the target of the department, but we fully believe that, and I think it bears fruit from what the department has said in West Virginia.

Now to clarify, for standing I don't think the states need to admit that the laws definitely conflict. I think they're exactly right under S.B.A. List, that all they need to show is the arguable standard; because otherwise, if you would have to show definite violation, well, in some ways, you've blended the merits and standing. You've resolved the issue if you decide, well, it definitely violates the law in these kind of what is the language or what does the interpretation mean or not, but that's just another argument that I think highlights our interests are different because our interests are not merely

1   upholding state sovereignty or upholding the state law.  It's to

2   gain the benefit of those laws which is equal athletic

3   opportunities, something that our clients desperately want.

4          So for all those reasons, we respectfully ask the

5   Court to grant intervention, unless the Court has any other

6   questions.

7          THE COURT:  I don't think so.  Thank you though.  Real

8   quick before, and it's my understanding the states do not oppose

9   this intervention?  I think that's what was represented in the

10  pleadings and --

11         MS. CAMPBELL:  That's correct, Your Honor.  We do not

12  oppose.

13         MR. HEALY:  Thank you, Your Honor.  So the proposed

14  intervenors appear to concede that they don't have standing, but

15  they argue that they need not show standing, and I think this is

16  a problem because this is not the rule from *Town of Chester*

17  which rejected the Court of Appeals' ruling finding that the

18  intervenors had sought essentially the same relief.  They claim

19  that they seek essentially the same practical relief, but that's

20  just not, that's just not the standard here.

21         There's a recent case from the Third Circuit which is

22  not cited in our briefing, but it's *Wayne Land & Mining Group*

23  *versus Delaware River Basin Commission*.  It's 959 F.3d 569 at

24  Note 6.  It says, "We clarify here that at the outset that under

25  *Town of Chester*, 'different from' does not necessarily mean

1  'entirely different from.'  For all relief sought, there must be
2  a litigant with standing.  A punitive intervenor of right is,
3  therefore, required to demonstrate Article III standing not only
4  in cases where the relief it seeks is categorically distinct
5  from that sought by the plaintiff but also in cases where the
6  intervenors seeks additional relief beyond that which the
7  plaintiff requests."

8        So I think it's very clear that they need to show
9  standing here.  They have not shown standing, and indeed they've
10  conceded that they don't have standing, and it's very clear that
11  the proposed complaint seeks additional relief beyond that which
12  the plaintiff states seek.

13        They now state on reply that they disclaim any relief
14  that is different than what the states seek, but this is an
15  appropriate attempt to make their intervention motion a moving
16  target.  The one case that they cite for their ability to do
17  that is this *North American Interpipe* case from the Court of
18  International Trade.  If you look at the docket in that case,
19  Your Honor, it's different than how they describe it.  There the
20  intervenors fail to file a proposed complaint, so the Court
21  issued an order asking the proposed intervenors whether they
22  sought the same relief or whether they needed to show standing
23  for the purposes of Article III; and they filed supplemental
24  briefs saying, no, actually we don't seek the same relief, so
25  it's not that they disclaimed it on reply which is what these

1    intervenors appear to attempt to do.

2         There's a case from the Western District of Tennessee

3    called *Martin versus Correction Corporation of America*, 231

4    F.R.D. 532.  At page 536, that identifies that the Court needs

5    to accept as true all well pleaded, nonconclusory allegations in

6    a motion to intervene in the proposed complaint or answer an

7    intervention in a declaration supporting the motion.  So this

8    belabored attempt to make this a moving target is inappropriate,

9    and indeed, if they merely are disclaiming what they're seeking,

10   I'm not really sure what their, what relief they are seeking,

11   particularly where they have a Title IX claim that is different.

12        And if you go to the *Town of Chester* case, Your Honor,

13   from the Supreme Court, it's says very, very forthrightly, "A

14   party must demonstrate standing for each claim he seeks to

15   press."  And these plaintiffs unlike the -- these proposed

16   intervenors -- unlike the plaintiff states bring claims directly

17   under the citizens sue provision of Title IX, and the fact that

18   they bring those separate claims is another reason that they

19   need to demonstrate standing under *Town of Chester*.

20        Unless Your Honor has questions about the particular

21   arguments on standing, I won't go through the reasons that they

22   don't have standing since they concede it.

23        THE COURT:  Do you concede it?

24        MR. SCRUGGS:  No, Your Honor.  We just -- we don't

25   concede it as a fact.  We're making a point that -- yeah.  You

1  got it.

2        THE COURT:  The no is sufficient.  Why don't you run

3  through the facts.

4        MR. HEALY:  Sure.  They haven't demonstrated standing

5  with respect to the student athletes because those athletes have

6  not identified any harms specific to them.  They only, they only

7  express their someday fear of potentially competing against a

8  transgender athlete and losing to that athlete or losing

9  potential scholarships in the future.  That's very clearly not a

10  harm.

11        With respect to associational standing -- I would

12  mention by the way that the proposed intervenors haven't

13  provided any argumentation in their reply brief, and the Court

14  can treat it as conceded even if they haven't developed those

15  arguments.  With respect to associational standing, they have

16  not established, notwithstanding this new declaration they've

17  provided, that they are a traditional membership association.

18  Their declaration appears to note that there is the sort of

19  financial transactions that happen back and forth between them

20  and their purported members.

21        Regardless, even if this were a traditional membership

22  association, there's no certainly impending injury, because just

23  as with the student athletes, the actual member, purported

24  member schools haven't identified that there will be any harm to

25  them.  They simply claim that they may lose some standing and

they may have to make the unilateral decision to pull out of particular athletic conferences and so forth, but these are merely speculative. I think it's very clear that these don't rise to the level of standing and they need to demonstrate that, and the reason they need to demonstrate that is there are a number of different aspects of their relief that, that are not the same as the relief that plaintiffs seek. They, for example, seek a declaratory judgment that Title IX never prohibits gender identity and sexual orientation relief, no discrimination which the states do not seek. That's paragraph 4 of the prayer for relief.

They have a separate request for money damages which they note in their briefing where there is a separate request for money damages that does require standing, and here they actually have in prayer for relief in paragraph 8, they have a request for nominal and actual damages that appears nowhere in the states' complaint.

They also request declaratory judgments as applied to them which the states of course do not seek. They haven't demonstrated third-party standing for the reasons we've stated in our briefing, and they also have not actually demonstrated any diversion of their resources that isn't connected with this litigation.

They're citing case law on the reasons that they don't need to establish standing is not in the contrary. For example,

in the *Doe versus Zucker* case which they cite, that merely stands for the unremarkable proposition that where a proposed intervenor actually does not seek anything different than what the current parties seek, they don't need to show standing. And similarly in the *Kane*, in *Kane* in California, those courts actually address the standing inquiry in the alternative. Here the intervenors very clearly do not have standing and have not even attempted to demonstrate that they do in their briefing.

They cite two out-of-circuit cases in a footnote for the proposition that they need not show standing for any relief that overlaps. No Sixth Circuit case appears to have so held.

The one district court in this circuit that, to have addressed this issue, the *Chapman versus Tristar* case which we cite in our briefing held that wherever a party seeks different relief, it must show Article III standing. That appears to be the rule in this circuit, and in any event, the government here disputes the standing of the states, so we think it would be inappropriate for this Court not to address the standing question with respect to the intervenors.

With respect to the declarations that they provided, they sort of dropped these declarations that have factual allegations on, along with their reply, but they don't actually develop any arguments as to these facts in their briefing. So I do think we would consider that, we think you could consider that conceded.

1    With respect to the significantly protectable
2    interest, counsel's argument appears to try to pivot defendants'
3    arguments from an interest to whether or not that interest was
4    affected and was impaired rather, and I think the simple fact is
5    that if this Court allows these parties to intervene, it would
6    essentially mean that any individual or any cisgender girl who
7    plays sports anywhere in a state with a Save Women's Sports Law
8    could intervene.  They don't appear to make any argument more
9    directly funneled than that.  I mean, that appears to be their
10   argument, that they have an interest in being protected by Title
11   IX and by Save Women's Sports laws, and that that alone gives
12   them an interest to intervene.

13   Now if that's true, that means that millions of
14   cisgender girls potentially who play sports in this country
15   could intervene in this lawsuit, and that simply can't be the
16   rule, and that can't be enough because the Sixth Circuit has
17   expressly cautioned against making Rule 24 essentially
18   meaningless.

19   With respect to *Grutter*, the, in the briefing on
20   reply, the proposed intervenors recognize that the intervenors
21   in *Grutter* actually had applied or intended to apply to the law
22   school at issue in that case.  Here, there's nothing like that.
23   There's no actual intention or actual impending competition
24   against a transgender athlete.  There's merely statements that
25   what if someday I have to participate in a competition and worry

1  about what would happen in that instance.

2         Similarly, in *Hecox*, counsel attempts to distinguish
3  that case, but the fact is that there, there actually was, there
4  had been a particular competition with a transgender person on a
5  sports team and a loss to that particular individual; so there
6  had been an ongoing demonstration of harm, and here that isn't
7  the case.

8         Similarly, with respect to adequate representation,
9  they make the point in their brief that they essentially seek
10  the same practical result with respect to standing, but they
11  claim that all they need to do to demonstrate inadequate
12  representation is come up with some set of arguments that the
13  plaintiff states haven't made.  And again, if that were the
14  case, if that were the rule in this circuit, that would mean
15  that all an intervenor would need to do to demonstrate
16  inadequate representation is make up some new arguments
17  regardless of how colorable they are that would allow them to
18  intervene, and I just think that can't be correct.

19         The *Bradley* case which we cite in our briefing
20  demonstrates that the key here is really adversity.  Is there
21  adversity between the proposed intervenors and the parties who
22  exist, and here I don't think that they can demonstrate
23  adversity.  They demonstrate merely that, that they may want to
24  make new arguments and they seek essentially the same result,
25  but there isn't actually any adversity of interest.  And without

more, I think we could end up in a situation where many, many

parties would seek to intervene in this lawsuit under a similar

theory, and they might be allowed to do so.

Finally, I'd make a point on permissive intervention.

They need standing on permissive intervention too. That's what

the *Chapman* case held. We've made a number of arguments in our

briefing about why intervention would prejudice defendants. We

didn't get an opportunity to respond to their preliminary

injunction motion with respect to the preliminary injunction

motion factors as applied to them, and I think that that is

clearly prejudiced.

And I also think that this would add unnecessary

factual complexity to this case. The intervenor counsel

suggested that this lawsuit should be about, about women in

athletics and that these documents necessarily determine an

outcome with respect to women in athletics, and as -- I don't

want to repeat a lot of the arguments I was making before, but I

do think it's important to note that these documents don't state

anything about athletics, and they don't state anything about

Save Women's Sports laws; and whether and to what extent there's

a conflict between those, those laws and the documents here or

the interpretation of Title IX rather is a question that is not

presented in this case.

They mention, again, this West Virginia amicus brief.

Once -- as I mentioned earlier, there's this whole record in

this case.  There's a set of facts in this case that apply.
There's a binding Fourth Circuit precedent there that the
department relied on, so the fact that the government has made
that statement there doesn't preclude them from making any
inconsistent, you know, a statement here that, that is reflected
in the documents.

I had a couple of smaller points.  On the FAQ
document, they mention that it essentially, their argument is
that it essentially determines where Title IX applies.  The
document on its face just says here's what the Department of
Education can investigate.  It doesn't determine the outcome of
particular investigations.  And they also haven't, they
mentioned the point about having not identified a specific
athlete.  I think they should be required to do that for
standing purposes.

I think that runs through my list, and I don't have
anything further unless Your Honor has questions.

THE COURT:  I don't believe I do.

MR. HEALY:  Thank you.

MR. SCRUGGS:  Thank you, Your Honor.  A few points.

As for standing, you know, I think we just
fundamentally disagree about what the law requires.  This --
just this past term, the U.S. Supreme Court in *Little Sisters of
the Poor versus Pennsylvania* said that intervenors do not need
to show standing if they're seeking the same relief.  That was

1  for standing to appeal, but I think that same logic applies.

2  I think the fundamental mistake the department is

3  making is essentially applying a standing analysis engross in a

4  sense.  So let's, for example, assume despite my disclaimer,

5  let's assume that we sought both similar relief and different

6  relief.  Well, the Court would have to engage in a standing

7  analysis about the different relief, but to the extent that we

8  sought it on the same relief, it would be sufficient if the

9  states had standing, so I think that's pretty basic, Your Honor.

10  I want to go to the point about anyone can intervene.

11  Well, let me back up.  I want to be clear on this.  I think

12  counsel is right that we did seek damages which would require

13  separate standing, and that's why I came up and said I'll, we're

14  disclaiming that.  We're not going to seek damages, and of

15  course it's perfectly appropriate for intervenors to do that as

16  the exact standard that counsel cited, that you take all the

17  papers put forth by the intervenors and construe them favorably

18  toward us and toward intervention.  So I don't think it's very

19  controversial that a litigant can disclaim a certain scope of

20  relief for example.

21  I want to go now to the intervention.  Essentially I

22  think the department's argument is it disagrees with the Sixth

23  Circuit's standard and disagrees with *Grutter*.  Counsel says it

24  can't be the standard that, you know, we would, we don't have to

25  show a male athlete who identifies as female competing.  Well,

| 1 | that exact same argument could have been made in *Grutter*, that |
| 2 | anyone in *Grutter* could have intervened who intended to apply to |
| 3 | the university or was about to apply to the university.  Of |
| 4 | course the answer to that question is, well, no.  They still |
| 5 | have substantial interest.  This Court has a fair amount of |
| 6 | discretion to exclude other potential intervenors either because |
| 7 | they're untimely or late or it would disrupt the flow of this |
| 8 | litigation which we don't, which is not true for us. |

One point on *Hecox* that is useful to point out, Your Honor, my friend correctly notes that there the two female athletes had competed against males who identified as females, but they did so in Montana.  So the Save Women's Sports Act in Idaho wouldn't have even protected them, but the Court still said they had a valid interest in that law to intervene on behalf to protect their rights in Idaho.  So I think *Hecox* is very relevant for that reason and to argue for intervention.

Your Honor, again, I point the Court to the FAQ specifically mentions cheerleading.  I think that's evident, combined that with the *B.P.J.* litigation.

For the most part, we will rest on the rest of our briefing.  I would just simply conclude by noting that, you know, what Title IX means directly affects the ability of our intervenors to compete on a fair playing field, and this case is going to determine what that playing field looks like and whether it stays fair.  So we believe we have a substantial

1  interest, and this Court should hear from the very parties most
2  invested in protecting women's sports.  Thank you.
3          THE COURT:  Did you have anything else you wanted to
4  add to that?
5          MR. HEALY:  No, Your Honor.
6          THE COURT:  All right.  Thank you.  Okay.  Real quick.
7  Back to our other, the injunction and everything else,
8  Ms. Campbell.  I understand we've talked about this before and
9  that you all have covered this issue in your briefing, and we've
10 already had today, but if you would please just sum up for me
11 exactly why this is ripe.
12         MS. CAMPBELL:  Sure, Your Honor.  May I approach?
13         THE COURT:  Absolutely.
14         MS. CAMPBELL:  Thank you.
15         THE COURT:  Take as much time as you need, and of
16 course the defense, I'm going to ask them the same thing, why
17 it's not, so.
18         MS. CAMPBELL:  Thank you, Your Honor.  I'm glad to
19 address ripeness.  I'll begin by reiterating that the ripeness
20 considerations that defendants point to are prudential ripeness
21 considerations, and the Sixth Circuit has, in a recent opinion
22 that's cited in our brief, proceeded to address the merits, you
23 know, without even determining whether the prudential ripeness
24 factors are satisfied, so we don't think those are
25 jurisdictional.  They don't go to the Court's Article III

1  jurisdiction, but even if they do, we have satisfied those
2  ripeness requirements.

3        Our challenge is to these guidance documents, the
4  words in these guidance documents, the interpretations that are
5  reflected in them.  Whatever factual differences, or you know,
6  specific facts defendants now say, you know, might change the
7  outcome of a particular adjudication, that's not reflected in
8  the guidance documents, and we don't need to know those.  This
9  Court doesn't need to know what those are in order to rule on
10 our claims challenging the existing guidance documents, and
11 really that's one of the very problems with the guidance
12 documents is that they take these definitive positions about
13 bathroom use by transgender individuals, and you know,
14 participation on athletic teams.  The Fact Sheet does
15 specifically mention that issue.  So does the EEOC -- sorry.
16 The EEOC documents does not and it mentions bathrooms
17 specifically.

18       One of the problems with the guidance documents is
19 that it draws those definitive lines and doesn't account for any
20 factual variations, and you know, I think it's notable that, you
21 know, some of the governing athletic associations that have
22 addressed these issues have, they haven't taken these sort of
23 blanket positions.  You know, what they have said is, well, you
24 know, it may depend on whether the athlete, transgender athlete
25 in question has undergone hormone therapy or it may depend on

the precise sport.  We don't disagree that perhaps -- I mean, we
think that our laws are valid, you know, but it doesn't really
turn on factual distinctions like that, but certainly it could;
and were this the subject of public notice and comment,
certainly those are the kinds of factual distinctions that would
be drawn out, but our challenge is to the guidance that the
agencies have actually issued, and those challenges do not
require any sort of factual development.  Those are ripe for
adjudication.  They are pure issues of law, Your Honor.

            And as to whether we have suffered significant
hardship which is the other ripeness factor, we believe that we
have and that we will if we aren't allowed to adjudicate these
issues now because of the significant threat of enforcement and
accompanying, you know, loss of federal funding that, and civil
penalties that could occur.

            THE COURT:  Well, and I certainly don't want to put
words in the defense mouths, but didn't they say that they
didn't even know how they were going to enforce this?  Didn't I
hear that?  So I mean, there's been no attempt to enforce at
all, right?

            MS. CAMPBELL:  Not that I am aware of, no, on any
specific investigations or complaints yet, but there has been no
disavowment of enforcement.

            THE COURT:  And it's almost like that this guidance
has gone out there and now they're looking at it and they're

1  thinking we don't know how to enforce this.

 2          MS. CAMPBELL:  I suspect that they are fully capable

 3  of determining how to enforce this if they wish, and it is in

 4  our opinion only a matter of time which is why enforcement, or

 5  sorry, pre-enforcement review is needed now.

 6          And I'll just reiterate too that the sovereignty

 7  injuries that we're pointing to, those are not future injuries.

 8  Those are present, ongoing injuries that have already occurred

 9  and that will continue to occur until we have preliminary relief

10  and are allowed to adjudicate these claims.

11          THE COURT:  Can you talk a little bit more about that,

12  the sovereignty?

13          MS. CAMPBELL:  Sure, Your Honor.  Specifically why

14  those are present injuries?

15          THE COURT:  Yes.

16          MS. CAMPBELL:  You know, the guidance is out there.

17  This is the position that the agency has said will bind it, will

18  guide its processing of complaints and that it has vowed to

19  enforce.  That creates a, I don't know if chilling effect is the

20  right word, but it creates a pressure for the state to change

21  its laws.

22          THE COURT:  I used chilling effect, and I probably

23  shouldn't have used that.

24          MS. CAMPBELL:  Well, yeah.  I'm not sure I should

25  either.

```
 1            THE COURT:  I understand what we're saying.

 2            MS. CAMPBELL:  I guess I'll refer to what the, how the

 3   courts have referred to it.  I think if you look to the two

 4   Fifth Circuit cases that I mentioned earlier, there's *Texas*

 5   *versus United States* in 2015 and *Texas versus EEOC* in 2019.

 6   Both of those cases talked about this, that this pressure that

 7   administrative action placed on states to change their laws, and

 8   that is exactly the pressure that is created now.  And those

 9   cases didn't involve -- you know, they didn't look at whether

10   there was a credible threat of enforcement.  They didn't engage

11   in that inquiry at all because the injury there had already

12   happened, this pressure because of the threat of enforcement to

13   change their law.  That was already occurring, and that's

14   exactly the same sovereignty injury that the states are already

15   facing as a result of this guidance.

16            THE COURT:  Thank you.

17            MS. CAMPBELL:  Anything else, Your Honor?

18            THE COURT:  I don't think so.  I'm sure there will be,

19   but it will be later tonight.  Thank you.

20            MS. CAMPBELL:  Thank you, Your Honor.

21            MR. TOMLINSON:  Thank you, Your Honor.  On the -- I

22   assume same questions to me or do you --

23            THE COURT:  Yes.

24            MR. TOMLINSON:  We can start there.

25            THE COURT:  Look, you can talk about what you want to,
```

1  but that's what I want to hear.

2        MR. TOMLINSON:  Okay.  Well, that's what I want to
3  talk to you about, Your Honor.

4        Your Honor, on the ripeness issue, as opposing counsel
5  said, there's a two-factor test that's set out by numerous
6  courts including the Sixth Circuit and *Warshak*.  The first
7  factor is is this claim fit for a judicial decision in the sense
8  that it arises in a concrete factual context and concerns a
9  dispute that is likely to come to pass.  That's from *Warshak*,
10  and here, Your Honor, clearly we don't have a concrete factual
11  context.  We know that just because you could look back through
12  the transcript of the argument here today.  We've talked about
13  women's sports, we've talked about bathrooms, we've talked about
14  warning letters, we've talked about whether there's some sort of
15  preemption issue, we've talked about all the various, various
16  kinds of hypotheticals, various sort of procedure mechanisms,
17  excuse me; but clearly we don't have a concrete factual context
18  which is why we're talking about these things in the
19  hypothetical and the abstract, and so it's just not present
20  here.

21        And second factor is what, whether there's a hardship
22  to the parties of withholding court consideration, and that sort
23  of dovetails with this Article III injury, in fact, issues that
24  we've been talking.  I won't belabor those same points over and
25  over again, but it is worth noting, I think there's a -- in the

1 *Sierra Club* case which I cited to the Court which was the
2 National Forestry Service, this clear-cutting plan case, there
3 the Court held that it was not ripe and specifically said it was
4 not ripe because there was no hardship to the Sierra Club in
5 waiting for a more concrete, fact specific context for this
6 challenge to arise.  And they noted that this general forestry
7 plan that Sierra Club was challenging at that early stage does
8 not command anyone to do anything or to refrain from doing
9 anything.  It does not grant, withhold, or modify any form of
10 legal license, power, or authority and does not subject anyone
11 to any civil or criminal liability.  It creates no legal rights
12 or obligations.

13         Now that's exactly what we have here.  We have a broad
14 interpretive document that doesn't specifically purport to
15 govern any of these factual situations we've talked about.  It
16 doesn't purport to preempt any laws.  It doesn't purport to do
17 any of these hypothetical circumstances we're talking about.

18         Are there scenarios in which it would become, these
19 issues could come to pass?  Possibly, but they, plaintiffs need
20 to wait for those situations to arise, and at that point they'll
21 be ripe, and this Court will have the benefit of a concrete
22 factual context to decide those issues.

23         And instead what we have here is exactly what *Warshak*
24 was warning that the Sixth Circuit does not want courts to do.
25 It says answering difficult legal questions before they arise

```
1   and before the courts know how they will arise is not the way
2   they typically handle litigation, and that's what we have here.
3           Your Honor, on the sovereignty point, I guess I would
4   just direct the Court to our briefs and the discussion earlier,
5   but again, we, the states, for all the states that are involved
6   in this, they make these general, abstract allegations that
7   there's been some sort of regulatory confusion or pressure on
8   them; but they don't actually give any concrete example or
9   evidence that there are some, there's something that they'll be
10  enforced to do or prohibited from doing in some sort of exercise
11  of state sovereignty, and I would once again sort of refer the
12  Court back to the process for making these challenges.
13          Even if there was some sort of abstract threat to
14  state sovereignty, they certainly have plenty of process by
15  which to challenge that, through the administrative process, and
16  ultimately they could bring all these same arguments they're
17  making here today before an Article III court once they do have
18  a concrete factual circumstance in which it arises.  Unless the
19  Court has any further questions --
20          THE COURT:  I don't think so.  All right.  Anything
21  else?
22          MS. CAMPBELL:  No, Your Honor.
23          THE COURT:  All right.  Okay.  Thank you.  Thank you,
24  both.  Actually thank all three of you.  Very well briefs.  It's
25  given me a lot to think about, and an order will be forthcoming,
```

1    all right?  Thank you.

2              MR. HEALY:  Thank you, Your Honor.

3              MS. CAMPBELL:  Thank you.

4              THE COURTROOM DEPUTY:  All rise.  This honorable court

5    is now in adjournment.

6              (Proceedings concluded at 1:18 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3    STATE OF TENNESSEE  )

 4    COUNTY OF KNOX  )

 5              I, Kara L. Nagorny, RPR, RMR, CRR, do hereby certify

 6    that I reported in stenographic machine shorthand the above

 7    proceedings; that the foregoing pages were transcribed under my

 8    personal supervision and with computer-aided transcription

 9    software and constitute a true and accurate record of the

10    proceedings.

11              I further certify that I am not an attorney or counsel

12    of any of the parties nor an employee or relative of any

13    attorney or counsel connected with the action nor financially

14    interested in the action.

15              Transcript completed and dated this 10th day of

16    December, 2021.

17

18

19

20

21    _____

22              Kara L. Nagorny, RPR, RMR, CRR
                United States District Court Reporter
23              P.O. Box 1121
                Knoxville, TN  37901
24              (865) 264-9628

25
```