

# Federal Register Notice of Proposed Rulemaking
## Title IX of the Education Amendments of 1972
### Notice of Language Assistance

**Notice of Language Assistance:** If you have difficulty understanding English, you may, free of charge, request language assistance services for this Department information by calling 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), or email us at: Ed.Language.Assistance@ed.gov.

**Aviso a personas con dominio limitado del idioma inglés:** Si usted tiene alguna dificultad en entender el idioma inglés, puede, sin costo alguno, solicitar asistencia lingüística con respecto a esta información llamando al 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), o envíe un mensaje de correo electrónico a: Ed.Language.Assistance@ed.gov.

**給英語能力有限人士的通知**: 如果您不懂英語, 或者使用英语有困难, 您可以要求獲得向大眾提供的語言協助服務, 幫助您理解教育部資訊。這些語言協助服務均可免費提供。如果您需要有關口譯或筆譯服務的詳細資訊, 請致電 1-800-USA-LEARN (1-800-872-5327) (聽語障人士專線：1-800-877-8339), 或電郵: Ed.Language.Assistance@ed.gov。

**Thông báo dành cho những người có khả năng Anh ngữ hạn chế:** Nếu quý vị gặp khó khăn trong việc hiểu Anh ngữ thì quý vị có thể yêu cầu các dịch vụ hỗ trợ ngôn ngữ cho các tin tức củaBộ dành cho công chúng. Các dịch vụ hỗ trợ ngôn ngữ này đều miễn phí. Nếu quý vị muốn biết thêm chi tiết về các dịch vụ phiên dịch hay thông dịch, xin vui lòng gọi số 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), hoặc email: Ed.Language.Assistance@ed.gov.

**영어 미숙자를 위한 공고:** 영어를 이해하는 데 어려움이 있으신 경우, 교육부 정보 센터에일반인 대상 언어 지원 서비스를 요청하실 수 있습니다. 이러한 언어 지원 서비스는 무료로제공됩니다. 통역이나 번역 서비스에 대해 자세한 정보가 필요하신 경우, 전화번호 1-800- USA-LEARN (1-800-872-5327) 또는 청각 장애인용 전화번호 1-800-877-8339 또는 이메일주소 Ed.Language.Assistance@ed.gov 으로 연락하시기 바랍니다.

**Paunawa sa mga Taong Limitado ang Kaalaman sa English:** Kung nahihirapan kayong makaintindi ng English, maaari kayong humingi ng tulong ukol dito sa inpormasyon ng Kagawaran mula sa nagbibigay ng serbisyo na pagtulong kaugnay ng wika. Ang serbisyo na pagtulong kaugnay ng wika ay libre. Kung kailangan ninyo ng dagdag na impormasyon tungkolsa mga serbisyo kaugnay ng pagpapaliwanag o pagsasalin, mangyari lamang tumawag sa 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), o mag-email sa: Ed.Language.Assistance@ed.gov.

**Уведомление для лиц с ограниченным знанием английского языка:** Если вы испытываете трудности в понимании английского языка, вы можете попросить, чтобы вампредоставили перевод информации, которую Министерство Образования доводит до всеобщего сведения. Этот перевод предоставляется бесплатно. Если вы хотите получить более подробную информацию об услугах устного и письменного перевода, звоните по телефону 1-800-USA-LEARN (1-800-872-5327) (служба для слабослышащих: 1-800-877- 8339), или отправьте сообщение по адресу: Ed.Language.Assistance@ed.gov.

**Note: The official version of this document is the document published in the Federal Register. This document has been sent to the Office of the Federal Register and is being scheduled for publication.**

4000-01-U

DEPARTMENT OF EDUCATION

34 CFR Part 106

[Docket ID ED-2021-OCR-0166]

RIN 1870-AA16

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance

AGENCY: Office for Civil Rights, Department of Education.

ACTION: Notice of proposed rulemaking.

SUMMARY: The U.S. Department of Education (Department) proposes to amend the regulations implementing Title IX of the Education Amendments of 1972 (Title IX). The purpose of the proposed regulations is to better align the Title IX regulatory requirements with Title IX's nondiscrimination mandate, and to clarify the scope and application of Title IX and the obligation of all schools, including elementary schools, secondary schools, postsecondary institutions, and other recipients that receive Federal financial assistance from the Department (referred to below as recipients or schools) to provide an educational environment free from discrimination on the basis of sex, including through responding to incidents of sex discrimination. The Department recognizes that schools vary in size, student populations, and administrative structure. The proposed regulations would enable all schools to meet their obligations to comply fully with Title IX while providing them appropriate discretion and

1

flexibility to account for these variations.

DATES: Comments must be received on or before [INSERT DATE 60 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER].

ADDRESSES: Comments must be submitted via the Federal eRulemaking Portal at http://www.regulations.gov.  However, if you require an accommodation or cannot otherwise submit your comments via http://www.regulations.gov, please contact the program contact person listed under FOR FURTHER INFORMATION CONTACT.  The Department will not accept comments by fax or by email, or comments submitted after the comment period closes. To ensure that the Department does not receive duplicate copies, please submit your comments only once.  Additionally, please include the Docket ID at the top of your comments.

The Department strongly encourages you to submit any comments or attachments in Microsoft Word format.  If you must submit a comment in Adobe Portable Document Format (PDF), the Department strongly encourages you to convert the PDF to "print-to-PDF" format, or to use some other commonly used searchable text format.  Please do not submit the PDF in a scanned format.  Using a print-to-PDF format allows the Department to electronically search and copy certain portions of your submissions to assist in the rulemaking process.

- Federal eRulemaking Portal: Please go to http://www.regulations.gov to submit your comments electronically.  Information on using http://www.regulations.gov, including instructions for finding a rule on the site and submitting comments, is available on the site under "FAQ."

Note: The Department's policy is to generally make comments received from members of the public available for public viewing on the Federal eRulemaking Portal at http://www.regulations.gov.  Therefore, commenters should include in their comments only

2

information about themselves that they wish to make publicly available.  Commenters should not

include in their comments any information that identifies other individuals or that permits

readers to identify other individuals.  If, for example, your comment describes an experience of

someone other than yourself, please do not identify that individual or include information that

would allow readers to identify that individual.  The Department will not make comments that

contain personally identifiable information (PII) about someone other than the commenter

publicly available on http://www.regulations.gov for privacy reasons.  This may include

comments where the commenter refers to a third-party individual without using their name if the

Department determines that the comment provides enough detail that could allow one or more

readers to link the information to the third party.  If your comment refers to a third-party

individual, to help ensure that your comment is posted, please consider submitting your comment

anonymously to reduce the chance that information in your comment about a third party could be

linked to the third party.  The Department will also not make comments that contain threats of

harm to another person or to oneself available on http://www.regulations.gov.

FOR FURTHER INFORMATION CONTACT: Alejandro Reyes, U.S. Department of

Education, 400 Maryland Ave., SW, PCP-6125, Washington, DC 20202.  Telephone: 202-245-

7705.  You may also email your questions to T9NPRM@ed.gov, but as described above,

comments must be submitted via the Federal eRulemaking Portal at http://www.regulations.gov.

If you are deaf, hard of hearing, or have a speech disability and wish to access

telecommunications relay services, please dial 7-1-1.

SUPPLEMENTARY INFORMATION:

Executive Summary:

*Purpose of This Regulatory Action*

The Department's review of the current regulations and of information received during and pursuant to a week-long public hearing as well as stakeholder listening sessions and meetings suggest that the current regulations do not best fulfill the requirement of Title IX of the Education Amendments of 1972 (Title IX) that schools and institutions that receive Federal financial assistance eliminate discrimination on the basis of sex in their education programs or activities. The Department therefore proposes that the current regulations should be amended to provide greater clarity regarding the scope of sex discrimination, including recipients' obligations not to discriminate based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity. Further, the Department proposes that the current regulations could better account for the variety of education programs or activities covered by Title IX, which include recipients' education programs or activities serving students in elementary schools, secondary schools, and postsecondary institutions.

The Department makes these proposals based on an extensive review of its regulations implementing Title IX, as well as the live and written comments received during a nationwide virtual public hearing on Title IX held in June 2021. In addition, in 2021, the Office for Civil Rights held numerous listening sessions with a wide array of stakeholders on various issues related to Title IX and considered input from stakeholders during meetings held in 2022 under Executive Order 12866, after the NPRM was submitted to OMB. *Executive Order on Regulatory Planning and Review*, Exec. Order No. 12866, 58 FR 51735 (Oct. 4, 1993), https://www.govinfo.gov/content/pkg/FR-1993-10-04/pdf/FR-1993-10-04.pdf. To address these concerns, the Department proposes amending the Title IX regulations to:

- Require recipients to adopt grievance procedures that provide for the prompt and equitable resolution of complaints of sex discrimination and take other necessary steps to

4

provide an educational environment free from sex discrimination;[1]

- Clarify the Department's view of the scope of Title IX's prohibition on sex discrimination, including related to a hostile environment under the recipient's education program or activity, as well as discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity; and

- Clarify a recipient's obligations to students and employees who are pregnant or experiencing pregnancy-related conditions.

*Summary of the Major Provisions of this Regulatory Action*:

With regard to sex-based harassment (as defined in proposed § 106.2), the proposed regulations would:

- Define sex-based harassment to include but not be limited to sexual harassment;

- Provide and clarify, as appropriate, definitions of various terms related to a recipient's obligations to address sex discrimination, including sex-based harassment;

- Clarify how a recipient is required to take action to end any sex discrimination that has occurred in its education program or activity, prevent its recurrence, and remedy its effects; and

- Clarify a recipient's obligations related to the grievance procedures and other necessary steps when it receives a complaint of sex discrimination.

With regard to discrimination against individuals who are pregnant or parenting, the proposed regulations would:

---

[1] Throughout this preamble, the term "sex discrimination" means "discrimination on the basis of sex" as that language is used in the statutory text of Title IX.

5

- Define the term "pregnancy or related conditions" and the term "parental status," and prohibit discrimination against students and applicants for admission or employment on the basis of current, potential, or past pregnancy or related conditions; and

- Clarify a recipient's obligations to students and employees who are pregnant or experiencing related conditions.

In addition, the proposed regulations would:

- Articulate the Department's understanding that sex discrimination includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity;

- Clarify and streamline administrative requirements with respect to designating a Title IX Coordinator, disseminating a nondiscrimination notice, adopting grievance procedures, and recordkeeping;

- Specify that a recipient must train a range of relevant persons on the recipient's obligations under Title IX;

- Clarify that, unless otherwise provided by Title IX or the regulations, a recipient must not carry out any otherwise permissible different treatment or separation on the basis of sex in a way that would cause more than de minimis harm, including by adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with their gender identity; and

- Clarify a recipient's obligation to address retaliation.

*Costs and Benefits*:

As further detailed in the *Regulatory Impact Analysis*, the Department estimates that the total monetary cost savings to recipients of the proposed regulations over ten years would be in

the range of $9.8 million to $28.2 million.  Although the Department cannot quantify, in monetary terms, the benefits of the proposed regulations to those who have been subjected to sex discrimination, the Department recognizes that sex discrimination, including sex-based harassment, can have profound and long-lasting economic costs for students, employees, and other members of a recipient's surrounding community.  *See, e.g.*, Centers for Disease Control and Prevention, *Fast Facts: Preventing Sexual Violence*, https://www.cdc.gov/violenceprevention/sexualviolence/fastfact.html (last visited June 16, 2022) (describing the economic impact of sexual violence involving physical contact on male and female victims within their lifetimes); Cora Peterson et al., *Lifetime Economic Burden of Intimate Partner Violence Among U.S. Adults*, 55 Am. J. Preventative Med. 433 (2018) (estimating the economic impact of intimate partner violence on male and female victims within their lifetimes).  The Department now believes that these proposed regulations more effectively fulfill Title IX's guarantee that a recipient's education program or activity is free from sex discrimination.  As proposed, the Department's preliminary view is that these amendments would lower the costs associated with sex discrimination, thereby producing a demonstrable benefit for students, employees, and others participating in a recipient's education program or activity.  In the *Regulatory Impact Analysis*, the Department estimates the likely monetary costs of this regulatory action for recipients.  The clarification of grievance procedures required for all forms of sex discrimination and adoption of new reporting and notification framework for employees will carry some costs.  The Department notes that although it cannot fully quantify the economic impact of the proposed regulations, the Department believes that these benefits are substantial and would significantly outweigh the estimated costs of the proposed regulations.

The Department also acknowledges that the proposed regulations deviate from some past

agency statements on Title IX's coverage of discrimination based on sexual orientation and gender identity. As explained in the *Regulatory Impact Analysis*, the Department believes that any costs associated with the shift away from its most recent prior interpretation would be minimal. For example, the proposed requirement to permit students to participate in a recipient's education program or activity consistent with their gender identity may require updating of policies or training materials, but would not require significant expenditures, such as construction of new facilities. The Department proposes that the benefits associated with this change—increased protection of students from sex discrimination and better alignment of the regulations with Title IX's nondiscrimination mandate—far outweigh any costs.

*Invitation to Comment*: The Department invites you to submit comments regarding the proposed regulations. To ensure that your comments have the maximum effect on developing the final regulations, you should identify clearly the specific section or sections of the proposed regulations that each of your comments addresses and arrange your comments in the same order as the proposed regulations.

The Department invites you to assist us in complying with the specific requirements of Executive Orders 12866 and 13563 (explained further below) and their overall goal of reducing the regulatory burden that might result from the proposed regulations. Please let the Department know of any further ways that it may reduce potential costs or increase potential benefits, while preserving the effective and efficient administration of the Department's programs and activities. The Department also welcomes comments on any alternative approaches to the subjects addressed by the proposed regulations.

During and after the comment period, you may inspect public comments about the proposed regulations by accessing *Regulations.gov*. You may also inspect the comments in

person.  Please contact the person listed under FOR FURTHER INFORMATION CONTACT to make arrangements to inspect the comments in person.

*Assistance to Individuals with Disabilities in Reviewing the Rulemaking Record*: Upon request, the Department will provide an appropriate accommodation or auxiliary aid to an individual with a disability who needs assistance to review the comments or other documents in the public rulemaking record for the proposed regulations.  To schedule an appointment for this type of accommodation or auxiliary aid, please contact the person listed under FOR FURTHER INFORMATION CONTACT.

*Table of Contents*

Background

- History of Title IX's Nondiscrimination Mandate and Related Regulations

- The Department's Review of the Title IX Regulations

- Significant Proposed Regulations

I.    Provisions of General Applicability

II.   Recipient's Obligation to Operate Its Education Program or Activity Free from Sex Discrimination

III.  Pregnancy and Parental Status

IV.   Title IX's Coverage of All Forms of Sex Discrimination

V.    Retaliation

VI.   Outdated Regulatory Provisions

VII.  Directed Questions

- Regulatory Impact Analysis

Background:

The mission of the Department's Office for Civil Rights (OCR) is to ensure equal access to education and to promote educational excellence through vigorous enforcement of civil rights in our nation's schools. One of the Federal civil rights laws that OCR enforces is Title IX, which prohibits discrimination on the basis of sex under education programs or activities that receive Federal financial assistance. 20 U.S.C. 1681-1688. Unfortunately, sex discrimination— sometimes overlapping with other forms of discrimination, such as race discrimination and disability discrimination—remains a serious problem, keeping affected students from benefiting fully from their school's education programs and activities.

In March 2021, President Joseph R. Biden, Jr. issued the Executive Order on Guaranteeing an Educational Environment Free from Discrimination on the Basis of Sex, Including Sexual Orientation or Gender Identity, and directed the Secretary of Education, in consultation with the Attorney General, to review all existing regulations, orders, guidance documents, policies and any other similar agency actions for consistency with Title IX and other governing laws. The goal of the Executive Order was to ensure "that all students [are] guaranteed an educational environment free from discrimination on the basis of sex, including discrimination in the form of sexual harassment, which encompasses sexual violence, and including discrimination on the basis of sexual orientation or gender identity." *Executive Order on Guaranteeing an Educational Environment Free from Discrimination on the Basis of Sex, Including Sexual Orientation or Gender Identity*, Exec. Order No. 14021, 86 FR 13803 (Mar. 11, 2021), https://www.govinfo.gov/content/pkg/FR-2021-03-11/pdf/2021-05200.pdf.

Also, as set out in the Executive Order on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation, issued in January 2021, this Administration's policy is "to prevent and combat discrimination on the basis of gender identity or sexual

orientation, and to fully enforce Title VII [of the Civil Rights Act of 1964] and other laws that prohibit discrimination on the basis of gender identity or sexual orientation." *Executive Order on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation*, Exec. Order No. 13988, 86 FR 7023 (Jan. 25, 2021), https://www.govinfo.gov/content/pkg/FR-2021-01-25/pdf/2021-01761.pdf. That Executive Order further noted that under the reasoning of *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), "[l]aws that prohibit sex discrimination—including Title IX of the Education Amendments Act of 1972, as amended (20 U.S.C. 1681 *et seq*.) . . . along with their respective implementing regulations—prohibit discrimination on the basis of gender identity or sexual orientation, so long as the laws do not contain sufficient indications to the contrary." *Id*. Like Executive Order 14021, Executive Order 13988 directed the Secretary of Education, in consultation with the Attorney General, to "review all existing orders, regulations, guidance documents, policies, programs, or other agency actions" promulgated under any statute or regulation that prohibits sex discrimination for their consistency with the stated policy. *Id.*

As these Executive Orders directed, the Department conducted an extensive review of its Title IX regulations and policy documents for consistency with Title IX's statutory prohibition on sex discrimination in federally funded education programs or activities. This review included careful consideration of the comments and feedback received during a nationwide virtual public hearing on Title IX that OCR held in June 2021, OCR's numerous listening sessions in 2021 with a wide array of individuals and organizations on various Title IX issues, and meetings with stakeholders held in 2022 under Executive Order 12866, after the NPRM was submitted to the Office of Management and Budget (OMB). Office of Management and Budget, Office of Information and Regulatory Affairs, Reginfo.gov, http://reginfo.gov/public (last visited June 2,

2022).  Based on that review and input, the Department proposes that the current regulations should be amended to support full implementation of Title IX's prohibition on sex discrimination under a recipient's education program or activity.

In its review, the Department heard two overarching concerns from students, parents, recipients, advocates, and other concerned stakeholders, namely that: (1) there is a need for greater clarity on how to ensure that complaints of sex-based harassment are resolved in a prompt and equitable manner; and (2) the current regulations do not adequately clarify or specify the scope of sex discrimination prohibited by Title IX, including discrimination based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, or gender identity.  The Department has determined that more clarity and greater specificity would better equip recipients of Federal funding[2] to create and maintain school environments free from sex discrimination.  This, in turn, will help recipients ensure that all persons have equal access to educational opportunities in accordance with Title IX's nondiscrimination mandate.

The goal of the Department's proposed regulations is thus to fully effectuate Title IX by clarifying and specifying the scope and application of Title IX protections and recipients' obligation not to discriminate on the basis of sex.  Specifically, this proposed regulatory action focuses on ensuring that recipients prevent and address sex discrimination, including but not

---

[2] The text of Title IX states that the statute applies to "any education program or activity receiving Federal financial assistance." 20 U.S.C. 1681(a).  The definition of the term "Federal financial assistance" under the Title IX regulations is not limited to monetary assistance, but encompasses various types of in-kind assistance, such as a grant or loan of real or personal property, or provision of the services of Federal personnel.  *See* 34 CFR 106.2(g)(2)-(3). Throughout this preamble, terms such as "Federal funding," "Federal funds," and "federally funded" are used to refer to "Federal financial assistance," and are not meant to limit application of the statute or its implementing regulations to recipients of certain types of Federal financial assistance.

12

limited to sex-based harassment, in their education programs or activities; clarifying the scope of Title IX's protection for students and others who are participating or attempting to participate in a recipient's education program or activity; defining important terms related to a recipient's obligations under Title IX; ensuring the provision of supportive measures, as appropriate to restore or preserve a complainant's or respondent's access to the recipient's education program or activity; clarifying a recipient's responsibilities toward students who are pregnant or experiencing pregnancy-related conditions; and clarifying that Title IX's prohibition on sex discrimination encompasses discrimination based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity. In addressing confusion about coverage of sex-based harassment in the current regulations, the Department's proposed regulations also set out requirements that enable recipients to meet their obligations in settings that vary in size, student populations, and administrative structure. The proposed regulatory action would strengthen the current framework, clarify the scope and application of Title IX, and fully align the Title IX regulations with the nondiscrimination mandate of Title IX.

I.   History of Title IX's Nondiscrimination Mandate and Related Regulations

Enacted in 1972, Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. 1681(a).

Title IX is cast in broad terms. It imposes, as a condition on receipt of Federal funds for education programs or activities, a blanket prohibition on sex-based discrimination, with a small number of "specific, narrow exceptions to that broad prohibition." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005). Congress did not limit Title IX's nondiscrimination

condition to conduct engaged in "by" the recipient or its agents, but rather extended it to any "exclu[sion] from participation in," "deni[al of] the benefits of," or "subject[ion] to discrimination under," any recipient's education program or activity.  Congress drafted Title IX "with an unmistakable focus on the benefited class," and did not "writ[e] it simply as a ban on discriminatory conduct by recipients of federal funds or as a prohibition against the disbursement of public funds to educational institutions engaged in discriminatory practices." *Cannon v. Univ. of Chi.*, 441 U.S. 677, 691-93 (1979).

Eliminating sex discrimination rooted in stereotypical perceptions of women's abilities, competence, and worthiness to participate in educational programs—as both student and employee—was also fundamental to Title IX.  *See generally* 118 Cong. Rec. 5803-12 (1972) (statement of Sen. Birch Bayh).  According to Senator Birch Bayh, Title IX's sponsor in the U.S. Senate, discrimination in postsecondary education was driven by the widespread, but false, perception that the duty or desire of women to get married and bear children made them disinterested in pursuing education or professional achievement.  *Id*. at 5804.  Because of this stereotype, many American schools did not wish to "waste a 'man's place' on a woman." *Id*. Thus, Senator Bayh said sex discrimination in "admissions, scholarship programs, faculty, hiring and promotion, professional staffing, and pay scales," was "one of the great failings of the American educational system." *Id*. at 5803.

Title IX authorizes and directs the Department, as well as other agencies "to effectuate the provisions of section 1681 of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken."  20 U.S.C. 1682.

In 1979, the Supreme Court explained in *Cannon v. University of Chicago* that the objectives of Title IX are two-fold: first, to "avoid the use of federal resources to support discriminatory practices" and second, to "provide individual citizens effective protection against those practices." 441 U.S. at 704. In 1982, the Court clarified the broad scope of Title IX in *North Haven Board of Education v. Bell*, stating: "[I]f we are to give Title IX the scope that its origins dictate, we must accord it a sweep as broad as its language." 456 U.S. 512, 521 (1982) (citations and internal alterations omitted). Throughout this preamble, when the Department refers to Title IX's nondiscrimination mandate or requirement, it means the directive of the statutory text, including Title IX's purposes and prohibition on sex discrimination as set out in *Cannon* and *North Haven Board of Education*.

\*\*\*

In 1975, the Department's predecessor, the Department of Health, Education, and Welfare (HEW), first promulgated regulations under Title IX[3] after multiple Congressional hearings. 121 Cong. Rec. 20467 (1975) (statement of Sen. Birch Bayh). They were also subject to a statutory "laying before" provision, designed to afford Congress an opportunity to examine the proposed regulations and disapprove them by resolution within 45 days if deemed inconsistent with Title IX. *N. Haven Bd. of Educ.*, 456 U.S. at 531-32. The Supreme Court has held that the fact that no such resolution succeeded "strongly implies" Congress' agreement with

---

[3] 45 CFR 86 (1975). In 1980, Congress created the United States Department of Education. Pub. L. 96-88, sec. 201, 93 Stat. 669, 671 (1979); Exec. Order No. 12212, 45 FR 29557 (May 5, 1980). By operation of law, all of HEW's determinations, rules, and regulations continued in effect and all functions of HEW's Office for Civil Rights, with respect to educational programs, were transferred to the Secretary of Education. 20 U.S.C. 3441(a)(3). The regulations implementing Title IX were recodified without substantive change in 34 CFR part 106. *See* 45 FR 30802, 30955-65 (May 9, 1980).

15

the Title IX regulations. *Grove City Coll. v. Bell*, 465 U.S. 555, 568 (1984); *N. Haven Bd. of Educ.*, 456 U.S. at 533-35.

The regulations were promulgated to effectuate the purposes of Title IX, specifically to "eliminate (with certain exceptions) discrimination on the basis of sex in any education program or activity receiving Federal financial assistance." 34 CFR 106.1. The regulations implemented Title IX's nondiscrimination mandate through provisions that addressed sex discrimination in hiring, admissions, athletics, and other aspects of a recipient's education program or activity. *See generally* 34 CFR part 106. Since 1975, the Department's Title IX regulations have required a recipient to take actions important for the prevention and elimination of sex discrimination, including by designating an employee to coordinate the recipient's efforts to comply with Title IX (34 CFR 106.8(a)), adopting a nondiscrimination policy (34 CFR 106.8(b)), adopting and publishing grievance procedures providing for prompt and equitable resolution of sex discrimination complaints (34 CFR 106.8(c)), and prohibiting discrimination against students and employees based on pregnancy and childbirth (34 CFR 106.40(b); 34 CFR 106.57). At that time, Federal courts had not yet addressed a recipient's Title IX obligations with respect to sex-based harassment (including sexual harassment), sex stereotyping, or discrimination based on sexual orientation and gender identity.

Since then, the understanding of Title IX has evolved through judicial interpretation, with relevant case law supporting the broad reach of its nondiscrimination mandate, and OCR guidance and subsequent regulations evolving accordingly. In 1992, the Supreme Court held that, in some circumstances, a school district could be liable for monetary damages under Title IX if a teacher sexually harasses a student. *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60 (1992); *see also Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998). In *Gebser*, the

16

Court specifically recognized the authority of Federal agencies, such as the Department, to "promulgate and enforce requirements that effectuate [Title IX's nondiscrimination mandate]," even in circumstances that would not give rise to a claim for monetary damages. 524 U.S. at 292. The Court later held that schools also may be liable for monetary damages under certain conditions if a student sexually harasses another student in the school's program. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999). OCR interpreted Title IX as prohibiting sexual harassment as early as 1981, *see* U.S. Dep't of Educ., Office for Civil Rights, Sexual Harassment: It's Not Academic, Office for Civil Rights at 2 (1988) (1988 Sexual Harassment Pamphlet) (quoting OCR Policy Memorandum, Aug. 31, 1981, from Antonio J. Califa, Director for Litigation, Enforcement and Policy Service, OCR to Regional Civil Rights Directors), https://files.eric.ed.gov/fulltext/ED330265.pdf, and issued a series of documents to provide guidance to recipients on how to meet their obligations as well as information about students' Title IX rights. In 2018, the Department issued a Notice of Proposed Rulemaking (2018 NPRM) to clarify and modify the Title IX regulations, 83 FR 61462 (Nov. 29, 2018), and in 2020 the Department amended the Title IX regulations (the 2020 amendments) specifying how recipients must respond to allegations of sexual harassment in their education programs or activities. 85 FR 30026 (May 19, 2020).

Title IX has also long been understood to prohibit discrimination related to pregnancy, consistent with its legislative history and the broad sweep of its sex-discrimination prohibition. *Conley v. Nw. Fla. State Coll.*, 145 F. Supp. 3d 1073, 1077-78 (N.D. Fla. 2015); *see also Wort v. Vierling*, Case No. 82–3169, slip op. (C.D. Ill. Sept. 4, 1984), *aff'd on other grounds*, 778 F.2d 1233 (7th Cir. 1985); *Muro v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, No. CV 19-10812, 2019 WL 5810308, at *3 (E.D. La. Nov. 7, 2019) ("Courts have held that

17

discrimination on the basis of pregnancy, childbirth, or related medical conditions is a form of sex discrimination prohibited by Title IX."); *Varlesi v. Wayne State Univ.*, 909 F. Supp. 2d 827, 854 (E.D. Mich. 2012) ("[P]regnancy discrimination . . . is unquestionably covered as a subset of sex discrimination under Title IX . . . .").

Title IX regulations regarding pregnancy, which were part of the 1975 HEW regulations, prohibit recipients from discriminating against students or employees based on "pregnancy, childbirth, false pregnancy, termination of pregnancy, or recovery therefrom," 34 CFR 106.40(b)(1), 106.57(b), and prohibit sex-based distinctions on the basis of "parental, family, or marital status," 34 CFR 106.40(a), 106.57(a). In guidance documents from 1991 and 2013, OCR emphasized that discrimination against pregnant students is a form of sex discrimination that may have significant adverse consequences for educational attainment and long-term economic stability, but the Department's regulations regarding pregnancy have remained unchanged since 1975. The Department proposes updated regulations to ensure full implementation of Title IX with respect to pregnancy and related conditions. Although the proposed regulations are based exclusively on Title IX, the Department notes that later-enacted statutes provide additional context and considerations related to discrimination based on pregnancy and or related conditions. In 1978, for example, Congress enacted the Pregnancy Discrimination Act (PDA), which amended the prohibition on sex discrimination in Title VII of the Civil Rights Act of 1964 (Title VII) to prohibit employers from discriminating against employees "on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. 2000e. The PDA requires that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." *Id.* In 2015, the Equal Employment Opportunity Commission

(EEOC) issued enforcement guidance on pregnancy discrimination and related issues clarifying that Title VII, as amended by the PDA, prohibits discrimination based on current pregnancy, past pregnancy, potential or intended pregnancy, and medical conditions related to pregnancy or childbirth, including lactation.  U.S. Equal Emp. Opportunity Comm'n, Enforcement Guidance on Pregnancy Discrimination and Related Issues (June 25, 2015) (2015 EEOC Pregnancy Guidance), https://www.eeoc.gov/laws/guidance/enforcement-guidance-pregnancy-discrimination-and-related-issues.  Breastfeeding employees also have protections under the Affordable Care Act (ACA), which amended the Fair Labor Standards Act to require employers to provide reasonable break times and a private place, other than a bathroom, for covered employees who are breastfeeding to express milk for one year after the child's birth, 29 U.S.C. 207(r)(1).  In addition, Section 188 of the Workforce Innovation and Opportunity Act (WIOA), enforced by the Department of Labor (DOL), prohibits WIOA Title I-financially assisted programs, activities, training, and services from discriminating based on pregnancy, childbirth, or related medical conditions, including lactation and pregnancy-related disorders, as a form of sex discrimination.  U.S. Dep't of Labor, Implementation of the Nondiscrimination and Equal Opportunity Provisions of the Workforce Innovation and Opportunity Act, 29 CFR 38.7(a), 38.8 (2017).  Because both Title VII and Title IX prohibit sex discrimination, the Supreme Court and lower Federal courts often rely on interpretations of Title VII to inform interpretations of Title IX, and both laws apply to employees in the educational context.  *See, e.g.*, *Franklin*, 503 U.S. at 75; *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007); *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 65-66 (1st Cir. 2002); *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1176 (10th Cir. 2001).  Consequently, the treatment of pregnancy-related discrimination under the PDA, the ACA, and other statutes enacted since 1975

19

informs, though does not dictate, the Department's understanding of discrimination on the basis of sex under Title IX.

The Department's Title IX regulations have never directly addressed the application of Title IX to discrimination based on sexual orientation or gender identity. OCR first issued guidance on the rights of gay and lesbian students in its 1997 Sexual Harassment Guidance, recognizing that harassment of a sexual nature directed at gay or lesbian students may constitute sexual harassment prohibited by Title IX. U.S. Dep't of Educ., Office for Civil Rights, Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 62 FR 12034, 12039 (Mar. 13, 1997) (1997 Sexual Harassment Guidance) (revised in 2001), https://www.govinfo.gov/content/pkg/FR-1997-03-13/pdf/97-6373.pdf. OCR reinforced Title IX's coverage of this form of harassment in 2001. U.S. Dep't of Educ., Office for Civil Rights, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties at 3, noticed at 66 FR 5512 (Jan. 19, 2001) (rescinded upon effective date of 2020 amendments, Aug. 14, 2020) (2001 Revised Sexual Harassment Guidance), www.ed.gov/ocr/docs/shguide.pdf. Since then, OCR has recognized that Title IX prohibits discrimination based on gender identity. *See, e.g.*, U.S. Dep't of Educ., Office for Civil Rights, Questions and Answers on Title IX and Sexual Violence at 5 (Apr. 29, 2014) (rescinded in 2017) (2014 Q&A on Sexual Violence), www.ed.gov/ocr/docs/qa-201404-title-ix.pdf; U.S. Dep't of Justice and U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter on Title IX and Transgender Students (May 13, 2016) (rescinded in 2017) (2016 Dear Colleague Letter on Title IX and Transgender Students),

https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf.

Most recently, in 2021, OCR published a Notice of Interpretation in the *Federal Register* to state

explicitly that Title IX's prohibition on sex discrimination encompasses discrimination on the basis of sexual orientation and gender identity, consistent with the Supreme Court's reasoning in *Bostock.* 140 S. Ct. 1731; U.S. Dep't of Educ., Office for Civil Rights, Notice of Interpretation - Enforcement of Title IX with Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County, 86 FR 32637 (June 22, 2021) (2021 Bostock Notice of Interpretation), https://www.govinfo.gov/content/pkg/FR-2021-06-22/pdf/2021-13058.pdf.

Against this backdrop and for reasons described in this preamble, the Secretary proposes to amend the Title IX regulations at 34 CFR 106.1, 106.2, 106.6, 106.8, 106.11, 106.21, 106.30, 106.31, 106.40, 106.41, 106.44, 106.45, 106.46, 106.51, 106.57, 106.60, 106.71, and 106.81, as well as add new 106.10 and 106.47 and redesignate current 106.16 as 106.18 in subpart B and current 106.46 to 106.48 within subpart D. The Secretary also proposes to delete 34 CFR 106.3(c)-(d), 106.16, 106.17, 106.30, and 106.41(d) in their entirety, and delete portions of 34 CFR 106.15 and 106.21 to the extent they refer to 34 CFR 106.16 and 106.17.

II. The Department's Review of the Title IX Regulations

On April 6, 2021, OCR issued a letter to students, educators, and other stakeholders that provided information about the steps the Department was taking to review its regulations, orders, guidance, policies, and other similar agency actions under Title IX. U.S. Dep't of Educ., Office for Civil Rights, Letter from Acting Assistant Secretary Suzanne B. Goldberg to Students, Educators, and other Stakeholders re Exec. Order 14021 (Apr. 6, 2021), http://www.ed.gov/ocr/correspondence/stakeholders/20210406-titleix-eo-14021.pdf. This comprehensive review, as directed by Executive Order 14021, includes OCR's review of all agency actions, including the 2020 amendments, to determine whether changes to the

Department's Title IX regulations are necessary to fulfill Title IX and OCR's commitment to ensuring equal and nondiscriminatory access to education for students at all educational levels. *Id.* at 2.  OCR explained that its review would be guided by "our responsibility to ensure that schools are providing students with a nondiscriminatory educational environment, including appropriate supports for students who have experienced sexual harassment, including sexual violence, and other forms of sex discrimination."  *Id.*  OCR also explained that "[t]his responsibility includes ensuring that schools have grievance procedures that provide for the fair, prompt, and equitable resolution of reports of sexual harassment and other sex discrimination, cognizant of the sensitive issues that are often involved."  *Id.*

On May 20, 2021, OCR published a notice in the *Federal Register* announcing a nationwide virtual public hearing to gather information for the purpose of improving enforcement of Title IX.  U.S. Dep't of Educ., Office for Civil Rights, Announcement of Public Hearing; Title IX of the Education Amendments of 1972, 86 FR 27429 (May 20, 2021), https://www.govinfo.gov/content/pkg/FR-2021-05-20/pdf/2021-10629.pdf.  OCR expressed a particular interest in comments on the Title IX regulations related to sexual harassment, including the 2020 amendments, and comments on discrimination based on sexual orientation and gender identity in educational environments.  *Id.*  OCR requested live comments through the virtual hearing platform and written comments via email.  The virtual hearing was held from June 7, 2021, to June 11, 2021.  Over 280 students, parents, teachers, faculty members, school staff, administrators, and other members of the public provided live comments during the virtual public hearing.  The transcript from the June 2021 Title IX Public Hearing is available at https://www2.ed.gov/about/offices/list/ocr/docs/202106-titleix-publichearing-complete.pdf.  OCR received over 30,000 written comments via email.  The written comments may be viewed

at https://www2.ed.gov/about/offices/list/ocr/public-hearing.html.

In addition to soliciting live and written comments as part of the June 2021 Title IX Public Hearing, OCR also conducted listening sessions with stakeholders expressing a variety of views on the 2020 amendments and other aspects of Title IX, including advocates for survivors of sexual violence, students accused of sexual misconduct, and LGBTQI+[4] students; organizations focused on Title IX and athletics; organizations focused on free speech and due process; organizations representing elementary schools, secondary schools, and postsecondary institutions, teachers, administrators, and parents; attorneys representing survivors, accused students, and schools; State attorneys general offices; Title IX Coordinators and other school administrators; individuals who provide training on Title IX to schools; individuals who work in campus law enforcement; and individuals who have participated in school-level Title IX proceedings.

Responses to OCR's request for comments for the June 2021 Title IX Public Hearing and listening sessions with stakeholders revealed to OCR areas of concern and confusion following the implementation of the 2020 amendments. OCR heard from stakeholders that aspects of the new requirements were not well-suited to some or all educational environments or to effectively advancing Title IX's nondiscrimination mandate. More specifically, at the June 2021 Title IX Public Hearing and in listening sessions, elementary school and secondary school recipients expressed concern that certain requirements impeded their successful management of the day-to-day school environment. At the postsecondary level, recipients expressed concern regarding the

---

[4] The Department generally uses the term "LGBTQI+" to refer to students who are lesbian, gay, bisexual, transgender, queer, questioning, asexual, intersex, nonbinary, or describe their sex characteristics, sexual orientation, or gender identity in another similar way. When referring to some outside resources or past OCR guidance documents, this preamble also uses variations of this acronym to track the content of those documents, as appropriate.

23

new requirement to provide a live hearing with advisor-conducted cross-examination (current § 106.45(b)(6)), both because of the increased administrative burden and because of the requirement's effect on students' willingness to bring forward complaints and participate in the grievance process. Other stakeholders also expressed that this requirement is unnecessarily adversarial, retraumatizing, chilling to students' willingness to report incidents, and not more effective than other means of determining whether a violation of the school's prohibition on sexual harassment occurred. Still other stakeholders urged the Department to preserve the live hearing and adversarial cross-examination requirements. These stakeholders stated that the hearing and cross-examination requirements ensured fundamental fairness in a high-stakes process in a way that is consistent with the tenets of the American justice system.

Some postsecondary recipients expressed concern that the requirements in the 2020 amendments intruded on their professional judgment and expertise about how best to respond to allegations of student misconduct in their educational environment. A variety of stakeholders, including some recipients, also expressed concerns about the limitations on a recipient's obligation to respond to notice of sexual harassment and the narrowing of the definition of "sexual harassment" from the Department's previous position (current §§ 106.30, 106.44). They suggested the limitations in the 2020 amendments allowed recipients to ignore conduct that could or would limit or deny access to their learning environment based on sex. Similarly, stakeholders expressed concerns that recipients refused to respond to complaints of a hostile environment based on sex in a program or activity because the initial sexually harassing conduct occurred off-campus or outside the United States (current § 106.44). OCR also heard from stakeholders who were concerned that the deliberate indifference standard was an inappropriately narrow standard of responsibility for the administrative enforcement context in

24

light of Title IX's nondiscrimination mandate.

Stakeholders also requested that the Department clarify Title IX's application to issues not currently addressed, or not viewed by the stakeholders as addressed adequately, by the current regulations. In particular, stakeholders requested that the Department specify protections related to discrimination based on sexual orientation and gender identity. These requests noted the historical and ongoing discrimination experienced by LGBTQI+ students, the recent enactment of State laws restricting transgender students from participating in school consistent with their gender identity, and the void created by OCR's withdrawal of its 2016 Dear Colleague Letter on Title IX and Transgender Students. Other stakeholders urged that transgender students must not be permitted to participate in school consistent with their gender identity, either in all or certain circumstances. Stakeholders also requested that the Department clarify that discrimination based on sex characteristics is a form of sex discrimination and, in particular, that Title IX protects intersex students from discrimination. OCR also heard from stakeholders requesting clarification on Title IX's protections against pregnancy discrimination and its prohibition on rules that treat parents differently based on sex. The Department heard more from stakeholders in 2022 in meetings held under Executive Order 12866, after the NPRM was submitted to OMB.

Having considered the comments and other information received in connection with the June 2021 Title IX Public Hearing, 2021 listening sessions, and the 2022 meetings held under Executive Order 12866, the Department's proposed regulations aim to strengthen the current framework, improve clarity for recipients to facilitate their compliance, and better align the Title IX regulations with the nondiscrimination mandate of Title IX, particularly its goal of "provid[ing] individual citizens effective protection against [discriminatory] practices." *Cannon*,

441 U.S. at 704. The Department's goals are to clarify the scope of Title IX's protection from sex discrimination for students participating or attempting to participate in an education program or activity; to state in greater detail and with greater clarity than in the current regulations a recipient's responsibilities toward pregnant students; to ensure the provision of supportive measures, as available and appropriate, to those who experience any form of sex discrimination, including but not limited to sex-based harassment; and to ensure that recipients understand their obligation to address sex discrimination in their education programs or activities. The overarching goal is to ensure that no person experiences sex discrimination in education. To that end, the Department aims to ensure that all recipients can implement Title IX's nondiscrimination mandate fully and fairly in their educational environments, including with procedures for responding to complaints of sex discrimination that are prompt and equitable for all participants.

In reviewing the 2020 amendments, the Department also considered its regulations implementing other laws with requirements that parallel or overlap with a recipient's obligations under Title IX. For example, the Department considered the requirements for postsecondary institutions under the 2013 reauthorization of the Violence Against Women Act (VAWA 2013), Pub. L. No. 113-4, § 304, 127 Stat. 54, 89-92, which amended the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (Clery Act), 20 U.S.C. 1092(f) (2018). The Clery Act requires institutions of higher education participating in Federal financial aid programs under the Higher Education Act of 1965, 20 U.S.C. 1001 et seq. (1965), to comply with certain campus safety- and security-related requirements. The 2013 VAWA amended the Clery Act to require higher education institutions to compile statistics for incidents of dating violence, domestic violence, sexual assault, and stalking and disclose that information in their

annual security reports.  20 U.S.C. 1092(f)(1)(F)(iii).  The Clery Act also requires disclosure of certain policies, procedures, and programs, including programs to prevent domestic violence, dating violence, sexual assault, and stalking and programs to promote the awareness of rape, acquaintance rape, domestic violence, dating violence, sexual assault, and stalking among students and employees.  20 U.S.C. 1092(f)(8)(A), (B).  The Department issued regulations in 2014 to implement those changes to the statute.  Final Rule, Violence Against Women Act: Institutional security policies and crime statistics, 79 FR 62752 (Oct. 20, 2014). https://www.govinfo.gov/content/pkg/FR-2014-10-20/pdf/2014-24284.pdf.  The Violence Against Women Act Reauthorization Act of 2022 did not amend the Clery Act, but it did update the definitions of "dating violence," "domestic violence," and "stalking" in VAWA, which are incorporated into the Clery Act and the current and proposed Title IX regulations.  Pub. L. 117-103, Division W, Consolidated Appropriations Act, 2022.  The Department proposes updates to the 2020 amendments as necessary to account for these changes.

The Department acknowledges that recipients and other stakeholders may have made changes to their policies or procedures to align with the 2020 amendments.  For example, schools have been required to revise existing policies and procedures, or adopt new policies and procedures, for the 2020-2021 school year and the current 2021-2022 school year in reliance on the 2020 amendments.  Recipients' changes may include—among others—policies and procedures based on the 2020 amendments' adoption of a new definition of "sexual harassment" and "notice" as well as the deliberate indifference standard, mandatory dismissals, the requirement for postsecondary recipients to hold live hearings with cross-examination, and the training of Title IX Coordinators, investigators, decisionmakers, and other staff regarding the new requirements.  However, stakeholder feedback from the June 2021 Public Hearing, the 2021

27

listening sessions, and the 2022 meetings held under Executive Order 12866 indicated that many recipients did not agree with the 2020 definition of "sexual harassment" and had found that some of the procedural requirements issued in 2020 made compliance more difficult for them. Recipients expressed concern that the mandatory dismissal requirements and live hearing and cross-examination requirements were having a chilling effect on students who might otherwise report sex-based harassment. The Department therefore has good reason to believe that many recipients would appreciate the flexibility the proposed regulations would afford them to better fulfill their obligation not to discriminate based on sex in their education programs or activities. For example, the proposed regulations would enable recipients to tailor procedures to be effective at addressing sex discrimination in their educational environment by providing an option to conduct live hearings with cross-examination or have the parties meet separately with the decisionmaker and answer questions submitted by the other party when a credibility assessment is necessary; an option to provide the parties an opportunity to review all relevant evidence instead of being obligated to produce a written investigative report; an option to offer informal resolution when appropriate without having to wait for a complaint to be filed; and an option to dismiss complaints when appropriate rather than an obligation to dismiss in specific circumstances. In addition, some stakeholders indicated that because the current regulations do not cover many forms of conduct that may cause a hostile environment based on sex in their program or activity, they created or repurposed alternative disciplinary policies to address such conduct. Such stakeholders would have discretion under the proposed regulations to keep in place policies and procedures they adopted in reliance on the 2020 amendments or to change course so long as they meet their obligations.

In addition, while the Department recognizes that there may be reliance interests related

28

to the current regulations, the Department's tentative view is that the value of better aligning the regulations with the objectives of Title IX, as reflected in proposed revisions to the regulations, substantially outweighs those interests. The proposed changes would strengthen implementation of Title IX and reduce the occurrence of sex discrimination within federally funded education programs or activities. Sex discrimination remains a serious problem that can derail students from participating and thriving in school. The Department's proposed changes would clarify Title IX's coverage of all forms of sex discrimination, strengthen existing protections, and better position schools to meet their obligation not to discriminate based on sex. The proposed changes would better ensure that schools take prompt and effective action to end sex discrimination, including sex-based harassment, with support for affected students and fair procedures for all. In short, the proposed regulations would reflect the statute's text and case law establishing that Title IX protects students from all forms of sex discrimination, including discrimination based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity. Moreover, as discussed in the *Regulatory Impact Analysis*, compliance with the proposed regulations would result in cost savings to recipients.

The Department has considered the interests that stakeholders may have in avoiding further changes to recipient policies and procedures or additional costs that may be required to comply with the proposed regulations. At the same time, the Department has also considered stakeholders' interests in having Title IX regulations that are sufficiently clear to allow for effective implementation and that provide recipients with flexibility and discretion to meet their Title IX obligations and to maintain any policies and procedures that do not conflict with Title IX or the proposed regulations. Based on the information OCR received during the June 2021 Title IX Public Hearing and additional listening sessions, as well as the 2022 meetings held

29

under Executive Order 12866, the Department believes that substantial interests support each change reflected in the proposed regulations, that these changes are designed to ensure full implementation of Title IX's nondiscrimination mandate, and that the benefits of the proposed changes in facilitating that implementation far outweigh the potential interests in maintaining the existing regulations. In each instance in which the Department is proposing to change an existing regulatory requirement, the preamble acknowledges that change when discussing the regulation and explains the Department's reasons for proposing the change. The most significant proposed revisions to the Title IX regulations are summarized below.

Significant Proposed Regulations:

The Department is proposing significant revisions to several subcategories of the Title IX regulations. The Department discusses these significant revisions by topic rather than in numerical order. Generally, the Department does not address proposed regulatory changes that are technical or otherwise minor in effect.

First, the Department discusses its proposed changes to existing definitions and its proposed new definitions of terms of general applicability in the regulations (proposed § 106.2), and its proposed provisions regarding the effect of other requirements and preservation of rights (proposed § 106.6). The Department then clarifies that Title IX obligates a recipient to respond to sex discrimination within the recipient's education program or activity in the United States, even if it occurs off-campus, including but not limited to conduct that occurs in a building owned or controlled by a student organization that is officially recognized by a postsecondary institution and conduct that is subject to the recipient's disciplinary authority. It also requires a recipient to respond to a hostile environment based on sex within its education program or activity in the United States, even if sex-based conduct contributing to the hostile environment occurred outside

30

the recipient's education program or activity or outside the United States (proposed § 106.11).

Second, the Department discusses a recipient's obligation to operate its education program or activity free from sex discrimination, and administrative requirements such as the responsibilities of a recipient to designate a Title IX Coordinator, disseminate a policy of nondiscrimination on the basis of sex, adopt prompt and equitable grievance procedures, and keep records to document its Title IX compliance (proposed § 106.8). The Department also discusses its proposed notification requirement, which would instruct recipients to require certain employees to notify the Title IX Coordinator when they have information about conduct that may constitute sex discrimination under Title IX, and would require other employees who have information about conduct that may constitute sex discrimination under Title IX to either (1) notify the Title IX Coordinator or (2) provide any person who gives them information about such conduct with the contact information for the Title IX Coordinator and information about how to report sex discrimination (proposed § 106.44(c)). The Department also addresses a recipient's obligation to offer supportive measures, as appropriate, to a complainant and respondent upon being notified of conduct that may constitute sex discrimination under Title IX, to the extent necessary to restore or preserve that party's access to the recipient's education program or activity (proposed 106.44(g)).

The Department also discusses its proposed definition of "sex-based harassment" (proposed 106.2) and explains in more detail its proposed changes to the regulations regarding grievance procedures for complaints of sex discrimination (proposed § 106.45), including its proposals to include the basic requirements for grievance procedures such as treating the complainant and respondent equitably (proposed § 106.45(b)(1)); the requirement to objectively evaluate all relevant evidence that is not otherwise impermissible (proposed § 106.45(b)(6)-(7));

31

the standard of proof for all complaints of sex discrimination (proposed § 106.45(h)(1)); and the requirement that grievance procedures be followed before the imposition of any disciplinary sanctions (proposed § 106.45(h)(4)). The Department also explains proposed bases for discretionary dismissal of a complaint (proposed § 106.45(d)) and the proposed requirement that the recipient have a process for the decisionmaker to adequately assess the credibility of the parties and witnesses to the extent that credibility is in dispute and relevant to evaluating one or more of the allegations of sex discrimination (proposed § 106.45(g)). The Department also describes the additional proposed requirements for postsecondary institutions in cases of sex-based harassment involving a student complainant or student respondent (proposed § 106.46), including the role of an advisor (proposed § 106.46(e)(2)) and revised hearing procedures (proposed § 106.46(g)). The Department states that a recipient will not be deemed to have violated the Title IX regulations solely because the Assistant Secretary would have reached a different determination than the recipient reached based on an independent weighing of the evidence in sex-based harassment complaints (proposed § 106.47).

Third, the Department describes its proposed revisions to the Title IX regulations related to pregnancy or related conditions as well as sex discrimination related to marital, parental, and family status, to provide clarity to recipients about their obligation not to discriminate against students or employees who are pregnant or experiencing pregnancy-related conditions. These proposed revisions aim to ensure that students and employees who are pregnant or experiencing pregnancy-related conditions are not subject to discrimination based on sex in education programs or activities and include revisions to the definitions of "pregnancy or related conditions" and "parental status" (proposed § 106.2) as well as revisions to the regulations on admissions (proposed § 106.21(c)); parental, family, or marital status of students (proposed

§ 106.40(a)); pregnancy or related conditions of students (proposed § 106.40(b)); employment (proposed § 106.51(b)(6)); parental, family, or marital status of employees (proposed § 106.57(a)); pregnancy or related conditions of employees (proposed § 106.57(b) and (e)); and pre-employment inquiries (proposed § 106.60).

Fourth, the Department proposes to clarify Title IX's scope of application, including nondiscrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity (proposed § 106.10). The Department also proposes clarifying Title IX's general prohibition on sex discrimination in education programs or activities receiving Federal financial assistance (proposed § 106.31(a)). The preamble explains that unless otherwise provided by Title IX or the regulations, in contexts in which a recipient may provide sex-separate programs or rules, such different treatment must not be applied to individuals in a way that would cause more than de minimis harm, which includes adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with their gender identity (proposed § 106.31(a)(2)).

Fifth, the Department discusses proposed revisions to the prohibition on retaliation (proposed § 106.71) that would build on the current regulations and further clarify what types of conduct would constitute prohibited retaliation, including peer retaliation.

Finally, the Department explains its proposal to delete outdated regulatory provisions (§ 106.2(s) Definition of Transition Plan; § 106.3(c)-(d) Self-evaluation; § 106.15(b) Admissions; §§ 106.16-106.17 Transition Plans; § 106.21(a) Admission; and § 106.41(d) Adjustment period).

It is the Department's intent that the severability clauses set out in §§ 106.9, 106.18 (proposed to be redesignated at 106.16), 106.24, 106.46 (proposed to be redesignated as 106.48),

106.62, and 106.72 of the 2020 amendments remain applicable to the proposed changes set out

below.  As discussed in the 2020 amendments, it is the Department's position that each of the

proposed regulations discussed in this preamble would serve an important, related, but distinct

purpose.  85 FR at 30538.  Each provision provides a distinct value to recipients, elementary

schools, secondary schools, postsecondary institutions, students, employees, the public,

taxpayers, the Federal government, and other recipients of Federal financial assistance separate

from, and in addition to, the value provided by the other provisions.  To best serve these

purposes, the continued application of the severability clauses in the 2020 amendments clarifies

that the proposed regulations operate independently of each other and that the potential invalidity

of one provision should not affect the other provisions.  In addition, the Department intends that

any final regulations following these proposed regulations be enforced prospectively and not

retroactively.

I.  Provisions of General Applicability

*Statute:* Title IX states that "[n]o person in the United States shall, on the basis of sex, be

excluded from participation in, be denied the benefits of, or be subjected to discrimination under

any education program or activity receiving Federal financial assistance," 20 U.S.C. 1681(a), but

does not specify how recipients can meet their Title IX obligations.  The Department has the

authority to "effectuate the provisions" of the Title IX prohibition on discrimination on the basis

of sex in education programs or activities receiving Federal financial assistance, specifically

under 20 U.S.C. 1682 and generally under 20 U.S.C. 1221e-3 and 3474.  Title IX also provides

that the Department may secure compliance by "the termination of or refusal to grant or to

continue assistance," or "by any other means authorized by law."  20 U.S.C. 1682.  The

Department may take such action only after providing a recipient with notice of the failure to

comply with the statute and the Department's regulatory requirements under Title IX and after determining that "compliance cannot be secured by voluntary means." *Id.*

A. Purpose

Section 106.1 Purpose and effective date

*Current regulations:* Section 106.1 has the heading of "Purpose and effective date." Current § 106.1 states that the purpose of the regulations is "to effectuate title IX of the Education Amendments of 1972, as amended by Pub. L. 93-568, 88 Stat. 1855 (except sections 904 and 906 of those Amendments) which is designed to eliminate (with certain exceptions) discrimination on the basis of sex in any education program or activity receiving Federal financial assistance, whether or not such program or activity is offered or sponsored by an educational institution as defined in this part." Current § 106.1 further states that the regulations are "intended to effectuate section 844 of the Education Amendments of 1974, Pub. L. 93-380, 88 Stat. 484." Finally, current § 106.1 provides that the effective date of the regulations is July 21, 1975.

*Proposed regulations:* The Department proposes consolidating the reference to Title IX in the first sentence by removing "of the Education Amendments of 1972, as amended by Pub. L. 93-568, 88 Stat. 1855 (except sections 904 and 906 of those Amendments)." The Department also proposes removing the sentence that identifies the effective date of the regulations.

*Reasons*: Current § 106.2 defines "Title IX" and proposed § 106.2 would retain this definition of Title IX with minor revisions for completeness, accuracy, and readability. Because proposed § 106.2 would define "Title IX," the Department proposes removing the legislative history of Title IX from § 106.1. In addition, it is the Department's view that it is unnecessary to retain a reference to the original effective date of the Title IX regulations in light of the passage of time

since the enactment of Title IX and the several amendments that have followed.  Because proposed § 106.1 would no longer include the effective date, the Department also proposes revising the section heading to "Purpose."

B.  Definitions

The Department proposes including all definitions in § 106.2, the original regulatory section containing definitions for all of the Department's Title IX implementing regulations.  As part of the 2020 amendments, the Department added a separate definitions section, § 106.30, that included definitions related to a recipient's obligation to address sexual harassment.  Because the definitions in that section pertain to a recipient's general obligations to take action to end sex discrimination, the Department proposes moving these definitions to § 106.2.

The Department also proposes to reorganize the definitions at § 106.2.  The existing definitions section does not present the definitions alphabetically, which may create confusion for recipients and others.  Proposed § 106.2 would reorder the definitions to present them in alphabetical order.  The Department also proposes technical edits to accommodate the consolidation of the definitions into § 106.2 and associated numbering changes.

Because the Department proposes consolidating all definitions into § 106.2, the proposed regulatory text would include existing definitions in current § 106.2, as well as definitions that are new to that section.  The Department limits its discussion in this preamble to the definitions that the Department proposes adding and the definitions for which the Department is proposing changes that are not exclusively technical in nature.

Immediately below, the Department discusses proposed revisions to definitions and new definitions that apply throughout the Title IX regulations.  In later topical sections of this preamble, the Department discusses proposed definitions relevant to those topics.

36

Section 106.2 Definition of "administrative law judge"

*Current regulations*: Section 106.2(f) defines "administrative law judge" as "a person appointed by the reviewing authority to preside over a hearing held under this part."

*Proposed regulations:* The Department proposes changing the reference to a hearing held "under this part" to refer to a hearing held "under § 106.81."

*Reasons:* The proposed definition would replace the general reference to "a hearing held under this part" with a specific reference to a hearing held under § 106.81. This clarification is necessary to distinguish a hearing conducted as part of a postsecondary institution's sex-based harassment grievance procedures in proposed § 106.46 from a hearing conducted by an administrative law judge to secure a recipient's compliance with Title IX. Current and proposed § 106.81 adopt and incorporate by reference into the Title IX regulations the procedural provisions applicable to Title VI of the Civil Rights Act of 1964, specifically 34 CFR 100.6-100.11 and Part 101. Proposed §§ 106.2 (definition of "retaliation") and 106.46 discuss hearings conducted as part of a recipient's sex-based harassment grievance procedures.

Section 106.2 Definition of "applicant"

*Current regulations*: Section 106.2(j) defines "applicant" as "one who submits an application, request, or plan required to be approved by a Department official, or by a recipient, as a condition to becoming a recipient."

*Proposed regulations:* The Department proposes adding language to clarify that this definition refers to the use of the term "applicant" in the definition of "educational institution" in § 106.2 and to the use of the term "applicant" in § 106.4.

*Reasons:* The proposed regulations would clarify that the definition of "applicant" in proposed § 106.2, which refers to one who seeks to become a recipient, applies only to the use of the term

37

"applicant" in the definition of "educational institution" in current § 106.2 and to the use of the term "applicant" in § 106.4.  In other provisions in the current and proposed regulations, applicant refers to one who is applying for admission as a student or other participant in a recipient's education program or activity (e.g., § 106.21) or applying for employment (e.g., § 106.51).  Because the definition of "applicant" in current § 106.2 does not apply throughout the regulations, the Department proposes revising the definition to identify the specific provisions to which this definition applies.

Section 106.2 Definitions of "elementary school" and "secondary school"

*Current regulations*: Section 106.30(b) defines an "elementary and secondary school" for purposes of §§ 106.44 and 106.45 as a "local educational agency (LEA), as defined in the Elementary and Secondary Education Act of 1965, as amended by the Every Student Succeeds Act (ESEA); a preschool; or a private elementary or secondary school."

*Proposed regulations:* The Department proposes removing the definition of "elementary and secondary school" and, in its place providing separate definitions of "elementary school" and "secondary school" in § 106.2.  Proposed § 106.2 would define an "elementary school" as that term is defined by section 8101 of the ESEA (20 U.S.C. 7801(19)), and a "public or private preschool."  Proposed § 106.2 would define a "secondary school" as that term is defined by section 8101 of the ESEA (20 U.S.C. 7801(45)), and an "institution of vocational education" as defined in § 106.2 that serves secondary school students.

*Reasons:* The proposed definitions of both "elementary school" and "secondary school" would remove the references to current §§ 106.44 and 106.45 that are in the current definition of "elementary and secondary school," because those sections are limited to sexual harassment, whereas the proposed definitions would apply to all provisions within part 106.  The proposed

38

definitions also would remove explicit references to private schools because these schools are already included in the ESEA definitions of "elementary school" and "secondary school," making these references unnecessary.

The proposed revisions would separately define "elementary school" and "secondary school" because there is a provision in the proposed regulations that distinguishes between elementary schools and secondary schools. For consistency with the Title IX statute at 20 U.S.C. 1681(c), which states that Title IX applies to public and private preschools, the proposed definition of "elementary school" also would cover a public or private preschool. The ESEA does not separately define "preschool" and the Department has not previously done so in its Title IX regulations. The Department's position remains that a separate definition of "preschool" is not necessary and that public and private preschools fall within the proposed definition of "elementary school."

The proposed definition of "secondary school" would also cover an institution of vocational education that serves secondary school students. This addition is necessary to ensure coverage of secondary school students who attend vocational institutions and to align with the definition of "postsecondary institution" in both the current and proposed regulations, which includes institutions of vocational education that serve postsecondary school students. As defined in current § 106.2(o) and proposed § 106.2, an "institution of vocational education" could serve both secondary and postsecondary school students but secondary school students attending institutions of vocational education are unaccounted for in the current definition of "elementary and secondary school."

Section 106.2 Definition of "postsecondary institution"

*Current regulations:* Section 106.30(b) defines "postsecondary institution" for purposes of

39

§§ 106.44 and 106.45 as an institution of graduate higher education as defined in § 106.2(*l*), an "institution of undergraduate higher education" as defined in § 106.2(m), an "institution of professional education" as defined in § 106.2(n), or an "institution of vocational education" as defined in § 106.2(o).

*Proposed regulations:* The Department proposes moving the definition of "postsecondary institution" from § 106.30(b) to § 106.2 with minor revisions.  Proposed § 106.2 would define a "postsecondary institution" as an "institution of graduate higher education" as defined in § 106.2, an "institution of undergraduate higher education" as defined in § 106.2, an "institution of professional education" as defined in § 106.2, or an "institution of vocational education" as defined in § 106.2 that serves postsecondary school students.

*Reasons:* The proposed definition would remove specific references to §§ 106.44 and 106.45 in the current definition of "postsecondary institution" because those sections are limited to sexual harassment, whereas the proposed definition of "postsecondary institution" in § 106.2 would apply to all of part 106.  The proposed revisions also would clarify that the definition of "postsecondary institution" applies to an "institution of vocational education" as defined in § 106.2 that serves postsecondary students.  It is the Department's current view that this clarification is necessary because an "institution of vocational education," as defined in § 106.2, could serve secondary school students or postsecondary institution students.

Section 106.2 Definition of "student with a disability"

*Current regulations:* None.

*Proposed regulations:* The Department proposes adding a definition of "student with a disability" to mean a student who is an individual with a disability who would be covered by Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 705(9)(B), (20)(B), or a child with a

disability as defined in the Individuals with Disabilities Education Act, 20 U.S.C. 1401(3).

*Reasons:* It is the Department's view that it is important to clarify how a recipient's Title IX obligations intersect with its obligation to ensure the rights of students with disabilities. The proposed regulations include provisions in §§ 106.8(e) and 106.44(g)(7) that would require a recipient to consider the requirements of Federal disability laws when implementing the Title IX regulations. A definition of a "student with a disability" is necessary for recipients to understand the scope of these two sets of obligations and how they intersect, and thus would strengthen overall enforcement of Title IX.

Section 106.2 Definition of "Title IX"

*Current regulations:* Section 106.2(a) defines "Title IX" as "title IX of the Education Amendments of 1972, Pub. L. 92-318, as amended by section 3 of Pub. L. 93-568, 88 Stat. 1855, except sections 904 and 906 thereof; 20 U.S.C. 1681, 1682, 1683, 1685, 1686."

*Proposed regulations:* The Department proposes updating this definition to incorporate statutory additions of sections 1687 and 1688 and to simplify its language.

*Reasons*: The current definition omits two sections of Title IX that were added in 1988 and relies on unnecessarily legalistic language. The proposed definition would be a more complete and accurate description of Title IX and it is presented in more accessible language.

C. Application

Section 106.11 Application

*Current regulations:* Section 106.11 states that, except as provided in this subpart, the Department's Title IX regulations apply to every recipient and its education program or activity that receives Federal financial assistance. The Civil Rights Restoration Act of 1987 amended Title IX to add a definition of "program or activity." 20 U.S.C. 1687. In 2000, the Department

41

amended the Title IX regulations to incorporate the statutory definition of "program or activity" at 34 CFR 106.2(h), which provides that a recipient's education program or activity encompasses all of its operations. 65 FR 68050 (Nov. 13, 2000). Current § 106.44(a) defines an "education program or activity" for purposes of §§ 106.30, 106.44, and 106.45 to include locations, events, or circumstances over which the recipient exercised substantial control over both the respondent and the context in which the sexual harassment occurs, and also includes any building owned or controlled by a student organization that is officially recognized by a postsecondary institution. Current §§ 106.8(d) and 106.44(a) limit the geographic scope of a recipient's obligation to address sexual harassment to incidents that occurred against a person while that person was in the United States. In addition, current § 106.45(b)(3)(i) requires a recipient to dismiss a formal complaint of sexual harassment if the alleged conduct did not occur against a person while that person was in the United States.

*Proposed regulations:* The Department proposes amending § 106.11, to clarify that Title IX's prohibition on sex discrimination applies to all sex discrimination occurring both under a recipient's education program or activity and in the United States. The proposed regulations would make clear that conduct that occurs under a recipient's education program or activity includes but is not limited to conduct that occurs in a building owned or controlled by a student organization that is officially recognized by a postsecondary institution, which is consistent with current § 106.44(a), and conduct that is subject to the recipient's disciplinary authority. It would also specify that a recipient has an obligation to address a sex-based hostile environment under its education program or activity, even if sex-based harassment contributing to that hostile environment occurred outside the recipient's education program or activity or outside the United States. Finally, the Department proposes eliminating the language in current § 106.44(a) that

defines "education program or activity" for purposes of sexual harassment to ensure that the term is applied uniformly throughout the regulations for all forms of sex discrimination, including sex-based harassment.

*Reasons*: Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. 1681(a). This statutory prohibition limits Title IX's application in two ways: the sex discrimination must occur (1) under the recipient's program or activity, and (2) against a person in the United States.

The current regulations require a recipient to dismiss a formal complaint of sexual harassment and not use its Title IX grievance process if the conduct did not occur against a person in the United States, even if that conduct contributes to a hostile environment in the recipient's education program or activity in the United States.

After receiving input from stakeholders, the Department has reconsidered its prior interpretation of Title IX's statutory language from the 2020 amendments and proposes revising the current regulations to more clearly and completely describe the circumstances in which Title IX applies. In proposed § 106.11, consistent with 20 U.S.C. 1687, the Department would clarify that an education program or activity includes all of the recipient's operations and that conduct occurring under a recipient's education program or activity would include but is not limited to conduct that occurs in a building owned or controlled by a student organization that is officially recognized by a postsecondary institution and conduct that is "under the school's disciplinary authority." *See Davis*, 526 U.S. at 646-47 (concluding "that recipients of federal funding may be liable for 'subject[ing]' their students to discrimination . . . [for] acts of student-on-student sexual harassment [when] the harasser is under the school's disciplinary authority"). Proposed § 106.11

43

would also recognize that even when an act of sex-based harassment occurs outside the recipient's education program or activity, or outside the United States, that conduct could contribute to a hostile environment based on sex under the recipient's education program or activity, or otherwise exclude a person from participation in, deny them the benefits of, or subject them to sex discrimination under the recipient's education program or activity in the United States. If such sex discrimination occurs, the recipient must address it.

*Obligation to address conduct occurring within the school's operations.* Under the proposed regulations, consistent with the current regulations, a recipient's education program or activity would include buildings or locations that are part of the school's operations, including online learning platforms. 34 CFR 106.44(a). A recipient's education program or activity would also include all of its academic and other classes, extracurricular activities, athletics programs, and other aspects of the recipient's education program or activity, whether those programs or activities take place in the facilities of the recipient, via computer and internet networks, on digital platforms, with computer hardware or software owned, operated by, or used in the operations of the recipient, on a school bus, at a class or training program sponsored by the recipient at another location, or elsewhere.

The Department's discussion in the preamble to the 2020 amendments regarding Title IX and online platforms used by a recipient would thus remain relevant under the proposed regulations. Specifically, in the preamble to the 2020 amendments the Department explained that the operations of a recipient "may certainly include computer and internet networks, digital platforms, and computer hardware or software owned or operated by, or used in the operations of, the recipient." 85 FR at 30202. The Department further explained that "the factual circumstances of online harassment must be analyzed to determine if it occurred in an education

44

program or activity." *Id.* The Department would maintain the same position in the proposed regulations as stated in the preamble to the current regulations: The definition of "program or activity" in the Title IX regulations does not create a distinction between sex discrimination occurring in person and that occurring online. *Id.* at 30203.

Under the proposed regulations, consistent with the current regulations, conduct occurring under a recipient's education program or activity would extend to conduct in off-campus settings that are operated or overseen by the school (e.g., a school field trip) and off-campus buildings owned or controlled by a student organization officially recognized by a postsecondary institution. *Id.*; 85 FR at 30196-98; *see, e.g.*, *Farmer v. Kan. State Univ.*, 16-cv-2256-JAR-GEB, 2017 WL 980460, at *7-10 (D. Kan. Mar. 14, 2017) (finding plaintiff sufficiently alleged that Kansas State University exercised substantial control over off-campus assault at a fraternity because the fraternity was subject to oversight by University and University had the authority to discipline fraternity), *aff'd on other grounds*, 918 F.3d 1094 (10th Cir. 2019); *Weckhorst v. Kan. State Univ.*, 241 F. Supp. 3d 1154, 1166-70 (D. Kan. 2017), *aff'd sub nom. Farmer v. Kan. State Univ.*, 918 F.3d 1094 (10th Cir. 2019) (holding plaintiff sufficiently alleged that Kansas State University exercised substantial control over off-campus assault that occurred during a fraternity event at a local park because the University subjected the fraternity to oversight and had the authority to discipline fraternity); *S.C. v. Metro. Gov't of Nashville*, No. 17-1098, 2022 WL 127978, *25 (M.D. Tenn. Jan. 12, 2022), *appeal pending* (noting that the Court's "formulation of potential liability for peer harassment notably shied away from drawing a hard line based on geography, focusing instead on whether the harassment was taking place 'under' an 'operation' of the funding recipient" (citing *Davis*, 526 U.S. at 646)).

*Obligation to address conduct that occurs under the school's disciplinary authority.*

45

Conduct occurring under a recipient's education program or activity would also include other settings in the United States but off campus or off school grounds when the conduct "is under the school's disciplinary authority." *Davis*, 526 U.S. at 647; *cf. Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2045 (2021) (noting a school's "regulatory interests remain significant in some off-campus circumstances" and "several types of off-campus behavior . . . may call for school regulation," including "serious or severe bullying or harassment targeting particular individuals [and] threats aimed at teachers or other students"). Thus, the proposed regulations would adopt the Department's recognition in the preamble to the 2020 amendments that a teacher's sexual harassment of a student is "likely" to constitute sexual harassment "in the program" of the school even if the harassment occurs off campus or off school grounds and outside a school-sponsored activity. 85 FR at 30200.

In addition, some schools have codes of conduct that address interactions, separate from discrimination, between students that occur off campus. If a school has such a code of conduct, then it may not disclaim responsibility for addressing sex discrimination that occurs in a similar context. If the school responds when, for instance, one student steals from another at an off-campus location, or when a student engages in a nonsexual assault of another student at an off-campus location, it must likewise respond when a student engages in sexual assault or sex-based harassment of another student off campus. Thus, the proposed rule would make clear, as in the 2020 amendments, that whether conduct falls under a recipient's education program or activity for purposes of Title IX is not contingent on the geographic location of the underlying conduct, but rather on whether the recipient exercises disciplinary authority over the respondent's conduct in that context. *See, e.g.*, *DeGroote v. Ariz. Bd. of Regents*, No. CV-18-00310-PHX-SRB, 2020 WL 10357074, at *8 (D. Ariz. Feb. 7, 2020) (finding a school exercised control over harasser

and context of harassment, in part, because the school's code of conduct addressed off-campus behavior and because the location of the initial harassment "is not dispositive").

*Obligation to address hostile environment created by conduct outside of the education program or activity.* Proposed § 106.11 would also clarify that Title IX obligates a recipient to address a hostile environment occurring within the recipient's education program or activity, even if the underlying sex-based harassment contributing to the hostile environment does not occur in the recipient's education program or activity or occurs outside the United States.

During OCR's numerous listening sessions and in the June 2021 Title IX Public Hearing, many stakeholders indicated that the current regulations could be interpreted to exclude conduct that occurs off campus or off school grounds outside of a recipient's education program or activity, or that occurs in a program or activity but outside the United States, even when that conduct creates a hostile environment based on sex in an education program or activity within the United States. They further asserted that Title IX requires a recipient to address a hostile environment based on sex in the recipient's education program or activity, regardless of whether the sex-based harassment contributing to that hostile environment occurred elsewhere. The Department takes seriously these comments and agrees that clarification is needed. After considering this issue and reweighing the facts and circumstances, including this feedback, the Department proposes regulatory language to enforce the full scope of Title IX's nondiscrimination mandate and ensure that recipients provide a nondiscriminatory environment for all students within their programs and activities in the United States. Proposed § 106.11 would clarify that Title IX's prohibition on sex discrimination would apply to a hostile environment under a recipient's education program or activity, even if sex-based harassment contributing to such a hostile environment occurred outside of the recipient's education program

47

or activity or occurred within an education program or activity but outside of the United States.

In the preamble to the 2020 amendments, the Department explained that in the context of a private lawsuit for monetary damages, the Supreme Court applied Title IX's program or activity language to "'limit a recipient's damages liability to circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs.'" 85 FR at 30196 (quoting *Davis*, 526 U.S. at 645). The Department acknowledged that the Court's decision was in the context of a lawsuit for monetary damages and not in the administrative enforcement context, but stated that because the Department, like the Court, is constrained by the text of the statute, including the definition of "program or activity," a similar analysis is appropriate in the administrative enforcement context. *Id.* at 30196 n.863. The Department recognizes that some Federal courts in private suits for monetary damages have held a school not liable under Title IX for harassment that occurred outside of the recipient's control. *See, e.g.*, *Roe v. St. Louis Univ.*, 746 F.3d 874, 883-84 (8th Cir. 2014) (holding that there was insufficient evidence alleged to demonstrate that university was deliberately indifferent to plaintiff's allegations of rape by a fellow student in a private residence over which the University exercised no control); *Samuelson v. Or. State Univ.*, 162 F. Supp. 3d 1123, 1132-34 (D. Or. 2016) (finding that plaintiff did not allege facts to demonstrate university had any control over a rape by a non-student at a private apartment for purposes of "pre-assault liability" and dismissing as time-barred plaintiff's allegations of deliberate indifference following her report of the rape to the university). In those cases, however, there were no actionable allegations that the schools were deliberately indifferent to a hostile environment based on sex *within* the recipient's education program or activity.

Indeed, several Federal courts have held that, even for purposes of monetary damages

under *Davis*, Title IX requires recipients to evaluate and address allegations of a hostile environment within a recipient's education program or activity, even when an initial incident of sex-based harassment may have occurred outside of the recipient's education program or activity. *See, e.g.*, *Rost v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1121 n.1 (10th Cir. 2008) (citing *Davis*, 526 U.S. at 645) (recognizing that sexual assault occurring in settings outside of the school can create Title IX liability, as long as there is "some nexus between the out-of-school conduct and the school," but finding that in this case, the district's response to such conduct was not deliberately indifferent); *Spencer v. Univ. of N.M. Bd. of Regents*, 15-cv-141-MCA-SCY, 2016 WL 10592223, at *6 (D.N.M. Jan. 11, 2016) (concluding that a reasonable jury could find the recipient deliberately indifferent for its failure to address the risk created by the possibility of future encounters between the plaintiff and the men who raped her off campus); *L.E. v. Lakeland Joint Sch. Dist. #272*, 403 F. Supp. 3d 888, 900-01 (D. Idaho 2019) (finding that the district was responsible for responding to a hostile environment in its education program or activity even where the initial sexual assault occurred outside the school's education program or activity).

The Department's current view is that these decisions are correct in reading *Davis* to require a recipient to address a hostile environment based on sex that exists within its education program or activity, whether or not the initial sex-based harassment or other contributing acts of sex-based harassment may have occurred elsewhere. This is because when the hostile environment exists within a recipient's education program or activity, the recipient exercises substantial control over both the harasser and the context. *See Davis*, 526 U.S. at 645. A recipient cannot, therefore, sever incidents that happened outside of its education program or activity from any subsequent harassment or resulting hostile environment within the recipient's

49

control. *L.E.*, 403 F. Supp. 3d at 900. To do so would allow "a person" to be "subjected to discrimination under an[] education program or activity receiving Federal financial assistance" in violation of Title IX's explicit text. 20 U.S.C. 1681(a).

For example, Student A reports that Student B sexually assaulted her while participating in the recipient's study abroad program and both students have now returned to campus in the United States. Student A reports that Student B has been taunting her with sexually suggestive comments about the prior assault since their return to campus. Because of the sexual assault and Student B's continuing conduct, Student A is unable to concentrate or participate fully in her classes and activities where Student B is present. In this scenario, because Student A has alleged a hostile environment based on sex within the recipient's education program or activity within the United States, the recipient would have an obligation to take action to address those allegations. The proposed regulations would require the recipient to provide Student A with appropriate supportive measures and, if the recipient's investigation finds that a hostile environment exists within its education program or activity, take action against Student B after following all applicable grievance procedures.

Evaluating whether a hostile environment exists as a result of conduct that is otherwise not covered by Title IX is a fact-specific inquiry. Consistent with Federal case law, when sex-based harassment occurs outside of the United States or outside of a recipient's education program or activity, it will not always result in a hostile environment that is within a recipient's control. The definition of "sex-based harassment" in proposed § 106.2 would set out the minimum factors that must be considered in determining whether a hostile environment has been created in a recipient's education program or activity. These factors would also apply when determining whether sex-based harassment that occurred outside of a recipient's education

program or activity has created a sex-based hostile environment in a recipient's education program or activity. A recipient should also consider in its fact-specific inquiry whether a complainant's encounters with an alleged respondent in the recipient's education program or activity give rise to a hostile environment, even when the incidents of harassment occurred outside of the recipient's education program or activity. *See Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1296-98 (11th Cir. 2007) (reasoning that Title IX claim could arise when a student withdrew from university rather than risk encountering her alleged perpetrators on campus when school waited months before taking action in response to her complaint); *Kinsman v. Fla. State Univ. Bd. of Trustees*, No. 4:15cv235-MW/CAS, 2015 WL 11110848, at *4 (N.D. Fla. Aug. 12, 2015) (holding that the effect of sex-based harassment does not end with the cessation of the harassing conduct, particularly when the complainant and respondent both remain at the institution and agreeing "that the possibility of further encounters 'between a rape victim and her attacker could create an environment sufficiently hostile to deprive the victim of access to educational opportunities provided by a university.'" (citation omitted)); *Spencer*, 2016 WL 10592223, at *6 ("'[A] reasonable jury [may] conclude that further encounters, of any sort, between a rape victim and her attacker could create an environment sufficiently hostile to deprive the victim of access to educational opportunities provided by a university.'" (quoting *Kelly v. Yale Univ.*, No. 3:01-CV-1591, 2003 WL 1563424, at *3 (D. Conn. Mar. 26, 2003))); *Doe v. Derby Bd. of Educ.*, 451 F. Supp. 2d 438, 444 (D. Conn. 2006) (holding that the "constant potential for interactions" between a harasser and rape victim due to the harasser's presence on campus could constitute sex-based harassment); *Crandell v. N.Y. Coll. of Osteopathic Med.*, 87 F. Supp. 2d 304, 316 (S.D.N.Y. 2000) (harassment by former professor at off-campus internship required Title IX response by school when "the presence of the perpetrator at the institution

51

would be expected to create a hostile environment"). In evaluating whether there is a hostile environment, courts have reiterated that recipients must adopt a "'totality of the circumstances' approach that rejects the disaggregation of the allegations and requires only that the alleged incidents cumulatively have resulted in the creation of a hostile environment." *Crandell*, 87 F. Supp. 2d at 319.

In the circumstances in which sex-based harassment occurs outside a recipient's education program or activity or outside the United States, and the harassment does not contribute to a hostile environment within the recipient's education program or activity, proposed § 106.11 would clarify that Title IX does not apply. For example, Student C reports she was sexually assaulted in a nightclub off campus by a third party who does not live in the area. Student C is now experiencing emotional distress and is unable to attend classes. Because the assault occurred off campus, and the respondent is not a representative of the recipient or otherwise a person over whom the recipient exercises disciplinary authority, the assault did not occur within the recipient's education program or activity. And because Student C is not alleging a hostile environment within the education program or activity due to the respondent's presence or additional harassment she is experiencing, proposed § 106.11 clarifies that a recipient's Title IX obligations would not be implicated. The recipient would still be encouraged to provide supportive measures to Student C and refer Student C to local law enforcement.

Finally, the proposed regulations would also recognize that when sex discrimination other than sex-based harassment occurs outside of a recipient's education program or activity, or outside of the United States, but causes sex discrimination within the recipient's education program or activity, Title IX would require the recipient to address this sex discrimination as well. For example, a student in a recipient's study abroad program complains that he was

subjected to different treatment in grading based on sex by a professor and, as a result, the student lost his scholarship. Under proposed § 106.11, the recipient would be required to address the complaint because, although the different treatment in grading occurred outside of the United States, that conduct caused discrimination based on sex in the recipient's education program in the United States. This response would include compliance with applicable grievance procedures, including investigating the complaint, and, if discrimination is found, taking steps to remedy the resulting discrimination. For instance, the recipient may remove the discriminatory grade from the student's transcript and reinstate the scholarship. In addition, there may be circumstances in which the recipient itself is alleged to have engaged in sex discrimination in its program outside the United States. When such conduct causes sex discrimination in its education program or activity within the United States, the recipient must address it.

### D. The Effect of Other Requirements and Preservation of Rights

Section 106.6(e) Effect of Section 444 of General Education Provisions Act (GEPA)/Family Educational Rights and Privacy Act (FERPA)

*Current regulations:* Current § 106.6(e) states that the obligation to comply with the regulations in part 106 is not obviated or alleviated by the FERPA statute, 20 U.S.C. 1232g, or FERPA regulations, 34 CFR part 99.

*Proposed regulations:* No proposed change.

*Reasons:* The Family Educational Rights and Privacy Act (FERPA) protects the privacy of students' education records and personally identifiable information contained therein. Privacy is an important factor that the Department carefully considered in promulgating the proposed regulations and recipients will need to consider this factor in implementing them.

To the extent that there may be circumstances in which a conflict exists between a

recipient's obligations under Title IX and under FERPA, the Department would maintain the provision in § 106.6(e) that expressly states that the obligation to comply with the Title IX regulations is not obviated or alleviated by the FERPA statute or regulations.  85 FR at 30424. As the General Education Provisions Act (GEPA) provides, nothing in that statute shall be construed to "affect the applicability of title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.], title IX of the Education Amendments of 1972 [20 U.S.C. 1681 et seq.], title V of the Rehabilitation Act of 1973 [29 U.S.C. 791 et seq.], the Age Discrimination Act [42 U.S.C. 6101 et seq.], or other statutes prohibiting discrimination, to any applicable program."  20 U.S.C. 1221(d).  The Department has long interpreted this provision to mean that "FERPA continues to apply in the context of Title IX enforcement, but if there is a direct conflict between the requirements of FERPA and the requirements of Title IX, such that enforcement of FERPA would interfere with the primary purpose of Title IX to eliminate sex-based discrimination in schools, the requirements of Title IX override any conflicting FERPA provisions."  85 FR at 30424.

Some aspects of the proposed regulations address areas in which recipients may also have obligations under FERPA or its implementing regulations, 34 CFR part 99, for example, provisions regarding the exercise of rights by parents, guardians, or other authorized legal representatives at proposed § 106.6(g); disclosure of supportive measures at proposed § 106.44(g)(5); consolidation of complaints at proposed § 106.45(e); a description of the relevant evidence at proposed § 106.45(f)(4); access to an investigative report or relevant and not otherwise impermissible evidence at proposed § 106.46(e)(6); and notification of the determination of a sex discrimination complaint at proposed §§ 106.45(h)(2) and 106.46(h)(1). The Department is seeking comments on the intersection between the proposed Title IX

54

regulations and FERPA, any challenges that recipients may face as a result of the intersection between the two laws, and any steps the Department might take to address those challenges in the Title IX regulations.

Section 106.6(g) Exercise of rights by parents, guardians, or other authorized legal representatives

*Current regulations:* Section 106.6(g) states that the Department's Title IX regulations must not be read in derogation of any legal right of a parent or guardian to act on behalf of a complainant, respondent, party, or other individual, subject to the obligation to comply with the Family Educational Rights and Privacy Act, 20 U.S.C. 1232g. This right to act on behalf of another includes but is not limited to, filing a formal complaint.

*Proposed regulations:* The Department proposes clarifying in this section that an authorized legal representative has the right to act on behalf of a complainant, respondent, or other person, subject to proposed § 106.6(e), including but not limited to making a complaint through the recipient's grievance procedures for complaints of sex discrimination, as would a parent or guardian.

*Reasons:* Upon reexamining this provision, the Department proposes adding to the current regulations the term "authorized legal representative" to fill a gap in the existing regulations that was brought to the Department's attention in listening sessions with a wide array of stakeholders, including students, parents, educators, school officials, and advocacy organizations. Throughout the United States, an individual in the role of an educational representative or another similar role is legally authorized to act on behalf of certain youth in out-of-home care but is not necessarily deemed a parent or guardian. The Department proposes adding the term "authorized legal representative" to § 106.6(g), recognizing that although terminology may differ across

55

States and contexts, there is a critical need to empower these individuals to act on behalf of another person, consistent with their legal authority, in matters addressed by the proposed regulations.

Section 106.6(h) and 106.6(b) Preemptive effect

*Current regulations:* Section 106.6(h) states that, to the extent there is any conflict between State or local law and the Title IX regulations at §§ 106.30, 106.44, and 106.45, the obligation to comply with those sections is not obviated or alleviated by any State or local law. Current § 106.6(b) states that the obligation to comply with part 106 is not obviated or alleviated by any State or local law or other requirement which would render any applicant or student ineligible, or limit the eligibility of any applicant or student, on the basis of sex, to practice any occupation or profession.

*Proposed regulations:* The Department proposes eliminating § 106.6(h) entirely and simplifying § 106.6(b) to make clear that all of the Title IX regulations would preempt State or local law. Proposed § 106.6(b) states that a recipient's obligation to comply with part 106 is not obviated or alleviated by any State or local law or other requirement, and that nothing in the Department's regulations would preempt a State or local law that does not conflict with these regulations and that provides greater protections against sex discrimination.

*Reasons:* The Department wants to ensure recipients understand that their obligations to comply with the Department's Title IX regulations are not dependent or conditioned on other obligations recipients may be subject to in their respective States or localities. Current § 106.6(b) states that this preemptive effect applies only with respect to "any State or local law or other requirement which would render any applicant or student ineligible, or limit the eligibility of any applicant or student, on the basis of sex, to practice any occupation or profession." The Department wants to

56

ensure that recipients are aware that the preemptive effect of these regulations are not just limited to the circumstances listed in § 106.6(b), nor the provisions specifically excerpted in § 106.6(h). The proposed regulations would delete the language limiting the provision to eligibility to practice any occupation or profession, making clear in a simple comprehensive statement that the Title IX regulations preempt *any* State or local law with which there is a conflict. The proposed change would also avoid the duplication that may exist under separate but overlapping provisions.

In addition, proposed § 106.6(b) would clarify that nothing in the Department's proposed regulations would preempt a State or local law that provides greater protections to students and does not conflict with these regulations. This clarification would ensure that the proposed regulations appropriately cover the full scope of Title IX while not extending further than the Department's authority to promulgate regulations to effectuate Title IX.

E. Procedures

Section 106.81 Procedures

*Current regulations:* Section 106.81 provides that the procedural provisions applicable to Title VI of the Civil Rights Act of 1964 are adopted and incorporated into the Title IX regulations by reference. Current § 106.81 states that these procedures may be found at 34 CFR 100.6-100.11 and 34 CFR part 101. Finally, current § 106.81 states that the definitions in current § 106.30 do not apply to 34 CFR 100.6-100.11 and 34 CFR part 101.

*Proposed regulations:* The Department proposes removing the final sentence of current § 106.81, which states that the definitions in current § 106.30 do not apply to 34 CFR 100.6-100.11 and 34 CFR part 101.

*Reasons*: As explained in greater detail in the discussion of Definitions in the Provisions of

57

General Applicability (Section I.B), the Department proposes removing current § 106.30 in its entirety. Accordingly, the Department also proposes removing the statement that the definitions in current § 106.30 do not apply to the Title VI regulations.

## II. Recipient's Obligation to Operate Its Education Program or Activity Free from Sex Discrimination

*Statute*: Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. 1681(a). The Department has the authority to regulate with regard to discrimination on the basis of sex in education programs or activities receiving Federal financial assistance, specifically under 20 U.S.C. 1682 and generally under 20 U.S.C. 1221e-3 and 3474.

### A. Sex Discrimination Generally

As discussed in the Background section, the Supreme Court explained in *Cannon* that the objectives of Title IX are two-fold: first, to "avoid the use of federal resources to support discriminatory practices," and second, to "provide individual citizens effective protection against those practices." 441 U.S. at 704. The Court also clarified the broad scope of Title IX in *North Haven Board of Education*, stating: "[I]f we are to give Title IX the scope that its origins dictate, we must accord it a sweep as broad as its language." 456 U.S. at 521 (citations and internal alterations omitted).

These cases, together with the text of Title IX, make clear that Title IX's prohibition on sex discrimination imposes a legal duty on every covered recipient of Federal funds to operate its education program or activity free from sex discrimination. This legal duty accordingly requires

a recipient to respond promptly and equitably when sex discrimination may be taking place within its education program or activity.

    B.   Sex-Based Harassment

        1.  OCR's Guidance and Supreme Court Precedent on Title IX's Application to Sexual Harassment

The Supreme Court and the Department have long interpreted Title IX to prohibit sexual harassment. In 1981, OCR Director for Litigation, Enforcement and Policy Service Antonio J. Califa issued a policy memorandum to all OCR regional directors advising them that "[s]exual harassment consists of verbal or physical conduct of a sexual nature, imposed on the basis of sex, by an employee or agent of a recipient that denies, limits, provides different, or conditions the provision of aid, benefits, services or treatment protected under Title IX." *See* 1988 Sexual Harassment Pamphlet at 2 (quoting OCR Policy Memorandum, Aug. 31, 1981, from Antonio J. Califa, Director for Litigation, Enforcement and Policy Service, OCR to Regional Civil Rights Directors), https://files.eric.ed.gov/fulltext/ED330265.pdf. Then in 1988, OCR issued a pamphlet titled Sexual Harassment: It's Not Academic, which characterized the 1981 memorandum as having "reaffirmed" OCR's jurisdiction: "In an August 1981 policy memorandum, the Office for Civil Rights (OCR) of the U.S. Department of Education reaffirmed its jurisdiction over sexual harassment complaints under Title IX . . . ." *Id.*

The Supreme Court addressed Title IX's coverage of sexual harassment for the first time in 1992, when it confirmed that a school district could be held liable for monetary damages in cases involving a teacher sexually harassing a student. *Franklin*, 503 U.S. 60. The Court noted that prior to filing her lawsuit, the plaintiff filed a complaint with OCR in August 1988 in which OCR concluded that the school district violated Franklin's Title IX rights by subjecting her to

sexual harassment and by interfering with her right to complain. *Id.* at 64 n.3. By allowing monetary damages as a remedy, the Court signaled approval for more robust enforcement of Title IX to cover sexual harassment. *See id.* at 76 ("[I]n this case the equitable remedies suggested by respondent and the Federal Government are clearly inadequate.").

Following *Franklin* and beginning in 1997, OCR issued a series of documents to provide additional guidance to recipients, students, and others regarding Title IX's prohibition on sexual harassment. *See, e.g.*, 1997 Sexual Harassment Guidance; 2001 Revised Sexual Harassment Guidance; U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter from Assistant Secretary Stephanie Monroe on Sexual Harassment (Jan. 25, 2006) (rescinded upon effective date of 2020 amendments, Aug. 14, 2020)

https://www2.ed.gov/about/offices/list/ocr/letters/sexhar-2006.html; U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter: Sexual Violence (Apr. 4, 2011) (rescinded in 2017) (2011 Dear Colleague Letter on Sexual Violence),

https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf; 2014 Q&A on Sexual Violence; U.S. Dep't of Educ., Office for Civil Rights, Q&A on Campus Sexual Misconduct (Sept. 22, 2017) (rescinded in 2020) (2017 Q&A on Campus Sexual Misconduct),

https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

OCR published the 1997 Sexual Harassment Guidance in the *Federal Register* for public comment after "extensive consultation with interested parties," including "students, teachers, school administrators, and researchers." 1997 Sexual Harassment Guidance, 62 FR at 12035. OCR set out the circumstances under which sexual harassment of students is a form of prohibited discrimination under Title IX, explaining that sexual harassment occurs when "a school employee explicitly or implicitly conditions a student's participation in an education program or

activity or bases an educational decision on the student's submission to unwelcome sexual [conduct]." *Id.* at 12038. OCR further explained that under Title IX, hostile environment harassment requires that the sexually harassing conduct be "sufficiently severe, persistent or pervasive to limit a student's ability to participate in or benefit from an education program or activity, or to create a hostile or abusive educational environment." *Id.* OCR also discussed what constitutes notice of sexual harassment of students by its employees, students, or third parties and how a school should respond upon receiving notice of sexual harassment. *Id.* at 12039, 12042-43. OCR rooted this interpretation in Supreme Court precedent and well-established legal principles under Title IX, as well as the related nondiscrimination provisions of Titles VI and VII of the Civil Rights Act of 1964. *Id.* at 12034.

In 1998, the Supreme Court held in *Gebser* that a school district may be liable for monetary damages if a teacher sexually harasses a student, an official who has the authority to address the harassment has actual knowledge of the harassment, and that official is deliberately indifferent in responding to the harassment. 524 U.S. at 277. The following year, the Court held in *Davis* that a school district also may be liable for monetary damages if the school has actual knowledge of student-on-student harassment in its programs or activities, it responds with deliberate indifference, and the harassment is sufficiently severe, pervasive, and objectively offensive that it effectively bars the student's access to an educational opportunity or benefit. 526 U.S. at 650.

The Court specifically and repeatedly stated that the liability standards for sexual harassment established in *Gebser* and *Davis* were required in *private* actions for monetary damages. *Gebser*, 524 U.S. at 283 ("In this case, moreover, petitioners seek not just to establish a Title IX violation but to recover *damages* based on theories of *respondeat superior* and

61

constructive notice. It is that aspect of their action, in our view, that is most critical to resolving the case." (emphasis in original)); *Davis*, 526 U.S. at 639 (affirming that Title IX's coverage of student-on-student harassment was not in dispute and instead that "at issue here is the question whether a recipient of federal education funding may be liable for damages under Title IX under any circumstances for discrimination in the form of student-on-student sexual harassment"); *see also Davis*, 526 U.S. at 633, 641-44, 649-53; *Gebser*, 524 U.S. at 287-88.

In particular, in setting the damages liability standards for recipients, the Court was concerned about the possibility of requiring a school to pay money damages for harassment of which it was not aware and in amounts that exceeded the recipient's level of Federal funding. *Gebser*, 524 U.S. 289-90. At the same time, the Court acknowledged the authority of Federal agencies, such as the Department, to "promulgate and enforce requirements that effectuate [Title IX's] nondiscrimination mandate," even in circumstances that would not give rise to a claim for monetary damages. *Id.* at 292. The Court noted that "the Department of Education could enforce the requirement administratively" that a school "promulgate a grievance procedure" even though the failure to do so "does not itself constitute 'discrimination' under Title IX." *Id.* Similarly, the Court has explained that the Department may require schools to sign assurances of compliance under Title IX, even though the failure to sign such assurances would not itself constitute sex discrimination by the recipient. *See Grove City Coll.*, 465 U.S. at 574.

Following the *Gebser* decision, the Department informed school superintendents and college and university presidents that the Court's decision did not change a school's obligation to take reasonable steps to prevent and eliminate sexual harassment as a condition of their receipt of Federal funding. *See* U.S. Dep't of Educ., Letter from Secretary Richard W. Riley to Superintendents of Schools (Aug. 31, 1998),

https://www2.ed.gov/offices/OCR/archives/pdf/AppC.pdf; U.S. Dep't of Educ., Letter from

Secretary Richard W. Riley to College and University Presidents (Jan. 28, 1999),

https://www2.ed.gov/News/Letters/990128.html.  In 2000, OCR explained in its notice and

request for comments on the proposed Revised Sexual Harassment Guidance that although "[i]n

most important respects, the substance of the 1997 Guidance was reaffirmed in the Court's

opinions in *Gebser* and *Davis*, [the Department] determined that in certain areas the 1997

Guidance could be strengthened by further clarification and explanation of the regulatory basis

for the guidance."  U.S. Dep't of Educ., Office for Civil Rights, Request for Comments, Revised

Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or

Third Parties 65 FR 66092 (Nov. 2, 2000) (Request for Comments on the 2001 Revised Sexual

Harassment Guidance), https://www.govinfo.gov/content/pkg/FR-2000-11-02/pdf/00-27910.pdf.

*See also* U.S. Dep't of Educ., Office for Civil Rights, Notice of Availability, Revised Sexual

Harassment Guidance, 66 FR 5512 (Jan. 19, 2001), https://www.govinfo.gov/content/pkg/FR-

2001-01-19/pdf/01-1606.pdf.

 The 2001 Revised Sexual Harassment Guidance did not change the standards that OCR

used to determine when prohibited sexual harassment has occurred.  Request for Comments on

the 2001 Revised Sexual Harassment Guidance, 65 FR at 66093.  Rather, OCR clarified that

"these standards apply to our ability to find a violation and seek corrective action in

administrative enforcement of Title IX."  *Id.*  OCR explained that "the focus of the guidance is

on a school's administrative responsibilities under the nondiscrimination requirements of the

Title IX statute and regulations" to take effective action to prevent, eliminate, and remedy sexual

harassment occurring in its programs or activities, rather than its liability for money damages in

private lawsuits.  *Id.*  When the revised guidance was issued, it noted that "commenters

uniformly agreed with OCR that the Court limited the liability standards established in *Gebser* and *Davis* to private actions for monetary damages" and "that the administrative enforcement standards reflected in the 1997 Guidance remain valid in OCR enforcement actions." 2001 Revised Sexual Harassment Guidance at iv, vi ("[B]oth *Davis* and the Department tell schools to look at the 'constellation of the surrounding circumstances, expectations, and relationships' (526 U.S. at 651 (citing *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 82 (1998)), and the *Davis* Court cited approvingly to the underlying core factors described in the 1997 Guidance for evaluating the context of the harassment."). Finally, OCR explained that "[w]hile *Gebser* and *Davis* made clear that Title VII agency principles do not apply in determining liability for money damages under Title IX, the *Davis* court also indicated, through its specific references to Title VII caselaw, that Title VII remains relevant in determining what constitutes hostile environment sexual harassment under Title IX." *Id.* at vi.

As noted above, OCR issued subsequent guidance documents on harassment on the basis of sex, including sexual harassment, that built on the concepts from the 1997 Sexual Harassment Guidance and the 2001 Revised Sexual Harassment Guidance. *See* U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter: Harassment and Bullying (Oct. 26, 2010) (2010 Dear Colleague Letter on Harassment and Bullying), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf; 2011 Dear Colleague Letter on Sexual Violence; 2014 Q&A on Sexual Violence; 2017 Q&A on Campus Sexual Misconduct. OCR issued these guidance documents to assist recipients in meeting their obligations and to provide the public with information about their rights under the Title IX statute and regulations. These guidance documents provided information and examples to inform recipients about how OCR evaluates compliance with Title IX.

64

2. The 2020 Amendments' Framework for Addressing Sexual Harassment Under Title IX

On November 29, 2018, the Department published a notice of proposed rulemaking to clarify and modify the Title IX regulations. 2018 NPRM. In response to the 2018 NPRM, the Department received more than 124,000 comments expressing a wide variety of views on the proposed regulations. On May 19, 2020, the Department published the 2020 amendments to the Title IX regulations, which went into effect on August 14, 2020. 85 FR 30026.

In the preamble to the 2020 amendments, the Department explained that "[n]either *Gebser* nor *Davis* opined as to what the appropriate conditions (e.g., definition of sexual harassment, actual knowledge) and liability standard (e.g., deliberate indifference) must or should be for the Department's administrative enforcement." *Id*. at 30033. The Department recognized its flexibility to depart from the standards and conditions articulated in *Gebser* and *Davis*, explaining that the "Department has regulatory authority to select conditions and a liability standard different from those used in the *Gebser/Davis* framework, because the Department has authority to issue rules that require recipients to take administrative actions to effectuate Title IX's non-discrimination mandate." *Id.*

Notwithstanding this recognition of its distinct administrative authority to enforce Title IX, in the 2020 amendments the Department chose to use the *Gebser/Davis* framework as the starting point for describing a recipient's legal obligation to address sexual harassment under Title IX, departing in many respects from OCR's prior longstanding guidance that had been developed to ensure a recipient's implementation of Title IX's protections. The Department also stated that it was using Title IX's "statutory authority to issue rules to effectuate the purpose of Title IX," to "reasonably expand[]" aspects of that "framework to further the purposes of Title

65

IX in the context of administrative enforcement, holding schools responsible for taking more actions than what the *Gebser/Davis* framework requires." *Id.* at 30033, 30035.

After extensive review, the Department's current view is that the 2020 amendments do not adequately promote full implementation of Title IX's prohibition on sex discrimination, including sex-based harassment, by a recipient in its education program or activity. For example, the 2020 amendments do not require a postsecondary institution to investigate sexual harassment in its education program or activity, even if its leadership has persuasive evidence that harassment is taking place, unless the person who experienced the harassment (i.e., the complainant) reported the harassment in writing to a specifically designated employee. As a result, a complainant who does not report the harassment to the correct individual may be denied access to an educational environment free from sex discrimination, and the recipient may be discriminating based on sex in operating its program or activity. Also, stakeholders reported that certain requirements of the 2020 amendments have resulted in decreased reporting of sexual harassment and may have impeded recipients from responding promptly and equitably to allegations of sexual harassment in its educational environment. The Department's current view is that it is necessary to amend its Title IX regulations to clarify a recipient's obligation to take prompt and effective action to end all sex-based harassment, to help ensure that Title IX's protections are fully enforced, and to avoid recipients' use of Federal funds to support discriminatory practices.

C. Revised Definitions

Section 106.2 Definition of "Complainant"

*Current regulations:* Section 106.30 defines "complainant" as "an individual who is alleged to be the victim of conduct that could constitute sexual harassment."

66

*Proposed regulations:* The Department proposes moving the definition of "complainant" to § 106.2, referring to "sex discrimination" rather than "sexual harassment," and removing the term "victim." The Department also proposes adding language stating that a third-party complainant (i.e., a person other than a student or employee) must be participating or attempting to participate in the recipient's education program or activity when the alleged sex discrimination occurred.

*Reasons:* The Department proposes that "complainant" encompass anyone who is alleged to have been subjected to conduct that could constitute sex discrimination under Title IX. The Department also proposes removing the current definition's reference to the complainant as a "victim" as the term could be perceived as stigmatizing or pejorative.

The Department recognizes in proposed § 106.6(g) that a parent, guardian, or other authorized legal representative may have a legal right to act on behalf of a complainant, including by making a complaint of sex discrimination. This approach is consistent with current § 106.6(g), which states that the Title IX regulations must not be "read in derogation of any legal right of a parent or guardian" to act on behalf of a complainant, including by filing a formal complaint. The Department stated in the preamble to the 2020 amendments that "when a party is a minor or has a guardian appointed, the party's parent or guardian may have the legal right to act on behalf of the party," although the minor or person with an appointed guardian would be the party (i.e., the complainant). 85 FR at 30453. As explained in the preamble to the 2020 amendments, "the parent or guardian must be permitted to exercise the rights granted to the party . . . whether such rights involve requesting supportive measures or participating in a grievance process." *Id.* The Department further explained in the preamble to the 2020 amendments that "the parent or guardian must be permitted to accompany the student to

meetings, interviews, and hearings during a grievance process to exercise rights on behalf of the student, while the student's advisor of choice may be a different person from the parent or guardian." *Id.* As explained in the discussion of proposed § 106.6(g), the Department has received feedback that a reference to parents and guardians is underinclusive because it does not recognize the rights of individuals who are legally authorized to act on behalf of children in out-of-home care. As a result, the Department proposes adding the phrase "other authorized legal representative" in proposed § 106.6(g). Under proposed § 106.6(g), a parent, guardian, or other authorized legal representative may have a legal right to act on a student's behalf, including by making a complaint on behalf of a complainant; however, the student would remain the complainant.

The current regulations restrict the persons who can make a complaint under the recipient's grievance procedures for complaints of sex discrimination other than sexual harassment to students and employees. 34 CFR 106.8(c). The current regulations permit any complainant, including a student, employee, or third party who was participating or attempting to participate in the recipient's education program or activity at the time of filing, to file a formal complaint alleging sexual harassment. 34 CFR 106.30(a) (definition of "complainant" and "formal complaint"). After considering the issue, the Department's current view is that a third party who was participating or attempting to participate in the recipient's education program or activity when the alleged sex discrimination occurred should be permitted to make a complaint of sex discrimination, including sex-based harassment, under the recipient's grievance procedures as addressed in proposed § 106.45(a)(2). This would be unlike the current regulations, which consider the complainant's participation in the education program or activity at the time of filing the formal complaint. In addition, although the current regulations' limits on

68

who can file a formal complaint address only complaints of sexual harassment, the proposed

regulations would address all complaints of sex discrimination, including sex-based harassment.

This proposal is consistent with the decision by the U.S. Court of Appeals for the First Circuit in

*Doe v. Brown University*, 896 F.3d 127, 132-33 (1st Cir. 2018), which found that the scope of

Title IX's "subject to discrimination under" language is "circumscribed to persons who

experience discriminatory treatment while participating, or at least attempting to participate, in

education programs or activities" provided by the recipient. *Id.* (upholding district court's

dismissal of Title IX claim by third party who was sexually assaulted on recipient's campus but

was not participating or attempting to participate in the recipient's education program or

activity). Examples of possible third-party complainants include a prospective student, a visiting

student-athlete, or a guest speaker who is participating or attempting to participate in the

recipient's education program or activity. This third-party participation requirement would not

apply to a student, employee, or those persons authorized to act on behalf of a complainant,

respondent, or other person under proposed § 106.6(g).

Section 106.2 Definition of "Complaint"

*Current regulations:* The current regulations do not define "complaint." However, current

§ 106.30 defines "formal complaint" as a document or electronic submission that contains the

complainant's signature or otherwise indicates that the complainant is the person filing the

formal complaint; alleges sexual harassment against a respondent; and requests that the recipient

investigate the allegation of sexual harassment under its grievance process for formal complaints

of sexual harassment in § 106.45. A formal complaint is filed by a complainant with the Title IX

Coordinator or signed by the Title IX Coordinator. The current regulations provide several

methods for filing the formal complaint, including in person, by mail, or by email. The current

regulations specify that when the Title IX Coordinator signs a formal complaint, the Title IX Coordinator is not a complainant or otherwise a party under part 106 or under § 106.45, and must comply with the requirements of part 106, including § 106.45(b)(1)(iii).

Current § 106.8(c) requires that a recipient provide notification of its grievance procedures, including how to report or file a complaint of sex discrimination, to the following: applicants for admission and employment; students; parents or legal guardians of elementary and secondary school students; employees; and all unions and professional organizations holding collective bargaining or professional agreements with the recipient.

*Proposed regulations:* The Department proposes defining "complaint" to cover complaints of any type of sex discrimination and not limiting "complaint" to a written request. Specifically, the Department proposes removing the definition of "formal complaint," which is limited to a document requesting that the recipient initiate its grievance process under current § 106.45, and replacing it with a definition of "complaint" that is an oral or written request to the recipient to initiate the recipient's grievance procedures for sex discrimination under § 106.45, and if applicable § 106.46. The Department proposes moving the definition of "complaint" to § 106.2 because its applicability is not limited to sex-based harassment.

The proposed definition would clarify that a complaint may be oral or written. The proposed regulations would remove the requirement that the formal complaint contain the complainant's physical or digital signature, or otherwise indicate that the complainant is the person filing the formal complaint.

The proposed definition of "complaint" would not specify who can make a complaint, but this information would be specified in proposed § 106.45(a)(2). As explained in the discussion of proposed § 106.45(a)(2), the Department proposes placing limitations on who may make a

70

complaint of sex-based harassment that obligates a recipient to initiate its grievance procedures due to the nature of those allegations. However, the Department does not propose placing any limitations on who can provide information to the Title IX Coordinator about conduct that may constitute sex discrimination under Title IX, including sex-based harassment. When a Title IX Coordinator is notified about conduct that may constitute sex discrimination under Title IX, including sex-based harassment, they would be required to act under proposed § 106.44.

*Reasons:* The Department proposes defining "complaint" to provide clarity for how an individual can request that a recipient initiate its grievance procedures under proposed § 106.45, and if applicable proposed § 106.46, for all types of sex discrimination prohibited by Title IX.

The current regulations do not provide information about how an individual could request that a recipient initiate its grievance procedures in response to sex discrimination other than sexual harassment. First, the current definition of "formal complaint" applies only to sexual harassment. Second, although current § 106.8(c) requires a recipient to notify individuals of how to make a complaint, the Department did not define the term "complaint" or specify that a complaint is a request to the recipient to initiate its grievance procedures. The current regulations have different requirements for complaints of sexual harassment and complaints of other forms of sex discrimination under Title IX and require a formal written document to request that the recipient initiate its grievance procedures in response only to sexual harassment. Specifically, current § 106.30 requires a formal written document to request that the recipient initiate its grievance procedures under § 106.45 with respect to allegations of sexual harassment but does not require a formal written document to request that the recipient initiate its grievance procedures under § 106.8(c) with respect to allegations of other forms of sex discrimination. In the preamble to the 2020 amendments, the Department explained that a formal written document

71

was important to avoid confusion in initiating a recipient's grievance procedures under § 106.45. *See* 85 FR at 30130.

OCR received feedback from stakeholders during the June 2021 Title IX Public Hearing, listening sessions, and the meetings held in 2022 under Executive Order 12866 that expressed concerns that the 2020 amendments created an onerous and cumbersome process for a complainant seeking to request that the recipient initiate its grievance procedures and requesting that the Department streamline the complaint process. Although the current regulations permit a complainant to file a formal complaint by email and using a digital signature, *see* 85 FR at 30133, several stakeholders stated that the signature and writing requirements generally discouraged individuals from making complaints.

Based on the feedback received from stakeholders and the current distinction between a complaint of sex discrimination and a formal complaint of sexual harassment, the Department is concerned that the current regulations may have created a barrier for potential complainants to effectively assert their rights under Title IX. It is the Department's current view that additional clarity is needed to ensure that recipients are aware of and can respond appropriately to sex discrimination in their education programs or activities.

The Department proposes creating a single process to receive these requests by replacing the definition of "formal complaint" with a definition of "complaint" to clarify that a complaint would be the mechanism by which an individual may request that a recipient initiate its grievance procedures in response to all forms of sex discrimination. The Department's proposed regulations would define "complaint" more broadly to include either an oral or a written request to the recipient to initiate the recipient's grievance procedures for complaints of sex discrimination under Title IX, as described in proposed § 106.45, and if applicable proposed

72

§ 106.46. This revised definition of "complaint" would recognize that a person may seek to make a complaint in a variety of ways and would allow both oral and written complaints, while also no longer requiring a signature.

The proposed regulations would also differ from the current regulations in that they would not require a complaint to be made to the Title IX Coordinator, or to any specific employee of the recipient; a complaint need only be made to the recipient. As explained in greater detail in the discussion of proposed § 106.44(c), the proposed regulations would require a recipient to ensure that its Title IX Coordinator is notified of information about conduct that may constitute sex discrimination under Title IX in the recipient's education program or activity when that information is provided to certain categories of employees. The proposed regulations would also require other categories of employees to, at a minimum, provide the Title IX Coordinator's contact information and information about how to report sex discrimination to any person who provides the employee with information about conduct that may constitute sex discrimination under Title IX. As explained in greater detail in the discussion of proposed § 106.44(f), the proposed regulations would also require a recipient's Title IX Coordinator to take certain steps upon being notified of conduct that may constitute sex discrimination under Title IX. In addition, as explained in greater detail in the discussion of proposed § 106.44(k), a complaint would no longer be required before a recipient could offer to a complainant and respondent its informal resolution process under proposed § 106.44(k); instead, the informal resolution process could be offered and, if accepted, initiated by the recipient when it receives information about conduct that may constitute sex discrimination under Title IX even when no complaint is made.

*Third-party complaints.* The current regulations require a complainant to be participating

or attempting to participate in the recipient's education program or activity at the time of filing a formal complaint of sexual harassment. 34 CFR 106.30(a) (definition of "formal complaint"). In adding that requirement to the 2020 amendments, the Department explained that "there is no requirement that [a] complainant must be a student, employee, or [have some] other designated relationship with the recipient in order to be treated as a 'complainant' entitled to a prompt, non-deliberately indifferent response from the recipient," but that the participation limitation on when a complainant can file a formal complaint of sexual harassment "prevents recipients from being legally obligated to investigate allegations made by complainants who have no relationship with the recipient." 85 FR at 30138, 30198. The Department also provided examples of situations in which a complainant would be attempting to participate in a recipient's education program or activity. *See id.* at 30138, 30198 n.869, 30219. The current regulations do not address third-party complainants or include a participation requirement with respect to complaints of sex discrimination other than sexual harassment; instead, the current regulations state that grievance procedures that address other forms of sex discrimination apply to student and employee complaints. 34 CFR 106.8(c).

OCR heard from several stakeholders during the June 2021 Title IX Public Hearing, listening sessions, and the meetings held in 2022 under Executive Order 12866 who requested either reconsideration of the scope of who is deemed to be attempting to participate in the recipient's education program or activity or eliminating the requirement that a complainant must be participating or attempting to participate in the recipient's education program or activity. The Department also considered that such a requirement may be redundant as applied to employee and student complainants who are, based on their enrollment or employment, either participating or attempting to participate in the recipient's education program or activity. After considering an

74

array of stakeholder views and reevaluating the issue, the Department proposes eliminating this requirement for making a complaint of sex discrimination, including sex-based harassment, with respect to a student or employee complainant.

In proposed § 106.45(a)(2), the Department would specify who can make a complaint requesting that the recipient initiate its grievance procedures.  Under proposed § 106.45(a)(2)(iv), a third party must be participating in or attempting to participate in the recipient's education program or activity in order to make a complaint requesting that the recipient initiate grievance procedures.  The Department's proposed regulations seek to ensure that anyone who is participating or attempting to participate in a recipient's program or activity is able to make a complaint of sex discrimination while being cognizant of the possible increased burden for a recipient based on complaints made by third parties who are not participating or attempting to participate in the recipient's education program or activity.  The Department's proposed regulations would also shift the focus from whether the third party was participating or attempting to participate in the recipient's education program or activity at the time the complaint was filed to whether the third party was participating or attempting to participate in the recipient's education program or activity when the alleged sex discrimination occurred.  For example, under the proposed regulations, the visiting student-athlete who was sexually harassed by a student of the recipient during an intercollegiate swim meet would be considered to be participating in the recipient's education program or activity at the time of the alleged sex-based harassment.  In contrast, and also under the proposed regulations, if the same visiting student-athlete was sexually harassed by one of the recipient's students at an off-campus bar days after the swim meet concluded, the visiting student-athlete would not be considered to be participating or attempting to participate in the recipient's education program or activity at the time that the

75

alleged sex-based harassment occurred.  The Department's tentative view is that the proposed regulations would be more aligned with the purpose of Title IX to ensure that a recipient operates its education program or activity free from sex discrimination.

Section 106.2 Definition of Prohibited "Sex-Based Harassment"

*Current regulations:* Section 106.30(a) defines "sexual harassment" as conduct on the basis of sex that satisfies one or more of the following: (1) an employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct; (2) unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity; or (3) "sexual assault" as defined in 20 U.S.C. 1092(f)(6)(A)(v), "dating violence" as defined in 34 U.S.C. 12291(a)(10), "domestic violence" as defined in 34 U.S.C. 12291(a)(8), or "stalking" as defined in 34 U.S.C. 12291(a)(30).

*Proposed regulations:* The Department proposes moving the definition from § 106.30(a) to § 106.2 and clarifying that the definition covers all forms of sex-based harassment, as opposed to only sexual harassment.  The proposed new definition of "sex-based harassment" would clarify that it covers sexual harassment, harassment on the bases described in proposed § 106.10, and other conduct on the basis of sex that is in one or more of the following categories: (1) an employee, agent, or other person authorized by the recipient to provide an aid, benefit, or service under the recipient's education program or activity explicitly or implicitly conditioning the provision of such an aid, benefit, or service on a person's participation in unwelcome sexual conduct; (2) unwelcome sex-based conduct that is sufficiently severe or pervasive, that, based on the totality of the circumstances and evaluated subjectively and objectively, denies or limits a person's ability to participate in or benefit from the recipient's education program or activity

76

(i.e., creates a hostile environment); or (3) (i) "sexual assault" meaning an offense classified as a forcible or nonforcible sex offense under the uniform crime reporting system of the Federal Bureau of Investigation; (ii) "dating violence" meaning violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the victim; (iii) "domestic violence" meaning felony or misdemeanor crimes of violence committed by a person who (A) is a current or former spouse or intimate partner of the victim under the family or domestic violence laws of the jurisdiction of the recipient, or a person similarly situated to a spouse of the victim; (B) is cohabitating, or has cohabitated, with the victim as a spouse or intimate partner; (C) shares a child in common with the victim; or (D) commits acts against a youth or adult victim who is protected from those acts under the family or domestic violence laws of the jurisdiction; or (iv) "stalking" meaning engaging in a course of conduct directed at a specific person that would cause a reasonable person to (A) fear for the person's safety or the safety of others; or (B) suffer substantial emotional distress. The proposed definition also clarifies that conduct meeting the definition of "sex-based harassment" in proposed § 106.2 constitutes sex-based harassment that is prohibited under Title IX. With this clarification, the Department recognizes that there may be other types of conduct that could constitute sex-based harassment under other laws or a recipient's policies but are not prohibited under Title IX.

The proposed definition would clarify that the scope of sex-based harassment includes bases that were not expressly covered under the term "sexual harassment" in current § 106.30(a), including harassment based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity.

The proposed definition would also include revisions to the scope of conduct described in its second category, which addresses unwelcome conduct on the basis of sex. These proposed

revisions would provide factors to consider when determining whether unwelcome sex-based conduct creates a hostile environment in a recipient's education program or activity.

The third category of the proposed definition would still incorporate the definition of "sexual assault" from the Clery Act.  The proposed definition would incorporate the definitions of "dating violence," "domestic violence," and "stalking" from the Violence Against Women Reauthorization Act of 2022 (VAWA 2022).  Instead of including cross-references to statutory provisions in the Clery Act and VAWA 2022, the proposed definition would include language from the statutory definitions themselves to make it clear in the text of the regulations how these terms are defined for purposes of Title IX.  The Department proposes incorporating the portion of the definition of "domestic violence" that is relevant to Title IX.

*Reasons: Sex-Based Harassment*.  The Department's proposed regulations refer to "sex-based harassment" rather than "sexual harassment."  This revision is consistent with the Department's statement that it interpreted Title IX to prohibit gender-based harassment in response to comments received on the 2018 NPRM.  Specifically, the Department explained that its position in the 2020 amendments remained similar to its position in the 2001 Revised Sexual Harassment Guidance that "'[a]lthough Title IX does not prohibit discrimination on the basis of sexual orientation, sexual harassment directed at gay or lesbian students that is sufficiently serious to limit or deny a student's ability to participate in or benefit from the school's program constitutes sexual harassment prohibited by Title IX under the circumstances described in this guidance.'" 85 FR at 30178-79 (quoting 2001 Revised Sexual Harassment Guidance at 3).  The Department also stated that "gender-based harassment, which may include acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on sex or sex-stereotyping, but not involving conduct of a sexual nature, is also a form of sex discrimination to which a school must respond."

*Id.* at 30179 (quoting 2001 Revised Sexual Harassment Guidance at 3). To address the concern that the 2020 amendments were underinclusive in scope because they were limited to sexual harassment, the Department stated that "[t]hese final regulations include sexual harassment as unwelcome conduct on the basis of sex that a reasonable person would determine is so severe, pervasive, and objectively offensive that it denies a person equal educational access; this includes but is not limited to unwelcome conduct of a sexual nature, and may consist of unwelcome conduct based on sex or sex stereotyping." *Id.*

During the June 2021 Title IX Public Hearing and in listening sessions with stakeholders, OCR received requests to clarify that the Title IX regulations apply to both sexual harassment and other forms of harassment based on sex, including harassment based on sexual orientation and gender identity. These requests indicated to the Department that the current definition of "sexual harassment" does not provide adequate clarity as to the scope of harassment covered. Specifically, stakeholders expressed confusion regarding the scope of sexual harassment, including noting that they were receiving questions from their students regarding whether certain forms of harassing conduct are covered under the current definition of "sexual harassment." Stakeholders also expressed concern that the definition of "sexual harassment" fails to protect many individuals who experience other forms of sex-based harassment due to the limited coverage of the definition.

After reevaluating the issue, the Department proposes revising the regulatory text to make clear that sexual harassment, as well as other forms of sex-based harassment on the bases described in proposed § 106.10, are covered under the Department's Title IX regulations to dispel any confusion regarding the scope of sex-based harassment that is prohibited under Title IX and therefore requires a recipient to respond. The proposed clarifications would more clearly

implement the statements made by the Department in the preamble to the 2020 amendments that Title IX's broad nondiscrimination mandate covers all forms of harassment based on sex, including sexual harassment, which has also been OCR's longstanding view. *See, e.g.*, 2001 Revised Sexual Harassment Guidance at v, 3 (explaining that gender-based harassment, including harassment based on sex stereotyping, is covered under Title IX); 2010 Dear Colleague Letter on Harassment and Bullying at 7-8 (stating that Title IX prohibits gender-based harassment and explaining that "it can be sex discrimination if students are harassed either for exhibiting what is perceived as a stereotypical characteristic for their sex, or for failing to conform to stereotypical notions of masculinity and femininity"); U.S. Dep't of Educ., Office for Civil Rights, Supporting the Academic Success of Pregnant and Parenting Students Under Title IX of the Education Amendments of 1972 at 8 (June 2013) (2013 Pregnancy Pamphlet), https://www2.ed.gov/about/offices/list/ocr/docs/pregnancy.pdf ("Title IX prohibits harassment of students based on sex, including harassment because of pregnancy or related conditions."); *see also* 85 FR at 30179. The Department also notes that consistent with the Department's position in the 2020 amendments, the proposed definition of "sex-based harassment" prohibited under Title IX would apply regardless of the sex of the harasser, i.e., including if the harasser and the person being harassed are members of the same sex and that sex-based harassment "is not limited to being bi-directional (male-to-female and female-to-male)" and "any person may experience [sex-based] harassment as a form of sex discrimination, irrespective of the identity of the complainant or respondent." *See* 85 FR at 30179. Further explanation of the scope of Title IX's prohibition on sex discrimination and the bases of sex-based harassment covered by this proposed definition is in the discussion of proposed § 106.10.

The Department proposes adding language to the proposed definition of "sex-based

harassment" clarifying that conduct that meets the definition of "sex-based harassment" is prohibited under Title IX and therefore a recipient must take action to address it in accordance with proposed § 106.44. This clarification would also serve to distinguish sex-based harassment that is prohibited under Title IX from conduct that may be sex-based harassment under other laws or recipients' policies but does not meet the Title IX regulatory definition of "sex-based harassment." A recipient may determine that it is obligated to address sex-based harassment that does not meet the definition of "sex-based harassment" prohibited under Title IX; however, nothing in the proposed regulations would require it to do so. This is consistent with the Department's position in the current regulations that even when conduct does not meet the definition of sexual harassment under current 106.30(a), nothing precludes a recipient from addressing the conduct under the recipient's code of conduct or other non-Title IX process. *See, e.g.*, *id.* at 30090, 30199, 30206. Thus, under the proposed regulations, a recipient would be able use its Title VII process to meet its obligations under Title VII to address alleged conduct by an employee that does not meet the proposed definition of "sex-based harassment" under Title IX because, for example, that conduct did not create a hostile environment. In these instances, a recipient may still have a duty under Title VII to address the alleged conduct before it becomes actionable. *See Erickson v. Wis. Dep't of Corr.*, 469 F.3d 600, 605-06 (7th Cir. 2006) (stating that Title VII's "'primary objective' . . . is 'not to provide redress but to avoid harm'" and that "[e]mployers need to take 'all steps necessary to prevent sexual harassment from occurring," including "taking reasonable steps to prevent harassment once informed of a reasonable probability that it will occur") (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 805-06 (1998)); *see also Vance v. Ball State Univ.*, 570 U.S. 421, 448-49 (2013) (stating that the employer is liable for harassment if it failed to act reasonably to prevent the harassment). This

Title VII obligation is separate from any obligation a recipient has under Title IX to address alleged conduct that meets the proposed definition of "sex-based harassment" under Title IX. If the alleged conduct also meets the proposed definition of "sex-based harassment" under Title IX, the recipient must use a process that satisfies the requirements set out in proposed § 106.45 and, if applicable proposed § 106.46.

*Unwelcome Conduct.* The Department proposes retaining the requirement that the conduct in categories one and two of the definition of "sex-based harassment" must be unwelcome. Although the Department does not propose revising this requirement, the Department understands it is important to provide recipients with additional clarity on how to analyze whether conduct is unwelcome under the proposed regulations. Conduct would be unwelcome if a person did not request or invite it and regarded the conduct as undesirable or offensive. Acquiescence to the conduct or the failure to complain, resist, or object when the conduct was taking place would not mean that the conduct was welcome, and the fact that a person may have accepted the conduct does not mean that they welcomed it. For example, a student may decide not to resist the sexual advances of another student out of fear, or a student may not object to a pattern of sexually harassing comments directed at the student by a group of fellow students out of concern that objections might cause the harassers to make more comments. On the other hand, if a student actively participates in sexual banter and discussions and gives no indication that they object, then that would generally support a conclusion that the conduct was not unwelcome, depending on the facts and circumstances. In addition, simply because a person willingly participated in the conduct on one occasion does not prevent that same conduct from being unwelcome on a subsequent occasion. Specific issues related to welcomeness may also arise if the person who engages in harassment is in a position of

82

authority.  For example, because a teacher has authority over the operation of their classroom, a student may decide not to object to a teacher's sexually harassing comments during class; however, this does not mean that the conduct was welcome because, for example, the student may believe that any objections would be ineffective in stopping the harassment or may fear that by making objections they will be singled out for harassing comments or retaliation.

*Category One: Quid Pro Quo.*

The Department proposes generally maintaining the language in the first category of the definition of "sexual harassment" in the current regulations with revisions to state that in addition to an employee, an agent or other person authorized by the recipient to provide an aid, benefit, or service under the recipient's education program or activity is also prohibited from engaging in the quid pro quo conduct described in the first category and that quid pro quo harassment may be explicit or implicit.

In response to requests to broaden the scope of quid pro quo harassment to include persons not directly employed by the recipient, the Department explained in the preamble to the 2020 amendments that "the quid pro quo harassment description is appropriately and sufficiently broad because it applies to all of a recipient's employees, so that it includes situations where, for instance, a teacher, faculty member, or coach holds authority and control over a student's success or failure in a class or extracurricular activity," and "decline[d] to expand the description to include non-employee students, volunteers, or others not deemed to be a recipient's employee." 85 FR at 30148.  The Department further stated that it was "persuaded by the Supreme Court's rationale in *Gebser* that Title IX and Title VII differ with respect to statutory reliance on agency principles" and referenced the language in *Gebser*, noting that Title VII "explicitly defines 'employer' to include 'any agent,'" *id.* at 30148, but "Title IX contains no comparable reference

to an educational institution's agents, and so does not expressly call for application of agency principles" *id.* at 30148 n.646 (quoting *Gebser*, 524 U.S. at 283). During the June 2021 Title IX Public Hearing and in listening sessions with stakeholders, OCR received similar requests to prohibit quid pro quo harassment by any person, not just employees. The Department reviewed these requests and now proposes to revise the scope of quid pro quo sex-based harassment to include an agent or other person authorized by the recipient to provide an aid, benefit, or service under the recipient's education program or activity. The Department proposes this change to effectuate Title IX, consistent with the statutory language prohibiting a person from being excluded from participation in or denied the benefits of any education program or activity on the basis of sex. This proposed change is also consistent with the Department's Title IX regulations regarding the provision of aid, benefit, or services, which have made clear since 1975 that a recipient is responsible for the nondiscriminatory provision of any aid, benefit, or service to a student and have not been limited to the provision of such aid, benefit, or services only by a recipient's employees. 34 CFR 106.31(b).

The Department is mindful of the Supreme Court's decision in *Gebser*, which the Department previously relied upon in declining to expand the description of quid pro quo harassment in response to comments received on the 2018 NPRM. Although the Court in *Gebser* rejected Title VII's agency principles for the purpose of determining a school's liability for monetary damages under Title IX, after revisiting this issue, the Department proposes that this is not the appropriate analysis for assessing the Department's responsibility for the administrative enforcement of Title IX. *Gebser*, 524 U.S. at 283. As explained in greater detail in the discussion of OCR's Guidance and Supreme Court Precedent on Title IX's Application to Sexual Harassment (Section II.B.1), the Court repeatedly and explicitly stated in *Gebser* and

*Davis* that the liability standard it established was limited to private actions for monetary damages, not administrative enforcement action. *See, e.g.*, *Gebser*, 524 U.S. at 283, 287; *see also Davis*, 526 U.S. at 633, 639-44, 649-53. It was within this framework that the Court rejected Title VII's agency principles for purposes of determining a school's liability for monetary damages under Title IX. In contrast, the Department's proposal to include agents or other persons authorized by the recipient to provide an aid, benefit, or service under the recipient's education program or activity in the scope of quid pro quo sex-based harassment is not based on Title VII agency principles and is consistent with Title IX sexual harassment case law holding that "someone in authority" may commit quid pro quo sexual harassment. *See, e.g.*, *Papelino v. Albany Coll. of Pharmacy Union Univ.*, 633 F.3d 81, 89 (2d Cir. 2011); *Willis v. Brown Univ.*, 184 F.3d 20, 25 (1st Cir. 1999).

Because determining whether a person has been authorized to provide aid, benefits, or services as part of a recipient's education program or activity is fact-specific, the Department declines at this time to provide a definitive list of individuals who would qualify but provides examples below to assist a recipient in making this determination for purposes of quid pro quo harassment. For example, some recipients may rely on unpaid volunteers to coach interscholastic athletic teams or club sports teams offered by the recipient. Even though these volunteers are not employed directly by the recipient, unpaid volunteer coaches hold authority and control over a student's participation or performance in an extracurricular activity offered by the recipient. As such, they would qualify as persons who are subject to the prohibition on quid pro quo harassment because they may properly be considered persons authorized by the recipient to provide aid, benefits, or services under the recipient's education program or activity. Similarly, graduate students who teach their own course or serve as a teaching assistant and are

85

responsible for providing instruction and assigning grades in a course (i.e., an aid, benefit, or services to students as part of a recipient's education program or activity) but who are not employed directly by a recipient would also be subject to the prohibition on quid pro quo harassment. In addition, if a recipient contracts with persons or organizations to provide benefits, services, or opportunities to students under the recipient's education program or activity, those individuals could commit quid pro quo harassment. Other examples of persons who may be authorized by a recipient to provide aid, benefits, or services under the recipient's education program or activity would include but are not limited to, persons who supervise internships or clinical experiences that are part of a student's academic program, volunteers who regularly provide an aid, benefit or service under a recipient's education program or activity, or board of trustees' members who serve as unpaid volunteers. On the other hand, in the Department's experience, students in positions of responsibility in an extracurricular activity, such as a team captain or club president, are generally not authorized by a recipient to provide aid, benefits, or services under the recipient's education program or activity and would not come under this prohibition.

The Department stated, in the preamble to the 2020 amendments, that quid pro quo harassment could include explicit and implicit conduct but did not expressly make this point in the text of the current regulations. The proposed revisions to the regulatory text would incorporate the principle the Department articulated in the preamble to the 2020 amendments that quid pro quo harassment should be interpreted "broadly to encompass situations where the quid pro quo nature of the incident is implied from the circumstances" and that "quid pro quo harassment applies whether the 'bargain' proposed by the recipient's employee is communicated expressly or impliedly." 85 FR at 30147 (footnotes omitted). In addition, the Department

86

proposes retaining the interpretation articulated in the preamble to the 2020 amendments that "quid pro quo harassment does not depend on whether 'the student resists and suffers the threatened harm or submits and avoids the threatened harm,'" to show that the student's ability to participate in or benefit from the school's program has been denied or limited, on the basis of sex in violation of the Title IX regulations. *Id.* at 30148 n.645 (emphasis omitted) (quoting 2001 Revised Sexual Harassment Guidance at 5).

*Category Two: Hostile Environment.*

   *Distinction between administrative enforcement and private lawsuits for monetary damages.* In the 2020 amendments, the Department adopted verbatim the formulation that the *Davis* Court used in the context of private lawsuits for monetary damages: "unwelcome conduct that a reasonable person would determine is 'so severe, pervasive, and objectively offensive' that it effectively denies a person equal access to education." *Id.* at 30036 (quoting *Davis*, 526 U.S. at 650). OCR heard from a variety of stakeholders in connection with the June 2021 Title IX Public Hearing and in listening sessions regarding the current definition of "sexual harassment." In addition, stakeholders provided views on the current definition of "sexual harassment" during meetings held in 2022 under Executive Order 12866. Some stakeholders supported the current definition while other stakeholders urged the return to the prior definition of "sexual harassment" (i.e., hostile environment) previously used in OCR's administrative enforcement and expressed concern that the current narrower definition, which is based on case law related to private lawsuits for monetary damages, could leave some serious sexual misconduct unaddressed. These stakeholders also expressed concern about the inconsistency between the new, narrower definition in the 2020 amendments and the longstanding, broader definition used in prior OCR guidance, Title VII case law, and EEOC guidance. These stakeholders encouraged the

Department to take a more uniform approach to hostile environment harassment, noting that it is a concept developed though court decisions interpreting other Federal statutes prohibiting discrimination, including Title VII and Title VI.

The Department reviewed its decision to use the standards applicable to private suits for monetary damages as the starting point for the standards used by OCR in its administrative enforcement of Title IX, including the Supreme Court's standard for actionable sexual harassment under Title IX. The Department's tentative view is that it is permitted to depart from the standards set out by the Court for actionable sexual harassment under Title IX because the Court expressly acknowledged the power of Federal agencies, such as the Department, to "promulgate and enforce requirements that effectuate [Title IX's] nondiscrimination mandate," even in circumstances that would not give rise to a claim for monetary damages. *Gebser*, 524 U.S. at 292. Such a view is consistent with how the Court has interpreted the Department's broad regulatory authority in other Title IX contexts. For example, the Court also noted that "the Department of Education could enforce the requirement administratively" that a school "promulgate a grievance procedure" even though the failure to do so "does not itself constitute 'discrimination' under Title IX." *Id.* Similarly, the Court has explained that the Department may require schools to sign assurances of compliance under Title IX, even though the failure to sign such assurances would not itself constitute sex discrimination by the recipient. *See Grove City Coll.*, 465 U.S. at 574.

After considering the issues and reweighing the facts and circumstances, including the views expressed by a variety of stakeholders, the Department proposes retaining the term "unwelcome conduct" from the 2020 amendments, but replacing the definition of "sexual harassment" from *Davis* in the current regulations with the hostile environment framework to

88

describe when sex-based harassment in category two is prohibited under Title IX.

The proposed regulations thus provide that sex-based harassment in category two would cover unwelcome sex-based conduct that is sufficiently severe *or* pervasive that, based on the totality of the circumstances and evaluated subjectively and objectively, it denies or limits a person's ability to participate in or benefit from the recipient's education program or activity (i.e., the conduct creates a hostile environment).

In the preamble to the 2020 amendments, the Department acknowledged that it is not legally required to adopt the *Gebser/Davis* framework for sexual harassment, but noted that the Supreme Court did not prohibit the Department from doing so and chose to adopt the *Davis* standard for actionable sexual harassment in part because "aligning the Title IX sexual harassment definition in administrative enforcement and private litigation contexts provides clear, consistent expectations for recipients." 85 FR at 30149.

The Department's tentative view is that defining "sex-based harassment" in category two using the hostile environment framework will enable the Department to enforce Title IX's nondiscrimination mandate and provide more effective protection against sex discrimination in a recipient's education program or activity because the definition of "sex-based harassment" covers a broader range of sexual misconduct than that covered under the definition of "sexual harassment" in the current regulations. The Department's tentative view is also that the hostile environment framework appropriately captures the key concepts articulated by the Court in *Davis* and protects the First Amendment rights and interests of students and employees. The Department acknowledges that revising the definition of "sex-based harassment" in category two using the hostile environment framework may create additional work for recipients because they will be subject to a different standard in the administrative enforcement context than they are in

89

the context of private suits for monetary damages and because the definition may require recipients to respond to a broader range of conduct, but Title IX's plain language prohibits any discrimination on the basis of sex in a recipient's education program or activity and the Department proposes that in the administrative enforcement context Title IX must function as a strong and comprehensive measure to effectively address sex discrimination. *See generally* 118 Cong. Rec. 5803-5812 (1972) (statement of Sen. Bayh).

*Hostile environment analysis.* The proposed revisions to the second category of sex-based harassment would require that the unwelcome sex-based conduct be sufficiently severe or pervasive that, based on the totality of the circumstances and evaluated subjectively and objectively, it denies or limits a person's ability to participate in or benefit from the recipient's education program or activity. Requiring the unwelcome sex-based conduct to be evaluated subjectively and objectively and based on the totality of the circumstances is consistent with the analysis discussed by the Department in the preamble to the 2020 amendments, which stated that "whether harassing conduct is 'objectively offensive' must be evaluated under a reasonable person standard, as a reasonable person in the complainant's position" and also required that the conduct be unwelcome from a subjective perspective. 85 FR at 30167. This is also consistent with *Davis* and relevant Title VII Supreme Court cases. *See, e.g.*, *Davis*, 526 U.S. at 650 (conduct must be "objectively offensive" to trigger liability for money damages); *Harris v. Forklift Sys.*, 510 U.S. 17, 21-22 (1993) (explaining that "if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation" and that a "reasonable person" standard should be used to determine whether sexual conduct constituted harassment); *Oncale*, 523 U.S. at 81 ("[T]he objective severity of harassment should be judged from the perspective of

a reasonable person in the [complainant's] position, considering 'all the circumstances.'"
(quoting *Harris*, 510 U.S. at 23)).

The Department's proposal to require that the conduct be "severe or pervasive" as opposed to "severe, persistent, or pervasive" is consistent with the Court's opinion in *Davis.* Although the *Davis* Court described the conduct at issue in the case as "persistent," that term was not part of the Court's analysis or the definition adopted by the Court. *See Davis*, 526 U.S. at 650-53 (describing damages liability standard when funding recipient is deliberately indifferent to harassment that is "severe, pervasive, and objectively offensive").

*Title IX prohibits sex-based harassment that denies or limits a person's ability to participate in or benefit from the education program or activity.* The Department explained in the preamble to the 2020 amendments that the unwelcome conduct under category two must "effectively den[y] a person equal access to the recipient's education program or activity" for two reasons: first, because that was the language used by the Court in *Davis*; and second, because the Department believed that it was the "equivalent of a violation of Title IX's prohibition on exclusion from participation, denial of benefits, and/or subjection to discrimination." 85 FR at 30156-57. After considering the issue and reweighing the facts and circumstances, the Department proposes revising this language to encompass sex-based conduct that denies or limits a person's ability to participate in or benefit from the recipient's education program or activity. The Department's current position is that this language more appropriately captures the full scope of Title IX's nondiscrimination mandate. The language of the statute, "denied the benefits," does not require otherwise and, to the contrary, supports the Department's proposed revision because a limitation on equal access constitutes a denial of benefits. 20 U.S.C. 1681(a). For example, Title IX prohibits a recipient from awarding female students half as many

credits as male students for taking the same class, even though the recipient has not completely denied female students the credit benefits of taking the class. In this way, a recipient need not completely deny, by policy or effect, a student's equal access to its education program or activity based on sex before it denies a student the benefits of its program or activity, thereby violating Title IX.

The Department's proposed regulatory language is consistent in many respects with the principles articulated in the preamble to the 2020 amendments, which explained the variety of situations that would be covered under the current regulations. There the Department explained that a complainant does not need to have been "entirely, physically excluded from educational opportunities," 85 FR at 30169, and "no specific type of reaction to the alleged sexual harassment is necessary to conclude" that the complainant was effectively denied equal access to the recipient's education program or activity, *id.* at 30170. The Department also explained that "[c]ommenters' examples of a third grader who starts bed-wetting or crying at night due to sexual harassment, or a high school wrestler who quits the team but carries on with other school activities following sexual harassment, likely constitute examples of denial to those complainants of 'equal' access to educational opportunities even without constituting a total exclusion or denial of an education." *Id.* at 30170. These examples would also satisfy the requirement in the proposed regulations that the harassment must deny or limit the complainant's ability to participate in or benefit from the recipient's education program or activity in order to be covered. The Department also noted in the preamble to the 2020 amendments that "signs of enduring unequal educational access due to . . . harassment may include, as commenters suggest, skipping class to avoid a harasser, a decline in a student's grade point average, or having difficulty concentrating in class." *Id.* These examples would also constitute signs of a denial or limitation

of a complainant's ability to participate in or benefit from the recipient's education program or activity under the proposed regulations. Additional information and examples related to this element of the definition are provided in the discussion of factors that a recipient must consider when determining if a hostile environment has been created.

*Consistency with the First Amendment.* In the preamble to the 2020 amendments, the Department wrote that the "*Davis* definition of sexual harassment as 'severe, pervasive, and objectively offensive' comports with First Amendment protections," while the definition articulated in prior Department guidance "has led to infringement of rights of free speech and academic freedom of students and faculty." *Id.* at 30036 n.88. After considering these issues, the Department's tentative view is that the proposed scope of conduct that would constitute a hostile environment under the definition of "sex-based harassment" in proposed § 106.2 would sufficiently protect the constitutional rights and interests of students and employees. It would do so by requiring not only that the prohibited conduct be sufficiently severe or pervasive that, based on the totality of the circumstances and evaluated subjectively and objectively, it creates a hostile environment, but also that the conduct be based on sex and occur under the recipient's education program or activity. Title IX protects individuals from sex discrimination and does not regulate the content of speech as such. OCR has expressed this position repeatedly in discussing Title IX in prior guidance. *See* 2001 Revised Sexual Harassment Guidance at 22; 2003 First Amendment Dear Colleague Letter; 2014 Q&A on Sexual Violence at 43-44. The Department emphasizes that in cases of alleged sex-based harassment, the protections of the First Amendment must be considered if, for example, issues of speech or expression are involved, including academic freedom. Students, employees, and third parties retain their First Amendment rights, and the Department's proposed regulations would not infringe these rights.

93

The Department further notes that current § 106.6(d), to which the Department is not proposing any changes, states that nothing in the Title IX regulations requires a recipient to "[r]estrict any rights that would otherwise be protected from government action by the First Amendment of the U.S. Constitution." 34 CFR 106.6(d).

Consistent with the proposed hostile environment category of sex-based harassment discussed above, the offensiveness of a particular expression as perceived by some persons, standing alone, would not be a legally sufficient basis to establish a hostile environment under Title IX. In addition, a recipient must formulate, interpret, and apply its rules in a manner that respects the legal rights of students and employees when taking action to end sex-based harassment that creates a hostile environment. For instance, although the First Amendment may prohibit a recipient from restricting the rights of students to express opinions about one sex that may be considered derogatory, the recipient can affirm its own commitment to nondiscrimination based on sex and take steps to ensure that competing views are heard. The age of the students involved and the location or forum in which such opinions are expressed may affect the actions a recipient can take consistent with the First Amendment.

*Alignment with Title VII.* Although courts often rely on interpretations of Title VII to inform interpretations of Title IX, in the preamble to the 2020 amendments the Department explained that there are differences between Title IX "and workplace policies that may exist in the corporate world." 85 FR at 30199; *see also Franklin*, 503 U.S. at 75; *Jennings*, 482 F.3d at 695; *Frazier*, 276 F.3d at 66; *Gossett*, 245 F.3d at 1176. The Department also noted that Title VII's prohibition on sexual harassment differs from that under Title IX in the 2020 amendments and recipients that are subject to both Title VII and Title IX must comply with both sets of obligations. 85 FR at 30440. The Department further noted that "[c]ourts impose different

94

requirements under Title VII and Title IX and recipients comply with case law that interprets Title VII and Title IX differently." *Id.* at 30443. The Department recognizes the differences between educational and workplace environments and that in the context of private suits for monetary damages under Title IX, the Supreme Court has applied a different definition of "sexual harassment" under Title IX than it has in the Title VII context. *Id.* at 30199, 30440, 30443. The Department also heard from stakeholders, including recipients, that the differences between the definitions of "sexual harassment" in OCR's administrative enforcement context and the Title VII context created confusion for employees and requesting alignment between the Title IX and Title VII definitions, if possible, for sex-based harassment under the recipient's education program or activity. Although these stakeholders acknowledged that different grievance procedures may be appropriate for resolving student and employee complaints of sex-based harassment given the varying rights of students and employees, they nonetheless expressed a desire for consistency in the definition of "sex-based harassment" under Title IX and Title VII.

After considering this issue, including the concerns expressed by stakeholders, the Department's tentative view is that, while not required to do so, it is appropriate to more closely align the hostile environment category of "sex-based harassment" in the context of OCR's administrative enforcement of Title IX with how hostile environment sexual harassment is defined by courts and the EEOC under Title VII in the employment context given that recipients must comply with both laws and both Title VII and Title IX cover employees. The proposed hostile environment framework under Title IX is more similar to the definition of "hostile environment" under Title VII than the definition of "sexual harassment" under the current Title IX regulations. The Department's tentative view is that this alignment will better facilitate recipients' ability to comply with their obligations under the Department's proposed Title IX

regulations, while also recognizing recipients' obligations under Title VII. Also, and most fundamentally as discussed above, the proposed hostile environment framework will better enable the Department to implement Title IX's prohibition on sex discrimination. In addition, as explained in the discussion of hostile environment factors, whether unwelcome sex-based conduct has created a hostile environment is a fact-specific determination based on the totality of the circumstances, which enables recipients to take into consideration the characteristics of the parties involved, including whether they are students or employees, in making the determination. Although the Department proposes more closely aligning the definition of "sex-based harassment" under Title IX with the definition of "sexual harassment" under Title VII, a recipient must still be able to make individualized determinations whether certain conduct constitutes prohibited sex-based harassment and may conclude that certain conduct between employees is not prohibited while the same conduct between students is prohibited and vice versa.

As explained in the discussion of the Framework for Grievance Procedures for Complaints of Sex Discrimination (Section II.F), the Department continues to recognize there are differences between recipients' relationships with their employees and their students. However, the Department does not view these differences as relevant for the analysis of the hostile environment category of sex-based harassment in OCR's administrative enforcement of Title IX, and the Department thus proposes that the same analysis of what constitutes hostile environment sex-based harassment should apply regardless of whether the persons involved in the sex-based harassment are students or employees. The Department's tentative position is that although a recipient's grievance procedures may appropriately vary to ensure an equitable response to complaints involving students and those involving only employees in the postsecondary setting,

particularly in light of Title VII's protections for employees, there is no similar justification for variation in the analysis of what constitutes hostile environment sex-based harassment that applies to students and employees. In addition, as explained in the discussion of the hostile environment factors, the hostile environment analysis requires the recipient to examine the alleged facts from the position of a reasonable person in the complainant's position, considering the surrounding circumstances, and make an individualized determination whether the unwelcome sex-based conduct created a hostile environment based on the totality of the circumstances, including the age and roles of the parties. The Department recognizes that, particularly in a secondary or postsecondary education program or activity, the student environment may differ from the environment of teachers, faculty, and staff in ways that may be relevant for the recipient's fact-specific analysis of whether a hostile environment was created. For additional information regarding the differences between recipients' relationships with their employees and their students and the applicable procedural requirements to complaints of sex-based harassment, see the discussion of the Framework for Grievance Procedures for Complaints of Sex Discrimination (Section II.F). The Department also notes that in addition to more closely aligning with how hostile environment sexual harassment is defined by courts and the EEOC under Title VII, the proposed hostile environment framework in category two of the definition of "sex-based harassment" would also more closely align with the definition of "hostile environment harassment" in the context of enforcement of the Fair Housing Act by the U.S. Department of Housing and Urban Development. 24 CFR 100.600(a)(2). The Department's tentative view is that although the Department is not required to align its analysis of what constitutes a hostile environment under Title IX with the definition of "hostile environment harassment" under the FHA, closer alignment of the two definitions would assist recipients given

97

that the FHA applies to campus housing for students, faculty, or staff, and those institutions that are subject to the FHA and receive Federal funding from the Department must also comply with the Department's Title IX regulations.

*Alignment with other Federal civil rights laws enforced by OCR.* The Department's proposed regulations would also more closely align the hostile environment analysis under Title IX with how OCR defines "harassment" based on race, color, national origin, or disability for administrative enforcement purposes, which would provide increased clarity to recipients. *See* Notice of Investigative Guidance, Racial Incidents and Harassment Against Students at Educational Institutions, 59 FR 11448, 11449-50 (Mar. 10, 1994) (1994 Racial Harassment Guidance), https://www.govinfo.gov/content/pkg/FR-1994-03-10/pdf/FR-1994-03-10.pdf (also available at https://www2.ed.gov/about/offices/list/ocr/docs/race394.html) (explaining that a hostile environment under Title VI includes racial harassment "that is sufficiently severe, pervasive or persistent so as to interfere with or limit the ability of an individual to participate in or benefit from the services, activities or privileges provided by a recipient"); U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter: Prohibited Disability Harassment (July 25, 2000), https://www.ed.gov/ocr/docs/disabharassltr.html ("When harassing conduct is sufficiently severe, persistent, or pervasive that it creates a hostile environment, it can violate a student's rights under the Section 504 and Title II regulations."); 2010 Dear Colleague Letter on Harassment and Bullying at 1-2 (stating that harassment on the basis of race, color, national origin, sex, or disability "creates a hostile environment when the conduct is sufficiently severe, pervasive, or persistent so as to interfere with or limit a student's ability to participate in or benefit from the services, activities, or opportunities offered by the school"). The Department is not proposing to simply import a definition of "hostile environment" from the context of

harassment based on race, color, national origin, or disability.  As explained in the preamble to the 2020 amendments, the Department is not required under the Administrative Procedure Act "to devise identical or even similar rules to eliminate discrimination on the bases of sex, race, or disability (or of any other kind)."  85 FR at 30528.  The Department's tentative view, however, is that there is value for recipients, students, and others in incorporating similar concepts, to the extent possible, into the analyses of hostile environment harassment under all of the civil rights laws that the Department enforces.

*Factors that a recipient must consider when determining if a hostile environment has been created.*  Whether a hostile environment has been created is a fact-specific inquiry and requires analyzing the conduct and its effect on the complainant to draw distinctions between conduct that creates a hostile environment and conduct that does not rise to that level.  A hostile environment may manifest itself in different ways for different complainants.  In view of this fact-specificity, the Department proposes adding language to category two of the definition of "sex-based harassment" that would identify factors for determining whether the unwelcome conduct created a hostile environment.  Category two of the proposed definition of "sex-based harassment" would set out the following factors to consider when determining whether a hostile environment based on sex exists: (i) the degree to which the conduct affected the complainant's ability to access the recipient's education program or activity; (ii) the type, frequency, and duration of the conduct; (iii) the parties' ages, roles within the recipient's education program or activity, previous interactions, and other factors about each party that may be relevant to evaluating the alleged unwelcome conduct; (iv) the location of the conduct, the context in which the conduct occurred, and the control the recipient has over the respondent; and (v) other sex-based harassment in the recipient's education program or activity.  A recipient must consider

whether each of these factors applies in determining whether a hostile environment based on sex exists but may determine that one or more factors is not relevant to a particular set of facts. Also, the Department does not intend that the specific hostile environment factors listed in proposed § 106.2 would be exhaustive, as evidenced by the use of the word "includes." A recipient would not be prohibited from considering additional relevant factors to determine whether a hostile environment has been created. Below the Department discusses the analysis under each factor in greater detail. Although the facts in the examples below are not necessarily sufficient to demonstrate a sex-based hostile environment (i.e., a fuller, fact-specific analysis would be required), they illustrate how recipients might consider the relevant factors in determining whether a hostile environment has been created.

(1) *The degree to which the conduct affected the complainant's ability to access the recipient's education program or activity.* A hostile environment may manifest itself in different ways for different complainants. In some cases, a complainant's grades may go down or the complainant may feel forced to withdraw from school because of the harassing behavior. A complainant may also suffer physical injuries or mental or emotional distress. Other complainants may be able to maintain their grades or remain in a program or activity, but it may be more difficult for them to do so because of the harassment. For example, a student may remain in class while enduring a teacher's repeated hostile comments about the complainant's pregnancy, but they may be anxious throughout the day and have difficulty concentrating in class. Similarly, some complainants may be able to remain on a sports team, despite performing less successfully or with greater effort than previously due to humiliation and anger caused by repeated, unwelcome sexual advances from team members. A

hostile environment can occur even if the harassment is not targeted specifically at the individual complainant.  For example, if a group of students or a teacher regularly directs sexual comments toward a student, a sex-based hostile environment may be created for others in the classroom.  A hostile environment can also arise when sex-based harassment occurring *outside* of a recipient's education program or activity creates a sex-based hostile environment *within* the recipient's education program or activity.  For example, if a student is sexually assaulted by a fellow student while participating in a travel soccer program not sponsored by the school, the student who was assaulted may be subject to a sex-based hostile environment while at school as a result of that sexual assault when the student who perpetrated the sexual assault and his friends intimidate and mock the student who was sexually assaulted, which causes the student who was sexually assaulted to skip classes to avoid interactions with the other student and his friends.

(2) *The type, frequency, and duration of the conduct*.  The more severe or pervasive, the conduct is, the more likely it is to create a hostile environment.  For instance, if a complainant is taunted repeatedly by one or more students about not conforming to sex stereotypes because he wears nail polish and has long hair, the complainant may experience a hostile environment based on sex, particularly if the conduct has been going on for a period of weeks or takes place throughout the school or if the taunts are made by a number of students.  The more severe the conduct, the less the need to show a repetitive series of incidents; this is particularly true if the harassment is physical.  For example, a single incident of severe physical violence targeting the above student would also likely create a hostile environment for that student.  The

Department notes that a single incident of sexual assault, stalking, dating violence, or domestic violence as described in category three of the proposed definition of "sex-based harassment" (and under the current regulations) would constitute prohibited sex-based harassment with no further showing necessary to demonstrate that a hostile environment exists. These examples are not exhaustive. On the other hand, conduct would not likely create a hostile environment if the recipient determines that the conduct occurs infrequently or is not objectively and subjectively offensive, such as a one-off comment by a student's friend that she was acting "girly" or "like a boy." Similarly, because students may date one another, a single request for a date or a gift of flowers from one student to another, for example, even if unwelcome, generally would not create a hostile environment if the request was infrequent. There may be circumstances, however, in which repeated unwelcome requests for dates or similar conduct could create a hostile environment, especially if a person, whose requests for dates have been refused previously, continues requesting dates from the same person in an intimidating, threatening, or repetitive manner. Depending on the facts and circumstances, such conduct could also constitute stalking under category three of the proposed definition of "sex-based harassment." It would be the recipient's responsibility to determine whether the conduct is severe or pervasive.

(3) *The parties' ages, roles within the recipient's education program or activity, previous interactions, and other factors about each party that may be relevant to evaluating the alleged unwelcome conduct.* The parties' ages and roles may be especially relevant in cases involving allegations of sex-based harassment of a student by a school employee. For example, due to the level of control a professor, teacher,

102

or coach has over students, harassing conduct by that person toward a student is more likely to create a hostile environment than similar conduct by another student. This factor would also involve consideration of any prior relationships or interaction between the parties, subject to the limitations in proposed § 106.45(b)(7)(iii), and other factors such as how often the parties are required to interact with each other on a regular basis. The parties' previous interactions and other factors about each party may also be particularly relevant when considering allegations that involve conduct that originated outside of the recipient's education program or activity or outside of the United States. For example, if a student was assaulted by a peer in a study abroad program and alleges that a hostile environment exists when both students return to campus, the recipient should consider the parties' previous interactions to fully address any hostile environment within its education program and activity. For additional discussion of conduct that originated outside of the recipient's education program or activity or outside the United States see the discussion of proposed § 106.11.

(4) *The location of the conduct, the context in which the conduct occurred, and the control the recipient has over the respondent.* Harassing conduct that occurs on a school bus may be more intimidating than similar conduct on a school playground, for example, because the restricted area makes it impossible for students to avoid their harassers. Harassing conduct that occurs in a personal or secluded area, such as a dorm room or residence hall, can have a greater effect (e.g., be experienced as more threatening) than would similar conduct in a more public area. On the other hand, harassing conduct that occurs in a more public space may be more humiliating to the

person being targeted. Even when harassing conduct occurs outside of the recipient's education program or activity, the location and context of that conduct, and whether or not the recipient has control over the respondent, are relevant to evaluating whether a hostile environment based on sex exists within the recipient's education program or activity. Recipients should be aware that although a recipient's control over a respondent is relevant to evaluating whether a hostile environment based on sex exists when the harassing conduct occurs outside of the recipient's education program or activity, the analysis is different when the harassing conduct occurred in a recipient's education program or activity. In that context, a hostile environment may exist regardless of whether the recipient has control over the respondent, and the recipient would be required to meet its obligations under proposed § 106.44. The amount of control that a recipient has over a respondent is relevant only to the extent it may impact the scope of the recipient's response. For example, if a non-affiliated third party sexually assaults a student on campus, the recipient would be able to provide the student with supportive measures and could issue a no-trespass order against the non-affiliated third party, if it knows that person's identity, even if the recipient otherwise lacks control over the person.

(5) *Other sex-based harassment in the recipient's education program or activity.* A series of harassing incidents in the recipient's education program or activity could— taken together—create a hostile environment for the targeted student, even if each incident by itself would not. For example, if a student's peers repeatedly denigrate a student as "girly" over a period of weeks and the student reports that the treatment is causing him distress and interfering with his ability to concentrate in class, the

recipient would have an obligation to determine whether a hostile environment based on sex exists. Even if infrequent or inconsistent incidents may not be sufficiently serious to create a hostile environment, that same treatment repeated by different students in each class throughout the day may do so.

*Category Three: Clery Act*

The current regulations incorporate the statutory definitions of "sexual assault" from the Clery Act and "dating violence," "domestic violence," and "stalking" from the Violence Against Women Reauthorization Act of 2013 through cross-references to those statutes. VAWA 2022 renumbered the definitions of "dating violence" and "stalking" and renumbered and made substantive changes to the definition of "domestic violence." Pub. L. 117-103.[5] The definition of "sexual assault" in the Clery Act remains unchanged.

The Department proposes to include in the proposed definition of "sex-based harassment" (§ 106.2) the text of the definitions of "sexual assault" in the Clery Act at 20 U.S.C. 1092(f)(6)(A)(v), "dating violence" in VAWA 2022 at 34 U.S.C. 12291(a)(11), and "stalking" in VAWA 2022 at 34 U.S.C. 12291(a)(36), instead of merely including cross-references to the applicable provisions in VAWA 2013 and the Clery Act. In addition, the Department proposes explicitly setting out how "domestic violence" would be defined by incorporating relevant language from the definition of "domestic violence" in VAWA 2022 at 34 U.S.C. 12291(a)(12). The Department's proposed definition of "domestic violence" would not include all of the language from the definition of "domestic violence" in VAWA 2022 because in the Department's current view, some of the VAWA 2022 definition of "domestic violence" is not

---

[5] The Department notes that VAWA 2022 does not take effect until October 1, 2022, but chooses to include definitions from VAWA 2022 in these proposed regulations to provide clarity for recipients because it will be in effect when the final regulations are published.

applicable to Title IX.  The Department, therefore, proposes including the specific portions of the VAWA 2022 definition of "domestic violence" that are applicable to Title IX to avoid confusion given the expanded definition in the VAWA 2022 reauthorization, which added "in the case of victim services, includes the use or attempted use of physical abuse or sexual abuse, or a pattern of any coercive behavior committed, enables or solicited to gain or maintain power and control over a victim, including verbal, psychological, economic, or technological abuse that may or may not constitute criminal behavior."  However, omitting this language does not create a substantive change to the VAWA 2022 definition of "domestic violence" for Title IX purposes. The Department also does not propose any substantive changes to the content of the definitions of "sexual assault," "dating violence," and "stalking."  The definitions of those terms are the same as the definitions that were incorporated by cross-reference to the Clery Act and VAWA 2013 in the definition of "sexual harassment" in the current regulations.  The Department's current position is that including the language from the statutory definitions themselves in the proposed definition of "sex-based harassment" as opposed to including cross-references to the Clery Act and VAWA will be helpful for recipients by making it clear how these terms are defined for purposes of Title IX.

During the June 2021 Title IX Public Hearing and in listening sessions, OCR heard from stakeholders that there has been some confusion regarding the reference in the current Title IX regulations to the Clery Act's statutory definition of sexual assault.  The Department similarly heard about this confusion during meetings held in 2022 under Executive Order 12866. Specifically, stakeholders conveyed confusion because the Clery Act's statutory definition of "sexual assault," which is referenced in the Title IX regulations, refers to forcible and non-forcible sex offenses, but the FBI has retired those terms and those terms are not included in the

definition of "sexual assault" in the Department's Clery Act regulations. The Department notes

that to dispel this confusion, all recipients may find it useful to consult the Department's Clery

Act regulations, discussed below, for additional information about the Clery Act's definition of

"sexual assault," although only postsecondary institutions are subject to the Clery Act.

As explained above, current and proposed Title IX regulations adopt the Clery Act's

statutory definition of the term "sexual assault," 20 U.S.C. 1092(f)(6)(A)(v), which that Act

defines as "an offense classified as a forcible or nonforcible sex offense under the uniform crime

reporting [UCR] system of the Federal Bureau of Investigation [FBI]." The FBI UCR previously

consisted of two crime reporting systems: the Summary Reporting System (SRS) and the

National Incident-Based Reporting System (NIBRS). The current Clery Act regulations, 34 CFR

668.46(a) and 34 CFR Part 668, Subpart D, Appendix A, define sexual assault as an offense that

meets the definition of rape, fondling, incest, or statutory rape as used in the FBI's UCR program

and direct recipients to look to the SRS for a definition of "rape" and to the NIBRS for

definitions of "fondling," "statutory rape," and "incest" as the offenses falling under sexual

assault. The Department notes that although the FBI retired the SRS and transitioned to using

only the NIBRS in January 2021, the Clery Act regulations, including those regulations'

definition of "sexual assault," remain in effect and may be useful for recipients to consult. The

Department stated in the preamble to the 2014 Clery Act NPRM that the definition of "sexual

assault" in the Clery Act regulations reflects the definition of "sexual assault" in the Clery Act

statute, but the Clery Act regulations remove "references to forcible and nonforcible sex offenses

and identify the sex offenses that sexual assault would include to make the definition clear." 79

FR 35418, 35427 (June 20, 2014). The Department explained that it was removing the terms

"forcible" and "nonforcible" from the definition of "sexual assault" "to combat the suggestion

that a sex offense has not occurred if physical force was not used."  *Id.* at 35435.

Section 106.2 Definition of "Relevant"

*Current regulations:* None.  The term "relevant" is not defined in the existing Title IX regulations.  The Department stated in the preamble to the 2020 amendments that "the ordinary meaning of the word should be understood and applied."  85 FR at 30247 n.1018.  In addition, current § 106.45(b)(6)(i)-(ii) states that "[q]uestions and evidence about the complainant's sexual predisposition or prior sexual behavior are not relevant, unless such questions and evidence about the complainant's prior sexual behavior are offered to prove that someone other than the respondent committed the conduct alleged by the complainant, or if the questions and evidence concern specific incidents of the complainant's prior sexual behavior with respect to the respondent and are offered to prove consent."

The current regulations incorporate the concept of relevance into several provisions, specifically:

- Recipients must conduct an objective evaluation of all relevant evidence (§ 106.45(b)(1)(ii));

- Recipients must train investigators on issues of relevance (§ 106.45(b)(1)(iii));

- Recipients must create an investigative report that fairly summarizes relevant evidence (§ 106.45(b)(5)(vii));

- Recipients must not restrict the ability of either party to gather and present relevant evidence (§ 106.45(b)(5)(iii));

- Postsecondary institutions must ensure that each party's advisor has the ability to ask the other party and any witnesses all relevant questions and follow-up questions, and that only relevant cross-examination and other questions may be asked of a party or witness

(§ 106.45(b)(6)(i));

- For all other institutions, including elementary and secondary schools, recipients must provide parties with the opportunity to submit written, relevant questions to the other party (§ 106.45(b)(6)(ii)); and

- For all recipients, the decisionmaker must exclude oral or written questions that are not relevant and explain any decision to exclude a question as not relevant (§ 106.45(b)(6)(i)-(ii)).

*Proposed regulations:* The Department proposes adding a definition of "relevant" to the regulations to help recipients understand their obligations under Title IX. The Department proposes defining "relevant" as related to the allegations of sex discrimination under investigation as part of the grievance procedures in § 106.45, and if applicable § 106.46. The proposed regulations would clarify as part of the definition that questions are relevant "when they seek evidence that may aid in showing whether the alleged sex discrimination occurred," and that evidence is relevant "when it may aid a decisionmaker in determining whether the alleged sex discrimination occurred."

In addition, the proposed regulations, at § 106.45(b)(7), would set out three categories of evidence, including records, that would be impermissible (i.e., must not be accessed, considered, disclosed, or otherwise used) in the grievance procedures, regardless of whether the evidence is relevant. Likewise, questions seeking these types of evidence would be impermissible.

*Reasons:* Both the current regulations and the proposed regulations use a relevance standard in the grievance procedures. The Department proposes to add a definition of "relevant" to the regulatory text to assist recipients in determining relevance and to help parties to understand these determinations. In the preamble to the 2020 amendments, the Department "decline[d] to

109

define" the term "relevant" and stated that it "should be interpreted using [its] plain and ordinary meaning." 85 FR at 30304.

In connection with the June 2021 Title IX Public Hearing, OCR received comments about the difficulty of making relevancy determinations without a regulatory definition. Notwithstanding the Department's instruction in the preamble to the 2020 amendments to use the plain and ordinary meaning of the term "relevant," OCR continued to receive requests for a definition in connection with the June 2021 Title IX Public Hearing. After considering the issue and reweighing the facts and circumstances, including these continued requests, the Department proposes adding a definition of "relevant" to the proposed regulations. In light of the varying size, structure, and expertise of recipients, and because relevancy determinations are an integral part of a recipient's grievance procedures, the Department proposes defining "relevant" within the regulatory text to provide clarity for recipients, students, and others involved in a recipient's grievance procedures, and to assist those recipients that may not have substantial experience applying this legal concept.

The Department proposes setting out in the regulations the general principle that questions and evidence are relevant when they are related to the allegations of sex discrimination under investigation as part of a recipient's grievance procedures. Although the Department drew a distinction in the preamble to the 2020 amendments between evidence that is directly related to the allegations and relevant evidence, *id.* at 30304, OCR received comments through the June 2021 Title IX Public Hearing that this distinction is not well delineated and is confusing. The Department proposes merging these concepts by defining "relevant" as evidence related to the allegations of sex discrimination. This proposed definition would clarify for recipients and others that questions are relevant when they seek evidence that may aid in showing whether the

110

alleged sex discrimination (i.e., the alleged sex-based harassment or other conduct that could constitute sex discrimination under Title IX) occurred, and that evidence is relevant when it may aid a decisionmaker in determining whether that alleged sex discrimination occurred. If a question or evidence is related to the allegations but is not helpful for determining whether the alleged sex discrimination occurred, that question or piece of evidence would not qualify as relevant.

As explained in greater detail in the discussion of proposed § 106.45(b)(7), the Department also proposes identifying three categories of evidence, as well as questions seeking this evidence, as impermissible regardless of relevance. The current regulations include similar protections against any use of evidence in these three categories but do so in several different provisions. The Department proposes moving these provisions to proposed § 106.45(b)(7) for ease of reference and to make clear to recipients and others that these types of evidence are completely excluded from a recipient's grievance procedures. As explained in greater detail in the discussion of proposed § 106.45(b)(7), the Department also proposes minor changes to the three types of evidence that are not permitted regardless of relevance.

First, proposed § 106.45(b)(7)(i) would provide that evidence that is protected under a privilege as recognized by Federal or State law (e.g., attorney-client privilege, doctor-patient privilege, spousal privilege) would not be permitted and must not be accessed, considered, disclosed, or otherwise used in a recipient's grievance procedures—unless the person holding the privilege has waived it voluntarily in a manner permitted in the recipient's jurisdiction. A similar prohibition is included at current § 106.45(b)(1)(x).

Second, proposed § 106.45(b)(7)(ii) would provide that a party's records that are made or maintained by a physician, psychologist, or other recognized professional or paraprofessional in

connection with the provision of treatment to the party would not be permitted and must not be accessed, considered, disclosed, or otherwise used in the grievance procedures without the party's consent for use in the recipient's grievance procedures. Any consent must be voluntary and in writing. A similar prohibition is included at current § 106.45(b)(5)(i).

Third, proposed § 106.45(b)(7)(iii) would provide that evidence related to the complainant's sexual interests would not be permitted in a recipient's grievance procedures. Proposed § 106.45(b)(7)(iii) would also provide that evidence related to the complainant's prior sexual conduct would not be permitted in a recipient's grievance procedures unless it is offered to prove that someone other than the respondent committed the alleged conduct or to prove consent with evidence concerning specific incidents of the complainant's prior sexual conduct with the respondent. Similar prohibitions appear at current § 106.45(b)(6)(i)-(ii). Proposed revisions to these prohibitions, such as replacing "sexual behavior" with "sexual conduct" and replacing "sexual predisposition" with "sexual interests" are explained in greater detail in the discussion of proposed § 106.45(b)(7). Proposed § 106.45(b)(7)(iii) would further clarify that the fact that prior consensual sexual conduct occurred between the complainant and the respondent does not itself demonstrate or imply the complainant's consent to the alleged sex-based harassment or preclude determination that sex-based harassment occurred.

Section 106.2 Definition of "Respondent"

*Current regulations:* Section 106.30(a) defines a "respondent" as an individual who has been reported to be the perpetrator of conduct that could constitute sexual harassment.

*Proposed regulations:* The Department proposes moving the definition of "respondent" from § 106.30(a) to § 106.2 with minor revisions. The Department proposes defining a "respondent" as an individual who is alleged to have violated the recipient's prohibition on sex discrimination.

*Reasons:* The definition of "respondent" in the current regulations is limited to persons who may have engaged in conduct that could constitute sexual harassment. As the proposed regulations would require a recipient to initiate its grievance procedures in response to a complaint of any form of sex discrimination, consistent with Title IX, the Department proposes revising the definition of "respondent" to include a person who is alleged to have violated a recipient's prohibition on sex discrimination as opposed to a person who may have engaged in conduct that could constitute sexual harassment. Under proposed § 106.8(b)(1), a recipient would be required to "adopt and publish a policy stating that it does not discriminate on the basis of sex and prohibits sex discrimination in any education program or activity that it operates." The Department's current view is that it is more accurate to frame the allegations against a respondent in the context of violating the recipient's prohibition on sex discrimination because this prohibition on sex discrimination is directly tied to the recipient's obligation under Title IX to operate its education program or activity free from sex discrimination. A determination that the respondent violated the recipient's prohibition would amount to a determination that sex discrimination occurred, which in turn would obligate the recipient under proposed § 106.44(a) to take prompt and effective action to end any sex discrimination that has occurred in its education program or activity, prevent its recurrence, and remedy its effects.

The Department would recognize in proposed § 106.6(g) that a parent, guardian, or other authorized legal representative may have a legal right to act on behalf of a respondent. This approach is consistent with current § 106.6(g), which states that the Title IX regulations must not be "read in derogation of any legal right of parent or guardian" to act on behalf of a respondent. As explained in the preamble to the 2020 amendments, although the student would be the respondent, in such situations involving a minor, "the parent or guardian, must be permitted to

113

exercise the rights granted to the party . . . whether such rights involve requesting supportive measures or participating in the process outlined in the recipient's grievance process."  85 FR at 30453.  The Department further explained in the preamble to the 2020 amendments, that "the parent or guardian must be permitted to accompany the student to meetings, interviews, and hearings during a grievance process to exercise rights on behalf of the student, while the student's advisor of choice may be a different person from the parent or guardian."  *Id.* Accordingly, under proposed § 106.6(g), the parent, guardian, or other authorized legal representative may have a legal right to act on a student respondent's behalf; however, the student would remain the respondent.

The Department also notes that, consistent with the current regulations, a third party may be a respondent to a complaint of sex discrimination, including sex-based harassment, under these proposed regulations.  The Department highlighted examples of a recipient's response to complaints involving third-party complainants and respondents in the preamble to the 2020 amendments and explained that the "regulations require a recipient to respond to sexual harassment whenever the recipient has notice of sexual harassment that occurred in the recipient's own education program or activity, regardless of whether the complainant or respondent is an enrolled student or an employee of the recipient."  *Id.* at 30488.

Section 106.2 Definitions of "Supportive Measures," "Disciplinary Sanctions," and "Remedies"
*Current regulations:* The Title IX regulations, at § 106.30, define "supportive measures" as non-disciplinary, non-punitive individualized services offered as appropriate, as reasonably available, and without fee or charge to the complainant or the respondent before or after the filing of a formal complaint or when no formal complaint has been filed.  The regulations state that such measures are designed to restore or preserve equal access to the recipient's education program or

activity, without unreasonably burdening the other party, including measures designed to protect the safety of all parties or the recipient's educational environment, or deter the respondent from engaging in sexual harassment. The current regulations include a non-exhaustive list of certain types of measures that a recipient can provide as supportive measures. Current § 106.30 also requires a recipient to maintain as confidential any supportive measures it provides, except to the extent such confidentiality would impair the recipient's ability to provide the supportive measures. Finally, the current regulations state that the Title IX Coordinator is responsible for coordinating the effective implementation of supportive measures.

The current regulations do not define "disciplinary sanctions" or "remedies." The term "remedies" is used in current § 106.45(b)(i), which states that a recipient must treat "the complainant and respondent equitably by providing remedies to a complainant where a determination of responsibility for sexual harassment has been made against the respondent, and by following a grievance process that complies with this section before the imposition of any disciplinary sanctions or other actions that are not supportive measures as defined in § 106.30, against a respondent." The current regulations explain that remedies "must be designed to restore or preserve equal access to the recipient's education program or activity" and may include the same individualized services described in § 106.30 as supportive measures. 34 CFR 106.45(b)(i). Finally, they provide that "remedies need not be non-disciplinary or non-punitive and need not avoid burdening the respondent." *Id*.

*Proposed regulations*: The Department proposes to define two related, but distinct, terms— "disciplinary sanctions" and "remedies"—and to retain the current definition of "supportive measures" with some edits. The Department proposes adding definitions of "disciplinary sanctions" and "remedies" to provide clarity for recipients as to the meanings of these terms as

115

they are used in the Department's Title IX regulations and to help ensure consistency in how disciplinary sanctions and remedies are utilized by recipients under Title IX.

The Department proposes retaining the current definition of "supportive measures" as non-disciplinary, non-punitive, individualized measures, offered as appropriate, as reasonably available, without unreasonably burdening a party, and without fee or charge to the complainant or respondent, with some clarifying amendments. In addition, the Department proposes moving the following provisions from the definition of "supportive measures" to other provisions in the proposed regulations: the range of supportive measures to proposed § 106.44(k)(1); and the Title IX Coordinator's obligation to offer and coordinate supportive measures to proposed § 106.44(f)(3). A recipient's obligation to maintain as confidential any supportive measures it provides would be moved to proposed § 106.44(g)(5) and modified to permit a recipient to provide information about supportive measures to persons other than the complainant or respondent as necessary to provide the measure, or to a party only if necessary to restore or preserve the other party's access to the recipient's education program or activity. Finally, the Department proposes revising the definition to clarify that supportive measures may be offered to restore or preserve that party's access to the recipient's education program or to provide support during the recipient's grievance procedures in § 106.45, and if applicable § 106.46, or during the informal resolution process in § 106.44(k). The Department would also clarify that supportive measures can include temporary measures that burden a respondent during the pendency of a grievance procedures, but only when such measures are imposed for non-punitive and non-disciplinary reasons and are designed to protect the safety of the complainant or the recipient's educational environment. And, as explained in greater detail in the discussion of proposed § 106.44(g), the Department proposes including additional provisions to guide the

coordination of supportive measures, including the requirement that these temporarily burdensome measures may be imposed only if the respondent is given the opportunity to seek modification or reversal of them.

The Department proposes defining "disciplinary sanctions" as consequences imposed on a respondent following a determination that the respondent violated the recipient's prohibition on sex discrimination. As in the current regulations, the Department's proposed definition of "disciplinary sanctions" would recognize that a recipient must follow grievance procedures consistent with regulatory requirements before imposing disciplinary sanctions on a respondent. The proposed definition would encompass disciplinary sanctions applied when a recipient determines that the respondent has violated any aspect of the recipient's prohibition on sex discrimination after following grievance procedures under proposed § 106.45, and if applicable proposed § 106.46. Under the proposed regulations, disciplinary sanctions may be applied to a respondent who is a student, employee, or third party.

Finally, the Department proposes including a definition of "remedies" in § 106.2 to clarify that remedies are measures provided, as appropriate, to a complainant or any other person the recipient identifies as having had equal access to the recipient's education program or activity limited or denied by sex discrimination. The proposed definition would also clarify that remedies are designed to restore or preserve access to the recipient's education program or activity after a recipient determines that sex discrimination occurred.

*Reasons:* The Department proposes these definitions to provide clarity and ensure that recipients are aware of their obligations under Title IX. All three definitions describe ways in which a recipient may provide effective protection against and response to sex discrimination. The Department emphasizes that a recipient must take into account the distinct timing, purpose, and

considerations of supportive measures, disciplinary sanctions, and remedies before providing or imposing them, as their definitions make clear:

- Supportive measures are intended to preserve or restore a complainant's or respondent's access to the recipient's education program or activity and may be provided to the complainant or respondent, as appropriate, after the Title IX Coordinator has been notified of conduct that may constitute sex discrimination under Title IX;

- Disciplinary sanctions are consequences imposed on a respondent in response to a determination that a respondent violated the recipient's prohibition on sex discrimination and may be applied to a respondent only after a recipient has made this determination; and

- Remedies are intended to preserve or restore access to the recipient's education program or activity and may be provided to a complainant or other person after a recipient determines that sex discrimination occurred, including when a recipient engages in sex discrimination through its own action or inaction.

*Supportive Measures.*  The Department proposes maintaining the existing definition of "supportive measures" with revisions to increase readability and clarity and to align this section with other modifications the Department proposes making to the regulations.  The Department proposes retaining in the definition of "supportive measures" that such measures are non-disciplinary and non-punitive, but proposes using the term "measures" rather than using the term "services" that is in the current definition.  The Department proposes making this change to avoid confusion that may be caused by the current regulations' use of both "services" and "measures" to describe supportive measures.

The Department also proposes that a recipient must offer supportive measures, as

appropriate, to a complainant or respondent for any type of conduct that constitutes sex discrimination, including but not limited to sex-based harassment and retaliation. The Department proposes retaining the language that supportive measures are designed to restore or preserve a party's access to the recipient's education program or activity. At the same time, the Department proposes clarifying that a supportive measure that may burden a respondent during the pendency of a grievance procedure may be imposed as a temporary supportive measure, but only when such a supportive measure is imposed for non-punitive and non-disciplinary reasons and is designed to protect the safety of the complainant or the recipient's educational environment and, as the discussion of proposed § 106.44(g) clarifies, only if the respondent is given an opportunity to seek modification or reversal of such a measure. As explained in greater detail in the discussion of proposed § 106.44(g), a recipient would also be permitted to impose supportive measures that burden a respondent even if the specific measure imposed is also available as a disciplinary sanction, but only if such a supportive measure is not imposed for punitive or disciplinary reasons and is intended to restore or preserve the complainant's access to the recipient's education program or activity. In light of the potential harm to a student respondent's education from unnecessary or inappropriate implementation of such temporarily burdensome supportive measures, however, a recipient would not be required to impose supportive measures that burden a respondent, but rather would be permitted to impose such measures if the recipient deems the measures appropriate to the circumstances of that case. When imposing supportive measures that burden a respondent, the recipient would be required to engage in a fact-specific inquiry to determine whether burdensome supportive measures are necessary as part of its grievance procedures under proposed § 106.45, and if applicable proposed § 106.46, and if so, which supportive measures would be the least restrictive of the

respondent's access to the program or activity while still ensuring nondiscriminatory access for the complainant. As proposed, supportive measures that burden a respondent would terminate once the recipient has determined whether sex discrimination occurred at the conclusion of a grievance procedure. Because supportive measures that burden a respondent may be imposed only during the pendency of a recipient's grievance procedures, they would not be available during an informal resolution process under proposed § 106.44(k).

The Department also proposes adding to the existing definition of "supportive measures" that, in addition to the purposes set out in the current regulations and discussed above, supportive measures that do not burden the respondent may be necessary to provide a party with support through the recipient's grievance procedures in proposed § 106.45, and if applicable § 106.46, as well as through the informal resolution process in proposed § 106.44(k). This addition to the existing definition acknowledges that a party may need supportive measures in order to participate fully in and have equal access to a recipient's grievance procedures, whether formal or informal.

The Department proposes moving the list of examples of supportive measures from the definition of "supportive measures" to proposed § 106.44(g)(1), which would require a Title IX Coordinator, upon being notified of conduct that may constitute sex discrimination under Title IX, to offer supportive measures to complainants and, if appropriate, respondents. As explained in the discussion of that section, the list is intended to be illustrative and non-exhaustive. In addition, the Department proposes removing from the definition of "supportive measures" that a "recipient must maintain as confidential any supportive measures provided to the complainant or respondent, to the extent that maintaining such confidentiality would not impair the ability of the recipient to provide the supportive measures" and moving this clarification of a recipient's

obligation to maintain the confidentiality of supportive measures that it provides, subject to limited exceptions, to proposed § 106.44(g)(5).

Finally, the Department proposes removing from the definition of "supportive measures" the requirement that the Title IX Coordinator is responsible for coordinating the effective implementation of supportive measures. Instead, the Department proposes moving this requirement to proposed § 106.44(g)(6), which would state that a Title IX Coordinator would be responsible for offering and coordinating supportive measures.

*Disciplinary Sanctions.* The Department proposes adding a definition of "disciplinary sanctions" to § 106.2 to clarify what constitutes a disciplinary sanction and when imposition of a disciplinary sanction is appropriate.

The proposed definition of "disciplinary sanctions" explains that disciplinary sanctions are consequences imposed on a respondent for violating the recipient's prohibition on sex discrimination, but it does not specify the consequences a recipient can or must impose. The proposed definition of "disciplinary sanctions" would apply to all determinations that a respondent has violated the recipient's prohibition on sex discrimination. In contrast, the current regulations address disciplinary sanctions only in relation to sexual harassment, following a grievance process under § 106.45 in response to a formal complaint of sexual harassment. The proposed definition would accord with the Department's intent to enable full implementation of Title IX's purpose. Consistent with the current regulations, the proposed regulations would not permit a recipient to impose disciplinary sanctions on a respondent prior to the conclusion of the grievance procedures because imposing a non-temporary or punitive consequence before reaching a determination would be contrary to the requirement to have an adequate, reliable, and impartial investigation and resolution of complaints under proposed § 106.45(f) or the

requirement to include a presumption that the respondent is not responsible for the alleged conduct until a determination whether sex discrimination occurred is made at the conclusion of the recipient's grievance procedures for complaints of sex discrimination under proposed § 106.45(b)(3).

*Remedies.* The Department's proposed regulations would provide a definition of "remedies" that ensures effective response to sex discrimination and consistency in available remedies for all forms of discrimination. The Department proposes this change following consideration of comments received as part of the June 2021 Title IX Public Hearing regarding the limited scope of remedies available under the current regulations. Stakeholders asked OCR to clarify the role of remedies in ensuring that students have access to a nondiscriminatory education program or activity following a determination that sex discrimination occurred or that the recipient's own action or inaction resulted in sex discrimination, including but not limited to sex-based harassment.

The Department's proposed definition would also ensure that remedies are available to restore and preserve access to the educational environment when any form of sex discrimination, not only sexual harassment, disrupts that educational environment. For example, following a determination that a teacher retaliated against a student who made a Title IX complaint by disciplining that student in violation of the recipient's prohibition on sex discrimination, that student may be eligible for remedies, such as changes to the student's transcript to remove the disciplinary notation, or a classroom change so that the student is no longer in that teacher's class.

Moreover, the Department recognizes that persons other than the complainant who are participating or attempting to participate in a recipient's education program or activity where sex

discrimination occurred may also have their access to the education program or activity limited or denied as a result of that sex discrimination.  For this reason, the Department proposes clarifying in the regulations that these individuals may be able to receive remedies.  For example, if a high school coach engages in sex-based harassment of a student-athlete in front of the student-athlete's teammates who then notify the school of the sex-based harassment, and the school determines that sex-based harassment occurred, it may be appropriate to provide remedies to these student-athletes who were also exposed to the sex-based harassment if their equal access to the education program or activity was denied or limited by, for example, the psychological impact of the harassment they witnessed.  Remedies in the form of counseling or other supports may be appropriate for these students following the school's determination.

The proposed regulations also recognize that remedies may be appropriate when the recipient's own action or inaction in response to an allegation of sex discrimination resulted in a distinct Title IX violation.  For example, if a student reported to the Dean of Students that another student sexually assaulted them on campus and the recipient failed to take the necessary action, the recipient's inaction would likely violate Title IX.  *See, e.g.*, *Davis*, 526 U.S. at 643; *Jackson*, 544 U.S. at 173-74.  In this example, if the student, as a result of the recipient's failure to act after receiving the student's report, has to continue to attend classes with the respondent and drops out of these classes due to further sex-based harassment or peer retaliation, then the recipient would need to provide remedies to the student to restore or preserve their access to the recipient's education program or activity.  These remedies could include, for example, counseling, tutoring, or additional time to complete an assignment to address limitations on the student's access to their education caused by the recipient's failure to meet the requirements of Title IX.  In addition, if the recipient's initial steps to address the sex-based harassment were

insufficient, then it would be required to take additional steps and provide additional remedies to the student to fulfill its obligation under proposed § 106.44. For example, if a recipient failed to take the steps required under proposed § 106.44 upon being notified that a student was sexually assaulted by another student on campus because of insufficient Title IX Coordinator training, it would need, at minimum, to revise its Title IX Coordinator training on the recipient's obligation to address sex discrimination and the Title IX Coordinator's responsibilities in coordinating the recipient's actions to comply with that obligation as a remedy for its own inaction and, in addition, would need to fully comply with its obligations under proposed § 106.44 to prevent the recurrence of such sex discrimination and remedy its effects.

Examples of possible measures a recipient may need to offer a student to remedy the effects of sex-based harassment, to remedy the additional harm caused by a recipient's action or inaction, or to restore or preserve a student's continued access to a recipient's education program or activity after a determination that sex-based harassment occurred could include: ensuring that a complainant can move safely between classes and while at school or on campus such as by providing a campus escort or allowing a student to park in the teacher's parking lot; making changes to class schedules and extracurricular activities to ensure the complainant and respondent are separated; making adjustments to student housing; providing services including medical support and counseling; providing academic resources and support; reviewing any disciplinary actions taken against the complainant to determine whether there is a causal connection between the sex-based harassment and the misconduct; providing reimbursement for professional counseling services; making tuition adjustments; and any other remedies it deems appropriate.

Remedies provided following a determination that sex discrimination occurred may

include measures that were provided as supportive measures during the pendency of the investigation. A temporary restriction on contact or removal from an activity that was imposed as a supportive measure thus may be imposed as a remedy after a finding that sex discrimination occurred if it would be necessary to preserve or restore the complainant's access. Because the remedy would be instituted following a determination that sex discrimination occurred, its function would be to remedy past discrimination rather than provide a temporary protection of the complainant's access while the grievance procedures are underway.

Some actions taken by a recipient could also serve as both a remedy and a disciplinary sanction, e.g., the suspension of a respondent who engaged in sex discrimination may aid in restoring a complainant's access to the recipient's education program or activity while also serving as a disciplinary consequence for the respondent's violation of the recipient's policy.

Neither remedies nor disciplinary sanctions would be available under informal resolution in proposed § 106.44(k) because there would be no final determination that sex discrimination occurred in the informal resolution process. As described in greater detail in the discussion of proposed § 106.44(k), the respondent may agree to terms of a voluntary agreement that may otherwise constitute remedies or disciplinary sanctions had the recipient determined that sex discrimination occurred under the recipient's grievance procedures.

Section 106.30(a) Removal of reference to a definition of "consent"

*Current regulations:* Current § 106.30(a) states that the Assistant Secretary will not require recipients to adopt a particular definition of "consent" with respect to sexual assault, as referenced in this section.

*Proposed regulations:* The Department proposes removing this provision from the definitions section.

*Reasons:* The Department proposes removing § 106.30 as a whole and proposes moving some provisions from that section to other provisions in the proposed regulations. The Department proposes removing the current provision addressing consent from the regulations altogether because it is unnecessary and confusing to include language in the definitions section stating that the Department declines to define a certain term.

The Department's position remains, as stated in the preamble to the 2020 amendments, that "the definition of what constitutes consent for purposes of sexual assault within a recipient's educational community is a matter best left to the discretion of recipients, many of whom are under State law requirements to apply particular definitions of consent for purposes of campus sexual misconduct policies." 85 FR at 30124. For these reasons, in the 2020 amendments, the Department "decline[d] to impose a federalized definition of consent for Title IX purposes" despite requests by some stakeholders to do so. *Id.* at 30125. In response to those requests, the Department instead included a provision for consent in the definitions section stating that the Department would not require recipients to adopt a particular definition of consent.

      D. Administrative Requirements

Section 106.8 Designation of coordinator, adoption and publication of nondiscrimination policy and grievance procedures, notice of nondiscrimination, training, and recordkeeping.

*Current regulations*: The section heading is "Designation of coordinator, dissemination of policy, and adoption of grievance procedures."

*Proposed regulations*: The Department proposes changing this section heading to "Designation of coordinator, adoption and publication of nondiscrimination policy and grievance procedures, notice of nondiscrimination, training, and recordkeeping."

*Reasons*: The proposed section heading would more accurately describe the content of the section.

Section 106.8(a) Designation of a Title IX Coordinator

*Current regulations:* Section 106.8(a) requires each recipient to designate at least one employee as the Title IX Coordinator to coordinate its efforts to comply with Title IX's statutory and regulatory requirements. Current § 106.8(a) requires a recipient to notify applicants for admission and employment, students, parents or legal guardians of elementary and secondary school students, employees, and all unions or professional organizations holding collective bargaining or professional agreements with the recipient, of the name or title, office address, email address, and telephone number of the employee or employees designated as the Title IX Coordinator. Current § 106.8(a) also states that any person may report sex discrimination, including sexual harassment, to the Title IX Coordinator using a variety of means at any time.

*Proposed regulations*: The Department proposes adding two new headings to the section for clarity: "Title IX Coordinator" and "Delegation to designees." Proposed § 106.8(a)(1) would maintain the requirement that a recipient must designate and authorize at least one employee as the "Title IX Coordinator" to coordinate its efforts to comply with the recipient's responsibilities under the Department's Title IX regulations. In proposed § 106.8(a)(2), the Department proposes adding that, as appropriate, the Title IX Coordinator may assign one or more designees to carry out some of the recipient's responsibilities, but that one Title IX Coordinator must retain ultimate oversight over those responsibilities.

The Department proposes removing language from the existing provision that requires a recipient to provide the contact information for its Title IX Coordinator and that includes specific instructions for how to report sex discrimination to the Title IX Coordinator. Instead, the

Department proposes moving the requirement that a recipient must provide notice of nondiscrimination, which must include the contact information for the Title IX Coordinator, how to report information that may constitute sex discrimination under Title IX, how to make a complaint of sex discrimination, and how to locate the recipient's grievance procedures, to proposed § 106.8(c).

*Reasons*: The Department proposes revisions to § 106.8(a)-(c), to afford greater clarity about a recipient's core obligation to designate a Title IX Coordinator (proposed § 106.8(a)), adopt and publish a nondiscrimination policy and grievance procedures for complaints of sex discrimination and any action prohibited by the regulations (proposed § 106.8(b)), and provide notice of the contact information for its Title IX Coordinator, as well as notice of its nondiscrimination policy and grievance procedures to individuals entitled to receive notification via specific means of publication (proposed § 106.8(c)). As part of this restructuring, the Department proposes limiting § 106.8(a)(1) to the requirement to designate a Title IX Coordinator. The Department proposes moving the requirement that a recipient notify certain people of the contact information for its Title IX Coordinator to the requirement regarding providing a notice of nondiscrimination, which would also include notice of a recipient's nondiscrimination policy and grievance procedures, as described in proposed § 106.8(c)(1)(i)-(v). The Department anticipates that consolidating all of the required contents of the notice of nondiscrimination into proposed § 106.8(c)(1) will make it easier for recipients to understand how to comply with these requirements.

*Designees.* The Department proposes revisions to § 106.8(a) to expressly permit a recipient to assign one or more designees to carry out some of the Title IX Coordinator's responsibilities, as long as one individual, referred to as the "Title IX Coordinator," retains

Case 3:21-cv-00308-CEA-DCP   Document 83-1   Filed 06/27/22   Page 129 of 701   PageID #: 1362

ultimate authority to coordinate the recipient's compliance with Title IX and oversight over those designated responsibilities. This approach would enable a recipient that enrolls large numbers of students, employs large numbers of employees, provides services in multiple locations, or engages in a large variety of activities to carry out its various Title IX responsibilities effectively. For example, in the elementary school and secondary school setting, a school district could designate the Title IX Coordinator and authorize that person to appoint or oversee building-level coordinators for each school building within the district. These building-level coordinators could carry out some of the Title IX Coordinator's duties, such as providing training or ensuring that grievance procedures are administered correctly in that school building. Alternatively, a Title IX Coordinator could assign a designee to oversee several buildings, or a unit, such as all elementary schools in a district or a medical school within a university. Similarly, a Title IX Coordinator could have designees that oversee compliance with different aspects of the recipient's Title IX obligations, such as those related to athletics, pregnant and parenting students, financial assistance, or sex-based harassment. In each example, the Title IX Coordinator, not one particular designee or group of designees, would retain ultimate authority to coordinate the recipient's compliance with Title IX and oversight over each of the designees' responsibilities and over the recipient's overall compliance with Title IX.

By having one Title IX Coordinator oversee designees, the Title IX Coordinator would ensure consistent Title IX compliance across the recipient's education program or activity. This structure may also help the Title IX Coordinator identify trends across multiple programs or activities of the recipient and coordinate training or educational programming responsive to those trends. For example, if students at three different schools report sex-based harassment on the school bus, the Title IX Coordinator, who is aware of each discrete incident, may realize that

these incidents are not isolated, but rather, part of a larger trend indicating a need for better training, supervision, or staffing on school buses across the district.

In addition, this oversight structure is consistent with the view the Department expressed in the preamble to the 2020 amendments, which stressed that a recipient must ensure that a Title IX Coordinator is not "designated 'in name only'" and instead is fully authorized to coordinate a recipient's efforts to comply with Title IX. 85 FR at 30464. A recipient must ensure that the Title IX Coordinator is effective in this role by ensuring that the Title IX Coordinator has the appropriate authority, support, and resources to coordinate the recipient's Title IX compliance efforts. In light of this proposed revision to § 106.8(a), every reference to the "Title IX Coordinator" in this preamble, other than in the discussion of proposed § 106.8(a)(1)-(2), should be understood to include the Title IX Coordinator and any designees.

*Notification requirements.* The Department proposes deleting the specific instructions for how to report sex discrimination to the Title IX Coordinator from current § 106.8(a). The Department added the instructions as part of the 2020 amendments; however, as explained in greater detail in the discussion of the notice of nondiscrimination in proposed § 106.8(c), the Department proposes adding to proposed § 106.8(c)(1)(v) a requirement that a recipient include in the content of its notice of nondiscrimination how to report information about conduct that may constitute sex discrimination under Title IX, how to make a complaint of sex discrimination under the regulations, and how to locate the recipient's grievance procedures as described in § 106.45, and if applicable § 106.46. In addition, the Department proposes including in proposed § 106.44(c) that a recipient must impose specific notification requirements upon various employees when the employee has information about conduct that may constitute sex discrimination under Title IX. These notification requirements are explained in greater detail in

130

the discussion of proposed § 106.44(c).

Section 106.8(b) Adoption and publication of nondiscrimination policy and grievance procedures

*Current regulations:* Section 106.8(b)(1) requires a recipient to notify persons entitled to notification under current § 106.8(a) that the recipient does not discriminate on the basis of sex in its education program or activity and that it is required by Title IX not to discriminate in that manner. Current § 106.8(b)(2) requires each recipient to prominently display contact information for its Title IX Coordinator, as well as its Title IX nondiscrimination notice, on its website and in each handbook or catalog. Current § 106.8(c) requires a recipient to adopt and publish grievance procedures for the prompt and equitable resolution of student and employee complaints alleging sex discrimination and a grievance process for formal complaints of sexual harassment under current § 106.45.

*Proposed regulations*: The Department proposes consolidating the requirements to adopt and publish a nondiscrimination policy and grievance procedures into proposed § 106.8(b). The consolidation would add two headings to clarify that a recipient must adopt and publish a nondiscrimination policy under paragraph (b)(1) and grievance procedures for the prompt and equitable resolution of any action that would be prohibited by Title IX or the regulations, under paragraph (b)(2). The Department proposes adding an explicit requirement in proposed § 106.8(b)(1) that a recipient must adopt and publish a policy stating it does not discriminate based on sex and prohibits sex discrimination in any education program or activity that it operates. The Department also proposes moving the requirement that a recipient adopt and publish grievance procedures consistent with the requirements of § 106.45, and if applicable § 106.46, that provide for the prompt and equitable resolution of complaints alleging any action that would be prohibited by the regulations from current § 106.8(c) to proposed § 106.8(b)(2).

131

As part of its proposed restructuring of § 106.8(a)-(c), the Department proposes moving the specific requirements in current § 106.8(b) regarding the persons entitled to receive notification of the recipient's notice of nondiscrimination as well as the publications in which a recipient must include its notice of nondiscrimination to proposed § 106.8(c) and 106.8(c)(2), respectively.

*Reasons*:  The Department proposes changes to § 106.8(b) to simplify and clarify a recipient's obligations to adopt and publish a nondiscrimination policy and Title IX grievance procedures.

*Adoption and publication of nondiscrimination policy*:  Although the Department has long required a recipient to notify certain individuals of its nondiscrimination policy, the current Title IX regulations do not make explicit that a recipient must adopt such a policy.  The proposed addition to § 106.8(b)(1) provides this clarification.  The process for adoption would vary by recipient and jurisdiction.  For example, it could include a vote by a board of education for a school district or by a governing board for a postsecondary institution or adoption by leadership within the school district or postsecondary institution.  As discussed in the following section regarding proposed § 106.8(c), although the Department proposes clarifying the requirements for publishing a "notice of nondiscrimination"—which would include information on how persons can locate the recipient's nondiscrimination policy and grievance procedures and specific requirements on where that notice must be published—the Department does not propose specific requirements for how a recipient must publish its nondiscrimination policy.  A recipient may choose to include its nondiscrimination policy in full on its website or in printed publications such as a handbook or catalog.  In addition, a recipient may choose to print its nondiscrimination policy and make it available in a specific, designated office such as a guidance counselor's office, a Title IX Coordinator's office, or a Dean of Students office.

132

*Adoption and publication of grievance procedures.* The Department proposes moving the requirement that a recipient must adopt grievance procedures that provide for the prompt and equitable resolution of complaints alleging any action that would be prohibited by Title IX and the regulations from current § 106.8(c) to proposed § 106.8(b)(2). The Department further proposes revisions to proposed § 106.8(b)(2) to clarify that a recipient's grievance procedures must be published and must provide for the resolution of complaints made by a student, employee, third party participating or attempting to participate in the recipient's education program or activity, or the Title IX Coordinator alleging any action that would violate Title IX or its regulations. The Department proposes adding § 106.8(b)(2) to clarify that a recipient must adopt and publish grievance procedures under Title IX to address all forms of sex discrimination, including sex-based harassment, consistent with the requirements of § 106.45, and if applicable § 106.46.

The Department's proposed revisions would apply proposed § 106.45 as the framework for all complaints of sex discrimination, including sex-based harassment, for all recipients. The Department proposes additional requirements in proposed § 106.46 for grievance procedures that would apply only to complaints of sex-based harassment at postsecondary institutions in which at least one party is a student. Rather than referring to the grievance procedures for complaints of sexual harassment as a grievance "process," the Department proposes making a non-substantive change to refer to the procedures required under both proposed §§ 106.45 and 106.46 as grievance "procedures," consistent with the language used in proposed §§ 106.45 and 106.46.

As with proposed § 106.8(b)(1), under proposed § 106.8(b)(2), a recipient may adopt the required grievance procedures by following its typical policy approval process approval. For some recipients, grievance procedures that comply with the requirements of proposed § 106.45,

and if applicable proposed § 106.46, will be approved by a vote of the recipient's board of education or governing board. For others, a recipient's administrative staff will provide approval. Also, similar to proposed § 106.8(b)(1), although the Department proposes clarifying the requirements for a recipient to provide and publish a notice of nondiscrimination under proposed § 106.8(c), the Department would further leave to a recipient's discretion where and how to publish its grievance procedures.

Section 106.8(c) Notice of nondiscrimination

*Current regulations*: Section 106.8(a) requires a recipient to notify applicants for admission and employment, students, parents or legal guardians of elementary school and secondary school students, employees, and all unions or professional organizations holding collective bargaining or professional agreements of the name or title, office address, electronic mail address, and telephone number of the employee or employees designated as the Title IX Coordinator. Current § 106.8(b) requires a recipient to notify the same persons listed in paragraph (a) that it does not discriminate on the basis of sex in the education program or activity that it operates, that it is required by Title IX and the regulations not to discriminate in such a manner, that the requirement not to discriminate in the education program or activity extends to admission and employment, and that inquiries about the application of Title IX and the regulations to such recipient may be referred to the recipient's Title IX Coordinator, to the Assistant Secretary, or both. Current § 106.8(b)(2) requires each recipient to prominently display contact information for its Title IX Coordinator, as well as its Title IX nondiscrimination notice, on its website and in each handbook or catalog. Current § 106.8(c) requires a recipient to notify the same persons listed in paragraph (a) of its grievance procedures and grievance process, including how to report or file a complaint of sex discrimination, how to report or file a formal complaint of sexual

134

harassment, and how the recipient will respond.

*Proposed regulations*: The Department proposes changing the heading of proposed § 106.8(c) from "Adoption of grievance procedures" to "Notice of nondiscrimination." The Department also proposes adding two headings—"Contents of notice of nondiscrimination" and "Publication of notice of nondiscrimination"—to consolidate and clarify the persons to whom this information must be provided (proposed § 106.8(c)), the specific content a recipient would be required to include in its notice of nondiscrimination, (proposed § 106.8(c)(1)), and where and how a recipient must publicize its notice of nondiscrimination (proposed § 106.8(c)(2)).

Proposed § 106.8(c) would require a recipient to provide a notice of nondiscrimination to the same individuals to whom notice must be provided under current § 106.8(a): students; parents, guardians or other authorized legal representatives of elementary school and secondary school students; employees; applicants for admission and employment; and all unions and professional organizations holding collective bargaining or professional agreements with the recipient. The Department proposes a minor change to include "other authorized legal representatives of elementary school and secondary school students" to the group of individuals entitled to receive the notice of nondiscrimination. Proposed § 106.8(c)(1) would further require a recipient to include the following specific information in its notice of nondiscrimination:

- A statement that the recipient does not discriminate on the basis of sex and prohibits sex discrimination in any education program or activity that it operates, as required by Title IX and its regulations, including in admission (unless subpart C of part 106 does not apply) and employment (proposed § 106.8(c)(1)(i));

- A statement that inquiries about the application of Title IX and the regulations to the recipient may be referred to the recipient's Title IX Coordinator, to the Office for Civil Rights, or to both (proposed § 106.8(c)(1)(ii));

- The name or title, office address, email address, and telephone number of the recipient's Title IX Coordinator (proposed § 106.8(c)(1)(iii));

- How to locate the recipient's nondiscrimination policy under proposed § 106.8(b)(1) (proposed § 106.8(c)(1)(iv)); and

- How to report information about conduct that may constitute sex discrimination under Title IX, how to make a complaint of sex discrimination under the regulations, and how to locate the recipient's grievance procedures under proposed § 106.8(b)(2), § 106.45, and if applicable § 106.46 (proposed § 106.8(c)(1)(v)).

In proposed § 106.8(c)(2)(i), the Department would provide that a recipient must prominently include all elements of its notice of nondiscrimination set out in paragraphs (c)(i)-(v) in various materials consistent with the existing provision, as well as in each announcement, bulletin, and application form that it makes available to persons entitled to notification under proposed § 106.8(c) or that are used for recruiting students and employees. In proposed § 106.8(c)(2)(ii), the Department proposes adding a provision that, if necessary due to the format or size of any publication referenced in § 106.8(c)(2)(i), the recipient may instead comply with § 106.8(c)(2) by including in those publications a statement that the recipient prohibits sex discrimination in any education program or activity that it operates and that individuals may report concerns or questions to the Title IX Coordinator, and providing the location of the notice on the recipient's website.

*Reasons: Addition of subparagraphs.* For clarity, the Department proposes revising the heading

of this provision, and adding proposed § 106.8(c)(1) and 106.8(c)(2). This would divide the proposed regulations into separate paragraphs addressing the recipients of the notice (proposed § 106.8(c)), the "Contents of notice" (proposed § 106.8(c)(1)) and the "Publication of notice" (proposed § 106.8(c)(2)).

*Persons entitled to notice of nondiscrimination.* The Department proposes maintaining the same group of persons entitled to receive notice under current § 106.8(a), with the addition of "other authorized legal representatives of elementary school and secondary school students" to encompass persons who are not parents or guardians, but otherwise are authorized to act on behalf of students. The Department also proposes revising "legal guardian" to "guardian" for consistency with proposed § 106.6(g), which would reference the rights of "a parent, guardian, or other authorized legal representative."

*Contents of notice of nondiscrimination.* The Department proposes maintaining some of the notice requirements in the current regulations and adding other requirements in proposed § 106.8(c)(1)(i)-(v) to ensure that a recipient provides adequate notice of nondiscrimination to all persons entitled to receive notice of this information. The current regulations require a recipient to notify the persons entitled to receive notification under § 106.8(a) of the following: (1) the contact information for the recipient's Title IX Coordinator; (2) the recipient is required by Title IX and the regulations not to discriminate on the basis of sex; (3) the recipient is prohibited from engaging in sex discrimination in admission and employment; (4) persons may contact the recipient or the Assistant Secretary with inquiries about Title IX or the application of the regulations; and (5) the recipient's grievance procedures and how to make report or file a complaint of sex discrimination, including sexual harassment. Although a recipient is required under current § 106.8(a)-(c) to provide notice of all of this information, a recipient is not required

137

to include this information in a single policy or document.  Therefore, the Department proposes requiring recipients to streamline all of these requirements in its notice of nondiscrimination to increase the likelihood that persons entitled to notification of this information are aware of their rights under Title IX and the regulations.

The Department proposes moving to proposed § 106.8(c)(1)(i) the requirement in current § 106.8(b) that a recipient include in its notice of nondiscrimination a statement that the recipient does not discriminate on the basis of sex in its education program or activity, that it is required by Title IX not to discriminate in such a manner, and that it also prohibits sex discrimination in admission (unless subpart C of part 106 does not apply) and employment.  The Department also proposes incorporating with slight modifications the requirement from current § 106.8(b)(1) into proposed § 106.8(c)(1)(ii) that a recipient notify the persons entitled to receive a notification under § 106.8(c) that inquiries about the application of Title IX and the regulations may be made to the recipient's Title IX Coordinator, to the Office for Civil Rights, or to both.  Current § 106.8(b)(1) refers to the "Assistant Secretary."  The Department proposes changing this reference to "the Office for Civil Rights" to afford greater clarity for recipients and all individuals entitled to receive such notification that they may contact OCR—in addition to or instead of contacting the recipient—with any inquiries about Title IX or the regulations.

The Department proposes moving the requirement that a recipient provide notice of the name or title, office address, email address, and telephone number of its Title IX Coordinator from current § 106.8(a) to proposed § 106.8(c)(1)(iii).  The proposed regulations would not prohibit a recipient from also providing the contact information of designees.  The Department's current view is that it will be less confusing for recipients and all persons entitled to receive notice of this information if it is included in a single notice of nondiscrimination.

138

In addition, the Department proposes requiring a recipient to include in its notice of nondiscrimination and grievance procedures information such as a web address, a direct link, or an explanation of how a hard copy of the recipient's nondiscrimination policy and grievance procedures may be obtained. By including this information, the Department would ensure that all persons entitled to notice of this information know how they can locate a recipient's nondiscrimination policy and grievance procedures on the recipient's website or how they may obtain a hard copy of the nondiscrimination policy and grievance procedures.

Finally, the Department proposes requiring a recipient to explain in its notice of nondiscrimination how to report information about conduct that may constitute sex discrimination under Title IX, how to make a complaint of sex discrimination under the regulations, and how to locate the recipient's grievance procedures under § 106.45, and if applicable § 106.46. The Department recognizes that some individuals may wish to report conduct that may constitute sex discrimination under Title IX without making a complaint that would initiate a recipient's grievance procedures. To afford the opportunity for this type of reporting, the Department proposes requiring a recipient to explain in its notice of nondiscrimination that reporting such conduct to a recipient's Title IX Coordinator or to specific employees as described in proposed § 106.44(c), would obligate a recipient to require its Title IX Coordinator to take further action consistent with proposed § 106.44(f).

To ensure that individuals who wish to make a complaint that initiates a recipient's grievance procedures know how to do so, the Department proposes that a recipient include in its notice of nondiscrimination clear information about sex discrimination and how to make a complaint about such discrimination, including how to locate a recipient's grievance procedures so that a potential complainant understands how the process will work if initiated. As the

139

Department explained in the preamble to the 2020 amendments, it is important to ensure that "people affected by a recipient's grievance procedures" know about the grievance procedures and how to initiate them. 85 FR at 30472-73. The Department further emphasizes that grievance procedures for investigating and resolving sex discrimination complaints cannot be prompt or equitable unless the parties whose rights are addressed through the grievance procedures have equitable access to them. At a minimum, this means that the parties must know that a recipient's grievance procedures exist, how they work, and how to make a complaint. Therefore, a recipient must ensure that its grievance procedures are widely disseminated and written in clear, accessible, easily understood language that is tailored to the age and background of those impacted by the grievance procedures.

Although proposed § 106.8(c)(1)(v) is similar in substance to current § 106.8(c), which requires a recipient to provide persons entitled to a notification under § 106.8(a) notice of the recipient's grievance procedures including how to report or file a complaint of sex discrimination, how to report or file a formal complaint of sexual harassment, and how the recipient will respond, the Department proposes changes consistent with the rest of its proposed regulations. Specifically, proposed § 106.8(c)(1)(v) would reflect the removal of the formal complaint requirement and instead specify that a recipient provide notice of its grievance procedures under proposed § 106.8(b)(2), § 106.45, and if applicable § 106.46, to persons entitled to a notification under § 106.8(c), and that notice include how to report information about conduct that may constitute sex discrimination under Title IX or make a complaint of sex discrimination. The Department also proposes eliminating the requirement that the notice state how the recipient will respond because it is redundant. Persons entitled to notice would already be informed of the recipient's grievance procedures under proposed § 106.8(b)(2), § 106.45, and

140

if applicable § 106.46, which would explain the recipient's process for responding to complaints.

*Publication of notice of nondiscrimination.* The Department proposes clarifying in § 106.8(c)(2) that a recipient must prominently include all elements of its notice of nondiscrimination set out in proposed § 106.8(c)(1)(i)-(v) in its notice. The Department proposes further clarifying that the types of documents used or distributed by a recipient that are required to include the information set out in proposed § 106.8(c)(1) include each announcement, bulletin, and application form that the recipient makes available to persons entitled to notification under proposed § 106.8(c) or otherwise uses for recruiting students or employees. As part of the 2020 amendments, the Department removed the previous requirement to include Title IX Coordinator and policy information in announcements, bulletins, and application forms that the recipient made available to specific persons identified in the regulation or otherwise used to recruit students or employees, and referred only to the recipient's website, if any, and handbooks and catalogs. Upon further consideration and reweighing the facts and circumstances, the Department currently understands that it is important that recruitment materials are included in the regulations to ensure that potential applicants are aware that the recipient does not discriminate, how to locate a recipient's nondiscrimination policy and the Title IX Coordinator's contact information when deciding whether to apply to or attend a recipient's education program or activity. The Department also now believes that restoring the requirement to include this information in each announcement, bulletin, and application form used generally or in connection with recruitment would increase awareness regarding the Title IX Coordinator and policy information by reaching additional individuals at various points throughout the year. In addition, providing this information in recruitment materials would assist any potential applicants in understanding and locating the recipient's nondiscrimination policy and grievance

141

procedures and in providing a point of contact within the recipient's organization if needed regarding an experience of sex discrimination during the recipient's recruitment process.

In light of the different types of materials a recipient may use in connection with recruitment (such as pamphlets, flyers, or postcards), and the fact that some of these are space-limited, the Department proposes minimizing the burden on a recipient by allowing an option for the recipient to comply with respect to these publications by providing a website reference to where the notice of nondiscrimination is found under proposed § 106.8(c)(2)(ii). This option would not apply to materials on websites and, in the vast majority of cases, would not apply to printed publications such as handbooks or catalogs, since those would have sufficient space to include at least one single and complete reference to the notice of nondiscrimination in at least one location on the website or in the handbook or catalog.

Section 106.8(d) Training

*Current regulations:* Section 106.45(b)(1)(iii) addresses a recipient's responsibility to provide training in connection with its obligation to respond to sexual harassment. Specifically, current § 106.45(b)(1)(iii) requires a recipient to ensure that its Title IX Coordinator, investigators, decisionmakers, and any person who facilitates an informal resolution process receives training on the definition of "sexual harassment" in current § 106.30, the scope of the recipient's education program or activity, how to conduct an investigation and grievance process including hearings, appeals, and informal resolution processes, as applicable, and how to serve impartially, including by avoiding prejudgment of the facts at issue, conflicts of interest, and bias. It also requires a recipient to ensure that decisionmakers receive training on any technology to be used at a live hearing and on issues of relevance of questions and evidence, including when questions and evidence about the complainant's sexual predisposition or prior sexual behavior are not

142

relevant. Finally, current § 106.45(b)(1)(iii) requires a recipient to ensure that investigators receive training on issues of relevance to create an investigative report that fairly summarizes relevant evidence. Under the current regulations, training materials must not rely on sex stereotypes and must promote impartial investigations and adjudications of formal complaints of sexual harassment.

*Proposed regulations:* The Department proposes § 106.8(d) as a new section to consolidate the recipient's training requirements under Title IX. Specifically, the recipient must provide training as follows, ensuring that training does not rely on sex stereotypes and that individuals receive training related to their responsibilities.

Proposed § 106.8(d)(1) would require that all employees be trained on the recipient's obligation to address sex discrimination in its education program or activity, the scope of conduct that constitutes sex discrimination, including the proposed definition of "sex-based harassment," and all applicable notification and information requirements under proposed §§ 106.40(b)(2) and 106.44.

Proposed § 106.8(d)(2) would require investigators, decisionmakers, and other persons who are responsible for implementing the recipient's grievance procedures or have the authority to modify or terminate supportive measures under proposed § 106.44(g)(4) to be trained, to the extent related to their responsibilities, on each of the following:

- The topics listed in proposed § 106.8(d)(1);

- The recipient's obligations under proposed § 106.44;

- The recipient's grievance procedures under proposed § 106.45, and if applicable proposed § 106.46;

- How to serve impartially, including by avoiding prejudgment of the facts at issue,

conflicts of interest, and bias; and

- The meaning and application of the term "relevant," in relation to questions and evidence, and the types of evidence that are impermissible regardless of relevance under proposed § 106.45, and if applicable proposed § 106.46.

Proposed § 106.8(d)(3) would require facilitators of an informal resolution process as described in proposed § 106.44(k) to be trained on the topics listed in proposed § 106.8(d)(1), the rules and practices associated with the recipient's informal resolution process, and on how to serve impartially, including by avoiding conflicts of interest and bias.

Proposed § 106.8(d)(4) would require the Title IX Coordinator and any designees to be trained on:

- All of the topics listed in proposed § 106.8(d)(1)-(3);

- Their specific responsibilities under §§ 106.8(a), 106.40(b)(3), 106.44(f), and 106.44(g);

- The recipient's recordkeeping system and the requirements of § 106.8(f); and

- Any other training necessary to coordinate the recipient's compliance with Title IX.

*Reasons*: The Department has reviewed the training requirements in the current regulations and proposes that, to best fulfill Title IX's nondiscrimination mandate, appropriate staff training related to Title IX must cover more than the grievance procedures for sexual harassment. Many of the requirements of current § 106.45(b)(1)(iii) are included in proposed § 106.8(d), including the requirement that trainings not rely on sex stereotypes. The Department proposes adding § 106.8(d) to make clear that employees must receive training on a variety of aspects of Title IX that are relevant and critical to their specific roles. The proposed provision combines all proposed staff training requirements for easy accessibility and lists requirements according to employees' particular responsibilities. This would help a recipient ensure it is appropriately

144

training staff for each position.

Proposed § 106.8(d)(1) would first specify training requirements for all employees and would cover a recipient's confidential employees, non-confidential employees, and student-employees. This all-employee training requirement would serve an important purpose of ensuring that those most likely to interact with students in their day-to-day work (such as teachers, professors, and student-facing staff) as well as with other employees have the training necessary to understand their role in ensuring the recipient's compliance with its Title IX obligations. This would include the scope of conduct that constitutes sex discrimination, including the definition of "sex-based harassment," how to respond consistent with proposed § 106.40(b)(2) to information about a student's pregnancy or related conditions, and how to respond consistent with proposed § 106.44 to information about conduct that may constitute sex discrimination under Title IX.

Proposed § 106.8(d)(2) would require investigators, decisionmakers, and other persons who are responsible for implementing the recipient's grievance procedures or have the authority to modify or terminate supportive measures in proposed § 106.44(g)(4) to be trained on certain topics, to the extent related to their responsibilities. The group covered by this training requirement would be broader than current § 106.45(b)(iii) in that it includes persons who are not investigators, decisionmakers, or coordinators, but are responsible for implementing the recipient's grievance procedures or have the authority to modify or terminate supportive measures. This proposed clarification is meant to ensure that all persons who are involved in the investigation and resolution of a Title IX complaint are properly trained. The Department proposes moving the training requirements for facilitators of informal resolutions to a separate section to better reflect the unique responsibilities of that role.

145

Proposed § 106.8(d)(2) would require investigators, decisionmakers, and other persons who are responsible for implementing the recipient's grievance procedures or have the authority to modify or terminate supportive measures under proposed § 106.44(g)(4) to be trained on many of the same topics as are required in current § 106.45(b)(iii), including the definition of prohibited "sex-based harassment," the recipient's grievance procedures, how to serve impartially, and how to assess the relevance of questions and evidence. Proposed § 106.8(d)(2) would also add additional topics, including the core elements included in training for all employees under proposed § 106.8(d)(1) and the recipient's obligations under proposed § 106.44. It would also apply the existing training requirement of § 106.45(b)(iii) on issues of relevance more generally because relevancy considerations are not limited to an investigative report and arise throughout an investigation. The Department also proposes that this training would include training on the types of questions and evidence that that are impermissible regardless of relevance. The Department believes these topics would be important for those persons who are responsible for implementing the recipient's grievance procedures or have the authority to modify or terminate supportive measures to understand their responsibilities as part of the recipient's Title IX compliance efforts.

The Department also proposes removing certain named topics from current § 106.45(b)(1)(iii). The Department has not proposed training on "the scope of the recipient's education program or activity" as an express, separate topic because this should be covered by the obligation to provide training on the recipient's obligation to address sex discrimination in its education program or activity in proposed § 106.8(d)(1). Similarly, the specific requirement in current § 106.45(b)(iii) to provide training on "how to conduct an investigation and grievance process including hearings, appeals, and informal resolution processes" would be covered by the

146

proposed requirement in proposed § 106.8(d)(2) to provide training on "the recipient's obligations under § 106.44" and "the recipient's grievance procedures as described in § 106.45, and if applicable § 106.46."

The current regulations, at § 106.45(b)(1)(iii), also require training on any technology to be used at a live hearing. The proposed regulations would permit the use of technology to conduct live hearings with the parties in separate locations. Unlike the current regulations, the Department proposes removing the requirement that the decisionmaker personally receive technology training; however, a recipient would be responsible for ensuring that technology used during any live hearing enables the decisionmaker and parties to simultaneously see and hear the party or witness while that person is speaking or communicating in another format. Accordingly, the proposed regulations would require that the technology operate effectively as required but not that the decisionmaker serve as the operator of the technology.

Proposed § 106.8(d)(3) would set special training requirements for facilitators of an informal resolution process under proposed § 106.44(k), including the core elements included in training for all employees under proposed § 106.8(d)(1), as well as training on the rules and practices associated with the recipient's informal resolution process and on how to serve impartially, including by avoiding conflicts of interest and bias. Proposed § 106.8(d) would not require facilitators of informal resolution to be trained on the recipient's grievance procedures or on prejudgment of the facts at issue because a facilitator is not responsible for implementing the recipient's grievance procedures and is not engaged in factfinding, so training on those topics would not be appropriate for a facilitator of an informal resolution process in the way it would be for a decisionmaker or investigator.

Lastly, proposed § 106.8(d)(4) would require the Title IX Coordinator and any designees

to be trained on all topics required under proposed § 106.8(d)(1)-(3), as well as their specific

responsibilities under proposed §§ 106.8(a), 106.40(b)(3), 106.44(f), and 106.44(g), the

recipient's recordkeeping system and the requirements of proposed § 106.8(f), and any other

training necessary to coordinate the recipient's compliance with Title IX.  Because of the central

role of the Title IX Coordinator under the current and proposed regulations, training of the Title

IX Coordinator is critical to a recipient's effective compliance with Title IX.  The Department

proposes the broadest training requirement for the Title IX Coordinator because the person in

that role should understand all aspects of the recipient's Title IX compliance program, including

their own roles and responsibilities and the roles and responsibilities of all other employees.

Section 106.8(e) Students with disabilities

*Current regulations:* None.

*Proposed regulations*: The Department proposes adding a new paragraph that addresses the

potential intersection of Federal disability law with Title IX in the elementary school, secondary

school, and postsecondary institution contexts.  Proposed § 106.8(e) would provide clarification

regarding the alignment of Title IX compliance with the requirements of the Individuals with

Disabilities Education Act (IDEA) and Section 504 of the Rehabilitation Act of 1973 (Section

504) throughout the recipient's implementation of grievance procedures as discussed in § 106.45,

and if applicable § 106.46.  The Department proposes requiring that if a complainant or

respondent is an elementary or secondary student with a disability, the Title IX Coordinator must

consult with that student's Individualized Education Program (IEP) team or group of persons

knowledgeable about the student under Section 504 (Section 504 team).  Further, the Department

proposes adding that for a postsecondary student with a disability, the Title IX Coordinator may

consult, as appropriate, with the individual or office that the recipient has designated to provide

support to students with disabilities.

*Reasons*: Students with disabilities experience sex-based harassment in significant numbers, with certain populations of students with disabilities at higher risk, as the Department has recognized previously, including in the preamble to the 2020 amendments. 85 FR at 30079. For these students, supportive measures that address the harassment's effects in relation to a student's disability may require tailoring in ways that may not be obvious to a Title IX Coordinator. In addition, in cases in which students with disabilities are respondents, care must be taken that any supportive measures are adopted with awareness of how they might impact the students' equal access to the recipient's education program or activity. Similarly, the rights of students with disabilities under the Federal laws cited in the proposed provision may preclude or require tailoring of otherwise appropriate supportive measures or emergency removals, or, for students found responsible for sex-based harassment, disciplinary sanctions. To help elementary school and secondary school recipients and their Title IX Coordinators comply with the proposed regulations and not interfere with rights of students with disabilities under other Federal laws, the Department proposes that the regulations make clear the Title IX Coordinator has the responsibility to consult with the IEP team and Section 504 team who are already charged by Federal law with making individualized decisions about students with disabilities.

In the elementary school and secondary school context, the IDEA and Section 504 ensure protections for students with disabilities. There are distinctions among the rights granted and procedures required by each statute that are crucial in other contexts. For purposes of the proposed regulations, however, it is only necessary to note that the implementing regulations for the IDEA and Section 504 require that a group of persons—the IEP team or Section 504 team— is responsible for making individualized determinations about what constitutes a free appropriate

149

public education (FAPE) for each child with a disability. 34 CFR 300.17; 34 CFR 104.33. The team must address, among many other things, questions regarding the placement, special education, and related services that are appropriate for that student. 34 CFR 300.300-300.328; 34 CFR 104.34-104.36.

For an elementary or secondary student complainant or respondent who is a student with a disability, the Title IX grievance procedures may intersect with the decisions, including those about FAPE, made by the IEP team or Section 504 team. A student with a disability involved in a Title IX proceeding would best be served by the Title IX Coordinator consulting the student's IEP team or Section 504 team throughout the implementation of the grievance procedures described in proposed § 106.45, as well as in the offer and coordination of any supportive measures as described in proposed § 106.44(g)(7). For this reason, the Department proposes making this consultation with the IEP team or Section 504 team a requirement for an elementary or secondary student complainant or respondent who is a student with a disability. This consultation should be carried out with an understanding of the sensitivity of the issues involved and a priority on preserving the confidentiality of the student and other parties involved to the extent possible.

Federal law does not grant students with disabilities in higher education any similar right to a team of knowledgeable persons coming together to make individualized FAPE decisions. Under Section 504, a postsecondary student with a disability does not have to disclose that they have a disability. Generally, if a student with a disability would like an academic adjustment or other modification related to their disability, they must provide information related to their disability to the postsecondary institution, and the institution must then consider their request. Because of those differences, including that a student with a disability may not have established

150

a voluntary relationship with the postsecondary institution's office that serves students with disabilities, the Department proposes that the consultation between a Title IX Coordinator and the postsecondary institution's disability services office should be permitted but not required.

Section 106.8(f) Recordkeeping

*Current regulations:* Section 106.45(b)(10)(i) requires a recipient to maintain the following records for a period of seven years: each sexual harassment investigation including any determination regarding responsibility and any audio or audiovisual recording or transcript required under paragraph (b)(6)(i) of this section; any disciplinary sanctions imposed on the respondent; any remedies provided to the complainant designed to restore or preserve equal access to the recipient's education program or activity; any appeals and the result therefrom, any informal resolution and the result therefrom; and all materials used to train Title IX Coordinators, investigators, decisionmakers, and any person who facilitates an informal resolution process. A recipient must make these training materials publicly available on its website, or if the recipient does not maintain a website, the recipient must make these materials available upon request for inspection by members of the public.

For each response required under § 106.44, current § 106.45(b)(10)(ii) requires a recipient to create and maintain for a period of seven years: records of any actions, including supportive measures, taken in response to a report or formal complaint of sexual harassment. It further requires a recipient to document the basis for its conclusion that its response was not deliberately indifferent, and document that it has taken measures designed to restore or preserve equal access to the recipient's education program or activity. If a recipient does not provide a complainant with supportive measures, current § 106.45(b)(10)(ii) requires the recipient to document the reasons why such a response was not clearly unreasonable in light of the known

151

circumstances. The documentation of certain bases or measures does not limit the recipient in the future from providing additional explanations or detailing additional measures taken.

*Proposed regulations:* The Department proposes moving the recordkeeping requirements to § 106.8(f), broadening them to cover records related to a recipient's actions in response to all forms of sex discrimination, not only sexual harassment, and maintaining the seven-year retention period for records and the general types of records described in the current regulations. The Department proposes revising the description of the records a recipient is required to maintain to align with the other proposed changes to the regulations. The Department also proposes removing current § 106.45(b)(10)(ii) requiring a recipient to maintain records documenting that its response was not deliberately indifferent and that its decision not to provide a complainant with supportive measures was not clearly unreasonable in light of the known circumstances because these types of records would no longer be applicable under the proposed regulations at § 106.44, which would no longer refer to a deliberate indifference standard.

Consistent with the Department's proposed clarification of a recipient's duty to prevent discrimination and ensure equal access for students and employees in connection with pregnancy or related conditions, the Department proposes revising the recordkeeping requirement to include records documenting the actions the recipient took to meet its obligations under proposed §§ 106.40 and 106.57.

In addition, the Department proposes retaining the requirement that a recipient must retain records of certain training materials but broadening the scope of the training materials to cover all forms of sex discrimination, including but not limited to sexual harassment, consistent with proposed § 106.8(d).

The Department also proposes retaining the requirement that a recipient make these

152

training materials publicly available on its website, or if the recipient does not maintain a website, the recipient must make these materials available upon request for inspection by members of the public.  The Department proposes broadening the scope of the training materials that must be posted on the recipient's website or made available upon request to cover all forms of sex discrimination, not just sexual harassment, consistent with proposed § 106.8(d).

Proposed § 106.8(f)(1) would require each recipient to maintain, for a period of seven years:

- For each complaint of sex discrimination, records documenting the informal resolution process under proposed § 106.44(k) or the grievance procedures under proposed § 106.45, and if applicable proposed § 106.46, and the resulting outcome;

- For each incident of conduct that may constitute sex discrimination under Title IX of which the Title IX Coordinator was notified, records documenting the actions the recipient took to meet its obligations under proposed § 106.44;

- All materials used to provide training under proposed § 106.8(d).  A recipient would be required to make these training materials publicly available on its website, or if the recipient does not maintain a website the recipient would be required to make these materials available upon request for inspection by members of the public; and

- All records documenting the actions the recipient took to meet its obligations under proposed §§ 106.40 and 106.57.

*Reasons:* After reevaluating the issues covered by the current recordkeeping requirements, the Department proposes revising the requirements to ensure that they address the full scope of a recipient's obligation to respond to complaints of sex discrimination under Title IX.  The Department's current regulations do not address the types of records, if any, a recipient is

Case 3:21-cv-00308-CEA-DCP   Document 83-1   Filed 06/27/22   Page 154 of 701   PageID #: 1387

required to maintain regarding complaints of sex discrimination other than sexual harassment.

The Department proposes maintaining the requirement in the current regulations related to the general types of records that must be kept and maintaining the seven-year record retention period, while eliminating the specificity in the types of records each recipient is required to maintain. This proposed change corresponds with proposed changes elsewhere in the proposed regulations regarding a recipient's obligations to respond to complaints of sex discrimination under Title IX. For example, when a recipient uses its grievance procedures under proposed § 106.45, and if applicable proposed § 106.46, to meet its obligations under proposed § 106.44, the recipient would be required to maintain records of that process, which would include some of the same records currently required under § 106.45(b)(10)(i)(A). In addition, consistent with current § 106.45(b)(10)(i)(C), proposed § 106.8(f)(1) would require a recipient to maintain records of its informal resolution process under proposed § 106.44(k), if it uses that process to meet its obligations under proposed § 106.44. The Department's statement in the preamble to the 2020 amendments "that while the final regulations require records to be kept for seven years, nothing in the final regulations prevents recipients from keeping their records for a longer period of time if the recipient wishes or due to other legal obligations" would also continue to apply under the proposed regulations. 85 FR at 30411.

The Department also proposes removing the records described in current § 106.45(b)(10)(ii) that relate to a recipient's demonstrating its compliance with the deliberate indifference standard from the recordkeeping requirement because those requirements would no longer be relevant under the proposed regulations which, as explained in the discussion of proposed § 106.44, would remove the deliberate indifference standard. The recordkeeping requirement related to supportive measures in § 106.45(b)(10)(ii) of the current regulations,

154

although still applicable under the proposed regulations, is covered by records discussed in proposed § 106.8(f)(2), which would require a recipient to maintain records of the actions the recipient took to meet its obligations under § 106.44. As explained in the discussion of proposed § 106.44(g), these actions would include offering supportive measures, as appropriate, to the complainant and respondent.

For the same reasons discussed above regarding the modification of the recordkeeping requirement to cover all sex discrimination, including but not limited to sexual harassment, consistent with Title IX, the Department proposes revising the requirement in current § 106.45(b)(10)(i)(D) to require a recipient to maintain all training materials used to provide training on sex discrimination, including sexual harassment, under § 106.8(d). Under proposed § 106.8(f)(3), a recipient would also be required to publicly post these materials on its website consistent with current § 106.45(b)(10)(i)(D), or if the recipient does not maintain a website, to make these materials available upon request for inspection to members of the public.

Finally, under proposed § 106.8(f)(4), the Department proposes requiring a recipient to maintain all records documenting the actions the recipient took to meet its obligations under proposed §§ 106.40 and 106.57 regarding students and employees who are pregnant or experiencing pregnancy-related conditions. This would ensure that OCR is able to assess a recipient's compliance with those obligations, including but not limited to, the implementation of reasonable modifications and provision of lactation space for students because of pregnancy or related conditions under proposed § 106.40(b)(3)-(4), and the provision of lactation time and space for employees under proposed § 106.57(e).

155

E. Action by a Recipient to Operate Its Education Program or Activity Free from Sex Discrimination

Section 106.44(a) General

*Current regulations:* Section 106.30(a) defines "actual knowledge" as notice of sexual harassment or allegations of sexual harassment to a recipient's Title IX Coordinator or any official of the recipient who has authority to institute corrective measures on behalf of the recipient, or to any employee of an elementary and secondary school recipient. Imputation of knowledge based solely on vicarious liability or constructive notice is insufficient to constitute actual knowledge. This standard is not met when the only official of the recipient with actual knowledge is the respondent. The mere ability or obligation to report sexual harassment or to inform a student about how to report sexual harassment, or having been trained to do so, does not qualify an individual as one who has authority to institute corrective measures on behalf of the recipient. Notice as used in this paragraph includes but is not limited to, a report of sexual harassment to the Title IX Coordinator as described in § 106.8(a). The regulations require a recipient to respond to sexual harassment or allegations of sexual harassment only if it has actual knowledge.

Current § 106.44(a) states that a recipient with actual knowledge of sexual harassment in its education program or activity against a person in the United States must respond promptly in a manner that is not deliberately indifferent. That provision further states a recipient is deliberately indifferent only if its response to sexual harassment is clearly unreasonable in light of known circumstances.

*Proposed regulations:* Proposed § 106.44(a) states that a recipient must take prompt and effective action to end any sex discrimination that has occurred in its education program or

156

activity, prevent its recurrence, and remedy its effects, and it clarifies that to ensure it can satisfy this obligation, the recipient must comply with proposed § 106.44.

*Reasons: A recipient's duty to operate its education program or activity free from sex discrimination.*  Title IX prohibits all forms of sex discrimination in a recipient's education program or activity.  In the 2020 amendments, the Department added a requirement at 34 CFR 106.44(a) that "[a] recipient with actual knowledge of sexual harassment in an education program or activity of the recipient against a person in the United States, must respond promptly in a manner that is not deliberately indifferent."  In doing so, the Department extended and adapted the *Gebser/Davis* framework from private litigation for monetary damages to the context of administrative enforcement of Title IX.  *See, e.g.*, 85 FR at 30038, 30088 (noting that the 2020 amendments "apply an adapted condition of actual knowledge" and a deliberate indifference standard that was "adapted from the *Gebser/Davis* framework").  In discussing the actual knowledge standard in the preamble to the 2020 amendments, the Department stated that "[b]ecause Title IX is a statute 'designed primarily to prevent recipients of Federal financial assistance from using the funds in a discriminatory manner,' it is a recipient's own misconduct—not the sexually harassing behavior of employees, students, or other third parties—that subjects the recipient to liability in a private lawsuit under Title IX, and the recipient cannot commit its own misconduct unless the recipient first knows of the sexual harassment that needs to be addressed."  *Id.* at 30038 (quoting *Gebser*, 524 U.S. at 292) (footnotes and emphasis omitted).  The Department added that "[t]he Supreme Court thus rejected theories of vicarious liability (e.g., respondeat superior) and constructive notice as the basis for a recipient's Title IX liability in private Title IX lawsuits."  *Id.* (citing *Gebser*, 524 U.S. at 289; *Davis*, 526 U.S. at 650).

With respect to deliberate indifference as the appropriate standard of liability for

administrative enforcement, the Department stated in the preamble to the 2020 amendments that the "adaptions of the three-part *Gebser/Davis* framework achieve important policy objectives that arise in the context of a school's response to reports, allegations, or incidents of sexual harassment in a school's education program or activity, including respect for freedom of speech and academic freedom, respect for complainants' autonomy, protection of complainants' equal educational access while respecting the decisions of State and local educators to determine appropriate supportive measures, remedies, and disciplinary sanctions, consistency with constitutional due process and fundamental fairness, and clear legal obligations that enable robust administrative enforcement of Title IX violations." *Id.* at 30035.

The Department remains committed to these objectives: respect for freedom of speech and academic freedom; respect for complainants' autonomy; protection of complainants' equal educational access while respecting the decisions of recipients to determine appropriate supportive measures, remedies, and disciplinary sanctions; consistency with constitutional due process and fundamental fairness; and clear legal obligations that enable robust administrative enforcement of Title IX violations. Further, the Department's tentative view is that the proposed revisions to § 106.44 would effectively achieve these objectives while better ensuring that all recipients fulfill the Title IX mandate to provide a nondiscriminatory educational environment. As explained in greater detail in the discussion of the proposed definition of "sex-based harassment" (§ 106.2), the Department also holds the tentative position that the administrative enforcement standard set out in the proposed regulations would adequately and fully address the particular concerns regarding free speech and academic freedom that the Department discussed in the 2020 amendments in connection with its standard for enforcing Title IX.

The Department recognized in the preamble to the 2020 amendments that there are

important differences between judicial and administrative enforcement for purposes of effectuating Title IX's nondiscrimination mandate and noted that "some violations of Title IX may lend themselves to the administrative remedy of terminating Federal financial assistance, while other violations may lend themselves to a judicial remedy in private litigation." *Id.* at 30032 (citing *Cannon*, 441 U.S. at 704-06). More specifically, OCR's focus in the administrative enforcement context is on a recipient's responsibility under the nondiscrimination requirements of the Title IX statute and regulations to take prompt and effective action to prevent, eliminate, and remedy sex discrimination occurring in its programs or activities, while a court's focus is on a school's liability to compensate a person who suffered harm as a result of the school's action or inaction.

OCR received feedback from stakeholders during the June 2021 Title IX Public Hearing and in listening sessions both in support of and in opposition to the references to actual knowledge and the deliberate indifference standard in the 2020 amendments. For example, OCR heard from stakeholders who supported the "actual knowledge" definition or who wanted the definition of "notice" to be narrowed even further. On the other hand, OCR also received feedback from stakeholders expressing concern about the narrowness of the actual knowledge standard. These stakeholders urged the Department to return to the constructive knowledge standard set out in OCR's prior guidance. Stakeholders also expressed concern that the actual knowledge standard enables a recipient to ignore sexual harassment simply because allegations of harassing conduct were not reported to the right employee.

OCR also heard from stakeholders since the 2020 amendments went into effect asking the Department to reconsider the application of the standard of liability for private actions for monetary damages to a recipient's obligation to respond to sexual harassment in the

administrative enforcement context.  A variety of stakeholders representing all educational levels, including elementary school and secondary school administrators, representatives from postsecondary institutions, Title IX Coordinators, State Attorneys General, and advocacy organizations, expressed concern that the deliberate indifference standard is inappropriate in the administrative enforcement context.  Stakeholders stated that the deliberate indifference standard erodes efforts to promote and nurture institutional trust by appearing to hold schools to a lower standard and could be construed to deprive OCR of critical enforcement authority, including the ability to address sex discrimination before it rises to the level of the recipient being held liable for money damages in private lawsuits.  In addition, other stakeholders explained that it is difficult for recipients to implement the deliberate indifference standard for sexual harassment in cases that also raise discrimination on other bases, such as race and disability, in which the Department has retained its longstanding standard that looks to the reasonableness of a recipient's response as the appropriate standard for administrative enforcement.  They argued that by maintaining uniform standards across civil rights statutes, the Department would reduce confusion and strengthen enforcement in addressing such intersectional claims.  In addition to the difficulty associated with requiring recipients to navigate different policies, stakeholders noted that the Department's application of a different standard of liability for sexual harassment than for other forms of discrimination raises questions regarding equity, specifically as to why the Department requires recipients to meet a less stringent standard for responding to complaints about sexual harassment than for complaints of other types of prohibited harassment and discrimination, including sex discrimination.

The Department acknowledged in the preamble to the 2020 amendments that "[n]either *Gebser* nor *Davis* indicated whether the Department's administrative enforcement of Title IX

should continue to turn on vicarious liability and constructive notice." *Id*. at 30038. The preamble to the 2020 amendments further acknowledged that *Gebser* and *Davis* did not require the Department to adopt deliberate indifference as the standard of liability in the administrative enforcement context. *Id*. at 30043. As explained in greater detail in the discussion of OCR's Guidance and Supreme Court Precedent on Title IX's Application to Sexual Harassment (Section II.B.1), the Supreme Court explicitly acknowledged the authority of Federal agencies, such as the Department, to "promulgate and enforce requirements that effectuate [Title IX's] nondiscrimination mandate," even in circumstances that would not give rise to a claim for money damages. *Gebser*, 524 U.S. at 292. The Department thus explained in the preamble to the 2020 amendments that it "adopt[ed] the actual knowledge condition from the *Gebser/Davis* framework," even though the Department was not required to do so, and acknowledged that it had adapted that standard, stating that it was "tak[ing] into account the different needs and expectations of students in elementary and secondary schools, and in postsecondary institutions, with respect to sexual harassment and sexual harassment allegations." 85 FR at 30038. The Department further explained that it chose to invoke deliberate indifference as an apparent threshold for the Department's administrative enforcement of Title IX with certain modifications, even though it was not required to do so under either *Gebser* or *Davis*, because it viewed this standard as "the best policy approach to further Title IX's non-discrimination mandate." *Id*. at 30043.

The Department's longstanding position is that it cannot compel a recipient to comply with Title IX—for example by terminating Federal funds from the recipient—simply because an official identified in the "actual knowledge" definition of the current regulations (e.g., an elementary school teacher or bus driver) knew of sexual harassment and failed to tell the

recipient's Title IX administrators about it, with the result that the school failed to promptly and effectively respond. This is consistent with OCR's practice when it seeks to administratively enforce the Department's Title IX regulations through an investigation or compliance review. OCR begins by providing notice to the recipient of the allegations of potential Title IX violations it is investigating; if OCR finds a violation, OCR is required to seek voluntary corrective action from the recipient before pursuing fund termination or other enforcement mechanisms. 20 U.S.C. 1682; 34 CFR 100.7(d) (incorporated by reference through 34 CFR 106.81); *see also Gebser*, 524 U.S. at 287-89; 2001 Revised Sexual Harassment Guidance at iii-iv. In the administrative enforcement process, OCR provides notice of the alleged sex discrimination to the recipient, as well as an opportunity for the recipient to take appropriate corrective action at multiple stages during the process.

Notwithstanding that a recipient cannot be liable for *monetary damages*, or be subject to administrative enforcement, unless and until officials with authority to take corrective action are made aware of the problem and fail to adequately respond, because Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance," 20 U.S.C. 1681(a), a recipient has a legal duty to operate its education program or activity free from sex discrimination at all times. This legal duty to operate its education program or activity in a manner in which people are not subjected to sex discrimination exists regardless of who has notice of any discriminatory conduct. It also covers all forms of sex discrimination and is not limited just to sexual harassment. Thus, proposed § 106.44(a) would require a recipient to take prompt and effective action to end any sex discrimination in its education program or activity, prevent its recurrence, and remedy its effects,

consistent with the statutory text. This requirement would include situations in which a recipient determines that a respondent's conduct violated its prohibition on sex discrimination, which would amount to a determination that sex discrimination had occurred, as explained in the discussion of the proposed definition of "respondent" (§ 106.2). This requirement would also include situations in which a recipient reviews its own actions in response to a complaint and determines that it discriminated based on sex in its policy or practice. For example, proposed § 106.44(a) would require a recipient to provide remedies as appropriate to a student who experienced discrimination as a result of another student violating its prohibition on sex discrimination and prevent the recurrence of that discrimination. Likewise, if a recipient determines that it did not provide a required modification to a pregnant student or discriminated based on sex in the provision of athletic opportunities, it would be required under proposed § 106.44(a) to provide remedies for its own discrimination based on sex and take additional action as needed to prevent recurrence.

Current § 106.44(a) states that "[a] recipient with actual knowledge of sexual harassment in an education program or activity of the recipient against a person in the United States, must respond promptly in a manner that is not deliberately indifferent" and provides that the recipient's "Title IX Coordinator must promptly contact the complainant to discuss the availability of supportive measures" and "explain to the complainant the process for filing a formal complaint." If the recipient receives a formal complaint under those procedures, current § 106.44(b) then obligates the recipient to follow additional requirements discussed elsewhere in the current regulations. Prior to the 2020 amendments, OCR had interpreted Title IX to require a recipient with notice of sexual harassment to "promptly investigate to determine what occurred and then take appropriate steps to resolve the situation." 2001 Revised Sexual Harassment

Guidance at 15; *see also* 1997 Sexual Harassment Guidance, 62 FR at 12042. This obligation existed regardless of whether the harassed student filed a complaint or asked the school to take action on the student's behalf. 2001 Revised Sexual Harassment Guidance at 15.

In the preamble to the 2020 amendments, the Department explained its view that requiring a recipient to take "'effective corrective actions to stop the harassment [and] prevent its recurrence,' . . . ostensibly holds a recipient strictly liable to 'stop' and 'prevent' sexual harassment." 85 FR at 30044 n.165 (quoting 2001 Revised Sexual Harassment Guidance at 10, 12); *see also id*. at 30046 (explaining that "these final regulations do not unrealistically hold recipients responsible where the recipient took all steps required under these final regulations, took other actions that were not clearly unreasonable in light of the known circumstances, and a perpetrator of harassment reoffends"). In light of these concerns, the Department adopted the deliberate indifference standard, stating that this standard would afford recipients greater discretion in responding to sexual harassment. *Id*. at 30044 n.165. In doing so, the Department specified that the only steps, outside of the grievance process, that a recipient was obligated to take were those listed in current § 106.44(a)—i.e., the Title IX Coordinator must promptly contact the complainant, discuss supportive measures, and explain the process for filing a complaint. None of these steps requires the recipient to ensure continued equal access to its education program or activity for the parties and more broadly for a recipient's educational community or otherwise ensures that a recipient meets its legal duty under Title IX to operate its education program or activity free from sex discrimination.

OCR heard, through the June 2021 Title IX Public Hearing and in listening sessions, concerns about the Department's suggestion that a school's obligation to respond to sexual harassment occurs only in situations in which a recipient has actual knowledge of sexual

harassment. OCR also heard concerns about the way in which the current regulations limit a recipient's required response to actual knowledge—that a recipient is required only to offer a complainant supportive measures and provide the complainant with information about the recipient's grievance procedures, unless a formal complaint is filed through the recipient's grievance procedures. Stakeholders expressed a concern that in shifting from a reasonableness standard to deliberate indifference, the Department no longer required schools to act proactively to address sex discrimination in their educational environment. They noted that under the 2020 amendments, the Department failed to require recipients to fully address the impact of sexual harassment in their educational environments, and further failed to impose any obligations to respond to possible sex discrimination other than requiring them to adopt grievance procedures for the prompt and equitable resolution of sex discrimination complaints contained in current § 106.8(c). Together, these concerns suggested that the approach adopted in the 2020 amendments may have created a troubling gap in implementing Title IX's prohibition on sex discrimination: a recipient may have information about possible sex discrimination in its education program or activity and yet may have no obligation to take any action to address it if a formal complaint is not filed and the recipient's Title IX Coordinator determines that the allegations do not warrant overriding a complainant's wishes and initiating a complaint. These stakeholders further commented that there are other steps a recipient can and should take to address sex discrimination outside of acting through its grievance procedures and asked the Department to reconsider its approach.

To address these concerns, dispel confusion created by the 2020 amendments, and ensure a recipient fulfills its legal duty to operate its education program or activity free from sex discrimination, proposed § 106.44(a) would require a recipient to take prompt and effective

action to end any sex discrimination that has occurred in its education program or activity, prevent its recurrence, and remedy its effects. Although the Department does not propose a specific timeframe for "prompt" action to end sex discrimination, as the Department explained in the preamble to the 2020 amendments, what would constitute reasonably prompt timeframes in a recipient's grievance process under current § 106.45 "is judged in the context of the recipient's obligation to provide students and employees with education programs and activities free from sex discrimination." 85 FR at 30269. Outside the context of a recipient's grievance procedures for complaints of sex discrimination, the Department reaffirms that "prompt" action to end sex discrimination in a recipient's education program or activity "is necessary to further Title IX's nondiscrimination mandate." *Id*. An unreasonable delay by a recipient to end sex discrimination would not meet Title IX's obligation.

The Department notes that proposed § 106.44(a)'s requirement of prompt and effective action would not compel any particular officials of a recipient to know of and respond effectively to sex discrimination that has not yet occurred; however, it would impose an obligation on a recipient to act effectively by taking reasonable steps calibrated to ensure that its Title IX Coordinator learns of possible discrimination so that the recipient can promptly and effectively address the discrimination based on all available information. And when a recipient's response does not end discrimination and prevent its recurrence, the prompt and effective response requirement would mean that the recipient must reevaluate its response and take additional steps to end sex discrimination in its education program or activity. This approach is consistent with Federal courts' interpretation of *Gebser* and *Davis* and what is required of a recipient under the deliberate indifference standard for monetary damages, when a recipient's response to discrimination must be designed to effectively end the discrimination and prevent its recurrence

166

and when courts have required a recipient to reevaluate its response if it proves ineffective. *See, e.g.*, *Patterson v. Hudson Area Sch.*, 551 F.3d 438, 449 (6th Cir. 2009) ("Given that [the recipient] knew that its methods were ineffective, but did not change those methods, 'a reasonable jury certainly could conclude that at some point during the . . . period of harassment[,] the school district's standard and ineffective response to the known harassment became clearly unreasonable.'"), abrogated on other grounds, *Foster v. Bd. of Regents of Univ. of Mich.*, 982 F.3d 960 (6th Cir. 2020); *see also, e.g.*, *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 669-71 n.12 (2d Cir. 2012) (applying *Davis* in Title VI claim); *Doe v. Sch. Bd. of Broward Cnty.*, 604 F.3d 1248, 1261 (11th Cir. 2010) ("'[W]here a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior.'" (quoting *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 260-61 (6th Cir. 2000))).

In the administrative enforcement context, the Department proposes that a recipient meets its obligation to take prompt and effective action to end any sex discrimination in its education program or activity, prevent its recurrence, and remedy its effects by complying with the steps required under the additional provisions in proposed § 106.44, as appropriate. Importantly, nothing in the proposed regulations would affect the fact that the Department may not "terminat[e] or refus[e] to grant or to continue [Federal financial] assistance under [a] program or activity to any recipient" until the Department has made an express finding on the record of a failure to comply with a regulatory or statutory requirement, "after opportunity for hearing." 20 U.S.C. 1682.

Section 106.44(b) Monitoring

*Current regulations*: None.

*Proposed regulations*: The Department proposes adding a requirement at § 106.44(b) that a recipient must require its Title IX Coordinator to monitor barriers in the recipient's education program or activity to reporting information about conduct that may constitute sex discrimination under Title IX, and then the recipient must take steps reasonably calculated to address barriers that have been identified.

*Reasons*: As explained in the discussion of Sex Discrimination Generally (Section II.A), Title IX requires a recipient to operate its education program or activity in a manner that is free from sex discrimination. It is the Department's current view that a recipient must identify and address barriers to reporting information that may constitute sex discrimination under Title IX in order to fulfill this obligation.

The Department has long emphasized the importance of a recipient's efforts to prevent sex discrimination. For example, in the preamble to its 2020 amendments to the Title IX regulations, the Department repeatedly acknowledged the importance of efforts to prevent sex discrimination. 85 FR at 30063 (stating that "the Department agrees with commenters that educators, experts, students, and employees should also endeavor to prevent sexual harassment from occurring in the first place" (emphasis omitted)); *id.* at 30070 ("The Department understands . . . that prevention of sexual harassment incidents before they occur is a worthy and desirable goal."); *id.* at 30126 ("The Department shares commenters' beliefs that measures preventing sexual harassment from occurring in the first place are beneficial and desirable."). The Department also added requirements related to training for certain employees in the 2020 amendments to the Title IX regulations, 34 CFR 106.45(b)(1)(iii), that serve a prevention function and thus are crucial to the fulfillment of Title IX. For example, current § 106.45(b)(1)(iii) requires "Title IX Coordinators, investigators, decision-makers, and any

person who facilitates an informal resolution process, receive training on the definition of sexual harassment in § 106.30" and "the scope of the recipient's education program or activity."

In addition, a longstanding concern of the Department has been that information about conduct that may constitute sex discrimination under Title IX may be underreported to officials of recipients who are able to take effective steps to address it. For example, in the preamble to the 2020 amendments, the Department noted concerns raised by stakeholders that "sexual assault is chronically underreported" and that while most of those who experience sexual assault tell someone about their experience, only a small minority of incidents of sexual assault are reported to officials such as the Title IX Coordinator. 85 FR at 30110. In response to these concerns, the Department emphasized that the Title IX Coordinator's role is to ensure that "all students have clear, accessible options for making reports." *Id.* at 30111. Under the 2020 amendments, a recipient is required to provide and disseminate the contact information for its Title IX Coordinator to those seeking to report sexual harassment, as well as to institute anti-bias training for the Title IX Coordinator. *Id.* at 30111-12. The current regulations do not, however, require a recipient to take specific steps to ensure that information about conduct that may constitute sex discrimination under Title IX is not underreported.

Following the implementation of the 2020 amendments, OCR continued to hear from stakeholders who expressed concerns regarding barriers to reporting information about conduct that may constitute sex discrimination under Title IX. During the June 2021 Title IX Public Hearing, OCR received feedback from some stakeholders noting that a majority of students (one stakeholder stated that it was 90 percent of students) who had experienced sex-based harassment did not report it to their school. Stakeholders pointed to a variety of reasons for this substantial underreporting, including inadequacies in a recipient's response to reports, such as a failure to

communicate promptly, to investigate as required, to address violations of restrictions on contact, or to respond effectively to retaliation.  In addition, some stakeholders stated that students were deterred from reporting sex-based harassment because they feared being disciplined for violating the recipient's code of conduct related to personal alcohol or drug use or consensual sexual activity.  On this issue, some stakeholders noted that they or others had been disciplined after reporting sex-based harassment, including for the very conduct about which they complained. *Cf.* Complaint at ¶¶ 8, 16, *L.C. v. Williamsburg Cnty. Sch. Dist.*, 2018-CP-45-00359 (S.C. Ct. Com. Pl. Aug. 14, 2018) (alleging that the plaintiff, a female middle school student, was disciplined for unauthorized access to the boys' bathroom following her report to the school that three male students forced her to enter the boys' bathroom to sexually assault her).  Stakeholders noted that discipline for these collateral conduct violations in response to reports of sex-based harassment deters further reporting.  Although stakeholders generally expressed that supportive measures encouraged reporting, some also explained that the lack of particular supportive measures, such as academic adjustments in the aftermath of sex-based harassment or trauma-informed counseling to provide confidential support, disincentivized reporting.  Finally, stakeholders shared concerns about the role of the Title IX Coordinator, particularly in elementary schools and secondary schools, including that students and employees may not know who the Title IX Coordinator is or what the Title IX Coordinator's responsibilities are, and that the Title IX Coordinator may not have sufficient experience or training to respond effectively to reports of sex discrimination.

Recognizing that these barriers may interfere with a recipient's ability to offer its programs and activities free from sex discrimination, as required by Title IX, the Department proposes that the recipient's Title IX Coordinator would have responsibility to monitor for

barriers to reporting. The Department also proposes requiring that when the Title IX

Coordinator has identified such a barrier, the recipient must take steps reasonably calculated to

address the barrier, consistent with Title IX and the Department's regulations. Proposed

§ 106.44(b) would thus complement the recipient's efforts under proposed § 106.44(a) to ensure

that its education program or activity is free from sex discrimination. By requiring its Title IX

Coordinator to monitor for barriers to reporting and then take steps reasonably calculated to

address those barriers, the recipient would ensure that it is monitoring conditions in its

educational environment that might have the effect of chilling reporting of sex discrimination.

By addressing barriers to reporting, proposed § 106.44(b) would also support a recipient in

complying with its obligations under Title IX, including to prohibit retaliation under proposed

§ 106.71. The Department notes that under this proposed requirement, a recipient may use

various strategies to identify barriers, such as conducting regular campus climate surveys,

seeking targeted feedback from students and employees who have reported or made complaints

about sex discrimination, participating in public awareness events for purposes of receiving

feedback from student and employee attendees, or regularly publicizing and monitoring an email

address designated for receiving anonymous feedback about barriers to reporting sex

discrimination. The Department acknowledges that recipients vary in size and resources, and

emphasizes that recipients have the opportunity to choose strategies that will be effective in their

educational setting. The Department also notes that in order to fulfill its monitoring obligation, a

recipient may need to direct its Title IX Coordinator to use multiple strategies to ensure that the

recipient is identifying barriers for all populations, particularly those who may face additional

barriers to reporting, including students with disabilities or persons with limited English

proficiency. *See* 85 FR at 30109.

Under proposed § 106.44(b), the recipient must take steps reasonably calculated to address actual or perceived barriers, if any, consistent with Title IX and the Department's regulations. These steps must be tailored to respond to the identified impediments and obstacles to reporting, and could include, for example, more frequent and prominent publication of the Title IX Coordinator's contact information; relocation of the Title IX Coordinator's office to a more visible, accessible location; ensuring that the Title IX Coordinator's office is adequately staffed; enhancing training for employees with Title IX responsibilities; the development and circulation of user-friendly Title IX materials; publicized assurances that the recipient will not discipline parties or witnesses to a grievance procedure for certain code of conduct violations (e.g., prohibitions on personal alcohol or drug use, consensual sexual relations, or unauthorized access to facilities) that may be disclosed or uncovered during the Title IX process; a wider variety of supportive measures; and targeted trainings on how to assert Title IX rights for students and employees.

Section 106.44(c) Notification requirements

*Current regulations:* Section 106.30(a) defines "actual knowledge" as notice of sexual harassment or allegations of sexual harassment to a recipient's Title IX Coordinator or any official of the recipient who has authority to institute corrective measures on behalf of the recipient, or to any employee of an elementary and secondary school recipient. Imputation of knowledge based solely on vicarious liability or constructive notice is insufficient to constitute actual knowledge. This standard is not met when the only official of the recipient with actual knowledge is the respondent. The mere ability or obligation to report sexual harassment or to inform a student about how to report sexual harassment, or having been trained to do so, does not qualify an individual as one who has authority to institute corrective measures on behalf of the

recipient. Notice as used in this paragraph includes but is not limited to, a report of sexual harassment to the Title IX Coordinator as described in § 106.8(a). The regulations require a recipient to respond to sexual harassment or allegations of sexual harassment only if it has actual knowledge.

Current § 106.44(a) states that a recipient with actual knowledge of sexual harassment in its education program or activity against a person in the United States must respond promptly in a manner that is not deliberately indifferent. That section further states a recipient is deliberately indifferent only if its response to sexual harassment is clearly unreasonable in light of known circumstances.

*Proposed regulations:* Under proposed § 106.44(c)(1), an elementary school or secondary school recipient would be obligated to require all of its employees who are not confidential employees to notify the Title IX Coordinator when the employee has information about conduct that may constitute sex discrimination under Title IX.

Under proposed § 106.44(c)(2)(i), all other recipients would be obligated, at a minimum, to require any employee who is not a confidential employee and who has authority to institute corrective measures on behalf of the recipient to notify the Title IX Coordinator when the employee has information about conduct that may constitute sex discrimination under Title IX.

Under proposed § 106.44(c)(2)(ii), all other recipients would also be obligated, at a minimum, to require any employee who is not a confidential employee and who has responsibility for administrative leadership, teaching, or advising in the recipient's education program or activity to notify the Title IX Coordinator when the employee has information about a student being subjected to conduct that may constitute sex discrimination under Title IX.

Under proposed § 106.44(c)(2)(iii), all other recipients would also be obligated, at a minimum, to require any employee who is not a confidential employee and who has responsibility for administrative leadership, teaching, or advising in the recipient's education program or activity and has information about an employee being subjected to conduct that may constitute sex discrimination under Title IX to either: (A) notify the Title IX Coordinator when the employee has information about conduct that may constitute sex discrimination against employees under Title IX; or (B) provide the contact information of the Title IX Coordinator and information about how to report sex discrimination to any person who provides the information.

Under proposed § 106.44(c)(2)(iv), all other recipients would also be obligated, at a minimum, to require all employees who are not confidential employees, if any, to either: (A) notify the Title IX Coordinator when the employee has information about conduct that may constitute sex discrimination under Title IX; or (B) provide the contact information of the Title IX Coordinator and information about how to report sex discrimination to any person who provides information regarding conduct that may constitute sex discrimination under Title IX.

Proposed § 106.44(c)(3) would provide factors for a postsecondary institution to consider when determining whether a person who is a student and an employee would be subject to the requirements in proposed § 106.44(c)(2) for employees.

Proposed § 106.44(c)(4) would explain that the requirements under proposed § 106.44(c)(1)-(2) would not apply when the only employee with information about conduct that may constitute sex discrimination under Title IX is the employee-complainant.

*Reasons*: The Department stated in the preamble to the 2020 amendments that the actual knowledge framework it adopted "achieve[s] important policy objectives that arise in the context of a school's response to reports, allegations, or incidents of sexual harassment in a school's

174

education program or activity, including . . . respect for complainants' autonomy, protection of complainants' equal educational access while respecting the decisions of State and local educators to determine appropriate supportive measures, remedies, and disciplinary sanctions, consistency with constitutional due process and fundamental fairness, and clear legal obligations that enable robust administrative enforcement of Title IX violations." *Id.* at 30035 (footnotes omitted). These objectives remain constant, and the Department submits that the proposed regulations more effectively achieve these objectives while ensuring that all recipients provide a nondiscriminatory educational environment consistent with their duty under Title IX.

As explained in the discussion of the definition of "actual knowledge" in the current regulations, current § 106.30(a) defines "actual knowledge" as notice of sexual harassment or allegations of sexual harassment to a recipient's Title IX Coordinator or any official of the recipient who has authority to institute corrective measures on behalf of the recipient, or to any employee of an elementary and secondary school recipient. In addition, current § 106.44(a) states that a recipient with actual knowledge of sexual harassment in its education program or activity against a person in the United States must respond promptly in a manner that is not deliberately indifferent. After reconsidering this issue in light of stakeholder feedback and a recipient's obligation to ensure that its education program or activity is free from sex discrimination regardless of notice, the Department proposes that the most effective way to ensure that a recipient's program or activity is free from sex discrimination is through regulations that set out a recipient's particular obligations regarding notification to the recipient's Title IX Coordinator and other requirements for various employees who have information concerning conduct that may constitute sex discrimination under Title IX. This would include requiring particular categories of employees to take specific actions when these employees have

175

information about conduct that may constitute sex discrimination under Title IX. In addition, because the obligation under Title IX for a recipient to operate its education program or activity free from sex discrimination extends to all forms of sex discrimination, not just sexual harassment, these obligations and employee actions must not be limited to sexual harassment.

Under proposed § 106.44(c), these specific employee obligations would include either notifying the recipient's Title IX Coordinator when the employee has information about conduct that may constitute sex discrimination under Title IX or providing the contact information of the recipient's Title IX Coordinator and information about how to report sex discrimination to any person who provides the employee with information about conduct that may constitute sex discrimination under Title IX. Whether an employee would be obligated to notify the Title IX Coordinator directly or provide the Title IX Coordinator's contact information and information about reporting would depend on the employee's role, including whether the employee is employed by an elementary school or secondary school or other recipient, whether the employee has authority to take corrective action or has responsibility for administrative leadership, teaching, or advising in the recipient's education program or activity, whether the conduct that may constitute sex discrimination under Title IX affected students or employees, and whether the employee meets the definition of a "confidential employee" in proposed § 106.2.

*Elementary schools or secondary schools (proposed § 106.45(c)(1)).* Under proposed § 106.44(c)(1), an elementary school or secondary school would be obligated to require any employee who is not a confidential employee to notify the Title IX Coordinator when the employee has information about conduct that may constitute sex discrimination under Title IX. This proposed requirement reflects the Department's current position that in the elementary school and secondary school setting, school administrators, teachers, and other employees

176

exercise a considerable degree of control and supervision over a recipient's students, and requiring all nonconfidential employees to notify the Title IX Coordinator about conduct that may constitute sex discrimination under Title IX would implement Title IX's guarantee of protection against sex discrimination in a manner that best serves the needs and expectations of those students. The Department agrees with the view expressed in the preamble to the 2020 amendments "that employees at elementary and secondary schools stand in a unique position with respect to students." *Id.* at 30040. In addition, as explained in the preamble to the 2020 amendments, "[e]lementary and secondary schools generally operate under the doctrine of in loco parentis, under which the school stands 'in the place of' a parent with respect to certain authority over, and responsibility for, its students" and "employees at elementary and secondary schools typically are mandatory reporters of child abuse under State laws for purposes of child protective services." *Id.* at 30039-40. This proposed amendment is also consistent with the definition in the 2020 amendments of "actual knowledge" for recipients that are elementary schools or secondary schools, which imputes to the recipient the knowledge of any of its employees.

*Recipients other than elementary schools and secondary schools (proposed § 106.44(c)(2)).* As explained in the discussion of proposed § 106.44(a), in connection with the June 2021 Title IX Public Hearing and listening sessions, OCR heard from stakeholders who supported the "actual knowledge" definition or who wanted the definition of "notice" to be narrowed even further and others who expressed concern that the actual knowledge standard might be read to enable a recipient to ignore sexual harassment simply because allegations of harassing conduct were not reported to the right employee. In addition, OCR also heard from several stakeholders in connection with the June 2021 Title IX Public Hearing who cautioned the

Department not to impose a requirement that all postsecondary employees report information about possible sexual harassment to the Title IX Coordinator and to instead permit postsecondary institutions to craft reporting procedures based on what will be most effective for ensuring compliance with Title IX in their educational environment, while also ensuring that students know what to expect before they share information about conduct that may constitute sex discrimination under Title IX with an employee.

The preamble to the 2020 amendments also discussed the desire to provide autonomy to complainants in support of limiting the definition of "actual knowledge" at postsecondary institutions to employees with the authority to institute corrective measures on behalf of the recipient. The preamble to the 2020 amendments stated that "[t]he extent to which a wide-net or universal mandatory reporting system for employees in postsecondary institutions is beneficial, or detrimental, to complainants, is difficult to determine, and research (to date) is inconclusive." *Id.* at 30042 (citing Merle H. Weiner, *A Principled and Legal Approach to Title IX Reporting*, 85 Tenn. L. Rev. 71, 78-79, 82-84 (2017)). The preamble further stated that research demonstrates "that respecting an alleged victim's autonomy, giving alleged victims control over how official systems respond to an alleged victim, and offering clear options to alleged victims are critical aspects of helping an alleged victim recover from sexual harassment." *Id.* at 30042-43 (citing Margaret Garvin & Douglas E. Beloof, *Crime Victim Agency: Independent Lawyers for Sexual Assault Victims*, 13 Ohio St. J. Crim. L. 67, 69-70, 71-72 (2015); Patricia A. Frazier et al., *Coping Strategies as Mediators of the Relations Among Perceived Control and Distress in Sexual Assault Survivors*, 52 J. Counseling Psych. 3 (2005); Ryan M. Walsh & Steven E. Bruce, *The Relationships Between Perceived Levels of Control, Psychological Distress, and Legal System Variables in a Sample of Sexual Assault Survivors*, 17 Violence Against Women 603, 611

178

(2011); Nancy Chi Cantalupo, *For the Title IX Civil Rights Movement: Congratulations and Cautions*, 125 Yale J.L. & Feminism 281, 291 (2016); Weiner at 117).  The preamble to the 2020 amendments explained that through the current regulations, "the Department aims to respect the autonomy of complainants and to recognize the importance of a complainant retaining as much control as possible over their own circumstances following a sexual harassment experience, while also ensuring that complainants have clear information about how to access the supportive measures a recipient has available (and how to file a formal complaint initiating a grievance process against a respondent if the complainant chooses to do so) if and when the complainant desires for a recipient to respond to the complainant's situation."  *Id.* at 30043.  The Department further asserted in the preamble that "complainants will benefit from allowing postsecondary institutions to decide which of their employees (aside from the Title IX Coordinator, and officials with authority) may listen to a student's disclosure of sexual harassment without being mandated to report the sexual harassment incident to the Title IX Coordinator."  *Id.* at 30113.

The Department continues to recognize the importance of complainant autonomy outside of the context of elementary school and secondary school settings, as discussed in the preamble to the 2020 amendments, and also recognizes concerns expressed by stakeholders that the limitation on which employees are covered by the definition of "actual knowledge" under current § 106.30(a) for postsecondary institutions is too narrow and insufficient to ensure that recipients meet their obligation under Title IX to operate their education programs or activities free from sex discrimination.  In view of this, the Department's tentative position is that it would be appropriate to obligate recipients other than elementary schools or secondary schools to require any employee who is not a confidential employee and who has authority to institute corrective measures on behalf of the recipient to notify the Title IX Coordinator when the employee has

179

information about conduct that may constitute sex discrimination under Title IX. The Department's tentative position is also that it would be appropriate to obligate recipients other than elementary schools or secondary schools to require any employee who is not a confidential employee and who has responsibility for administrative leadership, teaching, or advising in a recipient's education program or activity, to notify the Title IX Coordinator when the employee has information about a student being subjected to conduct that may constitute sex discrimination under Title IX.

Requiring employees with the authority to institute corrective measures to notify the Title IX Coordinator when they have information about conduct that may constitute sex discrimination under Title IX is generally consistent with the definition of "actual knowledge" in the sexual harassment context in current § 106.30(a). Although employees with responsibility for administrative leadership, teaching, and advising in the recipient's education program or activity may not actually have the authority to institute corrective measures on behalf of the recipient, these employees are responsible for providing aid, benefits, or services to students. In light of this responsibility, it is likely that a student would view these employees as persons who would have the authority to redress sex discrimination or to whom they could provide information regarding sex discrimination with the expectation that doing so would obligate the recipient to act. The same is true for employees with administrative roles who are not student-facing (e.g., a director of an employee benefits program). With respect to employees who have responsibility for administrative leadership, teaching, or advising, the Department proposes requiring these employees to notify the Title IX Coordinator only when they have information about a student being subjected to conduct that may constitute sex discrimination under Title IX. The Department's proposal is based on its current view that students are differently situated than

180

employees and may be less capable of self-advocacy than employees. The different characteristics of students and employees are explained in greater detail in the discussion of the Framework for Grievance Procedures for Complaints of Sex Discrimination (Section II.F).

The Department also now believes that it would be appropriate to provide recipients other than elementary schools and secondary schools with the option to determine, based on their own administrative structure, education community, and State or local legal requirements, the notification obligations of certain types of employees. This would include employees who are not confidential employees and who have responsibility for administrative leadership, teaching, or advising in the recipient's education program or activity who have information about an employee being subjected to conduct that may constitute sex discrimination under Title IX and all other employees who are not confidential employees, if any, who have information about conduct that may constitute sex discrimination under Title IX. Thus, under proposed § 106.44(c)(2)(iii)-(iv), these recipients would have discretion to determine whether these types of employees must either: (A) notify the Title IX Coordinator when they have such information; or (B) provide the contact information of the Title IX Coordinator and information about how to report sex discrimination when they receive such information. The recipient would have discretion to determine which of these two actions these types of employees must take.

The Department's current view is also that complainant autonomy and the ability to seek out confidential resources would be better supported by proposing a definition of "confidential employee" and requirements for confidential employees than by limiting the category of employees at recipients other than elementary schools and secondary schools who must notify the Title IX Coordinator of conduct that may constitute sex discrimination under Title IX. The proposed definition of "confidential employee" and requirements for confidential employees are

Case 3:21-cv-00308-CEA-DCP   Document 83-1   Filed 06/27/22   Page 182 of 701   PageID #: 1415

explained in greater detail in the discussion of the proposed definition of "confidential employee" (§ 106.2) and proposed requirements for confidential employees (§ 106.44(d)).

The Department explained in the preamble to the 2020 amendments that a recipient is required to notify all students or employees "of the contact information for the Title IX Coordinator and how to report sexual harassment for purposes of triggering a recipient's response obligations," but expressed the belief "that students at postsecondary institutions benefit from retaining control over whether, and when, the complainant wants the recipient to respond to the sexual harassment that the complainant experienced." *Id.* at 30040. The Department agrees that requiring this type of general notification is necessary to effectuate the goals of Title IX and proposed § 106.8(a)(2) and (c)(2) would require similar notifications. The Department's current understanding, however, is that in addition to these general notification requirements, recipients other than elementary schools or secondary schools should also have additional notification requirements when certain types of employees who are not confidential employees have information about conduct that may constitute sex discrimination under Title IX. The determination whether the employee would be required to notify the Title IX Coordinator of information about conduct that may constitute sex discrimination under Title IX or provide the contact information of the Title IX Coordinator and information about how to report sex discrimination would be made by the recipient and not the employee. A recipient would make this determination, and could do so either by determining that one of these two options would be more appropriate for the role and responsibilities of an individual employee or a group of employees (e.g., all employees who interact with students in the dining hall or all public safety officers or all employees with a particular employment status). Proposed § 106.44(c)(2)(iii)-(iv) would, however, require that if a recipient does not require these types of employees to notify the

Title IX Coordinator about conduct that may constitute sex discrimination under Title IX, the employee must be required to provide the contact information of the recipient's Title IX Coordinator as well as information regarding how to report sex discrimination to the person who shared the information about conduct that may constitute sex discrimination under Title IX. The Department's current understanding is that although it is appropriate to provide recipients other than elementary schools or secondary schools with some discretion regarding the reporting responsibilities of certain categories of nonconfidential employees, to fulfill the goals of Title IX it would be necessary for a recipient to require that any person who provides information regarding conduct that may constitute sex discrimination under Title IX also receive information regarding how they can contact the recipient's Title IX Coordinator and report or make a complaint of sex discrimination if they decide that they want the recipient to take the specific steps outlined in proposed § 106.44, proposed § 106.45, and if applicable proposed § 106.46.

*Employee with the authority to institute corrective measures.* The Department's current position, which is consistent with the Department's position in the 2020 amendments, is that whether an employee has the authority to institute corrective measures on behalf of a recipient is a fact-specific determination that rests on the recipient's own policies regarding whether an employee has the authority to take action to address sex discrimination on behalf of the recipient. As explained in the preamble to the 2020 amendments, this determination is best left up to the recipient because "[d]etermining whether an individual is an 'official with authority' is a legal determination that depends on the specific facts relating to a recipient's administrative structure and the roles and duties held by officials in the recipient's own operations" and "[p]ostsecondary institutions ultimately decide which officials to authorize to institute corrective measures on behalf of the recipient." *Id.* at 30039-40. The preamble to the 2020 amendments further noted

183

that "[t]he Supreme Court viewed this category of [employees] as the equivalent of what 20 U.S.C. 1682 calls an 'appropriate person' for purposes of the Department's resolution of Title IX violations with a recipient." *Id.* at 30039 (citing *Gebser*, 524 U.S. at 290 ("An 'appropriate person' under § 1682 is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination.")). The Department also explained that "a recipient also may empower as many officials as it wishes with the requisite authority to institute corrective measures on the recipient's behalf." *Id.* at 30107.

*Employee with responsibility for administrative leadership, teaching, or advising*. It is the Department's current understanding that employees with responsibility for administrative leadership would include deans, coaches, public safety supervisors, and other employees with a similar level of responsibility, such as those who hold positions as assistant or associate deans and directors of programs or activities. The Department anticipates that employees with teaching responsibilities would include any employee with ultimate responsibility for a course, which could include full-time, part-time, and adjunct faculty members as well as graduate students who have full responsibility for teaching and grading students in a course. It is the Department's current understanding that employees with responsibility for advising would include academic advisors, as well as employees who serve as advisors for clubs, fraternities and sororities, and other programs or activities offered or supported for students by the recipient. When a person is both a student and an employee, the Department expects that the person would be required to notify the Title IX Coordinator only of information that may constitute sex discrimination under Title IX that was shared with the person while they were fulfilling their employment responsibilities (e.g., receiving information about sex discrimination from a student during class or office hours). Similar to employees who have the authority to institute corrective measures on

behalf of the recipient, the Department now believes that whether an employee has responsibility for administrative leadership, teaching, or advising is a fact-specific determination to be made by the recipient taking into account the types of factors just discussed and any others that may be relevant in the recipient's educational environment.

*Information about conduct that may constitute sex discrimination under Title IX.*  The Department anticipates that under proposed § 106.44(c), it would not be necessary for the employee to have factual information that definitively indicates that sex discrimination occurred in order for the employee's notification requirements under proposed § 106.44(c) to apply. Rather, it would be enough for the employee to have information about conduct that could reasonably be understood to constitute sex discrimination under Title IX, including conduct that could constitute sex-based harassment.  This is similar to the position the Department took in the preamble to the 2020 amendments explaining that the recipient "need not have received notice of facts that definitively indicate whether a reasonable person would determine that the complainant's equal access has been effectively denied" in order to prompt its obligation to respond under current § 106.44 because the obligation to respond is also prompted by allegations of sexual harassment.  *Id.* at 30192.  The Department also notes that under proposed § 106.8(d)(1)(ii), a recipient would be required to train all employees on the scope of conduct that constitutes sex discrimination under Title IX, including the definition of "sex-based harassment" in proposed § 106.2.  The Department's current belief is that this proposed training requirement would help recipients ensure that employees are able to recognize when they have information about conduct that may constitute sex discrimination under Title IX.

The Department also currently believes that an employee may receive information about conduct that may constitute sex discrimination under Title IX in a variety of ways, which is

similar to the position the Department took in the 2020 amendments. *See, e.g.*, *id.* at 30110, 30115, 30040 (noting that allegations of sexual harassment can come from any source, i.e., from the person alleged to be the victim of sexual harassment, from any third party such as a friend, parent, or witness to sexual harassment, or from the employee's firsthand observation of conduct that could constitute sexual harassment).  Under the proposed regulations, similar to the discussion in the preamble to the 2020 amendments, an employee may witness sex discrimination, hear about sex discrimination allegations from a complainant or witness, receive information or a written or verbal complaint about sex discrimination from someone other than the complainant, including another student, a parent, a member of the local community, or the media, or learn of conduct that may constitute sex discrimination under Title IX by any other means.  These other means could include indirectly learning of conduct that may constitute sex discrimination under Title IX, for example, through flyers about the conduct distributed at the school or posted around the school.

The Department also notes the increasing use of social media and other online platforms as a means of communication between students and the rise of online harassment as a form of sex-based harassment, including on these platforms.  The Department recognizes that online harassment is constantly evolving as forms of these platforms evolve and that harassment targeted at students and employees on these media platforms may impact a recipient's education program or activity.  The Department does not expect that a recipient will follow the online activity of its students that is not part of the recipient's education program or activity; however, when an employee has information about sex-based harassment among its students that took place on social media or other online platforms and created a hostile environment in the recipient's education program or activity, the recipient would have an obligation to address that

186

conduct.  Therefore, a recipient under the proposed regulations would be required to ensure that its employees understand their obligation, depending on their role, to either provide that information to the Title IX Coordinator or provide the Title IX Coordinator's information and reporting information to the person who alerted them to the conduct that may constitute sex-based harassment.  *See Feminist Majority Found. v. Hurley*, 911 F.3d 674, 688-89 (4th Cir. 2018) (holding that a recipient cannot ignore "the sexual harassment that pervaded and disrupted its campus solely because the offending conduct took place through cyberspace").  For example, consider a situation in which sexually explicit photographs of a student have been posted on a social media group used by a number of students who attend school together.  Several students discuss these photographs and make comments about them to the student during class and a student who witnesses this reports it to a teacher.  As a result of the discussion and comments in class, the student in the photographs skips classes and extracurricular activities to avoid those students who made comments to her.  Although the photographs were on social media, the students' engagement with the explicit photographs at school and comments about them to the affected student would create a hostile environment in the recipient's education program or activity because the conduct was sufficiently severe or pervasive that it denied or limited that student's ability to participate or benefit from the school's education program or activity.

*Student employees (proposed § 106.44(c)(3)).*  The Department recognizes that a person may be both a student and an employee of a postsecondary institution.  In such cases a postsecondary institution would need to make a fact-specific inquiry to determine whether the requirements of proposed § 106.44(c)(2) would apply.  To guide a postsecondary institution in making this determination, proposed § 106.44(c)(3) would set out two factors that a postsecondary institution must consider, at a minimum: whether the person's primary

187

relationship with the postsecondary institution is to receive an education and whether the person

learns of conduct that may constitute sex discrimination under Title IX while the person was

performing employment-related work.  The Department's view is that a postsecondary institution

must consider these factors because they appropriately focus the inquiry on the primary

relationship between the person and the postsecondary institution (e.g., whether the person is a

full-time employee who enrolls in a class outside of work hours or a student who works part-time

for the postsecondary institution as part of the student's financial aid package) and the student-

employee's role or activities when the information regarding conduct that may constitute sex

discrimination under Title IX was received (e.g., whether they were in their work environment or

elsewhere fulfilling work-related responsibilities, or in class as a student, in the cafeteria with

friends, or in an extracurricular activity).  Nothing in proposed § 106.44(c)(3) would prohibit a

postsecondary institution from considering additional factors in determining whether a person is

primarily a student or an employee.

*Employee-complainants (proposed § 106.44(c)(4)).*  The Department proposes that it

would be inappropriate to require an employee to notify the Title IX Coordinator of information

about conduct that may constitute sex discrimination under Title IX when the only employee

with the information is the employee-complainant.  The Department recognizes that not all

employee-complainants may feel comfortable reporting sex discrimination to the recipient's Title

IX Coordinator.  The Department's current view is that in general, employees can reasonably be

expected to have more information and capacity than students to notify the Title IX Coordinator

that they were subjected to sex discrimination if they want the recipient to take action because

employees are required to be trained on the recipient's reporting requirements.  In view of this,

the Department currently believes that the decision as to whether to notify the Title IX

Coordinator that the employee was subjected to sex discrimination or make a complaint of sex discrimination, including sex-based harassment, should be left up to the employee-complainant. Under proposed § 106.44(c)(4), if an employee-complainant tells another employee that they were subject to sex discrimination, that employee would be required to comply with the requirements under proposed § 106.44(c)(1) or (2).

Sections 106.44(d) and 106.2 "Confidential employee" requirements and definition

*Current regulations:* Sections 106.30(a) and 106.44(a) require a recipient to respond to incidents of sexual harassment when the recipient receives notice through its Title IX Coordinator or any official who has authority to institute corrective measures on its behalf, or through any employee of an elementary school or secondary school.  The current regulations do not refer to confidential employees, or any group of employees to which reporting would not obligate the recipient to respond.

*Proposed regulations:* The Department proposes adding a definition of "confidential employee" and specifying certain requirements for those employees when they are informed of conduct that may constitute sex discrimination under Title IX.  Proposed § 106.44(d) would make clear that an employee covered by the definition of "confidential employee" in proposed § 106.2 would not be required to notify the Title IX Coordinator when a person informs them of conduct that may constitute sex discrimination under Title IX.  Instead, proposed § 106.44(d) would require a recipient to notify all participants in the recipient's education program or activity of the identity of its confidential employees, if any, and require that a confidential employee, in response to a person who informs that employee of conduct that may constitute sex discrimination under Title IX, explain their confidential status and provide that person with the contact information of the recipient's Title IX Coordinator and explain how to report information about conduct that may

constitute sex discrimination under Title IX.

The Department's proposed definition of "confidential employee" would include three categories. The first category would include employees whose communications are privileged under Federal or State law associated with their role or duties for the institution. The second category would include employees whom the recipient has designated as a confidential resource for the purpose of providing services to individuals in connection with sex discrimination. If the employee also has a role or duty that is not associated with providing these services, the employee's status as confidential would be limited to information received about sex discrimination in connection with providing these services. The third category would be limited to employees of postsecondary institutions who conduct human subjects-research studies that have been approved by the recipient's Institutional Review Board (IRB) and that are designed to gather information about sex discrimination. Those employees' status as confidential would be limited to information about sex discrimination received while conducting the approved study.

*Reasons:* As explained in the discussion of proposed § 106.44(a), the Department proposes clarifying the action a recipient must take in response to sex discrimination in its education program or activity.

OCR received comments through listening sessions and the June 2021 Title IX Public Hearing that stressed the importance of access to confidential resources for persons who have been subjected to sex-based harassment, including sexual violence. For example, one stakeholder emphasized the need for schools to have a mechanism for confidential reporting to allow students to receive supportive measures without disclosing their identity to their harasser or initiating a Title IX investigation.

The Department explained in the preamble to the 2020 amendments that because

postsecondary institutions have the discretion to decide who to authorize as officials with authority under current § 106.30(a), a postsecondary institution can "decide that other employees should remain confidential resources to whom a student at a postsecondary institution might disclose sexual harassment without automatically triggering a report by the employee to the Title IX Coordinator." 85 FR at 30526. As a result of the proposed changes reflected in proposed § 106.44(a) and (c), it is important to clarify a recipient's responsibilities in relation to its employees who provide confidential services.

The proposed role for confidential employees would take into account the need for a recipient to find out about and promptly take action in response to sex discrimination in its education program or activity, as discussed regarding proposed § 106.44(a)-(c), and the importance of ensuring that persons who have experienced discrimination also have access to confidential services when appropriate. Under proposed § 106.44(d), a confidential employee would not be expected to report what they learn about sex discrimination to the Title IX Coordinator, but the recipient would be required to take certain steps to ensure that persons who report sex discrimination to a confidential employee understand the employee's confidential status and how to report sex discrimination to the Title IX Coordinator. Ensuring that some employees are able to receive confidential reports of sex discrimination, including sex-based harassment, is a longstanding priority for the Department and would be consistent with the practices of many schools both before and since the 2020 amendments. The Department also notes that making confidential employees available may also result in more individuals feeling comfortable to seek the support they need to address the immediate effects of sex-based harassment or other sex discrimination and ultimately find the confidence to make the recipient aware of incidents that may otherwise have gone unreported.

The first category of confidential employees would include employees whose communications are privileged under Federal or State law associated with their role or duties. For example, physicians and clergy affiliated with the institution could be considered confidential employees under this first category. Current § 106.45(b)(1)(x) prohibits a recipient from using information protected under a legally recognized privilege, and current § 106.45(b)(5)(i) prohibits a recipient from using a party's records that are made or maintained by a physician, psychiatrist, psychologist, or other recognized professional or paraprofessional in connection with the provision of treatment to the party. The proposed regulations would provide similar protection for legally recognized privileges by designating employees who hold these privileges as confidential employees. The proposed regulations are also consistent with prior OCR guidance and the exemption of pastoral and professional counselors from reporting obligations under the Clery Act. *See* 2014 Q&A on Sexual Violence at 22; 34 CFR 668.46(c)(8).

The second category of confidential employees would include employees designated by the recipient to provide confidential services to individuals who may have experienced or been accused of engaging in conduct that may constitute sex discrimination. The information received by these employees about sex discrimination would also be confidential. For example, a recipient may designate certain employees as advisors to students in its grievance procedures. These advisors would serve as confidential employees while providing services to individuals in connection with those grievance procedures. Employees designated as confidential resources would not qualify as confidential employees while engaged in other activities, such as teaching or coaching. This category of confidential employees would enable recipients to offer confidential resources to students without creating overly broad exceptions. This proposed exception is consistent with the Clery Act's exemption of employees from reporting obligations

192

as campus security authorities when they are acting as a pastoral or professional counselor. 34 CFR 668.46(a), (b)(4)(iv), (c)(8).

The third category of confidential employees would apply in the limited situation in which employees of postsecondary institutions are conducting IRB-approved studies involving human subjects that are designed to gather information about sex discrimination. For example, participants in clinical trial or other research studies on sexual violence in campus settings may reveal information about personal experiences of sex-based harassment. If an employee were required to report these incidents to the Title IX Coordinator, the researchers would need to alert participants as part of the process for consenting to participate in the study, i.e., during the informed consent process. This would likely deter some individuals with relevant experience from participating in or making full disclosures in the study. Sharyn J. Potter & Katie M. Edwards, *Institutional Title IX Requirements for Researchers Conducting Human Subjects Research on Sexual Violence and other Forms of Interpersonal Violence* at 3-4 (2015), https://scholars.unh.edu/pirc_reports/3 (stating that if researchers inform participants that the researchers must disclose names revealed during research, "[t]he result will likely be that students with relevant victimization or perpetration experiences will not volunteer to participate in research, which would likely deter from participating the very people intended to be the primary subjects of the investigation. This may severely restrict the ability of researchers to gather credible data . . . ."). To enable postsecondary institutions to conduct effective research studies on sex discrimination, including studies that may assist postsecondary institutions with prevention or effective responses to incidents of sex discrimination, the proposed regulations would treat the employees who conduct these studies as confidential employees while they are working in their capacity as researchers for the study. *See id.* at 5. This designation as a

confidential employee would be limited to information received while conducting the approved study.

To make informed decisions about reporting sex discrimination, individuals must understand how to report such conduct and which employees will provide information they receive about such conduct to the recipient's Title IX Coordinator. Proposed § 106.44(d)(1) would require a recipient to inform students and any other participants in the recipient's education program or activity of the identity of any confidential employees. In addition, under proposed § 106.44(d)(2), whenever someone informs a confidential employee that sex discrimination, including sex-based harassment or related peer retaliation, may have occurred, the confidential employee would be required to explain to that person the employee's confidential status and how to report the conduct. As part of this explanation, the confidential employee would be required to provide that person with the contact information of the recipient's Title IX Coordinator and explain how to report information about conduct that may constitute sex discrimination under Title IX. These steps would help to ensure that individuals who provide information about sex discrimination to confidential employees understand what further steps they can take if they would like to report sex discrimination or make a Title IX complaint.

Nothing in proposed § 106.44(c), (d), or (e) is intended to exempt a recipient's employees—including confidential employees—from complying with any obligations under Federal, State, or local law to report sex discrimination, including sex-based harassment. In addition, § 106.6(f), to which the Department does not propose making any changes, makes clear that the requirements in the Title IX regulations do not alleviate recipient's obligations to its employees under Title VII. The exceptions set out in proposed § 106.44(d) pertain only to a

recipient's obligations under Title IX and would not alleviate any obligations a recipient may have under Title VII to respond to information about sex discrimination.

Section 106.44(e) Public awareness events

*Current regulations*: None

*Proposed regulations:* In proposed § 106.44(e), the Department clarifies that when a postsecondary institution's Title IX Coordinator is notified about conduct that may constitute sex-based harassment under Title IX that was provided by a person during a public event held on the postsecondary institution's campus or on an online platform sponsored by a postsecondary institution to raise awareness about sex-based harassment associated with a postsecondary institution's education program or activity, the postsecondary institution would not have to take action in response to this information under proposed §§ 106.44, 106.45, or 106.46 unless the information reveals an immediate and serious threat to the health or safety of students or other persons in the postsecondary institution's community. Although a postsecondary institution would not be obligated to act in response to information about individual allegations shared during a public awareness event in the manner set out in proposed §§ 106.44, 106.45, or 106.46, a postsecondary institution would be required to use this information to inform its efforts to prevent sex-based harassment, including by providing tailored training to address alleged sex-based harassment in a particular part of its education program or activity or at a specific location when information indicates there may be multiple incidents of sex-based harassment.

*Reasons:* OCR received feedback from stakeholders during the June 2021 Title IX Public Hearing explaining that information about sex-based harassment may be revealed during events like Take Back the Night, which are intended to empower students and promote public awareness about sex-based harassment. These stakeholders explained that requiring employees

195

to report allegations of sex-based harassment that they learn about during these events discourages students from participating in such events.

After considering these issues, it is the Department's current understanding that it would be appropriate under Title IX to take into account the many benefits provided by public awareness events hosted by postsecondary institutions or organized independently by a postsecondary institution's students to raise awareness about sex-based harassment, such as Take Back the Night or other forums at which a postsecondary institution's students may disclose experiences with sex-based harassment. In view of this, the Department's proposed regulations at proposed § 106.44(e) would include an exception to the required action that a postsecondary institution must take in response to information about conduct that may constitute sex-based harassment under Title IX, specifically that when a postsecondary institution's Title IX Coordinator is notified of information about conduct that may constitute sex-based harassment under Title IX that was provided by a person during public awareness events, the postsecondary institution would not be obligated to act in response to the information under proposed §§ 106.44, 106.45, or 106.46. This proposed exception would apply only to public awareness events held on a postsecondary institution's campus or through an online platform sponsored by a postsecondary institution because those are the events where it is most likely that a postsecondary institution's employees would be present and could hear information about conduct that may constitute sex-based harassment. Without this exception, under proposed § 106.44(f), the Title IX Coordinator would be required to take certain steps upon being notified of this information.

The Department notes that nothing in proposed § 106.44(e) would obligate a postsecondary institution's employees to attend public awareness events. If an employee is in

attendance, the notification requirements under proposed § 106.44(c)(2) would apply to the employee, but the Title IX Coordinator's obligations under proposed § 106.44(f) upon being notified by the employee of information about conduct that may constitute sex-based harassment under Title IX would not apply. Under proposed § 106.44(b), the recipient and the recipient's Title IX Coordinator would still be obligated to monitor the recipient's education program or activity for barriers to reporting information about conduct that may constitute sex discrimination under Title IX. The Department also notes that nothing in proposed § 106.44(e) would prohibit a postsecondary institution from sharing the contact information of the recipient's Title IX Coordinator or information about how to report discrimination, including sex discrimination, at public awareness events.

The proposed exception would not apply when a Title IX Coordinator is notified of information shared during a public awareness event about conduct that may constitute sex-based harassment under Title IX that reveals an immediate and serious threat to the health or safety of students or other persons in the postsecondary institution's community. The language regarding immediate and serious threat to health or safety is aligned with the language regarding emergency removals in current § 106.44(c) and proposed § 106.44(h) and should be interpreted in the same way as those terms are interpreted in the context of emergency removals, as explained in the discussion of proposed § 106.44(h). As noted in the discussion of proposed § 106.44(c)(1), the Department agrees with the position stated in the preamble to the 2020 amendments that employees at elementary schools and secondary schools stand in a unique position with respect to responding to sex discrimination affecting their students, and the Department anticipates that it would be appropriate to limit the proposed exception for public awareness events to postsecondary institutions. In addition, proposed § 106.44(e) would not bar

197

a recipient from taking additional action in response to information about conduct that may constitute sex-based harassment shared at a public awareness event if it so chooses.

Proposed § 106.44(e) would also clarify that although when a postsecondary institution's Title IX Coordinator is notified of information about conduct that may constitute sex-based harassment under Title IX provided by a person at a public awareness event, the postsecondary institution would not be obligated to act in response to this information under proposed §§ 106.44, 106.45, or 106.46, the postsecondary institution would be required to use this information to inform its efforts to prevent sex-based harassment. This use would include providing tailored training to address alleged sex-based harassment in a particular part of its education program or activity or at a specific location, or when information indicates there may be multiple incidents of sex-based harassment or when information indicates a single incident of sex-based harassment has occurred and there is a reasonable likelihood that additional incidents may occur at that location in the future. Depending on the information provided, a postsecondary institution might also take steps to protect against sex discrimination at a particular location, such as enhanced lighting, more frequent safety patrols. The proposed regulations would provide a postsecondary recipient with discretion to determine the specific manner in which it integrates the information from disclosures into its prevention training. The Department also notes that proposed § 106.44(e) is consistent with the requirements of at least one State law regarding responses by postsecondary institutions to information provided during public awareness events. *See, e.g.*, N.Y. Educ. Law § 6446(1)(e) (2015) (stating that an institution is not required to respond to information disclosed during a public awareness event but permitting the institution to use the information provided at such events to inform its education and prevention efforts).

In addition, § 106.6(f), to which the Department does not propose any changes, makes clear that the requirements under the Title IX regulations do not alleviate a recipient's obligations to its employees under Title VII. The public awareness event exception set out in proposed § 106.44(e) would pertain only to a postsecondary institution's obligations under Title IX and would not alleviate any obligations a postsecondary institution may have under Title VII to respond to information about sex-based harassment.

Section 106.44(f) Title IX Coordinator requirements

*Current regulations:* Section 106.44(a) requires a recipient's Title IX Coordinator to promptly contact the complainant to discuss supportive measures and to explain the process for filing a formal complaint. Current § 106.44(b)(1) states that a recipient must follow a grievance process that complies with § 106.45 in response to a formal complaint.

*Proposed regulations:* Proposed § 106.44(f) states that a recipient must require its Title IX Coordinator to take the following steps upon being notified of conduct that may constitute sex discrimination under Title IX: (1) treat the complainant and respondent equitably; (2) notify the complainant of the grievance procedures as described in proposed § 106.45, and if applicable proposed § 106.46, and if a complaint is made, notify the respondent of the applicable grievance procedures and notify the parties of the informal resolution process as described in this section if available and appropriate; (3) offer and coordinate supportive measures as described in proposed § 106.44(g), as appropriate, to the complainant and respondent to restore or preserve that party's access to the recipient's education program or activity; (4) in response to a complaint, initiate the grievance procedures or informal resolution process under § 106.44(k) as described in proposed § 106.45, and if applicable proposed § 106.46; (5) in the absence of a complaint or informal resolution process, determine whether to initiate a complaint of sex discrimination that complies

199

with the grievance procedures described in proposed § 106.45, and if applicable proposed § 106.46, if necessary to address conduct that may constitute sex discrimination under Title IX in the recipient's education program or activity; and (6) take other appropriate prompt and effective steps to ensure that sex discrimination does not continue or recur within the recipient's education program or activity, in addition to remedies provided to an individual complainant.

*Reasons*: *Treat the complainant and the respondent equitably*.  The Department proposes retaining the general requirement in current § 106.44(a) that a recipient must treat complainants and respondents equitably, although the Department proposes moving this requirement from current § 106.44(a) to proposed § 106.44(f)(1) to align with other changes made to this provision.  The Department also proposes eliminating the two examples of equitable treatment that appear in current § 106.44(a) because they may be underinclusive.  It is the Department's current view that equitable treatment requires more than providing supportive measures to the parties and following grievance procedures prior to imposing disciplinary sanctions.  This is explained in greater detail in the discussion of proposed §§ 106.45(b)(1) and (h)(3)-(4).

The Department proposes modifying the two examples of equitable treatment and moving them to proposed § 106.45(h)(3) (a recipient must provide remedies to a complainant as appropriate when it determines sex discrimination occurred) and proposed § 106.45(h)(4) (a recipient must follow grievance procedures that comply with proposed § 106.45, and if applicable proposed § 106.46, before imposing disciplinary sanctions against a respondent), which address a recipient's treatment of the parties in the context of its sex discrimination grievance procedures.  Proposed § 106.45(b)(1) would require a recipient's grievance procedures to treat the parties equitably, consistent with the requirement in proposed § 106.44(f)(1).

*Notify the complainant of the recipient's sex discrimination grievance procedures and*

*inform the respondent of the grievance procedures if a complaint of sex discrimination is made.*
The Department proposes § 106.44(f)(2)(i) to ensure that a complainant receives information about their right to request that the recipient initiate its grievance procedures. This provision is consistent with current § 106.44(a), which requires the Title IX Coordinator, as part of the recipient's general response to actual knowledge of sexual harassment, to promptly contact the complainant about the availability of supportive measures and the process for making a complaint with the recipient.

Because a recipient will not always learn of conduct that may constitute sex discrimination under Title IX directly from a complainant, proposed § 106.44(f)(2) would require a Title IX Coordinator, when the complainant's identity is known, to notify the complainant of the grievance procedures for sex discrimination complaints, and proposed § 106.44(k) would give the recipient the discretion to offer an informal resolution process, if available and appropriate. When a Title IX Coordinator does not know the identity of the complainant, the Title IX Coordinator may provide information about the recipient's grievance procedures to the individual, if any, who reported conduct that may constitute sex discrimination under Title IX.

Proposed § 106.44(f)(2)(ii) would also require a Title IX Coordinator to provide the respondent with information about its sex discrimination grievance procedures if a complaint is made that obligates the recipient to initiate those procedures. Although a recipient would be required to publish notice of its grievance procedures under proposed § 106.8(b)(2), providing this information to the respondent at the time the recipient initiates its sex discrimination grievance procedures would ensure the respondent, and the respondent's parent, guardian, or other authorized legal representative in the case of an elementary school or secondary school

student, is adequately apprised of the grievance procedures and the rights they afford the respondent. Proposed § 106.44(f)(2)(ii) would also require a Title IX Coordinator to provide the parties with information about informal resolution, if available and appropriate, when a complaint of sex discrimination is made.

*Offer and coordinate supportive measures to the complainant and respondent to restore or preserve that party's access to the recipient's education program or activity.* Proposed § 106.44(f)(3) would require a Title IX Coordinator to offer and coordinate supportive measures to restore or preserve a party's access to the recipient's education program or activity. The Department proposes requiring the Title IX Coordinator to not only offer but also "coordinate" supportive measures. The Department added this coordination requirement, which is not in current § 106.44(a), to align this provision with proposed § 106.8(a)(1), which would require a recipient to designate and authorize a Title IX Coordinator to coordinate its efforts to comply with its responsibilities under the regulations, including the Title IX Coordinator's responsibility to provide supportive measures to the complainant and respondent to restore or preserve a party's access to the recipient's education program or activity. A more detailed explanation of the types of supportive measures that are available to a complainant or a respondent is included in the discussion of supportive measures in proposed § 106.44(g).

*In response to a complaint, initiate the applicable grievance procedures or informal resolution process.* In many instances, a recipient and its Title IX Coordinator will learn of conduct that may constitute sex discrimination under Title IX when a complaint is made. In these circumstances, the recipient must initiate its grievance procedures under proposed § 106.45, and if applicable proposed § 106.46. These grievance procedures, each of which permit recipients to offer an informal resolution process, are explained in greater detail in the

202

discussion of individual sections in proposed §§ 106.45 and 106.46.

*Determine whether to initiate a complaint when a sex discrimination complaint is not made.* When a Title IX Coordinator is notified of conduct that may constitute sex discrimination under Title IX, but a complaint has not been made and an informal resolution process has not been initiated, the Department currently believes that a Title IX Coordinator must determine whether to initiate a complaint of sex discrimination that complies with the applicable grievance procedures as described in proposed § 106.45, and if applicable proposed § 106.46. A Title IX Coordinator would do so after determining, on a case-by-case basis, that initiating the recipient's grievance procedures is necessary to address conduct that may constitute sex discrimination under Title IX in the recipient's education program or activity. As explained in the discussion of proposed § 106.44(c), the Department continues to recognize the importance of complainant autonomy in decisionmaking about whether to request that the recipient initiate its grievance procedures or participate in the recipient's grievance procedures. Therefore, the Department currently believes a recipient should honor a complainant's request not to proceed with a complaint investigation when doing so is consistent with a recipient's obligation to ensure it operates its education program or activity free from sex discrimination.

The 2020 amendments authorize the Title IX Coordinator to initiate the grievance procedures in current § 106.45 by signing a "formal complaint" as defined in current § 106.30, while clarifying that doing so does not make the Title IX Coordinator a complainant or party for purposes of the complaint or the grievance procedures under current § 106.45. The 2020 amendments do not explain under what circumstances a Title IX Coordinator may initiate a formal complaint; however, the preamble to the 2020 amendments states that the regulations "leave recipients flexibility to investigate allegations even where the complainant does not wish

to file a formal complaint where initiating a grievance process is not clearly unreasonable in light of the known circumstances." 85 FR at 30131. The preamble provides one example of when a Title IX Coordinator might initiate a complaint—when presented with allegations "against a potential serial sexual perpetrator"—but gives no guidance other than this example on what factors a Title IX Coordinator should consider when determining to initiate the recipient's grievance procedures. *Id.*

The Department also offers its current understanding about when a Title IX Coordinator should initiate grievance procedures even though the complainant elected not to make a complaint. Consistent with the example provided in the preamble to the 2020 amendments, a Title IX Coordinator should initiate a complaint when the alleged conduct presents an immediate and serious threat to the health or safety of a complainant or other persons or would prevent the recipient from affording a nondiscriminatory environment for all students. To make this decision, a Title IX Coordinator may weigh the following factors, which take into account both a recipient's duty to ensure equal access to its education program or activity and a nondiscriminatory educational environment as well as the wishes of an individual complainant not to proceed with a complaint investigation.

- *Risk of additional sex discrimination*. Circumstances that suggest a risk of additional acts of sex discrimination, including when there have been other reports or complaints of sex discrimination by the respondent or a history or pattern of behavior that suggests a risk of future discrimination by the respondent (e.g., when a respondent continues to subject others to unwelcome sexual attention despite multiple unsuccessful efforts to address the respondent's behavior and prevent continued harassment);

- *Seriousness of alleged sex discrimination*. Whether the alleged incident involved violent

acts, threats of violence or retaliation, or use of a weapon;

- *Age and relationship of the parties.* The parties' ages and roles within the recipient's education program or activity, including whether there is a power imbalance between them, such as when a professor is accused of sexually harassing a student; and

- *Scope of alleged sex discrimination.* Information suggesting a pattern, ongoing sex discrimination, or conduct alleged to have occurred in a setting in which multiple individuals were impacted, such as in a particular graduate program, in an extracurricular activity, on in connection with a specific athletic team.

In addition to considering the alleged sex discrimination itself and the factors above, the Department notes that a Title IX Coordinator may also consider factors such as the ones below in determining whether to initiate a complaint to address sex discrimination in the recipient's education program or activity:

- *Availability of evidence to assess whether sex discrimination occurred.* When corroborating evidence such as video footage, visitor logs, communication records, written documentation, or multiple known witnesses is available, a Title IX Coordinator may determine that initiating the recipient's grievance procedures would be an effective step to address sex discrimination. The lack of such information could weigh against initiating the recipient's grievance procedures absent a cooperating complainant, in which case a recipient would still need to comply with proposed § 106.44(f)(6) and require its Title IX Coordinator to take other appropriate prompt and effective steps to ensure that sex discrimination does not continue or recur within the recipient's education program or activity, in addition to providing remedies to an individual complainant; and

- *Disciplinary Sanctions.* A Title IX Coordinator may also consider whether the alleged

205

conduct, if established, might require removal of the respondent from campus or another disciplinary restriction on the respondent to end the discrimination and prevent its recurrence, a factor that could counsel in favor of initiating the recipient's grievance procedures because disciplinary sanctions are not otherwise permitted.

Finally, the Department notes that in cases of sex discrimination by a recipient's employee, a Title IX Coordinator may be more likely to initiate the recipient's grievance procedures, even if the individual complainant does not wish to do so, because of considerations specific either to the affected workplace or the students with which the employee works, if any.

*Other appropriate prompt and effective steps to ensure that sex discrimination does not continue or recur within the recipient's education program or activity.* As explained in the discussion of proposed § 106.44(a), the Department has reconsidered the facts and circumstances and now believes current § 106.44 may not ensure that a recipient with information about conduct that may constitute sex discrimination under Title IX in its education program or activity will take steps to end the discrimination and prevent its recurrence. The current standard permits a recipient to limit its response to the steps required in current § 106.44(a) when the recipient has knowledge that sexual harassment has or may have taken place. The Department currently proposes in § 106.44(a) to require a recipient to take other appropriate prompt and effective responsive action to address sex discrimination in its education program or activity by taking steps to end any sex discrimination that has occurred, prevent its recurrence, and remedy its effects in every case. A recipient has this obligation because it is required under Title IX to operate its education program or activity free from sex discrimination. To effectuate that obligation, the Department proposes requiring additional steps when a Title IX Coordinator is notified of conduct that may constitute sex discrimination under Title IX. These steps are

206

designed to ensure a recipient addresses sex discrimination by taking appropriate prompt and effective steps to end any discrimination, prevent its recurrence, and remedy its effects.

Specifically, proposed § 106.44(f)(6) would require a Title IX Coordinator who has been notified of conduct that may constitute sex discrimination under Title IX to take other appropriate prompt and effective steps to ensure that sex discrimination does not continue or recur. These steps would be taken in addition to any supportive measures a Title IX Coordinator may offer an individual complainant under proposed § 106.44(f)(3) or remedies a complainant may receive if a recipient either initiates its grievance procedures under proposed § 106.45, and if applicable proposed § 106.46, and determines that sex discrimination occurred or affords the parties an informal resolution process. Proposed § 106.44(f)(6) would further recognize that, consistent with the recipient's obligation to operate its education program or activity free from sex discrimination, a Title IX Coordinator must take appropriate prompt and effective steps outside of a recipient's grievance procedures, when necessary, to ensure that sex discrimination does not continue or recur.

In addition, under proposed § 106.44(f)(6), a Title IX Coordinator would be required, as appropriate, to take other prompt and effective steps in response to information about conduct that may constitute sex discrimination under Title IX regardless of whether the recipient has also initiated its grievance procedures or facilitated an informal resolution process for the parties. The Department proposes these additional steps to address two distinct concerns. First, sex discrimination that is not investigated through a recipient's grievance procedures or addressed by the parties through an informal resolution process, because a complaint was not made or initiated by the recipient's Title IX Coordinator or the parties did not elect to participate in an informal process when offered to them, may nevertheless require prompt and effective action by the

recipient so sex discrimination does not continue or recur in its education program or activity. And second, even if a recipient's grievance procedures or informal resolution process fully resolve the parties' needs, sex discrimination in the recipient's education program or activity may impact individuals beyond the parties. In such cases, Title IX's prohibition on sex discrimination would also require a recipient's Title IX Coordinator to take additional prompt and effective steps to ensure sex discrimination does not continue or recur for the recipient's broader educational community. To address both concerns, the Department proposes in § 106.44(f)(6) that a recipient's Title IX Coordinator would need to take other prompt and effective steps to ensure a nondiscriminatory educational environment for the complainant and for others within its educational environment who are affected by the discrimination, as appropriate under the circumstances.

Although proposed § 106.44(f)(6) does not prescribe the specific steps that are necessary for a recipient to ensure that the sex discrimination does not continue or recur in its education program or activity, in all cases, a Title IX Coordinator's response must be effective to end the sex discrimination, prevent its recurrence, and remedy its effects. To ensure an effective response, the proposed regulation would require that a Title IX Coordinator must consider the report of possible sex discrimination in light of information reasonably available to the Title IX Coordinator. A Title IX Coordinator must also ensure that the response addresses any risk to the complainant of harm that is related to the allegations of sex discrimination, if a recipient did not initiate its grievance procedures or facilitate an informal resolution process, and to others within the school's educational environment who may be impacted by the discrimination. The steps a Title IX Coordinator would need to take will vary depending on the nature of the allegations, the source of the complaint, the individuals involved (e.g., elementary school or secondary school

students, undergraduate or graduate students, faculty/staff), the size and structure of the school, and other factors that the recipient deems relevant. If a Title IX Coordinator's actions are ineffective at ending the sex discrimination and preventing its recurrence, the Title IX Coordinator would need to take additional, different steps, to fulfill a recipient's obligation to address sex discrimination in its education program or activity.

If a recipient addressed a complaint through its grievance procedures, it may have access to specific information that the sex discrimination had an impact on the recipient's educational community beyond the parties. Even if a recipient did not investigate a complaint through its grievance procedures, the recipient's Title IX Coordinator may have access to information, including past reports to the Title IX Coordinator, corroborating information such as video footage, visitor logs available to the recipient, or written documentation, and any other relevant information that suggest the conduct has impacted the complainant and other members of the recipient's educational community. A Title IX Coordinator may need to speak with the respondent, if known, and other students or individuals who may have witnessed the reported sex discrimination or have information about the sex discrimination to determine what occurred or whether additional steps are necessary to ensure that sex discrimination does not continue or recur in its education program or activity.

The Department recognizes that it would not always be necessary for a Title IX Coordinator to take additional steps to ensure that sex discrimination does not continue or recur in its education program or activity, for example, when the sex discrimination involved only the parties and did not impact others participating or attempting to participate in the recipient's education program or activity, and the sex discrimination was addressed fully through a recipient's grievance procedures or informal resolution process. However, in all cases, when a

recipient's response to sex discrimination is not effective to end the sex discrimination and prevent the recurrence of discrimination for the complainant or the recipient's broader educational community, under the proposed regulations, a Title IX Coordinator must reevaluate the recipient's response and implement other approaches. In addition, when a Title IX Coordinator fails to take prompt and effective steps to end sex discrimination and prevent its recurrence, a recipient would be responsible for remedying the discriminatory effects of its inaction. For example, if a Title IX Coordinator delayed responding to a report of sex discrimination and as a result the complainant continued to experience sex discrimination that caused the complainant's grades and health to suffer, the recipient would be responsible for remedying these harms. This may require a recipient to permit the complainant to retake courses or resubmit assignments without academic or financial penalty or to reimburse the complainant for counseling expenses incurred while the recipient delayed responding. Affording remedies in these circumstances is also consistent with the proposed definition of "remedies" in § 106.2. Thus, in all cases, Title IX's prohibition on sex discrimination would require a recipient's Title IX Coordinator to take prompt and effective steps, including by remedying the effects of sex discrimination, to ensure that discrimination does not continue or recur in its education program or activity.

When a recipient has not initiated its grievance procedures, a Title IX Coordinator may need to take non-disciplinary action to stop the discrimination, such as instituting restrictions on contact between the parties, barring a third party from visiting the recipient's campus, or other action consistent with the recipient's policies. In some cases, after taking these steps, a Title IX Coordinator may learn of additional incidents or obtain information that causes the Title IX Coordinator to revisit whether to initiate a complaint under the recipient's grievance procedures.

For example, if the Title IX Coordinator determines that the recipient must impose disciplinary sanctions on a respondent to effectively end the sex discrimination and prevent its recurrence, the Title IX Coordinator would need to initiate the recipient's grievance procedures under proposed § 106.45, and if applicable proposed § 106.46, and would be able to impose sanctions only if there is a determination that the respondent violated the recipient's policy prohibiting sex discrimination. However, in many cases, a Title IX Coordinator's ability to take prompt and effective steps to end the sex discrimination and prevent its recurrence may not warrant imposition of discipline or otherwise require the Title IX Coordinator to initiate its grievance procedures.

To ensure sex discrimination does not continue or recur and deny equal access to its education program or activity for a recipient's educational community, a Title IX Coordinator may need to provide additional training for staff on how to respond appropriately to sex discrimination, monitor known risks of sex discrimination in programs and activities in which sex discrimination has been reported in the past, or pursue strategies other than discipline to address the conduct. For example, a Title IX Coordinator may need to take steps to repair an educational environment in which sex discrimination occurred, such as within a specific class, department, athletic team, or program. A Title IX Coordinator may also consider providing educational programming aimed at the prevention of sex discrimination.

Finally, a Title IX Coordinator's obligations under proposed § 106.44(f)(6) may also include taking action related to a third party who is engaging in sex discrimination. For example, if a Title IX Coordinator is notified that a third party who is not a student or an employee of the recipient is attending events organized by the recipient and engaging in harassing or discriminatory behavior at such events, the Title IX Coordinator would need to take prompt and

effective action to end such discrimination and prevent its recurrence even if no complaint is made. In this example, the Title IX Coordinator may choose to bar the third party from the recipient's events or campus in general, or otherwise take appropriate prompt and effective steps to ensure sex discrimination does not continue or recur in its education program or activity.

Section 106.44(g) Supportive measures

*Current regulations:* Section 106.44(a) of the current regulations requires a recipient to treat complainants and respondents equitably by offering supportive measures to a "complainant" as defined in current § 106.30, and following a grievance process that complies with current § 106.45 before imposing disciplinary sanctions or taking any action that is not a supportive measure with respect to a respondent. Current § 106.44(a) also requires a recipient's Title IX Coordinator to promptly contact the complainant to discuss supportive measures and to explain the process for filing a formal complaint.

*Proposed regulations:* The Department proposes adding several provisions to clarify a recipient's obligation to offer supportive measures to a complainant or a respondent. Proposed § 106.44(g) would make clear that upon being notified of conduct that may constitute sex discrimination under Title IX, a Title IX Coordinator must offer supportive measures, as appropriate, to the complainant or respondent to the extent necessary to restore or preserve that party's access to the recipient's education program or activity. Proposed § 106.44(g) would also clarify that for allegations of sex discrimination other than sex-based harassment or retaliation, a recipient, its employee, or other person authorized to provide aid, benefit or services on the recipient's behalf is not required to alter the conduct that is alleged to be sex discrimination for the purpose of providing a supportive measure. Proposed § 106.44(g)(1) provides examples of supportive measures that a recipient could deem to be appropriate, including but not limited to,

212

counseling, extension of deadlines and other course-related adjustments, campus escort services, increased security and monitoring of certain areas of the campus, restrictions on contact between the parties, leaves of absence, voluntary or involuntary changes in class, work, housing, or extracurricular or any other activity regardless of whether or not there is a comparable alternative, and training and education programs related to sex-based harassment.

Proposed § 106.44(g)(2) would clarify that supportive measures can include measures that burden a respondent, such as requiring changes in a respondent's class, work, housing, extracurricular or any other activity. Proposed § 106.44(g)(2) would, however, place limits on the ability of a recipient to impose measures that burden a respondent, including requiring that such measures are imposed only during the pendency of a recipient's grievance procedures under proposed § 106.45, and if applicable proposed § 106.46, requiring that they be terminated at the conclusion of the grievance procedures, and requiring that they must be no more restrictive of the respondent than necessary to restore or preserve the complainant's access to the recipient's education program or activity. In addition, under this proposed provision a recipient may not impose such supportive measures for punitive or disciplinary reasons. Proposed § 106.44(g)(4) would also require the recipient to provide a respondent burdened by a supportive measure with the opportunity to seek modification or termination of such measures before they are imposed, or, if necessary under the circumstances, as soon as possible after the measure has taken effect, by appeal to an official other than the one who originally imposed the measures. The Department further proposes that a recipient must also provide a complainant or respondent affected by a supportive measure with the opportunity to seek additional modification or termination of such supportive measure if circumstances change materially.

The proposed regulations would also permit a recipient to modify, terminate, or continue

supportive measures, other than those that burden a respondent, at the conclusion of grievance procedures or the informal resolution process (proposed § 106.44(g)(3)); protect complainant and respondent privacy by permitting disclosure of supportive measures only as necessary to provide them or when a recipient needs to inform a party of supportive measures provided to another party in order to restore or preserve that party's access to the education program or activity (proposed § 106.44(g)(5)); confirm that the Title IX Coordinator would be responsible for offering and coordinating supportive measures (proposed § 106.44(g)(6)); require a recipient to consult with the IEP team, 34 CFR 300.321, or Section 504 team, 34 CFR 104.35(c), when implementing supportive measures for an elementary school or secondary school student with a disability (proposed § 106.44(g)(7)(i)); and suggest that when implementing supportive measures for a postsecondary student with disability, a recipient may consult, as appropriate, with the individual or office that the recipient has designated to provide support to students with disabilities (proposed § 106.44(g)(7)(ii)).

*Reasons: Require a recipient to offer supportive measures to a complainant or respondent.* As explained in the discussion of amendments to regulatory definitions in Section II.C, "supportive measures" would be defined in proposed § 106.2 as non-disciplinary, individualized measures that are offered as appropriate, as reasonably available, without unreasonably burdening a party, and without fee or charge to a complainant or respondent to: (i) restore or preserve that party's access to the recipient's education program or activity, including temporary measures that burden a respondent when such measures are imposed for non-punitive and non-disciplinary reasons and are designed to protect the safety of the complainant or the recipient's educational environment, or deter the respondent from engaging in sex-based harassment; or (ii) provide support to the complainant or respondent through the recipient's grievance procedures or

informal resolution process.

Consistent with this definition, proposed § 106.44(g) would require a Title IX Coordinator to offer supportive measures not only to a complainant, but also to a respondent, when necessary to accomplish the objective of ensuring that party's access to the recipient's education program or activity. The appropriate supportive measures offered to a complainant or respondent would be determined by the recipient, as set out in proposed § 106.44(g), and would be offered and coordinated by the Title IX Coordinator. Proposed § 106.44(f)(3) and (g) would maintain the requirement from the current definition of "supportive measures" in § 106.30 that a Title IX Coordinator must offer supportive measures to the complainant before or after a complaint has been made or when no complaint has been made. Depending on the circumstances, it might be appropriate for a Title IX Coordinator to offer supportive measures to a respondent if, and then after, the respondent has received notice of the allegations.

In addition, the proposed regulations would also clarify that supportive measures are available for all forms of sex discrimination. Despite the current definition of "supportive measures" in § 106.30, which states that the measures are available for complainants and respondents, current § 106.44(a) requires only that a recipient, in responding to actual knowledge of sexual harassment in an education program or activity, offer supportive measures to a complainant. To align with the current and proposed definitions of "supportive measures," as well as proposed § 106.44(a), the Department proposes requiring a recipient to offer supportive measures whenever a Title IX Coordinator is notified of any type of conduct that may constitute sex discrimination under Title IX, not just sex-based harassment. For allegations of sex discrimination other than sex-based harassment or retaliation, proposed § 106.44(g) would clarify that a recipient's provision of supportive measures would not require the recipient, its

215

employee, or other person authorized to provide aid, benefit or services on the recipient's behalf to alter the alleged discriminatory conduct for the purpose of providing a supportive measure. However, if the recipient determines that sex discrimination occurred, the recipient would then be required to alter or end the discriminatory conduct. For example, in response to a complaint about sex discrimination in grading, a recipient would not be required to change the complainant's grade as a supportive measure while an investigation is pending. If the recipient determines that sex discrimination in grading occurred, the recipient might then be required to change the complainant's grade when providing a remedy to the complainant.

*A recipient has substantial discretion to offer supportive measures including, when necessary, measures that burden a respondent.* Proposed § 106.44(g)(1) is consistent with, and further clarifies, the definition of "supportive measures" in current § 106.30, which confers broad discretion on a recipient in deciding which supportive measures are reasonable. A recipient's discretion, however, would be limited by the requirement to offer supportive measures to a complainant or respondent only as appropriate to restore or preserve that party's access to the recipient's education program or activity. Supportive measures would also need to be reasonable in light of the facts and circumstances surrounding the allegations and the grievance procedures.

Factors a recipient may consider in offering such supportive measures include: (1) the need expressed by the complainant or respondent; (2) the ages of the parties involved, the nature of the allegations, and their continued effects on the complainant or respondent; (3) whether the parties continue to interact directly in the recipient's education program or activity, including student employment, shared residence or dining facilities, class, or while using campus transportation; and (4) whether steps have already been taken to mitigate the harm from the parties' interactions, such as implementation of a civil protective order. In addition to these

Case 3:21-cv-00308-CEA-DCP   Document 83-1   Filed 06/27/22   Page 217 of 701   PageID #: 1450

factors, a recipient should consider the supportive measures a complainant or respondent may need to facilitate their participation in the recipient's grievance procedures or informal resolution process. The Department recognizes that participation in grievance procedures or an informal resolution process may necessitate supportive measures to address not only the stress associated with participation, but also conflicts with classes, assignment deadlines, student employment, and other commitments that may arise as a result of that participation.

Proposed § 106.44(g)(2) would also clarify that a recipient has the discretion to impose supportive measures that temporarily burden a respondent but not for the purpose of discipline or punishment. This is consistent with the current definition of "supportive measures," which requires that supportive measures be non-disciplinary and non-punitive in nature and that they are not unreasonably burdensome to the non-requesting party as a procedural protection for a respondent. 34 CFR 106.30. In the preamble to the 2020 amendments, the Department also stated that any disciplinary sanctions described or listed by the recipient in its own grievance process would constitute actions that the recipient considers disciplinary and, thus, could not constitute supportive measures under current § 106.30. 85 FR at 30182. OCR received feedback from stakeholders through the June 2021 Title IX Public Hearing, as well as in listening sessions, that requested additional options for supportive measures during the pendency of an investigation to protect the complainant's access to the recipient's education program or activity. These stakeholders expressed frustration that under the 2020 amendments, it appears that the only supportive measures that burden a respondent that a recipient can impose prior to resolving a complaint are mutual restrictions on contact and expressed concern that preventing a recipient from imposing supportive measures that burden a respondent could limit a complainant's access to the recipient's education program or activity even in cases in which the recipient concludes

that it would be reasonable to impose such temporary limits on the respondent. Stakeholders also requested that the Department allow recipients to take additional actions to protect a complainant's safety. The Department heard from stakeholders who wanted to ensure that student respondents were still able to access their education while the recipient resolves a complaint through its grievance procedures, emphasizing that a student respondent is entitled to procedural protections prior to the implementation of any supportive measures that would limit their educational access.

After careful consideration of these comments, the Department proposes clarifying in § 106.44(g) that supportive measures would include measures that burden a respondent that are imposed temporarily during the pendency of a recipient's grievance procedures under proposed § 106.45, and if applicable proposed § 106.46. The Department also proposes clarifying that supportive measures that burden a respondent may include actions that a recipient has also identified as possible disciplinary sanctions. After reweighing the facts and circumstances, it is the Department's tentative position that actions by a recipient are not inherently disciplinary simply because they are listed as possible disciplinary sanctions, and that a recipient may utilize them as supportive measures as long as such actions are offered to restore or preserve a complainant's access to a recipient's education program or activity and not imposed for punitive or disciplinary purposes. In the Department's tentative view, these clarifications would provide a recipient with more discretion to make case-specific judgments about how best to proceed in cases in which one party or the other will necessarily be denied some access to a program or activity during the pendency of grievance procedures, but only if the measures meet the proposed regulations' requirements to ensure fairness to all parties as just described. In deciding which supportive measures are reasonable, a recipient should consider whether supportive measures

that do not burden the respondent would suffice to preserve the complainant's access to the recipient's education program or activity and, if not, should consider the impact of any contemplated supportive measures that temporarily burden the respondent or the respondent's access to the recipient's education program or activity. In undertaking this evaluation, a recipient must ensure that a supportive measure preserves or restores the complainant's nondiscriminatory access to the recipient's education program or activity.

In light of feedback OCR received from stakeholders during listening sessions and in connection with the June 2021 Title IX Public Hearing emphasizing the potential harm to a respondent's education from the unnecessary or inappropriate implementation of supportive measures that burden the respondent and to ensure fairness for all parties to a recipient's grievance procedures, the Department proposes, in § 106.44(g)(2), to include limitations on a recipient's discretion to impose these measures. The proposed limitations would require that supportive measures that burden a respondent be imposed only during the pendency of the recipient's grievance procedures and terminate following the recipient's determination regarding the allegations in the complaint. Further, proposed § 106.44(g)(2) would require supportive measures that burden a respondent to be reasonable and no more restrictive than necessary to restore or preserve the complainant's access to the education program or activity. The Department proposes these limits to ensure not only that a recipient considers the needs of the individuals involved, but also to ensure that, even when similar actions are involved, supportive measures remain distinct from disciplinary sanctions, which are consequences that can be imposed only following a determination that the respondent violated the recipient's prohibition on sex discrimination. As explained in the discussions of proposed § 106.44(h)-(i), nothing in proposed § 106.44(g)(2) should be construed as precluding a recipient from removing a

respondent from the recipient's education program or activity on an emergency basis if the recipient determines that an immediate and serious threat to the health and safety of students or other persons justifies the removal and the requirements of proposed § 106.44(h) are otherwise followed, nor would proposed § 106.44(g)(2) preclude a recipient from placing an employee respondent on administrative leave from employment responsibilities under proposed § 106.44(i).

The Department recognizes that by imposing supportive measures that burden a respondent, the recipient is potentially requiring the respondent to temporarily alter or forego access to the education program or activity during the pendency of grievance procedures. In view of this, the Department proposes requiring the recipient to provide the respondent procedural protections when imposing such measures. Proposed § 106.44(g)(4) would therefore require a recipient to provide a respondent with the opportunity to seek termination or modification of a burdensome supportive measure before the measure is imposed, or if necessary under the circumstances, as soon as possible after the measure has taken effect, from an impartial employee who is someone other than the employee who made the contested decision. The employee imposing the supportive measures or reviewing a request to terminate or modify such measures may be the Title IX Coordinator, who is also tasked with coordinating any supportive measures provided to the parties. However, to ensure that a respondent receives an independent review, the Department proposes that neither the Title IX Coordinator nor any other employee may both impose and review the same supportive measures. Moreover, proposed § 106.44(g)(4) would require that the recipient offer this opportunity to review prior to imposing any supportive measures that burden a respondent or, if necessary under the circumstances, as soon as possible after the measure has taken effect. Offering the opportunity for review prior to the imposition of

220

the measures is preferable from the standpoint of ensuring that a respondent is not unnecessarily restricted or deprived of educational opportunities. Accordingly, whenever it is practical and appropriate, the recipient should provide the respondent an opportunity to review and seek modifications of burdensome supportive measures prior to imposing them. Yet the Department proposes to offer recipients flexibility concerning timing in order to account for the wide range of supportive measures available under proposed § 106.44(g)(1) and to allow a recipient to take into account the respondent's interests as well as other concerns, such as ensuring the complainant's safety or ability to access the educational environment. There may be times when offering such a review is impractical until after supportive measures that burden the respondent have been imposed. Proposed § 106.44(g)(4) would also require a recipient to provide complainants and respondents affected by a supportive measure with the opportunity to seek additional modification or termination of such supportive measure if circumstances change materially.

Proposed § 106.44(g)(1) would specifically identify restrictions on contact as an example of a supportive measure that may be utilized by a recipient. Current § 106.30 includes only mutual restrictions on contact between the parties on the list of possible supportive measures. However, in the preamble to the 2020 amendments, the Department responded to concerns that mutual restrictions on contact may unfairly burden a complainant, may be unnecessary, and may fail to ensure complainant safety. 85 FR at 30184. In particular, stakeholders had asked the Department to clarify that recipients may also impose non-mutual restrictions on the parties when appropriate. Although the Department declined to modify § 106.30 to include non-mutual restrictions on contact in the list of supportive measures, the preamble clarified that their absence from the list "does not mean that one-way no-contact orders are never appropriate." *Id*. Rather,

221

the Department noted in the preamble that "[a] fact-specific inquiry is required into whether a carefully crafted no-contact order restricting the actions of only one party would meet the § 106.30 definition of supportive measures." *Id.* In particular, the Department recognized that non-mutual no-contact orders may be necessary supportive measures to enforce restraining or protective orders issued by a court. *Id.* The preamble further explained that "if a one-way no-contact order does not unreasonably burden the other party, then a one-way no-contact order may be appropriate." *Id.* OCR has since received feedback through the June 2021 Title IX Public Hearing and listening sessions urging clarification that temporary non-mutual no-contact orders are among those supportive measures that a recipient may offer when necessary. Stakeholders noted that by including mutual no-contact orders in the list of supportive measures without a reference to non-mutual no-contact orders, the 2020 amendments did not accurately communicate what supportive measures a recipient may offer consistent with its obligations under Title IX. These stakeholders stated that this apparent gap would be particularly problematic in dating or domestic violence situations when a respondent may manipulate or pressure a complainant into violating a mutual no-contact order, putting the complainant at risk of discipline as a result of the respondent's behavior.

To ensure that recipients understand that they are not limited to imposing mutual restrictions on contact between the parties as supportive measures, the Department proposes eliminating the term "mutual" from the non-exhaustive list of supportive measures under § 106.44(g)(1). The Department also reiterates that the list of possible supportive measures in proposed § 106.44(g)(1) would be illustrative and not exclusive. As with other supportive measures, a recipient should consider the appropriateness and necessity of non-mutual restrictions on contact in light of the factors described above, including a party's expressed need

222

for a non-mutual restriction, the nature of the allegations and their continued effects on the parties, and whether and how the parties continue to interact in the recipient's education program or activity. In addition, because a non-mutual restriction on contact may be a supportive measure that burdens a respondent, a recipient should also pursue less restrictive supportive measures to restore or preserve a complainant's access to the recipient's education program or activity when possible and only impose non-mutual restrictions on contact when necessary and when no other supportive measure will suffice.

Finally, the Department also includes in proposed § 106.44(g)(1) training and education programs related to sex-based harassment as supportive measures. Training and education programs are within the scope of the current definition of "supportive measures" in § 106.30, which states that supportive measures are designed to deter future sex-based harassment. The Department recognizes the significant role training plays in shaping a school and campus climate and environment, especially when the training is interactive and incorporates hypothetical examples of scenarios that may arise for recipients. In some circumstances, providing training and education programs to parties regarding a recipient's policies may be helpful in restoring or preserving access to a recipient's education program or activity or may assist the parties in ensuring meaningful participation in the recipient's grievance procedures. Although such training may be implemented as a remedy following a determination that sex discrimination occurred, there may also be circumstances in which training is warranted during the pendency of the recipient's grievance procedures or independent of the outcome of any grievance procedures. For example, when a recipient receives a complaint of sex-based taunts occurring at school athletic events, it may be clear to the recipient that additional training for the larger school community is necessary to preserve access to a recipient's education program or activity

regardless of the ultimate outcome of the complaint.

*Duration of supportive measures.* Proposed § 106.44(g)(3) would permit a recipient to terminate or modify supportive measures that do not burden a respondent at the conclusion of its grievance procedures under proposed § 106.45, and if applicable proposed § 106.46, or at the conclusion of the informal resolution process under proposed § 106.44(k), or the recipient may continue to provide supportive measures, as appropriate. The Department did not clarify in the 2020 amendments the duration of supportive measures or whether a recipient may continue to offer them after the conclusion of its sexual harassment grievance procedures, regardless of the outcome. However, the Department did emphasize in current § 106.44(a) that supportive measures could be provided in the absence of a complaint, and in that sense indicated that such measures would not be contingent on the outcome of a complaint. Under proposed § 106.44(g)(3), a recipient would have the discretion to decide on a case-by-case basis how long supportive measures are needed. The same factors used to make the determination about which supportive measures to offer would also be relevant to determinations about the duration of those measures, including whether they remain necessary to restore or preserve a complainant's or respondent's access to the recipient's education program or activity, such as when the parties participate in the same classes, student employment, residence, or dining facilities. Some supportive measures, such as those that limit interactions between the parties, may be necessary and appropriate to implement for the duration of the parties' participation in the recipient's education program or activity. Others, such as academic adjustments or counseling, may be necessary for a shorter period of time, also depending on the circumstances. As explained in the discussion of proposed § 106.44(g)(2), a recipient would be required to terminate supportive measures that burden a respondent no later than the conclusion of the recipient's grievance

procedures under proposed § 106.45, and if applicable proposed § 106.46.

*Confidentiality of supportive measures and Title IX Coordinator's role.* The current definition of "supportive measures" in § 106.30 states that recipients must maintain as confidential any supportive measures provided to the complainant or respondent except when doing so would impair the recipient's ability to provide the supportive measures. Proposed § 106.44(g)(5) would preserve this requirement and clarify that a recipient must ensure that it does not disclose information about supportive measures to persons other than the complainant or respondent unless necessary to provide the supportive measures. A recipient may also inform a party of supportive measures provided to, or imposed on, the other party only if necessary to restore or preserve that party's access to the education program or activity.

Proposed § 106.44(g)(6) would incorporate the requirement from the current definition of "supportive measures" and the requirement in current § 106.44(a) that a recipient's Title IX Coordinator is responsible for offering and coordinating supportive measures. 34 CFR 106.30 and 106.44(a). This responsibility would not require the Title IX Coordinator to be the employee who implements the supportive measures, but the Title IX Coordinator would ultimately be responsible for ensuring that the measures are implemented appropriately. For example, if the Dean of Academic Affairs implements a supportive measure during the recipient's grievance procedures to move a student respondent from one laboratory to another and bar their entry into their previous laboratory, the Title IX Coordinator would be responsible for ensuring that the supportive measure is fully implemented, including that the necessary personnel are notified to deactivate the student respondent's identification card or otherwise bar entry to the respondent's previous laboratory.

*Addressing disagreements over supportive measures.* The Department recognizes that a

complainant and respondent are impacted by a recipient's decisions regarding supportive measures. In certain situations, a complainant or respondent may not agree with a recipient's decision to grant or deny a request for a specific supportive measure, or may object to the decision to modify or terminate an existing supportive measure. To ensure that parties are afforded an opportunity to contest a recipient's decisions regarding a supportive measure, proposed § 106.44(g)(4) would provide a mechanism for parties to seek review from an impartial employee who is not the employee responsible for the contested decision and who has the authority to change the supportive measure, if appropriate. The Department further notes that although the opportunity to challenge a supportive measure exists at the time a recipient makes an initial decision to grant or deny a request for a specific supportive measure, or a decision to modify or terminate an existing supportive measure, proposed § 106.44(g)(4) would also require a respondent to allow a complainant or respondent to bring an additional challenge to a decision regarding a supportive measure, including a burdensome supportive measure, when circumstances change materially.

*Administering supportive measures involving a student with a disability.* Finally, when a recipient implements a supportive measure involving an elementary school or secondary school student with a disability, proposed § 106.44(g)(7)(i) would require the recipient's Title IX Coordinator to consult with the student's IEP team, 34 CFR 300.321, or the Section 504 team, 34 CFR 104.35(c), to help ensure the recipient's implementation of supportive measures complies with IDEA and Section 504. In the case of a postsecondary student with a disability, proposed § 106.44(g)(7)(ii) would permit a recipient's Title IX Coordinator, as appropriate, to consult with the person or office that the recipient designated to provide supports for students with disabilities to help ensure compliance with Section 504 (e.g., disability services office), including

226

consideration of any disability-related modifications, adjustments, or services required under Section 504. Because a postsecondary student with a disability is not required to disclose a disability to their school or request disability-related modifications, adjustments, or services, proposed § 106.44(g)(7)(ii) would leave it to the discretion of a recipient's Title IX Coordinator to consult with the disability services office in appropriate circumstances. For example, when a party discloses to a postsecondary recipient's Title IX Coordinator that they are a student with a disability, the recipient should discuss with the party available resources including those provided through the recipient's disability services office. The party may already receive disability-related supports and services and may or may not require additional supports, or the party may not wish to request disability-related support in connection with the recipient's response to alleged sex discrimination. In light of a postsecondary student's discretion to request such services, the Title IX Coordinator should provide the party information about available resources and honor the student's request regarding whether to involve disability services office staff. These protections would also ensure that a recipient appropriately considers its obligations to comply with Federal disability rights laws prior to offering supportive measures to a student as part of its grievance procedures.

Section 106.44(h) Emergency removal

*Current regulations:* Section 106.44(c) allows a recipient to remove a respondent from its education program or activity on an emergency basis following an individualized safety and risk analysis and a determination that the respondent poses an immediate threat to the physical health or safety of any student or other person arising from the allegations of sexual harassment. Current § 106.44(c) requires a recipient that seeks to remove a respondent on an emergency basis to provide the respondent with notice and an immediate opportunity to challenge the removal.

Current § 106.44(c) further states that emergency removal does not modify any rights under the IDEA, Section 504, or the Americans with Disabilities Act of 1990 (ADA).

*Proposed regulations:* The Department proposes broadening the language in current § 106.44(c), to permit emergency removal of a respondent after a recipient conducts an individualized assessment and determines that an immediate threat to the health or safety of any student, employee, or other person arising from the alleged sex discrimination exists, and moving it to proposed § 106.44(h). To afford protection for the full range of possible threats—physical and non-physical—that a respondent may pose, the Department proposes removing the limiting term "physical" and adding language that focuses instead on the seriousness of the threat to a person's health or safety (physical or non-physical).

*Reasons:* The Department recognizes the need to allow a recipient flexibility to remove a respondent from its education program or activity on an emergency basis, and expressly provides for such removals in current § 106.44(c). Consistent with other changes to proposed § 106.44, the Department proposes changing emergency removal to permit a recipient to address threats arising from all forms of alleged sex discrimination, and not limiting emergency removal to alleged sex-based harassment.

In addition, OCR received feedback through the June 2021 Title IX Public Hearing and listening sessions that current § 106.44(c) sets too high a bar to effectuate the provision's goal of safety. Specifically, postsecondary institutions and safety compliance officers noted that by limiting emergency removals to circumstances in which a respondent poses an immediate threat to the physical health or safety of any student or other individual arising from the allegations of sexual harassment, current § 106.44(c) fails to account for the significant non-physical harms some respondents pose to complainants and other individuals in connection with alleged sex-

228

based harassment.  Some threats may present an immediate and serious non-physical threat to student safety that warrants the emergency removal of a respondent following an individualized assessment.  For example, a complainant who is stalked by a respondent may not experience a physical threat as a result of stalking, yet the stalking could present a serious and immediate threat to the student's mental health.  The Department seeks to address such serious non-physical threats on the same basis as physical threats.  Therefore, the Department proposes clarifying the scope of threat to encompass all serious threats to health and safety, which would include but is not limited to threats to physical health and safety, to account for the non-physical threats that may justify immediate action.  To accomplish this change, the Department proposes deleting the term "physical" as a restrictive qualifier on threats to health and safety and adding the term "serious" to confirm that non-serious threats do not warrant emergency removal.  It is the Department's tentative view that this proposed revision would give recipients the necessary flexibility to ensure a safe campus community while protecting the rights of all students.  The Department further notes that the current regulations require a recipient to provide "the respondent with notice and an opportunity to challenge the decision immediately following the removal," 34 CFR 106.44(c), a protection that the proposed regulations retain.  Nothing in the current or proposed regulations would preclude a respondent from bringing an additional challenge to the emergency removal at a later time if circumstances have changed or new facts come to light that warrant reconsideration of the recipient's decision.

Section 106.44(i) Administrative leave

*Current regulations:* Section 106.44(d) states that "nothing in this subpart precludes a recipient from placing a non-student-employee respondent on administrative leave during the pendency of a grievance process" consistent with current § 106.45, provided that in doing so a recipient must

not modify any rights available to a respondent under Section 504 or the ADA.

*Proposed regulations:* The Department proposes maintaining current § 106.44(d) in proposed § 106.44(i) with minor revisions.  The Department proposes changing "nothing in this subpart" to "nothing in this part," and clarifying that administrative leave would be permitted during the pendency of the recipient's grievance procedures.

*Reasons:* The Department proposes changing "nothing in this subpart" to "nothing in this part" to align with other proposed changes to the regulations, including the relocation of the proposed definitions from subpart D to subpart A.  The Department also proposes removing the term "non-student" to clarify that a recipient may place any employee respondent on administrative leave. This change would allow a recipient to treat its employees similarly with respect to the conditions of their employment by allowing the recipient to place both student-employees and non-student-employees on administrative leave when appropriate.  The Department also proposes removing the reference to "grievance process that complies with § 106.45" and clarifying that this provision would apply to the recipient's grievance procedures, which encompass the grievance procedures under proposed § 106.45, and if applicable proposed § 106.46  The Department proposes this change to ensure that the recipient has discretion to place an employee respondent on administrative leave while following grievance procedures described in proposed § 106.45, and if applicable proposed § 106.46.

Section 106.44(j) Recipient prohibition

*Current regulations*: Current § 106.71(a) includes a requirement that a recipient must keep confidential the identities of "any individual who has made a report or complaint of sex discrimination, including any individual who has made a report or filed a formal complaint of sexual harassment, any complainant, any individual who has been reported to be the perpetrator

of sex discrimination, any respondent, and any witness, except as may be permitted by" FERPA or its regulations or required by law or to carry out the purposes of Title IX.

*Proposed regulations*: In proposed § 106.44(j), the Department would limit a recipient's ability to disclose the identities of parties, witnesses, or other participants when conducting an informal resolution process under proposed § 106.44(k), implementing grievance procedures under proposed § 106.45, and if applicable proposed § 106.46, and requiring a Title IX Coordinator to take any other appropriate steps under proposed § 106.44(f)(6). The Department would prohibit a recipient from disclosing the identity of a party, witness, or others participating in the above-referenced processes except when the person whose identity would be disclosed has consented to the disclosure, when permitted by FERPA, when required by law, or to carry out the purposes of Title IX.

*Reasons*: As explained in the discussion of proposed § 106.44(a), a recipient has a duty under Title IX to operate its education program or activity free from sex discrimination. The Department's tentative view is that, in order to effectuate Title IX in this regard, a recipient must refrain from disclosing the identities of parties, witnesses, and others participating subject to the exceptions listed in proposed § 106.44(j) because such disclosures are likely to chill participation in the recipient's efforts to address sex discrimination.

Current § 106.71(a) requires the recipient to keep confidential the identities of the parties or witnesses except for reasons required by law, permitted by FERPA, necessary to carry out Title IX responsibilities, or when the parties themselves permit disclosure of their own identities. The Department proposes changes to this prohibition on disclosure for clarity and also proposes moving this prohibition to proposed § 106.44 because it relates to a recipient's broader responsibilities to address information about conduct that may constitute sex discrimination in its

program or activity, as addressed in proposed § 106.44, and does not identify conduct that constitutes "retaliation," as defined in proposed § 106.2.

The Department proposes modifying the protection of this provision to apply beyond parties and witnesses to also include others participating in the informal resolution process, grievance procedures, and other appropriate steps taken by the Title IX Coordinator. Others participating in these processes may include advisors, parents, guardians, or other authorized representatives for the parties, an interpreter for a person with limited English proficiency, or a notetaker who provides services as a reasonable modification for a person with a disability. Without a prohibition on the recipient disclosing their identities, some of these other individuals may be reluctant to participate in the recipient's Title IX processes. Their lack of participation could, in turn, impair the recipient's efforts to address information about conduct that may constitute sex discrimination, including by affecting the equitable treatment of the complainant and respondent as required by proposed §§ 106.44(f)(1) and 106.45(b)(1). In addition, the proposed change aligns with how these individuals are described elsewhere in the proposed regulations, including in proposed § 106.71, and would provide clarity while ensuring comprehensive coverage.

The Department also seeks to provide clarity by relocating the prohibition on a recipient disclosing the identity of persons participating in any way in its Title IX processes to proposed § 106.44(j) because this requirement is not limited to retaliation, which is the subject of proposed § 106.71. The Department's tentative position is that this change would reduce confusion and enhance clarity about the scope of a recipient's obligation to keep these persons' identities confidential. As in current § 106.71(a), proposed § 106.44(j) would prohibit a recipient from disclosing the identities of parties, witnesses, or others participating in the recipient's Title IX

processes unless one of the stated exceptions applies. The Department proposes retaining the stated exceptions from current § 106.71(a) with minor changes in wording to be consistent with the proposed regulations. The prohibition in proposed § 106.71(a) on "retaliation," as defined in proposed § 106.2, would also continue to apply to any intimidation, threat, coercion, or discrimination by the recipient for the purpose of retaliation, including disclosures about persons participating in any of the recipient's Title IX processes. In the preamble to the 2020 amendments, the Department explained that unnecessary exposure of these persons' identities for any reason may lead to retaliation:

> [U]nnecessarily exposing the identity of any individual who has made a report or complaint of sex discrimination, including any individual who has made a report or filed a formal complaint of sexual harassment, any complainant, any individual who has been reported to be the perpetrator of sex discrimination, any respondent, and any witness, may lead to retaliation against them and [the Department] would like to prevent such retaliation.

85 FR at 30537. Through the June 2021 Title IX Public Hearing, OCR heard support for this prohibition because this type of disclosure may directly raise the risk of, and even encourage, retaliation. These stakeholders observed that once the information is released by the recipient, students may take sides and engage in retaliation against parties, witnesses, and those involved in administering the grievance procedures. In addition, stakeholders noted that some students may not choose to share with their classmates or family members that they reported, made a complaint, or participated in the recipient's grievance procedures, and disclosures by others could result in disclosures to those individuals. The Department notes that the same may be true for employees who may choose not to share their participation with colleagues. The Department

Case 3:21-cv-00308-CEA-DCP   Document 83-1   Filed 06/27/22   Page 234 of 701   PageID #: 1467

also reiterates that if the disclosure were made for retaliatory purposes as discussed by stakeholders, then it would constitute retaliation and would be prohibited by proposed § 106.71(a). However, the Department's tentative view is that, in addition to a disclosure made for retaliatory purposes, any disclosure for reasons other than those permitted or required by proposed § 106.44(j) may chill reporting of sex discrimination or participation in the recipient's efforts to address sex discrimination. Therefore, the Department's tentative position is that, independent of its obligation to prohibit retaliation, including its own retaliatory disclosure of the identities of parties, witnesses, or other participants under proposed § 106.71, the recipient must not disclose these identities other than as provided in proposed § 106.44(j) so that the recipient's own actions do not create a barrier to these individuals' participation in the recipient's efforts to address information that may constitute sex discrimination. In this regard, the Department's proposal would clarify that a recipient's disclosure of the identity of a party, witness, or other participant except as otherwise specified, is prohibited.

Section 106.44(k) Informal resolution process

*Current regulations:* Section 106.45(b)(9) allows a recipient to offer an informal resolution process that does not involve a full investigation and adjudication, such as mediation, at any time prior to reaching a determination regarding responsibility. This section also requires a recipient to provide a written notice to the parties disclosing the allegations; the requirements of the informal resolution process, including the circumstances under which it precludes the parties from resuming a formal complaint arising from the same allegations; that at any time prior to agreeing to a resolution, any party has the right to withdraw from the informal resolution process and resume the grievance process with respect to the formal complaint; and any consequences resulting from participating in the informal resolution process, including the records that will be

maintained or could be shared. Recipients must first obtain the parties' voluntary, written consent to the informal resolution process.

There are currently several restrictions on a recipient's discretion to offer an informal resolution process. A recipient must not offer or facilitate an informal resolution process to resolve allegations that an employee sexually harassed a student; require informal resolution as a condition of enrollment or continuing enrollment, or employment or continuing employment, or enjoyment of any other right, the waiver of the right to an investigation and adjudication of formal complaints of sexual harassment; require the parties to participate in an informal resolution process; or offer an informal resolution process unless a formal complaint is filed. *Proposed regulations:* The Department proposes adding § 106.44(k)(1), which would specify that a recipient may offer an informal resolution process at any time prior to determining whether sex discrimination occurred, unless there are allegations that an employee engaged in sex discrimination toward a student or such a process would conflict with Federal, State, or local law. Proposed § 106.44(k)(1) would also state that a recipient that provides an informal resolution process must, to the extent necessary, also require its Title IX Coordinator to take other appropriate prompt and effective steps to ensure that sex discrimination does not continue or recur within the recipient's education program or activity.

The Department proposes clarifying that a recipient would have discretion regarding whether to offer an informal resolution process at any time prior to determining under proposed § 106.45, and if applicable proposed § 106.46, whether sex discrimination occurred, which is a point not explicitly addressed in the current regulations. The Department also proposes, at § 106.44(k)(1)(i)-(ii), making clear that this discretion would include the recipient's authority to determine whether informal resolution is appropriate and to decline to offer informal resolution

regardless of one or more of the parties' wishes, including, for example, if the recipient determines that the alleged conduct would present a future risk of harm to others. Proposed § 106.44(k)(1)(i) would also make clear that a recipient may offer informal resolution without first requiring that a complaint be made; rather, a recipient has discretion to determine whether it is appropriate to offer an informal resolution process when it receives information about conduct that may constitute sex discrimination under Title IX, or a complaint of sex discrimination is made.

The Department also proposes clarifying that a recipient must not require or pressure the parties to participate in an informal resolution process instead of the recipient's grievance procedures. Proposed § 106.44(k)(2) would preserve the current requirement that the recipient must obtain the parties' voluntary consent to the informal resolution process and must not require waiver of the right to an investigation and adjudication of a complaint as a condition of enrollment or continuing enrollment, or employment or continuing employment, or exercise of any other right.

The Department proposes keeping the same elements currently required for written notice of the informal resolution process and would add requirements that provide the parties with more detailed information about what an informal resolution process would entail. This would include, in proposed § 106.44(k)(3), the types of potential terms that the parties might voluntarily agree to as a part of an informal resolution process, including, among others, restrictions on contact. In addition, proposed § 106.44(k)(3) would require a recipient to communicate that and other specified information to the parties before initiating an informal resolution process. A recipient would be required to communicate this information in writing only when offering informal resolution of sex-based harassment complaints involving a postsecondary student

Case 3:21-cv-00308-CEA-DCP   Document 83-1   Filed 06/27/22   Page 237 of 701   PageID #: 1470

complainant or respondent in proposed § 106.46(j).

*Reasons: Clarification of discretion.*  The Department proposes clarifying in § 106.44(k) that a recipient would have discretion to determine whether it is appropriate to offer an informal resolution process when it receives information about conduct that may constitute sex discrimination under Title IX or a complaint of sex discrimination is made.  The proposed regulations would not require a recipient to provide an informal resolution process and would not specify the types of informal resolution processes that a recipient may offer to its students, employees, or third parties, in part because appropriate options might vary depending on the factual circumstances.  In the elementary school setting, for example, options might include requiring the respondent to take steps to repair the relationship with the complainant without requiring the students to interact face-to-face, such as through writing or drawing an apology.  In the postsecondary setting, an informal resolution process could involve mediation or a more complex restorative justice process.  As the Department recognized in the preamble to the 2020 amendments, such an informal resolution process could provide "greater flexibility to recipients in serving their educational communities."  85 FR at 30403.  An informal resolution process is not a fact-finding, investigative process as specified in the grievance procedures under proposed § 106.45, and if applicable proposed § 106.46, and does not involve a determination of whether sex discrimination occurred.  Instead, it is an alternative avenue through which parties may reach a resolution.  The Department's tentative view is that a recipient is in the best position to determine whether an informal resolution process would be a potential good fit depending upon the facts and circumstances, except that a recipient must not offer an informal resolution process to resolve allegations that an employee engaged in sex-based harassment toward a student.  In that circumstance, the Department is concerned that it is too difficult to ensure that mediation or

other forms of informal resolution would be truly voluntary on the part of a student who reports sex-based harassment by a recipient's employee due to the power differential and potential for undue influence or pressure exerted by an employee over a student.

Proposed § 106.44(k)(1)(i)-(ii) also would make clear that a recipient would have the discretion to determine that informal resolution is not appropriate and decline to offer it regardless of one or more of the parties' wishes. This would clarify that a recipient has discretion to consider the context and circumstances when it receives information about conduct that may constitute sex discrimination under Title IX or a complaint of sex discrimination is made in deciding whether to offer an informal resolution option. The Department would like to ensure that recipients are aware of their flexibility regarding informal resolution, for example, in circumstances in which a recipient determines that the alleged conduct would present a future risk of harm to others and an informal resolution process would be inappropriate. This would allow a recipient to tailor its response to the needs of the parties, subject to the overall guardrails provided by the regulations. The Department also notes that, consistent with proposed § 106.44(f)(1), a recipient must exercise this discretion in a manner that is equitable to the parties and within its Title IX process as a whole; it may not act arbitrarily or otherwise impermissibly in offering or declining to offer an informal resolution process. A recipient's discretion would be further limited by proposed § 106.44(k)(2) which states a recipient must not require or pressure the parties to participate in an informal resolution process, and that the recipient must obtain the parties' voluntary consent to the informal resolution process.

*Take other appropriate prompt and effective steps to ensure that sex discrimination does not continue or recur within the recipient's education program or activity.* Even if the parties reach an informal resolution, sex discrimination, including sex-based harassment, in the

recipient's education program or activity may impact individuals beyond the parties.  In such cases, proposed § 106.44(k)(1) would require a recipient's Title IX Coordinator, to the extent necessary, to take other appropriate prompt and effective steps to ensure that sex discrimination does not continue or recur within the recipient's education program or activity.  To ensure equal access to its education program or activity for those persons, a recipient may need to provide additional training for staff on how to respond appropriately to sex discrimination, monitor known risks of sex discrimination in programs and activities in which sex discrimination has been reported in the past, or pursue strategies other than discipline to address the conduct.  For example, a recipient may need to take steps to repair an educational environment in which sex-based harassment occurred, such as within a specific class, department, athletic team, or program.  A recipient may also consider providing educational programming aimed at the prevention of sex-based harassment.

*Deletion of requirement to file a formal complaint to invoke informal resolution.*  As the proposed regulations would no longer require a party to file a formal complaint, the Department proposes removing the requirement in current § 106.45(b)(9) that a recipient must not offer informal resolution unless a formal complaint has been filed.  Under proposed § 106.44(k), a recipient would have discretion as to whether to offer an informal resolution process without requiring the complainant to make a complaint requesting that the recipient initiate its grievance procedures.  Circumscribing a recipient's ability to offer this process as an alternative to the recipient's grievance procedures would undermine the Department's goal of ensuring that, to the extent appropriate, a recipient can provide students and others with a range of effective options that are meaningful in their educational environments for addressing and resolving allegations of sex discrimination consistent with Title IX.  The Department's reasons for the proposed removal

Case 3:21-cv-00308-CEA-DCP   Document 83-1   Filed 06/27/22   Page 240 of 701   PageID #: 1473

of the formal complaint requirement are addressed in greater detail in the discussion of the proposed definition of "complaint" (§ 106.2).

*Provide notice and ensure that the facilitator for the informal resolution process is not the same as the investigator or decisionmaker for grievance procedures involving the same information reported or complaint.* Proposed § 106.44(k)(3) would clarify that as part of the informal resolution process, the recipient would be required to provide the parties with notice on a variety of points related to the informal resolution process. Proposed § 106.44(k)(3) would maintain all of the notice requirements of current § 106.45(b)(9)(i) and add requirements to ensure that parties would receive information that is important to understanding the process. Specifically, the Department proposes that a recipient must explain the allegations; requirements of the informal resolution process; the right to withdraw at any time and initiate or resume the recipient's grievance procedures; that agreement to a resolution would preclude initiating or resuming grievance procedures arising from the same allegations; a description of the potential terms that may be requested or offered in an informal resolution agreement; which records will be maintained or could be shared; a statement that if the recipient initiates or resumes its grievance procedures, the recipient or a party must not access, consider, disclose, or otherwise use information, including records, obtained solely through an informal resolution process as part of the investigation or determination of outcome of the complaint; and a statement that an informal resolution facilitator could serve as a witness[6] for purposes other than providing

---

[6] This provision includes an additional requirement that would codify an expectation from the preamble to the 2020 amendments regarding facilitators potentially serving as witnesses in a process under current § 106.45. Following comments received to the 2018 NPRM, the preamble to the 2020 amendments stated, "[w]ith respect to informal resolution facilitators potentially serving as witnesses in subsequent formal grievance processes, we leave this possibility open to recipients. If recipients were to accept such witnesses, then the Department would expect this

information obtained solely through the informal resolution process.

Proposed § 106.44(k)(3)(ii) would require a recipient to explain the requirements of the informal resolution process it chooses to offer to the parties. This explanation could include a discussion about to what extent, if any, the proceedings will be kept confidential. Informal or alternative dispute resolution processes often are confidential to ensure that the parties engage fully and candidly in the process. A recipient, if it chooses, should inform the parties if the informal resolution process would be confidential, and how the recipient would respond to any admissions made by a party. For example, the recipient could inform the parties that if someone makes an admission of criminal activity, that information could be forwarded to relevant law enforcement authorities. Similarly, the recipient could specify that it would keep confidential any record obtained solely through the informal resolution process, as stated in proposed § 106.44(k)(3)(vii), unless such disclosure is required by law, for example under a subpoena.

A recipient might also clarify the consequences that would follow upon learning of any fraud by a party to an informal resolution agreement. For example, if a recipient learns that a party to an informal resolution agreement made a material misstatement of a fact, or made fraudulent representations, that another party relied upon in reaching the agreement, then the recipient could decide to void the agreement and resume the grievance procedure or pursue other actions against that defrauding party. Finally, proposed § 106.44(k)(3)(iii) would make explicit that the parties have the right to withdraw from the informal resolution process prior to agreeing to a resolution and that any party could initiate or resume the recipient's grievance procedures.

---

possibility to be clearly disclosed to the parties as part of the § 106.45(b)(9)(i) requirement in the final regulations to provide a written notice disclosing any consequences resulting from participating in the informal resolution process, including the records that will be maintained or could be shared." 85 FR at 30400-01. The proposed regulations would clarify the situations in which an informal resolution facilitator can serve as a witness.

These additional requirements provide important information to the parties so that they have a complete understanding of all aspects of the informal resolution process. The Department notes that informal resolution of a complaint under Title IX would not necessarily resolve a recipient's obligations under other Federal law (e.g., Title VII), State law, or other applicable rules or policies.

In addition, proposed § 106.44(k)(4) would require that the facilitator of the informal resolution process not be the same person as the investigator or decisionmaker in the recipient's grievance procedures. The Department proposes adding this provision to further protect against any improper access, consideration, disclosure, or other use of information obtained solely through the informal resolution process, or conflict of interest, in the event a party terminates informal resolution and the complaint proceeds to grievance procedures under proposed § 106.45, and if applicable proposed § 106.46.

*Potential terms that may be requested or offered in an informal resolution agreement.* The Department also proposes adding § 106.44(k)(5), which would provide examples of potential terms that may be requested or offered in an informal resolution process and included in an agreement. Consistent with the other changes discussed above, the Department's current view is that this added specificity would provide recipients with needed guidance about the contours of an informal resolution process. The proposed regulations would emphasize the voluntary nature of entering into an agreement as part of an informal resolution process and would also preserve a recipient's discretion and flexibility to allow for these terms. Finally, proposed § 106.44(k)(5)(ii) would incorporate language from the preamble to the 2020 amendments contemplating that an informal resolution agreement can include measures that would be considered remedies or disciplinary sanctions had the recipient determined that sex

242

discrimination occurred under the recipient's grievance procedures.  *See* 85 FR at 30401

("Informal resolutions may reach agreements between the parties, facilitated by the recipient,

that include [measures similar to supportive measures] but that also could include disciplinary

measures, while providing finality for both parties in terms of resolving allegations raised in a

formal complaint of sexual harassment.").

   F. Framework for Grievance Procedures for Complaints of Sex Discrimination

    1. Title IX Grievance Procedures

   Grievance procedures are a critical component of effective enforcement of Title IX's

prohibition on sex discrimination because they ensure that a recipient has a process in place for

investigating and resolving complaints of sex discrimination.  For this reason, since 1975, the

Title IX regulations have required a recipient to adopt and publish grievance procedures that

provide for the prompt and equitable resolution of complaints of sex discrimination.  *See* 34 CFR

106.8(c).  OCR has addressed how individual recipients effectively implement their Title IX

grievance procedures through decades of enforcement activities.  *See* U.S. Dep't of Educ., Office

for Civil Rights, Case Resolutions Regarding Sex Discrimination,

https://www2.ed.gov/about/offices/list/ocr/frontpage/caseresolutions/sex-cr.html.  In addition,

OCR has provided subregulatory guidance on its interpretation of the regulatory requirement.

*See, e.g.*, 2014 Q&A on Sexual Violence at 12-14 (describing appropriate elements of grievance

procedures that provide for the prompt and equitable resolution of complaints).

   OCR's interpretation of the requirement to provide prompt and equitable grievance

procedures has always been informed by the due process rights of the persons involved in a

public recipient's grievance procedures.  Although it does not enforce the Due Process Clause,

"[t]he Department, as an agency of the Federal government, is subject to the U.S. Constitution,

including the Fifth Amendment, and will not interpret Title IX to compel a recipient, whether public or private, to deprive a person of due process rights." 85 FR at 30051, n.226 (citing 2001 Revised Sexual Harassment Guidance at 22). And although the Due Process Clause does not apply to private recipients, the Department's proposed regulations, consistent with the 2020 amendments, require all recipients to adopt grievance procedures that provide for the fair resolution of complaints of sex discrimination. *Id.* at 30047 (adopting "procedures that ensure that Title IX is enforced consistent with both constitutional due process, and fundamental fairness, so that whether a student attends a public or private institution, the student has the benefit of a consistent, transparent grievance process with strong procedural protections regardless of whether the student is a complainant or respondent").

The Supreme Court and other Federal courts have recognized that procedural due process requirements depend on the circumstances of each particular case. *See Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands."); *Gorman v. Univ. of R.I.*, 837 F.2d 7, 12 (1st Cir. 1988) ("Due process, which may be said to mean fair procedure, is not a fixed or rigid concept, but, rather, is a flexible standard which varies depending upon the nature of the interest affected, and the circumstances of the deprivation."). As a flexible standard, what due process requires will vary based on several factors, including the type of institution involved and the nature of the potential sanction at issue. The Supreme Court has stated that in the context of public elementary schools and secondary schools, procedural due process requires, at a minimum, notice and a meaningful opportunity to be heard. *Goss v. Lopez*, 419 U.S. 565, 579 (1975) ("At the very minimum, therefore, students facing suspension and the consequent interference with a protected property interest must be given some kind of notice and afforded some kind of hearing."). In *Goss*, the

Court observed that the Due Process Clause may require additional procedures for more severe sanctions. *Id.* at 584 ("Longer suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures."). In the context of an elementary school or secondary school student "facing temporary suspension," *Goss* noted that due process entitles the student to "oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id.* at 581. The Supreme Court emphasized that "[t]here need be no delay between the time 'notice' is given and the time of the hearing," noting that "[i]n the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred." *Id.* at 582.

Federal appellate courts have generally determined that a public postsecondary institution's disciplinary proceedings are subject to procedural due process requirements. *See, e.g.*, *Doe v. Miami Univ.*, 882 F.3d 579, 600 (6th Cir. 2018) ("When a student faces the possibility of suspension, we have held that the minimum process a university must provide is notice of the charges, an explanation of the evidence against the student, and an opportunity to present his side of the story before an unbiased decision maker.") (citations omitted); *Doe v. Cummins*, 662 F. App'x 437, 442, 445, 451 (6th Cir. 2016) (determining that procedural due process applies to disciplinary action against a student even when the student was placed on disciplinary probation and required to write extra papers, but was not suspended); *Gorman*, 837 F.2d at 12 (holding that a student facing expulsion or suspension from a public educational institution is entitled to the protections of the Due Process Clause); *Rosenfeld v. Ketter*, 820 F.2d 38, 40 (2d Cir. 1987) (holding that sufficient due process was provided to a university student facing suspension when the student was given the opportunity "to characterize his conduct, put it

245

in the proper context and urge that University rules not be enforced against him" and stating that a formal hearing was not required); *Dixon v. Ala. State Bd. of Educ.*, 294 F.2d 150, 151 (5th Cir. 1961) (holding that procedural due process requires some form of notice and hearing before public college students may be expelled for misconduct and noting that the nature of the hearing may vary depending on the particular circumstances of the case); *Janati v. Univ. of Nev. Las Vegas Sch. of Dental Med.*, No. 2:15-cv-01367-APG-CWH, 2017 WL 1181571, at *4 (D. Nev. Mar. 29, 2017), *aff'd*, 738 F. App'x 438 (9th Cir. 2018) (holding that "[u]niversity students likely have some procedural due process rights in academic disciplinary proceedings," and explaining that the required process in the educational context includes the minimums of some kind of notice and some kind of hearing, but not a full judicial hearing). Courts have also made clear, however, that school disciplinary proceedings are not civil or criminal trials and, as such, the parties are not entitled to the same rights as parties in a civil trial or defendants in a criminal trial. *See, e.g.*, *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 88 (1978) ("A school is an academic institution, not a courtroom or administrative hearing room."); *Doe v. Univ. of Ky.*, 860 F.3d 365, 370 (6th Cir. 2017) (citing *Cummins*, 662 F. App'x at 446) (holding that "school disciplinary proceedings, while requiring some level of due process, need not reach the same level of protection that would be present in a criminal prosecution"); *Nash v. Auburn Univ.*, 812 F.2d 655, 664 (11th Cir. 1987) ("Due process requires that appellants have the right to respond, but their rights in the academic disciplinary process are not co-extensive with the rights of litigants in a civil trial or with those of defendants in a criminal trial.").

### a. The 2020 Amendments

The Department explained in the preamble to the 2020 amendments that although the Supreme Court has held that sexual harassment is a form of sex discrimination under Title IX

and set out the circumstances under which a recipient may be liable for monetary damages when a student or employee sexually harasses a student, "the Supreme Court's Title IX cases have not specified conditions under which a recipient must initiate disciplinary proceedings against a person accused of sexual harassment, or what procedures must apply in any such disciplinary proceedings." 85 FR at 30046. More specifically, the Department recognized that "the Supreme Court has not ruled on what constitutional due process looks like in the 'particular situation' of Title IX sexual harassment adjudications . . . " *Id.* at 30051 (footnote omitted). As a result, "Federal appellate courts have taken different approaches to which specific procedures are constitutionally required under the general proposition that due process in the educational discipline context requires some kind of notice and some kind of opportunity to be heard, and for private institutions not subject to constitutional requirements, which specific procedures are required to comport with fundamental fairness." *Id.*

The Department nonetheless articulated in the 2020 amendments its understanding of the significant role due process principles play in shaping fair grievance procedures and affirmed that its understanding was consistent with OCR's prior guidance that "the rights established under Title IX must be interpreted consistent with any federally guaranteed due process rights involved in a complaint proceeding" and "[p]rocedures that ensure the Title IX rights of the complainant, while at the same time according due process to both parties involved, will lead to sound and supportable decisions." *Id.* at 30047 n.192 (citing 2001 Revised Sexual Harassment Guidance at 22). Although the Department explained in the preamble to the 2020 amendments that "[t]he grievance process [for formal complaints of sexual harassment] prescribed in the final regulations [in § 106.45] is important for effective enforcement of Title IX and is consistent with constitutional due process and conceptions of fundamental fairness," it also recognized that

247

"constitutional due process does not require the specific procedures included in the § 106.45 grievance process [for formal complaints of sexual harassment]." *Id.* at 30053. The Department further explained that "each of the procedural requirements in § 106.45 is prescribed because the Department views the requirement as important to ensuring a fair process for both parties rooted in the fundamental due process principles of notice and meaningful opportunities to be heard." *Id.*

In adopting very specific requirements for grievance procedures for formal complaints of sexual harassment, the Department explained that it had "determined that the current regulatory reference to 'grievance procedures' that are 'prompt and equitable' does not adequately prescribe a consistent, fair, reliable grievance process for resolving allegations of Title IX sexual harassment." *Id.* at 30240. The Department stressed that it adopted these additional requirements for sexual harassment complaints to help recipients "respond meaningfully to allegations of sexual harassment (including sexual assault) on campuses, while also providing due process protections for both parties." *Id.* at 30048. It explained that "[t]he § 106.45 grievance process is designed for the particular 'practical matters' presented by allegations of sexual harassment in the educational context." *Id.* at 30053 (footnote omitted). The Department also asserted that the grievance procedure requirements it adopted for complaints of sexual harassment "build upon the foundation set forth in the Department's guidance, yet provide the additional clarity and instruction missing from the Department's guidance as to how recipients must provide for the needs of complainants, with strong procedural rights that ensure due process protections for both complainants and respondents." *Id.* at 30049. The Department further stated "[w]e believe that the procedures in the § 106.45 grievance process will ensure that recipients apply a fair, truth-seeking process that furthers the interests of complainants,

248

respondents, and recipients in accurately resolving sexual harassment allegations." *Id.*

      b.  Feedback from Stakeholders regarding the Grievance Procedures in

          Current § 106.45

Having had some experience with the implementation of the 2020 amendments, stakeholders representing elementary school and secondary school teachers, administrators, and professional staff, postsecondary institution administrators and faculty, students and parents, professional organizations, advocacy groups, and States Attorneys General stressed to OCR, in listening sessions and through the June 2021 Title IX Public Hearing, that the Department should revise the grievance procedures required under current § 106.45 to account for concerns and challenges that this implementation presented across these settings. To avoid confusion, the preamble discussion refers to the procedures set out in proposed §§ 106.45 and 106.46 as "grievance procedures," even though the preamble to the 2020 amendments generally refers to procedures required under current § 106.45 as a "grievance process."

*Elementary schools and secondary schools.* OCR received significant feedback from stakeholders related to the unique needs of elementary schools and secondary schools as well as requests to reduce some of the burdens the grievance procedures requirements imposed on these schools. These stakeholders said the 2020 amendments related to grievance procedures impeded instead of effectuated efforts to comply with Title IX. Based on their experiences attempting to comply with the 2020 amendments, elementary school and secondary school stakeholders overwhelmingly reported that the current regulations taken as a whole are unworkable for elementary schools and secondary schools.

Administrators at elementary schools and secondary schools described their struggle to implement the grievance procedures under the current regulations and expressed the need for

grievance procedures that would allow for more flexibility. For example, stakeholders shared that the grievance procedures should permit them to quickly separate children in response to some incidents of sex-based harassment, such as when administrators of elementary schools and secondary schools need to be able to immediately address certain behavior on the playground. Stakeholders also stressed the need for grievance procedures in that setting that allow schools to address possible sex discrimination early and proactively to promote student and campus safety. These stakeholders urged the Department to exempt elementary schools and secondary schools from the provisions in current § 106.45 that impose a lengthy timeline. These provisions include, for example, requiring a recipient to provide written notice to the parties of allegations potentially constituting sex-based harassment with sufficient time to prepare a response before any initial interview; providing written notice of the logistic details and purpose of all meetings, including interviews and hearings, with sufficient time to prepare to participate; and building in ten days for parties to respond to a summary of the evidence obtained as part of the investigation (current § 106.45(b)(2)(i)(B), (b)(5)(v), and (b)(5)(vi)). Stakeholders explained that these and other provisions prevent schools from handling incidents when they arise and significantly delay their ability to respond to sex-based harassment when it occurs.

OCR also received feedback from multiple stakeholders that a process that may have taken days under an elementary school or secondary school's previous grievance procedures now takes several months under the 2020 amendments because of these and other time-consuming requirements, including the need to create an investigative report for the parties' review and written response at least ten days prior to a hearing or other time of determination (current § 106.45(b)(5)(vii)). Other stakeholders urged the Department to establish different grievance procedures for elementary schools and secondary schools than those required for postsecondary

institutions, noting their view that the 2020 amendments were clearly focused on postsecondary institutions.

*Postsecondary institutions.* OCR also heard from postsecondary institution stakeholders that the procedures in current § 106.45 are overly prescriptive and burdensome in ways that impede their response to sexual harassment, similar to concerns raised regarding application of the procedures to elementary schools and secondary schools. These stakeholders objected to the 2020 amendments as setting out regulations that micromanaged disciplinary processes at postsecondary institutions, significantly limiting their ability to resolve sexual harassment allegations promptly and equitably through grievance procedures that function effectively in their educational environment. The Department also heard from stakeholders in 2022 in meetings held under Executive Order 12866, after the NPRM was submitted to OMB, that application of the grievance procedures as required by the 2020 amendments at some recipients extends the process for resolving complaints, to the detriment of all parties. Stakeholders also objected to certain provisions that they said, based on experience, had discouraged reporting of sexual harassment. For example, as noted in the discussion of proposed § 106.46(f)-(g), some postsecondary institutions described the live hearing and cross-examination requirements as too prescriptive and burdensome to apply effectively. They questioned the utility of live hearings, noting that much of the information elicited during a hearing relates to questions that were asked and answered during an investigation. Stakeholders reported to OCR that they had observed a reduction in complaints filed and greater reluctance to move forward with grievance procedures as a result of the live hearing and cross-examination requirements in the 2020 amendments.

*Employee-complainants and respondents.* OCR also heard from a variety of stakeholders about the negative effect of current § 106.45 on a recipient's ability to handle complaints of sex-

251

based harassment involving employees. Some of these stakeholders expressed general concern about the lack of clarity in the 2020 amendments on how Title VII interacts with Title IX in instances of employee-on-employee harassment allegations. Other stakeholders suggested that incidents of sex-based harassment involving employees as a complainant or respondent be removed in their entirety from the proposed Title IX regulations and instead handled by a recipient under its existing Title VII procedures, while still others suggested that the Title IX regulations that govern employee respondents be revised so that they are less prescriptive than the procedures required in current § 106.45. A number of stakeholders commented that applying the requirements in current § 106.45 to sexual harassment complaints involving an employee respondent is unworkable because they are overly and unnecessarily burdensome, noting that those requirements were designed with students as the primary focus. Some of these stakeholders expressed the view that some aspects of current § 106.45, specifically the live hearing with cross-examination requirement, make it difficult for recipients to address sexual harassment in situations where a complainant or witness declines to submit to cross-examination. These stakeholders expressed concern that in these situations, current § 106.45 has negatively impacted their handling of sexual harassment allegations involving their employees. Some stakeholders also voiced concerns that because the requirements of current § 106.45 apply to sexual harassment allegations involving all of a recipient's employees, including at-will employees, recipients may not discipline at-will employees for sexual misconduct in the same way that they can address other forms of misconduct by such employees.

Third-party complainants and respondents. OCR also heard from stakeholders that current § 106.45 exceeds the appropriate bounds of the procedural protections required to ensure fairness when applied to third-party complainants and respondents. One stakeholder suggested

that a recipient should not be required to implement highly prescriptive procedures prior to restricting campus access for a third-party visitor who the recipient determined had engaged in sexual harassment on campus. The stakeholder noted that it would be excessive to require, for example, a hearing with cross-examination before imposing such restrictions on a visitor.

*Additional concerns.* Finally, the current regulations include detailed grievance procedure requirements only for complaints of sexual harassment. OCR heard from stakeholders that they need guidance regarding what provisions are necessary to ensure the prompt and equitable resolution of complaints of sex discrimination other than sex-based harassment. Stakeholders asserted that sexual harassment should not be singled out, and asked the Department to adopt uniform standards for grievance procedures that apply to all complaints of sex discrimination.

   2. The Department's Proposed Revisions to Title IX's Grievance Procedure Requirements

      a. Overall Considerations and Framework

The Department has preliminarily determined that certain grievance procedure requirements are appropriate for, and necessary to effectuate, Title IX's nondiscrimination mandate with respect to all types of sex discrimination complaints at all types of recipients. In addition, the Department has preliminarily determined that certain additional procedural protections are appropriate for one particular subset of sex discrimination complaints—those concerning sex-based harassment involving at least one student at a postsecondary institution. The Department recognizes the concerns expressed by stakeholders that current § 106.45 may limit the ability of recipients across a wide range of settings and serving a large variety of students to respond promptly and effectively to sex-based harassment. The Department also

recognizes the importance of recipients having clarity about grievance procedures necessary to ensure full implementation of Title IX.  The requirement that a recipient adopt grievance procedures dates back to 1975 and has remained constant in the Department's Title IX regulations, including the 2020 amendments—it provides that a recipient must adopt and publish grievance procedures that provide for the prompt and equitable resolution of sex discrimination complaints.  34 CFR 106.8(c).  The Department's proposed regulations take into account both this longstanding requirement and the concerns expressed about the 2020 amendments, and would provide for appropriate procedural protections that account for the age, maturity, and level of independence of students in various educational settings, the particular contexts of employees and third parties, and the need to ensure that recipients have grievance procedures that provide for prompt and equitable resolution of sex discrimination complaints in their respective settings.

*Elementary schools and secondary schools*.  In light of the stakeholder concerns described above, the Department proposes that grievance procedures that apply to complaints of sex discrimination at elementary schools and secondary schools must account for the younger student population and unique context for students attending these schools, which operate educational environments that are distinct from those attended by postsecondary students.  In addition to compulsory attendance rules and the need for age-appropriate standards for classroom behavior, certain adults (i.e., parents, guardians, or other authorized legal representatives) have a legal right to be present and provide assistance to their student in Title IX grievance procedures in the elementary school and secondary school setting.  This legal authorization for an adult representative does not apply to most students at postsecondary institutions.  Elementary schools and secondary schools also work with children for whom a lengthy process is less effective at preventing the recurrence of sex discrimination.  Younger students are less likely to appreciate

254

the causal connection between prior behavior and any subsequent discipline imposed after lengthy grievance procedures, possibly rendering the delayed discipline less effective at deterring similar conduct in the future.

*Postsecondary institutions.*  The Department recognizes that postsecondary institutions operate education environments that are distinct from elementary schools and secondary schools and serve a student population who are older, more likely to be living apart from a parent or guardian, and generally function with more independence from parents or guardians.  The Department also recognizes that parents or guardians do not typically have legal authority to exercise rights on behalf of a postsecondary student, by virtue of the student's age, in a way that they, or another authorized legal representative, would have for a student in elementary school or secondary school, under proposed § 106.6(g).  Students at postsecondary institutions are therefore required to self-advocate in grievance procedures related to alleged sex-based harassment that involves their own conduct or experiences, but also may have more need, especially postsecondary students who are newly independent, for additional procedural protections and for someone to assist them in an advisory capacity as set out in proposed § 106.46(c)(2)(ii) and (e)(2).  Also, in contrast to employees, who may have an employment relationship with the recipient of indeterminate length and who have protection in relation to sex-based harassment under Title VII as well as Title IX, students at postsecondary institutions typically are enrolled for a relatively short, finite term and do not have the protection of Title VII in their capacity as students.  Therefore, the Department tentatively recognizes the additional procedural protections in proposed § 106.46, as uniquely accounting for the needs of postsecondary students in that setting.

255

*Employee-complainants and employee respondents.* With respect to sex discrimination complaints involving a recipient's employees, the Department tentatively recognizes the need for grievance procedures to ensure that a recipient can respond to reports of employee-on-employee sex-based harassment and other forms of sex discrimination involving employees promptly and equitably as required by Title IX, and also comply with its obligations under Title VII, using a framework that is suited to these types of complaints. This includes complaints involving temporary, part-time, full-time, at-will, unionized, tenured, and student-employees, each category of whom may be entitled to unique grievance procedures based on their respective employment designations. The requirement that the recipient's grievance procedures must be prompt and equitable means, in this context, that a recipient's grievance procedures under Title IX must function well alongside the procedures it uses to implement Title VII and, to the extent not inconsistent, other laws and collective bargaining agreements that govern the employment relationship for complaints of sex-based harassment involving employees. The Department also recognizes that a recipient is not necessarily required by Title VII to apply all of the requirements in current or proposed § 106.45 to sex-based harassment complaints involving employees. Section 106.6(f), to which the Department does not propose any changes, makes clear that the requirements under the Title IX regulations do not alleviate a recipient's obligations to its employees under Title VII. The requirements for grievance procedures for complaints of sex discrimination in proposed § 106.45, and if applicable proposed § 106.46, are limited to Title IX and would not apply to any actions a recipient would take as part of its Title VII obligations to its employees. In addition, under the proposed regulations, a recipient would retain the ability to place an employee on administrative leave under proposed § 106.44(i) during the pendency of grievance procedures in proposed § 106.45, and if applicable proposed § 106.46.

*Third-party complainants and respondents.* The Department's tentative view is that to effectuate Title IX's objective to operate its education programs or activities free from sex discrimination, a recipient's grievance procedures would need to afford appropriate procedural protections to ensure the prompt and equitable resolution of complaints, even when applied to third parties. But the grievance procedures would not need to afford all the same procedural protections that are afforded when a party is a student at a postsecondary institution, in light of the different relationship the recipient has to a third party. The Department expects that, unlike a student, a third party may not have an ongoing connection to a recipient or any party to a complaint of sex discrimination. In addition, a third party's participation or attempted participation in the recipient's education program or activity is likely to be much more limited than that of a student or employee. Therefore, the Department recognizes that these differences in the third party's relationship to the recipient should inform the requirements a recipient must meet when responding to information about conduct by or involving a third party in its education program or activity that may constitute sex discrimination under Title IX. The Department views the requirements in proposed § 106.45 as accounting for these considerations.

The Department also proposes adding § 106.45(a)(2)(iv) to expressly state that third parties who are participating or attempting to participate in the recipient's education program or activity may make complaints of sex discrimination under proposed § 106.45.

*Other recipients.* In addition to elementary schools, secondary schools, and postsecondary institutions, Title IX applies to numerous other recipients such as State education agencies, State vocational rehabilitation agencies, public libraries, museums, and a range of other entities that receive Federal financial assistance from the Department. There is wide variation in the number and population of students served, the number of employees, and the administrative

structure within these additional categories of recipients, yet all are required to provide an education program or activity that is free from sex discrimination. The Department views the requirements for grievance procedures proposed under § 106.45 as affording adequate flexibility while providing the minimal requirements to ensure an equitable grievance procedure with respect to all sex discrimination complaints at these types of recipients.

*All claims of sex discrimination.* The Department also recognizes that the grievance procedure requirements in current § 106.45 do not apply to all types of sex discrimination complaints, and instead are limited to complaints of sexual harassment. As a result, stakeholders representing a range of recipients, including elementary schools and secondary schools, as well as postsecondary institutions and professional associations, reported to OCR that after the 2020 amendments, they lacked guidance on what grievance procedures are required for all other types of sex discrimination complaints, beyond the basic requirement that their grievance procedures must be prompt and equitable. *See* 34 CFR 106.8(c). OCR previously provided recipients subregulatory guidance on the basic elements of prompt and equitable grievance procedures; however, the Department rescinded that guidance and did not replace it with regulations. As noted in the discussion of stakeholders' concerns in Feedback from Stakeholders Regarding the Grievance Procedures in Current § 106.45 (Section II.F.1.b), stakeholders requested the Department restore guidance on grievance procedures for all forms of sex discrimination to ensure that recipients know how to satisfy their obligations under Title IX and how to address sex discrimination complaints other than sex-based harassment complaints. The Department notes concerns identified through OCR's enforcement experience that not all recipients apply prompt and equitable grievance procedures to address sex discrimination complaints at their schools outside the context of sex-based harassment. OCR also has observed that some

recipients make ad hoc decisions about complaints of different treatment and retaliation under Title IX, often without incorporating appropriate legal standards or involving the recipient's Title IX Coordinator, and thereby not ensuring that complainants and respondents are treated equitably. OCR has found in some cases that allegations of different treatment in grading were handled solely through application of a recipient's grading policies and not analyzed as sex discrimination even when a complainant alleges that the grade they received was the result of sex discrimination. This failure to involve the Title IX Coordinator means that complainants alleging sex-based grade disparities may be subjected to inconsistent processes for resolution of their complaints, which may or may not include the recipient's grievance procedures. It also may prevent the Title IX Coordinator from identifying and addressing a pattern of discrimination in the recipient's education program or activity. The Department is also aware of situations through OCR's enforcement efforts in which recipients did not apply grievance procedures that comply with Title IX to investigate complaints of sex discrimination in athletics, but rather applied general conduct codes promulgated by specific sports teams. Such codes do not focus on sex discrimination, do not provide for measures to preserve parties' access to the recipient's education program or activity or to protect against retaliation, and do not contain many of the requirements and safeguards of the Title IX grievance procedures, with the result that such cases were not promptly investigated and addressed.

*Proposed framework.* In light of these considerations, including this feedback from stakeholders and OCR's enforcement experience, a portion of which is described above, the Department reviewed the requirements in current § 106.45 to assess whether they are necessary to provide the parties with prompt and equitable grievance procedures that are designed to ensure a fair and reliable process. The Department also considered the need to adopt a framework for

259

the grievance procedures that a recipient must follow when responding to *all* complaints of sex discrimination in light of the recipient's obligations under Title IX to operate its education program or activity free from sex discrimination, not just sexual harassment.

The Department explained in the preamble to the 2020 amendments that the nature of the protections needed "in the 'particular situation' of elementary and secondary schools may differ from protections necessitated by the 'particular situation' of postsecondary institutions." 85 FR at 30052 (footnotes omitted). The Department maintains this view, and also currently believes that the specific procedures necessary to afford prompt and equitable grievance procedures that are designed to ensure a fair and reliable process for sex discrimination complaints will differ based on the nature of the allegations (e.g., sex-based harassment or other forms of sex discrimination, such as failure to provide equitable athletic opportunities or pregnancy discrimination) and the unique characteristics of the individuals involved (e.g., age, level of independence, relationship to the recipient). The Department reaffirms its commitment to promulgating regulations that provide clear requirements for prompt and equitable grievance procedures that afford a fair and reliable process consistent with principles of due process and the rights of all involved. The Department's view is that clear requirements for grievance procedures for all complaints of sex discrimination, not only sexual harassment complaints, are needed to provide recipients necessary clarity on how to afford an equitable process to resolve all sex discrimination complaints.

The Department proposes a comprehensive framework for grievance procedures that builds upon the grievance procedures required under the 2020 amendments, with certain modifications to address the concerns noted above, including to make that framework easier to follow and implement and to preserve discretion for recipients to meet their Title IX obligations

through procedures that will be effective in their educational environment. Under the Department's framework, proposed § 106.45 contains specific requirements for grievance procedures that would apply to all complaints of sex discrimination at any recipient and a new proposed § 106.46 contains additional requirements that would apply only to complaints of sex-based harassment involving a student complainant or student respondent at a postsecondary institution. The provisions the Department proposes limiting to grievance procedures required under § 106.46 include several requirements from current § 106.45—live hearings (which would be optional), equitable access to an investigation report that summarizes the relevant and not otherwise impermissible evidence in advance of a live hearing if a hearing is provided, and cross-examination if a live hearing is conducted—that stakeholders reported were unworkable and unhelpful for elementary schools and secondary schools in light of the unique educational needs of students in that setting. The requirements the Department proposes under the new framework would seek to clarify basic elements that are essential to a reliable and equitable process for resolving complaints of sex discrimination. The benefit of specifying these elements is to ensure that all recipients have information about what is necessary to satisfy the regulations' longstanding requirement of "prompt and equitable grievance procedures."

The proposed regulations at §§ 106.44, 106.45, and 106.46 would clarify the obligations of a recipient to respond promptly and effectively to information and complaints about sex discrimination in its education program or activity in a way that ensures full implementation of Title IX. The Department invites comments on whether there are additional requirements that should be included in, or removed from, the current and proposed regulations to assist recipients in meeting their obligation under Title IX to provide an educational environment free from discrimination based on sex. The Department also seeks comment on whether and how any of

the proposed grievance procedures (or any proposed additions from commenters) should apply differently to various subgroups of complainants or respondents, such as students or employees, or students at varying educational levels.

b. Proposed § 106.45

The Department's tentative view is that the provisions in proposed § 106.45 would establish the basic elements of a fair process, set clear guideposts for prompt and equitable grievance procedures, and ensure transparent and reliable outcomes for recipients, students, employees, and others participating or attempting to participate in a recipient's education program or activity. These grievance procedure requirements would apply to all complaints of sex discrimination, including sex-based harassment, at all recipients. The provisions in proposed § 106.45(b) include basic requirements that are overarching and apply at all or multiple stages of a recipient's grievance procedures. Some of these basic requirements are already included, in whole or in part, in current § 106.45, such as equitable treatment of complainants and respondents and a duty to ensure that any Title IX Coordinator, investigator, or decisionmaker involved in a recipient's grievance procedures does not have a conflict of interest or bias for or against an individual complainant or respondent or against complainants or respondents generally. The Department also proposes requiring grievance procedures for all sex discrimination complaints to include provisions regarding notice to the parties of allegations of sex discrimination (proposed § 106.45(c)), reasonably prompt timeframes for the major stages of a recipient's grievance procedures (proposed § 106.45(b)(4)), rules regarding what evidence is allowed in a recipient's grievance procedures and how a decisionmaker must weigh and assess the evidence (proposed § 106.45(b)(6)-(7), (h)(1)), and provisions to ensure an adequate, reliable, and impartial investigation of sex discrimination complaints (proposed § 106.45(f)).

262

These provisions build on the requirements of current § 106.45, which the Department explained included specific requirements to afford complainants and respondents in complaints of sexual harassment "clear, strong procedural rights and protections that foster a fair process leading to reliable outcomes," and to provide "consistency, predictability, and transparency as to a recipient's obligations." *Id.* at 30213; *see also id.* at 30381 ("[T]he Department has included in the § 106.45 grievance process those procedural protections the Department has determined necessary to serve the critical interests of creating a consistent, fair process promoting reliable outcomes."). The Department continues to believe that all parties and recipients require clear guidance for grievance procedures that lead to fair and reliable outcomes. The Department's current view is that the requirements in proposed § 106.45, which it adopted under the 2020 amendments to afford fair and reliable outcomes in sexual harassment complaints under current § 106.45, and which it proposes modifying in these proposed regulations, are also an effective means of ensuring that grievance procedures for all types of sex discrimination complaints are equitable and reliable for all parties.

Through its enforcement work, OCR has also recognized that reasonably prompt timeframes and an adequate, reliable, impartial investigation, among other requirements in proposed § 106.45, are essential to ensuring a prompt and equitable resolution for all sex discrimination complaints, including sex-based harassment. Because these requirements are fundamental to a fair process, the Department anticipates that many schools already incorporate them in their grievance procedures for sex discrimination complaints.

c. Proposed § 106.46

The Department's current position is that the requirements in proposed § 106.46, which are incorporated from current § 106.45 with modifications as explained in greater detail in the

263

discussion of individual sections in § 106.46, would apply only to complaints of sex-based harassment involving a student complainant or student respondent at a postsecondary institution. These requirements afford protections that are appropriate to the age, maturity, independence, needs, and context of students at postsecondary institutions. The Department limited some of the provisions in the 2020 amendments to postsecondary institutions for similar reasons, noting that "postsecondary institutions present a different situation than elementary and secondary schools because, for instance, most students in elementary and secondary schools tend to be under the age of majority such that certain procedural rights generally cannot be exercised effectively (even by a parent acting on behalf of a minor)." *Id.* at 30052 (footnotes omitted). Further, due to their age and independence from parents and guardians, postsecondary institutions generally expect students to self-advocate as part of their educational experience, including by participating independently of parents, guardians, or other authorized representatives in disciplinary proceedings. Consistent with the 2020 amendments, the Department aims to adopt requirements for grievance procedures that "accomplish the objective of a consistent, predictable Title IX grievance process while respecting the fact that elementary and secondary schools differ from postsecondary institutions." *Id.*

The Department also recognizes that postsecondary students are often newly independent and still learning to self-advocate. To account for this, proposed § 106.46 would retain certain provisions from current § 106.45 that afford postsecondary students greater protections. The Department's tentative view is that the additional requirements in proposed § 106.46 are necessary for students at postsecondary institutions who would not be entitled to have a parent, guardian, or other authorized legal representative present at meetings or proceedings, unlike complainants and respondents in complaints of sex-based harassment at elementary schools and

secondary schools.  The Department further submits that any delay associated with implementing the additional requirements of proposed § 106.46 would not limit a postsecondary student's ability to understand the consequences of their behavior in the same manner as it could for elementary school and secondary school students.  Such delays may limit an elementary school or secondary school's ability to prevent the recurrence of sex discrimination consistent with Title IX, which is of particular concern in the context of full-time, full-week school attendance requirements in elementary school and secondary school settings.

The Department's current view is that the additional requirements of proposed § 106.46 are also not necessary for others, including employees and third parties, who, as noted in the discussion of concerns raised by stakeholders in Feedback from Stakeholders Regarding the Grievance Procedures in Current § 106.45 (Section II.F.1.b), have different relationships with postsecondary institutions and in the case of employees, may be afforded additional rights or protections under Title VII or other laws, agreements, or commitments by the recipient. Afffording additional procedural requirements for postsecondary students is also consistent with the Department's understanding of due process as a "'flexible' concept dictated by the demands of a 'particular situation,'" which in the case of postsecondary institutions addressing complaints of sex-based harassment involving a student complainant or respondent "may dictate different procedures than what might be appropriate in other situations." *Id.*

The Department also currently believes that the provisions in proposed § 106.46 for sex-based harassment complaints involving students at the postsecondary level may not be necessary to ensure an equitable process for other types of sex discrimination complaints at the postsecondary level, and could have the unintended consequence of impeding effective enforcement of Title IX for such complaints by adding requirements that may unnecessarily

265

delay a recipient's prompt response to possible sex discrimination. At this time, the Department views these additional provisions as necessary to address sex-based harassment complaints, which allege conduct that is highly personal and often of a different nature than other types of alleged sex discrimination. Sex-based harassment complaints may require greater participation by a complainant and respondent in grievance procedures than other complaints of sex discrimination would require. In fact, not all sex discrimination complaints will involve two parties in a contested factual dispute where credibility determinations may play a critical role. In many sex discrimination complaints, such as complaints alleging unequal treatment of student athletes based on sex, there will not be two parties whose conduct and credibility are closely scrutinized. Instead, these cases, which are often highly contested, require analysis of available data and information regarding the specific factors that apply to equal opportunity in athletics. Similarly, alleged different treatment in grading or in providing opportunities to benefit from specific programs and activities, will require a close analysis of grading rubrics, opportunities offered, and other evidence, if any, of impermissible sex-based different treatment. Yet sex-based harassment complaints subject to the provisions of proposed § 106.46 could, and often would involve a student respondent who faces a potential disciplinary sanction as a consequence of the grievance procedures. The Department submits that the risk of disciplinary sanction of a student respondent necessitates affording additional procedural protections to ensure an equitable outcome. These additional provisions would not be necessary for other complaints of sex discrimination that often would not involve a student respondent facing similar consequences.

To account for all of these differences, under the Department's proposed framework, a postsecondary institution responding to complaints of sex-based harassment involving a student complainant or student respondent would apply the provisions in proposed § 106.46 in addition

to the provisions under proposed § 106.45. The additional requirements in proposed § 106.46 for complaints of sex-based harassment would address the specialized needs of postsecondary student complainants and postsecondary student respondents, and, when applied together with the requirements in proposed § 106.45, would afford such students equitable grievance procedures tailored to their circumstances. The Department also proposes several revisions to the provisions from current § 106.45 that are incorporated into proposed § 106.46 to address concerns raised by stakeholders; these changes are explained in greater detail in the discussion of individual sections in proposed § 106.46.

The Department includes the following additional procedural protections for sex-based harassment complaints involving at least one student at a postsecondary institution in proposed § 106.46:

- Provisions governing student employees (proposed § 106.46(b));

- Written notice requirements, including written notice of the allegations as well as written notice of information related to the parties' specific rights under the recipient's grievance procedures (proposed § 106.46(c));

- Additional requirements for complaint dismissal (proposed § 106.46(d)) and investigation (proposed § 106.46(e)) such as the right to an advisor during the investigation (proposed § 106.46(e)(2)), discretion to allow expert witnesses (proposed § 106.46(e)(4)), and equitable access to relevant and not otherwise impermissible evidence (proposed § 106.46(e)(6));

- A process for evaluating allegations and assessing credibility, including a process for evaluating and limiting questions during any hearing (proposed § 106.46(f));

- The option to provide for a live hearing (proposed § 106.46(g)); and

267

- Written notice related to the parties' rights and responsibilities in a recipient's informal resolution process under proposed § 106.44(k), if one is offered (proposed § 106.46(j)).

    Several of the provisions proposed in § 106.46 preserve the requirement that a postsecondary institution provide specified information to the parties in writing. These provisions would require a postsecondary institution in complaints of sex-based harassment involving a student complainant or student respondent to provide written notice of the allegations and information about the recipient's grievance procedures (proposed § 106.46(c)); obtain the complainant's voluntary withdrawal of a complaint in writing before dismissing a complaint per the complainant's request and provide the parties written notice of a dismissal and the basis for the dismissal (proposed § 106.46(d)); provide written notice explaining any delay in the timeframe to investigate the complaint (proposed § 106.46(e)(5)); provide a written determination of whether sex-based harassment occurred (proposed § 106.46(h)); and comply with the requirements for appeals in writing (proposed § 106.46(i)(3)). It is the Department's current view that preserving the requirement that a postsecondary institution comply with these provisions in writing is appropriate in light of the particular circumstances of postsecondary students, and will support postsecondary institutions' fulfillment of their obligation under Title IX to provide an education program or activity free from sex discrimination.

    The Department notes that, as set out in proposed § 106.45(i), the proposed framework for all grievance procedures under proposed § 106.45 would allow a recipient to incorporate any of the additional provisions required in grievance procedures under proposed § 106.46 to grievance procedures under proposed § 106.45, provided they apply equally to the parties.

G. Grievance Procedures for the Prompt and Equitable Resolution of Complaints of
   Sex Discrimination

Section 106.45 Grievance Procedures for the Prompt and Equitable Resolution of Complaints of
Sex Discrimination

*Current regulations:* Section 106.45 addresses the required grievance procedures for formal
complaints of sexual harassment.  The specific requirements of current § 106.45 are explained in
greater detail in the discussion of each subsection.

Current § 106.8(c) requires a recipient to adopt and publish grievance procedures that
provide for the prompt and equitable resolution of student and employee complaints alleging any
action that would be prohibited by the regulations and a grievance process that complies with
current § 106.45 for "formal complaints" as defined in current § 106.30.  The current regulations
do not include specific requirements for grievance procedures for complaints of sex
discrimination other than formal complaints of sexual harassment.

*Proposed regulations:* As explained in the discussion of the Framework for Grievance
Procedures for Complaints of Sex Discrimination (Section II.F), proposed § 106.45 contains
specific requirements for grievance procedures that would apply to all complaints of sex
discrimination at any recipient and a new proposed § 106.46 contains additional requirements
that would apply only to complaints of sex-based harassment involving a student complainant or
student respondent at a postsecondary institution.

Proposed § 106.45(a)(1) would clarify that for complaints of sex discrimination, a
recipient must have prompt and equitable grievance procedures in writing, with provisions that
incorporate the requirements of proposed § 106.45.  Proposed § 106.45(a)(2) would set out who
can make a complaint of sex discrimination requesting that the recipient initiate its grievance

procedures.  Proposed § 106.45(b) would provide a number of basic requirements that a

recipient's grievance procedures for complaints of sex discrimination under proposed § 106.45

would have to include.  In addition to the basic requirements, proposed § 106.45 would also

include the following provisions: notice of allegations (proposed § 106.45(c)); dismissal of a

complaint (proposed § 106.45(d)); consolidation of complaints (proposed § 106.45(e));

complaint investigation (proposed § 106.45(f)); evaluating allegations and assessing credibility

(proposed § 106.45(g)); and determination of whether sex discrimination occurred (proposed

§ 106.45(h)).  Proposed § 106.45(i) would also permit a recipient to adopt additional provisions,

as long as they apply equally to the parties, and proposed § 106.45(j) would permit a recipient to

resolve a complaint through its informal resolution process.  Finally, proposed § 106.45(k) would

provide that, for complaints alleging sex-based harassment, the grievance procedures must

describe the range of supportive measure available and describe (or list) the possible disciplinary

sanctions and remedies.

Additional detailed explanation of the requirements of proposed § 106.45 is provided in

the discussion of each subsection, including proposed changes from current § 106.45.

Section 106.45(a) Discrimination on the basis of sex

*Current regulations:* Section 106.45(a) states that a recipient's treatment of a complainant or a

respondent in response to a formal complaint of sexual harassment may constitute discrimination

on the basis of sex under Title IX.

*Proposed regulations:* The Department proposes removing this provision from the regulations in

its entirety.

*Reasons:* After reevaluating this issue, the Department proposes removing current § 106.45(a) as

redundant because current § 106.31(a) and (b)(4) already prohibit different treatment based on

sex, making this section unnecessary. In addition, it is appropriate to remove this provision because formal complaints would no longer be required under the proposed regulations.

The Department explained in the preamble to the 2020 amendments that current § 106.45(a) merely declares that actions toward a complainant or respondent may constitute sex discrimination. 85 FR at 30238-39. The Department also stated that this provision emphasizes that a recipient must not treat a party differently on the basis of sex and that the Department disagreed that the provision creates a new protected class of respondents because it provides protections from sex discrimination to all persons. *Id.*

After considering the issue and reweighing the facts and circumstances, the Department's tentative view is that § 106.31(a), both in its current form and with the revisions included in the proposed regulations, and current § 106.31(b)(4) are adequate to address the concerns that current § 106.45(a) was drafted to address. In particular, current § 106.31(a) and proposed § 106.31(a)(1) prohibit sex "discrimination under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient," 34 CFR 106.31(a), and § 106.31(b)(4) prohibits a recipient from "subject[ing] any person to separate or different rules of behavior, sanctions, or other treatment" on the basis of sex. *Id.* at 106.31(b)(4). The Department interprets these provisions to require a recipient to carry out its grievance procedures to address complaints of sex discrimination, including sex-based harassment, in a nondiscriminatory manner and to prohibit a recipient from treating any party differently based on sex. The Department maintains its view that discrimination based on sex against a party in the context of a grievance procedure would violate Title IX.

271

Section 106.45(a)(1) General

*Current regulations:* Section 106.45(b) states that for the purpose of addressing formal complaints of sexual harassment, a recipient's grievance process must comply with the requirements of this section. The current regulations do not contain a provision stating whether a recipient should be considered a respondent when the complaint alleges that the recipient's policy or practice discriminates based on sex.

*Proposed regulations:* Proposed § 106.45(a)(1) would clarify that for purposes of addressing complaints of sex discrimination, a recipient's prompt and equitable grievance procedures must be in writing and must include provisions that incorporate the requirements of proposed § 106.45. It would further clarify that the requirements in proposed § 106.45 related to a respondent apply only to sex discrimination complaints alleging that a person violated the recipient's prohibition on sex discrimination and explain that when a sex discrimination complaint alleges that a recipient's policy or practice discriminates based on sex, the recipient is not considered a respondent. For additional requirements regarding the application of this provision in grievance procedures for sex-based harassment complaints involving postsecondary students, see the discussion of proposed § 106.46(a).

*Reasons:* Proposed § 106.45(a)(1) would maintain the general principle from current § 106.45(b) that a recipient must comply with the requirements in the grievance procedures for complaints but would broaden the provision to apply to complaints of all forms of sex discrimination, not just sexual harassment, to conform with other changes in the proposed regulations. The Department proposes removing references to formal complaints of sexual harassment and applying proposed § 106.45(a)(1) to all complaints of sex discrimination to account for other proposed changes to the regulations.

The Department recognizes that not all complaints of sex discrimination involve active participation by a complainant and respondent in the grievance procedures and therefore, some provisions in proposed § 106.45 would not be applicable for all complaints of sex discrimination. This is true for complaints alleging that the recipient's own policy or procedures discriminate based on sex (e.g., when a complaint alleges that the recipient's policies discriminate on the basis of sex in the provision of extracurricular activities). For example, the requirement to follow grievance procedures before imposing disciplinary sanctions on a respondent (proposed § 106.45(b)(11)) would not apply when the alleged sex discrimination involves a policy or practice of the recipient but does not allege sex discrimination by an individual student, employee, or third-party respondent. Similarly, a recipient would not be afforded the right to appeal the dismissal of a sex discrimination complaint against it (proposed § 106.45(d)(3)), nor would an informal resolution process be available in sex discrimination complaints that do not involve a student, employee, or third-party respondent (proposed § 106.45(j)). The Department's current view is that because the provisions in proposed § 106.45 related to a respondent would not apply to all complaints of sex discrimination, it is necessary to include language clarifying this in proposed § 106.45(a)(1). Clarifying that a recipient is not a respondent is also consistent with how the Department proposes defining a "respondent" in proposed § 106.2 as a person alleged to have violated the recipient's prohibition on sex discrimination.

Section 106.45(a)(2) Complaint

*Current regulations:* The current regulations do not contain a related provision but state in § 106.44(b) that all recipients must follow a grievance process that complies with § 106.45 in response to a formal complaint of sexual harassment. The current regulations define a "formal complaint" in § 106.30(a) as a document filed by a complainant or signed by the Title IX

Coordinator alleging sexual harassment against a respondent and requesting that the recipient investigate the allegation of sexual harassment. The current regulations also state that at the time of filing a formal complaint, a complainant must be participating in or attempting to participate in the education program or activity of the recipient with which the formal complaint is filed. In addition, the current regulations in § 106.8(c) require a recipient to adopt and publish grievance procedures that provide for the prompt and equitable resolution of student and employee complaints of sex discrimination.

*Proposed regulations:* The Department proposes adding § 106.45(a)(2), which would state that the following persons have a right to make a complaint of sex discrimination, including complaints of sex-based harassment, requesting that the recipient initiate its grievance procedures: (i) a complainant; (ii) a person who has a right to make a complaint on behalf of a complainant under § 106.6(g); or (iii) the Title IX Coordinator. In addition, any student or employee, or any third party participating or attempting to participate in the recipient's education program or activity when the alleged sex discrimination occurred would have a right to make a complaint of sex discrimination other than sex-based harassment.

*Reasons:* Any person seeking to request that a recipient initiate its grievance procedures under proposed § 106.45, and if applicable proposed § 106.46, must make a complaint of sex discrimination, including sex-based harassment. In light of the unique circumstances of sex-based harassment, the Department proposes different requirements for who may make a complaint of sex-based harassment and who may make a complaint of sex discrimination other than sex-based harassment.

Proposed § 106.45(a)(2)(i)-(iii) would allow a "complainant," defined in proposed § 106.2 as a person alleged to have been subjected to sex discrimination; anyone who has a right

to make a complaint on a complainant's behalf under proposed § 106.6(g); or the Title IX Coordinator to make a complaint of sex discrimination, including sex-based harassment. Under the proposed definition of "complainant" in § 106.2, a third-party complainant who wants to make a complaint of sex discrimination, including sex-based harassment, must be participating or attempting to participate in the recipient's education program or activity when the alleged sex discrimination occurred. For example, if a student enrolled in University A is taking a class at University B through an agreement between the universities and is subjected to sex-based harassment by a student enrolled in University B while attending class at University B, the student would be permitted to make a complaint of sex-based harassment through University B's grievance procedures because the student is a third party participating in University B's education program or activity when the sex-based harassment occurred. Or, for example, if a student who plays for School A's basketball team is subjected to sex-based harassment by a student enrolled in School B while at School B to play in a basketball game, the student would be permitted to make a complaint of sex-based harassment through School B's grievance procedures because the student is a third party participating in School B's education program or activity when the sex-based harassment occurred. The Department notes that Student A could also choose to make a complaint through School A's grievance procedures because the basketball team is part of School A's education program or activity, but School A would not necessarily have authority to require the respondent student from School B to participate in School A's grievance procedures or to impose disciplinary sanctions on the respondent from School B.

Proposed § 106.45(a)(2)(i)-(iii) would generally be consistent with the requirements under the current regulations regarding who can file a formal complaint of sexual harassment,

with some minor revisions consistent with other proposed changes to the regulations. For additional information regarding these proposed changes see the discussion of the proposed definitions of "complaint" and "complainant" (§ 106.2).

Proposed § 106.45(a)(2)(i)-(iii) would allow a complainant, a person who has a right to make a complaint on behalf of a complainant under proposed § 106.6(g), and the Title IX Coordinator to make a complaint of sex-based harassment. Under proposed § 106.45(a)(2)(iv), however, the Department would limit the ability of non-complainants, including other students and employees, and third parties who are participating or attempting to participate in the recipient's education program or activity to make complaints of sex-based harassment, while allowing them to make complaints of sex discrimination other than sex-based harassment. The Department proposes this limitation because it recognizes that sex-based harassment complaints may involve allegations about deeply personal aspects of the complainant's life, and that a complainant should therefore have the opportunity to choose whether or not to request that the recipient initiate its grievance procedures, except in the limited circumstances in which a Title IX Coordinator would be obligated to initiate the recipient's grievance procedures if the complainant chose not to, as explained in the discussion of proposed § 106.44(f)(5). During the June 2021 Title IX Public Hearing, commenters requested that the Department provide flexibility to complainants to determine whether to participate in the recipient's grievance procedures given these considerations. The Department's proposed regulations recognize the importance of complainant autonomy and also the requirement under Title IX that a recipient operate an education program or activity free from sex discrimination, including sex-based harassment. Therefore, although the Department's proposal would limit who can make a complaint of sex-based harassment to the individuals identified in proposed § 106.45(a)(2)(i)-(iii), other

individuals, including witnesses to sex-based harassment, may inform the Title IX Coordinator of any potential sex-based harassment.  Upon receiving notification about conduct that may constitute sex-based harassment from someone other than the individuals identified in proposed § 106.45(a)(2)(i)-(iii), the recipient must require its Title IX Coordinator to take steps consistent with proposed § 106.44(f).

The Department recognizes that in some instances, particularly in situations in which systemic sex discrimination is being alleged, the person who may have information regarding the discrimination may not themselves be subjected to the sex discrimination at issue.  For example, the boys' soccer coach may have information about disparities between boys' and girls' athletic facilities, including locker rooms, that the girls' soccer coach may not be able to access.  Allowing the boys' soccer coach to make a complaint of sex discrimination brings this concern to the recipient's attention and serves the recipient's and Department's interest in ensuring a nondiscriminatory educational environment based on sex.  The Department's proposed approach is informed by its interest in allowing students and employees to make a complaint about sex discrimination in the education program or activity to the recipient and in permitting the recipient to focus its resources on complaints made by persons who have a relationship with the recipient.  The Department thus proposes to allow only those third parties who are participating or attempting to participate in a recipient's education program or activity at the time of the alleged discrimination to make a complaint.  This proposed limitation on third parties is generally consistent with the Department's reasoning in the preamble to the 2020 amendments.  85 FR at 30198 (explaining that the requirement that the complainant must be participating or attempting to participate in the recipient's education program or activity "prevents recipients from being legally obligated to investigate allegations made by complainants who have no relationship with

the recipient").

Section 106.45(b) Basic requirements for grievance procedures

*Current regulations:* Section 106.45(b) requires all recipients to use a grievance process for formal complaints of sexual harassment that complies with all of the requirements of § 106.45. It also states that any provisions, rules, or practices other than those required by this section that a recipient adopts as part of its grievance process for handling "formal complaints" of "sexual harassment" as defined in current § 106.30 must apply equally to both parties.

*Proposed regulations:* Proposed § 106.45(b) contains the introductory language to the basic requirements for the grievance procedures. The seven provisions in proposed § 106.45(b) would include basic requirements that are overarching and apply at all or multiple stages of a recipient's grievance procedures. As explained in the individual discussions of proposed § 106.45(b)(1)-(7), some of these basic requirements are already included, in whole or in part, in current § 106.45. The Department also proposes moving the language in current § 106.45(b) regarding additional provisions of a recipient's grievance procedures to proposed § 106.45(i).

*Reasons:* The Department's proposed revisions are necessary to be consistent with other proposed changes to the regulations.

Section 106.45(b)(1) Treat complainants and respondents equitably

*Current regulations:* Section 106.45(b)(1)(i) requires a recipient to treat complainants and respondents equitably by providing remedies to a complainant when a determination of responsibility for sexual harassment has been made against the respondent, and by following a grievance process that complies with this section before the imposition of any disciplinary sanctions or other actions that are not "supportive measures" as defined in current § 106.30, against a respondent. Remedies must be designed to restore or preserve a complainant's or other

278

person's access to the recipient's education program or activity. Remedies may include the same individualized services described in current § 106.30 as supportive measures; however, remedies need not be non-disciplinary or non-punitive and need not avoid burdening the respondent.

*Proposed regulations:* The Department proposes maintaining the requirement in the current regulations to treat complainants and respondents equitably but moving it to proposed § 106.45(b)(1) and applying it to all complaints of sex discrimination, not just formal complaints of sexual harassment. The Department proposes moving the language regarding remedies for the complainant to proposed § 106.45(h)(3) and the language regarding following grievance procedures that comply with this section before the imposition of any disciplinary sanctions against a respondent to proposed § 106.45(h)(4). In addition, the Department proposes moving the language describing what remedies may include to the definition of "remedies" in § 106.2.

*Reasons:* The proposed revision to require a recipient to treat complainants and respondents equitably in its grievance procedures for complaints of sex discrimination as opposed to limiting this requirement only to grievance procedures for complaints of sexual harassment is necessary to effectuate Title IX and make the regulatory text consistent with other changes proposed by the Department regarding a recipient's grievance procedures as explained in the discussion of the Framework for Grievance Procedures for Complaints of Sex Discrimination (Section II.F). The proposed addition of a definition of "remedies" in proposed § 106.2 would render unnecessary certain portions of the explanation of remedies in current § 106.45(b)(1)(i), including the examples of remedies in that provision.

Although the Department continues to believe that a recipient must provide remedies to a complainant and follow grievance procedures that comply with the requirements in proposed § 106.45, and if applicable proposed § 106.46, before imposing disciplinary sanctions on a

respondent, the Department proposes moving these requirements to different provisions rather than linking them to the requirement to treat complainants and respondents equitably. The purpose of this proposed change is to clarify that the requirement to treat complainants and respondents equitably is not limited to these two requirements. One factor for a recipient to consider in ensuring complainants and respondents are treated equitably is whether the parties, witnesses, and other participants can engage fully in the grievance procedures. In particular, to ensure equal opportunity for persons with disabilities, it may be necessary for a recipient to provide auxiliary aids and services for effective communication and make reasonable modifications to policies, practices, and procedures. In addition, it may be necessary for a recipient to provide language assistance services, such as translations or interpretation, for persons with limited English proficiency.

Section 106.45(b)(2) Conflicts of Interest/Bias

*Current regulations:* Section 106.45(b)(1)(iii) prohibits a Title IX Coordinator, investigator, decisionmaker, or anyone who facilitates an informal resolution process from having a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent. Section 106.45(b)(1)(iii) also outlines several specific training requirements for persons filling those roles. Current § 106.45(b)(7)(i) states that the decisionmaker cannot be the same person as the Title IX Coordinator or the investigator(s).

*Proposed regulations:* Consistent with the current regulations, proposed § 106.45(b)(2) would require that any person designated as a Title IX Coordinator, investigator, or decisionmaker not have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent. As further explained in the discussion of proposed § 106.44(k), the Department proposes moving the requirement that the facilitator of an informal

resolution process not have a conflict of interest or bias from current § 106.45(b)(1)(iii) to proposed § 106.44(k), as part of the section of the proposed regulations that describes a recipient's obligations related to informal resolution.

As further explained in the discussion of proposed § 106.8(d), the Department also proposes revising and moving training requirements from current § 106.45(b)(1)(iii) to a consolidated training provision at proposed § 106.8(d). The Department also proposes eliminating the categorical prohibition on the same person serving as both decisionmaker and Title IX Coordinator or investigator.

*Reasons:* To ensure that the grievance procedures are equitable, a recipient must ensure that the procedures are administered impartially. The Department therefore proposes retaining—in proposed § 106.45(b)(2)—the requirement that any person designated as a Title IX Coordinator, investigator, or decisionmaker must not have a conflict of interest or bias regarding complainants or respondents generally or regarding a particular complainant or respondent.

The Department proposes moving the requirement that the facilitator of the informal resolution process be free from bias and conflict of interest from current § 106.45(b)(1)(iii) to proposed § 106.44(k). The Department proposes this technical change to align with the relocation of the informal resolution process from § 106.45(b)(9) in the current regulations to § 106.44(k) in the proposed regulations.

The proposed regulations would continue to require the Title IX Coordinator, investigators, and decisionmakers to receive training; however, the Department proposes consolidating those training requirements in proposed § 106.8(d) rather than in the section on grievance procedures as the current regulations do.

Proposed § 106.45(b)(2) would also eliminate the prohibition on the decisionmaker being

the same person as the Title IX Coordinator or investigator.  Before the 2020 amendments, some recipients implemented a single-investigator model in which one person or one team both investigated a complaint and made findings of fact as to whether a respondent violated the recipient's prohibition on sexual harassment.  This model, then in use by a variety of recipients across the country, was specifically prohibited under the 2020 amendments.  In 2020, the Department said it was concerned that combining the investigative and adjudicative functions in a single entity raised an unnecessary risk of bias that unjustly impacts one or both parties in Title IX grievance procedures.  85 FR at 30367-69.  Specifically, the Department stated that placing these varied responsibilities in the hands of a single individual or team risks those involved improperly relying on information gleaned during one role to affect decisions made while performing a different role, and that separating the roles of investigation from adjudication protects the parties by making it more likely that the fact-based determination regarding responsibility is based on an objective evaluation of relevant evidence.  *Id.* at 30369-70.  The Department stated any concern about decisionmakers not having the same level of training or expertise as investigators would be addressed by the regulation's "robust training and impartiality requirements for all individuals serving as Title IX Coordinators, investigators, or decision-makers," that it would "effectively promote the reliability of fact-finding and the overall fairness and accuracy of the grievance process."  *Id*. at 30368

Through listening sessions and the June 2021 Title IX Public Hearing, OCR learned that the requirement that a recipient have separate staff members to handle investigation and adjudication is burdensome for some schools in a way that undermined these schools' ability to ensure that their education programs or activities are free from sex discrimination under Title IX, particularly those that are under-resourced or that do not have a large number of staff.

Stakeholders also explained that having an additional staff member who is unfamiliar with the allegations and evidence serve as decisionmaker after the conclusion of an investigation results in a prolonged Title IX process, negatively impacting the students who are participating in that process. Conversely, these stakeholders argued that using the single-investigator model permitted recipients to investigate and resolve complaints expeditiously, drawing from a small pool of trained experts, and would allow a recipient to more easily and effectively deliver the highest level of expertise available for assessing allegations and evidence. In light of these comments, the Department is concerned that the prohibition on the single-investigator model sometimes worked to the detriment of the quality of recipients' grievance procedures and their decisionmaking about the allegations and relevant facts.

In addition, OCR learned through the June 2021 Title IX Public Hearing that prior to the 2020 amendments, employing a single investigator from outside the recipient's community, under the guidance of the recipient's Title IX Coordinator, enabled some postsecondary institutions to have a highly trained expert who could conduct an equitable investigative process without perceived institutional bias. Some recipients also expressed their belief that, through this model, they saw more students seeking institutional support and resolution of complaints.

For small or under-resourced recipients, OCR also heard that permitting a single-investigator model would help ensure prompt and equitable grievance procedures while reducing the number of personnel a recipient would need for each investigation and resolution. If a recipient has a small school or campus community, a requirement that increases the number of employees involved in the grievance procedures also increases the likelihood of the parties having to interact with those employees in the regular course of their participation in the recipient's education program or activity. OCR heard about students who had changed majors or

avoided courses, clubs and organizations, and athletic opportunities to avoid interacting with employees in those areas who had also administered their grievance procedures related to sexual harassment allegations.  Stakeholders who provided these comments explained that some students had found the procedures painful, and some had concerns about those employees knowing traumatic information about them.

After reweighing the facts and circumstances, including but not limited to the feedback received through listening sessions and the June 2021 Title IX Public Hearing, it is the Department's current view that the single-investigator model, when implemented in conjunction with the other proposed measures designed to ensure equitable treatment of the parties as required throughout proposed § 106.45, and if applicable proposed § 106.46, can offer recipients an effective option for resolving complaints of sex discrimination in a way that ensures fair treatment of all parties and enables compliance with Title IX.  In conducting an investigation and reaching a determination, the recipient's responsibility is to gather and review evidence with neutrality and without bias or favor toward any party.  That is, the recipient is not in the role of prosecutor seeking to prove a violation of its policy.  Rather, the recipient's role is to ensure that its education program or activity is free of unlawful sex discrimination, a role that does not create an inherent bias or conflict of interest in favor of one party or another.  The Department's earlier stated concerns about the reliability of fact-finding and overall fairness and accuracy of the grievance procedures will still be effectively addressed by the other proposed requirements which clarify a recipient's obligations and make it easier to achieve those obligations, and these protections would now apply to all complaints of sex discrimination, not just those that allege sex-based harassment.  Among other obligations, a recipient must: treat the complainant and respondent equitably (proposed §§ 106.44(f)(1), 106.45(b)(1)); provide robust training and anti-

284

bias requirements (proposed §§ 106.8(d), 106.45(b)(2)); objectively evaluate all relevant

evidence (proposed § 106.45(b)(6)); review all evidence gathered to determine which evidence is

relevant and what is impermissible (proposed § 106.45(f)(3)); provide each party with a

description of evidence that is relevant and not otherwise impermissible (proposed

§ 106.45(f)(4)); provide the right to appeal a complaint dismissal (proposed § 106.45(d)); and, if

additional provisions are adopted as part of its grievance procedures, apply those provisions

equally to the parties (proposed § 106.45(i)).  These provisions would reinforce each other in

protecting the overall fairness and accuracy of the grievance procedures.

In conducting an investigation and reaching a determination, the recipient's responsibility

is to gather and review evidence with neutrality and without bias or favor toward any party.  That

is, the recipient is not in the role of prosecutor seeking to prove a violation of its policy.  Rather,

the recipient's role is to ensure that its education program or activity is free of unlawful sex

discrimination, a role that does not create an inherent bias or conflict of interest in favor of one

party or another.

The Department is aware that, prior to August 2020, some recipients used a single

investigator or team of investigators to investigate complaints of sex-based harassment and make

determinations whether sex-based harassment occurred.  The Department invites comments on

recipients' experiences using that model to comply with Title IX and the steps taken, if any, to

ensure adequate, reliable, and impartial investigation and resolution of complaints, including

equitable treatment of the parties and reliable grievance procedures that are free from bias.  The

Department also invites comments on these issues from persons who were parties or served as an

advisor to a party to a complaint that was investigated and resolved by a recipient using a single

investigator model.

Section 106.45(b)(3) Presumption that the respondent is not responsible for the alleged conduct until a determination is made at the conclusion of the grievance procedures.

*Current regulations:* Section 106.45(b)(1)(iv) requires a recipient to include a presumption that the respondent is not responsible for the alleged conduct until a determination regarding responsibility is made at the conclusion of the grievance process for formal complaints of sexual harassment.

*Proposed regulations:* The Department proposes maintaining this provision with minor revisions, including relocating the provision to proposed § 106.45(b)(3) and applying the provision to complaints of sex discrimination, not just sexual harassment.

*Reasons:* The proposed revisions are necessary to make the regulatory text consistent with the Department's proposed changes to apply the grievance procedures described in proposed § 106.45 to all forms of sex discrimination, including sex-based harassment, as explained in the discussion of the Overall Considerations and Framework (Section II.F.2.a). The Department also notes that proposed § 106.45(b)(3) would not apply to a sex discrimination complaint that does not allege that a person violated the recipient's prohibition on sex discrimination because in those complaints there would not be a respondent. Nevertheless, in such cases the Department would not presume that a recipient accused of sex discrimination through its policy or practice operated its program or activity in a discriminatory manner until a determination whether sex discrimination occurred is made at the conclusion of the recipient's grievance procedures for complaints of sex discrimination.

Section 106.45(b)(4) Timeframes

*Current regulations:* Section § 106.45(b)(1)(v) states that, with respect to a recipient's grievance process for formal complaints of sexual harassment, the recipient must include reasonably

286

prompt timeframes for conclusion of the grievance process, including reasonably prompt time frames for filing and resolving appeals and informal resolution processes if the recipient offers informal resolution processes, and a process that allows for the temporary delay of the grievance process or the limited extension of timeframes for good cause with written notice to the complainant and the respondent of the delay or extension and the reasons for the action. Good cause may include considerations such as the absence of a party, a party's advisor, or a witness; concurrent law enforcement activity; or the need for language assistance or accommodation of disabilities.

*Proposed regulations:* The Department proposes revising this provision to state that a recipient must establish reasonably prompt timeframes for the major stages of the grievance procedures, including a process that allows for the reasonable extension of timeframes on a case-by-case basis for good cause with notice to the parties that includes the reason for the delay. The Department also proposes providing examples of types of major stages and using "parties" instead of "complainant" and "respondent." The Department proposes removing the examples of good cause. Finally, the Department proposes moving the revised language of this provision to proposed § 106.45(b)(4). For additional requirements regarding the application of this provision in grievance procedures for sex-based harassment complaints involving postsecondary students, see the discussion of proposed § 106.46(e)(5).

*Reasons:* In the preamble to the 2020 amendments, the Department explained that recipients should retain flexibility to designate time frames that are reasonably prompt, and stated that what is "reasonable" is a "decision made in the context of a recipient's purpose of providing education programs or activities free from sex discrimination, thus requiring recipients to designate time frames taking into account the importance to students of resolving grievance processes so that

287

students may focus their attention on participating in education programs or activities," 85 FR at 30272. The Department added that a recipient must balance this consideration "with the need for recipients to conduct grievance processes fairly in a manner that reaches reliable outcomes, meeting the requirements of § 106.45, in deciding what time frames to include as 'reasonably prompt' in a recipient's grievance process for formal complaints of sexual harassment under Title IX." *Id.* Although the Department supports the rationale of current § 106.45(b)(1)(v), it proposes making minor revisions to the provision to simplify the regulatory language and better align it with other sections of the Title IX regulations and the Department's Clery Act regulations. In particular, the Clery Act regulations at 34 CFR 668.46(k)(3)(i)(A) require a proceeding that both is "[c]ompleted within reasonably prompt timeframes" designated by the postsecondary institution's policy and includes "a process that allows for the extension of timeframes for good cause with written notice to the accuser and the accused of the delay and the reason for the delay." Proposed § 106.45(b)(4) uses similar language. Allowing a recipient to use the same standard for different types of Title IX grievance procedures, and a standard that is largely similar to that required for postsecondary institutions under the Clery Act, would reduce administrative burden for all recipients and, in particular, postsecondary institutions.

To increase clarity, proposed § 106.45(b)(4) would require a recipient to establish timeframes for the major stages of the grievance procedures rather than only for the conclusion of the grievance process as in the current provision. Requiring a recipient to establish timeframes for the major stages of its grievance procedures would help parties understand the approximate length of each stage of the recipient's process, while the current provision requires only that a recipient alert parties to a timeframe for the completion of the overall process. Also, to assist recipients in understanding what a major stage is, the Department proposes providing

288

examples in § 106.45(b)(4) such as evaluation (i.e., the recipient's determination of whether to dismiss or investigate a complaint of sex discrimination), investigation, determination, and appeal, if any.

The Department also proposes deleting the examples of good cause for extending the recipient's timeframe and adding a requirement to consider extensions on a case-by-case basis. After reviewing these examples, the Department is concerned that their inclusion in the regulations may have inadvertently suggested to recipients that extensions were mandatory in each of those situations—regardless of whether they were requested by the parties or whether extensions were warranted in the particular situation—which may have slowed down overall investigation and resolution of complaints. The Department continues to believe that good cause may include, for example, considerations such as the absence of a party, a party's advisor, or a witness, or a variety of other situations. In proposed § 106.45(b)(4), the Department would remove the examples from the regulatory text to help clarify that the need to extend timeframes must be considered on a case-by-case basis. Recipients may be able to address many of these circumstances in a way that can avoid the need for an extension. For example, a witness who is unavailable in person may nevertheless be available through videoconference. Likewise, a recipient may require a party to choose an advisor who has appropriate availability, or to select another advisor with sufficient availability if their current advisor's availability is very limited, to enable the grievance procedures to proceed promptly and equitably. With respect to the need for language assistance or reasonable modifications, the Department anticipates that a recipient should ordinarily be expected to address these needs within its established timeframes. For example, a recipient should be prepared to provide a sign language or foreign language interpreter from the outset if needed for a party or witness to participate in the grievance

procedures. However, when the reasonable modification a party requests is itself an extension of time (for example, additional time for an individual with ADHD who requires additional time to review or respond to allegations), it may be appropriate for the recipient to extend time on this basis. In any event, a recipient should bear in mind that although proposed § 106.45(b)(4) would provide flexibility to accommodate the need for extensions, the recipient remains obligated to ensure that its overall grievance procedures are prompt and equitable to comply with proposed § 106.45, and if applicable proposed § 106.46.

In addition, the Department proposes revising § 106.45(b)(4) to state that a recipient must provide notice of an extension to the parties rather than to "the complainant and the respondent." This change would make clear that in cases in which there are multiple complainants or respondents (for example, if several complaints are consolidated), a recipient must provide notice of extensions to all parties. The Department also proposes changing the term "grievance process" to the term "grievance procedures" to be consistent with language used throughout proposed §§ 106.44, 106.45, and 106.46, including the heading of this subpart.

Section 106.45(b)(5) Reasonable limitations on sharing of information

*Current regulations:* Section 106.45(b)(5)(iii) prohibits a recipient from restricting the ability of either party to discuss the allegations under investigation or to gather and present relevant evidence.

*Proposed regulations:* Proposed § 106.45(b)(5) states that a recipient must take reasonable steps to protect the privacy of the parties and witnesses during the pendency of a recipient's grievance procedures. These steps to protect privacy must not restrict the parties' ability to obtain and present evidence, including by speaking to witnesses, subject to proposed § 106.71; to consult with a family member, confidential resource, or advisor; to prepare for a hearing, if one is

290

offered; or otherwise to defend their interests.  For additional requirements regarding the application of this provision in grievance procedures for sex-based harassment complaints involving postsecondary students, see the discussion of proposed § 106.46(e)(6)(iii).

*Reasons:* The current regulations, at § 106.45(b)(5)(iii), state that a recipient must not restrict either party's ability to discuss the allegations under investigation or to gather and present relevant evidence.  The Department proposes moving this requirement to proposed § 106.45(b)(5) and modifying this provision in several ways.  Under proposed § 106.45(b)(5), the Department would require a recipient to take reasonable steps—within specified limits—to protect the privacy of the parties and witnesses while the grievance procedures are ongoing.

First, the Department proposes revising the current regulations that prohibit a recipient from restricting in any way the parties' ability to discuss the allegations under investigation. Proposed § 106.45(b)(5) would instead require a recipient to take reasonable steps to protect privacy; however, proposed § 106.45(b)(5) would also continue to protect the parties' ability to discuss the allegations by imposing limitations on the types of reasonable steps that a recipient would be able to take to protect privacy.  Under proposed § 106.45(b)(5), a recipient would not be permitted to restrict the parties' ability to obtain and present evidence, including by speaking to witnesses.  Likewise, a recipient would not be permitted to restrict the parties' ability to speak with a family member, confidential resource, or advisor.  A recipient would also not be permitted to take steps to protect privacy that would restrict the parties' ability to prepare for a hearing (if one is offered) or to otherwise defend their interests (e.g., restricting the parties' ability to speak with providers of disability-related services or language access services).

In the preamble to the 2020 amendments, the Department concluded that a recipient should not restrict the right of its students and employees to discuss the allegations under

Case 3:21-cv-00308-CEA-DCP   Document 83-1   Filed 06/27/22   Page 292 of 701   PageID #: 1525

investigation.  In reaching this conclusion, the Department highlighted the importance of allowing parties "to seek advice and support outside the recipient's provision of supportive measures," and the "ability to discuss the allegation under investigation where the party intends to, for example, criticize the recipient's handling of the investigation or approach to Title IX generally."  85 FR at 30295.  The Department determined that a fair grievance process required that "both parties have every opportunity to fully, meaningfully participate by locating evidence that furthers the party's interests and by confiding in others to receive emotional support and for other personally expressive purposes," and that such benefits outweighed the risks of harm identified by stakeholders.  *Id.* at 30296.

During the June 2021 Title IX Public Hearing, stakeholders expressed concerns regarding the Department's prohibition on any restrictions on the parties' ability to discuss the allegations and to gather relevant evidence, emphasizing that parties need protection from slander and social retaliation, that some students use social media to harass and shame the parties, and that the potential consequences of harassment based on students' participation in the recipient's Title IX process and related allegations are serious, including attempted suicide.  One commenter expressed during the June 2021 Title IX Public Hearing that schools should not prohibit parties from discussing their cases with others since such discussions may be necessary for gathering evidence, but schools should stop that information from being used to retaliate.  A group of stakeholders urged the Department through a listening session to permit reasonable limitations on the sharing of information to protect students and prevent the spread of sensitive information that would undermine fair proceedings, as long as these limitations do not prejudice the ability of the parties to collect evidence, speak to witnesses, consult with an advisor, or prepare for a hearing.  These stakeholders asked the Department to make clear that it will not sanction schools

that take reasonable steps to protect privacy or require parties to keep information confidential.

Upon considering the issue and reweighing the facts and circumstances, including views expressed by a wide array of stakeholders in listening sessions and in connection with the June 2021 Title IX Public Hearing, the Department proposes modifying the current regulations to better address these concerns. Through proposed § 106.45(b)(5), the Department would take account of both the parties' need to disclose information to certain individuals and the harms of overbroad disclosure. Proposed § 106.45(b)(5) would enable a recipient to take steps to prevent the harms repeatedly raised by stakeholders, while also respecting the Department's objectives as discussed in the preamble to the 2020 amendments.

Proposed § 106.45(b)(5) would protect the ability of the parties to gather evidence and to confide in others and would address concerns about the chilling effect on reporting and potential interference with the integrity of the grievance procedures associated with widespread information sharing. Under proposed § 106.45(b)(5), the Department would require a recipient to take reasonable steps to protect the privacy of the parties and witnesses during the pendency of the grievance procedures. In doing so, proposed § 106.45(b)(5) would fulfill the purpose of enabling a recipient to take steps that are responsive to its educational environment and its interest in preserving the fairness and integrity of its grievance procedures. Unrestricted disclosures of sensitive information could threaten the fairness of the process by deterring parties or witnesses from participating, negatively affecting the reliability of witness testimony, facilitating retaliatory harassment, and other potential harms. Even if the parties, witnesses, and others participating do not disclose sensitive information, the fear that such information might be disclosed could affect those individuals' willingness to participate fully in the process. Proposed § 106.45(b)(5) would not permit a recipient to prohibit parties from criticizing the recipient's

293

handling of the grievance procedures; however, the provision would allow a recipient to take reasonable steps to protect the privacy of the parties and witnesses during the pendency of the grievance procedures.

The proposed regulations would also include protections against witness intimidation and retaliatory disclosures of information as part of the general prohibition on retaliation under current and proposed § 106.71. Proposed § 106.45(b)(5) would also further protect against the harmful effects of improper disclosures by requiring a recipient to take proactive steps to protect privacy while the grievance procedures are ongoing. A party's intimidation of a witness or a party's improper disclosure of information to a witness could compromise the fairness of the grievance procedures. Whereas current and proposed § 106.71 would allow, as appropriate, subsequent disciplinary action for a party who engages in this type of retaliatory conduct, proposed § 106.45(b)(5) would focus on the preventive steps that a recipient would need to take as a means of safeguarding the fairness of the process and the reliability of the outcome. In addition, proposed § 106.45(b)(5) would not apply after the conclusion of the grievance procedures, yet the protections of current and proposed § 106.71 would remain in effect.

Proposed § 106.45(b)(5) would cabin the discretion that a recipient has in taking these reasonable steps to protect privacy, however, including by clarifying that any steps must not restrict the parties' ability to obtain and present evidence. Similarly, to ensure the fairness of the process, proposed § 106.45(b)(5) would prohibit the recipient from taking any steps to protect privacy that restrict the parties' ability to consult with an advisor, prepare for a hearing, or otherwise defend their interests consistent with current § 106.45(b)(5)(iv) and (6). In addition, consistent with the Department's previous acknowledgment that the grievance process is "challenging, difficult, and stressful to navigate," 85 FR at 30305, proposed § 106.45(b)(5)

would protect the parties' ability to speak with family members or confidential resources about the process. Moreover, nothing in proposed § 106.45(b)(5) would prohibit a recipient from allowing the parties to consult with individuals beyond those listed in § 106.45(b)(5). Finally, proposed § 106.45(b)(5) would protect the parties' ability to speak with witnesses, subject to the requirement in proposed § 106.71 that a recipient prohibit intimidation, threats, coercion, or discrimination against any individual, including witnesses, for the purpose of interfering with any right under Title IX. A recipient's obligations under proposed § 106.71 are explained in more detail in the discussion of that proposed provision.

The Department reiterates that students, employees, and third parties retain their First Amendment rights, and the Department's proposed regulations would not infringe on these rights. The Department further notes that current § 106.6(d), to which the Department is not proposing any changes, states that nothing in the Title IX regulations "requires a recipient to . . . [r]estrict any rights that would otherwise be protected from government action by the First Amendment of the U.S. Constitution." 34 CFR 106.6(d). Accordingly, when taking reasonable steps to protect the privacy of the parties and witnesses, a recipient must be mindful of the rights protected by the First Amendment, when relevant.

Section 106.45(b)(6) Objective evaluation of all relevant evidence and 106.45(b)(7) Exclusion of impermissible evidence

*Current regulations:* Section 106.45(b)(1)(ii) requires a recipient to objectively evaluate all relevant evidence, including both inculpatory and exculpatory evidence. In addition, current § 106.45(b)(1)(ii) prohibits recipients from making credibility determinations based on a person's status as a complainant, respondent, or witness.

The current regulations also address in several different provisions certain types of

evidence that cannot be used or are not relevant in the grievance procedures. Current

§ 106.45(b)(1)(x) prohibits the use of questions or evidence that constitute, or seek disclosure of,

information protected under a legally recognized privilege unless that privilege has been waived

by the person holding the privilege. In addition, current § 106.45(b)(5)(i) prohibits a recipient

from accessing, considering, disclosing, or otherwise using a party's treatment records made or

maintained by recognized professionals, paraprofessionals, or assistants to those professionals

acting in those specified capacities unless the recipient obtains voluntary, written consent of that

party for use in the recipient's grievance procedures as defined in current § 106.45. Further,

current § 106.45(b)(6)(i)-(ii) state that "[q]uestions and evidence about the complainant's sexual

predisposition or prior sexual behavior are not relevant" unless questions and evidence about the

complainant's prior sexual behavior are offered to prove that someone other than the respondent

committed the alleged conduct or to prove consent, if the questions and evidence pertain to

specific incidents of the complainant's prior sexual behavior.

*Proposed regulations:* In proposed § 106.45(b)(6), the Department would retain the requirement

that a recipient objectively evaluate all relevant evidence, including both inculpatory and

exculpatory evidence, and the requirement that credibility determinations must not be based on a

person's status as a complainant, respondent, or witness. The Department proposes making a

minor change to this provision by incorporating a cross-reference to the definition of "relevant"

in proposed § 106.2. The Department also proposes moving and clarifying the three categories

of impermissible evidence, which appear in various provisions in the current regulations, to

proposed § 106.45(b)(7). Under proposed § 106.45(b)(7), a recipient must exclude these three

types of evidence, and questions seeking these types of evidence, as impermissible (i.e., must not

be accessed, considered, disclosed, or otherwise used), regardless of whether they are relevant—

except as specified in proposed § 106.45(b)(7).

The requirement that evidence must be relevant and the prohibition on the use of three types of evidence (except as specified in proposed § 106.45(b)(7)) would apply to the grievance procedures under proposed § 106.45, and if applicable proposed § 106.46. Thus, the prohibitions on the use of evidence, and questions seeking that evidence, would apply to all recipients in all sex discrimination grievance procedures.

Under the first category in proposed § 106.45(b)(7)(i), a recipient could not access, consider, disclose, or otherwise use in its grievance procedures evidence that is protected under a privilege as recognized by Federal or State law (e.g., attorney-client privilege)—unless the person holding the privilege has waived it voluntarily in a manner that is permitted in the recipient's jurisdiction. In light of this proposed addition, the Department proposes removing current § 106.45(b)(1)(x), which similarly prohibits the use of evidence or questions that seek evidence protected under a legally recognized privilege.

Under the second category in proposed § 106.45(b)(7)(ii), a party's records that are made or maintained by a physician, psychologist, or other recognized professional or paraprofessional in connection with the provision of treatment to the party must not be accessed, considered, disclosed, or otherwise used in the grievance procedures without that party's consent for the records to be used in the recipient's grievance procedures. Any consent must be voluntary and in writing. Current § 106.45(b)(5)(i) prohibits a recipient from accessing, considering, disclosing, or otherwise using these treatment records. The proposed regulations would move this prohibition to proposed § 106.45(b)(7)(ii).

Under the third category in proposed § 106.45(b)(7)(iii), evidence related to the complainant's prior sexual conduct must not be accessed, considered, disclosed, or otherwise

297

used in a recipient's grievance procedures unless it is offered to prove that someone other than the respondent committed the alleged conduct or to prove consent with evidence concerning specific incidents of the complainant's prior sexual conduct with the respondent. The proposed regulations would clarify that the fact that prior consensual sexual conduct between the complainant and respondent has occurred does not demonstrate or imply the complainant's consent to the alleged sex-based harassment or preclude a determination that sex-based harassment occurred. The consideration of evidence related to the complainant's sexual interests would also be impermissible. Because the proposed regulations incorporate these prohibitions into proposed § 106.45(b)(7)(iii), the Department proposes removing descriptions of these same prohibitions from current § 106.45(b)(6)(i)-(ii), which address hearings and written questions. Instead, the Department proposes including cross-references to proposed § 106.45(b)(7) within proposed § 106.46(f), which would address credibility assessments and hearings.

*Reasons:* In proposed § 106.45(b)(6), the Department proposes inserting a cross-reference to proposed § 106.2 to make clear that a recipient should apply the regulatory definition of "relevant" at proposed § 106.2 when evaluating the relevance of evidence. As noted in the discussion of the definition of "relevant" in proposed § 106.2, the Department proposes adding this definition to assist recipients in determining which evidence is relevant and to help parties understand these determinations.

Proposed § 106.45(b)(7) identifies three categories of evidence that a recipient must not access, consider, disclose, or otherwise use, or permit questions seeking, in a recipient's grievance procedures required by the proposed regulations regardless of whether evidence in these categories is relevant. The current regulations create similar protections against any use of this evidence but do so in several different provisions. The Department proposes moving these

298

provisions to § 106.45(b)(7) for ease of reference and to make clear to recipients and others that these types of evidence would be excluded from the general requirement that the recipient conduct an objective evaluation of all relevant evidence. The Department is also proposing minor changes to the three categories of evidence that may not be used regardless of relevance.

Under the first category, the Department proposes prohibiting any use of evidence or questions seeking evidence that is protected under a privilege as recognized by Federal or State law. Current § 106.45(b)(1)(x) prohibits the use of questions or evidence protected under a legally recognized privilege unless that privilege has been waived by the person holding the privilege. The Department remains committed to protecting this information, and proposes moving this protection of privileged information to § 106.45(b)(7)(i), without changing the nature or scope of this protection. Current § 106.45(b)(1)(x) prohibits a recipient from using information protected by a legally recognized privilege without specifying the source(s) for this privilege. To avoid any confusion, the Department proposes clarifying that the source of that legally recognized privilege would be a privilege that arises under Federal or State law. In the proposed regulations, the Department would clarify that this evidence may be used in the recipient's grievance procedures only if the person holding the privilege has waived the privilege voluntarily and in a manner permitted in the recipient's jurisdiction. Consequently, the Department proposes removing current § 106.45(b)(1)(x), which prohibits the use of evidence or questions that seek evidence protected under a legally recognized privilege, as duplicative of proposed § 106.45(b)(7)(i).

Under the second category, the Department proposes prohibiting any use of, or questions seeking, a party's records that are made or maintained by a physician, psychologist, or other recognized professional or paraprofessional in connection with the provision of treatment to the

299

party absent the party's voluntary, written consent. The current regulations prohibit the use of these records at § 106.45(b)(5)(i). The Department proposes reaffirming the protection of treatment records by moving it to the list of impermissible types of evidence at § 106.45(b)(7)(ii).

The Department also proposes technical edits to this provision. Specifically, the Department proposes removing the term "psychiatrist" from the list of professions because a psychiatrist is covered by the term "physician." The Department also proposes removing the phrase "requiring the professional or paraprofessional to be acting or assisting in the professional or paraprofessional's capacity" because this is covered by the requirement that the records be made in connection with the provision of treatment. The protection of treatment records under proposed § 106.45(b)(7)(ii) would encompass treatment records that are made and maintained by the recipient (such as when a physician is employed by the recipient), as well as treatment records that are made and maintained by external providers. Even when a party affirmatively provides treatment records to the recipient, proposed § 106.45(b)(7)(ii) would still require the recipient to obtain voluntary, written consent to use those records in the recipient's grievance procedures.

Current § 106.45(b)(5)(i) references the FERPA regulations, at 34 CFR 99.3, and requires the recipient to obtain consent of a parent related to the party's records for a party that is not an eligible student under those regulations. The FERPA regulations define an eligible student as "a student who has reached 18 years of age or is attending an institution of postsecondary education." 34 CFR 99.3. The Department proposes removing this reference because the proposed regulations would make clear, in proposed § 106.6(g), that nothing in these regulations would limit the rights of a parent, guardian, or otherwise authorized legal representative to act on

300

behalf of their child, including in a recipient's grievance procedures. When evaluating evidence that is relevant but may be impermissible, the Department expects recipients to be mindful of the rights of parents, guardians, and other authorized legal representatives under proposed § 106.6(g). These rights may include the authority to provide consent on behalf of a minor student for the use of such evidence.

Under the third category, the Department proposes clarifying in § 106.45(b)(7)(iii) that evidence, or questions seeking evidence, about the complainant's sexual interests and prior sexual conduct would be impermissible and a recipient must not rely upon such evidence regardless of relevance other than in either of two narrow exceptions: (1) when evidence of the complainant's prior sexual conduct is offered to prove that someone other than the respondent committed the alleged conduct; or (2) when evidence concerning specific incidents of the complainant's prior sexual conduct with the respondent is offered to prove consent. This provision is substantially similar to the corresponding prohibition in the current regulations, at § 106.45(b)(6)(i)-(ii), on questions and evidence about the complainant's sexual predisposition and prior sexual behavior. In the preamble to the 2020 amendments, the Department noted that these prohibitions "mirror[] rape shield protections applied in Federal courts," 85 FR at 30103, and that "rape shield protections serve a critically important purpose in a Title IX sexual harassment grievance process: Protecting complainants from being asked about or having evidence considered regarding sexual behavior, with two limited exceptions," *id.* at 30351. Although the current regulations deem these types of questions and evidence not to be relevant, *see id.* at 30353, the proposed regulations would clarify that these types of questions and use of these types of evidence would be impermissible regardless of relevance.

In addition, the Department proposes adding language concerning the exception for

301

specific incidents of prior sexual conduct between the complainant and the respondent to clarify the narrow scope of this exception. Proposed § 106.45(b)(7)(iii) would explain that although evidence concerning specific incidents of a complainant's prior sexual conduct with the respondent may be permissible when offered to prove consent, the mere fact that prior consensual sexual conduct between the complainant and respondent occurred or that there are similarities in the types of communications related to consent does not itself demonstrate or imply the complainant's consent to the alleged sex-based harassment and does not preclude a determination that sex-based harassment occurred.

The Department also proposes modifying two terms in § 106.45(b)(7)(iii), though the proposed provision would exclude the same universe of questions and evidence as the current provision. The Department proposes replacing references to the complainant's "prior sexual behavior" with "prior sexual conduct." The Department tentatively views the term "prior sexual conduct" as more precise because the proposed regulations repeatedly use the term "conduct," including within this provision to refer to an exception for evidence that would be offered to prove who engaged in the alleged conduct.

In addition, the Department proposes replacing the term "sexual predisposition" with the term "sexual interests." In the preamble to the 2020 amendments, the Department stated that its "use of the phrase 'sexual predisposition' is mirrored in Fed. R. Evid. 412." *Id.* In response to the 2018 NPRM, the Department received comments that the phrase "'sexual predisposition' . . . harkens back to the past and puts on trial the sexual practices and identity of the complainant, which have no relevance to the adjudication of particular allegations." *Id.* at 30351. The Department sought to clarify in the preamble to the 2020 amendments that "far from indicating intent to harken back to the past where sexual practices of a complainant were used

302

against a complainant, the final regulations take a strong position that questions or evidence of a complainant's 'sexual predisposition' are simply irrelevant, without exception." *Id.* at 30353. The Department would maintain its position that questions seeking this evidence are not permitted and that this evidence must not be relied upon; however, the Department would seek to convey this prohibition without using an outdated phrase that may conjure the type of assumptions that the Department seeks to prohibit. Evidence related to sexual predisposition that is prohibited under the current regulations would continue to be prohibited as evidence related to sexual interests under the proposed regulations.

The Department proposes moving the protection just described from current § 106.45(b)(6)(i)-(ii) to proposed § 106.45(b)(7)(iii). In the current regulations, the prohibition on questions and evidence about the complainant's sexual predisposition and prior sexual behavior appears in the section about hearings but does not provide protection when the same evidence is presented in connection with an investigation. Instead, under the current regulations, when evidence related to a party's sexual predisposition or prior sexual behavior is directly related to the allegations, the Department stated that "the recipient should allow both parties an equal opportunity to inspect and review such evidence to be able to prepare to respond to it or object to its introduction in the investigative report or at the hearing." *Id*. at 30428. The Department is concerned that permitting the parties to review these types of evidence undermines the purpose of this protection. Disclosing evidence of a complainant's prior sexual conduct (beyond the narrow exceptions) or sexual interests could unnecessarily harm complainants and chill reporting even if questioning about that evidence is ultimately prohibited at a hearing. Consequently, the Department proposes moving the prohibition on questions and evidence about sexual interests and prior sexual conduct to § 106.45(b)(7)(iii), where it would

303

apply to the entirety of the grievance procedures under § 106.45, and if applicable § 106.46.

Section 106.45(c) Notice of allegations

*Current regulations:* Current § 106.45(b)(2) requires a recipient to provide parties who are known to the recipient with written notice of the allegations of sexual harassment and of the recipient's grievance process, including any informal resolution process. Sufficient detail must be provided in this notice, including the conduct allegedly constituting sexual harassment, the identities of the parties involved in the alleged incident, and the date and location of the alleged incident.

In addition, current § 106.45(b)(2) requires that the notice inform the parties that they may have an advisor of their choice, who may be an attorney, that they have a right to inspect and review certain evidence, and of any provision in the recipient's code of conduct that prohibits knowingly making false statements or knowingly submitting false information during the grievance process. Current § 106.45(b)(2) also provides that if, in the course of an investigation, the recipient decides to investigate allegations about the complainant or respondent that are not included in the notice provided above, the recipient must provide notice of the additional allegations to the parties whose identities are known.

The current regulations do not include specific requirements for a written notice of allegations for complaints of sex discrimination other than formal complaints of sexual harassment.

*Proposed regulations:* The Department proposes maintaining some components of current § 106.45(b)(2), eliminating or clarifying others, and extending the requirement for a recipient to provide the parties with notice of allegations in its resolution of any complaints of sex discrimination, rather than only for sexual harassment. The Department proposes a more

detailed written notice of allegations for complaints of sex-based harassment involving students at postsecondary institutions in proposed § 106.46(c).

Because the proposed regulations do not include a formal complaint requirement, the Department would clarify that the notice of allegations must be provided upon initiation of the recipient's grievance procedures as described in proposed § 106.45 and any informal resolution process under proposed § 106.44(k).

Proposed § 106.45(c) would preserve the current requirements that the recipient notify the parties of the applicable grievance procedures and provide sufficient information available at the time to allow the parties to respond to the allegations, including the identities of the parties involved in the incident, the conduct alleged to constitute sex discrimination under Title IX, and the date and location of the alleged incident, to the extent that information is available to the recipient. The Department proposes requiring the notice to also include a statement that retaliation is prohibited.

Proposed § 106.45(c) would preserve, with some additional clarification, the requirement in the current regulations that a recipient provide notice of additional allegations to the parties if, in the course of an investigation, the recipient decides to investigate additional allegations about the respondent, if applicable, that were not included in the initial notice.

The Department proposes giving recipients flexibility to provide the notice that would be required under proposed § 106.45(c) either orally or in writing.

For additional requirements regarding the application of this provision in grievance procedures for sex-based harassment complaints involving postsecondary students, see the discussion of proposed § 106.46(c).

*Reasons*: Consistent with the requirement to provide adequate, reliable, and impartial

investigations, proposed § 106.45(c) would require a recipient to provide the parties with notice

of the allegations. The Supreme Court, in the context of a due process case concerning the rights

of public school students facing temporary disciplinary suspension, reinforced the importance of

this opportunity, stating that students in that context are entitled to notice of the charges and an

explanation of the evidence against them. *Goss*, 419 U.S. at 581. The Department therefore

proposes applying this principle to a recipient's initiation of grievance procedures for any

complaint of sex discrimination. Proposed § 106.45(c) would require a recipient to provide

notice of the applicable grievance procedures, any informal resolution process, the identities of

the parties involved in the incident, the conduct alleged to constitute sex discrimination under

Title IX, and the date and location of the alleged incident, to the extent that information is

available to the recipient.

The Department also proposes requiring a recipient to notify the parties that retaliation is

prohibited in proposed § 106.45(c). This proposed change responds to comments OCR received

in the June 2021 Title IX Public Hearing and in listening sessions that complainants sometimes

experience retaliation after complaining of sex discrimination. Requiring a recipient to remind

the parties early in the grievance procedures that retaliation for making a complaint or otherwise

participating in the grievance procedures is prohibited would help prevent efforts to retaliate and

would ensure that parties know to report it if it happens.

Proposed § 106.45(c) would preserve the requirement in current § 106.45(b)(2)(ii) that a

recipient provide notice of additional allegations to the parties if, in the course of an

investigation, the recipient decides to investigate additional allegations that were not included in

the initial notice. This requirement is important for ensuring that parties have sufficient

information about the allegations at issue with sufficient time as set out in the recipient's

grievance procedures to identify or provide evidence relevant to those allegations.  Consistent

with the scope of the grievance procedures under proposed § 106.45, the Department proposes

changing this requirement to cover any additional allegations of sex discrimination.  The

Department proposes a minor change to provide better guidance about the circumstances that

would trigger this requirement.  The proposed addition would specify that the additional

allegations requiring notice are about: (1) the respondent's conduct toward the complainant, if

applicable; or (2) conduct alleged in a new complaint that has been consolidated with the original

complaint.

As further explained in the discussion of proposed § 106.46(c), the Department proposes

requiring a more detailed and formal notice of allegations for complaints of sex-based

harassment involving student parties at postsecondary institutions.  The Department proposes

that complaints of sex discrimination but not sex-based harassment involving postsecondary

student parties be resolved under the more flexible and streamlined requirements of proposed

§ 106.45(c).

Proposed § 106.45(c) would not prescribe whether notice of the allegations must be in

writing; a recipient would be able exercise its discretion regarding whether to provide the

required notice in writing.  In some cases, it may be important to provide written notice of the

allegations, particularly in cases involving more serious conduct and more serious consequences.

Written notice may also sometimes be required under State or local law or recipient policy where

suspension or other serious disciplinary consequences may apply.  In all cases, proposed

§ 106.8(f) would require the recipient to maintain records documenting its response to

complaints of sex discrimination, including the notice of allegations.  However, the Department

does not propose to require notice of the allegations to be in writing in all cases because doing so

may limit a recipient's ability to respond promptly and in an age- and developmentally appropriate way when a student complains of sex discrimination. For example, in the elementary school or secondary school context, a requirement that a recipient always provide written notice of allegations would limit a recipient's ability to respond to an incident when it occurs, even though such a prompt response can be a valuable teaching moment, particularly with younger students. And with respect to many sex discrimination complaints that do not allege sex-based harassment, there may be no respondent and therefore no need to provide notice of the allegations because the complainant will already have information about the alleged sex discrimination. In all cases, however, the proposed regulations would require the notice of the allegations to be clear so that a respondent and complainant both understand the alleged conduct the recipient intends to investigate. Clear notice affords each party the opportunity to present their account of what happened, including providing relevant evidence and witnesses in support of their account. When notice is inadequate, it would not meet the requirements of proposed § 106.45(c).

In addition, proposed § 106.45(c) would not include an express provision permitting a recipient to delay providing notice of the allegations to the parties in circumstances when the recipient has legitimate concerns for the safety of any person as a result of providing notice. The Department's current view is that it is not necessary to include an express provision authorizing a recipient to delay providing notice of the allegations in order to address safety concerns because "upon initiation of grievance procedures" in proposed § 106.45(c) should be understood to permit a recipient to delay notice to the parties in order to address safety concerns. Consistent with proposed § 106.46(c)(3), a recipient's legitimate safety concerns must be based on individualized safety and risk analysis and not on mere speculation or stereotypes.

308

Similarly, proposed § 106.45(c) would not require the notice of allegations to include specific statements that the respondent is presumed not responsible, that a determination regarding responsibility is made at the conclusion of the grievance process, that parties may have an advisor of their choice, that they can review evidence, or whether the recipient's code of conduct prohibits knowingly making false statements or knowingly submitting false information, though a recipient may include such statements in its notice of allegations if it determines that doing so is appropriate. As with the question of whether the notice of allegations should be reduced to writing, providing the parties notice of this information may be appropriate and helpful in some cases, particularly in cases involving more serious conduct and more serious consequences, but the Department's tentative view is that requiring it in all cases may prevent a recipient from responding promptly and appropriately to all forms of sex discrimination in the educational environment. As explained in more detail in the discussion of proposed § 106.46(c), a postsecondary institution would be required to communicate these points in writing when implementing grievance procedures for complaints of sex-based harassment involving postsecondary students in light of the unique circumstances of those students.

Section 106.45(d) Dismissal of a complaint

*Current regulations:* Section 106.45(b)(3)(i) states that a recipient must investigate allegations in a formal complaint unless the conduct alleged in the formal complaint would not constitute "sexual harassment" as defined in current § 106.30 if proved, did not occur in the recipient's education program or activity, or did not occur against a person in the United States. In such cases, the recipient must dismiss the complaint with respect to that conduct for purposes of sexual harassment. Section 106.45(b)(3)(i) further states that such dismissals do not preclude the recipient from taking action under a different provision of its code of conduct.

309

Current section 106.45(b)(3)(ii) permits a recipient to dismiss a formal complaint or any of the allegations raised in a formal complaint if at any time during the investigation or hearing, the complainant notifies the Title IX Coordinator in writing that the complainant would like to withdraw the complaint or any of the allegations in the complaint, the respondent is no longer enrolled or employed by the recipient, or specific circumstances prevent the recipient from gathering sufficient evidence to make a determination on the complaint or any of the complaint allegations.

When a recipient dismisses a complaint for any of these reasons, current § 106.45(b)(3)(iii) requires the recipient to promptly and simultaneously send written notice of the dismissal and the reasons for it to the parties.

*Proposed regulations*: The Department proposes revising § 106.45(b)(3) to permit, but not require, a recipient to dismiss allegations in a complaint of sex discrimination in certain circumstances. Proposed § 106.45(d)(4) would further require a recipient that dismisses a complaint to comply with the requirements of proposed § 106.44 by, at a minimum: (1) offering supportive measures to the complainant as appropriate under proposed § 106.44(g); (2) offering supportive measures to the respondent as appropriate, under proposed § 106.44(g), for dismissals under § 106.45(d)(1)(iii) or (iv) in which the respondent has been notified of the allegations; and (3) requiring its Title IX coordinator to take other appropriate prompt and effective steps to ensure that sex discrimination does not continue or recur within the recipient's education program or activity under proposed § 106.44(f)(6), in addition to remedies provided to an individual complainant.

The Department proposes adding § 106.45(d)(1)(i) to provide that a recipient may dismiss a complaint when it is unable to identify the respondent after taking reasonable steps to

310

do so.  The Department also proposes changing current § 106.45(b)(3)(ii) to state in proposed § 106.45(d)(1)(ii) that a recipient may dismiss a complaint if the respondent is not participating in the recipient's education program or activity or not employed by the recipient, rather than allowing dismissal only if the respondent is no longer enrolled in the recipient's education program or activity or no longer employed by the recipient.  The Department proposes maintaining, in proposed § 106.45(d)(1)(iii), the part of current § 106.45(b)(3)(ii) that permits a recipient to dismiss a complaint or complaint allegations when a complainant withdraws them.  The Department proposes revising this provision by eliminating the requirement that the complainant notify the Title IX Coordinator in writing of the withdrawal (except in postsecondary complaints of sex-based harassment involving a student party, as explained in greater detail in the discussion of proposed § 106.46(d)).  In addition, the Department would add proposed § 106.45(d)(1)(iv), which would permit but not require a recipient to dismiss a complaint of sex discrimination or some of its allegations when, after making reasonable efforts to clarify the allegations with the complainant, the recipient determines that the conduct alleged, even if proven, would not constitute sex discrimination under Title IX.  The Department also proposes removing the requirement that a recipient dismiss a complaint when the conduct alleged did not occur in the recipient's education program or activity or against a person in the United States.  In addition, the Department proposes removing language from current § 106.45(b)(3)(i) that a dismissal under that paragraph does not preclude action under another provision of the recipient's code of conduct.  Finally, the Department proposes eliminating from current § 106.45(b)(3)(ii) the provision that permits a recipient to dismiss a complaint when "specific circumstances" prevent the recipient from gathering evidence sufficient to reach a determination as to the formal complaint or allegations therein.

The Department proposes clarifying in § 106.45(d)(2) that upon dismissal, a recipient must promptly notify the complainant of the dismissal and the reasons for it, and, if a respondent has already been notified of the allegations, then the recipient must also notify the respondent of the dismissal and the basis for the dismissal promptly following notification to the complainant, or simultaneously if notification is in writing. The Department also proposes incorporating current § 106.45(b)(8), which grants parties a right to appeal dismissals, into proposed § 106.45(d)(3). Proposed § 106.45(d)(3) would provide that when a complaint is dismissed, the recipient must notify all parties that a dismissal may be appealed, and in an appeal of a complaint dismissal, a recipient must: (i) notify the parties when an appeal is filed and implement appeal procedures equally for the parties; (ii) ensure that the decisionmaker for the appeal did not take part in an investigation of the allegations or dismissal of the complaint; (iii) ensure that the decisionmaker for the appeal has been trained as set out in proposed § 106.8(d)(2); (iv) provide the parties a reasonable and equivalent opportunity to make a statement in support of, or challenging, the outcome; and (v) notify all parties of the result of the appeal and the rationale for the result. For additional requirements regarding the application of this provision in grievance procedures for sex-based harassment complaints involving postsecondary students, see the discussion of proposed § 106.46(d).

*Reasons*: *Eliminating mandatory dismissals and permitting dismissals in certain circumstances.* To ensure a nondiscriminatory educational environment as required by Title IX, OCR has long interpreted Title IX to require that a recipient must respond to notice of possible sexual harassment by determining what occurred and resolving any sexual harassment. Prior to 2020, the Department had not addressed whether a recipient could dismiss complaints of sexual harassment (i.e., decline to investigate or decline to complete an investigation) and if so, under

what circumstances. Section 106.45(b)(3) of the 2020 amendments includes a mandatory dismissal provision, which requires an initial assessment of whether alleged conduct constitutes sexual harassment in a recipient's education program or activity. 85 FR at 30289. Since the 2020 amendments went into effect, however, OCR has received feedback objecting to § 106.45(b)(3)(i), including from recipients, through the June 2021 Title IX Public Hearing and numerous listening sessions with stakeholders, and the Department received additional feedback in 2022 meetings held under Executive Order 12866. Some stakeholders expressed concern that requiring the dismissal of complaints without completing an investigation deprives a recipient of the opportunity to afford students the full protections of Title IX's nondiscrimination mandate. Others raised practical concerns, including concerns about the timing of such dismissals, asking how a recipient can effectively judge at the outset whether an allegation meets the definition of sexual harassment, noting that such a rule creates uncertainty for all parties and exposes a recipient to potential liability if either party challenges the dismissal.

The Department's current view is that a recipient should not be required to determine whether the conduct alleged meets the definition of sex discrimination at the outset of a complaint. Based on the feedback described, the Department recognizes that in most cases, it will not be clear whether alleged conduct could constitute sex discrimination under Title IX and, therefore, a recipient would be required to take additional steps to comply with its obligation under Title IX to have its education program or activity free from sex discrimination. In these cases, the proposed grievance procedures would guide the recipient's investigation and determination to ensure that both are prompt and equitable. The Department recognizes, however, that making such a determination may be appropriate in a limited set of circumstances, when it is clear from the allegations alone that the conduct alleged, even if proven, would not

constitute sex discrimination under Title IX.  In those cases, the Department's current view is that a recipient should have the discretion to dismiss the complaint and avoid conducting an unnecessary investigation.

Having reconsidered the issues in light of the facts and circumstances, including but not limited to stakeholder concerns, the Department proposes amending § 106.45(b)(3) to permit but not require a recipient to dismiss a complaint for any of the following reasons: (i) the recipient is unable to identify the respondent after taking reasonable steps to do so (proposed § 106.45(d)(1)(i)); (ii) the respondent is not participating in the recipient's education program or activity and is not employed by the recipient (proposed § 106.45(d)(1)(ii)); (iii) the complainant voluntarily withdraws any or all of the allegations in the complaint and the recipient determines that without the complainant's withdrawn allegations, the conduct that remains in the complaint, even if proven, would not constitute sex discrimination under Title IX (proposed § 106.45(d)(1)(iii)); and (iv) the recipient determines the conduct alleged in the complaint, even if proven, would not constitute sex discrimination under Title IX (proposed § 106.45(d)(1)(iv)).

The Department recognizes that for many sex discrimination complaints, there will not be a "respondent" as that term is understood in the context of sex-based harassment complaints; rather, the claim will be that the school's policies or practices deprived students of an equal educational opportunity based on sex in violation of Title IX.  In such cases, a recipient would still be able to dismiss a complaint based on one of the two dismissal bases that are not tied to a particular respondent: proposed § 106.45(d)(1)(iii), when the complainant withdraws some or all of the allegations of the complaint and the remaining allegations, even if true, would not constitute sex discrimination under Title IX; and proposed § 106.45(d)(1)(iv), when the conduct alleged in the complaint, even if proven, would not constitute sex discrimination under Title IX.

314

Proposed § 106.45(d)(4) would further require a recipient that dismisses a complaint to comply with the requirements of proposed § 106.44(f)-(g) by, at a minimum: (1) offering supportive measures to the complainant as appropriate under proposed § 106.44(g); (2) offering supportive measures to the respondent as appropriate under proposed § 106.44(g) for dismissals under § 106.45(d)(1)(iii) or (iv) in which the respondent has been notified of the allegations; and (3) require its Title IX Coordinator to take other appropriate prompt and effective steps to ensure that sex discrimination related to any of the allegations or information contained in the complaint does not continue or recur within the recipient's education program or activity under proposed § 106.44(f). These steps are necessary because dismissal of a complaint of sex discrimination occurs before a recipient determines whether sex discrimination occurred. Therefore, although a recipient would not be required to comply with the requirements of its sex discrimination grievance procedures after dismissing a complaint, it would nevertheless be required to take steps to ensure that the complainant and respondent are offered supportive measures as appropriate and that its education program or activity operates free from sex discrimination.

Finally, the Department proposes deleting the statement that a dismissal under current § 106.45(b)(3)(i) does not preclude action under another provision of the recipient's code of conduct. The preamble to the 2020 amendments explained that this statement was included in response to concerns raised by commenters that a recipient would no longer be able to use its own grievance procedures to investigate and resolve allegations that did not meet the current regulations' definition of "sexual harassment." 85 FR at 30288. This provision would no longer be necessary because proposed § 106.45(d) would not require a recipient to dismiss allegations. This change would address recipients' concerns that the 2020 amendments excluded from the grievance procedures conduct that should be within their scope. Moreover, although the

Case 3:21-cv-00308-CEA-DCP   Document 83-1   Filed 06/27/22   Page 316 of 701   PageID #: 1549

Department does not consider it necessary to refer to the other tools a recipient may employ to address alleged misconduct, a recipient has always been and would continue to be free to use other available procedures, and nothing in proposed § 106.45(d) would preclude a recipient from doing so.

*When the recipient is unable to identify the respondent.* The Department proposes amending current § 106.45(b)(3) to permit a recipient to dismiss a complaint when, after taking reasonable steps to identify the respondent, the recipient is unable to do so. Reasonable steps may include but are not limited to interviewing the complainant, interviewing potential witnesses, and reviewing contemporaneous records such as video footage and visitor logs if relevant. The Department's position is that it is appropriate to allow such dismissals at a recipient's discretion when reasonable efforts to identify the respondent are not successful.

In deciding whether dismissal may be appropriate when the respondent is unknown, a recipient should consider whether there are good reasons to proceed with grievance procedures without a respondent. In some cases, the specific steps set out in proposed § 106.45 will not be effective without a respondent. Although proposed § 106.45(d)(1)(i) allows a recipient to dismiss a complaint for which a respondent cannot be identified, a recipient that chooses to do so must nevertheless comply with the requirements of proposed § 106.44(f)-(g) by offering supportive measures and requiring its Title IX Coordinator to take other appropriate prompt and effective steps to ensure that sex discrimination does not continue or recur within the recipient's education program or activity (proposed § 106.45(d)(4)).

In cases in which a recipient identifies a respondent after dismissing a complaint, either while taking necessary steps under proposed § 106.44(f) to ensure equal access to its education program or activity or through other means, it would be permitted to reinstate a dismissed

complaint and complete its grievance procedures at that time. A recipient would not need to reinstate its grievance procedures in every case. Factors a recipient may consider in deciding whether to reinstate its grievance procedures would include but are not limited to whether the complainant or the respondent still participates or is attempting to participate in the recipient's education program or activity, whether the alleged conduct has been addressed fully through the other steps taken under proposed § 106.44(f)-(g), and whether there is a risk of continued sex discrimination or a concern regarding safety of the broader community.

*When the respondent is not participating in the recipient's education program or activity and is not employed by the recipient.* The Department proposes clarifying in § 106.45(d)(1)(ii) that a recipient may dismiss a complaint when the respondent is not participating in the recipient's education program or activity and is not employed by the recipient. In such circumstances, proposed § 106.45(d)(4) would require the recipient to comply with the requirements of proposed § 106.44(f)-(g) by offering the complainant supportive measures and requiring its Title IX Coordinator to take other appropriate prompt and effective steps to ensure that sex discrimination does not continue or recur within the recipient's education program or activity.

The current regulations permit dismissal when a respondent is no longer enrolled in or employed by the recipient. The proposed modification—changing the term "enrolled in" to the term "participating in"—would recognize that some student respondents may continue to participate in a recipient's education program or activity even though they are not enrolled and that their participation could affect the complainant's access to the recipient's education program or activity. Such continued participation could include serving in an alumni organization, as a volunteer, or attending school-related events. In addition, a student who is on an approved leave

317

from a postsecondary institution typically plans to return to the campus community and thus remains part of, and therefore a participant in, the recipient's education program or activity, even if from a distance. A recipient would have the discretion to restrict such an individual's ability to continue participating in its education program or activity, either under proposed § 106.44(g) as a supportive measure to the extent necessary to restore or preserve the complainant's equal access to its education program or activity, or under proposed § 106.45, and if applicable proposed § 106.46, as a disciplinary action at the conclusion of its grievance procedures. Finally, proposed § 106.45(d)(1)(ii) would encompass complaints against a respondent who was never enrolled in or employed by a recipient, and permits dismissal of those complaints as well. As explained in the discussion of the proposed definition of a "respondent" (§ 106.2), a third party may be a respondent to a complaint of sex discrimination.

By proposing to permit a recipient to dismiss a complaint of sex discrimination because the respondent is not a student or an employee of the institution or is a former student or employee, the Department does not suggest that a recipient lacks an obligation under Title IX to address sex discrimination by such respondents. Rather, consistent with the Department's explanation in the preamble to the 2020 amendments, a recipient must respond to notice of sexual harassment in its education program or activity "regardless of whether the complainant or respondent is an enrolled student or an employee of the recipient." *See* 85 FR at 30488. As explained in greater detail in the discussion of proposed § 106.44(a), the proposed regulations would affirm a recipient's obligation to take action to end any sex discrimination that has occurred in its education program or activity, even by third parties.

Dismissal of a Title IX complaint against a third-party respondent or a respondent who is a former student or former employee is nevertheless permitted when, for example, a recipient

determines that its lack of control over the respondent or other factors would prevent it from completing its grievance procedures. In such cases, proposed § 106.45(d)(4)) would apply. Under the proposed regulations, the recipient would be required, at a minimum, to comply with the requirements of proposed § 106.44(f)-(g) by offering the complainant supportive measures and requiring its Title IX Coordinator to take other appropriate prompt and effective steps to ensure that sex discrimination does not continue or recur within the recipient's education program or activity. In some cases, ensuring equal access may warrant noting in a student's academic records that the student withdrew with a disciplinary action pending and is ineligible to re-enroll without reinstatement of the grievance procedures, or noting in a former employee's personnel file that the employee is ineligible for rehire pending completion of the grievance procedures. In other cases, to ensure equal access to its education program or activity for the complainant, a recipient may need to impose restrictions on a respondent who has no relationship to the recipient, such as barring the respondent from accessing the recipient's facilities or participating in activities that are otherwise open to members of the public.

*When the complainant voluntarily withdraws any or all of the allegations in the complaint.* The Department proposes maintaining current § 106.45(b)(3)(ii), which permits a recipient to dismiss a complaint or any of the allegations raised in a complaint upon request of the complainant. The Department proposes revising this dismissal basis in proposed § 106.45(d)(1)(iii) to clarify that such dismissals are permitted when the complainant voluntarily withdraws any or all of the allegations in the complaint. Requiring a recipient to determine that the complainant's withdrawal is voluntary would guard against situations in which a complainant is coerced or pressured to withdraw a complaint but does not do so voluntarily or knowingly. For recipients and complaints subject only to the Title IX grievance procedures in proposed

319

§ 106.45, the Department proposes eliminating the requirement that a complainant request dismissal of a complaint or complaint allegations in writing to the Title IX Coordinator, although a complainant is not precluded from making a request in that manner. The Department recognizes that through discussions between a complainant and a Title IX Coordinator or others during the course of grievance procedures, a complainant may withdraw some or all complaint allegations. As explained in the discussion of the proposed definition of a "complaint" (§ 106.2), which the Department proposes would not have to be made in writing, OCR heard from stakeholders during the June 2021 Title IX Public Hearing that requirements from the 2020 amendments that a formal complaint be written and indicate that the complainant is the person filing, such as by including the complainant's physical or digital signature, created an unnecessarily burdensome process and discouraged some individuals from making complaints. Based on the information received from stakeholders and after reconsidering the issue, the Department's current position is that requiring a written withdrawal request for purposes of complying with Title IX may be overly prescriptive and impose unnecessary requirements on complainants and recipients in those circumstances and possibly imposes unnecessary burdens on respondents (except in postsecondary complaints of sex-based harassment involving a student party, which is explained in greater detail in the discussion of proposed § 106.46(d)(1)).

In cases in which a complainant withdraws some or all of the allegations and informs the recipient that they do not want an investigation to proceed, the Department's current view is that a recipient should override a student's request that an investigation not proceed only in limited instances in which the recipient determines that the potential harm from ongoing sex discrimination outweighs the complainant's interest in not initiating the grievance procedures, including consideration of any potential harms the complainant identifies that may follow from

initiation of the recipient's grievance procedures. This position is reflected in the preamble to the 2020 amendments, which noted that a Title IX Coordinator might initiate a grievance process when a complainant chooses not to file a formal complaint to prevent a respondent from continuing to engage in sexual harassment. 85 FR at 30131. Consistent with OCR's longstanding position regarding when a recipient should override a complainant's request for confidentiality or not take action in response to a report of sexual harassment, the recipient must, prior to dismissing a complaint withdrawn by a complainant, determine whether it can honor such a request and still provide a safe and nondiscriminatory environment for all students. *See, e.g.*, 2014 Q&A on Sexual Violence at 20; *see also* 2001 Revised Sexual Harassment Guidance at 17 (a recipient should honor a complainant's request for confidentiality "as long as doing so does not prevent the school from responding effectively to the harassment and preventing harassment of other students").

In addition, the Department proposes including a safeguard in § 106.45(d)(1)(iii)—that the recipient may dismiss the complaint only if it determines that without the withdrawn allegations, the conduct alleged in the complaint would not constitute sex discrimination under Title IX if proven—to balance a complainant's request not to proceed with a complaint of sex discrimination against a recipient's obligation to ensure its education program or activity operates free from sex discrimination. In some cases, a complainant's withdrawal of allegations would leave no remaining allegations for a recipient to address through its grievance procedures. Dismissal would then be permitted under proposed § 106.45(d)(1)(iii). In other cases in which a complainant withdraws some or all of the allegations in a complaint, there may be remaining allegations that would independently constitute sex discrimination under Title IX. This might occur in a complaint that involves multiple complainants, allegations against several

respondents, or alleged discrimination that occurred on more than one occasion. Before dismissing the complaint under proposed § 106.45(d)(1)(iii), the recipient must consider whether other factors, including its obligation to afford equal access to its education program or activity, warrant initiating grievance procedures. In making this determination, a recipient may consider the seriousness of the sex discrimination, whether circumstances suggest an increased risk of additional acts of sex discrimination by the respondent or others, and whether the recipient has other means to obtain relevant evidence to determine whether sex discrimination occurred. These considerations may similarly guide a Title IX Coordinator in determining whether to initiate sex discrimination grievance procedures in response to information about conduct that may constitute sex discrimination under Title IX but where there is no complaint or the complainant requests that the grievance procedures not be initiated, as explained in the discussion of proposed § 106.44(f)(5). Proposed § 106.45(d)(1)(iii) would leave to the discretion of the recipient to determine whether any alleged conduct that remains could, if proven, constitute sex discrimination under Title IX.

*Dismissal of allegations involving conduct that if proven would not constitute sex discrimination under Title IX.* Proposed § 106.45(d)(1)(iv) would permit, but not require, a recipient to dismiss a complaint when, prior to completing its grievance procedures, the recipient determines that the conduct alleged would not constitute sex discrimination under Title IX even if proven. The procedures in proposed § 106.45 are designed to elicit sufficient information to enable a recipient to make an informed decision as to whether sex discrimination occurred. Prohibiting a recipient from continuing its grievance procedures, as the mandatory dismissal provision of the current 2020 amendments does, may require a recipient to make a hasty judgment call at the outset of the complaint about whether the allegations, if proven, would

constitute sex discrimination under Title IX.  However, in the early stages of the complaint process, gathering more information may help to confirm whether the allegations, if true, would amount to sex discrimination.  For instance, in cases of sex-based harassment in which one or more of the parties may have been incapacitated during the alleged incident, a recipient may gain additional information to establish what occurred through witness interviews conducted as part of its investigation under its grievance procedures.  In other cases, a complainant may report an allegation of sex-based harassment but lack information about severity or pervasiveness, for example, that a recipient might receive through evidence gathering under its grievance procedures.  Requiring dismissal of all such complaints would prevent a recipient from using its grievance procedures to address possible sex-based harassment in its education program or activity.  The Department recognized this in the preamble to the 2020 amendments when, in response to comments, the Department declined to permit dismissal of "frivolous complaints" because "the point of the § 106.45 grievance process is to require the recipient to gather and objectively evaluate relevant evidence before reaching conclusions about the merits of the allegations."  85 FR at 30290.

The Department proposes revising the regulations to ensure it is clear that a recipient has the discretion to dismiss allegations that, if proven, would establish that the alleged conduct was not based on sex or did not subject a person to sex discrimination in a recipient's education program or activity in the United States, as set out in proposed § 106.11.  Proposed § 106.45(d)(1)(iv) would require a recipient to make reasonable efforts to clarify the allegations with the complainant prior to dismissal.  In cases of sex-based harassment, this would require a recipient to clarify with the complainant, when relevant, whether the complainant is experiencing a hostile environment within the recipient's education program or activity in the United States

323

stemming from conduct that occurred outside the education program or activity or outside the United States. Although a recipient has discretion under proposed § 106.45(d)(1)(iv) to distinguish between allegations that implicate Title IX and those that do not, the Department reiterates that a recipient must not exercise its discretion in a manner that predetermines witness credibility or the sufficiency of evidence nor would the recipient be permitted to dismiss complaints to avoid a complicated or contested investigation.

*Specific circumstances.* The Department proposes removing language from § 106.45(b)(3)(ii) that permits a recipient to dismiss a complaint when specific circumstances prevent the recipient from gathering evidence sufficient to reach a determination as to the formal complaint or allegations therein. In the preamble to the 2020 amendments, the Department explained that this provision "is intended to apply narrowly to situations where specific circumstances prevent the recipient from meeting its burden in § 106.45(b)(5)(i) to gather sufficient evidence to reach a determination." *Id.* The 2020 amendments did not define "specific circumstances," but the preamble included examples of the types of specific circumstances that might warrant dismissal, including when the passage of time between alleged sex-based harassment and the filing of a formal complaint "prevent a recipient from collecting enough evidence to reach a determination," *id.* at 30214, and "[w]hen a formal complaint contains the allegations that are precisely the same as allegations the recipient has already investigated and adjudicated," *id.* at 30214 n.939.

The Department's current view is that allowing a recipient to dismiss a complaint for undefined "specific circumstances" is unnecessary in light of other, specific dismissal provisions. The Department is also concerned that this undefined category is potentially so broad that it fails to provide adequate guidance to recipients about when it applies. To address the first example

324

from the preamble to the 2020 amendments, the passage of time between alleged sex discrimination and when a complaint is made does not always mean a recipient will be unable to collect enough evidence to reach a determination. Under the proposed regulations, the "specific circumstances" provision would not be necessary because a recipient would have two other avenues for resolving complaints in this circumstance: (1) It would be able to dismiss the complaint under proposed § 106.45(d)(1)(iv) if the allegations in the complaint—once clarified with the complainant—could not constitute sex discrimination under Title IX; or (2) It could conduct an investigation, evaluate the available evidence it has been able to gather (if any) for its persuasiveness, and, if appropriate, determine that sex discrimination did not occur. As for the second example from the preamble to the 2020 amendments, if a complainant were to make a complaint with only specific allegations that the recipient had already investigated, the recipient could notify the complainant that the allegations have already been resolved and either (1) decline to open a new complaint, or (2) dismiss the complaint if it had been opened before the recipient realized that the allegations duplicate those previously investigated. Considering the discussion above, the Department's current view is that allowing specific circumstances to serve as a basis for dismissal without defining what constitutes specific circumstances does not adequately apprise a recipient of the circumstances that would permit dismissal and those circumstances—such as a complicated, resource intensive investigation—that would not. Rather than retain the term "specific circumstances" as a vague, catchall basis for dismissing complaints, the Department proposes eliminating that provision and revising § 106.45(b)(3) to include several defined bases for discretionary dismissal.

*Notification of Dismissal.* Proposed § 106.45(d)(2) would clarify that upon dismissal, a recipient must promptly notify the complainant of the dismissal and the basis for the dismissal,

and, if a respondent has already been notified of the allegations, then the recipient must also notify the respondent of the dismissal and the basis for it promptly following notification to the complainant, or simultaneously if notification is in writing. The Department proposes requiring that notice of a complaint dismissal be in writing only for postsecondary recipients for sex-based harassment complaints involving a student complainant or student respondent (*see* proposed § 106.46(d)(2)), but nothing in the proposed regulations would preclude other recipients or postsecondary recipients in other circumstances from providing notice of a dismissal to the parties in writing.

*Appeal of Dismissal.* In addition, proposed § 106.45(d)(3) would incorporate current § 106.45(b)(8), which grants parties a right to appeal dismissals. The provision at proposed § 106.45(d)(3) would require a recipient to notify all parties that a dismissal may be appealed; provide any party with an opportunity to appeal; notify the other party when an appeal is filed; and implement appeal procedures equally for the parties. This right to appeal would further require robust protections such as training for appeal decisionmakers on how to serve impartially, including by avoiding bias, conflicts of interest, and prejudgment of the facts at issue; strict separation of the appeal decisionmakers from those who investigated and adjudicated the underlying complaint to reinforce independence and neutrality; and a reasonable, equivalent opportunity for the parties to participate in the appeal process. Finally, the recipient must notify all parties of the result of the appeal and the rationale for the result.

Section 106.45(e) Consolidation of complaints

*Current regulations:* Section 106.45(b)(4) permits a recipient to consolidate formal complaints involving allegations of sexual harassment against more than one respondent, or by more than one complainant against one or more respondents, or by one party against the other party, when

the sexual harassment allegations arise out of the same facts or circumstances. The preamble to the 2020 amendments clarified that complaints "by one party against the other party" refers to counter-complaints. 85 FR at 30291. Section 106.45(b)(4) also states that when "a grievance process involves more than one complainant or more than one respondent, references in this section to the singular 'party,' 'complainant,' or 'respondent' include the plural, as applicable."

*Proposed regulations:* The Department proposes retaining the language of § 106.45(b)(4) as it appears in the current regulations, with one substantive change and four minor changes for consistency with changes in other provisions of the proposed regulations. The Department also proposes moving this provision to proposed § 106.45(e). Proposed § 106.45(e) would allow a recipient to consolidate complaints of sex discrimination against more than one respondent, or by more than one complainant against one or more respondents, or by one party against another party (i.e., when a respondent seeks to pursue a counter-complaint against a complainant), when the allegations of sex discrimination arise out of the same facts or circumstances. If one of the complaints to be consolidated is a complaint of sex-based harassment involving a student complainant or student respondent at a postsecondary institution, proposed § 106.45(e) would clarify that the grievance procedures for investigating and resolving the consolidated complaint must comply with the requirements of proposed §§ 106.45 and 106.46.

In addition, the Department proposes replacing references to "formal complaints" with "complaints," and replacing references to "sexual harassment" with "sex discrimination" and "sex-based harassment," as applicable. The Department proposes replacing the phrase "the other party" with "another party" to reflect that certain complaints might involve more than two parties. The Department also proposes removing the reference to the "grievance process."

Consistent with current § 106.45(b)(4), proposed § 106.45(e) would state that when more

than one complainant or more than one respondent is involved, references in this section and in proposed § 106.46 to the singular form of the terms "party," "complainant," or "respondent" include the plural, as applicable.

*Reasons:* The Department proposes maintaining a recipient's ability to consolidate complaints against more than one respondent, or by more than one complainant against one or more respondents, or by one party against another party, when the allegations arise out of the same facts or circumstances. In order to align this provision with proposed § 106.45, which addresses grievance procedures for any complaint of sex discrimination, not just sex-based harassment, the Department proposes modifying the scope of consolidation under proposed § 106.45(e) to allow a recipient to consolidate any complaint of sex discrimination with another complaint of sex discrimination as long as the allegations of sex discrimination arise out of the same facts or circumstances. Current § 106.45(b)(4) limits consolidation to complaints of sexual harassment and does not address whether consolidation is available for other forms of sex discrimination such as consolidation of complaints involving retaliation related to complaints of sex-based harassment.

For example, if a person alleges that they were retaliated against for making a complaint of sex-based harassment or otherwise exercising their rights under Title IX related to sex-based harassment, the retaliation complaint may involve the same parties as a complaint related to the underlying sex-based harassment. Accordingly, when the sex-based harassment and related retaliation allegations arise out of the same facts or circumstances (and when the complaints are against more than one respondent, or by more than one complainant against one or more respondents, or by one party against the other party), proposed § 106.45(e) would permit a recipient to consolidate these complaints.

Case 3:21-cv-00308-CEA-DCP   Document 83-1   Filed 06/27/22   Page 329 of 701   PageID #: 1562

Proposed § 106.45(e) would require that when one of the complaints to be consolidated is a complaint of sex-based harassment involving a student complainant or student respondent at a postsecondary institution, the recipient must comply with the requirements of proposed §§ 106.45 and 106.46 to investigate and resolve the consolidated complaint. Proposed § 106.71 likewise would require that when a complaint of retaliation is consolidated with a complaint of sex-based harassment involving a student at a postsecondary institution, the recipient must comply with the grievance procedures in proposed §§ 106.45 and § 106.46. As explained in the discussion of proposed § 106.46 (Section II.F.2.c), the Department's current view is that the additional provisions of proposed § 106.46 would address the specialized needs of postsecondary student complainants and respondents in complaints of sex-based harassment and, when applied together with the requirements in proposed § 106.45, would ensure equitable grievance procedures tailored to the circumstances of students attending postsecondary institutions. For this reason, when a consolidated complaint involves a complaint of sex-based harassment involving a student at a postsecondary institution, the Department proposes that the postsecondary institution would be required to comply with these additional requirements.

In addition to clarifying that consolidation is available for any complaint of sex discrimination, the Department proposes minimal changes to proposed § 106.45(e) to align with global changes in the proposed regulations.

First, the Department proposes replacing "formal complaints" with "complaints." As explained in the discussion of the proposed definition of "complaint" (§ 106.2), the Department proposes removing the formal complaint requirement for purposes of initiating a recipient's obligation to follow its grievance procedures for complaints of sex discrimination as described in proposed §§ 106.45 and 106.46.

Second, the Department proposes replacing the term "sexual harassment" with the term "sex discrimination" or "sex-based harassment," as applicable. As explained in greater detail in the discussion of the Overall Considerations and Framework (Section II.F.2.a) and the proposed definition of "sex-based harassment" (§ 106.2), the Department proposes these changes to make clear that all forms of sex discrimination and all forms of harassment based on sex are within the scope of the grievance procedures described in proposed §§ 106.45 and 106.46 to dispel any confusion regarding the scope of Title IX's coverage of harassment.

Third, the Department proposes to replace the phrase "the other party" with "another party" because complaints might involve more than two parties.

Finally, the Department proposes removing the reference to the "grievance process" because the proposed regulations instead use the term "grievance procedures" to refer to the procedures outlined in proposed §§ 106.45 and 106.46.

Section 106.45(f)(1) Investigative burden on recipients

*Current regulations:* Section 106.45(b)(5)(i) requires a recipient to ensure that both the burden of proof and the burden of gathering evidence sufficient to reach a responsibility determination rest on the recipient and not on the parties. This provision prohibits a recipient from accessing, considering, disclosing, or using a party's records that are made or maintained by a physician, psychiatrist, psychologist, or other recognized professional or paraprofessional acting in the professional's or paraprofessional's capacity, or assisting in that capacity, and which are made and maintained in connection with the provision of treatment to the party—unless the party provides voluntary, written consent to the recipient for use in the grievance process. If the party is not an "eligible student," as defined in 34 CFR 99.3, the recipient must obtain the voluntary,

written consent of a "parent," as defined in 34 CFR 99.3.[7]

*Proposed regulations:* Proposed § 106.45(f)(1) would require that the recipient—and not the parties—bear the burden of conducting an investigation that gathers sufficient evidence to determine whether sex discrimination occurred.

The Department proposes retaining the prohibition in current § 106.45(b)(5)(i) that a recipient may not access, consider, disclose, or otherwise use a party's treatment records, but would move this language to proposed § 106.45(b)(7) with technical edits.

*Reasons:* Proposed § 106.45(f)(1) would retain the language in the current provision requiring that the recipient—and not the parties—bear the burden of gathering sufficient evidence to reach a determination. The Department proposes replacing the phrase "determination of responsibility" with the phrase "determine whether sex discrimination occurred." The Department proposes substituting this language consistent with the language used in other provisions in the proposed regulations and to provide clarity about the type of determination involved.

Current § 106.45(b)(5)(i) prohibits a recipient from accessing, considering, disclosing, or using a party's treatment records, unless the party consents to their use. The Department proposes moving the full description of this prohibition, with minor proposed revisions, to proposed § 106.45(b)(7), where all three categories of impermissible evidence are described in full. As outlined by the Department in the discussion of proposed § 106.45(b)(7), the Department proposes consolidating this prohibition with other forms of impermissible evidence

---

[7] Under § 99.3 of the regulations implementing the FERPA set out at 34 CFR part 99, an "[e]ligible student means a student who has reached 18 years of age or is attending an institution of postsecondary education," and a "[p]arent means a parent of a student and includes a natural parent, a guardian, or an individual acting as a parent in the absence of a parent or a guardian."

for ease of reference and to make clear to recipients and others that these types of evidence would be excluded from the general requirement that the recipient conduct an objective evaluation of all relevant evidence. The Department explains the proposed changes to the protection of treatment records in greater detail in the discussion of proposed § 106.45(b)(7).

Section 106.45(f)(2) Opportunity to present relevant witnesses and other evidence

*Current regulations:* Section 106.45(b)(5)(ii) requires a recipient to provide an equal opportunity for the parties to present witnesses, including fact and expert witnesses, and to present other inculpatory and exculpatory evidence.

*Proposed regulations:* Proposed § 106.45(f)(2) would require a recipient to provide an equal opportunity for the parties to present relevant fact witnesses, as well as other inculpatory and exculpatory evidence.

*Reasons:* Proposed § 106.45(f)(2) would retain the requirement that a recipient provide an equal opportunity for the parties to present fact witnesses and other inculpatory and exculpatory evidence, and would clarify that the fact witnesses and evidence must be "relevant" as defined in proposed § 106.2. The topic of expert witnesses in grievance procedures resolving complaints of sex-based harassment involving students at the postsecondary level would now appear in proposed § 106.46(e)(4).

The proposed relevance limitation on the opportunity to produce witnesses and other evidence is consistent with the numerous provisions in the current and proposed regulations that limit the evidence in the grievance procedures to evidence that is "relevant," as defined in proposed § 106.2. The current regulations incorporate the concept of relevance into several provisions, specifically:

- § 106.45(b)(1)(ii) (objective evaluation of all relevant evidence);

- § 106.45(b)(1)(iii) (training on issues of relevance);

- § 106.45(b)(5)(iii) (no restriction on the ability of either party to gather and present relevant evidence);

- § 106.45(b)(5)(vii) (investigative report that fairly summarizes relevant evidence);

- § 106.45(b)(6)(i) (ability of the party's advisor to ask all relevant questions and follow-up questions, and only relevant cross-examination and other questions may be asked of a party or witness);

- § 106.45(b)(6)(ii) (opportunity to submit written, relevant questions to the other party); and

- § 106.45(b)(6)(i)-(ii) (decisionmaker must exclude oral or written questions that are not relevant and explain any decision to exclude a question as not relevant).

Similarly, in proposed §§ 106.45 and 106.46, relevance is discussed in:

- § 106.45(b)(6) (objective evaluation of all relevant evidence);

- § 106.45(f)(2) (equal opportunity for parties to present relevant fact witnesses and other evidence);

- § 106.45(f)(3) (review of evidence gathered to determine relevance);

- § 106.45(f)(4) (description of the relevant evidence);

- § 106.45(h)(1) (requirement that the decisionmaker evaluate relevant evidence for persuasiveness);

- § 106.46(c)(2)(iii) (notice of the opportunity to receive access to relevant evidence or to an investigative report that accurately summarizes this evidence);

- § 106.46(e)(6) (provide either equitable access to the relevant evidence or to the same written investigative report that accurately summarizes this evidence);

333

- § 106.46(f)(1)(i) (credibility determinations include allowing the decisionmaker to ask relevant questions and allowing each party to propose relevant questions);

- § 106.46(f)(1)(ii) (ability of the party's advisor to ask all relevant questions);

- § 106.46(f)(3) (decisionmaker must determine whether a proposed question is relevant and explain any decision to exclude a question as not relevant); and

- § 106.46(h)(1)(iii) (written determination must contain an evaluation of relevant evidence).

The Department justified the requirement to provide an equal opportunity to present witnesses and evidence in the preamble to the 2020 amendments as "an important procedural right and protection for both parties" that "will improve the reliability and legitimacy of the outcomes recipients reach in Title IX sexual harassment grievance processes." 85 FR at 30293. In the preamble to the 2020 amendments, the Department described this provision as referring to relevant witnesses and evidence. *See id.* at 30283 (stating that information about the allegations under investigation "allows both parties to meaningfully participate during the investigation, for example by gathering and presenting inculpatory or exculpatory evidence (including fact and expert witnesses) relevant to each allegation under investigation"). The Department now proposes making this explicit in the proposed regulations. Placing a relevance limitation on witnesses and evidence would limit the potential harm and unnecessary or wasteful use of recipients' and parties' resources caused by the introduction of irrelevant testimony and evidence.

Under proposed § 106.45(f)(2), a recipient would be required to provide the parties with the opportunity to present fact witnesses and other relevant evidence. Separately, under proposed § 106.45(f)(3), the recipient then would be required to evaluate whether the evidence is

relevant and not otherwise impermissible, consistent with proposed §§ 106.2 and 106.45(b)(7).

Although current § 106.45(b)(5)(ii) requires a recipient to provide an equal opportunity for the parties to present expert witnesses, the Department proposes moving this requirement to proposed § 106.46(e)(4) and limiting its application to complaints of sex-based harassment involving a student complainant or a student respondent at a postsecondary institution. A recipient investigating and resolving a complaint under proposed § 106.45 would retain the discretion to determine whether to allow the parties to present expert witnesses. In making this determination, a recipient would be required to comply with proposed § 106.45(b)(1) and (f). A recipient would need to apply the determination about whether to allow expert witnesses equally to the parties, as part of the requirement to provide for equitable procedures and for the adequate, reliable, and impartial investigation and resolution of complaints. As explained in greater detail in the discussion of proposed § 106.46(e)(4), the use of expert witnesses may introduce delays without adding a meaningful benefit to the recipient's investigation and resolution of the case.

Section 106.45(f)(3) Review and determination of relevant evidence

*Current regulations:* None.

*Proposed regulations:* Proposed § 106.45(f)(3) would require a recipient to review all evidence gathered through the investigation and determine which evidence is relevant and which evidence is impermissible regardless of relevance, consistent with proposed §§ 106.2 and 106.45(b)(7).

*Reasons:* The Department proposes clarifying in proposed § 106.45(f)(3) that a recipient must review all evidence gathered throughout the investigation. This provision would require the recipient to determine which evidence is "relevant," as defined in proposed § 106.2, and which evidence is impermissible regardless of relevance, as set out in proposed § 106.45(b)(7).

The current regulations, at § 106.45(b)(1)(ii), state that a recipient's grievance process

Case 3:21-cv-00308-CEA-DCP   Document 83-1   Filed 06/27/22   Page 336 of 701   PageID #: 1569

must "[r]equire an objective evaluation of all relevant evidence." The proposed regulations would retain this requirement for the recipient's grievance procedures at § 106.45(b)(6). The Department proposes adding § 106.45(f)(3) to make clear that when investigating a complaint of sex discrimination and throughout the process set out in the § 106.45 grievance procedures, a recipient must determine which evidence gathered through the investigation is relevant and which is impermissible regardless of relevance, consistent with proposed §§ 106.2 and 106.45(b)(7).

Section 106.45(f)(4) Description of evidence

*Current regulations*: Section 106.8(c) requires a recipient to adopt and publish grievance procedures for the prompt and equitable resolution of student and employee complaints alleging sex discrimination and a grievance process for formal complaints of sexual harassment under § 106.45. Current § 106.45(b)(5)(vi) provides that for formal complaints of sexual harassment, a recipient must provide the parties with an equal opportunity to review and respond to evidence obtained during the investigation that is directly related to the allegations raised in a formal complaint of sexual harassment. Current § 106.45(b)(5)(vi) contains additional requirements related to reviewing evidence, which are explained in the discussion of proposed § 106.46(e)(6).

*Proposed regulations*: Proposed § 106.45(f)(4) would require a recipient, as part of its obligation to conduct an adequate, reliable, and impartial investigation of sex discrimination complaints, to provide each party with a description of the evidence that is relevant to the allegations of sex discrimination and not otherwise impermissible. Proposed § 106.45(f)(4) would also require a recipient to provide the parties with a reasonable opportunity to respond to this description of evidence. For additional requirements regarding the application of this provision in grievance

procedures for sex-based harassment complaints involving postsecondary students, see the discussion of proposed § 106.46(e)(6).

*Reasons*: The current regulations require a recipient to provide the parties with the opportunity to inspect and review the evidence directly related to the allegations in response to a formal complaint of sexual harassment. The current regulations do not expressly require a recipient to provide access to the evidence or a description of the evidence for complaints of sex discrimination other than formal complaints of sexual harassment.

Under proposed § 106.45(f)(4), the Department proposes requiring a recipient to, at minimum, provide the parties with a description of the relevant evidence as part of the investigation of all sex discrimination complaints. A recipient may provide this description orally or in writing. Proposed § 106.8(f)(1) would require a recipient to maintain records documenting the process that the recipient conducted under the grievance procedures under proposed § 106.45, and if applicable proposed § 106.46, for each complaint of sex discrimination. Accordingly, a recipient that provides the parties with an oral description of the evidence to comply with proposed § 106.45(f)(4) would need to maintain a written record of this description. Likewise, a recipient would need to maintain any written description of the evidence that it provides to the parties.

In addition, under proposed § 106.45(f)(4), the Department proposes requiring a recipient to provide the parties with a reasonable opportunity to respond to the description of the evidence as part of the investigation of the complaint.

For complaints of sex-based harassment involving a student complainant or student respondent at a postsecondary institution, the postsecondary institution would be required to comply with both proposed §§ 106.45(f)(4) and 106.46(e)(6). As explained in the discussion of

337

proposed § 106.46(e)(6), a postsecondary institution would be required to provide the parties with equitable access to the relevant and not otherwise impermissible evidence, or to a written investigative report that accurately summarizes this evidence. As stated in proposed § 106.46(e)(6)(iv), compliance with the requirements of proposed § 106.46(e)(6) would also satisfy the requirements of proposed § 106.45(f)(4).

In the preamble to the 2020 amendments, the Department stated that the purpose of current § 106.45(b)(5)(vi) is to enable the parties to "meaningfully prepare arguments based on the evidence that further each party's view of the case, or present additional relevant facts and witnesses that the decision-maker should objectively evaluate before reaching a determination regarding responsibility, including the right to contest the relevance of evidence." 85 FR at 30303. The proposed regulations would likewise provide the parties with sufficient information about the relevant evidence to meaningfully prepare arguments, contest the relevance of evidence, and present additional evidence for consideration but would also enable recipients to more effectively fulfill their obligations under Title IX by allowing them to tailor the manner in which they present the relevant, permissible evidence in light of the ages of the parties, severity of the alleged conduct, volume of evidence, other case-specific factors, and factors specific to the recipient's educational environment.

Numerous stakeholders, in listening sessions and the June 2021 Title IX Public Hearing, urged the Department to provide greater discretion for elementary school and secondary school recipients. Many stakeholders commented that they have found the current regulations to be onerous, protracted, and unworkable in practice for elementary school and secondary school recipients. It is the Department's tentative view that proposed § 106.45(f)(4) would streamline the investigation process while ensuring that parties receive a description of the relevant

338

evidence so that they can have a meaningful opportunity to be heard in response to the evidence under consideration by the recipient. The Department observes that in *Goss*, the Supreme Court held that students facing a temporary suspension are entitled to notice of the charges against them and "if [the student] denies them, an explanation of the evidence the authorities have and an opportunity to present [the student's] side of the story." 419 U.S. at 581. The description of the relevant evidence that would be required by proposed § 106.45(f)(4) would satisfy *Goss*'s requirement for an explanation of the evidence.

Under proposed § 106.45(i), a recipient may adopt additional provisions as part of its grievance procedures as long as they are applied equally to the parties. Accordingly, a recipient that would not be required by proposed § 106.46(e)(6) to provide access to the relevant evidence or to an investigative report would nevertheless have the discretion to do so.

Section 106.45(g) Evaluating allegations and assessing credibility

*Current regulations:* Section 106.8(c) requires a recipient to adopt and publish grievance procedures for the prompt and equitable resolution of student and employee complaints alleging sex discrimination and a grievance process for formal complaints of sexual harassment under § 106.45. Current § 106.45(b)(6)(i) provides that for formal complaints of sexual harassment, postsecondary institutions must provide for a live hearing during which the decisionmaker must permit each party's advisor to ask the other party and any witnesses all relevant questions and follow-up questions, including those challenging credibility.

*Proposed regulations:* The Department proposes adding § 106.45(g), which would require a recipient to provide a process that enables the decisionmaker to adequately assess the credibility of the parties and witnesses to the extent credibility is both in dispute and relevant to evaluating one or more allegations of sex discrimination. For additional requirements regarding the

application of this provision in grievance procedures for sex-based harassment complaints

involving postsecondary students, see the discussion of proposed § 106.46(f).

*Reasons:* The current regulations require that a recipient have a process for assessing the

credibility of the parties and witnesses to formal complaints of sexual harassment but do not

have a similar requirement for other complaints of sex discrimination. The Department's current

position is that to the extent credibility is relevant, as discussed in proposed § 106.46(f), a

process for assessing credibility must be included in grievance procedures for complaints of

other forms of sex discrimination as well.

In view of this, proposed § 106.45(g) would require a recipient to have a process in place

to assess the credibility of the parties and witnesses, to the extent credibility is in dispute and

relevant to evaluating one or more allegations of sex discrimination. A recipient would have the

ability to structure this process in a way that is consistent with its obligation to have an equitable

process for all parties and takes into account the recipient's administrative structure, education

community, and any applicable State or local legal requirements. The Department notes the

specific requirements for assessing credibility in proposed § 106.46(f) related to questioning by

the decisionmaker or cross-examination are limited to complaints of sex-based harassment

involving student complainants or student respondents at postsecondary institutions and would

not apply under proposed § 106.45(g). However, and consistent with the discussion of proposed

§ 106.46(g), if as a part of its process for assessing credibility under proposed § 106.45(g), a

recipient elects to include any of these additional provisions, including conducting a live hearing

with both parties present, the Department's current view is that the recipient's grievance

procedures would not be equitable if either party requested to participate in the live hearing in a

separate room and the recipient denied the request. For additional discussion of the distinction

between provisions under proposed §§ 106.45 and 106.46, see the discussion of the Framework

for Grievance Procedures for Complaints of Sex Discrimination (Section II.F). Under proposed

§ 106.45(g) a recipient would be permitted to incorporate the methods for assessing credibility

that would be required under proposed § 106.46(f) or may choose to incorporate other methods

that the recipient believes are better suited to the nature of the allegations and the recipient's

educational environment as long as they aid in fulfilling the recipient's obligation to provide an

education program or activity free from sex discrimination. In situations in which credibility is

not in dispute or is not relevant to evaluating one or more allegations of sex discrimination, a

recipient would not be required to implement its process required under proposed § 106.45(g) for

assessing credibility.

Section 106.45(h) Determination of whether sex discrimination has occurred

*Current regulations:* Section 106.45(b)(7) states that the decisionmaker(s) cannot be the same

person(s) as the Title IX Coordinator or the investigator(s), and that the recipient must issue a

written determination regarding responsibility. This written determination must be provided to

the parties simultaneously. To reach this determination, the recipient must apply its chosen

standard of evidence and the written determination must include several components:

identification of the allegations potentially constituting sexual harassment; a description of the

procedural steps taken from the receipt of the formal complaint through the determination;

findings of fact supporting the determination; conclusions regarding the application of the

recipient's code of conduct to the facts; a statement of, and rationale for, the result as to each

allegation, including a determination regarding responsibility, any disciplinary sanctions the

recipient imposes on the respondent, and whether remedies will be provided by the recipient to

the complainant; and the recipient's procedures and permissible bases for the complainant and

341

respondent to appeal.

This provision also states that the Title IX Coordinator is responsible for the effective implementation of any remedies, and that the determination regarding responsibility becomes final either on the date that the recipient provides the parties with the written determination of the result of the appeal, if an appeal is filed, or if an appeal is not filed, the date on which an appeal would no longer be considered timely.

*Proposed regulations:* Under proposed § 106.45(h), following an investigation as set out in proposed § 106.45(f) and (g), a recipient would have to determine whether sex discrimination occurred. The Department proposes reorganizing the requirements from the current regulatory provisions §§ 106.45(b)(1)(i), 106.45(b)(1)(vii), 106.45(b)(2), 106.45(b)(7), and 106.71(b)(2) into proposed § 106.45(h) with strengthened protections for the parties and other changes so that this provision is consistent with the other revisions proposed throughout the regulations.

Proposed § 106.45(h)(1) would require a recipient to use the preponderance of the evidence standard of proof to determine whether sex discrimination occurred, unless the recipient uses the clear and convincing evidence standard of proof in all other comparable proceedings, including proceedings relating to other discrimination complaints. In those situations, proposed § 106.45(h)(1) would allow the recipient to elect to use the clear and convincing evidence standard of proof in determining whether sex discrimination occurred. Proposed § 106.45(h)(2) would require that a recipient notify the parties of the outcome of the complaint, including the determination of whether sex discrimination occurred, and the procedures and permissible bases for the complainant and respondent to appeal, if applicable. Proposed § 106.45(h)(3) would require that, if there is a determination that sex discrimination occurred, the recipient must, as appropriate, require the Title IX Coordinator to provide and

342

implement remedies to a complainant or other person the recipient identifies as having their equal access to the recipient's education program or activity limited or denied by sex discrimination, and require the Title IX Coordinator to take other appropriate prompt and effective steps to ensure that sex discrimination does not continue or recur within the recipient's education program or activity. Proposed § 106.45(h)(4) would preserve the requirement that the recipient must comply with this section, and if applicable § 106.46, before the imposition of any disciplinary sanctions against a respondent. Proposed § 106.45(h)(5) would prohibit a recipient from disciplining a party, witness, or others participating in the recipient's grievance procedures for making a false statement or for engaging in consensual sexual conduct based solely on the recipient's determination of whether sex discrimination occurred.

*Reasons:* The Department's current view is that these provisions should be grouped together in the proposed regulations because all of them would govern a recipient's determination of whether sex discrimination occurred. Additional detailed explanation of the requirements of proposed § 106.45(h) is provided in the discussion of each provision, including proposed changes from current § 106.45. For additional requirements regarding the application of proposed § 106.45(h) in grievance procedures for sex-based harassment complaints involving postsecondary students, see the discussion of proposed § 106.46(h).

Section 106.45(h)(1) Standard of proof

*Current regulations:* Section 106.45(b)(1)(vii) requires a recipient to state whether the standard of evidence to be used to determine responsibility is the preponderance of the evidence standard or the clear and convincing evidence standard, apply the same standard of evidence for formal complaints against students as for formal complaints against employees, including faculty, and apply the same standard of evidence to all formal complaints of sexual harassment.

*Proposed regulations:* Proposed § 106.45(h)(1) would require a recipient to use the preponderance of the evidence standard of proof when determining whether sex discrimination occurred except that the recipient could use the clear and convincing evidence standard if the recipient uses that standard of proof in all other comparable proceedings, including proceedings relating to other discrimination complaints. Under either standard of proof, proposed § 106.45(h)(1) would require the decisionmaker to evaluate the relevant evidence for its persuasiveness.

*Reasons: Standard of proof.* The Department proposes using the term "standard of proof" instead of "standard of evidence" to clarify that this would be the standard a recipient must use to determine whether sex discrimination occurred. This proposed change would also prevent confusion with the proposed definition of "relevant," which sets out a standard that must be applied to all evidence. The term "relevant" is explained in greater detail in the discussion of the proposed definition of "relevant" (§ 106.2) and the discussion of proposed § 106.45(b)(6).

*Requiring use of the preponderance of the evidence standard of proof unless the clear and convincing evidence standard is used for comparable proceedings.* OCR heard from stakeholders during the June 2021 Title IX Public Hearing and in listening sessions regarding what standard of proof a recipient should be required to use in its Title IX grievance procedures, and similar comments were made by stakeholders in meetings held in 2022 under Executive Order 12866, after the NPRM was submitted to OMB. Some stakeholders said that the preponderance of the evidence standard ensures fairness to the parties, who have an equal stake in the outcome of the proceedings, by giving equal weight to accounts of a complainant and respondent as to whether sexual harassment occurred. Some stakeholders made the point that the preponderance of the evidence standard is the typical standard applied to evidence in civil

344

litigation, including in cases alleging discrimination under Title VII and Title VI, as well as under Title IX. Others said that because litigation is different from a recipient's administrative process, it is not appropriate to require recipients to use the same standard as would be applied in civil litigation. Some stakeholders also pointed to differences between the workplace and education contexts, while others noted that Title IX applies to both employees and students. Some stakeholders urged the Department to require recipients to use the clear and convincing standard, or at a minimum require it for sexual assault cases, because allegations related to sexual misconduct, especially including sexual assault, are of a serious nature, findings of responsibility may have long-term consequences for a respondent, and the Title IX grievance process does not afford all the same protections to the parties that are available in a court proceeding. Other stakeholders described the framework from the 2020 amendments— specifically, allowing recipients to choose between the preponderance of the evidence and the clear and convincing evidence standards of proof—as creating inequities in the grievance process because it allows schools to use a different standard of proof for sexual harassment allegations than it does for other misconduct complaints, including complaints that allege other types of discrimination.

When the Department promulgated the 2020 amendments and declined to mandate either the preponderance of the evidence standard or the clear and convincing evidence standard, the Department explained that "either standard of evidence, in combination with the rights and protections required under § 106.45, creates a consistent, fair process under which recipients can reach accurate determinations regarding responsibility." 85 FR at 30381. The Department further explained that "it [was] not aware of a Federal appellate court holding that the clear and convincing evidence standard is required to satisfy constitutional due process or fundamental

fairness in Title IX proceedings, and the Department [was] not aware of a Federal appellate court holding that the preponderance of the evidence standard is required under Title IX." *Id.* at 30384. This remains true as the Department is not aware of a Federal appellate court that has since held that a particular standard of proof is required to satisfy constitutional due process or fundamental fairness in Title IX proceedings.

Under the preponderance of the evidence standard of proof, a determination that sex discrimination occurred can be made only if the decisionmaker finds it is more likely than not that a respondent engaged in sex discrimination. A respondent would not be found responsible for sex discrimination if the evidence were in equipoise, meaning evenly balanced for and against a determination of responsibility. In such a case, there would not be sufficient evidence for the decisionmaker to find it more likely than not that sex discrimination occurred. The Department notes that several Federal courts, including appellate courts, have held that the preponderance of the evidence standard is constitutionally sound and sufficient to ensure due process to a respondent when a school evaluates allegations of sexual harassment. *See, e.g.*, *Doe v. Univ. of Ark.-Fayetteville*, 974 F.3d 858, 868 (8th Cir. 2020) ("[W]e do not think a higher standard of proof [than preponderance of the evidence] is compelled by the Constitution. . . . A heightened burden of proof may lessen the risk of erroneous deprivations for an accused, but it also could frustrate legitimate governmental interests by increasing the chance that a true victim of sexual assault is unable to secure redress and a sexual predator is permitted to remain on campus."); *Cummins*, 662 F. App'x at 449 ("Allocating the burden of proof [equally under the preponderance of the evidence standard]—in addition to having other procedural mechanisms in place that counterbalance the lower standard used (e.g., an adequate appeals process)—is constitutionally sound and does not give rise to a due-process violation."); *Lee v. Univ. of N.M.*,

449 F. Supp. 3d 1071, 1132 (D.N.M. 2020) ("[D]ue process permits state education institutions . . . to adjudicate sexual misconduct disciplinary proceedings according to a preponderance-of-the-evidence standard."); *Messeri v. DiStefano*, 480 F. Supp. 3d 1157, 1167-68 (D. Colo. 2020) ("Increasing the evidentiary standard would undoubtedly make it less likely that the University erroneously sanctioned Plaintiff or others similarly situated. . . . [but] requiring a higher evidentiary standard would . . . detract from the University's 'strong interest in the educational process, including maintaining a safe learning environment for all its students.' . . . Balancing these interests, the Court concludes that it is beyond dispute that due process currently permits state educational institutions to adjudicate disciplinary proceedings relating to sexual misconduct using a preponderance of the evidence standard." (quoting *Plummer v. Univ. of Hous.*, 860 F.3d 767, 773 (5th Cir. 2017))); *Doe v. Haas*, 427 F. Supp. 3d 336, 350 (E.D.N.Y. 2019) ("The Court also rejects the contention that due process required that the university apply a standard more stringent than the preponderance of the evidence. Such a standard is the accepted standard in the vast majority of civil litigations and . . . courts have rejected the notion that the safeguards applicable to criminal proceedings should be applied in the school disciplinary context."); *Marshall v. Ind. Univ.*, 170 F. Supp. 3d 1201, 1206-08 (S.D. Ind. 2016) (finding that, based on the law in Indiana and the Seventh Circuit, the university did not violate the plaintiff's due process rights when it applied the preponderance of the evidence standard at his disciplinary hearing before expelling him for sexual misconduct).

Other courts have refused to dismiss cases challenging the preponderance of the evidence standard or indicated that without other procedural safeguards, use of the preponderance of the evidence standard could violate due process. *See, e.g., Doe v. Univ. of Miss.*, 361 F. Supp. 3d 597, 614 (S.D. Miss. 2019) (refusing to dismiss a challenge to the use of the preponderance of

the evidence standard, "[g]iven the developing nature of the law, and the fact that other portions of this claim survive Defendants' Rule 12(b)(6) [motion]"); *Doe v. Univ. of Colo.*, 255 F. Supp. 3d 1064, 1082 n. 13 (D. Colo. 2017) (finding, on a motion to dismiss, that the plaintiff raised "a viable procedural due process claim" regarding "whether preponderance of the evidence is the proper standard for disciplinary investigations"); *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 607 (D. Mass. 2016) (explaining that the use of the preponderance of the evidence standard "is not problematic, standing alone; that standard is commonly used in civil proceedings, even to decide matters of great importance," but taking issue with its use in its use in this case because it "appear[ed] to have been a deliberate choice by the university to make cases of sexual misconduct easier to prove" and further noting that this was "particularly troublesome in light of the elimination of other basic rights of the accused," including the use of a single investigator model, no right to an effective appeal, and no right to examine evidence or witness statements).

The preponderance of the evidence standard is commonly used in civil litigation, including in cases involving alleged discrimination in violation of civil rights laws, and the Supreme Court has applied a preponderance of the evidence standard in litigation involving discrimination under Title VII. *See, e.g.*, *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003) (declining to depart from the traditional rule of civil litigation, that the preponderance of the evidence standard generally applies in Title VII cases); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 252-55 (1989) (approving preponderance standard in Title VII sex discrimination case) (plurality opinion); *id.* at 260 (White, J., concurring in the judgment); *id.* at 261 (O'Connor, J., concurring in the judgment). Further, numerous courts have held that the preponderance of the evidence standard is a constitutionally appropriate burden of proof in civil actions seeking to impose liability for sexual assault and rape in State court. *See, e.g.*, *Ashmore v. Hilton*, 834 So.

348

2d 1131, 1134 (La. Ct. App. 2002) (holding that the preponderance of evidence standard is sufficient in civil rape case); *Jordan v. McKenna*, 573 So. 2d 1371, 1376 (Miss. 1990) (holding, in civil action for rape, that plaintiff's burden is "by a preponderance of the evidence"); *Dean v. Raplee*, 39 N.E. 952, 954 (N.Y. 1895) (finding preponderance of evidence sufficient in civil case alleging sexual assault); *cf. Metz v. Dilley (In re Dilley)*, 339 B.R. 1, 7 (B.A.P. 1st Cir. 2006) ("The crime of murder and the civil tort of wrongful death require proof of different elements judged against two different standards of proof." (citations omitted)); *Metro. Life Ins. Co. v. Kelley*, 890 F. Supp. 746, 749 (N.D. Ill. 1995) (stating that although criminal murder must be proven beyond reasonable doubt, proof of wrongful death by murder in civil case must be proven only by preponderance of evidence).

The Department acknowledges that in the civil litigation context, there are procedural safeguards, such as discovery, that help to ensure a fair process. In the preamble to the 2020 amendments, the Department noted that "civil litigation generally uses the preponderance of the evidence standard" and that Title IX grievance procedures "are analogous to civil litigation in some ways," but the Department also stated that the Title IX grievance procedures as prescribed under the 2020 amendments "do not have the same set of procedures available in civil litigation." 85 FR at 30381. Although the procedures may not be the same, it is the Department's current view that the proposed regulations include a number of key safeguards to ensure that a recipient's grievance procedures provide a fair process for all involved. For example, under the proposed regulations, at both elementary schools and secondary schools as well as at postsecondary institutions, a recipient's grievance procedures would have to, among other things:

- Treat complainants and respondents equitably;

349

- Prohibit the Title IX Coordinator, the investigator, and the decisionmaker from having a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent;

- Provide the recipient the discretion to dismiss a complaint in four different circumstances, including when the allegations, even if true, would not constitute sex discrimination under Title IX;

- Require notice to the parties of the allegations;

- State that the grievance procedures must be followed before determining whether sex discrimination occurred and before the imposition of any disciplinary sanctions against a respondent and that such sanctions may be imposed only if it is determined that the respondent violated the recipient's prohibition on sex discrimination;

- Require an objective evaluation of all relevant evidence and exclude certain types of evidence as impermissible;

- Place the burden on the recipient to conduct an investigation that gathers sufficient evidence to reach a determination;

- Provide an equal opportunity for the parties to present relevant fact witnesses and other inculpatory and exculpatory evidence;

- Provide each party with a description of the relevant and not otherwise impermissible evidence and a reasonable opportunity to respond to that evidence;

- Require the decisionmaker to adequately assess the credibility of the parties and witnesses to the extent credibility is in dispute and relevant to the allegations; and

- Include the right of appeal in complaint dismissals, and on certain bases for students in postsecondary institutions in cases of sex-based harassment.

350

Under the proposed regulations, a recipient would be permitted to adopt additional provisions as part of its grievance procedures, as long as such provisions are applied equally to the parties. Proposed § 106.45(i).

The Department's current view is that these procedural safeguards together would establish a strong framework for a fair process for all. It is also the Department's current view that the preponderance of the evidence is the standard of proof for complaints of sex discrimination that would best promote compliance with Title IX because it ensures that when a decisionmaker determines, based on evidence, that it is more likely than not that sex discrimination occurred in its program or activity, the recipient can take sufficient steps to deter the respondent from engaging in similar conduct and prevent future such violations. Use of a preponderance standard also equally balances the interests of the parties in the outcome of the proceedings by giving equal weight to the evidence of each party, and it begins proceedings without favoring the version of facts presented by either side. *See, e.g.*, *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 (1983) ("A preponderance-of-the-evidence standard allows both parties to 'share the risk of error in roughly equal fashion'" while "[a]ny other standard expresses a preference for one side's interests." (quoting *Addington v. Texas*, 421 U.S. 418, 423 (1979))). The Department understands that there can be serious consequences for a respondent who is found to be responsible for sex-based harassment, including sexual assault, and for complainants who have been subjected to sex-based harassment. The Department further understands that all parties have an equal interest in the outcome of the proceedings.

In addition, the Department notes that, according to recent research, preponderance of the evidence is the standard of proof already commonly used by postsecondary institutions for evaluating evidence regarding all student conduct allegations, including sex-based harassment.

*See* Foundation for Individual Rights in Education, *Spotlight on Due Process 2020-2021*,

https://www.thefire.org/resources/spotlight/due-process-reports/due-process-report-2020-2021

(last visited June 17, 2022) (analysis of disciplinary procedures at 53 top-ranked public and

private postsecondary institutions nationwide). Stakeholders have confirmed for the Department

that a very large majority of elementary schools and secondary schools use the preponderance of

the evidence standard for evaluating evidence as well.

 Nevertheless, the Department recognizes that a relatively small number of recipients

currently apply the clear and convincing evidence standard of proof to code of conduct

violations, either for the code as a whole or for a subset of alleged violations of the code. Under

the clear and convincing evidence standard of proof, a decisionmaker would be required to find,

based on evidence it has gathered consistent with its grievance procedures, that it is highly

probable that allegations of sex-based harassment or other sex discrimination are true before

determining that sex discrimination occurred. This is a higher standard than proof by a

preponderance of the evidence, but it would not require proof beyond a reasonable doubt, as is

required in a criminal proceeding. The Department understands that these recipients have

determined that the clear and convincing evidence standard advances certain other important

institutional interests in a broad array of disciplinary cases, not limited to those involving sex

discrimination. For some of these recipients, the use of a clear and convincing evidence

standard, like the use of a preponderance standard, may reflect certain values of their educational

community related to student discipline generally. For others, there may be historical or other

factors that have guided their choice of standard of proof. The Department also notes that if a

recipient uses a clear and convincing standard to evaluate evidence of other potential student

conduct violations, a requirement that a recipient maintain a lower standard of proof for

evaluating sex discrimination allegations may in some circumstances give rise to confusion, perceptions of unfairness, and resentment. *See, e.g. Brandeis*, 177 F. Supp. 3d at 607 (court stated that requiring a preponderance of the evidence standard for sexual misconduct cases may be seen "as part of an effort to tilt the playing field against accused students" where an institution applies the clear-and-convincing standard for "virtually all other forms of student conduct"). These perceptions may complicate a recipient's administration of its student disciplinary codes in general, and in particular its grievance procedures for complaints of sex discrimination, in ways that are counterproductive to preventing and responding to sex discrimination in the recipient's education program or activity.

The Department notes that the American Law Institute (ALI) membership, at its May 2022 Annual Meeting, approved the following principle as part of its project on procedural frameworks for resolving campus sexual misconduct cases in postsecondary institutions:

> § 6.8. Standard of Proof
>
> Colleges and universities should adopt the same standard of proof for resolving disciplinary claims of sexual misconduct by students as they use in resolving other comparably serious disciplinary complaints against students. Standards that require proof either by a "preponderance of the evidence" or by "clear and convincing evidence" can satisfy the requirements of procedural due process and fair treatment. Whatever standard of proof is adopted, decisions that the standard of proof is met should always rest on a sound evidentiary basis.

American Law Institute, *Black Letter of Student Sexual Misconduct: Procedural Frameworks for Colleges and Universities,* Tentative Draft No. 1 (Apr. 2022) (as approved by the ALI membership, May 2022) at 12-13, https://www.ali.org/media/filer_public/ce/1c/ce1ca6e7-557b-

[4f73-bba8-ef12d9ae56a2/student-misconduct-td1-black-letter.pdf](4f73-bba8-ef12d9ae56a2/student-misconduct-td1-black-letter.pdf).  The Department's proposed regulations would align with the ALI position, providing that for sex discrimination complaints a recipient can use either the preponderance of evidence or the clear and convincing evidence standard of proof but must not use a higher standard of proof for evaluating evidence of sex discrimination than for other forms of discrimination or other comparable proceedings.

The Department's current view is that the "beyond a reasonable doubt" standard from criminal law is never appropriate for evaluating evidence in a recipient's grievance procedures under Title IX.  This position is consistent with the 2020 amendments, which do not permit application of the "beyond a reasonable doubt" standard in Title IX grievance proceedings.  *See* 85 FR at 30051 n.225.  The criminal standard is designed specifically as a safeguard for proceedings in which an accused person may be deprived of their liberty or their life by the State or Federal government, which are not possible sanctions associated with a recipient's grievance procedures.

*Reasonable limitations on recipients' choice of standard of proof for allegations of sex discrimination.*  In proposed § 106.45(h)(1), the Department proposes allowing recipients to use the clear and convincing evidence standard of proof for sex discrimination allegations only if the recipient uses the clear and convincing evidence standard of proof in all other comparable proceedings, including proceedings relating to other discrimination complaints.  The Department's current view is that a recipient that used a clear and convincing evidence standard for sex discrimination allegations, but a preponderance standard for other comparable proceedings, would not effectuate Title IX's nondiscrimination mandate because applying a more demanding standard of proof for sex discrimination allegations than for allegations of other

types of discrimination or other comparable proceedings would impose a uniquely heavy burden on complainants alleging sex discrimination.

Specifically, in light of recipients' substantially similar legal obligations under Federal laws that prohibit various types of discrimination, the Department believes it is appropriate to require a recipient to use a standard of proof for allegations of sex discrimination that is not higher than the standard of proof for allegations of other forms of discriminatory conduct that the recipient must address consistent with its obligations under Federal law. This means that a recipient that uses a preponderance of the evidence standard for evaluating allegations of harassment or other discrimination based on race, color, national origin disability, or age, for example, must use that standard for evaluating allegations of sex discrimination. Similarly, a recipient that uses a clear and convincing evidence standard for evaluating allegations of other forms of discrimination may choose to use that standard for evaluating alleged sex discrimination as well. Otherwise, a singular imposition of a higher standard on sex discrimination complaints would impermissibly discriminate based on sex.

*Removing the requirement to use the same standard for complaints against students and employees.* Proposed § 106.45(h)(1) would also differ from current § 106.45(b)(1)(vii) in that it would not require a recipient to use the same standard of proof for complaints against students as it would for complaints against employees. The Department's current view, informed by the input of stakeholders, is that allegations regarding sex discrimination by a student are comparable to allegations of other types of discrimination by a student, and that allegations of sex discrimination by an employee are comparable to allegations of other types of discrimination by an employee. Therefore, under the proposed regulations a recipient would be able to apply a

355

different standard of proof to allegations of student misconduct than it would to allegations of employee misconduct.

During the June 2021 Title IX Public Hearing and in listening sessions, OCR heard from stakeholders that requiring recipients to use the same standard of proof for complaints against students and employees hampered the recipients' flexibility to choose a standard that is responsive to the many differences in a recipient's interactions with and obligations to its students and its employees. After reevaluating the issue and taking into account factors relevant to a recipient's distinct, even if interrelated, functions and obligations as an educator and as an employer, the Department proposes removing the requirement for recipients to use the same standard of proof for sexual harassment complaints against students and employees. As discussed in the preamble to the 2020 amendments, recipients may have collective bargaining agreements or State laws mandating certain standards of proof for evaluating employee conduct allegations and may want to select a different standard of proof for student conduct allegations or may have State laws requiring them to use a different standard of proof for students. *Id.* at 30376, 30378. The Department now believes that requiring the same standard of proof for complaints against students and employees is not necessary because of the difference in the relationships and obligations recipients have vis-à-vis students as compared to employees. Requiring the same standard of proof to be used for student and employee complaints also is not necessary to ensure predictability for students (another concern raised by commenters in 2020, *id.* at 30375-76), because current § 106.45(b)(1)(vii) already requires recipients to state whether the standard of proof to be used to determine whether the respondent violated the recipient's prohibition on sexual harassment is the preponderance of the evidence standard or the clear and convincing evidence standard, and proposed § 106.45(h)(1) would preserve that requirement for

all complaints of sex discrimination. Under the current regulations, recipients are already required and will continue to be required under the proposed regulations, to make their students and employees aware of what standard of proof they will apply to such allegations. For some recipients, this may require a statement that they will use one standard of proof for allegations of sex discrimination against employees, or against a certain subset of employees, and a different standard of proof for allegations of sex discrimination against students. Under proposed § 106.45(h)(1), the use of a clear and convincing evidence standard for any allegations of sex discrimination would be permitted only if the recipient used the same standard in all other comparable proceedings, including proceedings relating to other discrimination complaints, involving a given category of respondents.

For example, if a recipient is bound by a collective bargaining agreement to use the clear and convincing evidence standard for allegations that an employee engaged in race discrimination, as well as all other comparable allegations, it could elect to use the same standard for sex discrimination allegations against an employee. If the same recipient uses a clear and convincing evidence standard for allegations of race discrimination and other comparable offenses against a student, it could choose to use the clear and convincing evidence standard for allegations of student sex discrimination. However, if that recipient uses a preponderance of the evidence standard for allegations that a student engaged in race discrimination, it would have to use the preponderance of the evidence standard for allegations of student sex discrimination. The Department notes that it applies the preponderance of the evidence standard to evaluate allegations of discrimination under all of the laws it enforces and that it does so for the equity-related reasons explained in the discussion of its benefits.

In light of this discussion, the Department invites the public to comment on proposed § 106.45(h)(1). In particular, to the extent commenters take the position that the clear and convincing standard would be appropriate when used in all other comparable proceedings, the Department invites comments on steps that recipients implementing that standard have taken to ensure equitable treatment between the parties. The Department also invites comments on whether it is appropriate to allow a recipient to use a different standard of proof in employee-on-employee sex discrimination complaints, than it uses in sex discrimination complaints involving a student. Finally, the Department invites comments on whether it would be appropriate to mandate the use of only one standard of proof for sex discrimination complaints.

*The decisionmaker must evaluate the relevant evidence for its persuasiveness.* The Department recognizes that clarifying that relevant evidence must be evaluated for its persuasiveness will help inform decisionmakers of the appropriate way to evaluate evidence under either a preponderance of the evidence or clear and convincing evidence standard of proof. In particular, OCR has received comments and heard in listening sessions that this type of clarification may be especially useful for those without formal legal training to confirm that the evaluation of evidence involves an assessment of the persuasiveness of evidence rather than a weighing of the sheer quantity of evidence tending to support or disprove the allegations.

Section 106.45(h)(2) Notification of outcome of complaint

*Current regulations*: Section 106.45(b)(7) states that the recipient must issue a written determination regarding responsibility that is provided to the parties simultaneously. To reach this determination, the recipient must apply its chosen standard of evidence and the written determination must include several components: (A) identification of the allegations potentially constituting sexual harassment; (B) a description of the procedural steps taken from the receipt of

the formal complaint through the determination; (C) findings of fact supporting the determination; (D) conclusions regarding the application of the recipient's code of conduct to the facts; (E) a statement of, and rationale for, the result as to each allegation, including a determination regarding responsibility, any disciplinary sanctions the recipient imposes on the respondent, and whether remedies will be provided by the recipient to the complainant; and (F) the recipient's procedures and permissible bases for the complainant and respondent to appeal.

*Proposed regulations:* Proposed § 106.45(h)(2) would require that a recipient notify the parties of the outcome of the complaint, including the determination of whether sex discrimination occurred, and the procedures and permissible bases for the complainant and respondent to appeal, if applicable. Regarding the right to appeal, the Department proposes maintaining the existing language of § 106.45(b)(1)(viii) but proposes clarifying its applicability to all complaints of sex discrimination, not just complaints of sex-based harassment.

*Reasons:* Proposed § 106.45(h)(2) would preserve the requirement that a recipient notify the parties of the outcome of the complaint, but the notification would not have to be in writing. The Department reconsidered the need to adopt a framework for the grievance procedures that a recipient must follow when responding to all complaints of sex discrimination in light of the recipient's obligations under Title IX to operate its education program or activity free from sex discrimination, not just sexual harassment. In light of that restructuring, all of the current requirements for sexual harassment complaints would not necessarily be appropriate or necessary for all sex discrimination complaints, or in all settings. The Department explained in the preamble to the 2020 amendments that the nature of the protections needed "in the 'particular situation' of elementary and secondary schools may differ from protections necessitated by the 'particular situation' of postsecondary institutions." 85 FR at 30052. The Department maintains

this view and also believes that that the specific procedures necessary to afford prompt and equitable grievance procedures that are designed to ensure a fair and reliable process for sex discrimination complaints will differ based on the nature of the allegations (e.g., sex-based harassment or other forms of sex discrimination such as prohibited different treatment or pregnancy discrimination), and the unique characteristics of the individuals involved (e.g., age, level of independence, relationship to the recipient).

The Department also takes the tentative position that the provisions in proposed § 106.46, which contain requirements related to written communications with the parties, may not be necessary to ensure an equitable process for other types of sex discrimination complaints, and could have the unintended consequence of impeding effective enforcement of Title IX by delaying a recipient's prompt response to other forms of possible sex discrimination. The Department recognizes the requirements in current § 106.45 (many of which appear in proposed § 106.46) were applied in the 2020 amendments only to sexual harassment complaints, which may require greater participation by a complainant and respondent than other complaints of sex discrimination. With regard to the written determination requirement, the Department stated in the preamble to the 2020 amendments that requiring a written determination in sexual harassment complaints served the important function of ensuring the parties know the reasons for the outcome of the grievance procedure and help ensure independent judgment and decisionmaking free from bias. *Id.* at 30389. Although the Department continues to prioritize independent judgment and bias-free decisionmaking, it proposes that the written determination requirement would not be necessary in the broader context of all sex discrimination complaints and, in some educational environments, may function as an impediment to addressing sex discrimination in a recipient's program or activity.

It is the Department's current view that the requirement of proposed § 106.45(h)(2) that the recipient notify the parties of the outcome of the complaint is sufficient to fulfill Title IX's nondiscrimination requirement, coupled with the requirement that a recipient maintain a record of the outcome, as explained in greater detail in the discussion of proposed § 106.8(f)(1). Previously, the Department asserted that the burden created by the current written determination requirement was outweighed by the benefits of a reliable, consistent, transparent process for students in elementary and secondary schools, as well as students at postsecondary institutions, irrespective of the size of the institution's student body. *Id.* The Department has since reconsidered whether that burden is necessary, particularly for all sex discrimination complaints in the elementary school and secondary school setting. In the June 2021 Title IX Public Hearing, OCR heard from elementary school and secondary school recipients that the current regulations were not developed with their interests in mind, and that elementary school and secondary school recipients do not have the infrastructure to perform all the current requirements. Specifically, the written determination of responsibility was highlighted as one of the requirements that increases the length of time for an elementary school or secondary school recipient to resolve a complaint and makes the overall procedures more difficult.

It is the Department's tentative view that transparency and consistency would be achieved with the other proposed changes to the regulations, and that the burden of requiring all recipients to provide a written determination for all types of complaints may actually impede effective fulfillment of Title IX's nondiscrimination guarantee and should therefore not be required here. The Department also notes additional requirements in proposed § 106.45 that would ensure transparency and consistency in a recipient's grievance procedures, including requirements of notice of the allegations to the parties (proposed § 106.45(c)); equitable

treatment of complainants and respondents (proposed § 106.45(b)(1)); prohibition on conflict of interest or bias for or against complainants or respondents (proposed § 106.45(b)(2)); presumption of non-responsibility (proposed § 106.45(b)(3)); objective evaluation of all relevant, and not otherwise impermissible, evidence (proposed § 106.45(b)(6)-(7)); allowing the parties an equal opportunity to present relevant witnesses and other inculpatory and exculpatory evidence (proposed § 106.45(f)(2)); providing each party with a description of the evidence that is relevant and not otherwise impermissible (proposed § 106.45(f)(4)); requiring adherence to these grievance procedures before imposition of any disciplinary sanctions (proposed § 106.45(h)(4)); and the right to appeal complaint dismissals (proposed § 106.45(d)(3)). In light of these protections, which together create the framework for an equitable process, the Department's current view is that a requirement of written communication of the outcome in all cases is not necessary to ensure effective implementation of Title IX. The Department recognizes that some recipients may determine that, for their educational environment, providing outcome determinations in writing for some or all types of complaints will be appropriate, particularly when students have the skills and maturity to understand the recipient's written communication or where such communications may be useful in providing outcome information to parents, guardians, or legally authorized representatives of students in elementary school or secondary school.

In addition, the Department recognizes that some recipients may provide detailed information to parties regarding the facts determined through an investigation while others may state only whether sex discrimination occurred under Title IX. Proposed § 106.45(h)(2) provides a recipient with flexibility to choose what information to share while setting a baseline requirement that recipients inform any parties of the outcome of the investigation and a

362

determination as to whether sex discrimination occurred under Title IX. The purpose of this proposed change is to ensure consistency so that all parties to sex discrimination complaints, rather than only those involved in sex-based harassment complaints, receive information about the outcome and determination. In addition, learning about the outcome of complaints and the recipient's determination would provide parties with confirmation that the grievance procedures were completed; without that confirmation, parties could be left unsure about whether the grievance procedures were completed or whether the recipient determined the alleged conduct to be sex discrimination.

Proposed § 106.45(h)(2) would also require a recipient to notify the parties of the procedures and permissible bases of appeal, if applicable. The proposed regulations would not require a recipient to provide a right to appeal, other than for complaint dismissals or in grievance procedures for a complaint of sex-based harassment involving a student at a postsecondary institution, but would require that information about appeals be provided, if any are available. It is the Department's current view that, for complaints of sex discrimination, other than complaint dismissals or complaints of sex-based harassment involving a student at a postsecondary institution, a recipient should have the discretion to decide whether a right to appeal a determination would be appropriate for a given type of complaint. For example, in some elementary school and secondary school settings involving complaints related to less serious conduct, the delay associated with an appeal could impair a recipient's ability to manage the school environment while sex-based harassment may be ongoing. In addition, a recipient's relationships with its employees vary significantly, ranging from temporary and at-will employees to those who are tenured. A right to an appeal may not be necessary or appropriate in all instances for a recipient to resolve, promptly and equitably, as required by Title IX, every

complaint of employee-on-employee sex-based harassment. The same is true for complaints involving third parties. Further, with respect to employees, as explained in the discussion of the Overall Considerations and Framework (Section II.F.2.a), the Department recognizes that recipients have Federal law obligations to employees under Title VII as well as Title IX, and may also have obligations under other State or local laws, which may require processes that are specifically adapted to these types of complaints, and may or may not include a right to appeal.

The Department notes that, whatever a recipient decides, it must not be arbitrary in the exercise of its discretion to offer a right to appeal. That is, a recipient must treat similar complaints similarly, consistent with its obligations under Title IX and other applicable Federal nondiscrimination laws. If a recipient offers appeals, proposed §§ 106.45(d) and 106.46(i) would provide guidelines for how to provide those appeals. In particular, as explained in the discussion of proposed § 106.45(d)(3), any decisionmaker for an appeal must be trained on how to serve impartially, avoiding bias, conflicts of interest, and prejudgment of the facts.

Section 106.45(h)(3) Remedies to a complainant and other appropriate prompt and effective steps

*Current regulations*: Section 106.45(b)(7) states that the Title IX Coordinator is responsible for the effective implementation of any remedies.

*Proposed regulations:* Proposed § 106.45(h)(3) would require that, if there is a determination that sex discrimination occurred, the recipient must, as appropriate, require the Title IX Coordinator to provide and implement remedies to a complainant or other person the recipient identifies as having their equal access to the recipient's education program or activity limited or denied by sex discrimination, and require the Title IX Coordinator to take other appropriate prompt and effective steps to ensure that sex discrimination does not continue or recur within the

364

recipient's education program or activity.

*Reasons:* The requirement in proposed § 106.45(h)(3) to provide and implement remedies to a complainant or other person the recipient identifies, as appropriate, is similar to the language in current § 106.45(b)(1)(i), but would apply to all forms of sex discrimination, not just sexual harassment, consistent with other proposed revisions to the regulations governing grievance procedures. In addition, proposed § 106.45(h)(3) would require a recipient to provide and implement those remedies as appropriate; the use of "as appropriate" accounts for the fact that in some situations, even when sex discrimination has occurred, it will not be appropriate to provide remedies to a complainant. For example, after investigating a student complaint alleging that a school district failed to adequately accommodate the athletic interests and abilities of girls, a school district determines that sex discrimination occurred. If the complainant since graduated, there may be no appropriate individual remedies for the recipient to provide to the complainant, in which case, the recipient's action to address the sex discrimination instead would include remedies as appropriate for current students who experienced the same sex discrimination and other remedies as necessary and appropriate to bring the athletic program into compliance with Title IX. Or, as another example, a recipient that provides a remedy to a complainant who experienced sex-based harassment might also need to provide training or other educational programming to address the educational environment for other participants in that environment who, while not harassed, may have witnessed the sex-based harassment. This additional step of providing training or other programming could help make clear what conduct is sex discrimination, and therefore mitigate the risk for future harassment if the harassment currently at issue is not addressed and recurs.

Section 106.45(h)(4) Comply with this section before imposition of disciplinary sanctions

*Current regulations:* Section 106.45(b)(1)(i) requires a recipient to follow a grievance process that complies with § 106.45 before the imposition of any disciplinary sanctions or other actions that are not "supportive measures" as defined in § 106.30, against a respondent.

*Proposed regulations:* Proposed § 106.45(h)(4) would require a recipient to follow grievance procedures that comply with proposed § 106.45, and, if applicable, proposed § 106.46, before the imposition of any disciplinary sanctions against a respondent.

*Reasons:* Proposed § 106.45(h)(4) would maintain the same general requirement as in current § 106.45(b)(1)(i) that a recipient follow grievance procedures that comply with proposed § 106.45, and if applicable proposed § 106.46, before imposing disciplinary sanctions on a respondent. As explained in the discussion of proposed § 106.45(b)(1), the Department proposes moving this requirement from the requirement to treat complainants promptly and equitably so as not to imply that the only action a recipient must take to treat a respondent equitably is to follow grievance procedures that comply with proposed § 106.45, and if applicable proposed § 106.46, before the imposition of any disciplinary sanctions. Proposed § 106.45(h)(4) would also apply to all complaints of sex discrimination, not just sexual harassment. This change is necessary to be consistent with other proposed changes to the regulations as explained in the discussion of the Overall Considerations and Framework (Section II.F.2.a).

Section 106.45(h)(5) Prohibition on discipline based solely on determination

*Current regulations*: Section 106.71(b)(2) provides that when a recipient charges an individual with a code of conduct violation for making a materially false statement in bad faith during a Title IX grievance proceeding, such an action is not retaliatory as long as the recipient did not base its determination that a person made a materially false statement in bad faith solely on the

outcome of the grievance proceeding.

*Proposed regulations*: Proposed § 106.45(h)(5) would prohibit a recipient from initiating a disciplinary process against a party, witness, or other participant in a recipient's grievance procedures under proposed § 106.45, and if applicable proposed § 106.46, for making a false statement or for engaging in consensual sexual conduct based solely on the recipient's determination of whether sex discrimination occurred. This proposed provision incorporates the relevant content of current § 106.71(b)(2), which the Department would fully remove.

*Reasons*: In order to provide an education program or activity free from sex discrimination, a recipient must implement grievance procedures under proposed § 106.45, and if applicable proposed § 106.46, in a way that does not impede parties, witnesses, and other participants from providing information to the recipient regarding sex discrimination that may have occurred in the recipient's program or activity. Allowing parties, witnesses, and other participants to participate fully in the recipient's grievance procedures is also integral to ensuring that a recipient's efforts to address sex discrimination are equitable. Proposed § 106.45(h)(5) would further these goals by providing parties, witnesses, and other participants in a recipient's grievance procedures with assurance that the recipient cannot discipline them for making a false statement or engaging in consensual sexual activity based solely on the determination of whether sex discrimination occurred.

The Department proposes changing the word "person" in current § 106.71(b)(2) to the phrase "parties, witnesses, or other participants" to make clear that this provision protects any form of participation in the recipient's grievance procedures under proposed § 106.45, and if applicable proposed § 106.46. In light of the Department's concern about chilling participation in these grievance procedures, the Department believes that providing protection for all

participants would best ensures a thorough and equitable process.

The Department also notes that these prohibitions would apply regardless of whether the recipient intended use the disciplinary process to retaliate against a person. If a recipient were to engage in this type of discipline for the purpose of retaliating against a party, witness, or other participant in its grievance procedures, it would be in violation of both proposed §§ 106.45(h)(5) and 106.71(a).

*False statements*. As explained in greater detail in the discussion of proposed § 106.71, the Department proposes removing current § 106.71(b)(2). Current § 106.71(b)(2) provides that it is not retaliatory to charge an individual with a code of conduct violation for making a materially false statement if the determination that the statement was materially false was not based solely on the recipient's determination of responsibility in the underlying grievance proceeding. The Department proposes explicitly stating in proposed § 106.45(h)(5), which applies to all grievance procedures under Title IX, that a recipient must not discipline a person for making a false statement based solely on a determination from the recipient's grievance procedures that the person's allegations, arguments, or other statements were not supported by the evidence.

In the preamble to the 2020 amendments, the Department explained that it added current § 106.71(b)(2) in response to comments stating that "lying should not be protected and that any retaliation provision should explicitly exclude from protection those who make false allegations or false statements during a grievance process." 85 FR at 30537. During the June 2021 Title IX Public Hearing and in listening sessions with stakeholders, OCR received feedback expressing confusion generated by the wording of current § 106.71(b)(2). Stakeholders requested that the Department clarify that it would be retaliatory to discipline a student for making a false report of

368

sex discrimination solely because the recipient found in favor of the respondent.

The Department acknowledges that the wording of this prohibition in current § 106.71(b)(2) as an exception to a general rule permitting discipline for false statements might have caused confusion. The Department is also concerned that current § 106.71(a) may have a chilling effect on a person's participation in a recipient's grievance procedures for fear of being disciplined. As a result, the Department proposes replacing the current provision with proposed § 106.45(h)(5), which would make clear that the recipient must not initiate its disciplinary process against a person for making a false statement based solely on a determination in the recipient's grievance procedures that sex discrimination did not occur including, for example, when the recipient found the person's statements were not supported by the evidence.

The Department also proposes removing the term "materially" from current § 106.71(b)(2) and referring simply to "false" statements. The Department now believes that allowing a recipient to discipline a person for making any false statement based solely on its determination in the underlying complaint of sex discrimination could chill participation in the grievance procedures. This proposed change would not only address concerns about adequate protection for those participating in the recipient's grievance procedures but also would maintain the recipient's discretion to discipline those who make false statements based on evidence other than the outcome of its grievance procedures.

*Consensual sexual activity*. Proposed § 106.45(h)(5) would also clarify that a recipient must not discipline a person for having engaged in consensual sexual activity when that determination is based solely on the findings of the recipient's grievance procedures. As noted in the discussion of proposed § 106.44(b), the Department recognizes that discipline for collateral conduct violations, including consensual sexual conduct, may create a barrier to

369

participation in the recipient's grievance procedures.

The Department received comments as part of the June 2021 Title IX Public Hearing requesting a broader prohibition on discipline for collateral conduct violations such as consensual sexual conduct to ensure that the regulations address a broader range of situations in which a complainant may fear that discipline for disclosing information about sexual conduct in a sex-based harassment grievance procedure. In addition, the Department notes that this concern regarding discipline for consensual sexual conduct has been raised by plaintiffs in Title IX litigation as well as in OCR's enforcement practice. *See, e.g.*, *Doe v. Gwinnett Cnty. Sch. Dist.*, Civil Action No. 1:18-CV-05278-SCJ, 2021 WL 4531082, at *6 (N.D. Ga. Sept. 21, 2021); OCR Case No. 06-11-1487, *Henderson Indep. Sch. Dist.* (June 14, 2012) (letter of finding), https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/06111487-a.pdf.

The Department proposes responding to the concerns raised by stakeholders by including in proposed § 106.45(h)(5) a prohibition on disciplining a party, witness, or other participant for engaging in consensual sexual conduct when the recipient's only basis for the discipline is a determination that sex discrimination did not occur. The Department would refer specifically to *consensual* sexual conduct to make clear that an individual's disclosure of additional sex discrimination, including sex-based harassment, during the grievance procedures would not be entitled to the protection of proposed § 106.45(h)(5) to implement Title IX's guarantee. By providing protection from collateral discipline for consensual sexual conduct in proposed § 106.45(h)(5), the proposed regulations would remove this potential barrier to information sharing in the grievance procedures and, in turn, further promote a fair process in which parties, witnesses, and participants are not discouraged from fully and accurately relating necessary facts.

370

Section 106.45(i) Additional Provisions

*Current regulations*: Section 106.45(b) requires all recipients to use a grievance process for formal complaints of sexual harassment that complies with all of the requirements of § 106.45. It also states that any provisions, rules, or practices other than those required by this section that a recipient adopts as part of its grievance process for handling "formal complaints of sexual harassment" as defined in § 106.30 must apply equally to both parties.

*Proposed regulations:* The Department proposes moving the language in the current regulations regarding additional provisions of a recipient's grievance procedures to proposed § 106.45(i) and applying this requirement to grievance procedures for all forms of sex discrimination, not only sexual harassment. The Department also proposes removing the language from current § 106.45(b) requiring all recipients to use a grievance process for formal complaints of sexual harassment that complies with all of the requirements of § 106.45 to account for other proposed changes to the regulations regarding the grievance procedure requirements. Proposed § 106.45(i) would state that if a recipient adopts additional provisions as part of its grievance procedures for complaints of sex discrimination, including sex-based harassment, these additional provisions must apply equally to the parties.

*Reasons:* The proposed revisions are necessary to make the regulatory text consistent with the Department's proposed changes to apply the grievance procedures described in proposed § 106.45 to all forms of sex discrimination, including sex-based harassment, as explained in the discussion of the Framework for Grievance Procedures for Complaints of Sex Discrimination (Section II.F). The proposed revisions are also consistent with the statements that the Department made describing this provision in the preamble to the 2020 amendments and do not represent a shift in position.

371

The Department maintains its position, as stated in the preamble to the 2020 amendments, that under Title IX, "recipients [have] discretion to adopt rules and practices not required under § 106.45." 85 FR at 30209. The Department also continues to hold the view that Title IX requires that any "grievance [procedure] rules a recipient chooses to adopt (that are not already required under § 106.45) must treat the parties equally." *Id.* at 30242.

The Department similarly affirms that under its proposed regulations, a recipient would be required to apply this provision to its handling of each sex discrimination complaint and that a recipient's equal treatment obligation would not necessarily require identical treatment of the parties to a complaint of sex discrimination. As the Department explained in the preamble to the 2020 amendments, "[w]here parties are given 'equal' opportunity, for example, both parties must be treated the same," but this does not mean that they must be given the exact same practice or accommodation. *Id.* at 30186. The Department provided two examples in the preamble to the 2020 amendments that help to illustrate this principle: "The equal opportunity for both parties to receive a disability accommodation does not mean that both parties must receive a disability accommodation or that they must receive the same disability accommodation. Similarly, both parties may not need [an interpreter], and a recipient need not provide [an interpreter] for a party who does not need one, even if it provides [an interpreter] for the party who needs one." *Id.* (emphasis omitted)

Likewise, consistent with the principle that equal treatment does not require identical treatment, a recipient's grievance procedures may recognize that employee parties may have distinct rights in a collective bargaining agreement with the recipient or by other means that are not applicable to parties who are not employees. This is recognized in current § 106.6(f), which states that "[n]othing in this part may be read in derogation of any individual's rights under title

372

VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq., or any regulations promulgated thereunder."  Similarly, student parties may have rights or benefits associated with their student status.

Section 106.45(j) Informal Resolution

*Current regulations*: Current § 106.45(b)(2)(A) requires a recipient, upon receipt of a formal complaint, to provide written notice of any informal resolution process to the parties who are known.  Current § 106.45(b)(9)(i) also requires a recipient to provide a written notice to the parties disclosing the allegations; the requirements of the informal resolution process, including the circumstances under which it precludes the parties from resuming a formal complaint arising from the same allegations; that at any time prior to agreeing to a resolution, any party has the right to withdraw from the informal resolution process and resume the grievance process with respect to the formal complaint; and any consequences resulting from participating in the informal resolution process, including the records that will be maintained or could be shared.

*Proposed regulations:* Proposed § 106.45(j) would state that, in lieu of resolving a complaint through the recipient's grievance procedures, the parties may instead elect to participate in an informal resolution process under § 106.44(k) if provided by the recipient consistent with that paragraph.  Proposed § 106.44(f)(2)(ii) would require the Title IX Coordinator to notify the parties to any complaint of sex discrimination of any informal resolution process, if available and appropriate.  For additional requirements regarding the application of this provision in grievance procedures for sex-based harassment complaints involving postsecondary students, see the discussion of proposed § 106.46(j).

*Reasons*: The Department's current view is that a recipient should continue to retain the discretion to offer the parties to a sex discrimination complaint an alternative option for resolving

the complaint, subject to the process protections described in the proposed regulations. As explained in greater detail in the discussion of proposed § 106.44(k), the Department recognized in the preamble to the 2020 amendments that informal resolution "empowers the parties by offering alternative conflict resolution systems that may serve their unique needs and provides greater flexibility to recipients in serving their educational communities." 85 FR at 30403. An informal resolution process is not a fact-finding, investigative process to reach a determination about whether sex discrimination occurred as set out in the grievance procedures under proposed § 106.45, and if applicable proposed § 106.46; instead, it is an alternative avenue through which parties may agree to a resolution of the complaint. The Department's view is that a recipient is in the best position to determine whether an informal resolution process would be a potential good fit for the facts and circumstances of a particular complaint, subject to the specific parameters described in the proposed regulation. The Department notes that, whatever a recipient decides, a recipient must treat similar complaints similarly, consistent with its obligations under Title IX and other applicable Federal nondiscrimination laws.

Section 106.45(k) Range of supportive measures and disciplinary sanctions and remedies

*Current regulations:* Section 106.45(b)(1)(vi) requires a recipient's grievance process to describe the range of possible disciplinary sanctions and remedies or list the possible disciplinary sanctions and remedies that a recipient may implement following any determination of responsibility. Section 106.45(b)(1)(ix) requires a recipient to include a description of the range of supportive measures available to a complainant and respondent.

*Proposed regulations:* The Department proposes maintaining the requirement in the current regulations that a recipient include a description of the range of supportive measures available to a complainant and respondent but moving this requirement to proposed § 106.45(k)(1). The

Department continues to recognize that the provision of supportive measures is fact-specific. Therefore, the Department emphasizes that proposed § 106.45(k)(1), like current § 106.45(b)(1)(ix), would require only that a recipient describe the range of supportive measures available "rather than a list." 85 FR at 30277. This requirement would ensure that a recipient continues to have the ability to offer a variety of supportive measures while continuing to require transparency for the recipient's educational community. The Department also proposes maintaining the requirement in the current regulations that a description of the range of supportive measures is required only for complaints alleging sex-based harassment. Although proposed § 106.44(g) would require a Title IX Coordinator to offer supportive measures upon being notified of any conduct that may constitute sex discrimination under Title IX, proposed § 106.45(k)(1), as with current § 106.45(b)(1)(ix), would require a recipient to describe the range of supportive measures available to a complainant and respondent only for grievance procedures addressing a complaint alleging sex-based harassment.

In proposed § 106.45(k)(2), the Department would also require a recipient's grievance procedures to either describe the range of possible disciplinary sanctions and remedies or list the possible disciplinary sanctions and remedies that a recipient may impose after it determines that sex-based harassment occurred.

The Department proposes clarifying that the phrase "any determination of responsibility" for which sanctions and remedies must be described or listed—as appears in current § 106.45(b)(1)(vi)—refers to a determination that sex-based harassment occurred. The Department also proposes removing one of the two references to possible disciplinary sanctions and remedies from this provision. As with the range of supportive measures, the Department proposes maintaining the requirement in the current regulations that a description of the range, or

list, of possible disciplinary sanctions and remedies that a recipient may impose is necessary only with respect to complaints alleging sex-based harassment. Although the proposed definitions of "disciplinary sanctions" and "remedies" in proposed § 106.2 provides that disciplinary sanctions and remedies are available following a determination that sex discrimination occurred, proposed § 106.45(k)(2) would require a recipient to describe the range, or list, of possible disciplinary sanctions and remedies only for grievance procedures addressing a complaint alleging sex-based harassment.

*Reasons:* In proposed § 106.45(k)(2), the Department proposes replacing the reference to "any determination of responsibility" with "a determination that sex-based harassment occurred." The Department proposes substituting this language to align with the language used in other provisions in the proposed regulations.

In addition, the Department proposes removing one of the references to "possible disciplinary sanctions and remedies" as a non-substantive edit to streamline the provision and avoid unnecessary duplication of this phrase in the current regulatory text.

Although proposed § 106.44(g) and the proposed definitions of "disciplinary sanctions" and "remedies" in proposed § 106.2 provide that supportive measures, disciplinary sanctions, and remedies may be utilized in response to any form of sex discrimination, not just sex-based harassment, the Department's current view is that the requirement to provide a range, or list, of such measures as part of a recipient's grievance procedures should be limited to complaints alleging sex-based harassment, consistent with the current regulations. Considering the wide range of conduct that may constitute alleged sex discrimination, the Department submits that it would be unduly burdensome to a recipient to attempt to anticipate all forms of alleged sex discrimination that may arise and the range of supportive measures and range, or list, of

disciplinary sanctions and remedies that may be responsive to all sex discrimination. For this reason, the Department proposes continuing to limit this aspect of the grievance procedures to complaints of alleged sex-based harassment.

> H. Grievance Procedures for the Prompt and Equitable Resolution of Complaints of Sex-Based Harassment Involving a Student Complainant or Student Respondent at Postsecondary Institutions

Section 106.46 Grievance procedures for the prompt and equitable resolution of complaints of sex-based harassment involving a student complainant or student respondent at postsecondary institutions

*Current regulations*: None.

*Proposed regulations*: Proposed § 106.46(a) would state that a postsecondary institution's prompt and equitable written grievance procedures for complaints of sex-based harassment involving a student complainant or student respondent must include provisions that incorporate the requirements of proposed §§ 106.45 and 106.46. Proposed § 106.46(b) would provide factors for a recipient to apply where a complainant or respondent is both a student and employee to determine whether the requirements of proposed § 106.46 would apply. Proposed § 106.46 would also include provisions addressing the following aspects of a postsecondary institution's grievance procedures for postsecondary students: written notice of allegations and information about the recipient's grievance procedures (proposed § 106.46(c)); dismissal of a complaint (proposed § 106.46(d)); complaint investigation (proposed § 106.46(e)); evaluating allegations and assessing credibility (proposed § 106.46(f)); live hearing procedures (proposed § 106.46(g)); written determination (proposed § 106.46(h)); appeals (proposed § 106.46(i)); and informal resolution (proposed § 106.46(j)).

Additional detailed explanation of the requirements of proposed § 106.46 is provided in the discussion of each subsection, including proposed changes from current § 106.45.

Section 106.46(a) General

*Current regulations:* None.

*Proposed regulations:* The Department proposes adding § 106.46(a), which would provide that a postsecondary institution's written grievance procedures for complaints of sex-based harassment involving a student complainant or student respondent must include provisions that incorporate the requirements of proposed § 106.45 and this section.

*Reasons:* As explained in the discussion of the Framework for Grievance Procedures for Complaints of Sex Discrimination (Section II.F), the Department proposes a comprehensive framework for grievance procedures that builds upon the grievance procedures required under the 2020 amendments, with certain modifications to address the concerns noted above. Under the Department's proposed grievance procedures framework, proposed § 106.45 would contain requirements for written grievance procedures that would apply to all complaints of sex discrimination at any recipient and a new proposed § 106.46 would contain additional requirements that would apply only to complaints of sex-based harassment involving a student complainant or student respondent at postsecondary institutions.

The Department's current position is that the requirements in proposed § 106.46, which are incorporated from current § 106.45 with modifications as explained in the discussion of proposed § 106.46 (Section II.F.2.c) and in the discussion of each provision below, would afford protections that are appropriate to the age, maturity, independence, needs, and context of students in postsecondary institutions.

378

Section 106.46(b) Student-Employees

*Current regulations:* None

*Proposed regulations*: The Department proposes adding § 106.46(b), which would provide that when a complainant or respondent is both a student and an employee of a postsecondary institution, the postsecondary institution must make a fact-specific inquiry to determine whether the requirements of proposed § 106.46 apply. In making this determination, a postsecondary institution must, at a minimum, consider whether the party's primary relationship with the postsecondary institution is to receive an education and whether the alleged sex-based harassment occurred while the party was performing employment-related work.

*Reasons:* The Department recognizes that a person may be both a student and an employee of a postsecondary institution. When a postsecondary institution has initiated its grievance procedures in response to a complaint of sex-based harassment and a party is both a student and an employee, the postsecondary institution must determine whether that party is subject to the additional grievance procedures specified under proposed § 106.46 for investigating and resolving allegations of sex-based harassment involving postsecondary students. Determining whether a party is a student or employee is a fact-specific inquiry.

To guide a postsecondary institution in making this determination, proposed § 106.46(b) would set out two factors that a postsecondary institution must consider, at a minimum: whether the person's primary relationship with the postsecondary institution is to receive an education and whether the alleged sex-based harassment occurred while the person was performing employment-related work. The Department's tentative view is that a postsecondary institution must consider these factors because they appropriately focus the inquiry on the primary relationship between the complainant or respondent and the postsecondary institution

(e.g., whether the complainant or respondent is a full-time employee who enrolls in a class outside of work hours or a student who works part-time for the postsecondary institution as part of the student's overall financial aid package) and the student-employee's role or activities when the alleged sex-based harassment occurred (e.g., whether they were in their work environment or elsewhere fulfilling work-related responsibilities, in class as a student, in the cafeteria with friends, or in an extracurricular activity). Nothing in proposed § 106.46(b) would prohibit a postsecondary institution from considering additional factors in determining whether a party is primarily a student or an employee.

Section 106.46(c) Written notice of allegations

*Current regulations:* Upon receipt of a formal complaint of sexual harassment, current § 106.45(b)(2) requires a recipient to provide parties who are known to the recipient with written notice of the allegations of sexual harassment and of the recipient's grievance process, including any informal resolution process. Sufficient detail must be provided in this notice, including the conduct allegedly constituting prohibited sexual harassment, the identities of the parties involved in the alleged incident, and the date and location of the alleged incident.

In addition, current § 106.45(b)(2) requires that the notice inform the parties that they may have an advisor of their choice, who may be an attorney, that they have a right to inspect and review certain evidence, and of any provision in the recipient's code of conduct that prohibits knowingly making false statements or knowingly submitting false information during the grievance process. Section 106.45(b)(2) also provides that if, in the course of an investigation, the recipient decides to investigate allegations about the complainant or respondent that are not included in the initial notice, the recipient must provide notice of the additional allegations to the parties whose identities are known.

380

*Proposed regulations:* The Department proposes maintaining the core components of this provision while offering several important clarifications for postsecondary institutions when notifying the parties of allegations of sex-based harassment in a complaint involving a student complainant or a student respondent.

Because the proposed regulations do not include a formal complaint requirement, the proposed regulations would clarify that written notice of allegations must be provided upon initiation of the postsecondary institution's sex-based harassment grievance procedures as described in proposed § 106.46. Proposed § 106.46(c)(3) would include an allowance for a reasonable extension of time to provide this written notice of allegations to the extent a postsecondary institution has legitimate concerns for a party's safety or the safety of any other person as a result of the notification.

Proposed § 106.46(c) would also revise the required statements that a postsecondary institution must include in the written notice of allegations. Under proposed § 106.46(c), a postsecondary institution would be required to include the information required under proposed § 106.45(c), including a statement that retaliation is prohibited. In addition, a postsecondary institution would still be required to include a statement that the respondent is presumed not responsible for the alleged conduct, as in current § 106.45(b)(2). Proposed § 106.46(c) would also retain the requirement that a postsecondary institution notify the parties of the right to review evidence, but the Department proposes revising the description of this right to reflect proposed changes to this right in proposed § 106.46(e)(6).

*Reasons:* It is the Department's tentative view that preserving the written notice requirement in the existing regulations, together with several proposed changes discussed here, would maintain and strengthen the regulations' protections for student complainants and student respondents

involved in a postsecondary institution's resolution of a complaint of sex-based harassment. Although proposed § 106.45(c) would not apply the same written requirements to other recipients or to postsecondary institutions in other circumstances, the Department's proposed changes would better align the notice requirements with the purpose of Title IX and the other proposed changes to the regulations, as described below.

The Department proposes that the notice of allegations should be in writing and include more detail in sex-based harassment cases involving postsecondary students. As explained in the discussion of proposed § 106.46 (Section II.F.2.c), students at postsecondary institutions are distinct from both elementary and secondary students and from school employees in that postsecondary students are largely young adults who may be expected to self-advocate in grievance procedures and lack protections available to many employees under Title VII, collective bargaining agreements, and tenure. The Department therefore proposes that a written notice of allegations is particularly important to support postsecondary students' ability to understand the requirements of Title IX grievance procedures and to effectively advocate for themselves.

The Department proposes removing the requirement that a recipient's grievance procedures must be initiated by a formal complaint. As stated in the discussion of the proposed definition of "complaint" (§ 106.2), it is the Department's tentative view, and one expressed by stakeholders during the June 2021 Title IX Public Hearing, that this formal complaint requirement unduly narrows the scope of a recipient's responsibility not to discriminate based on sex in its education program or activity. Consequently, the Department proposes revising the definition of "complaint" to clarify that a complaint would be the mechanism by which an individual may request that a recipient initiate its grievance procedures in response to all forms

of sex discrimination, and would permit individuals to make complaints in writing or orally to ensure that a recipient receives all complaints that would alert it to possible sex discrimination in violation of Title IX in its education program or activity.

*Physical and emotional safety.* The 2020 amendments did not address the timing needed for proper notice of the allegations to the respondent other than that notice be provided with sufficient time for the respondent to prepare a response before any initial interview. It is the Department's continuing view that the individual circumstances of each complaint may be relevant to the timing required for notifying the respondent of the allegations. 85 FR at 30283, 30288. In particular, the Department recognizes that there may be situations in which a postsecondary institution may reasonably delay notice to another party to address legitimate concerns about the safety of either party or others, and the proposed notice requirement provides a postsecondary institution with discretion to account for these safety concerns. This need may arise particularly in circumstances in which a complainant has made allegations of dating violence or domestic violence and the safety of the complainant or others may be at heightened risk after notice is provided to the respondent.

Proposed § 106.46(c)(3) would specify that legitimate concerns for safety must be based on individualized considerations and not on mere speculation or stereotypes and also would clarify that any delay must be reasonable. Further, regardless of whether the timeframe is extended, the proposed provision would continue to require that a party receive notice "with sufficient time . . . to prepare a response before any initial interview."

*Revisions to required statements.* In proposed § 106.46(c), the Department proposes revising the required additional information that must be included in the written notice of allegations. The Department's tentative view is that a postsecondary institution should still be

383

required to include a statement that the respondent will be presumed not responsible for the alleged conduct until the conclusion of the procedures. The Department also proposes retaining in proposed § 106.46(c) the requirement in current § 106.45(b)(2)(i)(B) that the written notice inform the parties of any provision in the recipient's code of conduct that prohibits knowingly making false statements or knowingly submitting false information during the grievance process. In the preamble to the 2020 amendments, the Department stated "that both parties deserve to know that their school, college, or university has such a provision that could subject either party to potential school discipline as a result of participation in the Title IX grievance process." *Id.* at 30279. This proposed provision dovetails with the Department's recognition of the importance of truthfulness for those providing information in grievance procedures in proposed §§ 106.45(g) and 106.46(f), which would require a postsecondary institution to provide a process that adequately assesses the credibility of the parties and witnesses, to the extent credibility is in dispute and relevant to evaluating one or more of the allegations of sex discrimination.

OCR received feedback from the June 2021 Title IX Public Hearing indicating that requiring recipients to include disciplinary provisions related to false statements in a notification about allegations of sex-based harassment risks creating the misimpression that the recipient has reason to believe that the complainant may consider providing knowingly false statements, or that individuals are especially likely to knowingly make false statements in sex-based harassment matters. The Department recognizes this concern and seeks to clarify that the inclusion of such a statement is not meant to imply in any way that any party to a recipient's grievance procedures would be presumed to be making a false statement. Nor is it intended to suggest that it would be a false statement if a report or allegation of misconduct does not align in all respects with the statement of other witnesses or parties, or that it would be a false statement if a respondent or

384

witness disagrees with the allegations, or an allegation contains unintentional inaccuracies. As generally understood, a false statement is one that a person makes knowing that the statement is false or that the person makes in bad faith. A good faith mistake would generally not constitute a false statement. Further, proposed § 106.45(h)(5) would, like the current regulations, specifically prohibit a recipient from disciplining a party, witness, or other participant in a recipient's grievance procedures for making a false statement based solely on the recipient's determination of whether sex discrimination occurred.

As described in the discussion of proposed § 106.45(c), the Department also proposes requiring a postsecondary institution to include a statement in the notice of allegations that retaliation is prohibited. OCR received feedback from student complainants in the June 2021 Title IX Public Hearing and in listening sessions describing retaliation by respondents and respondents' friends that they experienced after coming forward with information about sex-based harassment. The proposed change would serve the purpose of alerting the parties early in the grievance procedures, at the first time they receive notice from the postsecondary institution regarding each other's identity and the specific allegations at issue, that retaliation based on participation in the grievance procedures is prohibited for parties and others.

Proposed § 106.46(c), by incorporating the requirements of proposed § 106.45(c), would preserve the requirement in the current regulations that a recipient provide written notice of additional allegations to the parties if, in the course of an investigation, the postsecondary institution decides to investigate additional allegations about the respondent that were not included in the initial notice. The reasons for maintaining and clarifying this requirement are explained in more detail in the discussion of proposed § 106.45(c).

Section 106.46(d) Dismissal of a complaint

*Current regulations*: Current § 106.45(b)(3)(ii) states that a recipient may dismiss a formal complaint or any allegations therein if at any time during the investigation or hearing a complainant notifies the Title IX Coordinator in writing that the complainant would like to withdraw the formal complaint or any allegations therein. Current § 106.45(b)(3)(iii) states that upon a dismissal required or permitted pursuant to § 106.45(b)(3)(i) or (ii), the recipient must promptly send written notice of the dismissal and reason(s) therefor simultaneously to the parties.

*Proposed regulations*: Proposed § 106.46(d)(1) would provide that when a postsecondary institution dismisses a complaint of sex-based harassment involving a student party under any of the bases in proposed § 106.45(d)(1), it must provide the parties with simultaneous written notice of the dismissal and the basis for the dismissal. Proposed § 106.46(d)(2) would provide that when a postsecondary institution dismisses a sex-based harassment complaint involving a student complainant or a student respondent based on the complainant's voluntary withdrawal of the complaint or allegations under proposed § 106.45(d)(1)(iii), a postsecondary institution must obtain the complainant's withdrawal in writing.

*Reasons*: Proposed § 106.46(d)(1) would maintain the requirement that a postsecondary institution, upon dismissing a sex-based harassment complaint involving a student complainant or student respondent, notify the parties simultaneously in writing of the dismissal and the basis for the dismissal. Although proposed § 106.45(d) would not apply the same written requirements to other recipients or to postsecondary institutions in other circumstances, the Department's tentative position is that it is important to require a postsecondary institution to notify the parties simultaneously in writing of the dismissal of a complaint or allegations,

386

whether by electronic mail or other means.  As noted in discussion of proposed § 106.46 (Section II.F.2.c), the Department's tentative view is that requiring in proposed § 106.46(d)(1) that notice of a dismissal be in writing is appropriate in light of the particular circumstances of postsecondary students and the requirement that a recipient not discriminate based on sex in its education program or activity, including in its handling of discrimination complaints.

In addition, proposed § 106.46(d)(2) would maintain the requirement from the 2020 amendments that a complainant's request for voluntary dismissal of a complaint or complaint allegations must be made in writing to the Title IX Coordinator, for postsecondary student complainants alleging sex-based harassment.  The Department understands "written request" to include a request delivered to the Title IX Coordinator in person, by mail, by electronic mail, and by any additional method designated by the recipient, including an online portal that indicates that the complainant is the person requesting withdrawal of the allegations.  This is consistent with current § 106.30, which requires a "formal complaint" to be in writing and filed with the Title IX Coordinator.  *See* 85 FR at 30137 ("We have further revised this provision [§ 106.30] to state that 'document filed by a complainant' means a document or electronic submission (such as by electronic mail or through an online portal provided for this purpose by the recipient) that . . . indicates that the complainant is the person filing the formal complaint.").  As noted in the discussion of proposed § 106.46 (Section II.F.2.c), the Department's tentative view is that it is appropriate in light of the particular circumstances of postsecondary students and Title IX's nondiscrimination guarantee to preserve the requirements that postsecondary institutions communicate with parties in writing about withdrawals of allegations or complaints or about dismissals related to sex-based harassment involving a student party.

Section 106.46(e) Complaint investigation

*Current regulations:* Section 106.45(b)(5) sets out seven requirements that apply during the investigation of a formal complaint and throughout the sexual harassment grievance process.

*Proposed regulations:* Proposed § 106.46(e) would set out six requirements that apply—in addition to the requirements set out in proposed § 106.45—in a postsecondary institution's grievance procedures for sex-based harassment complaints involving a student complainant or a student respondent.

*Reasons:* The proposed regulations would retain many of the specific requirements for grievance procedures that appear in the existing regulations at § 106.45(b)(5), although the proposed regulations would also move, modify, or add certain requirements. The Department proposes making minor adjustments to the introductory language to be consistent with changes made throughout the regulations, including by clarifying that the proposed requirements in § 106.46 would cover sex-based harassment rather than only sexual harassment and would apply only to complaints of sex-based harassment involving a student complainant or student respondent at a postsecondary institution. In addition, the Department proposes to refer to the proceedings described in § 106.46 as "grievance procedures" rather than "grievance process," and would remove the reference to a "formal complaint."

Section 106.46(e)(1) Notice in advance of meetings

*Current regulations:* Section 106.45(b)(5)(v) requires a recipient to provide written notice of the date, time, location, participants, and purpose of all hearings, investigative interviews, or other meetings. A recipient must provide this notice to any party whose participation is invited or expected, and it must provide this notice with sufficient time for the party to prepare to participate.

*Proposed regulations:* Proposed § 106.46(e)(1) would require a postsecondary institution to provide written notice of the date, time, location, participants, and purpose of all meetings, investigative interviews, and hearings.  A postsecondary institution would be required to provide this notice to any party whose participation is invited or expected at a meeting, interview, or hearing with sufficient time for the party to prepare to participate.

*Reasons:* The Department proposes moving the provision requiring written notice of any meetings from current § 106.45(b)(5)(v) to proposed § 106.46(e)(1) without any substantive changes to the text, other than the overall change in applicability only to complaints of sex-based harassment involving a student complainant or respondent at a postsecondary institution.

In the preamble to the 2020 amendments, the Department stated that "the burden associated with providing this notice [required by current § 106.45(b)(5)(v)] is outweighed by the due process protections such notice provides."  85 FR at 30299.  The Department further noted that the parties should receive notice with sufficient time to prepare for meetings, interviews, or hearings "[b]ecause the stakes are high for both parties in a grievance process." *Id.*  As explained in the discussion of proposed § 106.46 (Section II.F.2.c), the Department recognizes the need to tailor the requirements for grievance procedures to the unique context of sex-based harassment complaints involving postsecondary student parties.  In light of the age, maturity, and independence of postsecondary students, the Department currently views the detailed requirements related to advance notice of meetings, interviews, or hearings as necessary to provide a postsecondary student with time to prepare and possibly to consult others for help with preparation.  The Department recognizes that many postsecondary students are only newly independent and typically have less experience with self-advocacy than parents, guardians, or other legally authorized representatives of students in elementary school and secondary school

389

settings or than employees, who may also have additional rights under Title VII, collective

bargaining agreements, or other employment-related agreements with the recipient. Finally, the

Department recognizes that postsecondary institutions are separately required by the Clery Act to

provide "timely notice of meetings" where one or more parties may be present in proceedings

based on an allegation of dating violence, domestic violence, sexual assault, or stalking. *See* 34

CFR 668.46(k)(3)(i)(B)(2).

Section 106.46(e)(2) Role of advisor

*Current regulations:* Section 106.45(b)(5)(iv) requires a recipient to provide the parties with the

same opportunities to have others present during any grievance proceeding, including the

opportunity to be accompanied to any related meeting or proceeding by the advisor of their

choice. This subsection states that the advisor of choice may be, but is not required to be, an

attorney. In addition, current § 106.45(b)(5)(iv) states that a recipient cannot limit the choice or

presence of the advisor for either party in any meeting or grievance proceeding; however, the

recipient may establish restrictions regarding the extent to which the advisor may participate, as

long as the restrictions apply equally to both parties.

*Proposed regulations:* Proposed § 106.46(e)(2) would require a postsecondary institution to

provide the parties with the same opportunities to be accompanied to any meeting or proceeding

by the advisor of their choice. This provision, like proposed § 106.46(c)(2)(ii) and (f)(1), would

provide that the advisor may be, but is not required to be, an attorney. The proposed regulations

would prohibit a postsecondary institution from limiting the choice or presence of the advisor in

any meeting or grievance proceeding; however, the proposed regulations would permit the

postsecondary institution to establish restrictions regarding the extent to which the advisor may

participate in the grievance procedures, as long as the restrictions apply equally to the parties.

390

*Reasons:* Current § 106.45(b)(5)(iv) addresses the requirements for the parties' advisors, as well as the requirements for who may attend proceedings. The proposed regulations would retain both sets of requirements but divide them into separate provisions—proposed § 106.46(e)(2) and (3)—for clarity.

With respect to advisors, current § 106.45(b)(5)(iv) requires a recipient to provide parties with the opportunity to be accompanied to any meeting or proceeding by the advisor of their choice. The current provision also notes that the advisor may be, but is not required to be, an attorney. In addition, the current provision states that the recipient must not limit the choice or presence of the advisor for either the complainant or the respondent; however, the recipient may limit the extent to which the advisor may participate, as long as the restrictions apply equally to both parties. The Department proposes to retain these requirements in proposed § 106.46(e)(2). The Department proposes two non-substantive changes: removing the word "either" because it is unnecessary and replacing the term "both parties" with "the parties" since some proceedings may involve more than two parties.

As explained in the discussion of the Framework for Grievance Procedures for Complaints of Sex Discrimination (Section II.F), students at postsecondary institutions are, generally, differently situated from other participants in a recipient's grievance procedures in a way that the Department currently believes warrants the proposed right to an advisor under § 106.46(e)(2) when they are a party in a recipient's grievance procedures for complaints of sex-based harassment. For example, unlike elementary school and secondary school students, postsecondary students generally would not be entitled to a parent, guardian, or other authorized legal representative at meetings or proceedings, yet they may also not have sufficient experience with self-advocacy or maturity to participate in meetings or proceedings without the assistance of

391

an advisor. And while employees may have access to a union representative or other employee-specific resources, postsecondary students do not generally have comparable resources available to them.

In addition, postsecondary students who are participating in grievance procedures for complaints of sex-based harassment are differently situated from postsecondary students who are participating in grievance procedures for complaints of sex discrimination other than sex-based harassment. Unlike many complaints of sex discrimination, complaints of sex-based harassment often involve multiple parties whose conduct and credibility are subjected to scrutiny. Investigations of complaints of sex-based harassment are more likely to involve sensitive material and to engender disputes over what evidence is relevant and what evidence is impermissible. Sex-based harassment complaints involving postsecondary students will often involve a student respondent who faces a potential disciplinary sanction. The Department currently believes that these features of the sex-based harassment grievance procedures support the proposed right to an advisor for postsecondary students in grievance procedures for complaints of sex-based harassment but not for complaints of other types of sex discrimination.

The Department also emphasizes that in grievance procedures when one party is a postsecondary student and another party is not, proposed § 106.46(e)(2) would require a postsecondary institution to permit the non-student party the same opportunity for an advisor as the postsecondary student to ensure equitable opportunity to participate, as would be required by proposed § 106.45(b)(1). In addition, as explained in the discussion of proposed § 106.46(f)(1), for a postsecondary institution that exercises its discretion to conduct live hearings with advisor-conducted questioning under proposed § 106.46(f)(1), advisors would be a necessary component of that process. The Department also notes that in proceedings based on an allegation of dating

violence, domestic violence, sexual assault, or stalking, postsecondary institutions are separately required by the Clery Act to provide the parties with the opportunity to be accompanied to any meeting or proceeding by an advisor of their choice. *See* 34 CFR 668.46(k)(2)(iii).

Section 106.46(e)(3) Individuals present at proceedings

*Current regulations:* Section 106.45(b)(5)(iv) requires a recipient to provide the parties with the same opportunities to have others present during any grievance proceeding.

*Proposed regulations:* Proposed § 106.46(e)(3) would require a postsecondary institution to provide the parties with the same opportunities, if any, to have persons other than the advisor of the parties' choice present during any meeting or proceeding.

*Reasons:* Current § 106.45(b)(5)(iv) requires a recipient to provide parties with the same opportunities to have individuals present during any grievance proceeding. The Department proposes retaining this requirement at proposed § 106.46(e)(3) with minor modifications.

Proposed § 106.46(e)(3) would clarify that a postsecondary institution may permit these individuals to attend any meeting or proceeding during the grievance procedures in matters of sex-based harassment involving a student complainant or student respondent.

The Department also proposes adding "if any" to this provision to make clear that a postsecondary institution generally would have the discretion not to permit parties to bring individuals other than their advisor of choice to meetings or proceedings. However, there are certain situations in which postsecondary institutions may need to permit a party to have another person, in addition to an advisor, present during any meeting or proceeding in order to ensure that all parties, witnesses, and others participating can engage fully in the grievance procedures as required by Title IX. In particular, a postsecondary institution must comply with its obligations to ensure effective communication for persons with disabilities through the provision

393

of auxiliary aids and services (such as providing a sign language interpreter for a party who is deaf or hard of hearing) and by making reasonable modifications to policies, practices, and procedures to avoid discrimination on the basis of disability.  In addition, a postsecondary institution may need to provide language assistance services, such as translations or interpretation for persons with limited English proficiency.  In these circumstances, a postsecondary institution would need to provide the parties with the same opportunities to have necessary support persons, although this may mean that only one party (e.g., the party with a disability) is permitted to have another person present.  The Department also notes that when the allegation involves dating violence, domestic violence, sexual assault, or stalking, the Clery Act requires separately requires postsecondary institutions to provide the parties with the same opportunities to have individuals present during any disciplinary proceeding.  *See* 34 CFR 668.46(k)(2)(iii).

Section 106.46(e)(4) Expert witnesses

*Current regulations:* Section 106.45(b)(5)(ii) requires a recipient to provide an equal opportunity for the parties to present witnesses, including fact and expert witnesses, and to present other inculpatory and exculpatory evidence.

*Proposed regulations:* The Department proposes modifying the requirement that a recipient provide an equal opportunity for parties to present expert witnesses.  Proposed § 106.46(e)(4) would provide a postsecondary institution with the discretion to determine whether to allow the parties to present expert witnesses as long as the determination of whether to permit expert witnesses applies equally to the parties.

*Reasons:* The Department proposes revising the requirement in current § 106.45(b)(5)(ii) that a recipient must provide an equal opportunity for the parties to present expert witnesses by

394

permitting a postsecondary institution discretion to determine whether the parties may present an expert witness—provided that this determination applies equally to the parties. Under proposed § 106.46(e)(4), the postsecondary institution would be permitted to exercise this discretion by deciding to allow each party to use experts, to not to allow any experts, or to use its own expert in lieu of experts presented by the parties.

Following the implementation of the 2020 amendments, stakeholders urged the Department to amend the regulations to provide recipients with discretion to determine whether parties may present expert witnesses, as long as the opportunity to present or not to present experts is provided equally to the parties. The Department recognizes that expert witnesses would not have observed the alleged conduct (unlike relevant fact witnesses, which a party has a right to present under current § 106.45(b)(5)(ii) and proposed § 106.45(f)(2)) and may not be necessary or helpful to the recipient in determining whether sex-based harassment occurred. Thus, the Department's current position is that a postsecondary institution would be in the best position to identify whether a particular case might benefit from expert witnesses. A postsecondary institution should also consider whether an expert witness would impede a prompt resolution to the grievance procedures due to the time that may be needed to hire an expert witness, for the expert witness to review the necessary information and formulate an opinion, and to arrange for the expert's attendance at any pertinent meetings or proceedings.

Although a postsecondary institution would have discretion on how to proceed in allowing expert witnesses under proposed § 106.46(e)(4), it would be required to apply any determination equally to the parties. When no experts are allowed or the postsecondary institution decides to use its own expert, this determination would have to be applied to all parties. When a postsecondary institution decides to permit parties to present expert witnesses,

395

the postsecondary institution would need to apply the same standards to determinations about the expert's participation and scope of testimony to all parties. Proposed § 106.46(e)(4) would not preclude a postsecondary institution from determining that the expert testimony of one party is permissible while another party's expert testimony is not, but it would require that a postsecondary institution apply the same standards to all parties in determining what evidence is permissible. The postsecondary institution would also need to comply with the requirements of proposed § 106.45(b)(6) and (7) in evaluating relevant and not otherwise impermissible evidence.

Section 106.46(e)(5) Timeframes

*Current regulations:* Section § 106.45(b)(1)(v) states that, with respect to a recipient's grievance process for formal complaints of sexual harassment, the recipient must include reasonably prompt timeframes for conclusion of the grievance process, including reasonably prompt timeframes for filing and resolving appeals and informal resolution processes if the recipient offers informal resolution processes, and a process that allows for the temporary delay of the grievance process or the limited extension of timeframes for good cause with written notice to the complainant and the respondent of the delay or extension and the reasons for the action. Good cause may include considerations such as the absence of a party, a party's advisor, or a witness; concurrent law enforcement activity; or the need for language assistance or accommodation of disabilities.

*Proposed regulations:* The Department proposes adding a provision at proposed § 106.46(e)(5) to clarify that a postsecondary institution investigating and resolving a sex-based harassment complaint involving a student complainant or student respondent must allow for reasonable extension of timeframes in its grievance procedures on a case-by-case basis for good cause with

written notice to the parties that includes the reason for delay.

*Reasons:* The Department's proposed regulations would clarify that a postsecondary institution's investigation and resolution of a sex-based harassment complaint involving a student complainant or student respondent would need to comply not only with the timeframe requirements set out in proposed § 106.45(b)(4) but also with the requirement in proposed § 106.46(e)(5) that it provide written notice for any reasonable extension of timeframes in its grievance procedures. The Department further proposes that any written notice from a postsecondary institution to the parties would need to include the reason for delay. These writing requirements are consistent with current § 106.45(b)(1)(v). It is the Department's tentative view that preserving the requirement that a postsecondary institution must provide notice of a reasonable extension of timeframes in writing is appropriate in light of the particular circumstances of postsecondary students and the requirement that a recipient not discriminate based on sex in its education program or activity.

The Department emphasizes that proposed § 106.46(e)(5) would not constitute an additional basis for granting extensions beyond proposed § 106.45(b)(4). A postsecondary institution would need to continue to evaluate any possible extension of timeframes on a case-by-case basis and such extensions must be allowed only for good cause, as required by proposed § 106.45(b)(4).

Section 106.46(e)(6) Access to relevant and not otherwise impermissible evidence

*Current regulations:* Section 106.45(b)(5)(vi) requires a recipient to provide both parties with an equal opportunity to inspect and review any evidence obtained as part of the investigation that is directly related to the allegations raised in a formal complaint, including evidence upon which the recipient does not intend to rely in reaching a responsibility determination and inculpatory or

exculpatory evidence whether obtained from a party or other source. The provision indicates that this opportunity to review the evidence should enable each party to meaningfully respond to the evidence prior to conclusion of the investigation. In addition, current § 106.45(b)(5)(vi) requires a recipient to send this evidence in an electronic format or a hard copy to each party and the party's advisor prior to the completion of the investigative report. The current regulations specify that the parties must have at least ten days to submit a written response, which the investigator must consider prior to the completion of the investigative report. Current § 106.45(b)(5)(vi) also requires a recipient to make all of the evidence subject to the parties' inspection and review available at any hearing so that the parties have an equal opportunity to refer to the evidence during the hearing, including for purposes of cross-examination.

Current § 106.45(b)(5)(vii) requires a recipient to create an investigative report that fairly summarizes the relevant evidence. This provision specifies that a recipient must send the investigative report in an electronic format or a hard copy to the parties and their advisors for their review and written response. The recipient must provide the report at least ten days prior to a hearing (if one is required or otherwise provided) or prior to the time of the responsibility determination.

*Proposed regulations:* Proposed § 106.46(e)(6) would require a postsecondary institution to provide parties and their advisors, if any, with equitable access to evidence that is relevant to the allegations of sex-based harassment and not otherwise impermissible, as described in proposed §§ 106.2 and 106.45(b)(7). Under proposed § 106.46(e)(6)(i), a postsecondary institution must provide either equitable access to the relevant and not otherwise impermissible evidence, or it must provide the parties with the same written investigative report that accurately summarizes this evidence. If a postsecondary institution chooses to provide an investigative report and then a

party requests access to the evidence, the institution would be required to provide all parties with equitable access to the relevant and not otherwise impermissible evidence.

Proposed § 106.46(e)(6)(ii) would require a postsecondary institution to provide the parties with a reasonable opportunity to review and respond to the evidence as described in the investigative report or as provided to the parties prior to the determination of whether sex-based harassment occurred.  In addition, if a postsecondary institution conducts a live hearing as part of its grievance procedures, proposed § 106.46(e)(6)(ii) would require the institution to provide the opportunity to review the evidence in advance of the live hearing; however, the proposed regulations would allow the postsecondary institution to decide whether to provide the opportunity to respond to the evidence prior to the hearing, during the hearing, or both prior to and during the hearing.

Proposed § 106.46(e)(6)(iii) would require a postsecondary institution to take reasonable steps to prevent and address any unauthorized disclosures by the parties and their advisors of information and evidence obtained solely through the sex-based harassment grievance procedures.

Finally, proposed § 106.46(e)(6)(iv) would clarify that compliance with proposed § 106.46(e)(6) would satisfy the requirements of proposed § 106.45(f)(4).

*Reasons:* Current § 106.45(b)(5)(vi) requires a recipient to provide the parties with an equal opportunity to review and respond to evidence obtained during the investigation, and current § 106.45(b)(5)(vii) requires a recipient to create an investigative report summarizing the relevant evidence for the parties' review and response.  The Department proposes modifying and merging these requirements in proposed § 106.46(e)(6).

*Scope of evidence provided to the parties*.  Current § 106.45(b)(5)(vi) requires the

recipient to provide the parties with an equal opportunity to inspect and review any evidence obtained as part of the investigation that is directly related to the allegations raised in a formal complaint. The current regulations distinguish between evidence that is directly related to the allegations, to which the recipient must provide the parties with access, and relevant evidence, which the recipient must evaluate (§ 106.45(b)(1)(ii)), include in the investigative report (§ 106.45(b)(5)(vii)), and permit questions about (§ 106.45(b)(6)). The current regulations require that if the recipient obtains evidence related to a complainant's sexual predisposition or prior sexual behavior that is directly related to the allegations, it should disclose it to both parties, *see* 85 FR at 30428, even though evidence about a complainant's sexual predisposition "would never be included in the investigative report and evidence about a complainant's prior sexual behavior would be included only if it meets one of the two narrow exceptions," *id.* at 30304. Similar restrictions on the use of evidence about a complainant's sexual predisposition or prior sexual behavior, as well as questions seeking this evidence, apply at a live hearing and to written questions (and their answers) at current § 106.45(b)(6)(ii).

In the preamble to the 2020 amendments, the Department stated that evidence should be disclosed to the extent it is "directly related" to the allegations and that "directly related may sometimes encompass a broader universe of evidence than evidence that is 'relevant.'" *Id.* OCR received feedback during the June 2021 Title IX Public Hearing that the distinction in the current regulations between evidence that is directly related to the allegations and relevant evidence is confusing and not well-delineated. One stakeholder expressed confusion as to why a recipient should provide access to evidence that is not relevant to the incident, and another commenter noted that discovery rules do not require production of irrelevant and confidential materials in court. OCR also received feedback in connection with the June 2021 Title IX Public Hearing

urging the Department to use a relevance standard for the provision of evidence to the parties. The Department's tentative view is that these comments highlight significant issues associated with the current regulations on access to evidence that may interfere with a recipient's ability to comply with their Title IX obligations.

To assist recipients (and parties) in determining the scope of permissible evidence, the Department proposes merging the "directly related" and "relevant" evidentiary standards by defining "relevant" in proposed § 106.2 as evidence related to the allegations of sex discrimination. Because relevant evidence includes all evidence related to the allegations of sex discrimination under investigation, any evidence that is directly related to the allegations would necessarily be considered evidence that is related to the allegations. Therefore, it is the Department's tentative view that once the term "relevant" is properly defined within the regulations, the proposed regulations would require a similar universe of evidence to be made available to the parties with one exception: unlike the current regulations, the proposed regulations would prohibit a postsecondary institution from disclosing evidence of the complainant's sexual interests and prior sexual conduct, except as narrowly permitted by proposed § 106.45(b)(7).

In the preamble to the 2020 amendments, the Department explained that using the "[directly related] approach balances the recipient's obligation to impartially gather and objectively evaluate all relevant evidence . . . with the parties' equal right to participate in furthering each party's own interests by identifying evidence overlooked by the investigator and evidence the investigator erroneously deemed relevant or irrelevant and making arguments to the decision-maker regarding the relevance of evidence and the weight or credibility of relevant evidence." *Id.* at 30303. The Department also stated in the preamble that "[t]he parties should

have the opportunity to argue that evidence directly related to the allegations is in fact relevant (and not otherwise barred from use under § 106.45), and parties will not have a robust opportunity to do this if evidence related to the allegations is withheld from the parties by the investigator." *Id.* at 30304. The Department further explained that the use of the "directly related" standard provides the parties with access to "the universe of relevant and potentially relevant evidence" with enough time for them to offer additional relevant facts and witnesses. *Id.* at 30303. The Department stated that it was "sensitive to commenters' concerns regarding the parties sharing irrelevant information, as well as relevant information that is relevant but also highly sensitive and personal, as part of the investigative process"; however, the Department stated that such concerns "must be weighed against the demands of due process and fundamental fairness, which require procedures designed to promote accuracy through meaningful participation of the parties." *Id.* Nevertheless, the Department noted that "it may be true in some respects that this provision affords parties greater protection than some courts have determined is required under constitutional due process or concepts of fundamental fairness." *Id.*

By defining "relevant" evidence in proposed § 106.2 to encompass all evidence related to the allegations of sex discrimination, the Department would address the concern previously expressed by the Department that an investigator might erroneously screen out evidence related to the allegations that the investigator believed to be related but not relevant. In addition, in response to the concern previously expressed by the Department that the parties must have the opportunity to offer additional relevant evidence after reviewing the universe of evidence directly related to the allegations, the Department would require a postsecondary institution to give the parties an opportunity to respond to the evidence prior to the determination of whether sex-based harassment occurred.

After considering the issue, including views expressed by a wide array of stakeholders to OCR in connection with the June 2021 Title IX Public Hearing and in listening sessions, the Department thus proposes clarifying the scope of evidence that a postsecondary institution must disclose. Under proposed § 106.46(e)(6), a postsecondary institution would be required to provide equitable access to evidence that is "relevant," as defined by proposed § 106.2, to the allegations of sex-based harassment, and not otherwise deemed impermissible regardless of relevance, as set out in proposed § 106.45(b)(7). The proposed provision would prohibit a postsecondary institution from disclosing information that is not relevant and evidence that is impermissible, including evidence of the complainant's sexual interests and prior sexual conduct, except as narrowly permitted by § 106.45(b)(7).

In addition, the Department has reweighed the facts and circumstances in light of the concerns expressed by stakeholders regarding the disclosure of information related to the complainant's sexual interests and prior sexual conduct. Considering the significant concerns that the current provision may incentivize the introduction of prejudicial information, chill reporting, and unnecessarily harm the parties, the Department does not view the requirements to disclose irrelevant evidence, as well as relevant but impermissible evidence, as furthering the fairness and accuracy of the process.

*Method of providing evidence to the parties.* Current § 106.45(b)(5)(vi) requires a recipient to provide the parties with the opportunity to inspect and review evidence directly related to the allegations, and current § 106.45(b)(5)(vii) requires a recipient to provide the parties with an investigative report summarizing the relevant evidence. In contrast, proposed § 106.46(e)(6)(i) would require a postsecondary institution to provide the parties and their advisors, if any, either with access to the relevant and not otherwise impermissible evidence, or

with the same written investigative report that accurately summarizes the relevant and not otherwise impermissible evidence. If the postsecondary institution chooses to provide an investigative report and a party requests access to the evidence, the institution would be required to provide access to the relevant and not otherwise impermissible evidence to all parties. Accordingly, parties would retain under the proposed regulations the right set out under current § 106.45(b)(5)(vi) subject to the limitation on access to evidence that is not relevant or is otherwise impermissible as discussed above.

In the preamble to the 2020 amendments, the Department recognized the concerns expressed by many stakeholders about the burden and costs that current § 106.45(b)(5)(vi)-(vii) may place on a recipient. In the preamble, the Department agreed that "these provisions have the potential to generate modest burden and costs, but believe[d] that the financial costs and administrative burdens resulting from the provisions are far outweighed by the due process protections ensured by these provisions." *Id.* at 30307. The Department stated that disclosing evidence to the parties is not an "unacceptable burden[] . . . because reviewing the universe of evidence that is, or may be, relevant represents a critical part of enabling parties to have a meaningful opportunity to be heard, which is an essential component of due process and fundamental fairness." *Id.*

After considering the issue and reweighing the facts and circumstances, the Department proposes giving a postsecondary institution the discretion to decide whether to provide access to the relevant and not otherwise impermissible evidence or to provide an investigative report that accurately summarizes the relevant and not otherwise impermissible evidence and then provide access to the evidence if requested by one or more parties. Postsecondary institutions vary greatly in terms of size, resources, and expertise, and complaints of sex-based harassment also

404

vary greatly in terms of the nature of the conduct alleged, the volume and format of the evidence, and in other ways. Proposed § 106.46(e)(6)(i) would give more flexibility to a postsecondary institution than the current regulations in the manner of presenting the evidence to the parties while ensuring that grievance procedures remain equitable and that the institution can meet its Title IX obligation to provide its program or activity free from sex discrimination.

Either option under proposed § 106.46(e)(6)— providing an investigative report or the evidence itself—would enable the parties to access the universe of evidence relevant to the allegations of sex-based harassment. In turn, this would enable the parties to meaningfully prepare arguments, contest the relevance of evidence, and present additional evidence for consideration. The Department tentatively views the requirement to convey the same universe of evidence in two different formats (an investigative report and access to the evidence) as unnecessary for ensuring that grievance procedures are implemented equitably and effectively, and as increasing costs, burden, and delay without providing a meaningful benefit to the parties.

Finally, proposed § 106.46(e)(6)(iv) would clarify that compliance with proposed § 106.46(e)(6) would satisfy the requirements of proposed § 106.45(f)(4). Proposed § 106.45(f)(4) requires recipients to provide the parties with a description of the evidence that is relevant to the allegations of sex discrimination and not otherwise impermissible, as well as a reasonable opportunity to respond.

*Equitable access to the evidence.* Proposed § 106.46(e)(6) would require a postsecondary institution to provide equitable access to the relevant and not otherwise impermissible evidence. This would mean, for example, that a postsecondary institution could not choose to provide access to the evidence to one party and an investigative report to the other party or parties. The requirement to provide equitable access would also extend to the mode of delivery. Under

405

proposed § 106.46(e), if a postsecondary institution provides an electronic copy of the relevant evidence to one party, the institution would be required to do the same for all parties. If a postsecondary institution permits a party only to inspect and review the evidence without providing that party their own copy, the institution would not be permitted to provide a physical copy to another party. If, however, a party needs to access the evidence in a particular mode due to a disability, a postsecondary institution would be required to comply with its obligations to ensure effective communication through the provision of auxiliary aids and services. For persons with limited English proficiency, a postsecondary institution may need to provide language assistance services, such as translations or interpretation. To comply with the requirement under proposed § 106.46(e)(6) to provide equitable access to the evidence, a postsecondary institution would also be required to be mindful of any extenuating circumstances (e.g., one party is studying abroad) that affect a party's ability to access the evidence in a particular manner.

Beyond the general requirement for equitable access to the relevant evidence, the Department is not proposing specific requirements for the manner of providing the investigative report or the evidence to the parties. A postsecondary institution would have the discretion to determine how to provide this information, as long as the parties and their advisors have a meaningful opportunity to review the information. As discussed below, proposed § 106.46(e)(6)(iii) would require a postsecondary institution to take reasonable steps to prevent unauthorized disclosure of information and evidence. The manner of providing the information to the parties may vary depending on the available resources to the institution, the location of the parties, the type of evidence, and other case-specific circumstances. The Department seeks to provide this flexibility to postsecondary institutions while ensuring meaningful review and

protection of the information.

    *Timeframe for receiving and responding to the evidence*.  The current regulations set out very specific timeframes for providing the parties with access to the evidence and a copy of the investigative report.  Current § 106.45(b)(5)(vi) requires the recipient to give the parties at least 10 days to submit a response after reviewing the evidence.  The investigator must then consider any response and then create an investigative report.  The recipient must provide the investigative report to the parties at least 10 days prior to a hearing (if one is required under current § 106.45) or other time of determination regarding responsibility.

    Following the implementation of the 2020 amendments, OCR received feedback from stakeholders in listening sessions and in comments provided in connection with the June 2021 Title IX Public Hearing that the rigid timeframes in the current regulations prolong the process and impede prompt resolutions.  One organization urged the Department to make the process simpler and more streamlined, noting that the current provisions could add a delay of nearly one month between the close of interviews and the start of a hearing.  A comment from a coalition of organizations urged the Department to permit greater flexibility for recipients and to permit "simplified procedures with shorter timelines" in certain cases, such as those involving detentions and brief suspensions.  OCR has also received comments indicating that the ten-day timelines are reasonable timeframes or even too short.  In the preamble to the 2020 amendments, the Department stated that "the time frame is appropriate for the parties to read and respond to the evidence subject to inspection and review, and then to the investigative report."  85 FR at 30306.

    After considering the issue and reweighing the facts and circumstances, including feedback received in connection with the June 2021 Title IX Public Hearing, the Department

proposes in § 106.46(e)(6)(ii) to remove the specific timeframes and instead permit a postsecondary institution flexibility to set reasonable timeframes for ensuring that parties have a reasonable opportunity to review and respond to evidence. When the grievance procedures do not involve a live hearing, proposed § 106.46(e)(6)(ii) would require a postsecondary institution to provide the parties with a reasonable opportunity to review and respond to the evidence prior to the determination of whether sex-based harassment occurred. When a postsecondary institution conducts a live hearing as part of its grievance procedures, proposed § 106.46(e)(6)(ii) would require the institution to provide the parties with the opportunity to review the evidence in advance of the live hearing. This provision would allow the postsecondary institution to decide whether to provide the opportunity to respond to the evidence prior to the hearing, during the hearing, or both prior to and during the hearing.

The nature and volume of evidence varies greatly based on the allegations in a complaint and the surrounding circumstances. The Department is proposing a reasonable timeframe to accommodate this variation. Parties may need more time to meaningfully review hundreds of pages of evidence and dozens of witness statements than they would need to review a much smaller evidentiary file. Proposed § 106.46(e)(6)(ii) would increase discretion for a postsecondary institution while still ensuring that the parties would be able to meaningfully review and respond to the relevant and not otherwise impermissible evidence prior to the live hearing or other determination of whether sex-based harassment occurred.

*Protections against unauthorized disclosures*. Current § 106.45(b)(5)(vi)-(vii) do not expressly require a recipient to take measures to safeguard the evidence and investigative report that they share with the parties and their advisors. Nevertheless, the Department recognized in the preamble to the 2020 amendments that a recipient may adopt additional practices to protect

408

privacy, such as digital encryption or sharing evidence in a way that prevents copying or saving the records. *See id.* at 30307-08, 30435. The Department also stated in the preamble that "[r]ecipients may require parties and advisors to refrain from disseminating the evidence (for instance, by requiring parties and advisors to sign a non-disclosure agreement that permits review and use of the evidence only for purposes of the Title IX grievance process)." *Id.* at 30304. Following the implementation of the 2020 amendments, OCR received feedback urging the Department to specify that recipients can and should impose reasonable limitations on the sharing of evidence by the parties to protect privacy and prevent the spread of sensitive information that could compromise the fairness of the proceedings or harm a party or witness.

In light of the important privacy considerations related to allegations and evidence in sex-based harassment grievance procedures, the Department proposes, at § 106.46(e)(6)(iii), to require a postsecondary institution to take reasonable steps to prevent and address any unauthorized disclosures by the parties and their advisors of information and evidence obtained through the sex-based harassment grievance procedures. As noted above, unauthorized disclosure of sensitive information could threaten the fairness of the process by deterring parties or witnesses from participating, affecting the reliability of witness testimony, leading to retaliatory harassment, and other consequences. The Department is not proposing specific steps that a postsecondary institution must take, as what is reasonable to prevent unauthorized disclosure may vary depending on the circumstances. In some circumstances, it may be sufficient to inform the parties of the institution's expectations for how the parties should safeguard the evidence and the consequences for unauthorized disclosures. A postsecondary institution may also use software that restricts further distribution of any reports or records. A postsecondary institution would have the discretion to define for the parties what types of further

disclosures are permissible; however, they would not be able to prohibit disclosures to confidential resources, such as a party's doctor or mental health counselor.

Section 106.46(f) Evaluating allegations and assessing credibility and 106.46(g) Live hearings

*Current regulations:* Section 106.45(b)(6)(i) requires a postsecondary institution to provide for a live hearing as part of its grievance process for formal complaints of sexual harassment. Live hearings may be conducted with all parties physically present in the same geographic location or, at the request of either party, the recipient must provide for the live hearing to occur with the parties located in separate rooms with technology enabling the decisionmaker and parties to simultaneously to see and hear the party or witness answering questions. The recipient must create an audio or audiovisual recording, or transcript, of any live hearing and make it available to the parties for inspection and review.

At the live hearing, the decisionmaker is required to permit each party's advisor to ask the other party and any witnesses all relevant questions and follow-up questions, including those challenging credibility. Cross-examination at the live hearing must be conducted directly, orally, and in real time by the party's advisor of choice and never by a party personally. At the request of either party, the recipient must provide for the live hearing to occur with the parties located in separate rooms with technology enabling the decisionmaker and parties to simultaneously see and hear the party or the witness answering questions.

Only relevant cross-examination and other questions may be asked of a party or witness. Before a complainant, respondent, or witness answers a cross-examination or other question, the decisionmaker must first determine whether the question is relevant and explain any decision to exclude a question as not relevant. If a party does not have an advisor present at the live hearing, the recipient must provide without fee or charge to that party, an advisor of the recipient's

410

choice, who may be, but is not required to be, an attorney, to conduct cross-examination on behalf of that party. Questions and evidence about the complainant's sexual predisposition or prior sexual behavior are not relevant, unless such questions and evidence about the complainant's prior sexual behavior are offered to prove that someone other than the respondent committed the conduct alleged by the complainant, or if the questions and evidence concern specific incidents of the complainant's prior sexual behavior with respect to the respondent and are offered to prove consent.

If a party or witness does not submit to cross-examination at the live hearing, the decisionmaker must not rely on any statement of that party or witness in reaching a determination regarding responsibility; provided, however, that the decisionmaker cannot draw an inference about the determination regarding responsibility based solely on a party's or witness's absence from the live hearing or refusal to answer cross-examination or other questions.

Current § 106.45(b)(6)(ii) permits, but does not require, elementary and secondary school recipients, and other recipients that are not postsecondary institutions, to provide for a hearing as part of their Title IX grievance process for formal complaints of sexual harassment.

With or without a hearing, after the recipient has sent the investigative report to the parties and before reaching a determination regarding responsibility, the decisionmaker must afford each party the opportunity to submit written, relevant questions that a party wants asked of any party or witness, provide each party with the answers, and allow for additional, limited follow-up questions from each party.

With or without a hearing, questions and evidence about the complainant's sexual predisposition or prior sexual behavior are not relevant, unless such questions and evidence

411

about the complainant's prior sexual behavior are offered to prove that someone other than the respondent committed the conduct alleged by the complainant, or if the questions and evidence concern specific incidents of the complainant's prior sexual behavior with respect to the respondent and are offered to prove consent. The decisionmaker must explain to the party proposing the questions any decision to exclude a question as not relevant.

*Proposed regulations:* The Department proposes adding § 106.46(f) to address the requirements for evaluating allegations and assessing credibility and moving the provision regarding procedures for live hearings to proposed § 106.46(g). Proposed § 106.46(f)(1) would require a postsecondary institution to provide a process as specified in this subpart that enables the decisionmaker to adequately assess the credibility of the parties and witnesses to the extent credibility is both in dispute and relevant to evaluating one or more allegations of sex-based harassment. This assessment of credibility would include either: (i) allowing the decisionmaker to ask the parties and witnesses relevant and not otherwise impermissible questions and follow-up questions, including those challenging credibility, during individual meetings with the parties or at a live hearing before determining whether sex-based harassment occurred and allowing each party to propose to the decisionmaker or investigator relevant and not otherwise impermissible questions and follow-up questions, including questions challenging credibility that the party wants asked of any party or witness and have those questions asked during individual meetings with the parties or at a live hearing subject to the requirements in proposed § 106.46(f)(3); or (ii) when a postsecondary institution chooses to conduct a live hearing, allowing each party's advisor to ask any party and any witnesses all relevant and not otherwise impermissible questions under proposed §§ 106.2 and 106.45(b)(7) and follow-up questions, including those challenging credibility, subject to the requirements in proposed § 106.46(f)(3).

412

Proposed § 106.46(f)(1)(ii) would retain the language from current § 106.45(b)(6)(i) that questioning at a live hearing must never be conducted by a party personally. In addition, under proposed § 106.46(f)(1)(ii), if a postsecondary institution permits advisor-conducted questioning and a party does not have an advisor who can ask questions on their behalf, the postsecondary institution must provide the party with an advisor of the postsecondary institution's choice, without charge to the party, for the purpose of advisor-conducting questioning, which is the same as the requirement in current § 106.45(b)(6)(i). The advisor may be, but is not required to be, an attorney.

Proposed § 106.46(f)(2) would state that compliance with proposed § 106.46(f)(1)(i) or (ii) satisfies the requirements of § 106.45(g) to provide a process that enables the decisionmaker to adequately assess the credibility of the parties and witnesses to the extent credibility is both in dispute and relevant to evaluating one or more allegations of sex discrimination.

Proposed § 106.46(f)(3) would require the decisionmaker to determine whether a proposed question is relevant and not otherwise impermissible under proposed §§ 106.2 and 106.45(b)(7) prior to the question being posed and explain any decision to exclude a question as not relevant, which is the same as the requirement in current § 106.45(b)(6)(i)-(ii). If a decisionmaker determines that a party's question is relevant and not otherwise impermissible, then it must be asked, with the exception that a postsecondary institution must not permit questions that are unclear, such that they are vague or ambiguous, or harassing of the party being questioned. A postsecondary institution would also be permitted to impose other rules regarding decorum, provided they apply equally to the parties.

Although proposed § 106.46(f)(1) and (3) do not include the specific language from current § 106.45(b)(6)(i)-(ii) regarding questions and evidence about the complainant's sexual

predisposition or prior sexual behavior, the concepts from the current regulations would be included in proposed § 106.45(b)(7) on evidence that is impermissible regardless of relevance and would be cross-referenced in proposed § 106.46(f)(1) and (3).

The Department proposes revising the language in current § 106.45(b)(6)(i) that prohibits the decisionmaker from relying on any statement of a party or witness who does not submit to cross-examination at the live hearing in reaching a determination regarding responsibility. Instead of prohibiting the decisionmaker from considering all prior statements in these cases, proposed § 106.46(f)(4) would provide that if a party does not respond to questions related to their credibility, the decisionmaker must not rely on any statement of that party that supports that party's position. The Department also proposes maintaining, with minor revisions, the general principle from current § 106.45(b)(6)(i) regarding drawing an inference based solely on a hearing participant's decision not to respond to questions. Proposed § 106.46(f)(4) would prohibit the decisionmaker from drawing an inference about whether sex-based harassment occurred based solely on a party's or witness's refusal to respond to questions related to credibility, including a refusal to answer such questions during a live hearing.

Proposed § 106.46(g) would eliminate the requirement in current § 106.45(b)(6)(i) that a postsecondary institution must provide for a live hearing with cross-examination in its grievance procedures for complaints of sex-based harassment. Instead, proposed § 106.46(g) would permit, but not require, a postsecondary institution to hold live hearings. If a postsecondary institution chooses to conduct a live hearing, it would be permitted to conduct the live hearing with the parties physically present in the same geographic location but at the postsecondary institution's discretion or upon the request of either party, it would conduct the live hearing with the parties physically present in separate locations with technology enabling the decisionmaker

414

and parties to simultaneously see and hear the party or the witness while that person is speaking or communicating in another format, which is the same as the requirement in current § 106.45(b)(6)(i). The Department also proposes maintaining the requirement in current § 106.45(b)(6)(i) that a postsecondary institution create an audio or audiovisual recording, or transcript, of any live hearing and make it available to the parties for inspection and review.

For information regarding proposed requirements related to evaluating allegations and assessing credibility for complaints of sex discrimination other than sex-based harassment complaints involving a student complainant or student respondent at a postsecondary institution, see the discussion of proposed § 106.45(g).

*Reasons: Live hearings, advisor-conducted questioning, process to assess credibility and evaluate allegations.* The Department proposes eliminating the requirement that all postsecondary institutions must hold a live hearing with advisor-conducted cross-examination. Under the proposed regulations, a postsecondary institution would be permitted, but not required, to hold a live hearing and to use advisor-conducted questioning when credibility is at issue and relevant to evaluating one or more allegations of sex-based harassment. The Department recognizes the importance of a postsecondary institution having procedures in place to assess credibility when necessary and to provide a meaningful opportunity for the parties to be heard, regardless of whether it chooses to hold a live hearing. The proposed regulations would require a postsecondary institution to provide a process that enables the decisionmaker, prior to determining whether sex-based harassment occurred, to adequately assess the credibility of the parties and witnesses to the extent credibility is in dispute and relevant to evaluating one or more allegations of sex-based harassment. This would include allowing the decisionmaker to ask the parties and witnesses relevant questions and follow-up questions, including questions

challenging credibility, at a live hearing or during individual meetings with the parties. It would also include allowing each party to propose to the postsecondary institution's decisionmaker or investigator relevant questions and follow-up questions, including questions challenging credibility, that they want asked of any party or witness and have those questions asked during individual meetings with the parties or at a live hearing subject to certain requirements. In addition, when a postsecondary institution chooses to conduct a live hearing, it would be permitted to use advisor-conducted cross-examination to satisfy the requirement to have a process to assess credibility. The Department provides an overview of the relevant preamble discussions from the 2018 NPRM and 2020 amendments for requiring live hearings and cross-examination in the grievance procedures of postsecondary institution recipients and provides the reasons for changing these requirements.

*Explanation in the 2018 NPRM.* In the 2018 NPRM, the Department described cross-examination as "'the greatest legal engine ever invented for the discovery of truth,'" 83 FR at 61476 (quoting *California v. Green*, 399 U.S. 149, 158 (1970) (quoting 5 John H. Wigmore, *Evidence* § 1367, at 29 (3d ed. 1940))), and noted that at least one Federal circuit court has held that cross-examination is a constitutional requirement of due process in the Title IX context involving a public institution, *id.* (citing *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018)). The Department added that after careful consideration regarding how to best to incorporate cross-examination for proceedings at both the postsecondary level and the elementary and secondary school level, it had determined that issues related to age and developmental ability may outweigh the benefits of cross-examination at a live hearing in the elementary and secondary school context. *See id.* The Department determined that because these same issues do not exist at postsecondary institutions since most parties and witnesses are adults, grievance procedures at

postsecondary institutions must include live cross-examination at a hearing. *Id.* The Department explained that requiring the party advisors to conduct the cross-examination provides the benefits of cross-examination while avoiding any unnecessary trauma that could arise from personal confrontation between the complainant and the respondent. *See id.* (citing *Baum*, 903 F.3d at 583).

*Discussion of balancing the rights of the parties in the preamble to the 2020 amendments.* In response to stakeholders' support for the proposal to require a postsecondary institution to hold live hearings with advisor-conducted cross-examination, the Department recognized that several appellate courts had recently considered the value of cross-examination in student misconduct proceedings in postsecondary institutions and concluded that a meaningful opportunity to be heard includes the ability to challenge the testimony of parties and witnesses. *See* 85 FR at 30313. The Department also agreed with stakeholders that cross-examination serves the interests of parties and recipients because, in their view, it allows the decisionmaker to observe parties and witnesses answer questions, including those challenging credibility, which serves the truth-seeking function. *See id.*

The Department further stated that cross-examination is a necessary part of a fair, truth-seeking grievance process in postsecondary institutions, and that the 2020 amendments include appropriate safeguards that minimize the traumatic effect on complainants. *See id.* at 30315. In response to concerns raised by stakeholders regarding the traumatic effect of live hearings and cross-examination, the Department explained that any re-traumatization of complainants can be mitigated because cross-examination is conducted only by party advisors and the 2020 amendments contain other protections regarding the types of questions and evidence permitted and the ability to request that the live hearing occur with the parties in separate rooms. *See id.* at

417

30313-14.

*Discussion of cross-examination and reporting in the preamble to the 2020 amendments.*
In response to concerns that requiring live hearings with cross-examination would have a chilling effect on reporting, the Department acknowledged in the preamble to the 2020 amendments that complainants may be dissuaded from pursuing a formal complaint out of fear of undergoing aggressive questioning, but noted that recipients may educate their students and employees regarding what cross-examination will look like and may also develop rules and practices that ensure that questioning during cross-examination is relevant, respectful, and non-abusive. *See id.* at 30316. In addition, in response to concerns that requiring cross-examination would discourage many students, including complainants, respondents, and witnesses, from participating in a Title IX grievance process, *see id.* at 30331, the Department stated that live hearings and cross-examination at postsecondary institutions, constitutes a serious, formal process" and noted that the 2020 amendments ensured that a recipient's students and employees are "aware of that process" and "each party has the right to assistance from an attorney or non-attorney advisor throughout the process," *id.* at 30332. The Department explained sexual harassment is a serious matter that warrants a predictable, fair grievance process with strong procedural protections for both parties" to ensure reliable determinations regarding responsibility. *Id.*

*Case law discussion regarding cross-examination and due process in the preamble to the 2020 amendments.* As noted in the discussion of the Framework for Grievance Procedures for Complaints of Sex Discrimination (Section II.F), the Department acknowledged in the preamble to the 2020 amendments that "the Supreme Court has not ruled on what procedures satisfy due process of law under the U.S. Constitution in the specific context of a Title IX sexual harassment

grievance process held by a postsecondary institution, and that Federal appellate courts that have considered this particular issue in recent years have taken different approaches." *Id.* at 30327. The Department explained that the procedures required under current § 106.45 "are consistent with constitutional requirements" and best effectuate both parties' rights to meaningfully be heard regarding the allegations in a formal complaint of sexual harassment. *Id.* The Department recognized that what constitutes a meaningful opportunity to be heard may depend on specific circumstances and explained that a live hearing with cross-examination is required in the postsecondary context but not in elementary schools and secondary schools. *See id.*

The Department stated that "the Sixth Circuit has held that cross-examination, at least conducted through a party's advisor, is necessary to satisfy due process in sexual misconduct cases that turn on party credibility." *Id.* at 30327-28 (citing *Baum*, 903 F.3d at 581). The Department agreed with the reasoning of the U.S. Court of Appeals for the Sixth Circuit in *Baum* that allowing the respondent's advisor to conduct cross-examination on behalf of the respondent provides the benefits of cross-examination without the "emotional trauma of directly confronting the complainant's alleged attacker." *Id.* at 30328. Based on this view, the Department explained that current § 106.45(b)(6)(i) is consistent with the Sixth Circuit's reasoning because it requires that both parties have the opportunity for cross-examination, allows either party to request that cross-examination (and the entire live hearing) be conducted with the parties in separate rooms, permits only party advisors to conduct cross-examination, forbids personal confrontation between parties, and requires the decisionmaker to determine the relevance of a cross-examination question before a party or witness answers. *See id.*

The Department noted that the *Baum* opinion involved certain circumstances that justified cross-examination: it involved a public university that was required to comply with

constitutional due process requirements; a sexual harassment case that turned on credibility and involved serious consequences; and a postsecondary institution that already provided hearings for other types of misconduct and could not argue that it faced more than a minimal burden to provide a live hearing for sexual harassment cases.  *See id*.  The Department asserted, however, that even though some recipients "are private institutions that do not owe constitutional protections," it is equally important to consistently apply a grievance process to accurately resolve allegations of sexual harassment under Title IX in private and public institutions.  *Id*. The Department agreed with stakeholders that not every formal complaint of sexual harassment "turns on party or witness credibility" but noted that "most of these complaints do involve plausible, competing narratives of the alleged incident, making party participation in the process vital for a thorough evaluation of the available, relevant evidence."  *Id*.

The Department also acknowledged in the preamble to the 2020 amendments that following the public comment period on the 2018 NPRM, the U.S. Court of Appeals for the First Circuit reached a different holding regarding cross-examination than the Sixth Circuit in a Title IX sexual misconduct case.  *Id*. at 30329 (citing *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 68-70 (1st Cir. 2019)).  The Department explained that the First Circuit held that a postsecondary institution could satisfy due process "by using inquisitorial rather than adversarial method of cross-examination, by having a neutral school official pose probing questions of parties and witnesses in real-time, designed to ferret out the truth about the allegations at issue."  *Id*. (citing *Haidak*, 933 F.3d at 69-70).  The Department further acknowledged that after the public comment period on the 2018 NPRM closed, the First Circuit also decided a case under Massachusetts State law involving discipline of a student by a private college for sexual misconduct, holding that the college "owed no constitutional due process to the student and that

420

State law did not require any form of real-time cross-examination as part of [the college's] contractual [obligation of] basic fairness." *Id.* (citing *Doe v. Trustees of Bos. Coll.*, 942 F.3d 527 (1st Cir. 2019)). The Department declined to make any changes to current § 106.45(b)(6)(i) in response to these decisions.

*Discussion of alternatives to advisor-conducted cross-examination in the preamble to the 2020 amendments.* In response to suggestions from stakeholders that the Department allow postsecondary institutions to use cross-examination conducted by a neutral college administrator, or questions submitted by the parties as permitted for elementary and secondary school recipients under the 2020 amendments, the Department stated that those procedures cannot ensure a fair process and reliable outcomes in postsecondary institutions. *See id.* at 30330. The Department explained that regardless of whether those practices are consistent with the requirements of constitutional due process it believed that current § 106.45 "appropriately and reasonably balances the truth-seeking function of live, real-time, adversarial cross-examination in the postsecondary institution context with protections against personal confrontation between the parties." *Id.* The Department further stated that "regardless of whether the provisions in [current] § 106.45(b)(6)(i) are required under constitutional due process of law, the Department believes that these procedures meet or exceed the due process required under *Mathews v. Eldridge*, 424 U.S. 319, 321 (1976)," and that the Department has the regulatory authority under Title IX to adopt provisions "the Department has determined best effectuate the purpose of Title IX." *Id.* (footnotes omitted). Finally, the Department stated that adversarial questioning must be conducted by persons who need not be impartial to the parties and the recipient's neutral, impartial decisionmaker benefits from observing the questions and answers of each party and witness posed by a party's advisor advocating for that party's interests. *See id.* at 30330-31.

*Feedback received after implementation of the 2020 amendments.* According to feedback received from stakeholders in connection with the June 2021 Title IX Public Hearing and listening sessions, although recipients had a limited amount of time to assess the impact of the 2020 amendments' live hearing and cross-examination requirement, some postsecondary institutions reported that they experienced a decrease in the number of complaints filed as well as an increase in the number of individuals who report sexual harassment but decline to move forward with the grievance process once they are provided with information about the grievance process. These postsecondary institutions expressed the belief that based on their experiences, the reduction in complaints filed and in complainants willing to move forward with the grievance process is likely due to the live hearing and advisor-conducted cross-examination requirements in the 2020 amendments. Other stakeholders questioned the utility of live hearings, asserting that many of the questions that arise during the hearings have already been asked and answered during the investigation. In addition, a number of postsecondary institutions pointed to the live hearing and cross-examination requirements as examples of provisions in the current regulations that are overly burdensome and prescriptive for recipients and have the effect of interfering with recipients' ability to meet their Title IX obligations. In the 2021 Title IX Public Hearing and in listening sessions, OCR also heard from stakeholders who supported an alternative approach to live hearings with cross-examination; these stakeholders favored giving the flexibility the current regulations provide for non-postsecondary institutions to all recipients by permitting the parties to submit questions to the decisionmaker to ask, providing each party with the answers, and allowing for additional, limited follow-up questions from each party. OCR also received comments from several non-recipient stakeholders expressing support for the current requirements regarding live hearings and cross-examination and noting that they provide a means

for a respondent to challenge credibility or inconsistencies.

After considering the issue and reweighing the facts and circumstances, including views expressed by a wide array of stakeholders, particularly those with experience in implementing or participating in a recipient's process that included the live hearing and cross-examination requirements, and reviewing the applicable case law and academic writing on the topic of cross-examination and alternatives to cross-examination, the Department proposes eliminating the requirement for postsecondary institutions to hold a live hearing with advisor-conducted cross examination while still permitting them to hold such a hearing if the postsecondary institution deems it appropriate in a particular sex-based harassment case. The Department's tentative view is that the requirement for all postsecondary institutions to hold a live hearing with advisor-conducted cross-examination exceeds what is required in order to provide equitable procedures to the parties and is not necessary to provide a respondent with a meaningful opportunity to be heard. The Department's view is also that this requirement in the current regulations does not adequately account for the diversity of postsecondary institutions subject to Title IX. This proposed approach would provide a recipient with reasonable options for how to structure its grievance procedures to ensure that they are equitable for the parties while accommodating each recipient's administrative structure, education community, the applicable Federal and State case law, and State or local legal requirements by still permitting any postsecondary institution that so chooses to hold a live hearing with advisor-conducted cross-examination.

The Department's tentative view is that neither Title IX nor due process and fundamental fairness require postsecondary institutions to hold a live hearing with advisor-conducted cross-examination in all cases. The Department currently believes, however, that a postsecondary institution should be required to provide a live-questioning process that enables the

decisionmaker to adequately assess the credibility of the parties and witnesses to the extent credibility is in dispute and is relevant to evaluating one or more allegations of sex-based harassment in its grievance procedures for sex-based harassment involving a student complainant or student respondent.  Further, the Department currently believes that the procedures described in proposed § 106.46(f)-(g) would appropriately protect the right of all parties to have a meaningful opportunity to respond to allegations and the postsecondary institution's interest in grievance procedures that enable the decisionmaker to seek the truth and minimize chilling effects on the reporting of sex-based harassment and on participation in the recipient's grievance procedures by a complainant or respondent.

The Department's tentative position is that the procedures described in proposed § 106.46(f)-(g) appropriately recognize that although all postsecondary institutions, regardless of their size, type, administrative structure, and location, must comply with the requirements of Title IX, promulgating regulations that take into account the diversity of postsecondary institutions subject to Title IX would best ensure effective implementation of Title IX.  In view of this, proposed § 106.46(g) would permit, but not require, all postsecondary institutions to hold a live hearing and proposed § 106.46(f)(1) would permit, but not require, postsecondary institutions to use advisor-conducted questioning at a live hearing when the decisionmaker determines that credibility is in dispute and relevant to evaluating one or more allegations of sex-based harassment.  Under this approach, a postsecondary institution would still be able to hold live hearings if it chose to do so and a postsecondary institution, including a public postsecondary institution located within the jurisdiction of the Sixth Circuit where, as described above, advisor-conducted cross-examination is currently required, may use advisor-conducted questioning at a live hearing under the circumstances articulated by the court in *Baum*.  A

postsecondary institution that opted to hold live hearings would, at the request of either party, be required to conduct the live hearings with the parties in separate locations with technology enabling the decisionmaker and parties to simultaneously see and hear the party or the witness while that person is speaking or communicating in another format.

*Review of relevant case law on cross-examination.* As the Department stated in the preamble to the 2020 amendments and as explained in the discussion of the Framework for Grievance Procedures for Complaints of Sex Discrimination (Section II.F), the Supreme Court has not ruled on what elements are necessary for a public postsecondary institution's Title IX sexual harassment grievance procedures to satisfy due process of law under the U.S. Constitution, and Federal appellate courts have taken different approaches on this issue in recent years. *See* 85 FR at 30327. It is important to recognize that academic disciplinary proceedings are not co-extensive with civil or criminal trials. *See, e.g.*, *Nash*, 812 F.2d at 664 ("Due process requires that appellants have the right to respond, but their rights in the academic disciplinary process are not co-extensive with the rights of litigants in a civil trial or with those of defendants in a criminal trial."). The Supreme Court and other Federal courts have held that there is no general right to cross-examine witnesses in disciplinary proceedings against students at the postsecondary school level, even in public institutions. *See, e.g.*, *Horowitz*, 435 U.S. at 86 n.3 (declining to recognize a right to a hearing with the opportunity for cross-examination during student disciplinary proceedings considering factors in *Matthews*); *Butler v. Rector & Bd. of Visitors of Coll. of William & Mary*, 121 F. App'x 515, 520 (4th Cir. 2005) (finding "no basis in law" to import the right to cross-examine witnesses into the academic context); *Gorman*, 837 F.2d at 16 (holding that the right to unlimited cross-examination is not "an essential requirement of due process in school disciplinary cases"); *Nash*, 812 F.2d at 664 (finding that the inability to

question adverse witnesses in the usual, adversarial manner did not result in a denial of appellants' constitutional rights to due process).

Even absent a general right to cross-examination, some courts have held, in both public and private postsecondary settings, that some method of live cross-examination is required by due process and basic fairness when a disciplinary charge rests on a witness's or complainant's credibility. *See, e.g.*, *Doe v. Univ. of Scis.*, 961 F.3d 203, 215 (3d Cir. 2020) (holding that in a sexual assault case that hinges on credibility, basic fairness requires the chance to test witnesses' credibility through some method of cross-examination, but declining "to prescribe the exact method by which a college or university must implement these procedures"); *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 401 (6th Cir. 2017) (holding that accused students must have the right to cross-examine adverse witnesses in the most serious of cases, such as those depending on witness credibility); *Winnick v. Manning*, 460 F.2d 545, 549-50 (2d Cir. 1972) (holding that although unlimited cross-examination is not an essential element of due process in college discipline cases, it may be required when the resolution of the case turns on credibility assessments); *Doe v. Allee*, 30 Cal. App. 5th 1036, 1039 (Ct. App. 2019) (holding that in a case in which a student faces serious discipline for alleged sexual misconduct, and the credibility of witnesses is central to the adjudication of the charge, fundamental fairness requires, at a minimum, that the university provide a way for the accused to cross-examine those witnesses, directly or indirectly, at a hearing where the witnesses appear in person or by other means). As explained in the discussion of the case law regarding cross-examination and due process and in the preamble to the 2020 amendments, the Sixth Circuit held in *Baum* that when a student is accused of misconduct, the university must hold some sort of hearing before imposing a sanction as serious as expulsion or suspension and if credibility is in dispute and material to the outcome,

426

the hearing must include an opportunity for cross-examination. 903 F.3d at 581-84. The Department notes, however, that the Sixth Circuit did not consider whether examination by a neutral party (at either a live hearing or in separate meetings with the parties) would be sufficient to satisfy its view of constitutional due process. *See Haidak*, 933 F.3d at 69-70.

Following the Sixth Circuit's decision in *Baum*, courts outside of the Sixth Circuit have generally held that even if there is a right to cross-examination in certain disciplinary cases, that right can be satisfied through indirect questioning—such as allowing parties to propose questions to be asked by a neutral actor—in both the public and private university setting. *See, e.g.*, *Univ. of Ark.-Fayetteville*, 974 F.3d at 867-68 (rejecting due process challenge when the accused student was permitted to submit questions to the hearing panel and the hearing panel had discretion about whether to pose the questions to witnesses); *Haidak*, 933 F.3d at 69 (holding that in the university disciplinary setting, due process may require some opportunity to confront the complaining witness, but that this confrontation need not be done by the accused student or that student's representative); *Lee v. Univ. of N.M.*, 500 F. Supp. 3d 1181, 1241--42 (D.N.M. 2020) (finding that the Due Process Clause does not require postsecondary institutions to permit respondents to personally confront complainants even when credibility is at issue); *Gendia v. Drexel Univ.*, No. 20-1104, 2020 WL 5258315, at *5 (E.D. Pa. Sept. 2, 2020) (finding that the university satisfied the requirements for fundamental fairness when it allowed the parties to submit cross-examination questions to the adjudicator); *Haas*, 427 F. Supp. 3d at 350-51 (declining to find a due process violation when the plaintiff was not allowed to personally cross-examine his accuser and noting that the Sixth Circuit's holding in *Baum* was not binding on the court). In addition, in *Doe v. Trustees of Boston College*, 942 F.3d 527, 535 (1st Cir. 2019), the U.S. Court of Appeals for the First Circuit rejected a fundamental fairness challenge to a one-

year suspension for sexual assault imposed upon a student without the use of any form of live questioning. The First Circuit held that the private college's basic fairness obligation did not require the school to provide an adjudicatory hearing process or even a process at which both parties are present and have the opportunity to suggest questions to be asked of the other in real time. *Id.* at 534.

The Department notes that a few district courts outside of the Sixth Circuit recently have cited *Baum* to support their holdings, but it is unclear from these decisions whether these courts would have held that such a right could be satisfied by indirect cross-examination at a live hearing or in separate meetings with the parties. *See, e.g.*, *Doe v. Univ. of Conn.*, No. 3:20cv92, 2020 WL 406356, at *5 (D. Conn. Jan. 23, 2020) (noting that courts have reached different conclusions as to whether the accused has a right to cross-examine witnesses in the traditional manner, referencing *Baum*, and holding that in this credibility case involving a severe sanction, the plaintiff was likely to succeed on his due process claim because he did not have the opportunity to question or confront two of the witnesses on whose statements the hearing officers relied); *Norris v. Univ. of Colo., Boulder*, 362 F. Supp. 3d 1001, 1020 (D. Colo. 2019) (referring to the holding in *Baum*, noting that the Tenth Circuit has not so opined, but finding that the absence of a full hearing with cross-examination supports a claim for a violation of plaintiff's due process rights); *Univ. of Miss.*, 361 F. Supp. at 611-13 (in refusing to grant the university's motion to dismiss and thus declining to reject the Sixth Circuit's approach to cross-examination in *Baum*, the court found that plaintiff pleaded enough facts to permit discovery as to whether there was a procedural due process violation because, inter alia, the plaintiff was not permitted to cross-examine his accuser or other witnesses either directly or through written questions because none of them appeared at the hearing). District courts in the Sixth Circuit have also extended the

holding in *Baum* from student disciplinary proceedings to the employment context. *See, e.g.*, *Smock v. Bd. of Regents of Univ. of Mich.*, 353 F. Supp. 3d 651, 657 (E.D. Mich. 2018) (applying *Baum*'s cross-examination requirement to a university professor's pre-deprivation hearing for alleged misconduct); *Frost v. Univ. of Louisville*, 392 F. Supp. 3d 793, 804-06 (W.D. Ky. 2019) (same).

After reevaluating this issue, including cases decided both before and after the promulgation of the 2020 amendments, it is the Department's tentative position that the relevant case law does not require a postsecondary institution to provide for a live hearing with advisor-conducted cross-examination in all cases, at least as long as it provides another live method of determining credibility. As noted, the proposed regulations would permit a postsecondary institution to employ live, advisor-conducted cross-examination when applicable case law or other sources of law require that approach or the postsecondary institution uses its discretion to choose that approach. The Department further notes that each permissible option for evaluating the allegations and assessing credibility under the proposed regulations would require that the questions posed be answered live, whether in individual meetings with the decisionmaker or investigator or at a live hearing.

*Scholarship on cross-examination.* The preamble to the 2018 NPRM and 2020 amendments, as well as the *Baum* court, referred to case law describing cross-examination as the greatest legal engine ever invented for the discovery of truth. The Department recognizes, however, that while that statement is oft-repeated, notable research from the last several decades has called into question whether adversarial cross-examination is the most effective tool for truth-seeking in the context of sex-based harassment complaints involving students at postsecondary institutions.

In particular, there is growing evidence to suggest that "adults who have been sexually victimized may be a particularly vulnerable group of witnesses overall," especially during cross-examination. Rachel Zajac & Paula Cannan, *Cross-Examination of Sexual Assault Complainants: A Developmental Comparison*, 16 Psychiatry, Psych., & L. S36, S38 (2009) (citations omitted). For example, sexual assault has been associated with low self-esteem and low self-confidence, which have been shown to increase a person's vulnerability to suggestion. *Id.* Adults who have been sexually victimized are also least likely to exhibit confidence, powerful speech, and perseverance in maintaining control of a verbal exchange, which are the attributes most favorable to adult witnesses. *Id.* (citations omitted).

In addition, studies have found that information-gathering approaches such as questions asked in individual meetings instead of during a live hearing (sometimes described as inquisitorial procedures) are more likely to produce the truth than adversarial methods like cross-examination. These studies "suggested that inquisitorial procedures may result in the presentation of more accurate and less biased information." Mark R. Fodacaro et al., *Reconceptualizing Due Process in Juvenile Justice: Contributions from Law and Social Science*, 57 Hastings L.J. 955, 982, 982 n.165 (2006) (citing E. Allan Lind & Tom R. Tyler, *The Social Psychology of Procedural Justice* 25 (1988)); *see also* Christopher Slobogin, *Lessons from Inquisitorialism*, 87 S. Cal. L. Rev. 699, 711 (2014). Because non-adversarial information gathering approaches tend to reduce opportunities for bias, researchers have found that such methods are "most likely to produce truth." John Thibaut & Laurens Walker, *A Theory of Procedure*, 66 Calif. L. Rev. 541, 547 (1978).

The Department recognizes that some courts, advocates, and legal scholars believe that advisor-conducted cross-examination is the most effective way, and in the view of some, the

430

only way, to ensure the accuracy of witness testimony, especially in cases that hinge on credibility. After reevaluating the issue, however, including the case law and research discussed above, the Department's tentative position is that methods that require parties and witnesses to answer questions in a live format, other than advisor-conducted cross-examination during a live hearing, can provide an effective way to seek the truth in sex-based harassment cases involving postsecondary students and ensure that the parties have a meaningful opportunity to be heard. For this reason, to the extent credibility is in dispute and relevant to evaluating one or more allegations of sex-based harassment, proposed § 106.46(f)(1) would permit a postsecondary institution to have the decisionmaker ask the parties and witnesses relevant questions and follow-up questions, including questions challenging credibility. Proposed § 106.46(f)(1) would permit the decisionmaker to do this during individual meetings with the parties or at a live hearing. Proposed § 106.46(f)(1) would also allow each party to propose to the decisionmaker or investigator relevant questions and follow-up questions, including those challenging credibility that they want asked of any party or witness and have those questions asked, subject to the requirement in proposed § 106.46(f)(3), during individual meetings with the parties or at a live hearing, in addition to permitting any postsecondary institution that so chooses, to use advisor-conducted cross-examination. The Department's tentative view is that any benefit that adversarial cross-examination may have over other methods of live questioning is not sufficient to justify mandating that all postsecondary institutions permit adversarial cross-examination in every case, either as a matter of due process or fundamental fairness or of effectuating Title IX's nondiscrimination mandate, in light of the considerable costs imposed by adversarial cross-examination, particularly in the context of allegations of sex-based harassment.

As explained in the discussion of proposed § 106.46(f)(1), regardless of format, this

credibility assessment, if needed to evaluate one or more allegations of sex-based harassment, would have to take place prior to the decisionmaker determining whether sex-based harassment occurred. The decisionmaker must determine whether a proposed question is relevant prior to the question being posed and explain any decision to exclude a question as not relevant. If a decisionmaker determines that a party's question is relevant and not otherwise impermissible, then the question must be asked; however, a postsecondary institution must not permit questions that are unclear or harassing of the party being questioned. A postsecondary institution would also retain discretion to impose other reasonable rules regarding decorum, provided they apply equally to the parties. The Department anticipates that the requirements in proposed § 106.46(f)(1) would provide an effective means for assessing credibility and seeking the truth while avoiding some of the deficiencies or drawbacks that may be associated with requiring advisor-conducted cross-examination in all sex-based harassment cases and for all types of postsecondary institutions. The Department notes that proposed § 106.46(e)(6)(i) would require a postsecondary institution to either provide the parties with equitable access to the relevant and not otherwise impermissible evidence or to the same investigative report that accurately summarizes this evidence. This evidence or investigative report would include a discussion of the evidence obtained through questioning of the parties and witnesses by the decisionmaker. In addition, although not required to do so, nothing in proposed § 106.46(f) would prohibit a postsecondary institution from compiling a transcript of questioning of the parties and witnesses by the decisionmaker and providing a copy of the transcript to the parties.

Under proposed § 106.46(f)(1), a postsecondary institution would have discretion to structure its processes for enabling the decisionmaker to adequately assess the credibility of the parties and witnesses to the extent credibility is both in dispute and relevant to evaluating one or

more allegations of sex-based harassment as long as the process complies with the requirements set out in proposed § 106.46(f)(1) and (3). For example, some postsecondary institutions may decide to have the decisionmaker ask their questions and the parties' questions of any party and witnesses during individual meetings. Other postsecondary institutions may decide to hold a live hearing in which a decisionmaker poses their own questions and follow-up questions to the parties and also asks questions and follow-up questions of each party and witnesses that were proposed by the other party. In all instances, a postsecondary institution would not be permitted to have grievance procedures in which the questions and answers would be provided in writing. Although the discussion here refers to witnesses, the Department recognizes that not all grievance procedures will involve witnesses in addition to the parties.

Notwithstanding the research discussed above regarding the potential deficiencies of advisor-conducted cross-examination as a truth-seeking tool, some postsecondary institutions may view it as the most effective means to assess credibility in certain cases and may choose to use it or may be required to use it based on the jurisdiction in which they are located. To accommodate these postsecondary institutions, proposed § 106.46(f)(1) would permit a postsecondary institution to use advisor-conducted questioning at a live hearing to satisfy the requirement in proposed § 106.46(f)(1) regarding a process for assessing credibility. During this questioning, the party's advisor would be permitted to ask any party and any witnesses all relevant questions and follow-up questions, including those challenging credibility, subject to the requirements in proposed § 106.46(f)(3), which are discussed above.

*When credibility is not in dispute.* Courts, including the Sixth Circuit in *Baum*, have held that there are situations in which cross-examination is unwarranted. These include, for example, situations in which the respondent admits to engaging in the misconduct, in which a recipient

reaches a decision based on evidence other than the complainant's statements, and in which the respondent waives their right to a hearing. *See, e.g.*, *Doe v. Case W. Rsrv. Univ.*, 809 F. App'x 276, 281-82 (6th Cir. 2020) (noting that the Sixth Circuit has yet to decide whether the right to cross-examination exists in Title IX proceedings conducted by a private university when credibility is at issue and holding that the plaintiff waived any right to cross-examination when he stated that he did not want any witnesses and selected the sole administrator hearing that did not allow for the presentation of evidence or cross-examination of witnesses); *Baum*, 903 F.3d at 584 (explaining that if a student admits to engaging in misconduct cross-examination is unnecessary because there is little to be gained by adversarial questioning when the accused student has already confessed); *Plummer*, 860 F.3d at 775-76 (holding that accused students had no right to cross-examination when the defendant university did not rely on testimonial evidence from the alleged victim); *Winnick*, 460 F.2d at 549-50 (even assuming the right to confront witnesses may be essential in some disciplinary hearings, due process did not require cross-examination in this case, because, inter alia, credibility was not at issue because the plaintiff admitted to the crucial fact at issue in the case); *Doe v. Univ. of Neb.*, 451 F. Supp. 3d 1062, 1123 (D. Neb. 2020) (holding that while some courts have recently held that a state-college student facing expulsion for alleged sexual misconduct has the right under the Fourteenth Amendment to confront and cross-examine their accuser when credibility is material to the outcome, no such right exists when the accused admits to engaging in the misconduct); *Flor v. Univ. of N.M.*, 469 F. Supp. 3d 1143, 1153-54 (D.N.M. 2020) (holding that no right to cross-examination existed in this case because the university did not rely on the accuser's statements in concluding that the plaintiff violated university policy and instead relied on communications between the plaintiff and the accuser and plaintiff did not challenge the authenticity of those

communications). In these situations, a recipient would not be required to implement its process required under proposed § 106.46(f)(1) for enabling the decisionmaker to adequately assess the credibility of the parties and witnesses because credibility is not in dispute and is not relevant to evaluating the allegations.

*Removing the prohibition on statements not subject to cross-examination.* On July 28, 2021, the United States District Court for the District of Massachusetts issued a decision in *Victim Rights Law Center et al. v. Cardona* vacating the language in current § 106.45(b)(6)(i) prohibiting a decisionmaker from relying on any statement of a party or witness who does not submit to cross-examination at a live hearing in reaching a determination regarding responsibility. 552 F. Supp. 3d 104, 134 (D. Mass. 2021), order clarified, No. 20-11104-WGY, 2021 WL 3516475, at *1 (D. Mass. Aug. 10, 2021), *appeals filed*, Nos. 21-1773, 21-1777, 21-1782, 21-1783, 21-1784, 21-1853 (1st Cir. 2021). The court found that the vacated language was arbitrary and capricious, concluding that the Department "failed to consider the consequences of § 106.45(b)(6)(i)'s prohibition on statements not subject to cross-examination in conjunction with other challenged provisions." 552 F. Supp. 3d at 132. The court discussed that nothing in the 2020 amendments would prevent a respondent from working with the school to schedule the live hearing at an inconvenient time for third-party witnesses and the respondent may choose not to attend the hearing to avoid the possibility of self-incrimination, and the respondent may speak freely about the investigation to collect evidence or persuade other witnesses not to attend the hearing as long as this is not done in a "tortious or retaliatory manner." *Id.* at 132-33. The court explained that when the prohibition on statements not subject to cross-examination is applied under such circumstances and a recipient applies the clear and convincing evidence standard, it is hard to "imagine how a complainant reasonably could overcome the presumption of non-

435

responsibility [in the current regulations] to attain anything beyond the supportive measures that he or she is offered when they first file the formal complaint." *Id.* at 133. The court further explained that it was striking down this prohibition not because this result is manifestly unreasonable, but because "nothing in the administrative record demonstrates that the Department was aware of this result, considered its possibility, or intended this effect" and "the construction of the [2020 amendments] suggests that the Department failed even implicitly to recognize this result." *Id.* A party that the court gave leave to intervene has appealed the court's judgment vacating the language in current § 106.45(b)(6)(i) and plaintiffs have also appealed the court's judgment. Those appeals are currently pending with the U.S. Court of Appeals for the First Circuit.

The Department proposes revisions to the language in current § 106.45(b)(6)(i) that was vacated by the U.S. District Court of Massachusetts. The Department recognizes that the language in current § 106.45(b)(6)(i) placing limitations on the decisionmaker's ability to consider statements not subject to cross-examination was vacated by the district court and is thus no longer part of the current regulations. The Department is concerned, however, that placing no limitations on the decisionmaker's ability to consider statements made by a party who does not submit to a credibility assessment could lead to manipulation by the parties. For example, if there were no limitations placed on the decisionmaker's ability to consider prior statements from parties who do not submit to a credibility assessment, a complainant could write an email to a friend and leave a voicemail for another friend detailing the events related to the alleged sex-based harassment. If the complainant refused to submit to a credibility assessment, the decisionmaker would be permitted to consider the email and voicemail for their truth, but the respondent would not have an opportunity to question the complainant, including to assess

436

credibility. This same result could also occur if a respondent writes an email to a friend and leaves a voicemail for another friend detailing the events in question and then refuses to submit to a credibility assessment. Under proposed § 106.46(f)(4), if a party does not respond to questions related to their own credibility, the decisionmaker would be prohibited from relying on any statement of that party that supports that party's position. The Department's proposed language is intended to avoid situations like that described above in which a party could avoid responding to questions related to their own credibility and the decisionmaker would have to consider prior statements made by that party that support that party's position. It would apply when a party refuses to answer questions related to their own credibility either during the investigation in individual meetings with the decisionmaker or investigator or during the live hearing, if the postsecondary institution holds a live hearing. The Department would propose this change regardless of whether the district court's vacatur is ultimately upheld on appeal.

The Department also proposes incorporating language similar to current § 106.45(b)(6)(i) regarding inferences based on a party's or witness's absence from a live hearing or refusal to answer questions related to credibility into proposed § 106.46(f)(4). Under proposed § 106.46(f)(4), the decisionmaker would be prohibited from drawing an inference about whether sex-based harassment occurred based solely on a party's or witness's absence from a live hearing or refusal to respond to questions related to credibility, including a refusal to answer such questions during a live hearing.

*Incorporation of requirements from the 2020 amendments.*

*Live hearing logistics.* As explained in the summary of proposed § 106.46(g), the Department proposes incorporating the requirement from current § 106.45(b)(6)(i) into proposed § 106.46(g) so that if a postsecondary institution chooses to conduct a live hearing under

437

proposed § 106.46(g), it may conduct the live hearing with the parties physically present in the same geographic location, but at the postsecondary institution's discretion or upon the request of either party, it would conduct the live hearing with the parties physically present in separate locations with technology enabling the decisionmaker and parties to simultaneously see and hear the party or the witness while that person is speaking or communicating in another format. Participating from separate locations would include virtually participating from separate locations or participating while physically present but in separate rooms on the postsecondary institution's campus. The Department also proposes incorporating into proposed § 106.46(g) the requirement in current § 106.45(b)(6)(i) that a postsecondary institution create an audio or audiovisual recording, or transcript, of any live hearing and make it available to the parties for inspection and review. Nothing in the proposed regulations would prohibit a recipient from imposing rules that restrict the parties from creating their own recording. Proposed § 106.46(g) would not impose specific requirements regarding how a recipient provides the recording or transcript to the parties for inspection and review and it is up to each recipient to determine how to fulfill this requirement and whether to also provide a copy of the recording or transcript to the parties. As explained in the discussion of proposed § 106.45(b)(1), a recipient's grievance procedures must treat complainants promptly and equitably, which may require certain considerations when the parties, witnesses, or other hearing participants are persons with disabilities or persons with limited English proficiency. When conducting a live hearing, it may be necessary for a recipient to provide auxiliary aids and services to persons with disabilities who are participating in the hearing. In addition, it may be necessary for a recipient to provide language assistance services, such as translations or interpretation, for persons with limited English proficiency who are participating in the hearing.

438

*Ability of the parties to propose questions and the recipient's obligation to make relevance determinations.* Current § 106.45(b)(6)(ii) requires recipients that are elementary and secondary schools, and other recipients that are not postsecondary institutions to afford each party the opportunity to submit written, relevant questions that a party wants asked of any party or witness, provide each party with the answers, and allow for additional, limited follow-up questions from each party. As explained in the summary of proposed § 106.45(f)(3), proposed § 106.46(f)(3) would impose a similar obligation on postsecondary institutions by requiring them to allow each party to propose to the decisionmaker or investigator relevant and not otherwise impermissible questions that they want asked of any party or witness and have those questions subject to the requirements in proposed § 106.46(f)(3). Proposed § 106.46(f)(3) would include the requirement from current § 106.45(b)(6)(i)-(ii) that the decisionmaker determine whether a proposed question is relevant prior to the question being posed and explain any decision to exclude a question as not relevant.

*Advisor-conducted questioning.* When a postsecondary institution chooses to use advisor-conducted questioning at a live hearing, proposed § 106.46(f)(1)(ii) would incorporate the language from current § 106.45(b)(6)(i) requiring: (1) the recipient to permit each party's advisor to ask the other party and any witnesses all relevant questions and follow-up questions, including those challenging credibility; (2) the decisionmaker to determine whether the proposed question is relevant and explain any decision to exclude a question as not relevant before a party or witness answers a question; and (3) the postsecondary institution to provide the party with an advisor of the postsecondary institution's choice, who may be but is not required to be an attorney, without charge to the party, for the purpose of advisor-conducted questioning if a party does not have an advisor who can ask questions on their behalf.

439

*Relevance.*  Current § 106.45(b)(6)(i)-(ii) limit questions during advisor-conducted cross-examination and written cross-examination to those that are relevant and state that questions and evidence about the complainant's sexual predisposition or prior sexual behavior are not relevant, unless such questions and evidence about the complainant's prior sexual behavior are offered to prove that someone other than the respondent committed the conduct alleged by the complainant, or if the questions and evidence concern specific incidents of the complainant's prior sexual behavior with respect to the respondent and are offered to prove consent.  Although the language in proposed § 106.46(f)(1) and (3) would not explicitly refer to the complainant's sexual predisposition or prior sexual behavior, the same limitations regarding those concepts would be incorporated into those proposed provisions.  These limitations are explained in greater detail in the discussion of the proposed definition of "relevant" (§ 106.2) and the discussion of relevant evidence and evidence that is impermissible regardless of relevance in proposed § 106.45(b)(7).  *Additional clarifications in the proposed regulations.*

*Questions that are unclear or harassing and other rules regarding decorum.*  Although the 2020 amendments do not address unclear or harassing questions, or rules of decorum in the regulatory text, the Department stated in the preamble to the 2020 amendments that a recipient may adopt rules of decorum and noted that a recipient is better positioned than the Department to adopt rules of decorum that are tailored to its educational community.  *See* 85 FR at 30319.  The Department also stated that a recipient may prohibit advisors from questioning parties or witnesses in an abusive, intimidating, or disrespectful manner and may require a party to use a different advisor if the party's advisor refuses to comply with the school's rules of decorum.  *See, e.g.*, *id.* at 30319-20, 30324, 30331, 30342, 30361.  For example, the Department explained that if a party's advisor of choice yells at others in violation of a school's rules of decorum, the

school may remove the advisor and require a replacement.  *See, e.g.*, *id.* at 30320, 30324, 30342.

The school has this authority even when the advisor is asking a question that is relevant to the

hearing.  If the manner in which an advisor attempts to ask the question is harassing,

intimidating, or abusive (e.g., advisor yells, screams, or approaches a witness in an intimidating

manner), the preamble explained that a school may enforce a rule requiring that relevant

questions must be asked in a respectful, non-abusive manner.  *See id.*  The Department further

stated that nothing in the 2020 amendments prohibits a recipient from applying a rule that

duplicative questions are irrelevant, or from imposing rules of decorum that require questions to

be asked in a respectful manner as long as it applies those rules clearly, consistently, and equally

to the parties.  *See id.* at 30331.

      The Department's tentative position is that it is important to explicitly require in the

regulatory text that a postsecondary institution prohibit questions that are unclear or harassing of

the party being questioned because a proceeding in which questions are unclear or harassing is

not an equitable proceeding and not one likely to produce accurate information needed for

evaluating the allegations of sex-based harassment and assessing credibility which impacts the

postsecondary institution's ability to determine whether sex-based harassment occurred and

effectuate Title IX's nondiscrimination mandate.  A question would be unclear if it is vague or

ambiguous such that it would be difficult for the decisionmaker or the party being asked to

answer the question to discern what the question is about.  For example, some of the key words

in the question may have more than one meaning, or the period of time to which the question

refers to may be unclear.  Under the proposed regulations, a postsecondary institution would be

permitted to request that the party or party's advisor rephrase any questions that do not comply

with these requirements.  Permitting a postsecondary institution to impose other reasonable rules

of decorum as long as it applies them equally to the parties and their advisors is consistent with current § 106.45(b) and proposed § 106.45(i), which would permit a postsecondary institution to adopt additional provisions as part of its grievance procedures as long as they apply equally to the parties, and would also assist it in crafting procedures that are designed to accurately assess credibility and are also equitable for the parties.  For these reasons, the Department included language in proposed § 106.46(f)(3) to make clear that a postsecondary institution must prohibit questions that are unclear or harassing of the party being questioned and to permit a postsecondary institution to impose other reasonable rules regarding decorum.  In addition, when considering what other reasonable rules of decorum to impose, if any, a postsecondary institution should be aware of current § 106.6(d), which the Department is not proposing to revise.  Current § 106.6(d) states that nothing in the Title IX regulations require a recipient to restrict any rights that would otherwise be protected from government action by the First Amendment of the U.S. Constitution.

Section 106.46(h) Determination of whether sex-based harassment has occurred

*Current regulations:* Section 106.45(b)(7) requires a recipient to issue a written determination regarding responsibility, applying the standard of evidence described in current § 106.45(b)(1)(vii).  In this written determination, a recipient must include: identification of the allegations potentially constituting sexual harassment; a description of the procedural steps taken from the receipt of the formal complaint through the determination; findings of fact supporting the determination; conclusions regarding the application of the recipient's code of conduct to the facts; a statement of, and rationale for, the result as to each allegation including a determination regarding responsibility, any disciplinary sanctions the recipient imposes on the respondent, and whether remedies will be provided by the recipient to the complainant; and the recipient's

procedures and permissible bases for appeal.  Current § 106.45(b)(7) also requires that the recipient provide this written determination to the parties simultaneously; that the Title IX Coordinator is responsible for effective implementation of any remedies; and provides information about when the determination regarding responsibility becomes final.

*Proposed regulations:* The Department proposes reorganizing the requirements from the current regulatory provision at § 106.45(b)(7) into §§ 106.45(b)(2), 106.45(h) and 106.46(h), with strengthened protections for the parties and additional changes so that this provision is consistent with other revisions proposed throughout the regulations.

In addition to the requirements of proposed § 106.45(h), which would apply to all complaints of sex discrimination, postsecondary institutions would have to comply with proposed § 106.46(h) in the context of complaints of sex-based harassment involving a student complainant or student respondent.  Proposed § 106.46(h) would remove the current reference to the postsecondary institution's code of conduct and impose additional requirements regarding written communications with the parties.  A postsecondary institution would have to provide a written determination simultaneously to the parties.  The written determination would have to include a description of the alleged sex-based harassment; information about the policies and procedures the postsecondary institution used to evaluate the allegations; the decisionmaker's evaluation of the relevant evidence and determination as to whether sex-based harassment occurred; whether the decisionmaker has found that sex-based harassment occurred; any disciplinary sanctions to be imposed on the respondent; whether remedies other than the imposition of disciplinary sanctions will be provided to the complainant, and, to the extent appropriate, other students identified to or by the postsecondary institution to be experiencing the effects of the sex-based harassment; and the postsecondary institution's procedures for an appeal.

*Reasons:* Following an investigation as set out in proposed § 106.46(e), (f), and (g), a postsecondary institution would have to provide the determination of whether sex-based harassment occurred in writing to the parties simultaneously.

The Department also proposes revisions to improve overall clarity and to make § 106.46(h) consistent with other changes in the regulations. Proposed § 106.46(h)(1)(ii) would clarify that a postsecondary institution must include information about the policies and procedures that it used to evaluate the allegations in the complaint. The proposed regulations also would clarify at § 106.46(h)(1)(iii) that the written determination must provide the decisionmaker's evaluation of relevant evidence and determination as to whether sex-based harassment occurred. This would consolidate and simplify the current regulations' separate requirements at § 106.45(b)(7)(ii)(C) and (E) that the postsecondary institution provide findings of fact supporting its determination and provide a statement of, and the rationale for, the result as to each allegation, including the postsecondary institution's determination regarding responsibility. The Department anticipates that this consolidated requirement would provide the parties with a more useful explanation of how a recipient reached its determination than as required under the current regulations, and would render unnecessary the current requirement to provide the "conclusions regarding the application of the recipient's code of conduct to the facts," at § 106.45(b)(7)(ii)(D).

Further, the Department proposes that providing this determination in writing regarding sex-based harassment is appropriate in light of the particular circumstances of postsecondary students, as explained in the discussion of proposed § 106.46 (Section II.F.2.c), and the requirement that a recipient not discriminate based on sex in its education program or activity.

Section 106.46(i) Appeals

*Current regulations:* Section 106.45(b)(8) requires a recipient to offer both parties an appeal from a determination regarding responsibility, and from a recipient's dismissal of a formal complaint or any allegations therein on the bases of procedural irregularity, new evidence not reasonably available at the time, or conflict of interest or bias on the part of the Title IX Coordinator, investigator, or decisionmaker.

*Proposed regulations:* The Department proposes preserving current § 106.45(b)(8) at proposed § 106.46(i), including the clarification that an appeal must be offered from a postsecondary institution's dismissal of any complaint or any allegations in a complaint. Proposed § 106.46(i) would state that, in addition to complying with the requirements in proposed § 106.45(d)(3), a postsecondary institution must offer the parties an appeal from a determination that sex-based harassment occurred, and from a postsecondary institution's dismissal of a complaint or any allegations therein. Proposed § 106.46(i) would provide required grounds for appeal: (i) procedural irregularity that would change the determination in the matter; (ii) new evidence that would change the outcome of the matter and was not reasonably available at the time the recipient dismissed the complaint or determined that sex-based harassment occurred; and (iii) conflict of interest or bias for or against complainants or respondents or the individual complainant or respondent by the Title IX Coordinator, investigator, or decisionmaker that would change the outcome of the matter. Consistent with the current regulations, if a postsecondary institution were to offer an appeal on additional bases, proposed § 106.46(i)(2) would require that postsecondary institution to offer that right to appeal equally to the parties and ensure those additional bases are available to all parties. In addition, the Department proposes to require the postsecondary institution to comply in writing with the requirements in proposed

445

§ 106.45(d)(3)(i), (iv), and (v).

*Reasons:* It is the Department's tentative view that the current regulatory text should be retained concerning postsecondary institutions in grievance procedures involving postsecondary students and concerning the required bases for appeal, with a small number of revisions that reflect other proposed changes to the Title IX regulations. Further, as discussed in proposed § 106.45(d)(3), this right to appeal also requires robust protections such as training for appeal decisionmakers on how to serve impartially, including by avoiding bias, conflicts of interest, and prejudgment of the facts at issue; strict separation of the appeal decisionmakers from those who investigated and adjudicated the underlying case to reinforce independence and neutrality; and a reasonable, equivalent opportunity for the parties to participate in the appeals process.

The proposed regulations would also maintain, for postsecondary students in proposed § 106.46(i), the right to appeal to a different decisionmaker as an additional safeguard designed to protect the integrity of the process. It is the Department's current position that appeals can be an "important mechanism to reduce the possibility of unfairness or to correct potential errors made in the initial responsibility determination." 85 FR at 30397. Proposed § 106.46(i) would provide the same grounds for appeal in cases involving postsecondary students as are set out in the current regulations on appeals. More specifically, under the proposed regulations, postsecondary institutions in cases involving one or more students must offer the right to appeal on any of the following bases that may have affected the postsecondary institution's determination: (i) a procedural irregularity that would have altered the determination of whether sex-based harassment occurred;[8] (ii) new evidence that was not reasonably available at the time

___

[8] As discussed in the 2020 amendments, "if a party disagrees with a decisionmaker's relevance determination, the party has the opportunity to challenge the relevance determination on appeal"

the determination of whether sex-based harassment occurred or dismissal was made; or (iii) if the Title IX Coordinator, investigator, or decisionmaker had a conflict of interest or bias for or against complainants or respondents generally, or for or against the individual complainant or respondent. Nothing in these proposed regulations would preclude a recipient from offering additional grounds for appeal, as long as they are offered equally to all the parties.

The Department proposes substituting "complaint" for "formal complaint" because the proposed Title IX regulations no longer use the term "formal complaint," as explained in the discussion of the proposed definition of "complaint" (§ 106.2).

The Department also proposes referring to "the parties" rather than "both parties" because there may be instances in which complaints are consolidated and there is more than one complainant or respondent in a single investigation and hearing.

Lastly, the Department proposes requiring that postsecondary institutions fulfill the following requirements by communicating with the parties in writing: notifying the parties when an appeal is filed; providing the parties with a reasonable and equivalent opportunity to make a statement supporting or challenging the outcome; and notifying all parties of the result of the appeal, and the rationale for the result. It is the Department's tentative view that preserving the requirements that a postsecondary institution must comply with these provisions in writing is appropriate in light of the particular circumstances of postsecondary students, as explained in the discussion of proposed § 106.46 (Section II.F.2.c), and the requirement that a recipient not discriminate based on sex in its education program or activity.

---

on the basis of procedural irregularity if the relevance determination affected the outcome. 85 FR at 30349 n.1340.

Section 106.46(j) Informal resolution

*Current regulations:* Section 106.45(b)(2)(A) requires a recipient, upon receipt of a formal complaint, to provide written notice of any informal resolution process to the parties who are known. Current § 106.45(b)(9) also requires a recipient to provide a written notice to the parties disclosing the following: the allegations; the requirements of the informal resolution process, including the circumstances under which it precludes the parties from resuming a formal complaint arising from the same allegations; the fact that at any time prior to agreeing to a resolution, any party has the right to withdraw from the informal resolution process and resume the grievance process procedures with respect to the formal complaint; and any consequences resulting from participating in the informal resolution process, including the records that will be maintained or could be shared.

*Proposed regulation*s: The Department proposes preserving the requirements currently in § 106.45(b)(9). Proposed § 106.44(k) would set out the requirements a recipient would have to follow if it chooses to offer an informal resolution process. Proposed § 106.46(j) would state that if a postsecondary institution offers or provides the parties to the grievance procedures in proposed §§ 106.45 and 106.46, with an informal resolution process under proposed § 106.44(k), the postsecondary institution must inform the parties in writing of the offer and of their rights and responsibilities in the informal resolution process, and must provide the information required under proposed § 106.44(k)(3) in writing.

*Reasons:* The Department's tentative view is that a recipient should continue to retain the discretion to offer the parties to a sex discrimination complaint, including sex-based harassment complaints, an alternative option for resolving such complaints. As explained in greater detail in the discussion of proposed § 106.44(k), the Department recognized in the preamble to the 2020

448

amendments that an informal resolution process could provide greater flexibility to recipients in serving their educational communities. 85 FR at 30403. Further, the Department's current view continues to be that a recipient is in the best position to determine whether an informal resolution process would be a potential good fit for the facts and circumstances of a particular complaint.

Finally, the Department proposes that preserving the requirements that postsecondary institutions must comply with these provisions in writing is appropriate in light of the particular circumstances of postsecondary students, as explained in the discussion of proposed § 106.46 (Section II.F.2.c), and the requirement that a recipient not discriminate based on sex it its education program or activity.

I. Assistant Secretary Review

Section 106.47 Assistant Secretary

*Current regulations:* Section 106.44(b)(2) states that the Assistant Secretary will not deem a recipient's determination regarding responsibility to be evidence of deliberate indifference by the recipient, or otherwise evidence of discrimination under Title IX, solely because the Assistant Secretary would have reached a different determination based on an independent weighing of the evidence.

*Proposed regulations:* The Department proposes making minor revisions to the language in current § 106.44(b)(2) and moving it to proposed § 106.47.

*Reasons:* For clarity, the Department proposes moving the language in current § 106.44(b)(2), which concerns the Assistant Secretary's review of a recipient's determination of whether sex-based harassment occurred, to proposed § 106.47. Proposed § 106.44 would set out actions that a recipient must take to operate its education program or activity free from sex discrimination. Because proposed § 106.47 would describe the Assistant Secretary's approach to reviewing sex-

449

based harassment complaints rather than describe requirements for a recipient, the Department proposes to move current § 106.44(b)(2) to proposed § 106.47. Current § 106.44(b)(2) is limited to formal complaints of sexual harassment and the Department similarly proposes limiting the application of proposed § 106.47 to complaints of sex-based harassment. The Department continues to believe that as stated in the preamble to the 2020 amendments, limiting this provision to sex-based harassment complaints "serves the interests of complainants and respondents in resolving [sex-based] harassment allegations, by limiting the circumstances under which a 'final' determination reached by the recipient may be subject to being set[] aside and requiring the parties to go through the grievance process for a second time." 85 FR at 30221. In addition, the Department notes that as explained in the preamble to the 2020 amendments, violations of these proposed regulations may result in a recipient's determination whether sex-based harassment occurred being set aside by OCR, but determinations will not be overturned "solely" because OCR would have weighed the evidence differently. *Id.*

III. Pregnancy and Parental Status

*Statute:* Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance," 20 U.S.C. 1681(a), but does not specifically address discrimination related to pregnancy or parental status. The Department has the authority to "effectuate the provisions" of the Title IX prohibition on discrimination on the basis of sex in education programs or activities receiving Federal financial assistance, specifically under 20 U.S.C. 1682 and generally under 20 U.S.C. 1221e-3 and 3474.

A. The 1975 Title IX Regulations Related to Pregnancy and Parental Status

As explained in the Background discussion of the History of Title IX's

Nondiscrimination Mandate and Related Regulations, the regulations pertaining to pregnancy and parental status for students and employees have remained consistent since HEW first promulgated them in 1975. The regulations give effect to Title IX's prohibition on sex discrimination in a recipient's education program or activity in two ways. First, the Department's Title IX regulations prohibit sex discrimination based on pregnancy, childbirth, false pregnancy, termination of pregnancy, or recovery therefrom, as well as sex-based distinctions based on parental, family, or marital status. 34 CFR 106.21(c)(1)-(2), 106.40(a), 106.40(b)(1), 106.57(a)(1), and 106.57(b). This prohibition ensures that persons are not denied or limited in their access to a recipient's program or activity because of sex-based stereotypes associated with pregnancy, parenting, or marital status. Second, current §§ 106.21(c)(3), 106.40(b)(4), and 106.57(c) require that a recipient treat a student or employee's pregnancy or related conditions in the same manner with respect to certain matters as any other temporary disability. The regulations also require a recipient to take proactive steps, such as providing for leave and reinstatement for pregnancy, childbirth, false pregnancy, termination of pregnancy, or recovery therefrom, without the need to show comparable treatment with persons with temporary disabilities. 34 CFR 106.40(b)(5), 106.57(d). These provisions in the current regulations underscore that Title IX requires a variety of implementation strategies if it is to serve as a "strong and comprehensive measure," 118 Cong. Rec. at 5804 (statement of Sen. Bayh), to "achieve[] . . . the objective[]" of eliminating sex discrimination in federally subsidized education programs and activities under 20 U.S.C. 1682, *id.* at 5803.

> B. Need for Clarification Regarding Protections Because of Pregnancy and Parental Status

The Title IX regulations regarding pregnancy and related conditions have remained static

for nearly a half century.  In that time, much has been learned about what appropriate standards are necessary to afford students and employees the ability to learn and work while pregnant or experiencing pregnancy-related conditions, and about what is necessary to ensure that such persons are not subject to discrimination on the basis of these conditions.  As explained in greater detail in the discussion of the specific proposed regulations, the Department heard feedback from stakeholders through the June 2021 Title IX Public Hearing and in meetings held in 2022 under Executive Order 12866, after the NPRM was submitted to OMB, that revisions to the Department's Title IX pregnancy regulations are necessary to give effect to the statute's nondiscrimination mandate in the contemporary educational context.  Several stakeholders told the Department that the regulations are not sufficient to ensure full access to educational and employment opportunities for students and employees who are pregnant, experiencing pregnancy-related conditions, or who have been pregnant.  They requested that the Department address forms of discrimination based on pregnancy and related conditions that are not currently covered explicitly by the regulations, such as discrimination based on past pregnancy and medical conditions related to pregnancy and childbirth, including lactation, and clarifying a recipient's obligation to provide reasonable modifications to students because of pregnancy or related conditions.  Stakeholders argued that students generally may not be aware of their rights and urged therefore that employees need better training in how to support students who are pregnant or experiencing pregnancy-related conditions.  Further, stakeholders stressed that when simple modifications such as leave for childbirth and recovery or intermittent absences for lactation were not provided, students could face partial or total exclusion from education and a loss of future economic stability.  They also asked that the Department strengthen its overall nondiscrimination protections for discrimination related to parental status, which is a particular

issue at the postsecondary and graduate level, where education involves the provision of research projects, teaching assistance opportunities, and professional development opportunities often denied to mothers. Overall, stakeholders asked that the Department take steps to ensure that students are not denied access to a recipient's education program or activity because of pregnancy or a related condition, or due to sex discrimination based on parental status, to prevent students from being forced to choose between their children and their education.

Discrimination against students and employees who are pregnant or experiencing pregnancy-related conditions, in the Department's experience, often reflects sex discrimination, whether based on "mutually reinforcing stereotypes" about the roles of men and women, *Nevada Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 736 (2003), the failure to accommodate conditions associated with women as effectively as those associated with men, *see id.* at 730-34, or otherwise. Importantly, this sort of discrimination can result not only from animus, but also from sex-based indifference to the needs of this student and employee population. *Cf. Alexander v. Choate*, 469 U.S. 287, 295-97 (1985) (stating that disability-based discrimination is "most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect" and thus that discrimination can include a failure to accommodate). In the Department's view, a policy that presents obstacles to the ability of a student or employee who is pregnant, lactating, or experiencing other pregnancy-related conditions to access a recipient's educational program or activity may constitute such discrimination under Title IX. Moreover, precisely because it is difficult to specify the counterfactual—how accommodating would the school have been if the person requesting an accommodation had done so for a condition associated with men rather than women—sex-based discrimination regarding pregnancy and related conditions will often take the form of "subtle discrimination that may be difficult to

detect on a case-by-case basis." *Hibbs*, 538 U.S. at 736. To prevent such discrimination and to ensure that pregnancy and related conditions are not the vector through which sex becomes a barrier to a student's or employee's participation in a recipient's education program or activity, proactive measures are necessary to ensure that a recipient affords students and employees who are pregnant or experiencing pregnancy related conditions full access throughout their pregnancy and recovery. To address these concerns, the Department now believes that its proposed regulations are necessary and appropriate to fully effectuate Title IX's nondiscrimination guarantee for both students and employees. *See* 20 U.S.C. 1682.

### C. Other Relevant Statutes and Agency Interpretations

Although the proposed regulations are exclusively for the purpose of implementing Title IX, the Department notes that the treatment of pregnancy-related discrimination under other statutes enacted since 1975 confirms a general understanding by Congress that pregnancy-based discrimination is a form of sex discrimination and provides additional context for understanding how to eliminate discrimination based on pregnancy or related conditions. For example, in 1978, three years after the Department published its Title IX regulations, Congress passed the Pregnancy Discrimination Act (PDA), which amended Title VII's prohibition on sex discrimination to prohibit employers from discriminating against employees on the basis of pregnancy, childbirth, or related medical conditions. 42 U.S.C. 2000e(k). The PDA also requires that women affected by pregnancy, childbirth, or related medical conditions be treated the same as other persons not so affected but similar in their ability or inability to work. *Id.*

The fact that Congress did not amend Title IX's definition of "sex" to explicitly include pregnancy, as it did for Title VII in 1978, does not signal Congress's intent to exclude pregnancy coverage under Title IX. As articulated by the district court in *Conley* after recounting the

relevant legislative history, "Congress passed the Pregnancy Discrimination Act in direct response to a Supreme Court opinion, [*General Electric Co. v. Gilbert*, 429 U.S. 125 (1976),] that had substantively misinterpreted Title VII." *Conley*, 145 F. Supp. 3d at 1084-85 ("Although it is true that Congress has never amended Title IX's definition of sex to explicitly include pregnancy, the Court is not persuaded that this fact signals Congress's intent on the matter."). In contrast, there was no corresponding Title IX-related Supreme Court opinion that required Congress to respond. *Id*. at 1083-85 (stating that Congress delegated much less authority to the EEOC to promulgate the regulation considered in *Gilbert* than it did to the Department to promulgate 34 CFR 106.40, and holding that the Department's interpretation was entitled to deference under the standard set out in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984)).

Courts have considered the scope of the term "related medical conditions" under the PDA, particularly in connection with the issue of lactation. In 2013, for example, the U.S. Court of Appeals for the Fifth Circuit held that under the PDA, lactation is a medical condition related to pregnancy, explaining that "[i]t is undisputed . . . that lactation is a physiological result of being pregnant and bearing a child" and the definition of "medical conditions" includes physiological conditions. *Equal Emp. Opportunity Comm'n v. Hous. Funding II, Ltd.*, 717 F.3d 425, 428-29 (5th Cir. 2013). In 2017, the U.S. Court of Appeals for the Eleventh Circuit followed suit, holding that "lactation is a related medical condition and therefore covered under the PDA." *Hicks v. City of Tuscaloosa*, 870 F.3d 1253, 1259 (11th Cir. 2017).

In June 2015, the EEOC issued enforcement guidance on pregnancy discrimination and related issues, which clarified that Title VII, as amended by the PDA, prohibits discrimination based on current pregnancy, past pregnancy, potential or intended pregnancy, and medical

conditions related to pregnancy or childbirth. 2015 EEOC Pregnancy Guidance. The 2015 EEOC Pregnancy Guidance further emphasized that "[b]ecause lactation is a pregnancy-related medical condition, less favorable treatment of a lactating employee may raise an inference of unlawful discrimination." *Id.* The 2015 EEOC Pregnancy Guidance stated that:

> To continue producing an adequate milk supply and to avoid painful complications associated with delays in expressing milk, a nursing mother will typically need to breastfeed or express breast milk using a pump two or three times over the duration of an eight-hour workday. An employee must have the same freedom to address such lactation-related needs that she and her co-workers would have to address other similarly limiting medical conditions. For example, if an employer allows employees to change their schedules or use sick leave for routine doctor appointments and to address non-incapacitating medical conditions, then it must allow female employees to change their schedules or use sick leave for lactation-related needs under similar circumstances.

*Id.* Although the 2015 EEOC Pregnancy Guidance and related court cases interpreting the PDA are based on Title VII, not Title IX, the Department believes that they provide relevant background because both statutes long have been understood to prohibit pregnancy discrimination. Thus, Title VII and its application, including by the EEOC, provide a persuasive perspective for the Department's understanding of what may constitute pregnancy discrimination in modern society. Moreover, courts often rely on interpretations of Title VII to inform interpretations of Title IX, and both laws apply to employees in the educational context. *See, e.g.*, *Franklin*, 503 U.S. at 75; *Jennings*, 482 F.3d at 695; *Frazier*, 276 F.3d at 66; *Gossett*, 245 F.3d at 1176.

Like the PDA, protections in the Affordable Care Act (ACA) also reflect the types of supports breastfeeding employees need to participate fully in their employment. The ACA amended Section 7 of the Fair Labor Standards Act (FLSA) to require employers to provide reasonable break times and a private place, other than a bathroom, for employees covered under Section 7 of the FLSA who are breastfeeding to express milk for one year after a child's birth. 29 U.S.C. 207(r)(1). The space must be "shielded from view and free from intrusion from coworkers and the public." *Id.* DOL explained in a fact sheet that the space must be "functional" and "available when needed" because "[t]he frequency of breaks needed to express milk as well as the duration of each break will likely vary." U.S. Dep't of Labor, Fact Sheet #73: Break Time for Nursing Mothers under the FLSA (Apr. 2018), https://www.dol.gov/agencies/whd/fact-sheets/73-flsa-break-time-nursing-mothers. Under the ACA/FLSA, a temporary or converted space is sufficient provided that the space is available when needed, shielded from view, and free from any intrusion from co-workers and the public. *Id.* The Department finds these statutes informative of how a recipient can ensure that students and employees can continue to access the recipient's education program or activity while experiencing a pregnancy-related condition such as lactation. In addition, the nondiscrimination regulatory provisions of the WIOA, which are enforced by DOL,[9] include a section obligating WIOA, Title I-financially assisted programs, activities, training, and services to refrain from discrimination based on pregnancy, childbirth, or related medical conditions, including childbearing capacity, as a form of sex discrimination. 81 FR 87130, 87221-22 (Dec. 2, 2016)

---

[9] DOL's Civil Rights Center enforces Section 188 of WIOA. Section 188 of WIOA in pertinent part, incorporates the prohibitions on discrimination in programs and activities that receive Federal financial assistance under certain civil rights laws, including Title VI, Title IX, and Section 504.

(codified at 29 CFR Part 38.8), https://www.govinfo.gov/content/pkg/FR-2016-12-02/pdf/2016-27737.pdf.  The WIOA nondiscrimination regulations contain a non-exhaustive list of examples of related medical conditions, including but not limited to lactation; disorders directly related to pregnancy (for example, preeclampsia, placenta previa, and gestational diabetes) and other symptoms such as back pain; complications that require bed rest; and the after-effects of a delivery.  *Id.* at 87222.  In the preamble to the final rule, DOL explained that the regulations set out the standards that it will apply in enforcing the prohibition on pregnancy discrimination, and that these standards are consistent with Title IX, as well as with Title VII as amended by the PDA.  *Id.* at 87134.

Finally, with respect to parental status, Executive Order 13152 states that to provide for a uniform policy for the Federal government's efforts to prohibit discrimination based on a person's parental status, "status as a parent" should be understood to refer to "the status of an individual who, with respect to an individual who is under the age of 18 or who is 18 or older but is incapable of self-care because of a physical or mental disability, is: (a) a biological parent, (b) an adoptive parent, (c) a foster parent, (d) a stepparent, (e) a custodian of a legal ward, (f) in loco parentis over such individual, or (g) actively seeking legal custody or adoption of such an individual."  *Executive Order 13152 on Further Amendment to Executive Order 11478, Equal Employment Opportunity in Federal Government*, Exec. Order No. 13152, 65 FR 26115 (May 2, 2000), http://govinfo.gov/content/pkg/WCPD-2000-05-08/pdf/WCPD-2000-05-08-Pg977.pdf.  Executive Order 13152 authorized the U.S. Office of Personnel Management to develop guidance on its provisions.  *Id.*  The scope of the Executive Order's definition of "status of a parent" is informative for interpreting the Department's longstanding Title IX regulations regarding sex discrimination based on parental status, as it illuminates the Federal government's

recognition of the many types of parents beyond biological parents.

Against this backdrop, and after reweighing the relevant facts and circumstances, including a review of other civil rights laws that prohibit discrimination based on sex, the Department proposes revising its Title IX regulations related to pregnancy and related conditions, as well as sex discrimination related to marital, parental, and family status, to give greater effect to Title IX's nondiscrimination mandate within the educational context. The Department's current view is that in light of Title IX's focus on eliminating sex discrimination for all students and employees, it is necessary to strengthen and clarify the Department's regulatory protections for students and employees who are pregnant or experiencing pregnancy-related conditions, as well as those that prevent sex discrimination related to marital, parental, and family status.

### D. Revised Definitions

Section 106.2 Definition of "pregnancy or related conditions"

*Current regulations:* The current regulations do not define the term "pregnancy and related conditions." However, with respect to students, current § 106.40(b) uses that term as a section title. Current § 106.21(c)(2) prohibits discrimination against applicants for admission on the basis of "pregnancy, childbirth, termination of pregnancy, or recovery therefrom" and states that a recipient must treat "disabilities related to pregnancy, childbirth, termination of pregnancy, or recovery therefrom" in the same manner and under the same policies as any other temporary disability. Current § 106.40(b)(1) also prohibits discrimination against a student on the basis of "pregnancy, childbirth, false pregnancy, termination of pregnancy, or recovery therefrom." With respect to employees, current § 106.57(b)-(d) prohibits discrimination against an employee on the basis of "pregnancy, childbirth, false pregnancy, termination of pregnancy, or recovery

Case 3:21-cv-00308-CEA-DCP   Document 83-1   Filed 06/27/22   Page 460 of 701   PageID #: 1693

therefrom"; states that "any temporary disability resulting therefrom" must be treated as any other temporary disability; and specifies that those situations must be used as a justification for leave. Finally, current § 106.51(b)(6) states that the subpart regarding employees applies to "granting and return from leaves of absence, leave for pregnancy, childbirth, false pregnancy, termination of pregnancy, leave for persons of either sex to care for children or dependents, or any other leave."

*Proposed regulations:* The Department proposes adding a definition of the term "pregnancy or related conditions" at proposed § 106.2. The Department proposes defining "pregnancy or related conditions" as:

(1) Pregnancy, childbirth, termination of pregnancy, or lactation;

(2) Medical conditions related to pregnancy, childbirth, termination of pregnancy, or lactation; or

(3) Recovery from pregnancy, childbirth, termination of pregnancy, lactation, or their related medical conditions.

*Reasons:* The Department's tentative view is that the current regulations may be misconstrued as leaving gaps in coverage of discrimination based on "pregnancy," "related conditions," or "recovery therefrom" because the regulations do not clearly define those terms. The proposed changes would clarify a recipient's obligations under Title IX to students and employees who are pregnant or experiencing pregnancy-related conditions to ensure full implementation of Title IX's nondiscrimination requirement. For example, the current regulations do not specify the status of medical conditions that are related to or caused by pregnancy, childbirth, termination of pregnancy, loss of pregnancy, or lactation but that are not necessarily related to "recovery" from pregnancy. These include a variety of common conditions including, for example, gestational

460

diabetes, preeclampsia, hyperemesis gravidarum (i.e., severe nausea and vomiting), mastitis, and many others. The proposed definition would explicitly include related medical conditions. Finally, the proposed regulations would clarify that discrimination based on lactation is covered by Title IX's prohibition on discrimination based on pregnancy-related conditions. Discrimination based on any of these conditions and situations may present serious impediments to, and can lead to loss of, learning or employment for students and employees seeking to access a recipient's education program or activity while at the same time managing health impacts of pregnancy or related conditions. The proposed definition would more fully implement Title IX by clarifying that Title IX covers discrimination based on medical conditions related to or caused by pregnancy, childbirth, termination of pregnancy, or lactation, even if they are not related to "recovery from pregnancy."

Because the Department's Title IX regulations have provided important protections for students and applicants against discrimination in access to educational opportunities based on recovery from pregnancy, childbirth, and termination of pregnancy since they were first promulgated in 1975, the Department proposes clarifying that Title IX's scope of coverage includes discrimination based on recovery from related medical conditions as well.

The Department's proposed definition would remove the term "false pregnancy," which appears in current §§ 106.40(b)(1), 106.40(b)(4)-(5), 106.51(b)(6), and 106.57(b)-(d). The Department's current view is that the meaning of this term is unclear in the contemporary context and could bear multiple interpretations, including a pregnancy that is suspected, but not confirmed; a pregnancy that is falsely confirmed; or another medical condition that is clinically similar to pregnancy. To eliminate confusion and uncertainty, the Department proposes interpreting "pregnancy" in proposed § 106.2 to encompass a student's or employee's belief

461

about either the student's or employee's own pregnancy or someone else's. For example, if a student takes a pregnancy test that shows a positive test result, tells the recipient about the pregnancy, and the recipient then refuses to allow the student to participate in the student council based on the student's pregnancy, the student would be protected from discrimination under this proposed definition even if, later, the student learned that the pregnancy test result was a false positive. Likewise, if an administrator believes—based on external physical indicators and a report from a colleague—that a professor is pregnant and assigns the professor fewer classes because of this, the professor would also be protected from discrimination under this proposed definition regardless of whether the professor was pregnant.

Section 106.2 Definition of "parental status"

*Current regulations:* None. Current §§ 106.21(c)(1), 106.37(a)(3), 106.40(a), and 106.57(a)(1) prohibit sex-based distinctions on the basis of "parental status" pertaining to students and applicants for admission, but do not define that term.

*Proposed regulations:* The Department proposes adding a definition of the term "parental status" at § 106.2, as used in proposed §§ 106.21(c)(2)(i), 106.40(a), and 106.57(a)(1), and current § 106.37(a)(3). The Department proposes defining "parental status" as the status of a person who, with respect to another person who is under the age of 18 or who is 18 or older but is incapable of self-care because of a physical or mental disability, is:

    (1) A biological parent;

    (2) An adoptive parent;

    (3) A foster parent;

    (4) A stepparent;

    (5) A legal custodian or guardian;

Case 3:21-cv-00308-CEA-DCP   Document 83-1   Filed 06/27/22   Page 463 of 701   PageID #: 1696

(6) In loco parentis with respect to such a person; or

(7) Actively seeking legal custody, guardianship, visitation, or adoption of such a person.

*Reasons:* As explained in the Background discussion of the History of Title IX's Nondiscrimination Mandate and Related Regulations, the Department has prohibited sex discrimination related to parental status since 1975. The Department recognizes that sex stereotypes about who bears responsibility for raising children are still common and may affect student- and employee-parents in accessing educational opportunities even though Title IX has long prohibited sex discrimination based on parental status. To provide clarity regarding this protection for recipients and others given the absence of a definition in the current regulations, the Department proposes adding a definition of "parental status" that would apply to proposed §§ 106.21(c)(2)(i), 106.40(a), and 106.57(a)(1), and current § 106.37(a)(3), the only four provisions of the proposed regulations that reference different treatment based on sex related to the parental status of applicants for admission or employment, students, and employees. The proposed definition would specify that a recipient must not discriminate against students, employees, or applicants for admission or employment who have caregiving responsibilities for others based on the status of being a biological or adoptive parent, guardian, foster parent, stepparent, legal custodian, or in loco parentis, or those who are actively seeking legal custody, adoption, visitation, or guardianship. This proposed change is informed by the definition of "status as a parent" in Executive Order 13152, which prohibits discrimination in Federal employment based on an individual's status as a parent. As noted in the discussion of Other Relevant Statutes and Agency Interpretations (Section III.C), that Executive Order is informative background as to how Federal agencies should understand the concept of parental status in light of the various

463

configurations of families.

E. Admissions

Section 106.21 Admissions

*Current regulations:* The section heading is "Admission."

*Proposed regulations:* The Department proposes changing this section heading to "Admissions."

*Reasons:* The proposed section heading would align with the section heading at current § 106.15.

Section 106.21(a) Admissions – status generally

*Current regulations:* The section heading is "General."

*Proposed regulations:* The Department proposes changing this section heading to "Status generally." As described in the discussion of Outdated Regulatory Provisions (Section VI), the Department also proposes removing references to §§ 106.16 and 106.17 from this paragraph because those sections are no longer operative.

*Reasons:* The proposed section heading would more accurately describe the content of the section and would align with proposed §§ 106.40(a) and 106.57(a).

Section 106.21(c) Parental, family, or marital status; pregnancy or related conditions

*Current regulations:* Section 106.21(c)(1) prohibits a recipient from treating students or applicants for admission differently based on sex in relation to their "actual or potential parental, family, or marital status." It also prohibits discrimination and exclusion on the basis of "pregnancy, childbirth, termination of pregnancy, or recovery therefrom," and requires pregnancy-related disabilities to be treated in the same manner as other temporary disabilities or conditions. Finally, current § 106.21(c)(4) prohibits pre-admission inquiries regarding marital status and limits inquiries as to sex.

*Proposed regulations:* The Department proposes revisions to clarify the scope of current

464

§ 106.21(c), make this section consistent with related provisions at proposed § 106.40, and enhance readability. Specifically, the Department proposes to:

- Revise the section heading to "Parental, family, or marital status; pregnancy or related conditions";

- Reorganize the section by separating items that require or prohibit certain actions by recipients;

- Replace the term "disabilities related to pregnancy, childbirth, termination of pregnancy, or recovery therefrom" with "pregnancy or related conditions or any temporary disability resulting therefrom";

- Clarify that the scope of coverage includes "past" parental, family, or marital status;

- Clarify that the scope of coverage includes "current, potential, or past pregnancy or related conditions";

- Replace "rule" with "policy, practice, or procedure";

- Replace "apply" with "adopt or apply";

- Replace "actual" with "current";

- Delete "exclude" and "excludes"; and

- Replace "A recipient may make pre-admission inquiry as to the sex of an applicant for admission, but only if such inquiry is made equally of such applicants of both sexes and if the results of such inquiry are not used in connection with discrimination prohibited by this part" with "A recipient may ask an applicant to self-identify their sex, but only if this question is asked of all applicants and if the response is not used as a basis for discrimination prohibited by this part."

*Reasons*: *Changes for clarity, consistency, and readability.* The Department proposes revising

465

the section heading for proposed § 106.21(c) to better reflect the content of the subsection. The Department also proposes replacing "shall" with "must" and reorganizing the section by dividing the "must" from the "must not" provisions for better readability. In addition, the Department proposes replacing the term "pregnancy, childbirth, termination of pregnancy, or recovery therefrom" with "pregnancy or related conditions" to align with the proposed definition of "pregnancy or related conditions" in proposed § 106.2.

*Changes to scope of coverage.* The Department proposes replacing "actual" with "current" in proposed § 106.21(c)(2)(ii). The Department proposes making this minor change throughout the regulations at proposed §§ 106.21(c) and 106.40 to add clarity and consistency to the regulations. Because the Department's proposed regulations would cover perceived pregnancy under the definition of "pregnancy or related conditions" in proposed § 106.2, the Department now believes that "actual" may cause confusion and be unduly limiting. "Current" would include the period of reasonable belief of pregnancy or related conditions. The Department further proposes clarifying that the scope of coverage in proposed § 106.21(c)(2)(ii) includes "current, potential, or past pregnancy or related conditions" to more fully address sex discrimination facing applicants at various points. This change would be consistent with similar proposed revisions to scope of coverage at proposed §§ 106.40(b)(1) and 106.57(b) pertaining to students and employees, respectively. Likewise, the Department proposes adding § 106.21(c)(2)(i) to clarify that the scope of coverage includes past parental, family, or marital status. This addition would make clear that prohibited sex discrimination includes discrimination based on sex related to a previously held parental, family, or marital status. For example, if a recipient refused to admit a woman to a graduate program because she was previously married, but admitted a previously married man with similar qualifications, this

466

would be a prohibited form of sex discrimination under the proposed regulations.

The proposed regulations also would clarify that covered actions include a recipient's policies, practices, and procedures. The purpose of this change would be to encompass a broader range of recipient actions that could be forms of sex discrimination based on parental, family, or marital status and to prevent circumvention by reliance on policies, practices, or procedures not reflected in the recipient's formal or informal rules. Likewise, the addition of "adopt" would indicate that a policy, practice, or procedure that is formally or informally decided upon would be subject to the proposed regulations, as well as those that are passed or otherwise announced formally but not yet applied in an individual case, and those that have been acted upon. For example, if a recipient announced a policy that student fathers, but not student mothers, could be admitted to a law enforcement training program, this policy would potentially violate proposed § 106.21(c)(2)(i) even if the recipient had not yet applied it to any student. Both changes mentioned in this paragraph would be consistent with changes proposed in a similar section related to parental, familial, and marital status at proposed § 106.40(a).

The Department proposes replacing the term "disabilities related to pregnancy, childbirth, termination of pregnancy, or recovery therefrom" with "pregnancy or related conditions or any temporary disability resulting therefrom" in proposed § 106.21(c)(1). "Disabilities related to pregnancy" could be interpreted to suggest that applicants would not be covered under the provision unless they had a disability under Section 504 or the ADA, something that could be difficult for a recipient or an applicant to ascertain during the admissions process. It also leaves unclear whether a pregnant student who is not experiencing any additional pregnancy-related conditions would be protected under the current regulations. The proposed change would clarify that an applicant who is pregnant or experiencing pregnancy-related conditions or a temporary

disability resulting therefrom must be treated in the same manner and under the same policies as those who have other temporary disabilities or physical conditions, simplifying the analysis both for the recipient and applicants.  The proposed change would also align with the language the Department suggests in proposed §§ 106.40(b)(5) and 106.57(c).

The Department proposes deleting "exclude" and "excludes" in proposed § 106.21(c)(2)(ii) because they are used only occasionally in the current regulations to refer to discrimination and such intermittent use may cause confusion.  Throughout the current and proposed regulations, the Department interprets "discriminate" to encompass exclusion.

*Pre-admission inquiries*.  In proposed § 106.21(c)(2)(iii), the Department proposes replacing the term "in connection with discrimination" with "as a basis for discrimination" to enhance clarity and consistency with usage elsewhere in the proposed regulations but does not intend this as a substantive change in meaning.  In addition, the Department proposes revising the last sentence in § 106.21(c)(2)(iii) to use the term "all applicants" instead of the term "both sexes" in recognition of the fact that some applicants may have a nonbinary gender identity.  For the same reason, if a recipient asks applicants to self-identify their sex and provides options from which applicants may choose, nothing in the current or proposed regulations would prohibit a recipient from offering nonbinary options in addition to male and female options.

### F. Discrimination Based on a Student's Parental, Family, Marital Status, Pregnancy, or Related Conditions

Section 106.40 Parental, family, or marital status; pregnancy or related conditions

*Current regulations:* The section heading is "Marital or parental status."

*Proposed regulations:* The Department proposes changing this section heading to "Parental, family, or marital status; pregnancy or related conditions."

*Reasons:* The proposed section heading would more accurately describe the content of the section.

Section 106.40(a) Status generally

*Current regulations:* Section 106.40(a) states that a "recipient shall not apply any rule concerning a student's actual or potential parental, family, or marital status which treats students differently on the basis of sex."

*Proposed regulations:* The Department proposes the following edits to current § 106.40(a):

- Replacing "rule" with "policy, practice, or procedure";

- Changing "apply" to "adopt or apply"; and

- Changing "actual or potential" to "current, potential, or past."

*Reasons:* The Department proposes several changes to clarify the scope of conduct prohibited by this section.  First, as explained in greater detail in the discussion of proposed § 106.21(c), the proposed regulations would add to the types of actions that are subject to the prohibition to prevent circumvention by reliance on policies, practices, or procedures not reflected in the recipient's express rules.  For example, if a high school had an informal practice of not inviting pregnant students to join the honor society, this action would violate proposed § 106.40(a) even if the practice was not written into any rule formally governing the activity.  Likewise, if a recipient passed a policy that student mothers could not participate in class field trips, this policy would violate proposed § 106.40(a) even if the recipient had not yet applied it to any student.

Second, the proposed regulations would clarify that a recipient is not permitted to adopt policies, practices, or procedures that treat students differently on the basis of sex; current § 106.40(a) references only the application of such a rule.  Use of the term "adopted" would indicate that the proposed regulations would cover a policy, practice, or procedure that is

469

formally or informally decided upon; those that are passed or otherwise announced formally but not yet applied in an individual case; and those that have been acted upon. The proposed regulations would therefore cover policies, practices, and procedures without requiring an analysis of whether they had been applied to a student.

Finally, to clarify coverage and maintain consistency with a similar provision at proposed § 106.21(c) regarding admissions, the Department proposes replacing the terms "actual or potential" with the terms "current, potential, or past." As explained in the discussion of proposed § 106.21(c), this revision would help ensure that students are more fully protected from discrimination, recognizing that a person can be subject to sex stereotypes due to past status as well as present status.

Section 106.40(b) Pregnancy or related conditions

*Current regulations:* The section heading is "Pregnancy and related conditions."

*Proposed regulations:* The Department proposes changing this section heading to "Pregnancy or related conditions."

*Reasons:* The proposed section heading would more accurately describe the content of the section and would be consistent with the proposed definition of "pregnancy or related conditions" at § 106.2.

Section 106.40(b)(1) Pregnancy or related conditions - nondiscrimination

*Current regulations:* Section 106.40(b)(1) prohibits a recipient from discriminating against or excluding a student from its education program or activity, including any class or extracurricular activity, on the basis of such student's pregnancy, childbirth, false pregnancy, termination of pregnancy or recovery therefrom, unless the student requests voluntarily to participate in a separate portion of the program or activity of the recipient.

Current § 106.40(b)(3) states that a recipient that operates a portion of its education program or activity separately for pregnant students to which students may voluntarily admit themselves must ensure that the separate portion is comparable to that offered to non-pregnant students.

*Proposed regulations:* Proposed § 106.40(b)(1) would prohibit a recipient from discriminating against any student based on current, potential, or past pregnancy or related conditions. The Department also proposes revising this provision to incorporate the requirement in current § 106.40(b)(3) that a recipient may permit a student based on pregnancy or related conditions to participate voluntarily in a separate portion of its education program or activity provided the recipient ensures that the separate portion is comparable to that offered to students who are not pregnant and do not have related conditions.

*Reasons:* Proposed § 106.40(b)(1) would merge related and overlapping aspects of current § 106.40(b)(1) and (3), which prohibit discrimination based on pregnancy or related conditions and permit a recipient to allow a pregnant student or a student experiencing pregnancy-related conditions to voluntarily opt into separate portions of the recipient's education program or activity provided the recipient ensures comparability with the standard education program or activity.

The Department proposes clarifying the scope of the nondiscrimination provision to cover current, potential, or past pregnancy or related conditions because protecting students from discrimination on these bases helps to achieve Title IX's objective of eradicating sex discrimination in federally funded education programs or activities. Title IX was enacted in large part because women were being denied educational access due to views that they were less capable and less committed to academic demands given their pregnancy and childrearing

471

obligations. *See* 118 Cong. Rec. at 5804 (statement of Sen. Bayh, sponsor of Title IX, explaining the widespread but false perception that women are disinterested in education or professional achievement because the duty or desire to marry and bear children has led to sex discrimination in education). Clarifying Title IX's protections to cover current, potential, or past pregnancy or related conditions would ensure that a student is not treated unfairly in the educational context due to, for example, a likelihood of having children in the future, having had children in the past or experienced pregnancy-related medical conditions. Although not the basis for this proposal, the Department notes that this scope of coverage would be like that provided by the PDA, which the EEOC has recognized covers current, potential, and past pregnancy. 2015 EEOC Pregnancy Guidance. This scope of coverage has contributed to addressing barriers to employment and professional achievement, and it is the Department's current view that, fundamental to the purpose of Title IX, it would help address the barriers to educational access arising from false perceptions about pregnancy and childbearing plans.

Section 106.40(b)(2) Pregnancy or related conditions - requirement for recipient to provide information

*Current regulations:* Section 106.40(b)(1) addresses pregnancy-related nondiscrimination requirements. Current § 106.8(a) requires a recipient to designate a Title IX Coordinator to coordinate its efforts to comply with Title IX. Current § 106.8(b) requires that a recipient notify its students of the recipient's nondiscrimination policy and that inquiries about a recipient's Title IX obligations may be referred to the Title IX Coordinator.

*Proposed regulations:* Proposed § 106.40(b)(2) would require a recipient to ensure that when any employee is informed of a student's pregnancy or related conditions by the student or a person who has a legal right to act on behalf of the student, the employee promptly informs that

Case 3:21-cv-00308-CEA-DCP   Document 83-1   Filed 06/27/22   Page 473 of 701   PageID #: 1706

person of how to notify the Title IX Coordinator of the student's pregnancy or related conditions for assistance and provides contact information for the Title IX Coordinator, unless the employee reasonably believes the Title IX Coordinator has already been notified.

*Reasons:* The Department's proposed provision seeks to effectuate Title IX's goal of preventing sex discrimination by ensuring that when an employee of a recipient is informed of a student's pregnancy or related conditions by the student or a person who has a legal right to act on behalf of the student, the employee is required to inform that person how they may contact the Title IX Coordinator for assistance. In doing so, the Department's proposed provision takes into account the student's interest in being free from sex discrimination and accessing necessary support and the right of the student and the student's legal representatives to control what information is shared with a recipient regarding a student's pregnancy or related health status, as well as when the information is shared. The Department also seeks to consider the administrative burden to recipients in carrying out this critical informational function.

Under the proposed regulations, only when a student informs an employee of the student's pregnancy would the employee be required to provide the student with information about how to notify the Title IX Coordinator. Similarly, only when a person who has a legal right to act on behalf of the student informs an employee of the student's pregnancy would the employee be required to provide that person information about accessing to the Title IX Coordinator. In either case, unless the employee reasonably believes the Title IX Coordinator has already been notified, the employee would be responsible for telling the person who contacted them only two things: (1) how the person may notify the Title IX Coordinator of the student's pregnancy or related conditions for assistance; and (2) contact information for the Title IX Coordinator. The Department expects that providing this information will be sufficient to

inform the person of their option to contact the Title IX Coordinator as they see fit. The proposed regulations would also ensure that if a student or a person who has a legal right to act on behalf of the student preferred not to report the student's pregnancy to the Title IX Coordinator, the person would have no obligation to do so.

The Department intends the term "a person who has a legal right to act on behalf of the student" to be interpreted consistent with proposed § 106.6(g), which would not impose limitations on "any legal right of a parent, guardian, or other authorized legal representative to act on behalf of" a student, subject to the FERPA statute, 20 U.S.C. 1232g, or its implementing regulations, 34 CFR part 99. Although a recipient would need to make a fact-specific determination, for purposes of proposed § 106.40(b)(2), "a person who has a legal right to act on behalf of the student" would typically include the parents or legal guardians of minor students, legal guardians of adult students (for example, in the case of a student with significant disabilities), and authorized legal representatives of youth in out-of-home care. For example, under proposed § 106.40(b)(2), if the parent of a minor student informs a high school teacher of a student's pregnancy, the teacher would have to tell the parent how to notify the Title IX Coordinator and provide contact information. However, if the parent of an adult student in graduate school who does not have a legal right to act on behalf of the student contacted the student's advisor to inform the advisor of the student's pregnancy, the advisor would not be required to inform the parent of how to notify the Title IX Coordinator. The Department anticipates this approach would support the rights of parents of younger students while respecting the privacy interests of older students.

The Department is mindful of recipient resources and submits that the proposed regulations are appropriately tailored and straightforward to implement. For example, an

employee would not be required to act under this provision when the employee only suspects that a student is pregnant based on observation of physical indicators or rumor, or when told by a third party who is not a person with a legal right to act on behalf of the student. The proposed regulations would not require a recipient's employees to inquire whether a student is pregnant based on physical indicators often associated with pregnancy.[10] And under the proposed regulations, the employee would not have a duty to provide the student, or a person who has a legal right to act on behalf of the student, with information about the Title IX Coordinator if the employee reasonably believes the Title IX Coordinator has already been notified. For example, if a student tells her professor that she is pregnant, but the professor has already been informed of this fact by the Title IX Coordinator who notified the professor about the student's upcoming parental leave, the professor would not be required to tell the student how to contact the Title IX Coordinator.

The Department expects the proposed regulations would also be easily understood by employees because there is little ambiguity as to when they are required to act: if a student, or a person who has a legal right to act on behalf of the student, informs an employee that the student

---

[10] The Department notes, however, that in elementary schools and secondary schools, Section 504 imposes a continuing duty on school districts to identify any student who needs or is believed to need special education or related services because of a disability and seek parental consent to evaluate the student to determine, in part, what, if any, special education or related services are appropriate. 34 CFR 104.35; U.S. Dep't of Educ., Office for Civil Rights, Parent and Educator Resource Guide to Section 504 in Public Elementary and Secondary Schools at 12, 19 (Dec. 2016), http://www.ed.gov/ocr/docs/504-resource-guide-201612.pdf. Depending on the specific circumstances, information about pregnancy-related conditions may initiate such a duty. For example, if Student A tells her high school teacher that a classmate, Student B, is home on bed rest due to pregnancy-related high blood pressure, this may be sufficient to trigger the school's obligation to evaluate the student for areas of suspected physical disability. In addition, a recipient and its employees may have obligations under State and local laws requiring notification or reporting of child abuse, child molestation, sexual abuse, rape, or incest.

475

is pregnant or experiencing pregnancy-related conditions, the employee would have to provide the two pieces of basic information (how to notify the Title IX Coordinator and contact information for the Title IX Coordinator) to the student or the person who has a legal right to act on behalf of the student unless the employee knew or reasonably believed that the Title IX Coordinator was already informed.  In addition, the provision would be helpful to students and their families because it would not require them to have any advance knowledge of a recipient's available supports or to invoke specific words or requests for the employee to be required to provide them with information about the Title IX Coordinator.  The standard also would afford recipients flexibility based on a student's age and maturity level.  Providing information as to how to notify the Title IX Coordinator would differ depending on the student's age and maturity level.  Nothing would prohibit an employee from offering to go with a student to the Title IX Coordinator or, at the student's option, contacting the Title IX Coordinator on the student's behalf; however, this is likely more appropriate at the elementary school or secondary school level and may not be necessary for a college student.  Overall, the Department's current view is that this provision would empower students and their families to decide whether they wish to obtain school-based supports at a potentially vulnerable time, thereby avoiding sex discrimination to the greatest extent possible.

Section 106.40(b)(3) Pregnancy or related conditions - specific actions to prevent discrimination and ensure equal access

*Current regulations:* Section 106.40(b)(1) addresses pregnancy-related nondiscrimination requirements.  Current § 106.40(b)(4) requires a recipient to treat "pregnancy, childbirth, false pregnancy, termination of pregnancy and recovery" similarly to any other temporary disability in certain contexts.  Current § 106.40(b)(5) addresses leaves of absence.  Current § 106.40(b)(5)

states that if a recipient does not maintain a leave policy for its students, or a student does not otherwise qualify for leave under such a policy, a recipient will treat "pregnancy, childbirth, false pregnancy, termination of pregnancy and recovery therefrom" as a justification for a leave of absence "for so long a period of time as is deemed medically necessary by the student's physician, at the conclusion of which the student shall be reinstated to the status which she held when the leave began."

*Proposed regulations:* Proposed § 106.40(b)(3) would combine aspects of the current regulations with specific actions the Title IX Coordinator would be required to take to ensure that a student who is pregnant or experiencing pregnancy-related conditions is not subject to discrimination and has equal access to the recipient's education program or activity. Once the student, or a person who has a legal right to act on behalf of the student, notifies the Title IX Coordinator of a student's pregnancy or related conditions, the Title IX Coordinator or appropriate designee would be required to promptly take four steps:

(i) Inform the student, and if applicable the person who notified the Title IX Coordinator, of the recipient's obligations to: (A) prohibit sex discrimination, including sex-based harassment; (B) provide the student with the option of reasonable modifications to the recipient's policies, practices, or procedures because of pregnancy or related conditions; (C) allow access, on a voluntary basis, to any separate and comparable portion of the recipient's education program or activity; (D) allow a voluntary leave of absence; (E) ensure the availability of lactation space; and (F) maintain grievance procedures that provide for the prompt and equitable resolution of complaints of sex discrimination, including sex-based harassment;

(ii) Provide the student with the option of reasonable modifications to the recipient's policies,

practices, or procedures, as described in proposed § 106.40(b)(4), because of pregnancy or related conditions;

(iii) Allow the student to take a voluntary leave of absence from the recipient's education program or activity to cover, at minimum, the period of time deemed medically necessary by the student's physician or other licensed healthcare provider. To the extent that a recipient maintains a leave policy for students that allows a greater period of time than the medically necessary period, the recipient must permit the student to take leave under that policy instead if the student so chooses. Upon the student's return to the recipient's education program or activity, the student must be reinstated to the academic status and, as practicable, extracurricular status held when the leave began; and

(iv) Ensure the availability of a lactation space, which must be a space other than a bathroom, that is clean, shielded from view, free from intrusion from others, and may be used by a student for expressing breast milk or breastfeeding as needed.

*Reasons:* As noted in the discussion of the 1975 Title IX Regulations Related to Pregnancy and Parental Status (Section III.A), although the Title IX regulations have long recognized that proactive steps such as leave and reinstatement may be necessary to help to prevent discrimination based on pregnancy or related conditions and other forms of sex discrimination and to ensure that students are not denied equal access on the basis of pregnancy or related conditions, the Department proposes this new provision to clarify how a recipient must ensure nondiscrimination when notified about a student's pregnancy or related condition and provide recipients with a simplified framework for compliance.

*Notice.* The Title IX Coordinator's responsibilities under this provision would be initiated upon notice to the Title IX Coordinator from the student—or a person who has a legal

right to act on behalf of the student—of the student's pregnancy or related conditions. At that point, the Title IX Coordinator would be required to take the specific actions set out in proposed § 106.40(b)(3) to ensure that the recipient takes steps to prevent inadvertent discrimination and ensure that the student is not excluded from the recipient's education program or activity.

As explained in the discussion of proposed § 106.40(b)(2), the Department interprets the term "a person who has a legal right to act on behalf of the student" to be consistent with proposed § 106.6(g), which does not impose limitations on "any legal right of a parent, guardian, or other authorized legal representative to act on behalf of" a student, subject to the FERPA statute, 20 U.S.C. 1232g, or its implementing regulations, 34 CFR part 99. Although a recipient would be required to make a fact-specific determination as to who constitutes "a person who has a legal right to act on behalf of the student" for purposes of proposed § 106.40(b)(3), this group would typically include the parents or legal guardians of minor students, legal guardians of adult students (for example, in the case of a student with significant disabilities), and authorized legal representatives of youth in out-of-home care. Under proposed § 106.40(b)(3), if the parent of a minor student were to inform the Title IX Coordinator of a student's pregnancy, the Title IX Coordinator would be obligated to take the steps set forth in proposed § 106.40(b)(3), including providing information regarding the recipient's obligations to both the parent and the student. However, if the parent of an adult student in graduate school who does not have a legal right to act on behalf of the student contacted the Title IX Coordinator to inform the Title IX Coordinator of the student's pregnancy, the Title IX Coordinator would not be obligated to take the steps set forth in § 106.40(b)(3) because parent does not have a legal right to act on behalf of the student. The Department believes this approach would account for the rights of parents of younger students, while respecting the privacy interests of older students. A student would also have the

right to directly inform the Title IX Coordinator of the student's pregnancy or related conditions, which would require the Title IX Coordinator to take the steps set out in proposed § 106.40(b)(3).

The Department's current view is that the proposed notice standard would aid students, their families and representatives, and recipients because it would clarify that the student and those with legal rights to act on behalf of the student are the appropriate persons for sharing information about a student's pregnancy or related conditions with the Title IX Coordinator. As explained in the discussion of the requirement for recipient to provide information in proposed § 106.40(b)(2), neither a student nor a person who has a legal right to act on behalf of the student would be obligated to disclose the student's pregnancy to the recipient. And, cognizant both of student privacy and recipient resources, the Title IX Coordinator would not be required to take the steps described in proposed § 106.40(b)(3) based only on observation of physical characteristics, rumors, or information from a third party who does not have a legal right to act on behalf of the student.

*Informing of the recipient's obligations.* The Title IX Coordinator would be required, after receiving notice of a student's pregnancy or related conditions to inform the student—and if applicable any person who has the legal right to act on behalf of the student to the extent that person notified the Title IX Coordinator—of the recipient's obligations under Title IX. This information would inform the student and a person who has a legal right to act on behalf of the student of the recipient's duties and the student's options. It would enable the student to voluntarily request reasonable modifications because of pregnancy or related conditions that would prevent discrimination, ensure continuing access to the recipient's education program or activity, and assist the student in understanding the recipient's obligations to the student going

480

forward. The recipient would also need to consider whether the student's pregnancy or related conditions separately require a determination of whether a student is covered under Section 504. Depending on the precise facts, certain pregnancy-related conditions—including, for example, preeclampsia, gestational diabetes, and postpartum depression, among others—could be considered disabilities under Section 504.

*Reasonable modifications for students because of pregnancy or related conditions.* The Department believes that providing a student with the option of reasonable modifications to the recipient's policies, practices, or procedures because of pregnancy or related conditions is essential to preventing pregnancy-based discrimination and to ensuring equal access to a recipient's education program or activity. Proposed § 106.40(b)(3)(ii) would require the Title IX Coordinator to provide the student with the option of such modifications. The standards for these proposed voluntary reasonable modifications are explained in greater detail in the discussion of proposed § 106.40(b)(4).

*Voluntary leave of absence.* Current § 106.40(b)(5) states that "in the case of a recipient which does not maintain a leave policy for its students, or in the case of a student who does not otherwise qualify for leave under such a policy, a recipient shall treat pregnancy" or related conditions "as justification for a leave of absence for so long a period of time as is deemed medically necessary by the student's physician." It is the Department's tentative view that, in the case of a recipient that maintains a leave policy, it may be unclear whether the appropriate length of leave is determined by the recipient's policy or the period of medical necessity, and which trumps if those two periods differ. Also, some recipients, particularly elementary schools and secondary schools, may not maintain such policies for students.

To increase clarity for recipients and students, proposed § 106.40(b)(3)(iii) would

preserve the right of a student who is pregnant or experiencing related conditions to take a leave of absence from the recipient's education program or activity for at least a medically necessary period, and to be reinstated to the same academic and, as practicable, extracurricular status upon return. The Department proposes revisions to clarify that any leave of absence must be voluntary and that the medically necessary period is only a minimum requirement. A recipient would be free to provide additional time if requested by the student and appropriate to the situation. For example, if a student's medically necessary period concludes in the middle of a college semester, the student and recipient may both find it advantageous to extend the period of leave until the end of the semester. However, for a college student in a self-paced independent study course who takes a voluntary leave of absence because of the student's pregnancy or related conditions, that student and college may find it more helpful not to extend the period of leave in light of the flexibility of the independent study and the possibility that additional time off could put the student behind in the program. In addition, proposed § 106.40(b)(3)(iii) would clarify that to the extent a recipient maintains a leave policy for students that allows a greater period of time than the medically necessary period, the recipient must permit the student to take leave under that policy instead if the student chooses. As explained in greater detail in the Background discussion of the History of Title IX's Nondiscrimination Mandate and Related Regulations, a student's right to take leave for pregnancy or related conditions, regardless of whether the recipient offers leave to students generally for other types of purposes, has been included in the Title IX regulations since 1975 and is designed to help achieve Title IX's underlying objective of eliminating sex-based discrimination and barriers to equal access to education programs or activities.

The Department also proposes revising this requirement to state that the period of

medical necessity may be determined either by a physician (as in the current regulations) or another licensed healthcare provider. This change would provide additional flexibility to students and recipients, and would take into account that some students may be under the care of a midwife, nurse practitioner, or other licensed healthcare provider who is not a physician.

The Department proposes revisions to clarify that a student must be reinstated to the same "academic and, as practicable, extracurricular" status upon return. OCR has long interpreted "same status upon return" under current § 106.40(b)(5) as referring to "academic and extracurricular" status. *See, e.g.*, U.S. Dep't of Educ., Office for Civil Rights, Teenage Pregnancy and Parenthood Issues under Title IX of the Education Amendments of 1972 at 6 (July 1991), https://files.eric.ed.gov/fulltext/ED345152.pdf; U.S. Dep't of Educ., Office for Civil Rights, Supporting the Academic Success of Pregnant and Parenting Students Under Title IX of the Education Amendments of 1972 at 5 (June 2013) (2013 Pregnancy Pamphlet), https://www2.ed.gov/about/offices/list/ocr/docs/pregnancy.pdf. This proposed revision would make clear that upon return to school, a student must be restored to the student's previous academic status, as well as to, as much as practicable, any extracurricular status the student may have held prior to the student's leave. The Department acknowledges that in OCR's previous guidance on pregnancy, OCR stated that a pregnant student who takes a voluntary leave of absence must be reinstated to the extracurricular status that the student held when the leave began. The Department recognizes, however, that in some instances, an extracurricular activity, event, or program will have ended by the time a student returns from leave or the student may not, due to timing or other logistical reasons, be able to participate. For example, if a particular school play in which a student was cast has ended its performance run before the student's return, it will not be practicable to reinstate a student in that role and play. Likewise, if a

student's pregnancy leave resulted in the student's absence during a qualifying event for an individual diving competition, it would not be practicable for the student to participate in that competition. These considerations would not, however, prevent the student in either situation from participating in plays with the drama club or competitions with the diving team in the future. Therefore, although the presumption is that a student returning from leave should be reinstated to the same extracurricular status, it is the Department's current view that there may be some limited instances when exact reinstatement would not be administratively possible or practicable under the circumstances.

*Lactation space.* As explained in the discussion in Need for Clarification Regarding Protections Because of Pregnancy and Parental Status (III.B) and the explanation of the proposed definition of the term "pregnancy or related conditions" (§ 106.2), the Department proposes explicitly recognizing lactation as a basis for protection from discrimination. The Department currently believes that without appropriate modifications to ensure that schools prevent and end sex discrimination, a student who is lactating may face significant barriers to participating in and benefiting from a recipient's education program or activity because of a recipient's lack of awareness about the significant adverse health consequences that can result from delays in lactation. This lack of awareness can easily lead to adverse educational consequences as well, causing a student to miss or drop out of school and lose access to a recipient's education program or activity due to their lactation needs.

A student who is lactating would typically need breaks every few hours of the school day to express breast milk or breastfeed and an appropriate, sanitary space in which to do so. Many school settings lack appropriate spaces for a student to engage in these activities with adequate privacy and cleanliness. Secondary school students may require such spaces if their daily

schedules allow limited flexibility and would not ordinarily allow for leaving school grounds two to three times each day to express milk or breastfeed.  Consequently, lactation space on school grounds is necessary to enable students who are lactating to access their classes and extracurricular activities.  Likewise, although postsecondary students often have more flexible class schedules than secondary school students, these students also need lactation space on campus so that they can have equal access to their courses and other campus activities.  For students who do not have housing on or near campus, this need is heightened.  Lack of access to lactation space in any of these scenarios could cause the student to miss school, quit school, or be unable to express breast milk or breast feed and, as a result, experience potentially painful physical side effects that prevents the student from fully accessing and obtaining the benefits of the recipient's education program or activity.

Proposed § 106.40(b)(3)(iv) would set out the requirements for a recipient's lactation space, specifically that the recipient provide a place, other than a bathroom, that is clean, shielded from view, free from intrusion from others, and may be used by a student for expressing breast milk or breastfeeding.  The Department anticipates that these requirements will provide the minimum acceptable standards for privacy, sanitation, and functionality necessary for students to attend to their lactation needs at school, be free from discrimination, and maintain equal access to the school's education program or and activity.  The Department expects that a bathroom would not be appropriate because in most cases, the only option for the student would be to sit on a toilet while expressing breast milk, which would not be sanitary or acceptable for the purpose of producing nutrition for a child.  Likewise, privacy is critical to ensure that lactating students do not have to expose themselves to classmates or strangers.

Nearly all recipients under Title IX are already required to provide a virtually identical

physical space to certain employees under the FLSA. 29 U.S.C. 207(r)(1). The only additional component added under the Department's proposed regulations would be that the space be "clean." Because most recipients already maintain janitorial services, the Department anticipates that the additional burden of cleaning a lactation space would not be significant.

Proposed § 106.40(b)(3)(iv) would set minimum standards for a recipient's student lactation space. The proposed regulations would not prohibit a recipient from using an employee lactation space for students as well, provided the space meets the requirements of proposed § 106.40(b)(3)(iv). Likewise, there would be no prohibition on a recipient from offering additional features in their lactation spaces to increase functionality and comfort. With respect to the location of the lactation space, if necessary to address individualized concerns about distance from the student's class or activity, the recipient may provide an alternative space or solution consistent with the student's needs as a reasonable modification to prevent discrimination and ensure equal access based on pregnancy or related conditions under proposed § 106.40(b)(3)(ii) and (4).

Finally, nothing in the Department's proposed regulations would preempt a State or local law that provides greater protections to students, as explained in the discussion of proposed § 106.6(b). This would ensure that if a State or local law goes further than the Department's proposed regulations, for example by requiring more features in the lactation space (such as refrigeration, an outlet, a table, etc.), the Department's proposed regulations would not interfere with those enhanced requirements.

Section 106.40(b)(4) Pregnancy or related conditions - reasonable modifications for students because of pregnancy or related conditions

*Current regulations:* Section 106.40(b)(1) prohibits discrimination on the basis of "pregnancy,

childbirth, false pregnancy, termination of pregnancy or recovery therefrom" and current § 106.40(b)(4), which requires a recipient to treat "pregnancy, childbirth, false pregnancy, termination of pregnancy and recovery" in the "same manner and under the same policies as any other temporary disability with respect to any medical or hospital benefit, service, plan, or policy which such recipient administers, operates, offers, or participates in with respect to students admitted to the recipient's educational program or activity."

*Proposed regulations:* The Department proposes adding § 106.40(b)(4), which includes protections from current § 106.40(b)(1) and (4). Proposed § 106.40(b)(4) would explain that, for purposes of this section, reasonable modifications to a recipient's policies, practices, or procedures for a student who is pregnant or is experiencing pregnancy-related conditions:

(i) Must be provided on an individualized and voluntary basis depending on the student's needs resulting from pregnancy or related conditions when necessary to prevent discrimination and ensure equal access to the recipient's education program or activity, unless the recipient can demonstrate that making the modification would fundamentally alter the recipient's education program or activity, when a "fundamental alteration" would be a change that is so significant that it alters the essential nature of the recipient's education program or activity;

(ii) Must be effectively implemented, coordinated, and documented by the Title IX Coordinator; and

(iii) May include but are not limited to, breaks during class to attend to related health needs, breastfeeding, or expressing breast milk; intermittent absences to attend medical appointments; access to online or other homebound education; changes in schedule or course sequence; extension of time for coursework and rescheduling of tests and

487

examinations; counseling; changes in physical space or supplies (for example, access to a larger desk or a footrest); elevator access; or other appropriate changes to policies, practices, or procedures.

*Reasons: Reasonable modification for pregnancy or related conditions standard.* The Department proposes adding § 106.40(b)(4) to require a recipient to offer a student reasonable modifications to its policies, practices, and procedures to prevent pregnancy-related discrimination and to ensure equal access to a student who is pregnant or experiencing pregnancy-related conditions, unless the recipient can demonstrate that making the modification would fundamentally alter the recipient's education program or activity.

As noted in the discussion of the 1975 Title IX Regulations Related to Pregnancy and Parental Status (Section III.A), the Department's Title IX regulations require a recipient to take a variety of steps to ensure equal treatment and access for students who are pregnant or experiencing pregnancy-related conditions. Current § 106.40(b)(1) prohibits discrimination based on pregnancy or related conditions. Current § 106.40(b)(4) requires a recipient to treat pregnancy or related conditions similarly to other temporary disabilities with respect to, inter alia, medical or hospital benefits. And current § 106.40(b)(5) requires a recipient to take specific, tailored steps necessary to support students who are pregnant or experiencing pregnancy-related conditions to enable them to access its education program or activity— regardless of whether the recipient takes similar steps for all students. The Department now believes that the current regulations may not sufficiently achieve the objectives of Title IX. For example, some recipients do not maintain policies related to temporary disabilities of students, leaving their responsibilities to pregnant students under current § 106.40(b)(4) unclear. Likewise, the wording of current § 106.40(b)(4) may suggest that a recipient's responsibility

488

extends only to "medical or hospital" benefits, services, plans or policies—for example, student health insurance plans—rather than requiring day-to-day modifications of the education program or activity that would be necessary to prevent discrimination and ensure equal access for pregnant students and students who are experiencing pregnancy-related conditions in a modern context.

The Department anticipates that recipients would benefit from increased clarity as to what proactive steps they must take to prevent intentional or inadvertent discrimination under Title IX. Measures designed to eliminate subtle and even unconscious forms of discrimination are particularly useful to ensure that students who are pregnant or experiencing pregnancy-related conditions have access to the recipient's education program or activity. It is the Department's current view that the proposed regulations provide clear and functional requirements for recipients to ensure that pregnant students and students experiencing pregnancy-related conditions are not discriminated against, and that these requirements are necessary to protect the rights of these students and help effectuate Title IX's nondiscrimination goal.

Recognizing the varied language used in different laws, regulations, and guidance, the Department proposes the reasonable modifications framework set out in proposed § 106.40(b)(4) as the appropriate framework to achieve Title IX's nondiscrimination objective in the educational context. The Department notes that this is similar to the framework under Title II of the ADA for determining necessary different treatment to meet the disability-related needs of a qualified individual with a disability. Specifically, under Title II, a public entity must reasonably modify its policies, practices, or procedures to avoid discrimination unless the modifications would fundamentally alter the nature of its service, program, or activity. 28 CFR 35.130(b)(7).

Although a pregnancy would not be in and of itself a disability under Title II, the reasonable modification framework of Title II applies to disabilities related to pregnancy, as well as all other disabilities. 28 CFR part 35, App. C (citing 2015 EEOC Pregnancy Guidance). It is the Department's current view that this framework would achieve Title IX's nondiscrimination mandate and account for both student and recipient needs. For example, it would require a recipient to act when necessary to prevent sex discrimination but would allow flexibility for the recipient to choose from among a range of options appropriate to the student's individualized needs under the circumstances. This approach would also invite collaboration between the student and the recipient to determine appropriate reasonable modifications in a situation as the recipient seeks to determine what is needed. As the recipient prevents discriminatory barriers in its education program or activity through the provision of reasonable modifications because of pregnancy or related conditions, over time, this process would benefit not only the students who receive reasonable modifications, but also subsequent students who may be in need of modifications as the recipient becomes more efficient and effective at providing them. The Department expects that this framework not only will be most effective in ensuring against sex discrimination as required by Title IX but also will be familiar to most schools and thus, would be relatively straightforward to adopt and implement in order to prevent discrimination and ensure equal access for students who are pregnant or experiencing related conditions. Moreover, Title II's treatment of pregnancy-related conditions informs the Department's understanding of what constitutes discrimination against students with those conditions.

The fundamental alteration standard would not compromise the integrity of a recipient's education program or activity. Proposed § 106.40(b)(4)(i) would clarify that a fundamental alteration is a change so significant that it alters the essential nature of the recipient's education

490

program or activity. Determining whether a change constitutes a fundamental alteration would necessarily be fact-specific. Proposed § 106.40(b)(4)(i) provides that it would be the recipient's burden to demonstrate that a proposed modification would fundamentally alter its education program or activity. To the extent a recipient determines that a requested modification would require a fundamental alteration under the proposed regulations, it would have to provide other modifications that would not result in a fundamental alteration but would nevertheless ensure that, to the maximum extent possible, the student who made the request is not discriminated against and receives equal access to the recipient's education program or activity. The recipient would also be required to document those efforts as part of the requirement under proposed § 106.40(b)(4)(ii) that the Title IX Coordinator effectively implement, coordinate, and document reasonable modifications for students because of pregnancy and related conditions, and retain such records under proposed § 106.8(f)(4).

*Individualized and voluntary basis.* Proposed § 106.40(b)(4)(i) would require a recipient to consider a student's needs on an individualized and voluntary basis as situations will vary widely based on many unique factors such as the age of student, the type of education program or activity, the student's health, and other circumstances. Under the proposed regulations, a recipient would be required to consider all reasonable modifications based on pregnancy or related conditions necessary to ensure equal access in each student's case rather than adopt a generalized approach for all students who are pregnant or experiencing related conditions. The recipient's actions under the Department's proposed regulations would be initiated by notice from the student or the student's family to the Title IX Coordinator; however, it would not be incumbent on the student or their family to identify or request a specific possible reasonable modification. For example, a recipient may engage in an interactive process with the student

491

and, when appropriate, the student's parent, guardian, or other authorized legal representative, to discuss the student's needs and options that would best ensure equal access. The identification of reasonable modifications would likely be a collaborative effort between the student and the recipient, but it would be the recipient's duty to select a reasonable modification, offer it, and—if accepted by the student on a voluntary basis—effectively implement it. As noted, the Department's proposed regulations would ensure that a student would receive a modification only on a voluntary basis, meaning that a student could not be required to accept a particular modification. The student would have the right to choose a reasonable modification or to remain in their program under the status quo.

*Role of Title IX Coordinator.* Proposed § 106.40(b)(4)(ii) would require that the Title IX Coordinator effectively implement, coordinate, and document reasonable modifications provided to students because of individual needs related to pregnancy or related conditions. The steps involved with implementation and coordination would vary depending on the circumstances but would generally include determining what modifications are appropriate with input from the student and any other necessary individuals, communicating approved modifications to the student and any relevant staff members, ensuring that all other staff members involved in carrying out the modifications were performing their roles, and documenting when and how modifications took place. For example, if a student were entitled to breaks from class for lactation, the Title IX Coordinator may need to take actions such as ensuring that the student's instructors were aware of their obligation to allow breaks, that the instructors met that obligation, that there was a plan for enabling the student to make up any time missed, and that the student knew how to report if there were any problem with implementation. The Title IX Coordinator would be required to document any modifications because of pregnancy or related conditions

492

provided under proposed § 106.40(b)(4)(ii) and maintain such records under proposed § 106.8(f)(4).

*Types of modifications.* Proposed § 106.40(b)(4)(iii) would explain that reasonable modifications for a student based on pregnancy or related conditions may include a wide array of supports. The Department notes that a student's options for reasonable modifications because of pregnancy or related conditions are in no way affected by reasonable modifications for students with disabilities (or vice versa). In addition, a student's options for reasonable modifications because of pregnancy or related conditions would not be limited by the fact that the recipient has never had occasion to provide a particular modification to any student in the past.

For example, if a student were to request intermittent absences to attend morning prenatal medical appointments and the opportunity to make up lost class time without penalty within a reasonable amount of time, that could be an appropriate reasonable modification for a pregnant student even if the recipient had not provided similar breaks to any other student (for example, because none had requested or needed them), as long as this arrangement was appropriate to the pregnant student's individualized need and did not require a fundamental alteration of the recipient's education program or activity. Likewise, if the recipient felt it could prevent discrimination through some alternative modification, such as offering the student the opportunity to switch to a comparable course that met in the afternoon, that could be reasonable as well.

Alternatively, depending on the facts and circumstances, if a student requested that her school waive her entire senior year and allow her to graduate without those credits as a reasonable modification because of pregnancy, this would likely present a fundamental alteration of the recipient's program under this section. In this case, the recipient would be obligated to

offer alternative modifications sufficient to prevent sex discrimination, such as allowing the student to complete her required number of credits at a slower pace or granting her extensions of time to complete certain tests or assignments. The proposed regulations would include several additional examples of potential reasonable modifications because of pregnancy or related conditions to inform both students and recipients of their broad range of options.

Section 106.40(b)(5) Pregnancy or related conditions - comparable treatment to temporary disabilities or conditions

*Current regulations:* Section 106.40(b)(4) requires a recipient to treat "pregnancy, childbirth, false pregnancy, termination of pregnancy and recovery" in the "same manner and under the same policies as any other temporary disability with respect to any medical or hospital benefit, service, plan or policy which such recipient administers, operates, offers, or participates in with respect to students admitted to the recipient's educational program or activity."

*Proposed regulations:* Proposed § 106.40(b)(5) would add a heading to the section, would replace "pregnancy, childbirth, false pregnancy, termination of pregnancy and recovery" with "pregnancy or related conditions or any temporary disability resulting therefrom," and would add a limitation to make clear that this provision would apply only when the issue is not otherwise addressed under proposed § 106.40(b)(3).

*Reasons:* The Department proposes minor edits to increase readability and align this section with the definition of "pregnancy or related conditions" in proposed § 106.2. In light of the proposed addition of a new provision on reasonable modifications because of pregnancy or related conditions, leave, and lactation space at proposed § 106.40(b)(3), the Department proposes clarifying that proposed § 106.40(b)(5) would apply only to issues not already resolved under the process set out in proposed § 106.40(b)(3). The Department anticipates that this clarification

494

would dispel confusion for recipients and students, but at the same time retain the protection of current § 106.40(b)(4). In addition, the inclusion of "temporary disability therefrom" would align this provision with proposed §§ 106.21(c)(1) and 106.57(c), creating consistency and comprehensibility for recipients, students, and employees.

Section 106.40(b)(6) Pregnancy or related conditions - certification to participate

*Current regulations:* Section 106.40(b)(2) allows a recipient to require a student, based on pregnancy, childbirth, false pregnancy, termination of pregnancy or recovery therefrom, to obtain the certification of a physician that the student is physically and emotionally able to continue participation so long as such a certification is required of all students for other physical or emotional conditions requiring the attention of a physician.

*Proposed regulations:* The Department proposes § 106.40(b)(6) to clarify that a recipient may not require a student who is pregnant or experiencing pregnancy-related conditions to provide certification from a physician or other licensed healthcare provider that the student is physically able to participate in the recipient's class, program, or extracurricular activity unless: (i) the certified level of physical ability or health is necessary for participation in the class, program, or extracurricular activity; (ii) the recipient requires such certification of all students participating in the class, program, or extracurricular activity; and (iii) the information obtained is not used as a basis for discrimination prohibited by the regulations. It would also remove "emotionally."

*Reasons:* Under the current regulations, a recipient can require a student who is pregnant or experiencing pregnancy-related conditions to obtain certification of physical and emotional ability to participate if it requires students with other physical or emotional conditions to obtain the same certification. Although the Department acknowledges that there may be reasons that this certification could be necessary in narrow circumstances, the Department now believes that

current § 106.40(b)(2)— a provision that exists solely to guide recipients on how and on what basis to exclude students who are pregnant or have pregnancy-related conditions—is too broad and permissive as written.

For example, under the current regulations, it would be difficult, or even impossible, for a student who is pregnant or experiencing pregnancy-related conditions to know whether an ability-certification requirement was being applied to the student appropriately because that student would not necessarily know whether or which other students had been asked for the same certification, especially in light of the privacy protections applicable to the health conditions of other students. The current regulations also may lead to different treatment of pregnant students from students who are not pregnant and do not have pregnancy-related conditions because they allow recipients to single out pregnant students, and students with "physical and emotional conditions," for ability-certification requirements. In addition, the current regulations lack any requirement that the certified level of physical ability or health be necessary to the activity for which a recipient seeks medical certification prior to permitting participation by a student who is pregnant or experiencing pregnancy-related conditions.

To address these concerns and to prevent and minimize the possibility of sex-based discrimination, the Department proposes clarifying that a recipient may not require a student who is pregnant or experiencing pregnancy-related conditions to provide a certification of physical ability or health unless (i) a certain level of physical ability or health is necessary for participation in a specific class, program, or extracurricular activity; (ii) it requires such certification of all students in the same class, program, or extracurricular activity; and (iii) the information obtained is not used as a basis for sex discrimination. The Department proposes allowing certification from licensed healthcare providers in addition to physicians to allow

greater flexibility and decrease burden to students being treated by these providers. Finally, the Department also proposes deleting "emotionally" from current § 106.40(b)(2), as it is unnecessary and suggests a stereotypical assumption regarding the mental health of students who are pregnant or recovering from childbirth. With these changes, the Department aims to ensure that pregnant students and students who are experiencing pregnancy-related conditions would not face different burdens than other students regarding certification to participate in the recipient's education program or activity.

In proposing these revisions, the Department notes several points. First, nothing in proposed § 106.40(b)(6) would bear in any way on the rights of a student experiencing, for example, postpartum depression. That student would be protected from discrimination based on pregnancy or related conditions under proposed § 106.40(b)(1), particularly considering the clarified definition of "pregnancy or related conditions" at proposed § 106.2, which would extend to medical conditions related to pregnancy. The recipient would also be required to provide the student reasonable modifications, leave, and the other steps set out in proposed § 106.40(b)(3). Likewise, nothing in proposed § 106.40(b)(6) would limit a student's rights or a recipient's obligations under Section 504, which prohibits discrimination on the basis of disability, whether physical or mental in nature. Depending on the nature of the impairment, the student would also likely qualify for protection as a person with a disability under Section 504. To the extent a recipient has a specific concern about the mental health of a student who is pregnant or experiencing pregnancy-related conditions, the proposed provision would not preclude the recipient from making an inquiry, provided that such inquiry did not subject the student to discrimination on the basis of sex or disability.

Second, proposed § 106.40(b)(6) would pertain only to limited situations in which

497

physical ability or health is necessary for a specific class, program, or extracurricular activity. Examples when this situation might arise include school sports, a vocational course (e.g., firefighting) that includes physical-ability requirements to perform specific tasks, or a class that will expose students to hazardous chemicals. Outside of these limited situations, the Department does not anticipate that most recipients would have any reason to request a certification of physical ability or health prior to allowing any students to participate in most classes, programs, or extracurricular activities.

Third, a recipient may not forbid participation as a general matter by students who are pregnant or experiencing pregnancy-related conditions. For example, if a high school requires certification of physical ability or health from all students who wish to join its track team, it may require that certification from a pregnant student. The school may not, however, require that a student certify prior to participation that the student is not pregnant or require only pregnant students to provide a certification of physical ability or health. Likewise, a recipient would be prohibited under proposed § 106.40(b)(6)(iii) from using any information obtained through its request for certification of physical ability or health to discriminate based on sex.

Fourth, a recipient's default assumption should be that a student who is pregnant or experiencing pregnancy-related conditions may participate, unless there is a specific, documented medical reason tied to the physical ability or health requirements of the class, program, or extracurricular activity that cannot be overcome with reasonable modifications for a student who is pregnant or experiencing pregnancy-related conditions under proposed § 106.40(b)(4). If reasonable modifications because of a student's pregnancy or related conditions would prevent discrimination by ensuring participation, the recipient must provide these modifications and allow participation.

Finally, this provision would not be intended to address how or when a recipient may request that a student provide medical documentation to support the need for certain reasonable modifications because of pregnancy or related conditions under proposed § 106.40(b)(4) or to determine a minimum amount of leave to which a student would be entitled under proposed § 106.40(b)(3)(iii).  Although the Department anticipates that such documentation will be unnecessary in most cases, it could be appropriate in limited situations depending on the circumstances of a student's needs, the education program or activity, and the modification at issue.

### G. Discrimination Based on an Employee's Parental, Family, Marital Status, Pregnancy, or Related Conditions

Section 106.51(b)(6) Employment

*Current regulations:* Section 106.51 describes certain prohibitions on sex discrimination in a recipient's employment actions.  Specifically, current § 106.51(b)(6) states that the subpart applies to "[g]ranting and return from leaves of absence, leave for pregnancy, childbirth, false pregnancy, termination of pregnancy, leave for persons of either sex to care for children or dependents, or any other leave."

*Proposed regulations:* The Department proposes replacing "pregnancy, childbirth, false pregnancy, termination of pregnancy" with "pregnancy or related conditions."

*Reasons:* As explained in greater detail in the Department's discussion of the proposed definition of "pregnancy or related conditions" (§ 106.2), the Department's tentative view is that using this term will add clarity and consistency regarding which individuals each provision covers.

Section 106.57 Parental, family, or marital status; pregnancy or related conditions.

*Current regulations:* The section heading is "Marital or parental status."

*Proposed regulations:* The Department proposes changing this section heading to "Parental, family, or marital status; pregnancy or related conditions."

*Reasons:* The proposed section heading would more accurately describe the content of the section.

Section 106.57(a)(1) General

*Current regulations:* Section 106.57(a)(1) states that a recipient shall not apply any policy or take any employment action "[c]oncerning the potential marital, parental, or family status of an employee or applicant for employment which treats persons differently on the basis of sex."

*Proposed regulations:* The Department proposes the following edits to current § 106.57(a) and (a)(1):

- Changing the heading of § 106.57(a) from "General" to "Status generally";

- Changing "apply" to "adopt or apply" in proposed § 106.57(a); and

- Changing "potential" to "current, potential, or past" in proposed § 106.57(a)(1).

*Reasons:* The Department proposes these three changes for the reasons set out in the discussion of proposed § 106.40(a), which applies a similar prohibition on discrimination to students. The Department's tentative view is also that using the same terms throughout the regulations would better enable recipients, students, and employees to understand and apply them. Specifically, with respect to the change from "apply" to "adopt or apply," the Department's tentative view is that a recipient should be prohibited from adopting discriminatory policies based on pregnancy or related conditions. Adding "adopt" is intended to enable persons to understand that they may challenge a rule as being discriminatory even before it has been applied and caused harm. For example, if a recipient adopted a rule that it would not hire pregnant individuals, this rule would raise compliance concerns even if the recipient had not yet applied it to exclude an individual

500

applicant.  Likewise, the Department's tentative view is that clarifying that Title IX's coverage includes current and past parental, family, or marital status would more fully implement Title IX's guarantee against sex discrimination.  For example, the proposed regulations would address a situation in which a recipient disciplined employees who are mothers for excessive absences more harshly than employees who are fathers because the recipient assumed that the mothers were less committed employees due to family obligations.

Section 106.57(b) Pregnancy or related conditions

*Current regulations:* Section 106.57(b) states that a recipient shall not discriminate against or exclude from employment any employee or applicant for employment on the basis of pregnancy, childbirth, false pregnancy, termination of pregnancy, or recovery therefrom.

*Proposed regulations:* The Department proposes the following edits to current § 106.57(b):

- Changing the heading of § 106.57(b) from "Pregnancy" to "Pregnancy or related conditions"; and

- Replacing "pregnancy, childbirth, false pregnancy, termination of pregnancy, or recovery therefrom" with "current, potential, or past pregnancy or related conditions."

*Reasons:* The Department proposes these two changes for the reasons set out in the discussion of proposed § 106.40(b), which would apply a similar prohibition on discrimination to students. The Department's tentative view is also that using the same terms throughout the regulations will better enable recipients and those covered to understand and apply them.  In this section, adding "lactation" and "related medical conditions" to the bases already explicitly covered would be consistent with Title IX's goal of preventing discrimination and eliminating barriers to equal access based on sex.  For the reasons explained in the discussion of the proposed definition of the term "pregnancy or related conditions" (§ 106.2), this change would address more types of sex

discrimination in employment in the educational context. For example, this proposed formulation would make clear that a recipient could not take an adverse employment action against an employee because the employee needed to miss work to receive treatment for mastitis, a medical condition related to lactation. It would also clarify that a recipient could not discriminate based on current, potential, and past pregnancy or related conditions. Proposed § 106.57(b) would also prohibit a recipient from terminating an employee for a past complication due to pregnancy, for example, out of concern that if the employee became pregnant again, the employee would require a long leave time to recover. *See* 2015 EEOC Pregnancy Guidance ("[I]f an employee was discharged during her pregnancy-related medical leave (i.e., leave provided for pregnancy or recovery from pregnancy) or her parental leave (i.e., leave provided to bond with and/or care for a newborn or adopted child), and if the employer's explanation for the discharge is not believable, a violation of Title VII may be found.")

Section 106.57(c) Comparable treatment to temporary disabilities or conditions

*Current regulations:* Section 106.57(c) states that a recipient shall treat pregnancy, childbirth, false pregnancy, termination of pregnancy, and recovery therefrom and any temporary disability resulting therefrom as any other temporary disability for all job-related purposes, including commencement, duration and extensions of leave, payment of disability income, accrual of seniority and any other benefit or service, and reinstatement, and under any fringe benefit offered to employees by virtue of employment.

*Proposed regulations:* The Department proposes the following revisions to current § 106.57(c):

- Changing the heading from "Pregnancy as temporary disability" to "Comparable treatment to temporary disabilities or conditions"; and

- Replacing "pregnancy, childbirth, false pregnancy, termination of pregnancy, or recovery

therefrom and" with "pregnancy or related conditions or."

*Reasons:* The Department proposes these two changes for the reasons set out in the discussion of proposed § 106.40(b)(5), which applies to students. The Department's current view is also that using the same terms throughout the regulations will better enable recipients and those covered to understand and apply them. Adding "lactation" and "related medical conditions" to the bases already explicitly covered in current § 106.57(c) would be consistent with Title IX's goal of preventing discrimination and eliminating barriers to equal access based on sex. For the reasons explained in the discussion of the proposed definition of the term "pregnancy or related conditions" (§ 106.2), this change will address a more comprehensive range of circumstances that could be the subject of sex discrimination in employment in the educational context. For example, under the proposed regulations, if a recipient provided paid leave time under a temporary disability policy for an employee to receive physical therapy to recovery from a broken leg, it would have to allow comparable paid time for an employee who needed to attend physical therapy to address a pelvic injury due to childbirth.

Section 106.57(d) Pregnancy leave

*Current regulations:* Section 106.57(d) states that in the case of a recipient which does not maintain a leave policy for its employees, or in the case of an employee with insufficient leave or accrued employment time to qualify for leave under such a policy, a recipient shall treat pregnancy, childbirth, false pregnancy, termination of pregnancy, and recovery therefrom as a justification for a leave of absence without pay for a reasonable period of time, at the conclusion of which the employee shall be reinstated to the status which she held when the leave began or to a comparable position, without decrease in rate of compensation or loss of promotional opportunities, or any other right or privilege of employment.

503

*Proposed regulations:* The Department proposes the following edits to current § 106.57(d):

- Replacing "pregnancy, childbirth, false pregnancy, termination of pregnancy, or recovery therefrom" with "pregnancy or related conditions";

- Revising "leave of absence" to "voluntary leave of absence"; and

- Replacing "the status which she held" with "the status held."

*Reasons:* The Department proposes these three changes for the reasons set out in the discussion of proposed § 106.40(b)(3)(iii), which applies to students. The Department's tentative view is also that using the same terms throughout the regulations would better enable recipients, students, and employees to understand and apply them. Adding "lactation" and "related medical conditions" to the bases already explicitly covered is consistent with Title IX's goal of preventing discrimination and eliminating barriers to equal access based on sex. For the reasons explained in the discussion of the proposed definition of the term "pregnancy or related conditions" (§ 106.2), this change would address a more comprehensive range of circumstances that could be the subject of sex discrimination in employment in the educational context. The Department proposes adding "voluntary" to clarify that an employee must not be forced to take leave due to pregnancy or related conditions, but rather must have the right to choose whether to take leave. Finally, the Department proposes clarifying the text of the provision for readability to replace "the status which she held" with "the status held."

Section 106.57(e) Lactation time and space

*Current regulations:* None.

*Proposed regulations:* The Department proposes adding requirements in proposed § 106.57(e) that a recipient must: (1) provide reasonable break time for an employee to express breast milk or breastfeed as needed; and (2) ensure the availability of a lactation space, which must be a space

other than a bathroom that is clean, shielded from view, free from intrusion from others, and may be used by an employee for expressing breast milk or breastfeeding as needed.

*Reasons: Overview*. Ensuring equal access to employment in the education sector regardless of sex was a central purpose of Title IX at the time of its passage. *See* 118 Cong. Rec. at 5810 (statement of Dr. Bernice Sandler explaining that employers in the education sector often refused to hire women because of concerns about absenteeism due to family obligations, despite the fact that the Women's Bureau of the Department of Labor found that "men lose more time off the job because of hernias than do women because of childbirth and pregnancy"). OCR and the Department received feedback from stakeholders during the June 2021 Title IX Public Hearing and in meetings held in 2022 under Executive Order 12866, after the NPRM was submitted to OMB, that civil rights protections based on pregnancy or related conditions are critical in the educational context. The Department now believes that clearly defined rights to lactation time and space are essential to prevent different treatment on the basis of sex and exclusion from recipient workplaces.

For employees in the education sector, lactation needs may present different challenges depending on the nature of the employment. Employees, particularly in elementary schools and secondary schools, may lack an appropriate place to express breast milk and instead resort to expressing milk in an unsanitary environment, such as a restroom stall, a supply closet, or even a car. If appropriate space is not provided, these employees may have little choice but to attend to their lactation needs in a space that is open and, in doing so, risk exposing themselves to colleagues and students. Or these employees may be denied the reasonable break time necessary to express milk, leading to painful health complications. If an employee is unable to access appropriate time and space for lactation, the employee may have no choice but to leave their

employment in order to continue to care for their child's nutritional needs in the way the employee thinks best. To prevent subtle forms of sex discrimination and ensure equal access regardless of sex, the Department would require that a recipient: (1) provide reasonable break time for an employee to express breast milk or breastfeed as needed; and (2) ensure the availability of a lactation space, which must be a space other than a bathroom that is clean, shielded from view, free from intrusion from others, and may be used by an employee for expressing breast milk or breastfeeding as needed.

Overall, it is the Department's current view that requiring a recipient to provide its employees with reasonable break time and space for lactation would prevent discrimination and address sex-based barriers to equal access in employment by allowing employees to attend to lactation needs while at work. Absent this rule, and depending on the circumstances, an employee could face discipline or job loss for absenteeism if the employee needed reasonable break time or space to express breast milk. An employee could also face harassment or retaliation because the current regulations do not clearly address lactation, including lactation time and space. Proposed § 106.57(e) would clearly set out a recipient's obligation, so both recipients and employees would have clear information about their obligations and rights consistent with Title IX.

*Reasonable break time.* Reasonable break time is necessary to ensure that a lactating employee can successfully access their school-based employment. As noted by the EEOC, "a nursing mother will typically need to breastfeed or express breast milk using a pump two or three times over the duration of an eight-hour workday." 2015 EEOC Pregnancy Guidance. Because the physical needs and employment scenarios may vary by individual, proposed § 106.57(e)(1) would provide flexibility for a recipient to adapt to a range of situations. The time must be

506

sufficient for the employee—every few hours—to travel to the lactation space, express breast milk or breastfeed, wash their lactation supplies if any, store the milk, and return to the work area.

*Lactation space.* Proposed § 106.57(e)(2) would also require a recipient to ensure the availability of a lactation space, which must be a space other than a bathroom that is clean, shielded from view, free from intrusion from others, and may be used by an employee for expressing breast milk or breastfeeding as needed. This requirement would be like the lactation space that the Department would require a recipient to provide to a student under proposed § 106.40(b)(3)(iv). As explained in greater detail in the discussion of proposed § 106.40(b)(3)(iv), the Department expects that these are also the appropriate minimum standards to prevent discrimination and create equal access for lactating employees. Specifically, these standards would allow an employee to express breast milk in a private, clean, and appropriate location as needed. Because the standards for both students and employee spaces would be the same, a recipient could choose to offer a common space for both students and employees, thereby minimizing cost while ensuring civil rights compliance.

The Department further notes that nothing in proposed § 106.57(e)(1) or (2) would preempt State or local laws that do not conflict with Title IX and may afford greater protection to employees regarding lactation time and space, as explained in greater detail in the discussion of proposed § 106.6(b).

Section 106.60 Pre-employment inquiries

*Current regulations:* Section 106.60 prohibits pre-employment inquiries regarding marital status and limits permissible inquiries as to sex.

*Proposed regulations:* The Department proposes revisions to make this section consistent with

related provisions at proposed § 106.21(c) regarding pre-admission inquiries and to enhance readability. Specifically, the Department proposes to replace "[a] recipient may make pre-employment inquiry as to the sex of an applicant for employment, but only if such inquiry is made equally of such applicants of both sexes and if the results of such inquiry are not used in connection with discrimination prohibited by this part" with "[a] recipient may ask an applicant for employment to self-identify their sex, but only if this question is asked of all applicants and if the response is not used as a basis for discrimination prohibited by this part" in proposed § 106.60(b).

*Reasons:* As explained in the discussion of proposed § 106.21(c), the Department proposes replacing the term "in connection with discrimination" with "as a basis for discrimination" to enhance clarity and consistency with usage elsewhere in the proposed regulations but does not intend this as a substantive change in meaning. In addition, the Department proposes revising § 106.60(b) to refer to "all applicants" instead of to "both sexes" in recognition of the fact that some applicants may have a nonbinary gender identity. For the same reason, if a recipient asks applicants to self-identify their sex and provides options from which an applicant may choose, nothing in the current or proposed regulations would prohibit a recipient from offering nonbinary options in addition to male and female options.

IV. Title IX's Coverage of All Forms of Sex Discrimination

*Statute*: Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. 1681(a). Title IX includes several statutory exemptions and exceptions from its coverage, including for the membership practices of certain organizations, admissions to private undergraduate colleges,

508

educational institutions that train individuals for the military services or merchant marine, and educational institutions that are controlled by a religious organization to the extent that application of Title IX would be inconsistent with the religious tenets of the controlling organization. 20 U.S.C. 1681(a)(1)-(9). Title IX also includes a provision concerning the discrete context of "living facilities for the different sexes." 20 U.S.C. 1686. The Department has the authority to regulate with regard to discrimination on the basis of sex in education programs or activities receiving Federal financial assistance, specifically under 20 U.S.C. 1682 and generally under 20 U.S.C. 1221e-3 and 3474.

The statute does not explicitly reference distinct forms of sex discrimination, such as discrimination based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, or gender identity, or discrimination taking the form of sex-based harassment. Although it does not address these specific applications, the Supreme Court made clear in 1982 that "if we are to give Title IX the scope that its origins dictate, we must accord it a sweep as broad as its language." *N. Haven Bd. of Educ.*, 456 U.S. at 521.

### A. History of the Department's Interpretation of Title IX's Coverage

The Department's Title IX regulations have long included provisions explaining Title IX's coverage of discrimination based on pregnancy or related conditions and sex stereotypes. *See, e.g.*, 34 CFR 106.21(c)(2)-(3), 106.40(b), 106.51(b)(6), 106.57(b)-(d), 106.61. In 2006 and 2020, the Department amended the regulations to address additional specific applications of Title IX's coverage of discrimination based on sex stereotypes. *See* 34 CFR 106.34(b)(4)(i), 106.45(b)(1)(iii). Although the Department has not previously used its rulemaking authority to clarify Title IX's specific application to discrimination based on sex characteristics, sexual orientation, or gender identity, OCR has previously addressed these applications of Title IX

through guidance and administrative enforcement.

OCR first issued guidance on Title IX's application to sexual orientation discrimination and the rights of gay and lesbian students in its 1997 Sexual Harassment Guidance, which stated: "Although Title IX does not prohibit discrimination on the basis of sexual orientation, sexual harassment directed at gay or lesbian students may constitute sexual harassment prohibited by Title IX." 62 FR at 12039 (footnote omitted). In 2001, OCR revised and reissued this guidance after the Supreme Court issued decisions in *Gebser* and *Davis*, two cases that addressed sexual harassment in educational settings, and *Oncale*, a case involving same-sex sexual harassment in the workplace. 2001 Revised Sexual Harassment Guidance at i-ii. This revised guidance added a few clarifications, including that "sufficiently serious sexual harassment is covered by Title IX even if the hostile environment also includes taunts based on sexual orientation," *id.* at 27 n.15, that "it can be discrimination on the basis of sex to harass a student on the basis of the victim's failure to conform to stereotyped notions of masculinity and femininity," *id.* at v, and that "Title IX prohibits sexual harassment regardless of the sex of the harasser, i.e., even if the harasser and the person being harassed are members of the same sex," *id.* at 3. The 1997 Sexual Harassment Guidance and 2001 Revised Sexual Harassment Guidance thus addressed some specific forms of sex discrimination against gay, lesbian, and gender-nonconforming students. They did not specifically address other forms of sex discrimination, such as discrimination based on gender identity. In October 2010, OCR issued a Dear Colleague Letter on Harassment and Bullying, which discussed Title IX's application to LGBT students:

> Although Title IX does not prohibit discrimination based solely on sexual
> orientation, Title IX does protect all students, including lesbian, gay, bisexual, and
> transgender (LGBT) students, from sex discrimination. When students are

510

subjected to harassment on the basis of their LGBT status, they may also . . . be

subjected to forms of sex discrimination prohibited under Title IX. The fact that

the harassment includes anti-LGBT comments or is partly based on the target's

actual or perceived sexual orientation does not relieve a school of its obligation

under Title IX to investigate and remedy overlapping sexual harassment or

gender-based harassment.

2010 Dear Colleague Letter on Harassment and Bullying at 8.

In July 2013, the Federal government resolved its first administrative enforcement case

finding compliance concerns under Title IX regarding a school's denial of a transgender

student's access to sex-separate facilities and accommodations during an overnight school trip.

In their resolution letter, OCR and the Civil Rights Division of the U.S. Department of Justice

(DOJ) emphasized the district's failure to contemplate any reasonable alternative arrangements

that would have been less burdensome on the student. OCR Case No. 09-12-1020, *Arcadia

Unified Sch. Dist.* (July 24, 2013) (resolution letter and agreement) (Arcadia Resolution Letter

and Agreement), www.justice.gov/sites/default/files/crt/legacy/2013/07/26/arcadialetter.pdf;

www.justice.gov/sites/default/files/crt/legacy/2013/07/26/arcadiaagree.pdf. In the resolution

agreement, the district agreed to, among other things, treat the transgender male student "the

same as other male students in all respects."

In 2014, OCR issued two more guidance documents that further clarified Title IX's

coverage of gender identity discrimination. In April 2014, OCR issued the 2014 Q&A on Sexual

Violence, which stated for the first time in a guidance document that Title IX's prohibition on

sex discrimination extends to claims of discrimination based on gender identity. 2014 Q&A on

Sexual Violence at 5. Then in December 2014, OCR issued a Question-and-Answer document

511

on single-sex classes and extracurricular activities, which stated that "[u]nder Title IX, a recipient generally must treat transgender students consistent with their gender identity in all aspects of the planning, implementation, enrollment, operation, and evaluation of single-sex classes." U.S. Dep't of Educ., Office for Civil Rights, Questions and Answers on Title IX and Single-Sex Elementary and Secondary Classes and Extracurricular Activities at 25 (Dec. 1, 2014) (2014 Q&A on Single-Sex Elementary and Secondary Classes and Activities), www.ed.gov/ocr/docs/faqs-title-ix-single-sex-201412.pdf. Although the 2014 Q&A on Sexual Violence was rescinded and replaced with new guidance in September 2017, the 2014 Q&A on Single-Sex Elementary and Secondary Classes and Activities is still in effect.

In May 2016, OCR and DOJ's Civil Rights Division issued a joint Dear Colleague Letter addressing the rights of transgender students under Title IX, stating that "the Departments treat a student's gender identity as the student's sex for purposes of Title IX and its implementing regulations." 2016 Dear Colleague Letter on Title IX and Transgender Students at 2. The 2016 Dear Colleague Letter then explained that "[t]his means that a school must not treat a transgender student differently from the way it treats other students of the same gender identity." *Id.* The letter addressed the application of Title IX with respect to harassment and issues related to identification documents, names and pronouns, sex-separate activities and facilities, and privacy and education records. It also included an extensive set of citations to examples of OCR's resolutions of past Title IX complaints and similar interpretations by courts and other agencies of Federal laws prohibiting sex discrimination. After the 2016 Dear Colleague Letter on Title IX and Transgender Students was issued, the Departments of Education and Labor revised regulations implementing other Federal laws to adopt similar interpretations that prohibitions on sex discrimination include discrimination based on gender identity, as well as

many aspects of discrimination based on sexual orientation.[11]

In August 2016, a Federal district court issued an order finding that the interpretation set out in the 2016 Dear Colleague Letter on Title IX and Transgender Students was contrary to law and should not have been issued without undergoing the notice-and-comment process required by the Administrative Procedure Act and granted a nationwide preliminary injunction barring OCR and DOJ from relying on the 2016 Dear Colleague Letter on Title IX and Transgender Students in their enforcement of Title IX. *Texas v. United States*, 201 F. Supp. 3d 810 (N.D. Tex. 2016). Other Federal courts that reviewed the Department's interpretation found it to be reasonable. *See*, *e.g.*, *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 723 (4th Cir. 2016) (according controlling weight to the "Department's interpretation of its own

---

[11] In August 2016, the Department adopted regulations governing Equity Assistance Centers under Title IV of the Civil Rights Act of 1964 defining "sex desegregation" to mean "assignment of students to public schools and within those schools without regard to their sex (including transgender status; gender identity; sex stereotypes, such as treating a person differently because he or she does not conform to sex-role expectations because he or she is attracted to or is in a relationship with a person of the same sex; and pregnancy and related conditions), including providing students with a full opportunity for participation in all educational programs regardless of their sex." *See* 34 CFR 270.7; U.S. Dep't of Educ., Office of Elementary and Secondary Educ., Final Regulations, Equity Assistance Centers (Formerly Desegregation Assistance Centers (DAC)), 81 FR 46807, 46816 (July 18, 2016), https://www.govinfo.gov/content/pkg/FR-2016-07-18/pdf/2016-16811.pdf. This interpretation of the term "sex" is relevant to the interpretation of Title IX because Title IX amended Title IV in 1972 to add sex segregation to the types of segregation that could be addressed by technical assistance. Similarly, in December 2016, DOL adopted regulations under Section 188 of WIOA, which incorporates Title IX's prohibition on sex discrimination. These regulations provide that unlawful sex-based discriminatory practices include "[t]reating an individual adversely because the individual identifies with a gender different from that individual's sex assigned at birth." *See* 29 CFR 38.7; U.S. Dep't of Labor, Office of the Sec'y, Final Rule, Implementation of the Nondiscrimination and Equal Opportunity Provisions of WIOA, 81 FR 87130, 87221 (Dec. 2, 2016), https://www.govinfo.gov/content/pkg/FR-2016-12-02/pdf/2016-27737.pdf. Neither of these regulatory provisions has been altered or challenged since 2016.

513

regulation, § 106.33), *vacated and remanded*, 137 S. Ct. 1239, 197 L. Ed. 2d 460 (2017); *Bd. of Educ. of the Highland Loc. Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 870 (S.D. Ohio 2016) (same); *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, No. 16-CV-943-PP, 2016 WL 5239829, at *3 (E.D. Wis. Sept. 22, 2016) (same), *aff'd sub nom. Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017), *abrogated on other grounds as recognized by Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020).

In February 2017, DOJ and OCR issued a letter withdrawing the statements of policy and guidance reflected in the 2016 Dear Colleague Letter on Title IX and Transgender Students "in order to further and more completely consider the legal issues involved." U.S. Dep't of Justice and U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter on Transgender Students at 1 (Feb. 22, 2017) (2017 Dear Colleague Letter on Transgender Students), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201702-title-ix.pdf. On March 3, 2017, the court dissolved the preliminary injunction when the plaintiffs voluntarily dismissed the lawsuit. Plaintiff's Notice of Voluntary Dismissal, *Texas v. United States*, No. 7:16-cv-00054 (N.D. Tex. Mar. 3, 2017), ECF No. 128.

When the Department amended the Title IX regulations in May 2020, it declined to address Title IX's coverage of discrimination on the basis of gender identity or sexual orientation, but noted in the preamble to the 2020 amendments that the most recent position of the United States in then-pending Supreme Court cases was "(1) that the ordinary public meaning of 'sex' at the time of Title VII's passage was biological sex and thus the appropriate construction of the word 'sex' does not extend to a person's sexual orientation or transgender status, and (2) that discrimination based on transgender status does not constitute sex

514

stereotyping but a transgender plaintiff may use sex stereotyping as evidence to prove a sex discrimination claim if members of one sex (e.g., males) are treated less favorably than members of the other sex (e.g., females)."  85 FR at 30178.  The Department also declined to define the term "sex" because it determined that doing so was not necessary: Sexual harassment "does not depend on whether the definition of 'sex' involves solely the person's biological characteristics (as at least one commenter urged) or whether a person's 'sex' is defined to include a person's gender identity (as other commenters urged)."  *Id*.  The Department asserted, however, that "Title IX and its implementing regulations include provisions that presuppose sex as a binary classification" and that the Department has previously acknowledged "physiological differences between the male and female sexes."  *Id.*

Subsequently in June 2020, the Supreme Court held in *Bostock* that sex discrimination, as prohibited by Title VII, encompasses discrimination based on sexual orientation and gender identity, 140 S. Ct. at 1737, even on the assumption (which the Court accepted for sake of argument) that "sex" refers "only to biological distinctions between male and female," *id.* at 1739.  The Court stated that to discriminate on the basis of sexual orientation or gender identity "requires an employer to intentionally treat individual employees differently because of their sex."  *Id.* at 1742.  The Court explained that when an employer fires a person for being gay or transgender, the employer necessarily fires that person for "traits or actions it would not have questioned in members of a different sex."  *Id.* at 1737.  The Court in *Bostock* found that "no ambiguity exists about how Title VII's terms apply to the facts before [it]"—i.e., allegations of discrimination in employment against several individuals based on sexual orientation and gender identity.  *Id.* at 1749.  Indeed, the Court stated that "it is impossible to discriminate against a person" because of their sexual orientation or gender identity "without discriminating against

that individual based on sex." *Id.* at 1741. In the months immediately following the Supreme

Court's decision in *Bostock*, OCR took steps to clarify its position on *Bostock*'s application to

Title IX. On August 31, 2020, OCR opened an investigation of a complaint of sexual orientation

discrimination. OCR Case No. 04-20-1409, *Shelby Cnty. Sch. Dist.* (Aug. 31, 2020) (letter of

notification), http://www.ed.gov/ocr/letters/20200831-letter-of-notification.pdf. In its

notification letter, OCR noted that although there are differences between workplaces and

schools, *Bostock* "guides OCR's understanding that discriminating against a person based on

their homosexuality or identification as transgender generally involves discrimination on the

basis of their biological sex." *Id.* at 2. OCR indicated that it would investigate allegations that

the complainant had been subjected to "'homophobic bigot[ry]'" because she "'didn't date

guys'" and "'likes girls'" and that she had been denied an opportunity because of her sexual

orientation. *Id.* at 1.

On the same day, OCR issued a revised Letter of Impending Enforcement Action in its

investigation of the Connecticut Interscholastic Athletic Conference (CIAC) and six school

districts, in which it denied that *Bostock* or its reasoning should alter its analysis of Title IX's

application to student participation on sex-separate athletics teams. OCR Case No. 01-19-4025,

*Conn. Interscholastic Athletic Conf. et al.* (Aug. 31, 2020) (revised letter of impending

enforcement action) (Rev. CIAC Letter),

http://www.ed.gov/ocr/docs/investigations/more/01194025-a2.pdf. The letter stated that when a

recipient provides "separate teams for members of each sex" under 34 CFR 106.41(b), "the

recipient must separate those teams on the basis of biological sex" and not on the basis of gender

identity. *Id.* at 36. The letter also departed from OCR's typical practice concerning enforcement

letters by stating that this letter "constitutes a formal statement of OCR's interpretation of Title

IX and its implementing regulations and should be relied upon, cited, and construed as such." *Id.*
at 49. In 2021, however, OCR closed the investigation after archiving and marking the letter
"not for reliance," citing its inconsistency with Executive Order 13988 (describing *Bostock*) and
the fact that it was issued without having followed the appropriate procedures required for
issuing guidance.

In January 2021, the Department posted a memorandum signed by the Principal Deputy
General Counsel in its Office of the General Counsel, which commented on *Bostock*'s
application to Title IX. U.S. Dep't of Educ., Office for Civil Rights, Memorandum from
Principal Deputy General Counsel delegated the authority and duties of the General Counsel
Reed D. Rubinstein to Kimberly M. Richey, Acting Assistant Secretary of the Office for Civil
Rights re *Bostock v. Clayton Cnty.* (Jan. 8, 2021) (rescinded 2021) (Rubinstein Memorandum),
https://www2.ed.gov/about/offices/list/ocr/correspondence/other/ogc-memorandum-
01082021.pdf. The Rubinstein Memorandum stated that the *Bostock* Court's "assumption that
the ordinary public meaning of the term 'sex' in Title VII means biological distinctions between
male and female . . . is consistent with and further supports the Department's long-standing
construction of the term 'sex' in Title IX to mean biological sex, male or female." Rubinstein
Memorandum at 2. The Rubinstein Memorandum also pointed to the preamble to the 2020
amendments, specifically the statement that "'[i]n promulgating regulations to implement Title
IX, the Department expressly acknowledged physiological differences between the male and
female sexes,'" to bolster its interpretation. *Id.* at 3. The Rubinstein Memorandum stated that
"[c]onsistent with *Bostock*, harassment on the basis of a person's transgender status or
homosexuality may implicate that person's biological sex and, thus, may at least in part
constitute 'conduct on the basis of sex,'" such that it "constitute[s] sexual harassment prohibited

by Title IX." *Id.* at 6. However, the Rubinstein Memorandum also argued that "*Bostock*'s holding and reasoning, to the extent relevant, support the Department's position that Title IX's statutory and regulatory provisions permit, and in some cases require, biological sex, male or female, to be taken into account in an education program or activity." *Id.* Thus, the Rubinstein Memorandum concluded, a recipient is required to separate athletic participants "solely based on their biological sex," to restrict access to sex-separate facilities "based on biological sex," and to rely on a student's "biological" sex in other circumstances in which sex separation is permitted by Title IX. *Id.* at 7, 9, 12-13. The Rubinstein Memorandum did not, however, explain how a school should determine a student's "biological" sex. The Rubinstein Memorandum stated that the Department's Office of the General Counsel was not persuaded to follow the recent appellate cases to the contrary. *Id.* at 9-11 (discussing *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *cert. denied*, 141 S. Ct. 2878 (2021); *Adams v. Sch. Bd. of St. Johns Cnty.*, 968 F.3d 1286 (11th Cir. 2020), *vacated and superseded*, 3 F.4th 1299 (11th Cir. 2021), *reh'g en banc pending*, 9 F.4th 1369 (11th Cir. 2021)).

In 2021, OCR archived the Rubinstein Memorandum and marked it "not for reliance," citing its inconsistency with Executive Order 13988 (describing *Bostock*) and its issuance without having followed the procedures required for issuing guidance. In June 2021, after reviewing the text of Title IX in light of the Supreme Court's decision in *Bostock* and other Federal courts' decisions in Title IX cases, OCR published a Notice of Interpretation in the *Federal Register* discussing those cases and clarifying that Title IX's prohibition on sex discrimination encompasses discrimination on the basis of sexual orientation and gender identity. 2021 Bostock Notice of Interpretation, 86 FR 32637. In the Notice of Interpretation, OCR discussed the text of Title IX and Federal courts' interpretation of Title IX and concluded that the

Supreme Court's reasoning in *Bostock* applies to Title IX. *Id.* at 32638. OCR underscored the similarity of the relevant text of Title VII and Title IX and recognized the harm these forms of discrimination can cause to students, citing numerous court rulings recognizing harm in individual students' cases. *Id.* at 32638-39. OCR made clear that this interpretation would inform OCR's evaluation and investigation of complaints but that it would not dictate the outcome in any particular case or set of facts. *Id.* at 32639. The Notice of Interpretation did not address how coverage of sexual orientation and gender identity discrimination affects obligations under the current Title IX regulations.

### B. Proposed Regulations

Section 106.10 Scope

*Current regulations:* None.

*Proposed regulations:* The Department proposes adding this provision to the regulations to clarify the scope of Title IX's prohibition on discrimination on the basis of sex.

*Reasons:* The Department proposes adding a new section, § 106.10, titled Scope, to its Title IX regulations to clarify Title IX's coverage of specific forms of sex discrimination, including some that are already addressed in the current regulations, such as discrimination based on pregnancy or related conditions, and others that are consistent with decisions of Federal courts and the Department's identification of sex-based barriers to equal educational opportunity. This new section would state that discrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity.

As summarized above, the Department has at times articulated a narrower interpretation of the scope of Title IX's prohibition on sex discrimination. For example, the Department

519

previously stated that Title IX does not fully encompass discrimination on the basis of sexual orientation or gender identity. *See, e.g.*, 2001 Revised Sexual Harassment Guidance at 3; 2010 Dear Colleague Letter on Harassment and Bullying at 8; Preamble to the 2020 Amendments, 85 FR at 30178-79. After the Supreme Court decided *Bostock*, however, Department officials acknowledged that Title IX covers sexual orientation and gender identity discrimination, albeit only so far as the discrimination impermissibly takes "biological" sex into account. *See, e.g.*, Rubinstein Memorandum at 4.

The Department now believes that its prior position (i.e., that Title IX's prohibition on sex discrimination does not encompass discrimination based on sexual orientation and gender identity) is at odds with Title IX's text and purpose and the reasoning of the *Bostock* Court and other courts to have considered the issue in recent years—both before and after *Bostock*.

Title IX and its implementing regulations do not use the term "on the basis of sex" in a restrictive way. For example, consistent with judicial interpretations, OCR has long recognized that Title IX prohibits sexual harassment and discrimination based on sex stereotypes. The specific forms of sex discrimination that the Department proposes to add to the express prohibitions in § 106.10 do not depend on resolving the question of whether the term "sex" is limited to physiological or "biological" characteristics. As noted, in certain documents in August 2020 and January 2021, the Department indicated that Title IX's scope should be limited to discrimination rooted in "biological sex," but as *Bostock* demonstrated with respect to Title VII, even accepting that definition of "sex" would not preclude Title IX's coverage of these forms of discrimination. Given that, and following the approach reflected in the 2020 regulations, the Department does not propose adding a definition of "sex" here because sex can encompass many traits and because it is not necessary for the regulations to define the term for

all circumstances. *See* 85 FR at 30178; *cf. Schroer v. Billington*, 424 F. Supp. 2d 203, 212-13 (D.D.C. 2006) (construing the phrase "because of . . . sex" broadly is "a straightforward way to deal with the factual complexities that . . . stem from real variations . . . in the different components" of sexuality, including "chromosomal, gonadal, hormonal, and neurological" variations); *Students & Parents for Priv. v. U.S. Dep't of Educ.*, No. 16-CV-4945, 2017 WL 6629520, at *3 (N.D. Ill. Dec. 29, 2017) ("As the Magistrate Judge correctly recognized, however, and as the Seventh Circuit has since conclusively held, federal protections against sex discrimination are substantially broader than based only on genitalia or chromosome."); *Rentos v. Oce-Office Sys.*, No. 95-cv-7908, 1996 WL 737215, at *6 (S.D.N.Y. Dec. 24, 1996) (recognizing the many different factors the medical community has determined to be pertinent in identifying someone's gender).

The Supreme Court in *Bostock* similarly declined to resolve the parties' dispute concerning the definition of "sex" under a civil rights law prohibiting discrimination on the basis of sex. The Court acknowledged the parties' competing definitions of "sex": the employers' definition of the term as "status as either male or female [as] determined by reproductive biology," and the employees' definition as "capturing more than anatomy and reaching at least some norms concerning gender identity and sexual orientation." 140 S. Ct. at 1739. The Court declined to resolve that dispute because "nothing in our approach . . . turns on the outcome of the parties' debate" about definitions. *Id.* The Court explained that, even if one assumes "for argument's sake" the employers' narrower definition of sex as referring "only to biological distinctions between male and female," discrimination "because of sex" occurs whenever an employer discriminates against a person for being gay or transgender: In such a circumstance, the Court explained, the employer "intentionally treats a person worse because of sex—such as

by firing the person for actions or attributes it would tolerate in an individual of another sex." *Id.* at 1739-40; *see also id.* at 1741 ("If the employer intentionally relies in part on an individual employee's sex when deciding to discharge the employee—put differently, if changing the employee's sex would have yielded a different choice by the employer—a statutory violation has occurred."). And, the Court explained, this is so whether or not "other factors besides the plaintiff's sex contributed to the decision" and regardless of whether "the employer treated women as a group the same when compared to men as a group." *Id.* at 1741. *Bostock* thus makes clear that it is "impossible to discriminate against a person" on the basis of sexual orientation or gender identity without "discriminating against that individual based on sex," even assuming that sex refers only to certain "biological distinctions." *Id.* at 1739, 1741.

The Department does not intend that the specific categories of discrimination listed in proposed § 106.10 would be exhaustive, as evidenced by the use of the word "includes." Title IX's broad prohibition on discrimination "on the basis of sex" under a recipient's education program or activity encompasses, at a minimum, discrimination against an individual because, for example, they are or are perceived to be male, female, or nonbinary; transgender or cisgender; intersex; currently or previously pregnant; lesbian, gay, bisexual, queer, heterosexual, or asexual; or gender-conforming or gender-nonconforming. All such classifications depend, at least in part, on consideration of a person's sex. The Department therefore proposes to clarify in this section that, consistent with *Bostock* and other Supreme Court precedent, Title IX bars all forms of sex discrimination, including discrimination based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity.

*Sex characteristics.* Proposed § 106.10 would also specifically recognize that Title IX prohibits discrimination on the basis of sex characteristics. These include a person's

physiological sex characteristics and other inherently sex-based traits. *See Grimm*, 972 F.3d at 608 (quoting *Whitaker*, 858 F.3d at 1051). The prohibition on discrimination based on sex characteristics would cover, among other things, discrimination based on intersex traits. The term "intersex" generally describes people with variations in physical sex characteristics. These variations may involve anatomy, hormones, chromosomes, and other traits that differ from expectations generally associated with male and female bodies. Intersex traits are typically a result of medical conditions, including but not limited to congenital adrenal hyperplasia, Klinefelter syndrome, and androgen insensitivity syndrome. Consortium on the Management of Disorders of Sex Development, *Clinical Guidelines for the Management of Disorders of Sex Development in Childhood* at 2-7 (2006), https://dsdguidelines.org/files/clinical.pdf. Discrimination based on intersex traits is rooted in perceived differences between an individual's specific sex characteristics and those that are considered typical for their sex assigned at birth. As discussed above, discrimination based on anatomical or physiological sex characteristics (such as genitals, gonads, chromosomes, and hormone function) is inherently sex-based. Thus, intersex traits are "inextricably bound up with" sex. *Cf. Bostock*, 140 S. Ct. at 1742; *id.* at 1746 (discrimination against "persons with one sex identified at birth and another today" is sex discrimination). The Department therefore proposes to clarify that sex discrimination under Title IX includes discrimination on the basis of sex characteristics, including intersex traits.

*Sexual orientation.* Proposed § 106.10 would clarify that the regulations prohibit discrimination on the basis of sexual orientation. Although the Department has previously stated that Title IX does not prohibit discrimination based solely on sexual orientation, the Department has long maintained that Title IX prohibits discrimination and harassment based on sex stereotypes. *See, e.g.*, 85 FR at 30179; 2010 Dear Colleague Letter on Harassment and Bullying

at 8; 2001 Revised Sexual Harassment Guidance at 3. In June 2021, OCR published a notice

clarifying that, in light of the Supreme Court's decision in *Bostock*, OCR interprets Title IX's

prohibition on sex discrimination to encompass discrimination on the basis of sexual orientation.

2021 Bostock Notice of Interpretation, 86 FR at 32637. The Supreme Court in *Bostock* provided

examples to illustrate how sexual orientation discrimination is necessarily a form of sex

discrimination. In one example, the Court stated:

> Consider, for example, an employer with two employees, both of whom are
>
> attracted to men. The two individuals are, to the employer's mind, materially
>
> identical in all respects, except that one is a man and the other a woman. If the
>
> employer fires the male employee for no reason other than the fact he is attracted
>
> to men, the employer discriminates against him for traits or actions it tolerates in
>
> his female colleague. Put differently, the employer intentionally singles out an
>
> employee to fire based in part on the employee's sex, and the affected employee's
>
> sex is a but-for cause of his discharge.

*Bostock*, 140 S. Ct. at 1741. As OCR explained in the 2021 Bostock Notice of Interpretation, it

carefully reviewed the *Bostock* decision, the similarities in the text of Title VII and Title IX, the

way other Federal courts have analyzed Title IX's application to sexual orientation

discrimination and the sex-based harms that sexual orientation discrimination causes and

concluded that OCR's interpretation of Title IX should be consistent with the Supreme Court's

reasoning in *Bostock*. Other Federal courts have likewise recognized that Title IX covers sexual

orientation discrimination. *See, e.g.*, *Koenke v. Saint Joseph's Univ.*, No. CV 19-4731, 2021 WL

75778, at *2 (E.D. Pa. Jan. 8, 2021); *Doe v. Univ. of Scranton*, No. 3:19-CV-01486, 2020 WL

5993766, at *5 n.61 (M.D. Pa. Oct. 9, 2020); *Videckis v. Pepperdine Univ.*, 150 F. Supp. 3d

1151, 1159-60 (C.D. Cal. 2015).

    *Gender identity.* Proposed § 106.10 would also clarify that Title IX prohibits discrimination on the basis of an individual's gender identity. The Department has previously described its jurisdiction over gender identity discrimination in guidance documents and in filings in Federal court. *See, e.g.*, 2016 Dear Colleague Letter on Title IX and Transgender Students; 2014 Q&A on Sexual Violence at 5; Brief for the United States as Amicus Curiae Supporting Plaintiff-Appellant, *Grimm*, 822 F.3d 709 (No. 15-2056), https://www.justice.gov/crt/file/788971/download; Statement of Interest of the United States, *Tooley v. Van Buren Pub. Schs.*, No. 2:14-cv-13466-AC-DRG (E.D. Mich. Feb. 24, 2015), https://www.justice.gov/sites/default/files/crt/legacy/2015/02/27/tooleysoi.pdf. Federal courts had likewise recognized that Title IX covers gender identity discrimination. *See, e.g.*, *Grimm*, 972 F.3d at 616-19; *Whitaker*, 858 F.3d at 1049-50. However, the Department subsequently rescinded the 2016 Dear Colleague Letter on Title IX and Transgender Students and declined to assert in the 2020 amendments that Title IX prohibits discrimination on the basis of a person's gender identity. *See, e.g.*, 85 FR at 30177-79. Then, following the Supreme Court's decision in *Bostock*, the Department once again acknowledged that complaints of discrimination on the basis of transgender status "might fall within the scope of Title IX's non-discrimination mandate because they allege sex discrimination." Rubinstein Memo at 4 (citing *Bostock*, 140 S. Ct. at 1741, 1737). More recently OCR affirmed that discrimination on the basis of sex under Title IX should align with the Supreme Court's reasoning in *Bostock*. Thus, in its 2021 Bostock Notice of Interpretation, OCR made clear that, consistent with *Bostock*, it interprets Title IX's prohibition on sex discrimination to cover discrimination on the basis of gender identity. 86 FR at 32637 (citing *Bostock*'s holding that when an employer discriminates against a person for

being transgender, "the employer necessarily discriminates against that person for 'traits or actions it would not have questioned in members of a different sex'").  The proposed regulations are consistent with OCR's 2021 Bostock Notice of Interpretation and the interpretation of Federal courts that have applied *Bostock* to Title IX.

*Sex stereotypes.*  Proposed § 106.10 would clarify that discrimination based on sex stereotypes, i.e., fixed or generalized expectations regarding a person's aptitudes, behavior, self-presentation, or other attributes based on sex, is prohibited under Title IX.  The proposed regulations would codify the long-recognized principle that Title IX and other sex discrimination laws prohibit harassment and other forms of discrimination based on a person's conformity or nonconformity to stereotypical notions of masculinity and femininity.  As the Supreme Court explained in *Price Waterhouse v. Hopkins*, the assumption that persons must act and dress in a particular way based on expectations related to a person's sex is a form of discrimination on the basis of sex.  *See* 490 U.S. at 235 (plurality opinion) ("[T]he man who . . . bore responsibility for explaining to Hopkins the reasons for the Policy Board's decision to place her candidacy on hold [advised her that] in order to improve her chances for partnership . . . Hopkins should 'walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry.'"); *accord id.* at 272 (O'Connor, J., concurring in the judgment).  "[W]e are beyond the day," wrote the Court, "when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for '[i]n forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.'" *Id.* at 251 (plurality opinion) (internal citations omitted); *see also Bostock*, 140 S. Ct. at 1742-43 ("[A]n employer who fires both Hannah and Bob for failing to fulfill traditional sex stereotypes

doubles rather than eliminates Title VII liability . . . .").  Many Federal courts have applied this

principle and recognized the ways that sex stereotyping can deprive students of equal access to

education in violation of Title IX.  *See, e.g.*, *Whitaker*, 858 F.3d at 1049 ("A policy

that . . . punishes [an] individual for his or her gender non-conformance . . . violates Title IX.");

*Pederson v. La. State Univ.*, 213 F.3d 858, 880 (5th Cir. 2000) (recognizing that a university

violated Title IX when its funding decisions in athletics were based on "paternalism and

stereotypical assumptions about [women's] interests and abilities," and a "remarkably outdated

view of women and athletics"); *Videckis*, 150 F. Supp. 3d at 1160 ("It is undisputed that Title IX

forbids discrimination on the basis of gender stereotypes."); *Pratt v. Indian River Cent. Sch.*

*Dist.*, 803 F. Supp. 2d 135, 152 (N.D.N.Y. 2011) (holding that allegations of peer harassment

based on nonconformity or perceived nonconformity with sex stereotypes state a claim under

Title IX); *Seiwert v. Spencer-Owen Cmty. Sch. Corp.*, 497 F. Supp. 2d 942, 953 (S.D. Ind. 2007)

(holding that harassment for "acting in a manner that did not adhere to the traditional male

stereotypes" states a Title IX claim); *Riccio v. New Haven Bd. of Educ.*, 467 F. Supp. 2d 219,

226 (D. Conn. 2006) ("The language set forth in the [2001] OCR Guidance and the holding in

*Oncale* clearly support the conclusion that a female student, subjected to pejorative, female

homosexual names by other female students, can bring a claim of sexual harassment under Title

IX."); *Theno v. Tonganoxie Unified Sch. Dist. No. 464*, 377 F. Supp. 2d 952, 965, 973 (D.

Kansas 2005) ("[A] rational trier of fact could conclude that plaintiff was harassed because his

harassers perceived that he did not act as they believed a man (or perhaps more accurately a

teenage boy) should act" when he was harassed for failing "to satisfy his peers' stereotyped

expectations for his gender"); *Montgomery v. Indep. Sch. Dist. No. 709*, 109 F. Supp. 2d 1081,

1092 (D. Minn. 2000) (stating that a reasonable factfinder "could infer that [plaintiff] suffered

harassment due to his failure to meet masculine stereotypes"); *cf. United States v. Virginia*, 518 U.S. 515, 533 (1996) (stating that in making classifications based on sex, the State "must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females").

Title IX's prohibition on discrimination on the basis of sex stereotypes is also embedded in the current regulations and OCR's historical guidance documents. *See, e.g.*, 34 CFR 106.34(b)(4) (prohibiting single-sex classes that rely on "overly broad generalizations about the different talents, capacities, or preferences of either sex"); 34 CFR 106.45(b)(1)(iii) ("Any materials used to train Title IX Coordinators, investigators, decisionmakers, and any person who facilitates an informal resolution process, must not rely on sex stereotypes and must promote impartial investigations and adjudications of formal complaints of sexual harassment."); 2001 Revised Sexual Harassment Guidance at 3 ("[G]ender-based harassment, which may include acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on sex or sex-stereotyping, but not involving conduct of a sexual nature, is also a form of sex discrimination to which a school must respond . . . ." (footnote omitted)). The proposed addition of this new section would be consistent with these provisions and increase clarity of Title IX's coverage of discrimination based on sex stereotypes.

*Pregnancy or related conditions.* Proposed § 106.10 would also clarify that the regulations prohibit discrimination based on pregnancy or related conditions, consistent with the Department's longstanding interpretation of Title IX and as explained in more detail in the discussion of proposed amendments to §§ 106.2, 106.21, 106.40, 106.51, and 106.57 in Pregnancy and Parental Status (Section III).

In sum, the Department proposes to clarify Title IX's scope in proposed § 106.10 to more

closely align with Title IX's text, purpose, and principles articulated in Federal case law and to more effectively protect people from all forms of sex discrimination under federally funded education programs and activities.

Section 106.31(a) Education programs or activities – general

*Current regulations:* Section 106.31(a) describes generally the conduct prohibited by Title IX and notes the limited application of this subpart to admissions to certain classes of institutions.

*Proposed regulations:* The Department proposes adding the word "otherwise" in redesignated paragraph (a)(1) and renumbering the paragraph accordingly. The Department also proposes adding a new paragraph (a)(2) to clarify that in the limited circumstances in which Title IX or the regulations permit different treatment or separation on the basis of sex, a recipient must not carry out such different treatment or separation in a manner that discriminates on the basis of sex by subjecting a person to more than de minimis harm, unless otherwise permitted by Title IX or the regulations. Proposed § 106.31(a)(2) would clarify that adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with their gender identity subjects a person to more than de minimis harm on the basis of sex.

*Reasons:* Adding the word "otherwise" before "be subjected to discrimination under" would clarify that denial of benefits based on sex and exclusion from participation based on sex are themselves forms of prohibited sex discrimination. The statute and current regulations generally use the term "discrimination" to describe any form of prohibited conduct under Title IX or the regulations—including when a person is, on the basis of sex, excluded from participation in or denied the benefits of an education program or activity receiving Federal financial assistance. *See, e.g.*, 20 U.S.C. 1681(a) (titled "Prohibition against discrimination"); 34 CFR part 106 (titled "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal

529

Financial Assistance"); 34 CFR 106.1 (Title IX is "designed to eliminate (with certain exceptions) discrimination on the basis of sex"). Regulations implementing other civil rights laws with similar statutory language also use the term "otherwise" in this context to make clear that "discrimination" is an umbrella term describing all conduct prohibited by the statute. *See, e.g.*, 34 CFR 100.1, 100.3(a) (Title VI); 34 CFR 104.4(a), 104.4(b)(5), 104.21, 104.43(a), 104.44(d) (Section 504).

Proposed § 106.31(a)(2) would clarify that in the discrete circumstances when Title IX or the regulations permits a recipient to separate or treat persons differently on the basis of sex, a recipient must not do so in a manner that discriminates on the basis of sex by subjecting a person to more than de minimis harm unless otherwise permitted by Title IX or the regulations.

When a recipient separates girls and boys, or women and men, or applies different rules to them, it treats such persons "on the basis of [sex]." This understanding of sex-based different treatment does not depend on any particular definition of the term "sex." A recipient's action is based on sex, for example, if it relies upon "biological distinctions between male and female." *Cf. Bostock*, 140 S. Ct. at 1739.

Since 1975, the Department's regulations have specified that such separate or differential treatment on the basis of sex is presumptively a form of prohibited sex discrimination. *See, e.g.*, 34 CFR 106.31(b)(4), (7) ("Except as provided in this subpart, in providing any aid, benefit, or service to a student, a recipient shall not, on the basis of sex . . . [s]ubject any person to separate or different rules of behavior, sanctions, or other treatment; [or] [o]therwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity."); *see also id.* at 106.34(a) ("Except as provided for in this section or otherwise in this part, a recipient shall not provide or otherwise carry out any of its education programs or activities separately on the basis of

530

sex . . . ."); *id.* at 106.41(a) ("No person shall, on the basis of sex, be excluded from participation

in, be denied the benefits of, be treated differently from another person or otherwise be

discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered

by a recipient, and no recipient shall provide any such athletics separately on such basis.").

These regulations, which were the subject of a congressional hearing before they took effect and

which Congress did not take steps to disapprove,[12] reflect the understanding that subjecting

students to differential treatment on the basis of their sex in the education context is

presumptively harmful, including because such differential treatment is often based upon, and

thus perpetuates, "overbroad generalizations about the different talents, capacities, or

preferences" of the sexes. *Virginia*, 518 U.S. at 533.

     Nevertheless, the Department has never treated all distinctions based on sex as

impermissible discrimination. The Department's regulations have recognized limited contexts in

which recipients are permitted to employ sex-specific rules or to separate students on the basis of

sex because the Department has determined that in those contexts such treatment does *not*

generally impose harm on students. *See, e.g.*, 34 CFR 106.33 (toilet, locker room, and shower

facilities); *id.* at 106.34(a)(3) (human sexuality classes).

---

[12] In 1974, HEW proposed regulations that contained earlier, materially identical versions of these general, presumptive prohibitions on sex-based separation and differential treatment. *See* 39 FR 22228, 22235-36 (1974) (proposing 45 CFR 86.31(b)(4) & (8), 86.34(a), 86.38(a)). President Ford approved those regulations and submitted them to the Speaker of the House and the President of the Senate for review pursuant to Section 431(d)(1) of the GEPA, under which Congress had 45 days in which to assess whether the rule was "inconsistent with the Act from which it derives its authority, and disapprove such final regulation." Pub. L. 93-380, 88 Stat. 567, § 431(d)(1), previously codified at 20 U.S.C. 1232(d)(1). Congress did not take any steps to disapprove the regulations because of these provisions, and the final regulations, which included the same provisions, were published on June 4, 1975, and went into effect on July 21, 1975. *See* 40 FR 24128, 24141-42 (1975).

Although the Department has the authority to interpret the statute and promulgate regulations, its regulations must not contradict the express provisions of the statute. Rather, those regulatory provisions are premised on the understanding that in certain situations, the fact that a recipient employs a sex-based distinction or separation does not, as such, amount to "discrimination" that Title IX forbids in the first place. In particular, to the extent separation or different treatment based on sex imposes no harm or only de minimis harm, it will not amount to discrimination on the basis of sex under Title IX. *Cf. Oncale*, 523 U.S. at 81 (Title VII does not reach non-harmful "differences in the ways men and women routinely interact with" each other.)

There may be, however, circumstances in which even generally permissible sex-based treatment would cause more than de minimis harm to protected individuals. Proposed § 106.31(a)(2) would clarify that in these circumstances, the harmful treatment would be discriminatory and therefore prohibited by Title IX, unless otherwise permitted by the statute or regulations. *See Peltier v. Charter Day Sch., Inc.*, Nos. 20-1001, 20-1023, 2022 WL 2128579, at *16 (4th Cir. June 14, 2022) (en banc) ("for the plaintiffs to prevail under Title IX, they must show that . . . the challenged action caused them harm, which may include 'emotional and dignitary harm'" (internal citation omitted)); *cf. Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59-60 (2006) ("No one doubts that the term 'discriminate against' refers to distinctions or differences in treatment that injure protected individuals."); *see also Threat v. City of Cleveland*, 6 F.4th 672, 678 (6th Cir. 2021) ("To 'discriminate' reasonably sweeps in some form of an adversity and a materiality threshold.").

Such harm may result, for example, if the sex separation or differential treatment is based upon, and thus perpetuates, "overbroad generalizations about the different talents, capacities, or preferences" of the sexes, *Virginia*, 518 U.S. at 533, or upon other harmful sex stereotypes. *See*

34 CFR 106.34(b)(4)(i) (requiring recipients to ensure that single-sex classes and activities permitted under the regulations do not rely upon "overly broad generalizations about the different talents, capacities, or preferences of either sex").

In addition, prohibited harm may result when a recipient applies a generally permissible sex-based policy, or makes an otherwise permissible sex-based distinction, in a manner that discriminates against one or more protected individuals by subjecting them to more than de minimis harm on the basis of sex. In these situations, even when a recipient's sex-specific treatment or separation does not materially harm *most* students to whom it applies, and therefore may generally be maintained by a recipient, Title IX prohibits its application to those individual students who would suffer more than de minimis harm on the basis of sex. *See, e.g.*, *Grimm*, 972 F.3d at 617-18 (applying Title IX's statutory prohibition against discrimination on the basis of sex when sex-based separation caused harm). This is because the statute specifies that "no person" shall be subjected to discrimination on the basis of sex in a federally funded education program or activity unless otherwise permitted by the statute. In *Bostock*, the Court explained that Title VII's prohibition on discrimination against an "individual" means that the "focus should be on individuals, not groups." 140 S. Ct. at 1740. Use of the term "person" in Title IX compels the same conclusion. *See Jackson*, 544 U.S. at 180 ("Congress enacted Title IX not only to prevent the use of federal dollars to support discriminatory practices, but also 'to provide individual citizens effective protection against those practices.'" (quoting *Cannon*, 441 U.S. at 704 (stating that, in enacting Title IX, Congress "wanted to provide individual citizens effective protection against those [discriminatory] practices"))).

In particular, courts have recognized that a recipient subjects students to such harm when it bars them from accessing otherwise permissible sex-separate facilities or activities consistent

with their gender identity. *See, e.g.*, *Whitaker*, 858 F.3d at 1045-46 (discussing district court's findings, based on expert testimony, that denying transgender student's access to a sex-separate education program or activity consistent with his gender identity imposed significant harm on his mental health and overall well-being); *Grimm*, 972 F.3d at 617-18 (holding that evidence that a transgender boy suffered physical, emotional, and dignitary harms as a result of being denied access to a sex-separate program or activity consistent with his gender identity was sufficient to constitute harm under Title IX); *B.P.J. v. W. Va. State Bd. of Educ.*, 550 F. Supp. 3d 347, 356 (S.D. W. Va. 2021) (finding a likelihood of success on middle school student's Title IX claim challenging a State law excluding her from a sex-separate education program or activity because she alleged that the law "both stigmatizes and isolates" her); *Bd. of Educ. of the Highland Loc. Sch. Dist.*, 208 F. Supp. 3d at 870-71 (describing stigma and isolation caused by district's exclusion of transgender girl from a sex-separate education program or activity consistent with her gender identity).[13]

For these reasons, proposed § 106.31(a)(2) would make clear that preventing any person from participating in an education program or activity consistent with their gender identity would subject them to more than de minimis harm on the basis of sex and therefore be prohibited, unless otherwise permitted by Title IX or the regulations.

Some members of the public have urged the Department that Title IX does not prohibit harms that result when a student is separated or treated differently based on sex in a way that is

---

[13] Research suggests that school policies that permit students to participate consistent with their gender identity may be associated with better mental health. *See, e.g*., Stephen T. Russell et al., *Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior among Transgender Youth*, 63 J. Adolescent Health 503, 505 (2018), https://pubmed.ncbi.nlm.nih.gov/29609917 (describing gender-affirming policies that "likely enhance safety and reduce physical and mental health disparities for transgender populations").

inconsistent with their gender identity. These members of the public have argued that preventing transgender students from accessing sex-separate spaces and programs consistent with their gender identity will serve to protect other students from harms to their safety, privacy, and comfort. The Department recognizes schools' legitimate interest in protecting the safety and privacy of all students. Yet schools can and do protect those interests without also causing harm to other students by excluding them from sex-separate spaces and programs. *See, e.g.*, Rehearing Amicus Brief of School Administrators from Twenty-Nine States and the District of Columbia in Support of Plaintiff-Appellee Gavin Grimm, *Grimm*, 972 F.3d 586 (No. 19-1952), 2019 WL 6341095. Indeed, Federal courts have rejected claims that treating students consistent with their gender identity harms cisgender students in violation of Title IX, and have specifically addressed and dismissed unsubstantiated concerns about privacy and safety associated with treating people consistent with their gender identity. *See, e.g.*, *Grimm*, 972 F.3d at 626 (Wynn, J., concurring) (describing and debunking "transgender predator" myth); *Whitaker*, 858 F.3d at 1052 (holding that transgender student's presence provides no more of a risk to other students' privacy rights than does the presence of any other student in a sex-separate space); *Doe v. Boyertown Area School District*, 897 F.3d 518, 521 (3d Cir. 2018) (same); *Parents for Priv. v. Barr*, 949 F.3d 1210, 1228-29 (9th Cir.), *cert. denied*, 141 S. Ct. 894 (2020) (holding that "[t]he use of facilities for their intended purpose, without more, does not constitute an act of harassment simply because a person is transgender"); *Cruzan v. Special Sch. Dist.* # 1, 294 F.3d 981, 984 (8th Cir. 2002) (per curiam) (holding that transgender woman's mere presence in a sex-separate space did not constitute actionable sexual harassment of her female co-workers). The Supreme Court has also rejected the notion that the preferences or discomfort of some can justify otherwise unconstitutional discrimination against others. *See City of Cleburne v. Cleburne Living Ctr.*, 473

U.S. 432, 450 (1985).

Proposed § 106.31(a)(2) would also recognize that, despite Title IX's general prohibition on sex discrimination against an individual, there are circumscribed situations in which Title IX or the regulations permit a recipient to separate students on the basis of sex, even where doing so may cause some students more than de minimis harm. For example, 20 U.S.C. 1681 specifically exempts certain sex-specific practices of certain designated entities from coverage by Title IX's antidiscrimination mandate. *See, e.g.*, 20 U.S.C. 1681(a)(5) (stating that 20 U.S.C. 1681 shall not apply to the admissions practices of traditionally single sex public institutions of undergraduate higher education); 20 U.S.C. 1681(a)(6) (stating that 20 U.S.C. 1681 shall not apply to the membership practices of social fraternities or sororities or certain voluntary youth organizations). Congress also enacted a specific, separate provision of Title IX with respect to living facilities, which provides that "[n]otwithstanding anything to the contrary contained in [Title IX]," including Title IX's general prohibition on sex discrimination by recipients of federal funds in 20 U.S.C. 1681, nothing in Title IX "shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes." 20 U.S.C. 1686. Of Title IX's voluminous legislative history, the debate over 20 U.S.C. 1686 fills only a few pages, all of which focus on the narrow question of whether Title IX should be understood to mandate coeducational living in all instances in light of the then-growing prevalence of coeducational dormitories. Rep. Standish Thompson of Georgia introduced an amendment that "simply would state that nothing contained herein shall preclude any educational institution from maintaining separate living facilities because of sex." 117 Cong. Rec. 39260 (1971) (statement of Rep. Standish Thompson). Rep. Thompson further stated that "[a]ll this amendment does is to allow for different living accommodations for the sexes,"

and urged his colleagues to support it—as they did, without recorded opposition. *Id.* at 39263. The Department's current view is thus that regardless of whether some students might experience more than de minimis harm if excluded from a particular sex-separate living facility on the basis of sex, Congress has nonetheless permitted that exclusion. Congress's choice to specify limited circumstances where harm resulting from sex separation is permitted illustrates that, outside of those contexts, Title IX's general prohibition on sex discrimination prohibits such harm.

Moreover, 20 U.S.C. 1686 itself affects only one aspect of Title IX's nondiscrimination mandate, even within the context of "living facilities." Schools may maintain "separate living facilities for the different sexes." 20 U.S.C. 1686. The Department's regulations, however, have long provided that housing offered for students of one sex must "as a whole" be "[c]omparable in quality and cost" to the housing offered to students of the other sex. 34 CFR 106.32(b)(2)(ii). The Supreme Court's observation that Title IX's protection against discrimination must be construed broadly reinforces that view. *N. Haven Bd. of Educ.*, 456 U.S. at 521 ("[I]f we are to give Title IX the scope that its origins dictate, we must accord it a sweep as broad as its language." (citations and internal alterations omitted)).

The Department also recognizes that exclusion from a particular male or female athletics team may cause some students more than de minimis harm, and yet that possibility is allowed under current § 106.41(b). The Department's authority to permit such different treatment in the context of athletics is described in the discussion of § 106.41.

In addition, the regulations also specify circumstances in which a recipient may not afford students of one sex preferential benefits or treatment that it denies to students of the other sex—another form of prohibited sex discrimination. *See, e.g.*, 34 C.F.R. 106.33 (providing that a

recipient "may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex"); *id.* at 106.34(b) (providing that nonvocational coeducational elementary or secondary schools may provide nonvocational single-sex classes or extracurricular activities if doing so is "substantially related to achieving" an "important" objective, but only if, inter alia, "[t]he recipient provides to all other students, including students of the excluded sex, a substantially equal coeducational class or extracurricular activity in the same subject or activity").

***

The Department has previously articulated inconsistent interpretations with respect to how a recipient must treat a student's gender identity when the recipient is otherwise permitted to separate or treat students differently on the basis of sex. Between 2013 and 2016, the Department investigated and resolved complaints to address noncompliance with Title IX regarding schools' denial of transgender students' access to education programs or activities consistent with their gender identity and issued policy guidance explaining how Title IX bars gender identity discrimination. *See, e.g.*, Arcadia Resolution Letter and Agreement; 2016 Dear Colleague Letter on Title IX and Transgender Students.

In 2017, however, the Department withdrew the 2016 Dear Colleague Letter on Title IX and Transgender Students to "further and more completely consider the legal issues involved." *See* 2017 Dear Colleague Letter on Transgender Students. In 2020, in a letter subsequently archived and marked not for reliance, the Department asserted in the context of an enforcement case that permitting transgender girls to participate on a girls' athletics team denied cisgender girls athletic benefits and opportunities in violation of Title IX. *See* Revised CIAC Letter at 3-4.

Then, in January 2021, in a memorandum subsequently archived and marked not for reliance, the Department interpreted its Title IX regulations to require that a recipient rely on a student's "biological" sex in circumstances in which sex separation or sex-specific treatment is permitted under Title IX and these regulations, based on the argument that this was "the ordinary public meaning of the term 'sex' at the time of Title IX's enactment," that the original implementing regulations included provisions acknowledging "physiological differences between the male and female sexes," and that this has been "OCR's longstanding construction" of the term. Rubinstein Memorandum at 2, 3 (quoting 85 FR 30178), 7, 9, 12-13. The Department also stated that refusing to treat a student consistent with their gender identity generally would not violate Title IX. *See* Rubinstein Memorandum at 4; *see also* U.S. Dep't of Educ., Office for Civil Rights, Letter from Assistant Secretary Kenneth L. Marcus to Representative Mark E. Green (Mar. 9, 2020), http://www.ed.gov/ocr/correspondence/congress/20200309-title-ix-and-use-of-preferred-pronouns.pdf. The Rubinstein Memorandum explained that the Department was not persuaded by the decisions of Federal appellate courts to the contrary. Rubinstein Memorandum at 10-11.

In the June 2021 Title IX Public Hearing, in listening sessions, and during meetings held under Executive Order 12866 in 2022, stakeholders urged the Department to clarify that Title IX's prohibition on sex discrimination includes discrimination based on gender identity following the Supreme Court's ruling in *Bostock* and that it also prohibits recipients from treating transgender students based upon their actual or perceived physiological characteristics rather than their gender identity. Stakeholders specifically expressed concern about how regulatory provisions that permit sex separation and sex-specific norms have been implemented in ways that harm transgender students and explained how barriers to participating in school consistent with those students' gender identity cause a range of serious dignitary, academic,

social, psychological, and physical harms.

The Department has reevaluated its approach to Title IX's application to discrimination based on gender identity after reviewing and considering the scope of Title IX's nondiscrimination mandate, interpretations of Federal courts, public feedback, and the standards OCR has long applied to evaluate compliance with current § 106.41. The Department's further review confirms that the interpretations articulated in statements such as the Rubinstein Memorandum and Revised CIAC Letter are inconsistent with the text and purpose of the Title IX statute and regulations.

Contrary to assertions made in 2020 and January 2021, the Department does not have a "long-standing construction" of the term "sex" in Title IX to mean "biological sex." The text of the statute and current regulations do not resolve this issue; neither the statute nor the regulations define "sex," purport to restrict the scope of sex discrimination to biological considerations, or even use the term "biological." The Department does not construe the term "sex" to necessarily be limited to a single component of an individual's anatomy or physiology. Further, the Department need not define "sex," as explained in more detail above in the discussion of proposed § 106.10. Just as the Supreme Court in *Bostock* declined to engage in the parties' debate over dictionary definitions, the Department also focuses in its proposed regulations on "what [the law] says about" sex in context. 140 S. Ct. at 1739. As the regulations have stated since they were first issued in 1975, the purpose of the Department's Title IX regulations is to effectuate the statute, "which is designed to eliminate (with certain exceptions) discrimination on the basis of sex in any education program or activity receiving Federal financial assistance." 34 CFR 106.1. In any event, and as *Bostock* demonstrates, treating individuals in a particular way on the basis of "biological distinctions between male and female," 140 S. Ct. at 1739, is action

taken "on the basis of" sex, however else the term "sex" might also be defined. And, as

discussed above, if such sex-based action results in more than de minimis harm to an individual,

it constitutes prohibited sex discrimination unless permitted by the statute or the regulations.

When a person is denied access to education programs or activities consistent with their gender

identity, it causes them more than de minimis harm on the basis of sex. Therefore, such

treatment generally violates Title IX's prohibition on discrimination to the extent it causes more

than de minimis harm and unless otherwise permitted by Title IX or the regulations, and the

Department's regulations should effectuate that prohibition. 20 U.S.C. 1682.

Section 106.41 Athletics

*Current regulations:* Although paragraph (a) of current § 106.41 establishes a baseline rule that

"[n]o person shall, on the basis of sex, be . . . treated differently from another person . . . in any

interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no

recipient shall provide any such athletics separately on such basis," paragraph (b) authorizes a

recipient to offer male and female athletic teams when selection for such teams is based upon

competitive skill or the activity involved is a contact sport. However, when a recipient operates

or sponsors a team in a particular sport for members of one sex but operates or sponsors no such

team for members of the excluded sex, and athletics opportunities for members of that sex have

previously been limited, members of the excluded sex must be allowed to try out for the team

offered unless the sport involved is a contact sport. Paragraph (b) also lists examples of contact

sports. Paragraph (c), in turn, establishes that even where a recipient does offer male and female

teams, "[a] recipient . . . shall provide equal athletic opportunity" for the sexes.

*Proposed regulations:* None. The Department does not propose any particular changes to §

106.41 at this time. The Department instead plans to issue a separate notice of proposed

rulemaking to address whether and how the Department should amend § 106.41 in the context of sex-separate athletics, pursuant to the special authority Congress has conferred upon the Secretary to promulgate reasonable regulations with respect to the unique circumstances of particular sports. Specifically, the Department plans to address by separate notice of proposed rulemaking the question of what criteria, if any, recipients should be permitted to use to establish students' eligibility to participate on a particular male or female athletics team. The scope of public comment on this notice of proposed rulemaking therefore does not include comments on that issue; those comments should be made in response to that separate rulemaking.

*Reasons*: Athletics has long been recognized by Federal courts, Congress, and the Department as an integral part of a recipient's education program or activity subject to Federal civil rights requirements. *See, e.g.*, U.S. Dep't of Health, Educ., and Welfare, *Final Rule: Nondiscrimination on the Basis of Sex In Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance*, 40 FR 24128, 24134 (June 4, 1975) (citing cases); U.S. Dep't of Health, Educ., and Welfare, Office for Civil Rights, A Policy Interpretation: Title IX and Intercollegiate Athletics, 44 FR 71413 (Dec. 11, 1979),

https://www.govinfo.gov/content/pkg/FR-1979-12-11/pdf/FR-1979-12-11.pdf; *N. Haven Bd. of Educ.*, 456 U.S. at 516, 531-32 (noting that the Title IX regulations cover athletics and describing congressional review of those regulations). School-based athletic programs have been associated with many physical, emotional, academic, and interpersonal benefits for students, and athletics participation has the potential to help students develop skills that benefit them in school and throughout life, including teamwork, discipline, resilience, leadership, confidence, social skills, and physical fitness. *See, e.g.*, Scott L. Zuckerman et al., *The Behavioral, Psychological, and Social Impacts of Team Sports: A Systematic Review and Meta-analysis*, 49 Physician &

Sports Med. 246 (2021); Ryan D. Burns et al., *Sports Participation Correlates With Academic Achievement: Results From a Large Adolescent Sample Within the 2017 U.S. National Youth Risk Behavior Survey*, 127 Perceptual & Motor Skills 448 (2020); *Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 916 (7th Cir. 2012) ("The impact of Title IX on student athletes is significant and extends long beyond high school and college; in fact, numerous studies have shown that the benefits of participating in team sports can have life-long positive effects on women." (citations omitted)).

Despite the general principle that differential treatment or separation based on sex presumptively results in prohibited sex-based discrimination, Congress has authorized the Department to approach athletics in a distinct manner. In 1974, responding to concerns that Title IX would disrupt intercollegiate athletics, Congress enacted the Javits Amendment as part of the Education Amendments of 1974 to specifically authorize the Department to promulgate reasonable regulations in the context of athletics in light of "the nature of particular sports." Education Amendments of 1974, Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (1974). The Javits Amendment states:

> The [HEW] Secretary shall prepare and publish, not later than 30 days after the
> date of enactment of this Act, proposed regulations implementing the provisions
> of title IX of the Education Amendments of 1972 relating to the prohibition of sex
> discrimination in federally assisted education programs which shall include with
> respect to intercollegiate athletic activities reasonable provisions considering the
> nature of particular sports.

*Id.*; *see also* S. Conf. Rep. 93-1026, 1974 U.S.C.C.A.N. 4206, 4271. The Secretary responded to this congressional direction by promulgating a regulation permitting sex separation in athletics in

certain circumstances in "any interscholastic, intercollegiate, club or intramural athletics offered by a recipient." 45 CFR 86.41(a) (1975); *see also* U.S. Dep't of Health, Educ., and Welfare, Sex Discrimination in Athletic Programs, 40 FR 52655 (Nov. 11, 1975). Under Section 431(d)(1) of GEPA, Congress had forty-five days to find that HEW's "final regulation is inconsistent with the Act from which it derives its authority, and disapprove such final regulation." Congress did not take any steps to disapprove the regulation, and the regulation went into effect on July 21, 1975.

The 1975 athletics regulation, still in effect today, provides that when selection for athletic teams is based upon competitive skill or the activity involved is a contact sport, a recipient may offer teams either separately by sex or on a coeducational basis. The Department made clear that, in some instances, individual students may be denied access to particular teams as a result of such decisions, so long as "equal opportunity" is ensured across "the totality of the athletic program of the institution rather than each sport offered." 40 FR at 52656. As one court explained, the regulations grant some "flexibility to the recipient of federal funds to organize its athletic program as it wishes, so long as the goal of equal athletic opportunity is met." *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 171 (3d Cir. 1993).

Thus, the Education Amendments of 1974 established that, as to intercollegiate athletics, Congress contemplated that the Department might promulgate regulations that permit sex separation in contexts and in a manner that Title IX might otherwise prohibit, as long as such regulations are "reasonable" and result in overall equality in athletic opportunities for the sexes. Congress's effective approval of the 1975 HEW regulation reflects a further legislative understanding that, even apart from the intercollegiate setting, the Department's regulations could allow recipients to adopt rules for male and female teams that may result in a denial of participation for individual students. These developments embody a longstanding congressional

view that athletics presents unique considerations, and that therefore the Department may promulgate regulations to account for those considerations in ways that may sometimes deprive individual students, based on sex, of opportunities to fully participate on particular athletic teams, as long as the regulations are otherwise reasonable and require a recipient to provide equal athletics opportunities in its program as a whole.

Consistent with Title IX and with Congress's decision to afford the Secretary special discretion to promulgate regulations in the unique context of athletics, the Department will consider, in a separate notice of proposed rulemaking, amendments to § 106.41 to address whether and how the Department should amend § 106.41 in the context of sex-separate athletics, pursuant to the special authority Congress has conferred upon the Secretary to promulgate reasonable regulations with respect to the unique circumstances of particular sports, including what criteria, if any, recipients should be permitted to use to establish students' eligibility to participate on a particular male or female athletics team.

V. Retaliation

*Statute:* Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance," 20 U.S.C. 1681(a), but does not specifically mention retaliation for the exercise of rights under Title IX. Although it is not explicit in the statutory language of Title IX, the Supreme Court and the Department have long interpreted Title IX to prohibit retaliation. The Department has the authority to regulate with regard to discrimination on the basis of sex in education programs or activities receiving Federal financial assistance, specifically under 20 U.S.C. 1682 and generally under 20 U.S.C. 1221e-3 and 3474.

Case 3:21-cv-00308-CEA-DCP   Document 83-1   Filed 06/27/22   Page 546 of 701   PageID #: 1779

Section 106.2 Definitions of "retaliation" and "peer retaliation"

*Current regulations:* The current regulations do not define "retaliation," however, current § 106.71(a) specifies the conduct that constitutes prohibited retaliation. Current § 106.71(a) states in part that "[n]o recipient or other person may intimidate, threaten, coerce, or discriminate against another individual for the purpose of interfering with any right or privilege secured by title IX or this part, or because the individual has made a report or complaint, testified, assisted, or refused to participate in any manner in an investigation, proceeding, or hearing under this part."

The current regulations do not include a definition of "peer retaliation," or use the term "peer retaliation," however, current § 106.71(a) prohibits a "recipient or other person" from retaliating against "any individual."

*Proposed regulations:* The Department proposes defining the term "retaliation" in § 106.2 to mean intimidation, threats, coercion, or discrimination against any person by the recipient or by a specific individual affiliated with the recipient, including a student, an employee, or a person who provides aid, benefit, or service on behalf of the recipient.

The proposed definition would encompass both retaliation by the recipient, including through its employees or others who are authorized by the recipient to provide aid, benefit, or service under the recipient's education program or activity, and retaliation by students against other students. For clarity, the Department proposes defining the term "peer retaliation" separately in proposed § 106.2.

The proposed definition would further clarify that these actions would constitute retaliation if they are taken for the purpose of interfering with any right or privilege secured by Title IX or the Department's Title IX regulations, or because the person has reported

information, made a complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under the regulations, including in an informal resolution process under proposed § 106.44(k), in grievance procedures under proposed § 106.45, and if applicable proposed § 106.46, and in any other appropriate steps taken by a recipient under proposed § 106.44(f)(6) in response to sex discrimination.

*Reasons: Retaliation generally.*  Although the current regulations do not define the term "retaliation," retaliatory conduct is prohibited under the current regulations in § 106.71. Retaliation was also prohibited prior to the 2020 amendments, also in § 106.71, which had been included in the initial 1975 implementing regulations under Title IX.  This initial version of § 106.71 incorporated by reference the Title VI regulations' procedural provisions, including Title VI's prohibition on retaliation at § 100.7(e).  The Supreme Court has also recognized Title IX's prohibition on retaliation, holding in *Jackson* that retaliation against a person for complaining of sex discrimination is "discrimination 'on the basis of sex'" in violation of Title IX.  544 U.S. at 173-74 ("Retaliation against a person because that person has complained of sex discrimination . . . is discrimination 'on the basis of sex' because it is an intentional response to the nature of the complaint: an allegation of sex discrimination.").  The Court also explained that retaliation by an employee against a person who complains of sex discrimination can be attributed to a recipient.  *See, e.g.*, *id.* at 171-74 (considering the plaintiff's supervisors' negative performance evaluations and the school board's decision to remove the plaintiff as a coach to be conduct by the recipient for purposes of the plaintiff's retaliation claim); *id.* at 183 (stating that retaliation "is easily attributable to the funding recipient, and it is always—by definition— intentional").

The Department did not propose amending the Title IX regulations to address retaliation

Case 3:21-cv-00308-CEA-DCP   Document 83-1   Filed 06/27/22   Page 548 of 701   PageID #: 1781

more specifically in the 2018 NPRM.  However, in response to the 2018 NPRM, the Department received comments regarding the prevalence of retaliation in the context of complaints of sexual harassment.  These comments stated that the existing protections against retaliation were inadequate to protect participants in a recipient's grievance procedures, and commenters urged the Department to adopt an explicit prohibition on retaliation in its regulations implementing Title IX.  In response, the Department codified current § 106.71 as part of the 2020 amendments to explicitly prohibit retaliation, 85 FR at 30535-38, and moved the incorporation of the remaining Title VI procedural protections to current § 106.81.  The Department explained in the preamble to the 2020 amendments that it added the explicit prohibition on retaliation because otherwise "reporting may be chilled."  *Id.* at 30536.

The Department now proposes separating the prohibition on retaliation in current § 106.71(a) into three distinct but related provisions: a definition of "retaliation" in proposed § 106.2, a definition of "peer retaliation" in proposed § 106.2, and a prohibition on retaliation in proposed § 106.71.  The Department proposes this revision to enhance clarity for recipients regarding their obligations related to retaliation under Title IX, which may differ from their obligations under other Federal statutes that also prohibit retaliation.  *See, e.g.*, *Peters v. Jenney*, 327 F.3d 307, 320-21 (4th Cir. 2003) (stating that retaliation is prohibited under Title VI); *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002) (stating that retaliation is prohibited under the ADA, the Age Discrimination in Employment Act, and Title VII); *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1949 (2018) (stating that retaliation for exercising First Amendment rights is prohibited under 42 U.S.C. 1983); 42 U.S.C. 2000e-3(a) (prohibiting

retaliation in employment under Title VII.[14]  In order to ensure that the prohibition on retaliation in the Department's Title IX regulations adequately identifies retaliatory conduct prohibited by Title IX's statutory and regulatory framework, the Department proposes defining "retaliation" and "peer retaliation" in proposed § 106.2 in a manner that would identify the scope of the retaliatory conduct under Title IX.

Substantively, the proposed definitions of "retaliation" and "peer retaliation" in proposed § 106.2 would encompass the same conduct as current § 106.71(a), but would clarify that such conduct is retaliatory when undertaken against a student, employee, or third party participating or attempting to participate in the recipient's program or activity by a student, employee, or person authorized by the recipient to provide aid, benefit, or service under the recipient's education program or activity.  This clarification would align with the Department's proposed definitions of "complainant" and "sex-based harassment" in § 106.2, which also refer to students, employees, or persons authorized by the recipient to provide aid, benefit, or service under the recipient's education program or activity, or third persons participating or attempting to participate in a recipient's education program or activity.

In its proposed definitions of "retaliation" and "peer retaliation" in § 106.2, the

---

[14] The regulations implementing each of the Federal civil rights laws enforced by the Department contain prohibitions on retaliation.  34 CFR 100.7(e) (Title VI); 34 CFR 104.61 (Section 504) (incorporating 34 CFR 100.7(e) by reference); 34 CFR 108.9 (Boy Scouts of America Equal Access Act) (incorporating 34 CFR 100.7(e) by reference); 28 CFR 35.134 (Title II); 34 CFR 110.34 (Age Discrimination Act of 1975).  Although the Department's implementing regulations for Section 504 and the Boy Scouts of America Equal Access Act incorporate Title VI's prohibition on retaliation wholesale, its implementing regulations for the Age Discrimination Act and the Department of Justice's implementing regulations for Title II include their own prohibitions on retaliation, which differ from the Title VI regulation to address issues unique to those statutes.  *See, e.g.*, 34 CFR 110.34 (expressly prohibiting retaliation in mediation and conciliation processes, which are required under the Age Discrimination Act).

Department would maintain the requirement in current § 106.71(a) that conduct that meets the definition of "retaliation" is undertaken for the purpose of interfering with a right or privilege under Title IX or because someone participated or refused to participate in an investigation, proceeding, or hearing under Title IX.  Participating or refusing to participate in a Title IX investigation, proceeding, or hearing includes an informal resolution process under proposed § 106.44(k), grievance procedures under proposed § 106.45, and if applicable proposed § 106.46, and any other appropriate prompt and effective steps to ensure that sex discrimination does not continue or recur within the recipient's education program or activity under proposed § 106.44(f)(6).  The Department proposes these changes after considering comments received during the June 2021 Title IX Public Hearing and feedback received from stakeholders during listening sessions that additional protections from retaliation for those participating in grievance procedures are necessary to ensure full protection from prohibited retaliation.  The Department does not intend, by specifying the proceedings just described, to exclude other Title IX processes in the current or proposed regulations.

Peer retaliation.  In addition to the definition of "retaliation," the Department proposes including a definition of "peer retaliation" in proposed § 106.2.  Although the prohibition in current § 106.71(a) applies to retaliation by a recipient or other person against any individual, the regulations do not specifically address retaliation by a student against another student.  In proposed § 106.71(b), the Department would explicitly state that a recipient has an obligation to prohibit and respond to peer retaliation.  In response to feedback received during the June 2021 Title IX Public Hearing highlighting the pervasiveness of peer retaliation against those who participate in a recipient's grievance procedures for sexual harassment, the Department proposes specifically defining "peer retaliation" in proposed § 106.2 to make clear that it would be a form

550

of retaliation under Title IX. Proposed § 106.71(b) would clarify a recipient's responsibility to address peer retaliation, and this responsibility is explained in greater detail in the discussion of proposed § 106.71. It is the Department's current view that adding a specific definition of "peer retaliation" would enhance clarity for both recipients and students regarding a recipient's responsibility to respond to all forms of retaliatory conduct. The Department proposes defining "peer retaliation" as retaliation by and against students. The retaliatory conduct covered under this proposed definition would be the same as the conduct set out in the proposed definition of "retaliation," but it would cover only conduct engaged in by students against other students. For example, if a student's locker is vandalized by his teammates because the student complained to the administration that his high school is not providing substantially proportional athletics participation opportunities for girls, that conduct would constitute peer retaliation. Similarly, if a student council president threatens to remove a student council member from a student council committee close in time to the student council member's participation as a witness in sex-based harassment grievance procedures in which the student council president's friend is the respondent, that conduct would constitute peer retaliation. As this example shows, retaliation by the friends of a student party against another party and conduct intended to threaten, punish, or deter a student from participating in a Title IX process could constitute peer retaliation. Peer retaliation can also constitute sex-based harassment or other adverse actions that do not meet the definition of "sex-based harassment," but still meet the definition of "retaliation" in proposed § 106.2.

Section 106.71 Retaliation

*Current regulations:* Current § 106.71(a) prohibits intimidation, threats, coercion, or discrimination "against any individual for the purpose of interfering with any right or privilege

secured by title IX or this part, or because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under this part."  Current § 106.71(a) further states that intimidation, threats, coercion, or discrimination, including imposing discipline for code of conduct violations, arising out of the same facts or circumstances as a report or complaint of sex discrimination is prohibited retaliation when it is done "for the purpose of interfering with an individual's Title IX rights."  Under current § 106.71(a), a recipient must keep confidential the identities of "any individual who has made a report or complaint of sex discrimination, including any individual who has made a report or filed a formal complaint of sexual harassment, any complainant, any individual who has been reported to be the perpetrator of sex discrimination, any respondent, and any witness," unless disclosure is permitted by FERPA, required by law, or is made to carry out Title IX obligations.  All complaints alleging retaliation must be filed according to the grievance procedures under current § 106.8(c) for complaints of sex discrimination.

Current § 106.71(b) clarifies that two specific circumstances do not constitute retaliation: the exercise of rights protected under the First Amendment and charging an individual with a code of conduct violation for making a materially false statement in bad faith during a Title IX grievance proceeding.  With respect to the latter circumstance, current § 106.71(b)(2) clarifies that a determination of responsibility alone is not sufficient to conclude that any party made a materially false statement in bad faith.

*Proposed regulations:*  In proposed § 106.71, the Department would require that a recipient prohibit retaliation, as defined in proposed § 106.2, in its education program or activity.  The Department proposes moving the language describing the conduct that constitutes retaliation from current § 106.71(a) to new proposed definitions of "retaliation" and "peer retaliation" in

§ 106.2 and moving the prohibition in current § 106.71(a) on recipients disclosing the identities of those involved in the recipient's Title IX process to proposed § 106.44(j).

Proposed § 106.71 would specify the recipient's obligation to prohibit and address retaliation. Proposed § 106.71 states that when a recipient receives information about possible retaliation, it would have to comply with proposed § 106.44, and when a recipient receives a complaint alleging retaliation, it would have to initiate its grievance procedures under proposed § 106.45. When a complaint of retaliation is consolidated under proposed § 106.45(e) with a complaint of sex-based harassment involving a student complainant or student respondent at a postsecondary institution, the Department proposes that the grievance procedures for investigating and resolving the consolidated complaint would have to comply with the requirements of proposed §§ 106.45 and 106.46.

Proposed § 106.71 would identify two examples of prohibited retaliation. Proposed § 106.71(a) would prohibit a recipient from initiating its disciplinary process against a person for a code of conduct violation that does not involve sex discrimination but arises out of the same facts and circumstances as a complaint or information reported about possible sex discrimination, for the purpose of interfering with the person's exercise of their Title IX rights. The Department proposes removing the references to "intimidation, threats, coercion, or discrimination" in current § 106.71(a) because they are duplicative of the definition of "retaliation" in proposed § 106.2, and proposes replacing "charges" in current § 106.71(a) with "initiating a disciplinary process" in proposed § 106.71(a). The Department also proposes identifying peer retaliation in proposed § 106.71(b) as a form of retaliation a recipient would have to prohibit and address. The Department also proposes limited changes to current § 106.71(a) for consistency and clarity in proposed § 106.71(a).

553

Finally, the Department proposes changing "individual" to "person" throughout proposed § 106.71 for consistency throughout this section. This change also would better align this section with other sections of the proposed regulations and the Title IX statute, all of which use "person."

*Reasons:* The Department affirms that retaliation is a form of sex discrimination prohibited by Title IX, *Jackson*, 544 U.S. at 173-74, and that robust protection against retaliation is necessary to ensure fulfillment of Title IX's requirement that a recipient operates its education program or activity free from sex discrimination. The Department agrees with the Supreme Court that "if recipients were permitted to retaliate freely, individuals who witness [sex] discrimination would be loath to report it and all manner of Title IX violations might go unremedied as a result." *Id.* at 180. To fulfill Title IX's guarantee, and consistent with the new definitions of "retaliation" and "peer retaliation" in proposed § 106.2, the Department proposes revising current § 106.71 to ensure that a recipient would prohibit all forms of retaliation in its education program or activity.

As explained in greater detail in the discussion of the proposed definitions of "retaliation" and "peer retaliation" (proposed § 106.2), the Department has consistently prohibited retaliation against any person for the purpose of interfering with a right or privilege under Title IX or for participating or refusing to participate in a recipient's Title IX processes, including its grievance procedures. Prior to the 2020 amendments, the Department prohibited retaliation by incorporating the prohibition on retaliation from the procedural protections in § 100.7(e) of the Department's Title VI regulations. As part of the 2020 amendments, the Department revised § 106.71 to expressly prohibit retaliation. The Title IX regulations have always extended the prohibition on retaliation to all participants in a recipient's Title IX processes, including complainants, respondents, witnesses, and others participating in these processes, regardless of

554

whether the participant provided information or otherwise participated in the process in support of the complainant, respondent, or the recipient.

The Department notes that in *DuBois v. Board of Regents of the University of Minnesota*, 987 F.3d 1199 (8th Cir. 2021), the U.S. Court of Appeals for the Eighth Circuit stated that the Department's regulations do not "prohibit discrimination because of participation in an investigation," in contrast to the Title VI regulations. *Id.* at 1205 (citing 34 CFR 100.7(e)). The Department also notes, however, that in the 47 years since HEW first promulgated regulations under Title IX, those regulations have always prohibited retaliation against participants in Title IX processes and OCR has consistently relied on this interpretation in its enforcement practice. *See* 45 CFR 86.71; *see* U.S. Dep't of Educ., Office for Civil Rights, Case Resolutions Regarding Sex Discrimination, https://www2.ed.gov/about/offices/list/ocr/frontpage/caseresolutions/sex-cr.html; *see also* U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter: Retaliation at 1-2 (Apr. 24, 2013), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201304.pdf. Therefore, the Department does not follow the Eighth Circuit's decision in enforcing the prohibition on retaliation in current § 106.71(a), or in proposing revisions to § 106.71(a).

*Changes to current § 106.71(a).* The Department seeks to restructure proposed § 106.71 to clarify the prohibition on retaliation and to move the language defining the term "retaliation" to proposed § 106.2. The Department would also move the requirement that a recipient keep confidential the identities of those involved in Title IX processes from current § 106.71(a) to proposed § 106.44(j). The Department proposes moving this provision because, as explained in the discussion of proposed § 106.44(j), current § 106.71(a)'s prohibition on the recipient's disclosure is not limited to circumstances in which the disclosure would be retaliatory. This prohibition would help ensure that persons involved in Title IX processes are able to participate

freely in the recipient's efforts to address sex discrimination. To the extent that a recipient discloses the identities of those involved in Title IX processes for the purpose of interfering with a Title IX right, that disclosure would violate proposed § 106.44(j) and constitute retaliation under proposed § 106.71(a).

Proposed § 106.71 would require a recipient to prohibit retaliation, set out a recipient's required response to prohibited retaliation, and identify two examples of common retaliatory conduct. The Department proposes revising § 106.71 to provide clarity regarding a recipient's obligations to prohibit and respond to retaliation, in response to concerns from stakeholders raised with OCR during the June 2021 Title IX Public Hearing and in listening sessions, that additional protections from retaliation for participants in Title IX grievance procedures are necessary to ensure full protection from prohibited retaliation.

*Proposed § 106.71.* In view of the Department's continued interest in ensuring full implementation of Title IX's prohibition on retaliation, the Department proposes requiring a recipient to prohibit retaliation against any person by students, employees, and other persons authorized by the recipient to provide an aid, benefit, or service to the recipient's education program or activity. In addition, in proposed § 106.71, the Department would specify the recipient's obligation to address retaliation and set out the specific ways that a recipient must address information regarding possible retaliation under proposed § 106.44 or a complaint of retaliation using its grievance procedures under proposed § 106.45.

Under proposed § 106.71, all complaints alleging retaliation as defined in proposed § 106.2, including complaints alleging retaliation that arise from the same facts or circumstances as a complaint or information reported about possible sex discrimination, would require the recipient to initiate its grievance procedures under proposed § 106.45. It bears noting that

although retaliation may arise in connection with sex-based harassment and some instances of retaliation may also constitute sex-based harassment, retaliatory conduct is not necessarily conduct that would constitute sex-based harassment; instead, it is a distinct form of sex discrimination as discussed above. Therefore, it is the Department's current position that retaliation complaints may be made by any of the persons specified in proposed § 106.45(a)(2) as entitled to make a complaint of sex discrimination, including: the complainant; anyone who has the right to act on behalf of the complainant under proposed § 106.6(g); the Title IX Coordinator; or any student, employee, or third party who is participating or attempting to participate in the recipient's education program or activity when the alleged sex discrimination occurred.

When a complaint alleging retaliation arises from the same facts or circumstances as another complaint or information reported about possible sex discrimination, such as when a person experiences retaliation for participating in the recipient's grievance procedures under Title IX, the recipient would be permitted to consolidate the retaliation complaint with the other complaint of sex discrimination under proposed § 106.45(e). When the complaint of retaliation is consolidated with a complaint of sex-based harassment involving a student complainant or student respondent at a postsecondary institution, the grievance procedures for the consolidated complaint would be required to comply with proposed §§ 106.45 and 106.46. By providing a recipient the discretion to consolidate retaliation complaints with complaints alleging other forms of sex discrimination, the proposed regulations would allow the recipient to respond to allegations of such retaliation more efficiently and effectively than under the current regulations.

*Proposed § 106.71(a).* The Department recognizes that a recipient's use of its disciplinary process to interfere with the ability of members of its community to exercise their rights under Title IX is a form of retaliation. In view of this, the Department proposes

557

maintaining this portion of current § 106.71(a), clarifying the application of this portion of current § 106.71(a), and making limited edits for consistency with other provisions in the proposed regulations.

Through the June 2021 Title IX Public Hearing, OCR received feedback requesting that the Department find ways to ensure that a recipient implements its grievance procedures in a manner that does not intimidate those seeking to provide information regarding sex discrimination or to participate fully in the recipient's grievance procedures. Stakeholders stated that complainants who reported sex-based harassment to their schools have been threatened with or faced disciplinary sanctions for reporting sex-based harassment. These stakeholders also expressed concern that retaliatory implementation of a recipient's code of conduct would deter students from reporting sex-based harassment and accessing supportive measures or other forms of support that may be provided by the recipient. The Department shares these concerns and proposes maintaining current § 106.71(a) but wishes to clarify the application of this provision.

In the preamble to the 2020 amendments, the Department explained that "[i]f a recipient always takes a zero tolerance approach to underage drinking in its code of conduct and always imposes the same punishment for underage drinking, irrespective of the circumstances, then imposing such a punishment would not be 'for the purpose of interfering with any right or privilege secured by' Title IX or these final regulations and thus would not constitute retaliation under these final regulations." 85 FR at 30536. After reweighing the facts and circumstances, including but not limited to feedback from stakeholders regarding the impact of such conduct on participation in the Title IX process, the Department submits that it is appropriate to clarify its interpretation of current § 106.71(a). The Department recognizes that when alleging that a recipient has engaged in retaliatory enforcement of its code of conduct, a complainant will not

typically have access to the information necessary to definitively allege that the recipient did not consistently implement its zero-tolerance approach in order to demonstrate that enforcement of the code of conduct was, in that instance, retaliatory. The Department's current view is that the position taken in the preamble to the 2020 amendments did not fully account for this imbalance in access to information. Under these proposed regulations, a recipient that implements a zero-tolerance approach would be required to comply with its obligations under proposed § 106.71(a). Moreover, as explained in greater detail in the discussion of proposed § 106.44(b), a recipient would have to ensure that, through its Title IX Coordinator, it is monitoring potential barriers to those seeking to provide information regarding conduct that may constitute sex discrimination under Title IX, including retaliation.

The Department also proposes a nonsubstantive change to the regulatory text for proposed § 106.71(a) to replace "charges" with "initiating a disciplinary process."

*Proposed § 106.71(b).* The Department proposes explicitly identifying peer retaliation as prohibited retaliatory conduct in proposed § 106.71(b) to ensure that a recipient prohibits and addresses any conduct that meets the definition of "peer retaliation" in proposed § 106.2.

The Department's 2018 NPRM did not propose amending the Title IX regulations to specifically address peer retaliation or retaliation more generally, as discussed above. Commenters on the 2018 NPRM, recognizing that the Title IX regulations have long prohibited retaliation, sought clarity about the standards that would apply to a recipient's obligation to respond to a complaint of peer retaliation and, in particular, whether the Department's proposed requirement of actual knowledge and proposed deliberate indifference standard for a recipient's response to sexual harassment would apply to retaliation as well. 85 FR at 30277, 30535. In response to these comments, the Department declined to apply an actual knowledge requirement

to retaliation, explaining in the preamble to the 2020 amendments that the "actual knowledge requirement in [the current regulations] applies to sexual harassment and does not apply to a claim of retaliation" because "the Supreme Court has not applied an actual knowledge requirement to a claim of retaliation," unlike with respect to sexual harassment, as set out in *Gebser* and *Davis*. *Id.* at 30537. The Department amended § 106.71 to explicitly prohibit retaliation without adding language regarding a recipient's obligation to respond to information about peer retaliation in its education program or activity.

OCR received feedback from stakeholders during listening sessions and through the June 2021 Title IX Public Hearing requesting that the Department review the 2020 amendments and take further steps to address a recipient's obligation to respond to peer retaliation. Stakeholders stated that peer retaliation continues to be a problem that chills reporting for potential complainants and affects both complainants and respondents going through a recipient's grievance procedures. These stakeholders requested that the Department strengthen its anti-retaliation protections and ensure that recipients address peer retaliation beyond the steps taken in the 2020 amendments.

The Department notes that courts have recognized that a recipient has a responsibility to address peer retaliation. *See Hurley*, 911 F.3d at 695 ("[A]n educational institution can be liable for acting with deliberate indifference toward known instances of student-on-student retaliatory harassment."); *Doe v. Sch. Dist. No. 1*, 970 F.3d 1300, 1311 (10th Cir. 2020) (holding that peer retaliation for reporting a sexual assault is a form of retaliation to which a school must respond).[15] In these cases, the courts recognize that a recipient must address peer retaliation

---

[15] The Department views the case law as instructive for explaining that a recipient has an obligation to respond to peer retaliation. At the same time, as explained in the discussion of

under Title IX as a form of prohibited retaliation consistent with *Jackson*.

The Department is aware that some courts have recognized a recipient's obligation to respond to retaliatory peer harassment as part of its obligation to respond to sex-based harassment. *See, e.g.*, *Doe v. Ohio Univ.*, No. 2:21-cv-858, 2022 WL 899687, *5 (S.D. Ohio Mar. 28, 2022). It is the Department's current view that Title IX requires the recipient to address this conduct whether it constitutes sex-based harassment or peer retaliation. *See Hurley*, 911 F.3d at 696 (holding that the plaintiffs may assert separate claims for both retaliation and sexual harassment against the university based on the same underlying facts).

After considering recent case law as well as the feedback received following the implementation of the 2020 amendments, it is the Department's current position that, to fully implement Title IX, the proposed regulations must require recipients to address sex discrimination in the form of peer retaliation. The Department also recognizes that the 2020 amendments did not specify the steps a recipient must take in response to peer retaliation, and that this lack of specificity may cause confusion for recipients and others. Therefore, the Department proposes specifically requiring a recipient to address information about possible peer retaliation consistent with its obligation to address conduct that may constitute sex discrimination

---

OCR's Guidance and Supreme Court Precedent on Title IX's Application to Sexual Harassment (Section II.B.1), the Department recognizes that its administrative enforcement of Title IX differs in significant ways from private lawsuits for monetary damages and proposes that the applicable standards for a recipient's response to peer retaliation in the administrative enforcement context should likewise differ from those imposed by courts in private litigation. In particular, as explained in the discussion of proposed § 106.44(a), the Department's role in implementing Title IX is to ensure that a recipient complies with its legal duty to operate its education program or activity free from sex discrimination, including retaliation against a student for seeking to enforce their right to be free from sex discrimination in the recipient's education program or activity.

under proposed § 106.44.

The Department notes that the items described in proposed § 106.71 as examples of prohibited retaliation do not represent an exhaustive list.  For example, in connection with the June 2021 Title IX Public Hearing and during listening sessions with stakeholders, OCR heard from individuals who identified instances in which respondents or others made complaints accusing a complainant of sex-based harassment for the purpose of intimidating a complainant or coercing a complainant to withdraw the complainant's original complaint of sex-based harassment.  If a complainant alleges that another person made a complaint in retaliation for their original complaint, the recipient would be required to determine whether that other person's complaint constituted prohibited retaliation under proposed § 106.71.

The Department also recognizes that a recipient may be engaging in prohibited retaliation when it disciplines an individual for discussing conduct that would constitute sex discrimination under Title IX if the recipient takes that disciplinary action for the purpose of retaliating against the individual rather than for another reason, such as taking reasonable steps to protect the privacy of parties, witnesses, and others participating in the recipient's grievance procedures in proposed § 106.45(b)(5).  OCR received comments during the June 2021 Title IX Public Hearing requesting clarification that discipline for engaging in these discussions is prohibited.  Whether this action constitutes retaliation would be a fact-specific inquiry to determine whether the recipient disciplined the individual for the purpose of interfering with that individual's Title IX rights.

*Removal of current § 106.71(b).*  The Department proposes removing current § 106.71(b)(1) as redundant because of the protections afforded in current § 106.6(d)(1).  The Department stated in the preamble to the 2020 amendments that it added current § 106.71(b)(1)

to address concerns that anti-retaliation efforts, when applied erroneously, may affect speech protected under the First Amendment. *Id.* at 30537. As explained in the discussion of the definition of prohibited "sex-based harassment" (proposed § 106.2), the Department has long made clear that it enforces Title IX consistent with the requirements of the First Amendment. The Department has explained that the Department's "regulations and policies do not require or prescribe speech, conduct or harassment codes that impair the exercise of rights protected under the First Amendment." 2003 First Amendment Dear Colleague Letter. In addition, current § 106.6(d)(1) states that nothing in the regulations requires a recipient to "restrict any rights that would otherwise be protected from government action by the First Amendment of the U.S. Constitution." Therefore, the Department submits that current § 106.71(b)(1) is redundant and its removal would be appropriate.

## VI. Outdated Regulatory Provisions

Section 106.3(c)-(d) Self-evaluation

*Current regulations:* Section 106.3(c) required that each recipient educational institution, within one year of the effective date of the original regulations, conduct a self-evaluation of its policies and practices and make modifications as necessary to comply with the regulations. Current § 106.3(d) required the recipient to maintain records of the self-evaluation for three years.

*Proposed regulations:* The Department proposes removing these paragraphs in their entirety.

*Reasons:* These provisions described requirements that expired in June 1979. The Department proposes to remove these provisions because they are no longer operative.

Sections 106.16 and 106.17 Transition plans

*Current regulations:* Section 106.16 required certain educational institutions that had admitted students of only one sex prior to the passage of Title IX to carry out a transition plan described in

current § 106.17.

*Proposed regulations:* The Department proposes removing these provisions from the regulations in their entirety.

*Reasons:* These provisions described the process for certain educational institutions to submit transition plans to convert their single-sex admissions processes to nondiscriminatory processes before June 1979.  The Department proposes to remove these provisions because they are no longer operative.

Section 106.2(s) Definition of "transition plan"

*Current regulations:* Section 106.2(s) defines the term "transition plan," which is used in current §§ 106.16 and 106.17.

*Proposed regulations:* The Department proposes removing this definition from § 106.2.

*Reasons:* The term "transition plan" is used in provisions that the Department proposes to remove because they are no longer operative.

Section 106.15(b) Admissions

*Current regulations:* Section 106.15(b) provides that, for purposes of §§ 106.15, 106.16, and 106.17, and subpart C, each administratively separate unit shall be deemed to be an educational institution.

*Proposed regulations:* The Department proposes removing the reference to §§ 106.16 and 106.17.

*Reasons:* The Department proposes removing current §§ 106.16 and 106.17 in their entirety, which makes the references to those sections in § 106.15(b) moot.

Section 106.21(a) Admission

*Current regulations:* Section 106.21(a) provides that no person shall, on the basis of sex, be

denied admission, or be subjected to discrimination in admission, by any recipient to which this subpart applies, except as provided in §§ 106.16 and 106.17.

*Proposed regulations:* The Department proposes removing the reference to §§ 106.16 and 106.17.

*Reasons:* The Department proposes removing current §§ 106.16 and 106.17 in their entirety, which makes the references to those sections in § 106.21(a) moot.

Section 106.41(d) Adjustment period

*Current regulations:* Section 106.41(d) specified the timeframe for recipients to come into compliance with the Title IX regulations after they were originally issued in 1975.

*Proposed regulations:* The Department proposes removing this subsection of the regulations in its entirety.

*Reasons:* This provision required recipients to come into compliance with § 106.41 no later than June 1978. The Department proposes to remove this provision because it is no longer operative.

VII. Directed Questions

The Department invites you to submit comments on all aspects of the proposed regulations, as well as the Regulatory Impact Analysis. The Department is particularly interested in comments on questions posed throughout the Preamble, which are collected here for the convenience of commenters, with a reference to the section in which they appear. The Department is also interested in comments on questions posed in the Regulatory Impact Analysis.

1. *Interaction with Family Educational Rights and Privacy Act (FERPA) (proposed § 106.6(e))*
Some aspects of the proposed regulations address areas in which recipients may also have obligations under FERPA, 20 U.S.C. 1232g, or its implementing regulations, 34 CFR part 99,

including, for example, provisions regarding the exercise of rights by parents, guardians, or other authorized legal representatives at proposed § 106.6(g); disclosure of supportive measures at proposed § 106.44(g)(5); consolidation of complaints at proposed § 106.45(e); description of the relevant evidence at proposed § 106.45(f)(4); access to an investigative report or relevant and not otherwise impermissible evidence at proposed § 106.46(e)(6); and notification of the determination of a sex discrimination complaint at proposed §§ 106.45(h)(2) and 106.46(h)(1). The Department is seeking comments on the intersection between the proposed Title IX regulations and FERPA, any challenges that recipients may face as a result of the intersection between the two laws, and any steps the Department might take to address those challenges in the Title IX regulations.

2. *Recipient's obligation to provide an educational environment free from sex discrimination (proposed §§ 106.44-106.46)*

The proposed regulations at §§ 106.44, 106.45, and 106.46 clarify the obligation of a recipient to respond promptly and effectively to information and complaints about sex discrimination in its education program or activity in a way that ensures full implementation of Title IX. The Department invites comments on whether there are additional requirements that should be included in, or removed from, the current and proposed regulations to assist recipients in meeting their obligation under Title IX to provide an educational environment free from discrimination based on sex. The Department also seeks comment on whether and how any of the proposed grievance procedures (or any proposed additions from commenters) should apply differently to various subgroups of complainants or respondents, such as students or employees, or students at varying educational levels.

566

3. *Single investigator (proposed § 106.45(b)(2))*

The Department is aware that, prior to August 2020, some recipients used a single investigator or team of investigators to investigate complaints of sex-based harassment and make determinations whether sex-based harassment occurred. The Department invites comments on recipients' experiences using that model to comply with Title IX and the steps taken, if any, to ensure adequate, reliable, and impartial investigation and resolution of complaints, including equitable treatment of the parties and reliable grievance procedures that are free from bias. The Department also invites comments on these issues from persons who were parties or served as an advisor to a party to a complaint that was investigated and resolved by a recipient using a single investigator model.

4. *Standard of proof (proposed § 106.45(h)(1))*

   a. To the extent commenters take the position that the clear and convincing standard would be appropriate when used in all other comparable proceedings, the Department invites comments on steps that recipients implementing that standard have taken to ensure equitable treatment between the parties.

   b. The Department invites comments on whether it is appropriate to allow a recipient to use a different standard of proof in employee-on-employee sex discrimination complaints, than it uses in sex discrimination complaints involving a student.

   c. The Department invites comments on whether it would be appropriate to mandate the use of only one standard of proof for sex discrimination complaints.

567

**Regulatory Impact Analysis (RIA)**

Under Executive Order 12866,[16] the Office of Management and Budget (OMB) must determine whether this regulatory action is "significant" and, therefore, subject to the requirements of the Executive Order and subject to review by OMB. Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action likely to result in regulations that may—

(1) Have an annual effect on the economy of $100 million or more, or adversely affect a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or Tribal governments or communities in a material way (also referred to as an "economically significant" rule);

(2) Create serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles stated in the Executive Order.

This proposed action is "significant" and therefore subject to review by OMB under section 3(f)(4) of this Executive Order because it raises novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in this Executive Order.

The Department has also reviewed the proposed regulations under Executive Order

---

[16] *Executive Order on Regulatory Planning and Review*, Exec. Order. No. 12866, 58 FR 51735 (Oct. 4, 1993), https://www.govinfo.gov/content/pkg/FR-1993-10-04/pdf/FR-1993-10-04.pdf.

568

13563,[17] which supplements and explicitly reaffirms the principles, structures, and definitions governing regulatory review established in Executive Order 12866.  To the extent permitted by law, Executive Order 13563 requires that an agency—

(1) Propose or adopt regulations only on a reasoned determination that their benefits justify their costs (recognizing that some benefits and costs are difficult to quantify);

(2) Tailor its regulations to impose the least burden on society, consistent with obtaining regulatory objectives and taking into account—among other things and to the extent practicable—the costs of cumulative regulations;

(3) In choosing among alternative regulatory approaches, select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity);

(4) To the extent feasible, specify performance objectives, rather than the behavior or manner of compliance a regulated entity must adopt; and

(5) Identify and assess available alternatives to direct regulation, including economic incentives—such as user fees or marketable permits—to encourage the desired behavior, or provide information that enables the public to make choices.

Executive Order 13563 also requires an agency "to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible."  The Office of Information and Regulatory Affairs of OMB has emphasized that these techniques may include "identifying changing future compliance costs that might result from technological innovation or anticipated behavioral changes."

---

[17] *Executive Order on Improving Regulation and Regulatory Review*, Exec. Order No. 13563, 76 FR 3821 (Jan. 18, 2011), https://www.govinfo.gov/content/pkg/FR-2011-01-21/pdf/2011-1385.pdf.

Under Executive Order 13563, the Department believes that the benefits of these proposed regulations justify their costs. In choosing among alternative regulatory approaches, the Department selected those approaches that maximize net benefits. Based on the analysis that follows, the Department believes that the proposed regulations are consistent with the principles in Executive Order 13563.

The Department has also preliminarily determined that this regulatory action would not unduly interfere with State, local, or Tribal governments in the exercise of their governmental functions.

This RIA discusses the need for regulatory action, the potential costs and benefits, assumptions, limitations, and data sources, as well as regulatory alternatives considered. Although most of the costs related to information collection are discussed within this RIA, under Paperwork Reduction Act of 1995, this notice also identifies and further explains burdens specifically associated with information collection requirements.

## 1. NEED FOR REGULATORY ACTION

In 2021, the President directed the Department in both Executive Order 13988[18] and Executive Order 14021[19] to review its current regulations implementing Title IX for consistency with Title IX's statutory prohibition on sex discrimination by a recipient of Federal financial assistance in its education program or activity. Consistent with those Executive Orders, the

---

[18] *Executive Order on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation*, Exec. Order No. 13988, 86 FR 7023 (Jan. 25, 2021), https://www.govinfo.gov/content/pkg/FR-2021-01-25/pdf/2021-01761.pdf.
[19] *Executive Order on Guaranteeing an Educational Environment Free from Discrimination on the Basis of Sex, Including Sexual Orientation and Gender Identity*, Exec. Order No. 14021, 86 FR 13803 (Mar. 11, 2021), https://www.govinfo.gov/content/pkg/FR-2021-03-11/pdf/2021-05200.pdf.

Department reviewed the current regulations based on Federal case law under Title IX, its

experience in enforcement, and feedback received by OCR from stakeholders during the June

2021 Title IX Public Hearing,[20] listening sessions, and the meetings held in 2022 under

Executive Order 12866.  Over 280 students, parents, teachers, faculty members, school staff,

administrators, and other members of the public provided live comments during the June 2021

Title IX Public Hearing, and OCR also received over 30,000 written comments[21] in connection

with the hearing.  In addition, a wide variety of stakeholders participated in the listening sessions

with OCR, including survivors of sexual violence, students accused of sexual misconduct,

LGBTQI+ students, and advocates representing these groups of students; organizations focused

on Title IX and athletics; organizations focused on free speech and due process; organizations

representing elementary schools and secondary schools (or local educational agencies (LEAs)),

as well as postsecondary institutions (or institutions of higher education (IHEs)), teachers,

administrators, and parents; attorneys representing survivors, accused students, and schools;

State attorneys general offices; Title IX Coordinators and other school administrators;

individuals who provide training on Title IX to schools; individuals who work in campus law

enforcement; and individuals who have participated in school-level Title IX proceedings.  The

meetings under Executive Order 12866 in 2022 included individuals and representatives of the

same types of groups, organizations, and offices as those who participated in the listening

sessions with OCR.  Based on this review, the Department proposes amending its regulations to

ensure that all aspects of its regulatory framework under Title IX are well-suited to implementing

---

[20] The transcript from the June 2021 Title IX Public Hearing is available
at https://www2.ed.gov/about/offices/list/ocr/docs/202106-titleix-publichearing-complete.pdf.
[21] The written comments that OCR received as part of the June 2021 Title IX Public Hearing are
available at https://www2.ed.gov/about/offices/list/ocr/public-hearing.html.

Title IX's prohibition on sex discrimination in education programs or activities that receive Federal financial assistance. The Department also proposes amendments intended to improve and promote educational environments free of sex discrimination in a manner that recognizes fairness and safety concerns.

Among the considerations was feedback received from many stakeholders during the June 2021 Title IX Public Hearing, listening sessions, and meetings held under Executive Order 12866, stating that the current regulations include onerous requirements for sexual harassment grievance procedures that are unnecessarily adversarial in nature—potentially resulting in a decrease in students' willingness to file complaints or fully participate in the grievance process. These stakeholders also stated that the current requirements for sexual harassment grievance procedures unduly increase administrative burden and intrude on a recipient's professional judgment and expertise regarding how best to respond to allegations of student misconduct without improving the recipient's ability to address sex discrimination within their education environments. During the June 2021 Title IX Public Hearing, some stakeholders expressed support for the current regulations, remarking that the requirements governing a recipient's sexual harassment grievance procedures should remain in place without change, while other stakeholders suggested the Department amend various provisions in the regulations that they deemed important (including the deliberate indifference standard, the actual knowledge requirement, and specific requirements related to grievance procedures for formal complaints of sexual harassment). Many stakeholders expressed concerns regarding the scope of the current regulatory definition of "sexual harassment," the requirement that a recipient need only respond to sexual harassment when it has actual knowledge, and that it need only respond in a manner that is not deliberately indifferent. Apart from addressing sexual harassment, many stakeholders

572

asked the Department to clarify protections related to discrimination based on sexual orientation and gender identity, presenting a variety of positions that they urged the Department to adopt, while other stakeholders asked the Department to clarify Title IX's protections against discrimination based on pregnancy or related conditions.

The Department proposes amending its Title IX regulations to address the concerns raised by stakeholders and anticipates that the proposed regulations would result in many benefits to recipients, students, employees, and others, including by:

- Requiring recipients to adopt grievance procedures that provide for the prompt and equitable resolution of complaints of sex discrimination and take other necessary steps to provide an educational environment free from sex discrimination;

- Clarifying the Department's view of the scope of Title IX's prohibition on sex discrimination, including related to a hostile environment under the recipient's education program or activity, as well as discrimination on the basis of sex stereotypes, sex characteristics, sexual orientation, pregnancy or related conditions, and gender identity;

- Clarifying a recipient's obligations to students and employees who are pregnant or experiencing pregnancy-related conditions.

As discussed in more detail in the following sections, it is the Department's belief that the proposed regulatory changes will fulfill Title IX's overarching goal: to ensure that no person experiences sex discrimination in education. To that end, the Department aims to ensure that all recipients can implement Title IX's nondiscrimination mandate fully and fairly in their educational environments.

## 2.    DISCUSSION OF COSTS, BENEFITS, AND TRANSFERS

The Department has analyzed the costs and benefits of complying with the proposed

regulations. Although many of the associated costs and benefits are not easily quantifiable, the Department currently believes that the benefits derived from the proposed regulations outweigh the associated costs given that the objectives of the rulemaking are to ensure: (1) that sex discrimination does not take place in any education program or activity receiving Federal financial assistance, and (2) that sex discrimination is redressed promptly and effectively if it occurs.

Title IX, which applies to approximately 18,000 LEAs, over 6,000 IHEs, and numerous other recipients such as libraries and museums, requires a recipient to provide an education program or activity that is free from sex discrimination. The proposed regulations would introduce new obligations and clarify existing obligations of entities subject to the regulations in order to promote an educational environment free from sex discrimination. The Department expects that the proposed regulations would benefit recipients, as well as students, employees, and others by ensuring that students, employees, and others understand their rights and recipients understand their responsibilities under Title IX; clarifying the scope and application of Title IX including but not limited to the obligation of recipients to address all forms of sex discrimination; ensuring that supportive measures will be provided, as appropriate, to a complainant and respondent to restore or preserve that party's access to the recipient's education program or activity; clarifying that remedies are available, as appropriate, to anyone subjected to sex discrimination while participating in or attempting to participate in a recipient's education program or activity; requiring recipients to provide training for employees regarding their obligations under Title IX; revising the requirements for grievance procedures to provide for the prompt and equitable resolution of complaints of any form of sex discrimination; allowing a recipient the ability to adapt its grievance procedures to its size, population served, and

administrative structure while ensuring equitable treatment of all parties; clarifying the

responsibilities of Title IX Coordinators; and ensuring nondiscriminatory access to a recipient's

education program or activity for students and employees who are pregnant or experiencing

related conditions. The Department believes that the proposed regulations would provide

numerous important benefits and also recognizes that it is not able to quantify each of these

benefits at this time. Still, it is the Department's tentative view that the proposed changes just

described, in addition to others discussed more fully throughout the RIA, would reduce the

occurrence of sex discrimination in a recipient's education program or activity and facilitate a

prompt and equitable resolution when sex discrimination occurs, thereby supporting a recipient's

efforts to provide an educational environment free from sex discrimination. Although there are

limited data quantifying the economic impacts of sex discrimination, including sex-based

harassment, on individuals, studies suggest that there is a cost associated with being subjected to

sex discrimination. *See, e.g.*, Centers for Disease Control and Prevention, *Fast Facts:*

*Preventing Sexual Violence*,

https://www.cdc.gov/violenceprevention/sexualviolence/fastfact.html (last visited June 16, 2022)

(describing the economic burden of sexual violence involving physical contact on victims within

their lifetimes); Cora Peterson et al., *Lifetime Economic Burden of Intimate Partner Violence*

*Among U.S. Adults*, 55 Am. J. Preventive Med. 433 (2018) (estimating the cost of intimate

partner violence on victims within their lifetimes). The Department recognizes that sex

discrimination in all forms, including sex-based harassment and prohibited retaliation, may have

both qualitative and quantitative costs for educational institutions, their students and employees,

applicants for admission and employment, their families, and the American educational system

and workforce in general, although the Department is unable to quantify reductions in these costs

resulting from the proposed regulations.

Due to the large number of affected recipients (over 24,000, as discussed more fully in the discussion of Developing the Model (Section 4.B)), the variation in likely responses to any regulatory change, and the limited information available about current practices, particularly at the LEA level, the Department is not able to precisely estimate the likely costs, benefits, and other effects of the proposed regulations. The Department specifically invites comment on data sources that would provide comprehensive information regarding current practices used in providing an educational environment free from sex discrimination as required by Title IX, information regarding the number of recipients in each group described in the discussion of Developing the Model (Section 4.B), and time estimates for the activities described in the discussion of Cost Estimates (Section 4.C) disaggregated by type of recipient. Despite these limitations and based on the best available evidence as explained in the discussion of Establishing a Baseline (Section 4.A), the Department estimates that the regulations would result in a discounted net cost savings to recipients of between $9.8 million to $28.2 million over ten years. These estimated cost savings arise largely from the additional flexibility that recipients would have to design and implement grievance procedures consistent with Title IX under proposed § 106.45, and if applicable proposed § 106.46.

The assumptions, data, methodology, and other relevant materials, as applicable, on which the Department relied in developing its estimates are described throughout this RIA.

## 3. BENEFITS OF THE PROPOSED REGULATIONS

The Department submits that this proposed regulatory action would address the potential gaps in coverage within the current regulatory framework that have been raised by stakeholders and observed by the Department, including but not limited to areas such as the steps a recipient

must take with respect to sex discrimination, the requirements for a recipient's grievance procedures for sex discrimination other than sexual harassment, a recipient's obligations toward students and employees who are pregnant or experiencing related conditions, the scope of coverage related to discrimination based on gender identity and sexual orientation, and a recipient's obligation to address prohibited retaliation.

Although the Department cannot quantify in monetary terms the ancillary benefits the proposed regulations may provide to those who have been subjected to sex discrimination in an educational setting, the Department recognizes that sex discrimination, including sex-based harassment, can have profound and long-lasting economic costs for students, employees, their families, and others who seek to participate in the recipient's education program or activity. Being subjected to sex discrimination in a recipient's program or activity can affect an applicant's opportunity to enroll in a recipient's education program or activity, a student's ability to learn and thrive in and outside of the classroom, a prospective or current employee's ability to contribute their talents to the recipient's educational mission, and the opportunity of all participants to benefit, on an equal basis, from the recipient's education program or activity. Likewise, barriers to reporting sex discrimination within a recipient's program or activity could undermine the recipient's education environment for the entire community. The Department believes that the proposed regulations would offer a clear and fair framework for fulfilling Title IX's prohibition on sex discrimination in any education program or activity receiving Federal financial assistance.

The Department's current view is that the proposed regulations would reduce the long-term costs associated with providing an educational environment free from sex discrimination, thereby producing a demonstrable benefit for students, employees, and others participating or

577

attempting to participate in the recipient's education program or activity. The Department

anticipates those benefits would be realized based on several proposed changes to the current

regulations. First, the proposed regulations would clarify the scope of Title IX's protection from

sex discrimination for students and others participating or attempting to participate in a federally

funded education program or activity and define terms integral to a recipient's obligations under

Title IX. Second, the proposed regulations would set out the contours of a recipient's obligation

to take action to address all forms of sex discrimination, including requiring a recipient's Title IX

Coordinator to monitor its education program or activity for barriers to reporting sex

discrimination and requiring the recipient to take steps reasonably calculated to address those

barriers. Third, the proposed regulations would modify and strengthen existing training

requirements by specifying the range of relevant persons that a recipient must train regarding the

recipient's obligations under Title IX. Fourth, the proposed regulations would revise the

notification requirements for a recipient, ensuring that specific employees notify the Title IX

Coordinator when they have information about conduct that may constitute sex discrimination

under Title IX in the recipient's education program or activity. Fifth, the proposed regulations

would ensure the effective provision and implementation of supportive measures, as appropriate,

to all complainants or respondents and clarify that when a recipient determines that sex

discrimination has occurred, the recipient must provide remedies, as appropriate, to a

complainant or any person the recipient identifies as having their equal access to the recipient's

education program or activity limited or denied by sex discrimination, and take other appropriate

prompt and effective steps to ensure that sex discrimination does not continue or recur within the

recipient's education program or activity. Sixth, the proposed regulations would revise the

requirements for grievance procedures to provide for the prompt and equitable resolution of

complaints of any form of sex discrimination and allow a recipient the ability to adapt its grievance procedures to its size, population served, and administrative structure while ensuring equitable treatment of all parties. Finally, the proposed regulations would provide clarity on the rights of students and employees who are pregnant or experiencing related conditions including, for example, by requiring a recipient to inform students of the recipient's obligations, providing students with the option of reasonable modifications necessary to prevent discrimination and to ensure equal access to its education program or activity, requiring a recipient to provide employees with reasonable break time to express breast milk or breastfeed as needed and, with respect to both students and employees, ensuring the availability of an appropriate space for lactation.

The Department expects that the proposed regulations, when reviewed in their totality, would reduce the likelihood of sex discrimination and the overall prevalence of sex discrimination in recipients' educational settings. Although the Department cannot, at this time, entirely quantify the economic impacts of these benefits, the Department believes that the benefits are substantial and far outweigh the estimated costs of the proposed regulations.

4.      **COSTS OF THE PROPOSED REGULATIONS**

The Department's analysis reviews the Department's data sources, describes the model used for estimating the likely costs associated with the proposed regulations, and sets out those estimated costs. Due to limited quantitative data, the Department emphasizes that the monetary estimates reflect only the likely costs of this regulatory action for recipients and do not seek to quantify, in monetary terms, the costs of sex discrimination, including sex-based harassment and prohibited retaliation.

As described in the Discussion of Costs, Benefits, and Transfers (Section 2), there are

limited data quantifying the economic impacts of sex discrimination, including sex-based

harassment, on individuals, and studies suggest that there is a cost associated with being

subjected to sex discrimination. *See* Centers for Disease Control and Prevention, *Fast Facts:*

*Preventing Sexual Violence*; Peterson et al., *Lifetime Economic Burden of Intimate Partner*

*Violence Among U.S. Adults*, 55 Am. J. Preventive Med. 433. Nonetheless, the Department

believes that the proposed regulations would reduce the harms of sex discrimination in multiple

ways.

First, proposed § 106.44 would clarify a recipient's obligation to take action to end all

forms of sex discrimination, including sex-based harassment, expressly covering more forms of

conduct than current § 106.44. Specifically, the proposed regulations would require a recipient

to take prompt and effective action to end any sex discrimination that has occurred in its program

or activity, prevent its recurrence, and remedy its effects, regardless of whether a complaint is

made. Current § 106.44 prescribes only how a recipient must respond to allegations of sexual

harassment in its education program or activity when a report is made to certain employees; the

current regulations at § 106.44 are silent with respect to a recipient's obligation to respond to

other forms of sex discrimination. By prescribing the actions a recipient must take to operate its

education program or activity free from sex discrimination, the Department's current view is that

the proposed changes would aid the recipient in reducing—and ultimately eliminating— all

forms of sex discrimination in its education program or activity. Any initial, short-term costs

associated with the proposed change are expected to be both minimal and offset in the longer

term by reduced incidence of sex discrimination. The Department submits that the proposed

requirements would increase recipient responsiveness to all reports and complaints of sex

discrimination and are also likely to deter or prevent some incidents of sex-based harassment and

its associated harms; however, the Department cannot quantify the potential reduction in incidents of sex-based harassment or other forms of discrimination.

Second, proposed § 106.44(g) would make clear that upon being notified of conduct that may constitute sex discrimination under Title IX, including sex-based harassment and prohibited retaliation, a Title IX Coordinator must offer supportive measures, as appropriate, to the complainant or respondent to the extent necessary to restore or preserve that party's access to the recipient's education program or activity. Proposed § 106.44(g) would also clarify that for allegations of sex discrimination other than sex-based harassment or retaliation, a recipient's provision of supportive measures would not require the recipient, its employee, or other person authorized to provide aid, benefit, or service on the recipient's behalf to alter the conduct that is alleged to be sex discrimination for the purpose of providing a supportive measure. As the proposed requirement regarding supportive measures would cover prohibited retaliation as well as other forms of sex discrimination not currently addressed by the current regulations, the Department recognizes that the number of incidents in which the parties would be provided supportive measures would likely increase compared to the current regulations, as would any related costs in providing those supportive measures. The Department estimates that this provision would incur a negligible monetary cost per incident and that the cumulative annual costs to the recipient would therefore be at a de minimis level. The Department also anticipates that these costs will either be reduced in the long-term or be offset by other savings. Those savings may come from other proposed changes (e.g., changes to the grievance procedure requirements) or from the anticipated reduction in instances of sex discrimination.

The Department expects that the proposed regulations would increase the use of a recipient's grievance procedures by students and others, thereby resulting in an increase in the

prompt and equitable resolution of complaints of sex discrimination in a recipient's program or activity.  If this assumption is correct, it is also reasonable to believe that the proposed regulations may reduce the prevalence of sex discrimination, including sex-based harassment, as well as the adverse academic, social, emotional, and economic effects of sex discrimination on individuals and recipient communities.  Again, the Department recognizes that it does not currently have data to form a reliable estimate of these effects as related to associated costs and requests comment on the extent to which implementation costs would be offset by such effects and how both the costs and long-term benefits may be reliably estimated, including any evidence that may be used to inform such estimates.

## 4.A.    ESTABLISHING A BASELINE

### 4.A.1.  DATA SOURCES

As discussed in the preamble to the Department's 2020 amendments to its Title IX regulations, the primary challenge associated with estimating the effects of any new regulatory action under Title IX is the lack of comprehensive data on the actions recipients are taking to comply with their current obligations.  As part of the comment process on the 2020 amendments, the Department requested information about data sources that would provide this information and which the Department could use to inform its estimates.  The Department did not receive such sources at that time and again requests comment to help identify high quality data sources on the actions currently being taken by recipients to comply with Title IX.

In the absence of a recent, high quality, and comprehensive data source, the Department relies, as it did for the 2020 amendments, on a 2014 report titled Sexual Violence on Campus (2014 Senate Subcommittee Report) issued by the U.S. Senate Subcommittee on Financial and

Contracting Oversight.[22]  The report included survey data from 440 four-year IHEs regarding the number of investigations of sexual violence that had been conducted during the previous five-year period; however, this report did not address the prevalence of other forms of sex discrimination, including discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity.  As described in the discussion of Estimates of Annual Investigations of Sexual Harassment Prior to the 2020 Amendments to the Title IX Regulations (Section 4.A.2), the Department adjusted these data to account for these exclusions.  For LEAs, the Department continues to rely on the most recent publicly available data from OCR's Civil Rights Data Collection (CRDC) regarding sexual harassment incidents to estimate the annual number of investigations in those settings.

### 4.A.2.  ESTIMATES OF ANNUAL INVESTIGATIONS OF SEXUAL HARASSMENT PRIOR TO THE 2020 AMENDMENTS TO THE TITLE IX REGULATIONS

To estimate the likely impact of the proposed regulations, the Department must consider the policies and practices of recipients in responding to sexual harassment prior to the promulgation of the 2020 amendments.  This consideration is necessary because the 2020 amendments specified in the Department's Title IX regulations, for the first time, the definition of "sexual harassment" and the obligation of a recipient to respond to sexual harassment under Title IX.  The proposed regulations would require a recipient to take prompt and effective steps to ensure that sex discrimination, including sex-based harassment that creates a hostile environment based on sex, does not continue or recur in the recipient's education program or activity.  This proposed use of a hostile environment standard encompasses conduct that was

---

[22] Claire McCaskill, *S. Subcomm. on Financial Contracting Oversight—Majority Staff, Sexual Violence on Campus, 113th Cong. (2014),* https://www.hsgac.senate.gov/imo/media/doc/2014-07-09 Sexual Violence on Campus Survey Report with Appendix.pdf.

addressed in enforcement practice prior to the current regulations; as a result, data regarding recipients' actions regarding sexual harassment prior to the 2020 amendments would assist in estimating the likely effects of the proposed regulations.  Note that the Department is not assuming that information relating to recipient behavior prior to the effective date of the 2020 amendments would impact the baseline (that is, behavior and burdens in the absence of the proposed regulations), but rather, that a number of the proposed changes would remove some of the restrictions on recipient responses to sexual harassment imposed by the 2020 amendments. However, the Department notes that the proposed regulations would create different requirements from those established in its enforcement practices prior to the 2020 amendments. As a result, recipient behavior prior to the effective date of the 2020 amendments, in the Department's view, provides some, but not complete, insight into what recipient behavior would be if the proposed regulations were promulgated.

In the 2020 amendments, the Department assumed that the number of incidents reported under the Clery Act could be used as an instrument to estimate total incidents of sexual harassment, including those not captured in the 2014 Senate Subcommittee Report; as a result, the Department estimated that, prior to the issuance of those amendments, IHEs conducted approximately 5.7 Title IX investigations of sexual harassment per year.[23]  The Department based this estimate on an analysis of the 2014 Senate Subcommittee Report and data submitted by IHEs under the Clery Act.

At the LEA level, the Department does not have publicly reported data on the average number of investigations of sexual harassment occurring each year.  The most recent publicly available data from the CRDC indicates an average of 3.23 incidents of sexual harassment per

---

[23] *See* 85 FR 30026, 30565 (May 19, 2020).

Case 3:21-cv-00308-CEA-DCP   Document 83-1   Filed 06/27/22   Page 585 of 701   PageID #: 1818

LEA per year.[24]  The Department, therefore, assumes that this was the number of investigations of sexual harassment occurring, on average, each year in each LEA.

### 4.A.3.  LACK OF DATA FOLLOWING THE PROMULGATION OF THE 2020 AMENDMENTS

The Department has not been able to identify reliable data sources about actions taken by recipients following the promulgation of the 2020 amendments.  As a result, it is difficult for the Department to estimate the number of investigations that have occurred since issuance of the 2020 amendments or the number that would likely occur in later years in the absence of the Department's proposed regulations.  This absence of data means the Department could not construct a baseline from which to estimate the likely effects of the proposed regulations. Instead, the Department has a reasonable framework for understanding the likely actions recipients would take to comply with the proposed regulations as well as a benchmark for generating baseline estimates of recipients' actions following the promulgation of the 2020 amendments, based on anecdotal information from experts in the field as well as feedback from the June 2021 Title IX Public Hearing, listening sessions, and the meetings held under Executive Order 12866 in 2022.  These sources provide some reasonably reliable information about actions taken by recipients to comply with Title IX prior to the promulgation of the 2020 amendments. However, in using this anecdotal information, the Department is mindful that the 2020 amendments introduced requirements and definitions not previously promulgated and thus actions prior to the 2020 amendments will not capture all aspects of a recipient's actions

---

[24] U.S. Dep't of Educ., Office for Civil Rights, Civil Rights Data Collection for the 2017-2018 School Year, https://ocrdata.ed.gov/assets/ocr/docs/2017-18-crdc-data.zip (open "2017-18 Public Use Files"; then select "Data"; then select "SCH"; then select "CRDC"; then select "CSV"; then select the "Harassment and Bullying.csv" file) (last visited June 21, 2022).

following the issuance of the 2020 regulations.

The Department is not attempting to estimate the degree of sex discrimination at recipient institutions. Rather, the Department is attempting to estimate the number of times recipients will be required to engage in particular activities, such as conducting investigations or providing supportive measures. For instance, in the preamble to the 2020 amendments, the Department estimated that approximately 90 percent of LEAs and 50 percent of IHEs would reduce the number of investigations conducted each year. The Department estimated that, on average, these LEAs would conduct 1.29 fewer investigations per year under the 2020 amendments. The Department also estimated that the annual average reduction in investigations would be -2.84 for those IHEs that reduced their number of investigations. Since making those assumptions in the 2020 amendments, OCR has received feedback from a variety of stakeholders, through the June 2021 Title IX Public Hearing, in listening sessions, and meetings held in 2022 under Executive Order 12866, that the actual reduction may have been higher due to the deterrent effect of the perceived burden associated with the current sexual harassment grievance procedure requirements on a complainant's willingness to report sexual harassment or participate in a process to resolve a formal complaint of sexual harassment. Further, based on anecdotal reports, the Department understands that many recipients that experienced a reduction in the number of sexual harassment complaints filed at their respective institutions subsequent to the 2020 amendments shifted their resolution processes away from what would have been a proceeding under current § 106.45 to an alternative disciplinary process, such as a general student conduct process outside of the scope of Title IX. Although this information from recipients and others confirms the Department's 2020 estimate related to the decrease in the number of investigations, it is anecdotal and, as such, does not provide the Department with sufficient evidence on which

to revise its 2020 estimate.  Further, the Department recognizes that the COVID-19 pandemic resulted in many LEAs and IHEs operating remotely, which may have reduced the incidence or reporting of sexual harassment, the willingness of students and others to initiate a recipient's grievance procedures in response to alleged sexual harassment, or both.  Again, however, the Department has not identified high-quality research studies to inform its analysis.  Therefore, the Department continues to assume that the estimates of the 2020 amendments represent the baseline level of a recipient's actions to comply with Title IX in future years when considered in the absence of the proposed regulations.  The Department invites comment on whether these estimates are reasonable and whether high quality data sources or studies exist regarding recipients' actions in response to the 2020 amendments.

Notwithstanding the estimates used for the 2020 amendments, for recipients that saw reductions in the number of investigations conducted each year under the 2020 amendments, the Department estimates that 90 percent of alleged incidents that were previously classified as sexual harassment under subregulatory guidance documents, but did not meet the definition of "sexual harassment" under the current regulations, were handled by a recipient in other disciplinary processes.  The Department invites comment on this estimate.

## 4.B.    DEVELOPING THE MODEL

After the effective date of the 2020 amendments to its Title IX regulations, the Department assumes that recipients complied with the regulatory requirements and fell into one of three groups in how they handled complaints of sexual harassment that fell outside the scope of the current § 106.45:

- Group A: Recipients did not adopt a new process to handle complaints falling outside the current § 106.45 grievance procedures;

- Group B: Recipients handled complaints falling outside the current § 106.45 regulations through a different grievance process;

- Group C: Recipients handled complaints falling outside the current § 106.45 regulations through a resolution process similar to current § 106.45.

The Department has not assumed a recipient would behave differently based on its public or private status. Further the Department does not distinguish cost structures or burden hours based on public or private status, but instead applied an average across all IHEs in each analytical group. The Department also assumes recipients in all three groups generally complied with the 2020 amendments to the Title IX regulations. To the extent that a recipient did not comply with some or all of those amendments, the following estimates may overestimate or underestimate actual costs of the proposed regulations for that recipient.

To populate each of the three groups, the Department is using the same disbursement as was used in the 2020 rulemaking analysis. That is, the Department assumes that approximately 5 percent of LEAs, 5 percent of IHEs, and 90 percent of other recipients[25] fall into Group A. Generally, the Department does not anticipate that LEAs or IHEs, which usually have existing disciplinary processes and a history of compliance with Title IX, would adopt the minimal framework of Group A. In contrast, other recipients, as defined in footnote 25, are less likely to have alternative disciplinary processes and the Department assumes that it is unlikely that these other recipients would have established alternative processes as a result of the 2020 amendments. The Department assumes that a recipient in this group, in response to the proposed regulations,

---

[25] Other recipients include entities other than LEAs and IHEs which operate education programs or activities supported by the Department and may include libraries, museums, and cultural centers, among other types of organizations. This group represents an exceptionally small number of LEAs and IHEs, many of which are likely to be very small in size (e.g., an LEA of fewer than 100 students or an IHE of fewer than 15 students).

Case 3:21-cv-00308-CEA-DCP   Document 83-1   Filed 06/27/22   Page 589 of 701   PageID #: 1822

would experience an increase in the number of incidents investigated each year but would also be likely to revise its grievance procedures to fit the context of its educational environment under proposed § 106.45. As a result, although the number of investigations may increase, each investigation and adjudication would be less burdensome relative to investigations and adjudications under the 2020 amendments, due to the ability of a recipient under the proposed regulations to adopt procedures consistent with Title IX that are prompt, equitable, and specifically adapted to its unique circumstances, including its setting, size, and administrative structure. Recipients in this group would see burden increases associated with necessary revision of procedures and recordkeeping.

The Department assumes that approximately 90 percent of LEAs, 50 percent of IHEs, and 5 percent of other recipients fall into Group B. The Department believes that a recipient in this group generally experienced some reduction in the number of sexual harassment investigations conducted under the grievance procedure requirements of the 2020 amendments, which would have been initiated only by a formal complaint of sexual harassment and, based on anecdotal evidence, would have also addressed at least some incidents that are no longer covered under the current grievance procedure requirements by using an alternative disciplinary process. In the preamble to the 2020 amendments, the Department did not account for such a shift in its estimates; however, the current model assumes such behavior as part of the baseline. The Department assumes that, in response to the proposed regulations, Group B would see an increase in the total number of investigations under Title IX due to the proposed application of regulatory grievance procedures to more than sexual harassment complaints. It is assumed that Group B would benefit from some of the additional flexibilities offered under the proposed regulations, such as having the option between providing equitable access to the relevant and not

589

otherwise impermissible evidence to the parties or providing them with a written investigative report that accurately summarizes the evidence under proposed § 106.46. The Department also believes that a recipient in this group would likely retain many aspects of its current grievance procedures in response to the proposed regulations. As a result, the Department estimates that the increase in the number of investigations for Group B under the proposed regulations would be smaller than the increase in the number of investigations for Group A because of the number of investigations and adjudications already occurring under the auspices of an alternative student or employee conduct process. It is estimated that recipients in Group B would see burden increases associated with necessary revision of procedures and recordkeeping under the proposed regulations.

The Department assumes that approximately 5 percent of LEAs, 45 percent of IHEs, and 5 percent of other recipients fall into Group C. A recipient in this group is assumed to use the grievance process established under the 2020 amendments to also resolve conduct that was not required to be resolved under Title IX. As a result, it is estimated that a recipient in Group C would not see a large increase in the number of investigations conducted annually or a meaningful change in the burden per investigation. However, a recipient in Group C, like those in the other two groups, may see burden increases associated with necessary revision of procedures and recordkeeping.

For recipients in both Groups A and B, the Department assumes that the proposed regulations addressing sex discrimination based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity, would result in an increase in the number of investigations conducted annually above the average encountered prior to the promulgation of the 2020 amendments. Although the Department has previously

590

addressed a recipient's obligation to address these forms of discrimination in OCR's prior

guidance, including harassment on these bases, the Department believes that at least some

recipients may not have fully addressed these incidents absent a regulatory requirement.[26] The

Department assumes that the proposed inclusion of these areas in the Department's Title IX

regulations may result in a 10 percent increase in the number of investigations conducted

annually.[27] The Department seeks comment on the assumptions regarding the categorization of

---

[26] This is explained in greater detail in the discussions of Pregnancy and Parental Status (Section III) and Title IX's Coverage of All Forms of Sex Discrimination (Section IV).

[27] As part of the 2017-2018 CRDC, schools reported 44,864 allegations of harassment and bullying on the basis of sex. That same year, they reported 18,414 allegations of harassment and bullying on the basis of sexual orientation, or approximately 33 percent of the number of allegations of harassment and bullying on the basis of sex. *See* U.S. Dep't of Educ., Office for Civil Rights, Civil Rights Data Collection for the 2017-2018 School Year, https://ocrdata.ed.gov/assets/ocr/docs/2017-18-crdc-data.zip (open "2017-18 Public Use Files"; then select "Data"; then select "SCH"; then select "CRDC"; then select "CSV"; then select the "Harassment and Bullying.csv" file) (last visited June 21, 2022). The sum of the allegations of harassment or bullying on the basis of sexual orientation (18,414) is found in Column L of harassment and bullying.csv in the 2017-2018 CRDC data by excluding cells with reserve codes. The Department believes that 33 percent would represent a very high upper bound of the number of additional investigations conducted annually by recipients based on the inclusion of sexual orientation and gender identity in the proposed regulations. OCR has long recognized that "[w]hen students are subjected to harassment on the basis of their LGBT status, they may also… be subjected to forms of sex discrimination prohibited under Title IX. The fact that the harassment includes anti-LGBT comments or is partly based on the target's actual or perceived sexual orientation does not relieve a school of its obligation under Title IX to investigate and remedy overlapping sexual harassment or gender-based harassment." U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter: Harassment and Bullying at 8 (Oct. 26, 2010), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf. The Department believes it would be extremely unlikely that the proposed regulations would result in such a large increase in the number of investigations occurring annually. First, such an assumption would imply that no allegations of harassment and bullying on the basis of sexual orientation were also reported as allegations of harassment and bullying on the basis of sex, which the Department believes is highly unlikely because the CRDC instructs schools to count a single harassment allegation under multiple categories if it meets the definition of more than one category. In

591

affected entities and the extent to which these assumptions are reasonable.

Although the Department notes that proposed § 106.45(a)(2) would allow a third party participating or attempting to participate in a recipient's education program or activity to make a complaint of sex discrimination, the Department assumes this proposed change would result in a minimal increase in a recipient's overall number of complaints of sex discrimination. Specifically, the Department assumes that third-party complaints are somewhat uncommon (and would remain so), but that these complaints serve to inform recipients of at least some incidents of sex discrimination. In the case of a Group A recipient, the Department assumes that the recipient's treatment of information about conduct that may constitute discrimination received from a third party would solely depend on whether the third party made a complaint that initiated the recipient's grievance procedures. If the complainant declined or was not permitted to make a complaint under the recipient's policy, the Department assumes that the Group A recipient would not take action to address the information. The Department assumes that in contrast to Group A recipients, Group B and Group C recipients would take steps to address a third-party allegation of sex discrimination—whether by way of their Title IX process, alternative disciplinary process, or other process depending on the circumstances and nature of the report. Thus, although the proposed regulations may change the process under which such information is addressed, the

_____

addition, such an assumption would imply that no allegations of harassment and bullying on the basis of sexual orientation are currently investigated under a recipient's Title IX procedures, which the Department also believes is highly unlikely because, as described in the discussion of proposed § 106.10, harassment based on sexual orientation can be difficult to distinguish from other forms of harassment based on sex. However, the Department also believes it is unreasonable to assume that the express inclusion of sexual orientation and gender identity in the proposed regulations would have no effect on the number of investigations occurring annually. Based on the analysis set out here, the Department estimates that the additional clarity provided by the proposed regulations would result in a 10 percent increase in the number of investigations occurring annually.

inclusion of third-party complaints would not meaningfully increase the overall number of complaints processed annually across recipients. The Department welcomes comment on the extent to which third party complaints might increase the average number of investigations occurring annually above those estimated herein.

Unless otherwise specified, the Department's model uses mean hourly wages for personnel employed in the education sector as reported by the Bureau of Labor Statistics[28] and a lading factor of 2.0 to account for the employer cost of employee compensation and indirect costs (e.g., physical space, equipment, technology costs). In addition, throughout this RIA, some described calculations have results that are fractions (e.g., the described analysis generates an estimate of 4.79655 incidents at LEAs in which supportive measures are offered). To improve readability, the Department presents these results rounded to two decimal places in the text (e.g., 4.80), but retains the unrounded value for purposes of its underlying calculations.

LEAs, IHEs, and other recipients would be subject to the proposed regulations. Estimates regarding the number of affected LEAs and IHEs are based on the most recent data available from the National Center for Education Statistics[29] regarding the number of LEAs nationwide with operational schools and the number of IHEs participating in programs under Title IV of the HEA (such as Direct Loans, Federal Work Study, and Pell grants). The estimate regarding the number of other institutions is based on an internal review of the Department's

---

[28] U.S. Dep't of Labor, Bureau of Labor Statistics, May 2021 National Industry-Specific Occupational Employment and Wage Estimates: Sector 61—Educational Services, https://www.bls.gov/oes/current/naics2_61.htm (last visited May 19, 2022).
[29] U.S. Dep't of Educ., Inst. of Educ. Sciences, Nat'l Ctr. for Educ. Statistics, Elementary/Secondary Information System, http://nces.ed.gov/ccd/elsi/ (last visited May 19, 2022); U.S. Dep't of Educ., Inst. of Educ. Sciences, Nat'l Ctr. for Educ. Statistics, IPEDS Data Center, https://nces.ed.gov/ipeds/datacenter/InstitutionByName.aspx (last visited May 19, 2022).

grant portfolio.

- LEAs: It is assumed that 18,131 LEAs would be impacted by the proposed regulations. Among affected LEAs, total enrollment during the 2020-2021 school year ranged from fewer than 10 students to more than 460,000 students.

- IHEs: It is assumed that 6,054 IHEs would be impacted by the proposed regulations. Among IHEs, recipients range from small, private, professional schools with fewer than 5 students enrolled in the Fall of 2020 to large, public research universities with enrollments of more than 85,000 students and institutions operating mostly virtually with enrollments in excess of 145,000 students.

- Others: It is assumed that 600 other recipients would be impacted by the proposed regulations. Other recipients include both small Tribal cultural centers located in remote rural areas and some of the largest and most well-funded arts centers and museums in the world. They also include State education agencies, State vocational rehabilitation agencies, local libraries, small parent organizations, and a range of other entities that receive Federal grant funds from the Department.

It is important to note that within each of these categories of recipients, there is wide variation in the number of students served, number of employees, administrative structure, and annual revenue. This wide variation has made estimating the effects of the proposed regulations challenging, and the Department notes that the estimates provided are intended to reflect the average burden across the full spectrum of affected entities. As a result, estimates may be lower than the actual burden realized by, for example, larger recipients or recipients with more complex administrative structures, and larger than those actually realized by smaller recipients

594

with less complex administrative structures.  The Department notes that the estimates in the discussion of Cost Estimates (Section 4.C) were developed based on the RIA from the 2020 amendments, as informed by comments in response to the 2018 NPRM, as well as information received by OCR through the June 2021 Title IX Public Hearing, in listening sessions, and during the meetings held under Executive Order 12866 in 2022.  The estimates were further informed by the input of internal subject matter experts.  The Department invites comment on all estimates provided herein to ensure that they accurately reflect realistic assumptions about average burdens the proposed regulations would impose on the full range of affected entities.

## 4.C.    COST ESTIMATES

Review of regulations and policy revisions

The Department assumes that all recipients would need to spend time reading and understanding the proposed regulations.  The time necessary to complete this task across all recipients would likely vary widely, with some recipients opting for a close and time-consuming review of both the regulations and preamble, while others would rely on shorter third-party summaries targeted for specific audiences resulting in a less burdensome and expedient process. The Department has developed on-average assumptions based on feedback provided by stakeholders in listening sessions and, as noted in the discussion of Developing the Model (Section 4.B), invites comment on these estimates.  On average, the Department assumes that it would take 4 hours each for a Title IX Coordinator ($100.36/hour) and lawyer ($148.76/hour) to complete this task.  In total, the Department estimates that reading and understanding the proposed regulations would have a total one-time cost of approximately $24,697,760 in Year 1.

The Department assumes that all recipients would need to make revisions to their grievance procedures as a result of the proposed regulations.  At each recipient institution, the

Department assumes that these revisions would take, on average, 6 hours for a Title IX Coordinator, 2 hours for an administrator ($100.36/hour), and 6 hours for a lawyer. In total, the Department estimates that revising grievance procedures would have a one-time cost of $42,021,480 in Year 1. This estimate includes the costs of a recipient's revisions to its grievance procedures associated with the Department's proposal to require recipients to comply with its proposed revisions to § 106.45 rather than current § 106.45, and for IHEs to also comply with proposed § 106.46.

The proposed regulations would provide substantial clarity on recipient obligations under Title IX. As such, some recipients may choose to engage in supplemental review of their existing policies to determine compliance and to make changes, if needed, in addition to the proposed changes that may impact a recipient's grievance procedures. The Department assumes that these estimates would be sufficient to account for such behavior but seeks comment on the proportion of recipients, disaggregated by type of entity if appropriate, that would be likely to engage in supplemental policy compliance reviews as a result of the proposed regulations, as well as the likely burden associated with such reviews.

Although the 2020 amendments required a recipient to post nondiscrimination statements on the recipient's website, the Department assumes that approximately 40 percent of LEAs, 20 percent of IHEs, and 50 percent of other institutions would experience more than de minimis burden to modify their existing statements to comply with the requirements of the notice of nondiscrimination under proposed § 106.8(c). These estimates are based, in part, on how recently the 2020 amendments went into effect, potential impacts from the COVID-19 pandemic which likely delayed at least some recipients from complying with the requirement in the 2020 amendments, and any updates to existing content that may be necessary due to the proposed

596

regulations.  For a recipient that has not yet completed this requirement, the Department assumes

doing so would take 1 hour from the Title IX Coordinator and 2 hours from a web developer

($68.48/hour).[30]  In total, the Department estimates that posting nondiscrimination statements on

websites would have a one-time cost of $2,081,380 in Year 1.

The Department requests comment on these estimates.

<u>Revisions to training</u>

The proposed regulations would likely impact the annual training provided to Title IX

Coordinators and designees, investigators, decisionmakers, and other persons who are

responsible for implementing a recipient's grievance procedures or have the authority to modify

or terminate supportive measures.  For individuals other than the Title IX Coordinator and

designees, the Department believes it is unlikely that the length of training would have to

change, and therefore believes that any associated burden for these individuals would not change

as a result of the proposed regulations.  The Department assumes that Title IX Coordinators

would revise existing training materials to incorporate any new content and adjust the remaining

parts of the training accordingly to avoid extending the length and cost of administering the

training.

Although the Department notes that the proposed regulations would require all

employees to be trained on the scope of conduct that constitutes sex discrimination, including the

definition of "sex-based harassment," and all applicable notification requirements under

proposed §§ 106.40(b)(2) and 106.44, the Department does not believe that this requirement

would meaningfully change the overall annual burden related to training requirements for

---

[30] Note that time burden estimates for this activity are unchanged from those used in the 2020
amendments.

recipient employees. As an initial matter, the Department assumes that all employees of recipients receive required trainings each year and that recipients generally strive to limit the total amount of time employees spend in these trainings. The Department also assumes that recipients will not budget additional funds in response to the modification of the current training requirement, and thus, will not experience an increased monetary burden due to this proposed change. The Department believes that recipients make purposeful decisions about the amount of time dedicated to each required training and would increase or decrease the time required for particular training sessions, as needed, to ensure that all required topics are covered within a set amount of time. As a result, the Department assumes that the proposed regulations would ultimately have a de minimis effect on the time burden for employees associated with training, and requests comment on this assumption.

Across all recipients, the Department estimates that updating training materials for individuals other than the Title IX Coordinators would take 4 hours for the Title IX Coordinator for a total one-time cost of $9,949,690. In subsequent years, the Department assumes that the burden associated with the annual updating of training materials would be about the same as it would be in the absence of the proposed regulations.

In contrast, the Department anticipates that the proposed regulations would require more extensive, longer training for Title IX Coordinators compared to the current regulations. As an initial matter, the Department assumes that a recipient would employ similar means by which to train its Title IX Coordinator in response to the current regulations as the recipient employed in response to the promulgation of the 2020 amendments; however, the Department acknowledges that the development and delivery method of the training varies among recipients. For example, the Department assumes that some recipients hired outside counsel, law firms, and professional

organizations to train their Title IX Coordinators while other recipients relied upon internal stakeholders such as the recipient's general counsel. In its tentative view, the Department has no reason to believe that a recipient would deviate from its current source of training because of the proposed regulations.

The Department assumes that such trainings would be 2 hours longer for each Title IX Coordinator in Year 1, and 1 hour longer in future years. In total, the Department estimates that the training of Title IX Coordinators would have a cost of $4,974,850 in Year 1 and $2,487,423 in each succeeding year. Costs will also be incurred to update training materials for Title IX Coordinators. These materials may be developed in a variety of ways, depending on the preferences of individual recipients. These materials will be more comprehensive in nature, but individual entities may develop training materials that will be used across many recipients. As a result, the Department assumes training development costs for Title IX Coordinators equal to those estimated for other individuals, equaling a one-time cost of $9,949,690. The Department seeks comment on assumptions related to the effects of the proposed regulations on training.

Supportive measures

With respect to the provision of supportive measures, the Department's proposed regulations would require a recipient to offer supportive measures, as appropriate, to complainants and respondents who may have experienced sex discrimination, including sex-based harassment and prohibited retaliation. Although the current regulations only require a recipient to offer supportive measures, as appropriate, to complainants and respondents in response to information regarding sexual harassment, nothing in the current regulations would prohibit a recipient from also offering supportive measures to address other types of sex discrimination. The Department assumes that prohibited retaliation would most likely occur

599

following a report or complaint of sex-based harassment (as opposed to other forms of sex discrimination) and that, in such instances, the types of supportive measures offered following the initial report or complaint of sex-based harassment would be largely indistinguishable from the types of supportive measures offered in response to prohibited retaliation and would not result in additional measurable cost to the recipient. Further, the Department submits that it is unlikely that there would be an increase in the number of individuals seeking and accepting supportive measures solely to address the impacts of "prohibited retaliation" as defined under proposed § 106.71.

The Department notes that the proposed regulations state that for allegations of sex discrimination other than sex-based harassment or prohibited retaliation, the recipient would not be required to alter the conduct that is alleged to be sex discrimination for the purpose of providing a supportive measure. The Department expects that there would be little impact on anticipated costs to recipients associated with the proposed provision requiring supportive measures to be offered to complainants and respondents who may have experienced other forms of sex discrimination. The Department's assumption is based on the belief that such information would likely fall into one of two categories. The first category consists of information a recipient would receive about sex discrimination related to unequal access to resources or facilities (e.g., reports that women's sports teams have lower quality practice facilities than men's teams or men's locker rooms are not maintained at the same level as women's locker rooms). In these instances, the Department anticipates that there are few, if any, appropriate supportive measures beyond eliminating the source of sex discrimination (e.g., improving the quality of women's practice facilities or the men's locker rooms). Although it is the Department's current belief that this type of information would likely result in increased costs

associated with the provision of supportive measures, there may be additional costs incurred when addressing these types of situations that are unrelated to providing supportive measures.

Likewise, the Department anticipates that complaints of and information about sex discrimination in educational settings (e.g., a teaching assistant treating an individual student differently because of sex) would be the most likely reason for a request for supportive measures. In these instances, appropriate supportive measures would likely be academic in nature and have relatively minor costs (e.g., allowing a student to attend a section of the same class taught by a different teaching assistant after a complaint of sex discrimination has been made and is proceeding; counseling the teacher's aide).

For supportive measures related to sex-based harassment, the Department assumes that the proposed regulations would have a negligible effect on the burden per incident. Specifically, as the variety of supportive measures and need to adapt those measures to a particular situation makes estimating the full spectrum of costs impracticable, the Department used the cost of more commonly provided supportive measures when calculating cost estimates. Moreover, as it is likely that many of the supportive measures available to individuals are already provided by recipients, the Department expects that the actual costs of each type of measure would be de minimis; however, the Department has added a flat cost of $250 per incident to account for any potential costs. The Department cannot provide greater specificity regarding specific measures given the wide range of possible measures that could be offered, the varying administrative structures of recipients, and the need to align any supportive measures to the specific facts of each case.

At the LEA level, the Department assumes that, per incident, the provision of supportive measures currently takes 2 hours from a Title IX Coordinator and 2 hours from an administrative

assistant ($61.06/hour), with a flat additional cost of $250 per incident.[31]  As such, the Department assumes that, on average, the provision of supportive measures at a LEA costs approximately $570 per incident (staff time plus flat additional cost).  At the IHE level and at other recipients, the Department assumes that, per incident, the provision of supportive measures currently takes 2 hours from a Title IX Coordinator and 1 hour from an administrative assistant with a flat additional cost of $250 per incident.  Therefore, the Department estimates that, on average, the provision of supportive measures at an IHE or other recipient costs approximately $510 per incident.  The Department anticipates that the proposed regulations may increase the number of incidents for which supportive measures are provided per year.

Currently, the Department assumes that a recipient offers and potentially provides supportive measures in all instances that, prior to the 2020 amendments, would have triggered an investigation, as well as in many instances that previously would not have triggered an investigation.  Across all recipient types, the Department assumes that under the proposed regulations, the number of incidents prompting an offer and provision of supportive measures would be approximately 50 percent higher than the number of investigations conducted under the current regulations.  For example, at LEAs, where the Department assumes an average of 3.23 investigations per year were conducted before the 2020 amendments, the Department assumes that there would be an average annual increase to 4.85 incidents prompting an offer of supportive

---

[31] This flat cost is intended to capture any non-staff time costs associated with the provision of supportive measures, including but not limited to fees for services covered by the recipient (such as for counseling) or foregone fees not collected by the recipient (such as a waiver of fees for housing reassignment).  Note that, due to the wide variety of supportive measures that may be offered by recipients and the need to tailor any such measures to the specific circumstances of a particular individual, more precise estimation of the costs associated with the provision of supportive measures is not practicable.

Case 3:21-cv-00308-CEA-DCP   Document 83-1   Filed 06/27/22   Page 603 of 701   PageID #: 1836

measures under the proposed regulations. The Department assumes that, across all recipient types, supportive measures are accepted in approximately 90 percent of the incidents in which they are offered. Thus, the Department assumes that LEAs provide supportive measures 4.36 times per year. At IHEs, the Department assumes 7.70 provisions of supportive measures per year and at other recipients, 2.70 provisions per year. Across all recipient types, the Department estimates that the provision of supportive measures based on pre-2020 amendments incident data costs approximately $69,962,040 per year.

The Department's estimates also reflect an anticipated change in the behavior of complainants across all recipient types due to the proposed regulations. Specifically, the Department has received anecdotal reports of complainants accepting supportive measures while declining to participate in a recipient's grievance procedures due to the perceived burden associated with initiating those procedures. The Department estimates that currently, the number of individuals accepting supportive measures is two to three times greater than the number of individuals choosing to pursue resolution through the recipient's grievance procedures. Under the proposed regulations, however, the Department estimates that the percentage of individuals who report an incident to a recipient and choose to make a complaint to initiate the recipient's grievance procedures under proposed § 106.45, and if applicable proposed § 106.46, would increase, with the discrepancy between the two reduced, on average, to approximately 35 percent. This change is also likely to result in large, unquantified benefits to complainants by providing increased opportunities for reporting sex discrimination and accepting supportive measures, as explained in the discussion of Benefits of the Proposed Regulations (Section 3). In response to the proposed regulations, the Department assumes, as described in the discussion of Developing the Model (Section 4.B), that all recipients would see a 10 percent increase in the

number of incidents in which a complainant accepts some supportive measures offered. The Department notes that this is not an assumption that the proposed regulations would increase the number of incidents that may initiate an offer of supportive measures, but rather, the Department believes this increase likely would be driven by greater clarity regarding the scope of coverage created by the proposed regulations and enhanced training requirements which would inform individuals who are already eligible for such measures of the availability of these measures. The Department assumes that under the proposed regulations, each LEA would provide supportive measures 4.80 times per year, each IHE would do so 8.47 times per year, and other recipients would do so 2.97 times each per year. In all, the Department estimates that after the enactment of the proposed regulations, the provision of supportive measures would cost a total of $76,958,240, for a net increase of $6,996,200.

The Department requests comment on the likely effect of the proposed regulations on the costs associated with the provision of supportive measures, particularly regarding assumptions about the likely effects of recipients offering supportive measures in instances of receiving information about sex discrimination not related to sex-based harassment or prohibited retaliation.

<u>Investigations and adjudications</u>

Under the current regulations, the geographic location of an alleged incident affects whether the allegations would be covered under Title IX. As a result, the Department recognizes that LEAs and IHEs spend time investigating whether incidents took place in a location that requires the use of Title IX grievance procedures to investigate and adjudicate allegations of sexual harassment. The proposed change to § 106.11 would clarify that Title IX applies to every recipient and all sex discrimination occurring under a recipient's education program or activity.

604

This includes the obligation to respond to a hostile environment based on sex under a recipient's education program or activity in the United States, even if the sex-based harassment contributing to the hostile environment occurred outside the recipient's education program or activity or outside the United States. In some instances, such as when an alleged incident occurred outside of the United States and may have contributed to a hostile environment in the recipient's education program or activity domestically, the Department anticipates that the resulting investigation may be more time consuming. Due to a lack of high-quality data on these issues, the Department does not have a basis upon which to develop estimates of this change. The Department seeks comment to help better estimate the effects of this change.

As noted in the discussion of Developing the Model (Section 4.B), it is the Department's preliminary view that recipients would fall into three groups for purposes of categorizing their likely responses to the proposed regulations. A recipient in Group A would likely experience an increase in the number of Title IX investigations conducted under the proposed regulations, but it would also likely exercise flexibilities built into the proposed regulations which would reduce the burden per complaint. It is important to note that the Department assumes that the exercise of these flexibilities would not impact a recipient's ability to ensure fair investigations and adjudications but rather, would allow it to develop and maintain prompt and equitable procedures tailored to its educational settings, reducing the burden on the recipient while ensuring the implementation of a fair and equitable proceedings for the parties. A recipient in Group B also would likely experience an increase in the number of investigations conducted annually. However, the Department believes in its tentative view that a recipient in Group B would be more likely to maintain the structures required under the 2020 amendments, as these recipients likely already investigate and adjudicate the forms of conduct covered by the proposed

605

regulations but excluded from the scope of the current regulations, by way of an alternative disciplinary process. Likewise, a recipient in Group C, having complied with the 2020 amendments and also having continued to respond to sex discrimination as it had prior to those amendments, would be unlikely to experience any burden changes associated with increased numbers of investigations or changes in the burden of such investigations.

As described in the discussion of Developing the Model (Section 4.B), the Department has a reasonable framework for understanding the likely actions of recipients, including how long it would take for a recipient to investigate a complaint of sexual harassment, based on discussions with organizations that work directly with Title IX Coordinators at LEAs and IHEs. For LEAs in Group A, the Department estimates that an investigation currently takes, on average, 3 hours from a Title IX Coordinator, 4 hours from an administrative assistant, 2 hours each from two lawyers/advisors ($148.76/hour) when they are involved, 6 hours from an investigator ($56.52/hour), and 2 hours from an adjudicator ($75.94/hour). Note that the Department assumes that lawyers/advisors would be involved in approximately 15 percent of cases. For IHEs in Group A, the Department assumes an investigation currently takes, on average, 6 hours from a Title IX Coordinator, 8 hours from an administrative assistant, 5 hours each from two lawyers/advisors, 10 hours from an investigator, and 2 hours from an adjudicator. For other recipients in Group A, the Department assumes an investigation currently takes, on average, 2 hours from a Title IX Coordinator, 24 hours from an administrative assistant, 2 hours each from two lawyers/advisors, 1 hour from an investigator, and 2 hours from an adjudicator. Across all recipients in Group A, the Department assumes a flat rate of $100 per adjudication to meet the recording requirements of the 2020 amendments. The Department estimates that LEAs in Group A currently conduct, on average, 1.94 investigations per year. At the IHE level, the

Department estimates that Group A institutions conduct 3.82 investigations per year, while other recipients in Group A conduct, on average, one investigation per year. In total, the Department estimates that investigations and adjudications for recipients in Group A currently cost a total of approximately $6,807,190.

Under the proposed regulations, the Department estimates that recipients in Group A would develop revised procedures to ensure fair investigations tailored to their educational settings, which would reduce the burden associated with each investigation and adjudication. Specifically, the removal of LEAs from some of the specific obligations under current § 106.45 would result in such recipients in Group A no longer being required to supplement the work of their own administrators with specialized individuals when conducting an investigation and making a determination in response to a complaint of sex-based harassment. The Department assumes investigations would require 4 hours from a Title IX Coordinator or other administrator (such as a building-level principal or assistant principal) and 4 hours from an administrative assistant. At the IHE level, the Department assumes each investigation and adjudication would take 5 hours from a Title IX Coordinator, 8 hours from an administrative assistant, 5 hours each from two lawyers/advisors, 10 hours from an investigator, and 2 hours from an adjudicator. For other recipients, the Department anticipates a need for 2 hours from a Title IX Coordinator, 4 hours from an administrative assistant, 2 hours each from two lawyers/advisors, 1 hour from an investigator, and 2 hours from an adjudicator.

As a preliminary matter, the current regulations require a recipient to create an "audio or audiovisual recording, or transcript" of all live hearings. As LEAs are not required to hold hearings, the Department assumes that few, if any, choose to do so. However, because IHEs are required to hold hearings under the current regulations, many recipients with means have chosen

607

to fulfill this requirement by using a court reporter.

For IHEs and other recipients in Group A, the Department anticipates no change in the flat rate of $100 per investigation associated with meeting the recording requirements. The Department assumes no recording costs for LEAs in Group A. Under the proposed regulations, the Department assumes that LEAs in Group A would conduct, on average, 3.55 investigations per year; IHEs in Group A would conduct an average of 6.27 investigations per year, and other recipients would conduct, on average, 2.20 investigations per year. The Department therefore estimates that, under the proposed regulations, investigations and adjudications among recipients in Group A would cost approximately $9,548,740 per year, which represents a net burden increase of $2,741,550 per year.

**Table I. Investigations and Adjudications Burden Estimates – Group A Recipients[32]**

| | Baseline | | | After Proposed Regulations | | |
|---|---|---|---|---|---|---|
| Cost Category | LEAs | IHEs | Other | LEAs | IHEs | Other |
| Title IX Coordinator | 3 hours | 6 hours | 2 hours | 4 hours | 5 hours | 2 hours |
| Adm. Assistant | 4 hours | 8 hours | 4 hours | 2 hours | 8 hours | 4 hours |
| Lawyer/Advisor[1] | 2 hours[2] | 5 hours | 2 hours | -- | 5 hours | 2 hours |
| Investigator | 6 hours | 10 hours | 1 hour | -- | 10 hours | 1 hour |
| Adjudicator | 2 hours | 2 hours | 2 hours | -- | 2 hours | 2 hours |
| Recording | $100 | $100 | $100 | $0 | $100 | $100 |
| # of Investigations | 1.94 | 3.82 | 1.00 | 3.55 | 6.27 | 2.20 |

[32] Estimates were based on information provided by national professional organizations and discussions with internal subject matter experts.

[1] When present, the Department assumes two lawyers/advisors per investigation and adjudication.

[2] The Department assumes lawyers/advisors are involved in only 15 percent of investigations and adjudications. This estimate is based on information from a professional organization.

For LEAs in Group B, the Department assumes an investigation currently requires 3 hours of time from a Title IX Coordinator, 14 hours from an administrative assistant, 8 hours each from two lawyers/advisors in 15 percent of cases, 8 hours from an investigator, and 2 hours from an adjudicator. At the IHE level in Group B, the Department estimates that current practices likely require 6 hours from a Title IX Coordinator, 20 hours from an administrative assistant, 20 hours each from two lawyers/advisors, 20 hours from an investigator, and 10 hours from an adjudicator. At other recipients in Group B, the Department assumes that current practices require 8 hours from a Title IX Coordinator, 16 hours from an administrative assistant, 8 hours each from two lawyers/advisors, 5 hours from an investigator, and 2 hours from an adjudicator. At LEAs and other recipients in Group B, the Department estimates that it would cost a flat rate of $100 per hearing to meet the recording requirements of the 2020 amendments. At IHEs, the Department assumes a rate of $200 per hearing to account for the possibility that IHEs may want more extensive records of hearings, such as official transcripts, in addition to an audio recording. The Department assumes that LEAs in Group B currently conduct, on average, 1.938 investigations per year; that IHEs in Group B conduct 3.82 investigations per year, and that other recipients in Group B conduct one investigation per year. In total, therefore, the Department estimates that investigations and adjudications for a recipient in Group B currently cost approximately $184,185,730 per year.

As noted in the discussion of Lack of Data Following the Promulgation of the 2020

Amendments (Section 4.A.3), the Department assumes that a recipient in Group B shifted approximately 90 percent of those incidents into an alternative disciplinary process rather than not taking any action in response to incidents that were previously covered under their Title IX policies. As described in the discussion of Developing the Model (Section 4.B), the Department has initially determined, based on internal subject matter expertise, that many recipients developed alternative processes by which to address conduct that fell outside of the parameters of current § 106.45. As noted in that section, Group B and Group C recipients created alternative processes that either reflected the recipient's student conduct process (Group B recipients) or mirrored the current § 106.45 grievance procedures (Group C recipients). The Department assumes that resource and time expenditures for these alternative processes mirror those of the recipient's student conduct process for Group B recipients or the recipient's current § 106.45 grievance procedures for Group C recipients.

At the LEA level, the Department assumes that an alternative disciplinary process requires 3 hours from an administrator ($100.36/hour), 14 hours from an administrative assistant, 6 hours each from two lawyers/advisors in 5 percent of cases, and 6 hours from an investigator. The Department estimates that in 75 percent of LEAs, the process is adjudicated by an administrator for 3 additional hours, while in the other 25 percent of LEAs, an independent adjudicator is needed for 2 hours. At the IHE level, the Department assumes that the alternative disciplinary process requires 6 hours from an administrator, 20 hours from an administrative assistant, 10 hours each from two lawyers/advisors, and 15 hours from an investigator. The Department estimates that in 60 percent of IHEs, the process is adjudicated by an administrator for 6 additional hours, while in the other 40 percent of IHEs, an independent adjudicator is required for 8 hours. The Department estimates that LEAs in Group B, on average, shifted 1.628

investigations per year into alternative disciplinary processes in response to the 2020 amendments, while IHEs did the same with 1.70 investigations, and other recipients did so for 0.9 investigations.  The Department therefore estimates that a recipient currently spends approximately $62,463,510 per year on implementing alternative disciplinary processes for incidents that were previously covered under their grievance procedures prior to the 2020 amendments.

Under the proposed regulations, the Department assumes that all of those incidents would be handled under the recipient's Title IX grievance procedures.  At LEAs in Group B, the revised procedures would require approximately 4 hours from a Title IX Coordinator or other administrator (such as a building level principal or assistant principal) and 2 hours from an administrative assistant.  The Department assumes that, in approximately 25 percent of instances, LEAs would use an investigator and adjudicator other than the Title IX Coordinator or other administrator.  In such instances, the Department assumes that those LEAs would need 2 hours from an investigator and 1 hour from an adjudicator.  The Department assumes that, in 5 percent of instances, each party would have a lawyer/advisor each spending 4 hours on the incident. These LEA level estimates represent an assumption that most LEAs would return to their processes from prior to the 2020 amendments due to the removal of LEAs from some of the specific obligations under current § 106.45.  At the IHE level in Group B, the revised procedures would require 5 hours from a Title IX Coordinator, 13 hours from an administrative assistant, 15 hours each from two lawyers/advisors, 18 hours from an investigator, and 8 hours from an adjudicator.  For other Group B recipients, revised procedures would require 2 hours from a Title IX Coordinator, 6 hours from an administrative assistant, 2 hours each from two lawyers/advisors in 5 percent of proceedings, 2 hours from an investigator, and 1 hour from an

adjudicator.

Under the proposed regulations, the Department believes that Group B LEAs would conduct, on average, 3.553 investigations per year, while IHEs would conduct 6.27 investigations per year, and other recipients would conduct 2.20 investigations per year. Therefore, under the proposed regulations, investigations and adjudications at a recipient in Group B would cost a total of approximately $180,542,490 per year which represents a net decrease in the burden associated with investigations and hearings by $66,106,750 per year.

**Table II. Investigations and Adjudications Burden Estimates – Group B Recipients**

| Cost Category | Baseline | | | After Proposed Regulations | | |
|---|---|---|---|---|---|---|
| *Harassment Grievance Procedures* | LEAs | IHEs | Other | LEAs | IHEs | Other |
| Title IX Coordinator | 3 hours | 6 hours | 8 hours | 4 hours | 5 hours | 2 hours |
| Adm. Assistant | 14 hours | 20 hours | 16 hours | 2 hours | 13 hours | 6 hours |
| Lawyer/Advisor[1] | 8 hours[2] | 20 hours | 8 hours | 4 hours[3] | 15 hours | 2 hours |
| Investigator | 8 hours | 20 hours | 5 hours | 2 hours[4] | 18 hours | 2 hours |
| Adjudicator | 2 hours | 10 hours | 2 hours | 1 hours[4] | 8 hours | 1 hour |
| Recording | $100 | $200 | $100 | $100 | $200 | $100 |
| # of Investigations | 1.94 | 3.82 | 1.00 | 3.55 | 6.27 | 2.20 |
| *Alternate Process* | LEAs | IHEs | Other | | | |
| Administrator | 3 hours[5] | 6 hours[6] | 4 hours | | | |
| Adm. Assistant | 14 hours | 20 hours | 8 hours | | | |

Case 3:21-cv-00308-CEA-DCP   Document 83-1   Filed 06/27/22   Page 613 of 701   PageID #: 1846

| Lawyer/Advisor[1] | 6 hours[3] | 10 hours | -- |
|---|---|---|---|
| Investigator | 6 hours | 15 hours | -- |
| Adjudicator | 2 hours | 8 hours | -- |
| Recording | $100 | $200 | $100 |
| # of Investigations | 1.16 | 1.70 | 0.90 |

[1] When present, the Department assumes two lawyers/advisors per investigation and adjudication.

[2] The Department assumes lawyers/advisors are involved in 15 percent of investigations and adjudications.

[3] The Department assumes lawyers/advisors are involved in 5 percent of investigations and adjudications.

[4] The Department assumes investigators and adjudicators other than the Title IX Coordinator or another administrator would be used in approximately 25 percent of instances.

[5] The Department assumes administrators also serve as adjudicators in 75 percent of instances and their burden doubles in such cases.

[6] The Department assumes administrators also serve as adjudicators in 60 percent of instances and their burden doubles in such cases.

Appeals and informal resolution

The Department assumes that nothing in the proposed regulations would change the nature of the appeal process for fully adjudicated complaints. The Department notes that the proposed regulations would require all recipients to offer an appeal of a dismissal of a sex discrimination complaint. This limited right to an appeal is an expansion of recipients' current obligations as it would apply to any dismissal of a sex discrimination complaint, not just to

complaints of sex-based harassment. Although it is possible that at least some portion of recipients have an appeal process as part of their current procedures for resolving complaints of sex discrimination, the Department assumes that its current estimates may overestimate the costs of the proposed regulations in this area. The Department requests comment on this issue. Assuming that there is a de minimis change regarding the number of recipients that offer an appeal because all recipients would need to offer an appeal from a dismissal of a complaint of sex discrimination, there would be additional costs to a recipient associated with appeals because of the estimated increase in the number of complaints brought under the proposed regulations and the proportion of decisions that could be appealed.

Across all recipients, the Department estimates that one or more parties in approximately half of all fully adjudicated complaints appeal the determination. This estimate is consistent with estimates from the 2020 amendments and the Department again seeks comment on the extent to which this estimate is reasonable and whether this proportion is likely to change under the proposed regulations. The Department assumes that at the LEA level, the appeal process would require 2 hours each from a Title IX Coordinator, administrative assistant, and two lawyers/advisors as well as an additional 6 hours from an adjudicator while at the IHE level, the Department assumes that the appeal process requires 2 hours from a Title IX Coordinator, 4 hours from an administrative assistant, 5 hours each from two lawyers/advisors, and 8 hours from an adjudicator. Likewise, at other recipients, the Department assumes that the appeal process requires 2 hours each from a Title IX Coordinator, administrative assistant, and two lawyers/advisors, with an additional 8 hours from an adjudicator. Assuming that LEAs, on average, would handle an additional 0.605 appeals per year as a result of the proposed regulations, IHEs, on average, would receive an additional 0.921 appeals per year, and other

614

recipients, on average, would see an additional 0.5 per year, the Department estimates that the increase in appeals stemming from the increase in complaints likely to be made under the proposed regulations would result in an additional cost of approximately $21,084,350 per year.

The Department expects that the proposed regulations would have a de minimis change on the proportion of complaints resolved through informal resolution and would not affect the general burden associated with each such resolution. Specifically, although the requirements for grievance procedures would be less burdensome under the proposed regulations than under the current regulations, the Department expects that the majority of complainants who would have elected to proceed with informal resolution under the current regulations would continue to do so under the proposed regulations because of the elimination of the current regulations' formal complaint requirement prior to initiating the informal resolution process. Although it is possible that a complainant would decide to make a complaint and pursue an investigation because of the reduced burden under the proposed regulations, it is the Department's tentative view that there is no basis to assume that a complainant who would have pursued informal resolution under the current regulations is more or less likely to choose informal resolution under the proposed regulations because individuals' rationales for choosing an informal resolution process vary widely.

Based on anecdotal reports from recipients and other stakeholders, the Department assumes that informal resolutions require more time from a Title IX Coordinator and an administrative assistant than an investigative process. In contrast, the Department assumes that the informal resolution process would remove all costs associated with investigators, adjudicators, and recording at all levels and eliminate costs for lawyers/advisors at the LEA level. At the LEA level, informal resolution may require 1 additional hour from a Title IX

615

Coordinator and 5 hours from an administrative assistant above the level needed for a full

hearing; at the IHE level, the additional burden would be 2.5 hours from a Title IX Coordinator

and 1 hour from an administrative assistant, while at other recipients, the additional burden is

estimated to be 1 hour from a Title IX Coordinator and 3 hours from an administrative assistant.

The Department assumes that, in instances of informal resolution, there would be no burden for

investigators or adjudicators at LEAs, IHE, or other recipients, and no burden for

lawyers/advisors at LEAs or other recipients.  At the IHE level, the Department assumes that,

even in instances of informal resolution, there would be a burden of 6 hours each for two

lawyers/advisors (one working with each party), assuming that the individuals serving in those

roles may become involved earlier in the process than at other educational levels or at other

recipients.  In light of the increase in complaints that the Department anticipates under the

proposed regulations, the estimated increase in the cost of informal resolutions would be

approximately $12,830,090 per year.

<u>Recordkeeping</u>

The Department assumes that all recipients would need to modify their existing

recordkeeping systems to comply with the proposed regulations.  Specifically, the Department

submits that proposed § 106.8(f) would broaden the existing scope of the recordkeeping

requirements under current § 106.45(b)(10) because, unlike the current regulations, the proposed

recordkeeping requirement applies to all incidents or complaints of sex discrimination.

However, the Department assumes that many recipients already maintain records related to sex

discrimination under the auspices of State, local, or other requirements.  In these instances,

proposed § 106.8(f) would not impose any additional burden on those recipients as their existing

recordkeeping activity would likely address all pertinent requirements under the proposed

616

regulations.

Alternatively, for recipients that only maintain records related to sexual harassment as required by current § 106.45(b)(10) and do not preserve information related to other forms of sex discrimination, the proposed changes would increase their burden based on the volume of records they will need to maintain related to forms of sex discrimination other than sexual harassment, as would be required by proposed § 106.8(f).  The Department estimates that the proposed regulations, in general, would increase the recordkeeping burden for these recipients.  At the LEA level, the Department estimates that necessary modifications to current practice would require 2 hours each from a Title IX Coordinator and an administrative assistant, whereas at the IHE level, where a recipient is more likely to maintain electronic systems for these records, these changes would require 4 hours from a Title IX Coordinator, 8 hours from an administrative assistant, and 4 hours from a database administrator ($76.54/hour).  At other recipients, the Department estimates that modifications would require 2 hours each from a Title IX Coordinator and an administrative assistant.  In total, the Department estimates that modifications to recipients' recordkeeping systems would cost approximately $13,288,180 in Year 1.

In future years, the Department assumes the proposed regulations would necessitate an ongoing increase, above the baseline year, in recordkeeping costs.  Specifically, at the LEA level, the Department estimates that recordkeeping would require 1 additional hour each from the Title IX Coordinator and an administrative assistant; at the IHE level, 1 additional hour from the Title IX Coordinator and 5 hours from an administrative assistant; and at other recipients, 1 additional hour each from the Title IX Coordinator and an administrative assistant.  In total, the Department estimates the ongoing recordkeeping burden to increase by approximately $5,382,570 per year.

617

The Department seeks comment on these estimates, particularly whether they accurately reflect the likely changes in annual burden on recipients associated with the proposed changes to § 106.8(f).

Monitoring the recipient's education program or activity for barriers to reporting information about conduct that may constitute sex discrimination

The Department's proposed regulations would require a recipient to ensure that its Title IX Coordinator monitors the recipient's education program or activity for barriers to reporting sex discrimination and that the recipient take steps reasonably calculated to address such barriers. Although a recipient is neither required to nor prohibited from monitoring its environment for these barriers under the current regulations, the Department assumes that many recipients, particularly IHEs, currently monitor their education programs or activities for such barriers to avoid potential legal liability because barriers to reporting limit a recipient's ability to ensure that its education program or activity is operating free from sex discrimination. The Department also assumes that Title IX Coordinators are motivated to proactively identify and address sex discrimination in the recipient's education program or activity. Although some recipients may need to create new mechanisms to monitor their environments, the Department believes that many of these recipients will select options with de minimis costs, such as incorporating questions designed to elicit information from students and employees about barriers to reporting into existing training materials, incorporating such questions into conversations with students, employees, and others during roundtable discussions or listening sessions with interested stakeholders, or through other means. The Department similarly assumes that the steps a recipient would need to take to remove these barriers, should they be identified, would likely have a de minimis cost as well (e.g., reminding students, employees, and others during trainings

618

about the range of reporting options available at a particular recipient or reporting an employee who discourages their students from reporting to human resources for violating the recipient's code of ethics standards). That said, the Department recognizes that there is a wide range of possible recipient responses to this proposed requirement with potentially varying costs and benefits. Therefore, the Department requests comment on the likely costs associated with monitoring a recipient's environment for barriers to sex discrimination and taking steps reasonably calculated to remove such barriers.

## 4.D.    CHANGES IN THE PROPOSED REGULATIONS NOT ESTIMATED TO HAVE COSTS

In addition to the changes explained in the discussion of Cost Estimates (Section 4.C) that are estimated to have costs, there are several proposed changes that the Department does not anticipate would generate costs for regulated entities above and beyond general costs described previously. The Department believes it is important to discuss some of these proposed changes to clarify the basis for that assumption and ensure that the public has an adequate opportunity to review and comment on the Department's analysis.

Lactation space for students and employees

Although the current regulations specifically prohibit discrimination against students and employees based on pregnancy, childbirth, termination of pregnancy, and recovery, the Department proposes revising the regulations to clarify that a recipient may not discriminate based on pregnancy or related conditions, including lactation. The Department also proposes revisions to the regulations that would require a recipient to provide a lactation space for students and employees and reasonable modifications for students and break time for employees to enable use of the space as needed. Specifically, proposed § 106.40(b)(3)(iv) would require a recipient

to "[e]nsure the availability of a lactation space, which must be a space other than a bathroom, that is clean, shielded from view, free from intrusion from others, and may be used by a student for expressing breast milk or breastfeeding as needed." Similarly, proposed § 106.57(e) would require a recipient to provide "reasonable break time for an employee to express breast milk or breastfeed as needed" and to "ensure the availability of a lactation space, which must be a space other than a bathroom that is clean, shielded from view, free from intrusion from others, and may be used by an employee for expressing breast milk or breastfeeding as needed." Both measures are critical means for preventing discrimination and ensuring that students and employees are able to continue pursuing their education and employment, respectively, while taking brief breaks from their classes or job duties as needed to express breast milk or breastfeed.

The Department does not anticipate significant cost to recipients based on this proposed revision. Although it is possible that the proposed regulations' clarification that a lactation space must be available for both students and employees may result in an increase in demand for a such a space, it is the Department's tentative view that any such increase would likely result in a de minimis impact on costs as distributed over all recipients over time. The Department posits this for several reasons.

First, although it is unknown how many recipients presently offer lactation space for students or employees due to a lack of data, all or virtually all recipients are already required to comply with provisions for lactation time and space for employees covered under the Affordable Care Act's amendments to Section 7 of the Fair Labor Standards Act (FLSA).[33] The FLSA

_____

[33] Under the FLSA, a covered enterprise is "the related activities performed through unified operation or common control by any person or persons for a common business purpose and… is engaged in the operation of a …a preschool, an elementary or secondary school, or an institution of higher education (whether operated for profit or not for profit)" or "is an activity of a public

Case 3:21-cv-00308-CEA-DCP   Document 83-1   Filed 06/27/22   Page 621 of 701   PageID #: 1854

requires employers to provide reasonable break times and a private place, other than a bathroom, to employees covered under Section 7 of the FLSA who are breastfeeding to express milk for one year after their child's birth. 29 U.S.C. 207(r)(1). The space must be "shielded from view and free from intrusion from coworkers and the public." *Id.* The Department of Labor (DOL) has explained that the space must also be "functional" and "available when needed" and that the "frequency of breaks needed to express milk as well as the duration of each break will likely vary." U.S. Dep't of Labor, Fact Sheet #73: Break Time for Nursing Mothers under the FLSA (April 2018), https://www.dol.gov/agencies/whd/fact-sheets/73-flsa-break-time-nursing-mothers. DOL has also clarified that a temporary or converted space is sufficient if the space is available when needed, shielded from view, and free from any intrusion from co-workers and the public. *Id.* Employees who would be covered by the lactation time and space requirements of the FLSA include many full-time and part-time workers in public and private education programs or activities. 29 U.S.C. 203(e). Although the FLSA exempts certain employees, such as professors, teachers, and certain academic administrative personnel from coverage, virtually all recipients would nevertheless have to provide lactation space to their non-exempt staff. *See* 29 U.S.C. 213(a)(1) (exempting executive, administrative, and professional employees, including academic administrative personnel and teachers, from the FLSA); 29 U.S.C. 207(r)(1) (FLSA lactation time and space requirement). The Department does not have specific information about existing lactation spaces for employees due to a lack of relevant data. The Department assumes, however, that given the limited requirements for the lactation space itself, that most recipients would be able to locate such a space within their current property or maximize the use of an

---

agency." U.S. Dep't of Labor, Handy Reference Guide to the Fair Labor Standards Act (Sept. 2016), https://www.dol.gov/agencies/whd/compliance-assistance/handy-reference-guide-flsa.

existing space. The Department's proposed requirements regarding lactation space are similar to those of the FLSA with the additional requirement that the space be clean. The Department assumes that most, if not all, recipients already clean their facilities, including any existing lactation space, and anticipates that the additional cost of cleaning associated with the proposed regulations would be negligible.

Second, some States also require a recipient either to provide lactation space to employees or to make reasonable attempts to do so. *See, e.g.*, Minn. Stat. Ann. § 181.939 (2014) (requiring employers to make a reasonable effort to provide a private location, other than a bathroom or toilet stall, in close proximity to the workplace that is shielded from view, free from intrusion, and has an electrical outlet); N.M. Stat. Ann. § 28-20-2 (2007) (requiring employers to provide a clean, private place, not a bathroom, for employees who are breastfeeding to pump); N.Y. Labor Law § 206-C (2007) (requiring that employers make a reasonable attempt to provide employees a private location for lactation); Okla. Stat. tit. 70, § 5-149.3 (2021) (requiring each school district board of education to make a reasonable effort to provide a private, secure, sanitary room or other location, other than a toilet stall, for an employee to express milk or breastfeed a child); R.I. Gen. Laws § 28-5-7.4 (2015) (prohibiting employers from refusing to reasonably accommodate an employee's or prospective employee's condition related to pregnancy, childbirth, or a related medical condition, including but not limited to the need to express breast milk for a nursing child; "reasonable accommodation" is defined to include a "private non-bathroom space for expressing breast milk"); S.C. Code Ann. § 41-1-130 (2020) (requiring employers to make reasonable efforts to provide certain areas where employees may express breast milk); Tenn. Code Ann. § 50-1-305 (1999) (requiring employers to make a reasonable effort to provide a private location, other than a toilet stall, near the workplace for

employees' lactation); Utah Code Ann. § 34-49-202 (2015) (requiring public employers to provide employees a clean, private room or location that is not a bathroom and that has an electrical outlet for lactation, as well as access to a refrigerator or freezer for the storage of breast milk); Vt. Stat. Ann. Tit. 21, § 305 (2008) (requiring employers to "[m]ake a reasonable accommodation [for lactation] to provide appropriate private space that is not a bathroom stall"); Va. Code § 22.1-79.6 (2014) (requiring local school boards to designate private, non-restroom locations for employees and students to express breast milk); Wash. Rev. Code 43.10.005 (2017) (requiring employers to provide a private location, other than a bathroom, for employee lactation, or if no such space exists, work with the employee to identify a convenient location for lactation). As some States already require recipients to provide lactation spaces or make reasonable attempts to do so, the Department believes that the proposed requirement would be neither burdensome nor costly as many recipients may already be required to comply with similar provisions due to State law.

In addition, for some recipients, lactation space and break times may be the subject of local laws or separate employment agreements, such as collective bargaining agreements. Some recipients may simply provide lactation space and break time voluntarily. In short, the Department anticipates that its proposed regulations would impose de minimis cost on a recipient that is already providing lactation space and breaks to its staff.

The Department acknowledges that in some cases, the proposed regulations may result in increased demand for lactation space or break time. It is difficult to quantify the extent to which demand might increase or how demand might vary over time as the Department is not aware of any available data source that tracks the numbers of students or employees in need of lactation space. The Department anticipates that demand would vary across recipients, based on the

composition of the student and employee population at any time, further reducing the impact to individual recipients.

When a recipient already has a lactation space, the Department anticipates that it is likely that the space would meet the Department's proposed requirements for the reasons already discussed. In addition, because a lactation space is only in use by any given person for a limited period of time, it is possible that many recipients already have sufficient capacity to accommodate additional users; however, the Department anticipates that a recipient that does not currently provide lactation space would be able to comply with the proposed regulations using existing space at minimal cost. For example, the proposed regulations do not require that a lactation space be of a particular size, shape, or include particular features other than being private and clean. Similarly, the Department anticipates that a recipient that currently provides lactation space would already have a system in place to administer use of the space (for example, through a sign-up system) to the extent needed and that this could be adapted to accommodate new demand with minimal cost.

With respect to the Department's proposed requirement that a recipient provide its employees with reasonable break time for lactation, the Department also anticipates that any increased demand could be managed through an existing system for coverage of employees who require brief breaks for other reasons. This is more likely to be necessary for LEA school teachers, whose breaks may require coverage because of the nature of school schedules, rather than employees at IHEs who may not require coverage during breaks needed for lactation because those employees do not typically have supervisory responsibility for children. The Department also recognizes that at some IHEs and other types of recipients, some employees would have access to a private office that is sufficient for lactation needs.

624

Finally, the Department anticipates that its proposed regulations regarding lactation time and space would also likely improve the recipient's retention of its students and employees. For example, a student parent may be more comfortable remaining in an education program or activity in which the recipient is reducing barriers to remaining in school during the early months and years of a child's life. Likewise, an employee who has access to sufficient lactation time and space may also be more likely to return to the workplace or return earlier from parental leave than one who does not have such access because the employee knows that they can continue to breastfeed after returning to work. For these reasons, the Department submits that this provision, as proposed, would impose de minimis costs and would provide important benefits in terms of eliminating sex-based barriers to education and employment.

Reasonable modifications for students because of pregnancy or related conditions

The Department does not anticipate significant cost to a recipient based on proposed § 106.40(b)(3)(ii) and (4), which would require that a recipient provide a student the option of reasonable modifications because of the student's "pregnancy or related conditions" as defined by proposed § 106.2, because this requirement is similar to OCR's previous discussion of a recipient's obligations in this context. U.S. Dep't of Educ., Office for Civil Rights, Supporting the Academic Success of Pregnant and Parenting Students Under Title IX of the Education Amendments of 1972 at 9 (June 2013) (2013 Pregnancy Pamphlet), https://www2.ed.gov/about/offices/list/ocr/docs/pregnancy.pdf. Current § 106.40(b)(1) prohibits a recipient from discriminating against or excluding "any student from its education program or activity, including any class or extracurricular activity, on the basis of the student's pregnancy, childbirth, false pregnancy, termination of pregnancy or recovery therefrom, unless the student requests voluntarily to participate in a separate portion of the program or activity of the

recipient."  Likewise, current § 106.40(b)(4) has long required a recipient to treat pregnancy or related conditions similarly to other temporary disabilities "with respect to any medical or hospital benefit, service, plan, or policy [the] recipient administers, operates, offers, or participates in with respect to students admitted to the recipient's educational program or activity."

OCR's 2013 Pregnancy Pamphlet clarified that to "ensure a pregnant student's access to its educational program, when necessary, a school must make adjustments to the regular program that are reasonable and responsive to the student's temporary pregnancy status.  For example, a school might be required to provide a larger desk, allow frequent trips to the bathroom, or permit temporary access to elevators."  2013 Pregnancy Pamphlet at 9.  As the requirement for reasonable modifications because of pregnancy or related conditions builds upon the former "reasonable and responsive" standard and sets a clearer framework for how to assess what must be provided, the Department does not anticipate that the required steps for compliance with the proposed "reasonable modifications because of pregnancy or related conditions" standard under proposed § 106.40(b)(4) would be more costly than under the prior OCR interpretation of a recipient's duties.

Participation consistent with gender identity

The Department does not anticipate significant cost to a recipient above and beyond the general costs described in the discussion of Costs of the Proposed Regulations (Section 4), to comply with proposed §§ 106.31(a)(2) and 106.41(b)(2).  Proposed § 106.31(a)(2) would clarify that even in the discrete, limited settings in which a recipient may impose different treatment or separate students on the basis of sex, a recipient must not do so in a manner that subjects a person to more than de minimis harm, unless otherwise permitted by Title IX or the Title IX

626

regulations.  Proposed § 106.31(a)(2) also would clarify that adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with their gender identity causes more than de minimis harm.  As described in the discussion of Coverage of All Forms of Sex Discrimination (Section IV), the proposed regulations' prohibition on preventing a person from participating in an education program or activity consistent with their gender identity is consistent with the analysis of Federal courts that have addressed how Title IX protects students from discrimination based on sex stereotypes and gender identity. Some stakeholders have expressed concern about costs associated with permitting students to participate in certain education programs or activities consistent with their gender identity. Compliance with proposed § 106.31(a)(2) may require updating of policies or training materials, but would not require significant expenditures, such as construction of new facilities or creation of new programs.  For the many schools that have long maintained policies and practices that generally permit students to participate in school consistent with their gender identity, the proposed regulations may not require any change.  *See*, *e.g.*, Cal. Dep't of Educ., Legal Advisory regarding application of California's antidiscrimination statutes to transgender youth in schools (updated Sept. 16, 2021), https://www.cde.ca.gov/re/di/eo/legaladvisory.asp (describing obligation under California and Federal law that schools afford students equal opportunity and access to the school's facilities, activities, and programs, in a manner that is consistent with each student's gender identity); Washoe Cnty. Sch. Dist., Administrative Regulation 5161: Gender Identity and Gender Non-Conformity – Students (2019), https://www.wcsdpolicy.net/pdf_files/administrative_regulations/5161_Reg-Gender_Identify-v2.pdf (permitting students to participate in sex-separate activities in accordance with their gender identity).  A recipient that maintains policies and practices that prevent students from

627

participating in school consistent with their gender identity would be required to review and update those policies and practices under the proposed regulations; however, the Department anticipates that the costs of these modifications would be subsumed into the general costs of updating policies and procedures to comply with the proposed regulations.

The Department notes that some costs associated with proposed § 106.31(a)(2) may be addressed elsewhere in the RIA. For instance, to the extent that a recipient's failure to comply with proposed § 106.31(a)(2) would lead to additional investigations of alleged discrimination, those costs are addressed in the discussion of costs associated with the proposal to clarify Title IX's coverage of gender identity discrimination. Similarly, to the extent that a recipient would take steps to train employees or students on gender identity discrimination, those costs are addressed in the discussion of costs associated with training. As this is an evolving area of the law, the Department anticipates there may be some costs associated with potential litigation.

The Department acknowledges that these assumptions are uncertain, and requests comment on anticipated changes associated with compliance with proposed § 106.31(a)(2), along with information on any costs associated with such changes.

## 5. REGULATORY ALTERNATIVES CONSIDERED

The Department reviewed and assessed various alternatives prior to issuing the proposed regulations, drawing from internal sources, as well as feedback OCR received in connection with the June 2021 Title IX Public Hearing, numerous listening sessions, and the meetings held in 2022 under Executive Order 12866. In particular, the Department considered the following alternative actions: (1) leaving the current regulations without amendment; (2) rescinding the current regulations in their entirety and reissuing past guidance, including U.S. Dep't of Educ., Office for Civil Rights, Revised Sexual Harassment Guidance: Harassment of Students by

School Employees, Other Students, or Third Parties at 3, noticed at 66 FR 5512 (Jan. 19, 2001)

(rescinded upon effective date of 2020 amendments, Aug. 14, 2020),

www.ed.gov/ocr/docs/shguide.pdf; U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague

Letter: Sexual Violence (Apr. 4, 2011) (rescinded in 2017),

https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf; and U.S. Dep't of

Educ., Office for Civil Rights, Questions and Answers on Title IX and Sexual Violence at 5

(Apr. 29, 2014) (rescinded in 2017), www.ed.gov/ocr/docs/qa-201404-title-ix.pdf; (3) rescinding

the current regulations, either in whole or in part, and issuing new guidance; (4) proposing

narrower amendments to the current regulations, or (5) issuing completely new proposed

amendments to address significant areas (e.g., clarifying coverage includes gender identity,

applying regulatory grievance procedure requirements to all sex discrimination complaints, and

adding regulatory provisions on a recipient's obligation to students and employees who are

pregnant or experiencing pregnancy-related conditions).

The Department believes a combination of (4) and (5), which involves issuing proposed

amendments, is the better alternative. The combination of these alternatives would mean

amending the current regulations to make noteworthy adjustments that would better achieve the

objectives of the statute, are consistent with recent case law, and account for the feedback OCR

received in connection with its June 2021 Title IX Public Hearing, numerous listening sessions,

and the meetings held in 2022 under Executive Order 12866. Based on its internal review, the

Department's current view is that the current regulations may not fully address all forms of sex

discrimination in a recipient's education program or activity or offer sufficient safeguards to

reduce—and ultimately remove—sex discrimination in the educational setting. The approach

adopted in the 2020 amendments may have created a gap in implementing Title IX's prohibition

on sex discrimination: a recipient may have information about possible sex discrimination in its education program or activity and yet may have no obligation to take any action to address it if a formal complaint is not filed and the recipient's Title IX Coordinator determines that the allegations do not warrant overriding a complainant's wishes and initiating a complaint. Numerous stakeholders shared their concerns with the Department, specifically that certain requirements in the current regulations may impede a recipient from taking prompt and effective action in response to allegations of sexual harassment in the recipient's education program or activity. By creating extensive obligations related only to certain forms of sexual harassment and leaving a recipient's obligations with respect to the necessary grievance procedures to respond to other forms of sex-based harassment and sex discrimination unaddressed, the current regulations may have created a risk that Title IX's prohibition on sex discrimination would be underenforced. In addition, it is the Department's tentative view that greater clarity is required than what is in the current regulations with respect to the scope of sex discrimination, including with respect to discrimination based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity. The Department is concerned that equal access to a recipient's education program or activity free from sex discrimination may be impaired absent this clarity.

For reasons explained in the RIA as well as throughout the preamble, and in light of stakeholder feedback received in 2021 and 2022, alternative (1) was not a reasonable option. Alternatives (2) and (3) were rejected because the Department continues to believe that it is necessary to establish, through regulations, the legal obligations of a recipient to ensure that its education program or activity is free from all forms of sex discrimination; guidance documents, which are not legally binding on a recipient, would not serve that function.

630

After careful consideration of these alternatives, the Department proposes that adopting alternatives (4) and (5) to (a) best fulfill Title IX's guarantee of nondiscrimination on the basis of sex by a recipient of Federal funds in its education program or activity; (b) ensure that a recipient understands its obligations to address sex discrimination in all forms, including sex-based harassment, so that students and others can participate in the educational environment free from discrimination based on sex; (c) safeguard fairness for all who participate in a recipient's grievance procedures for sex discrimination, including sex-based harassment; (d) protect a person's rights under Title IX by requiring a recipient to provide appropriate supportive measures to the complainant and the respondent and remedies to a complainant or any other person the recipient identifies as having their equal access to the recipient's education program or activity limited or denied by sex discrimination; and (e) ensure that a recipient understands its obligations to prevent discrimination against and ensure equal access for students and employees who are pregnant or experiencing pregnancy-related conditions.

In addition to reviewing stakeholder feedback, the Department considered alternatives to the proposed regulations based upon its internal analysis of the costs and benefits of various options.

Clarification of the scope of Title IX

During its review of various alternatives to the proposed regulations, the Department considered whether to clarify and define the scope of Title IX. Specifically, although the current regulations define sexual harassment, they do not clarify the scope of Title IX's prohibition on sex discrimination. The Department considered several options to address this area and chose to specify in the proposed regulations that Title IX's prohibition on sex discrimination includes discrimination on the basis of pregnancy or related conditions, sex stereotypes, sex

characteristics, sexual orientation, and gender identity.  Although the Department recognizes that clarifying the scope of Title IX could result in increased costs to recipients, especially those recipients that limited the application of their Title IX policies to those forms of conduct explicitly referenced in the current regulations, the Department believes that the non-monetary benefits of providing clarity and recognizing the broad scope of Title IX's protections outweighs the costs associated with the implementation of these robust protections.

Clarification of the geographic scope of Title IX's prohibition on sex discrimination

The Department also considered retaining the current regulations' scope of coverage with respect to conduct that occurs off-campus and off school grounds.  Numerous stakeholders in OCR's June 2021 Title IX Public Hearing, OCR's listening sessions, and the meetings held in 2022 under Executive Order 12866 requested that the Department explicitly include additional instances of off-campus conduct within the scope of its proposed regulations.  Specifically, these stakeholders commented that excluding such conduct denied students, employees, and others equal access to a recipient's education program or activity and failed to fully implement Title IX. As explained in greater detail in the discussion of investigations and adjudications in Cost Estimates (Section 4.C), the Department acknowledges the potential cost increase for a recipient in addressing discrimination that occurs off-campus and also in addressing a hostile environment within the recipient's education program or activity that arises in part from sex-based harassment that occurs off-campus.  However, the Department expects that many recipients are already addressing such conduct and incurring related costs through their creation and implementation of alternative disciplinary proceedings to address discriminatory conduct previously addressed through their Title IX procedures prior to the current regulations.  Moreover, the Department now believes that the conduct excluded from the current regulations may have profound and

long-lasting economic impacts on students, employees, a recipient's educational environment, and the general public and that the benefits of addressing this conduct through the proposed regulations far outweighs any associated costs.

<u>Distinguishing between educational levels</u>

The Department also considered whether to distinguish between educational levels in the proposed regulations. Specifically, during the June 2021 Title IX Public Hearing, in listening sessions, and during the meetings held in 2022 under Executive Order 12866, stakeholders associated with LEAs expressed concerns that certain requirements in the current regulations impeded their ability to successfully address sexual harassment in their day-to-day school environment. Likewise, the Department considered whether all students and employees should remain subject to identical regulations or whether, for the reasons set out in the preamble, equitable treatment under Title IX would be best ensured by amending the regulations in ways that require IHEs to be responsive to the unique needs of their students. For reasons explained in the discussions of Benefits of the Proposed Regulations (Section 3) and Costs of the Proposed Regulations (Section 4), the Department is unable to quantify the benefits or costs of enabling recipients to adapt equitable grievance procedures to their educational environment; however, as discussed throughout the preamble, the Department believes that not doing so would result in continuing impediments to full implementation of Title IX's nondiscrimination guarantee. Alternatively, the Department believes that the proposed regulations create the benefit of enabling all recipients to respond promptly and equitably to sex discrimination in their program or activity, remedy that discrimination as appropriate, and increase access and the opportunity to participate free from sex discrimination.

**6.    ACCOUNTING STATEMENT**

As required by OMB Circular A-4, the following table is the Department's accounting statement showing the classification of the expenditures associated with the provisions of the proposed regulations. This table provides the Department's best estimate of the changes in annual monetized costs, benefits, and transfers as a result of the proposed regulations.

| Category | Benefits (calculated on an annual basis) | |
|---|---|---|
| Address gaps in coverage in current regulations | Not quantified | |
| Clarify scope of Title IX's protection | Not quantified | |
| Clarify responsibilities toward students who are experiencing pregnancy or related conditions | Not quantified | |
| | | |
| | Costs (calculated on an annual basis) | |
| | 3% | 7% |
| Reading and Understanding the Regulations | $2,811,001 | $3,286,360 |
| Policy Revisions | $4,782,718 | $5,591,508 |
| Publishing Notice of Nondiscrimination | $236,894 | $276,955 |
| Training of Title IX Coordinators | $2,770,531 | $2,818,407 |
| Updating Training Materials | $$2,264,868 | $2,647,873 |
| Supportive Measures | $6,996,204 | $6,996,204 |

| | | |
|---|---|---|
| Group A Investigations | $2,741,547 | $2,741,547 |
| Group B Investigations | ($66,106,747) | ($66,106,747) |
| Appeal Process | $21,084,353 | $21,084,353 |
| Informal Resolutions | $12,830,088 | $12,830,088 |
| Creation and Maintenance of Documentation | $6,425,456 | $6,761,161 |

**Clarity of the Regulations**

Executive Order 12866 and the Presidential memorandum "Plain Language in Government Writing" require each agency to write regulations that are easy to understand. The Secretary invites comments on how to make the proposed regulations easier to understand, including answers to questions such as the following:

- Are the requirements in the proposed regulations clearly stated?

- Do the proposed regulations contain technical terms or other wording that interferes with their clarity?

- Does the format of the proposed regulations (grouping and order of sections, use of headings, paragraphing, etc.) aid or reduce their clarity?

- Would the proposed regulations be easier to understand if the Department divided them into more (but shorter) sections? (A "section" is preceded by the symbol "§" and a numbered heading; for example, is § 106.8 Designation of coordinator, adoption and publication of nondiscrimination policy and grievance procedures, notice of nondiscrimination, training, and recordkeeping.)

- Could the description of the proposed regulations in the **SUPPLEMENTARY INFORMATION** section of this preamble be more helpful in making the proposed

regulations easier to understand?  If so, how?

- What else could the Department do to make the proposed regulations easier to understand?

To send any comments that concern how the Department could make the proposed regulations easier to understand, see the instructions in the **ADDRESSES** section of the preamble.

**Regulatory Flexibility Act (Small Business Impacts)**

**1.     INTRODUCTION**

This analysis, required by the Regulatory Flexibility Act (RFA), presents an estimate of the effect of the proposed regulations on small entities.  The U.S. Small Business Administration (SBA) Size Standards define "proprietary IHEs" as small businesses if they are independently owned and operated, are not dominant in their field of operation, and have total annual revenue below $7,000,000.  "Nonprofit institutions" are defined as small entities if they are independently owned and operated and not dominant in their field of operation.  "Public institutions and LEAs" are defined as small organizations if they are operated by a government overseeing a population below 50,000.

**2.     INITIAL REGULATORY FLEXIBILITY ANALYSIS**

As explained in the discussion of Lack of Data Following the Promulgation of the 2020 Amendments (Section 4.A.3) of the RIA, there is a lack of high quality, comprehensive data about recipients' Title IX compliance activities and burdens following the implementation of the 2020 amendments.  As a result, the Department could not definitively conclude that burdens on small entities, particularly among recipients other than IHEs or LEAs, would be sufficiently low to justify certification under the RFA.  If an agency is unable to make such a certification, it must

636

prepare an Initial Regulatory Flexibility Analysis (IRFA) as described in the RFA. Based on the data available, the Department has completed an IRFA and requests comments from affected small entities.

The purpose of this analysis is to identify the number of small entities affected, assess the economic impact of the proposed regulations on those small entities, and consider alternatives that may be less burdensome to small entities that meet the Department's regulatory objectives. Specifically, the Department estimates the number of small entities potentially impacted by the proposed regulations in the discussion of Estimated Number of Small Entities (Section 2.B), assesses the potential economic impact of the proposed regulations on those small entities in the discussion of Estimate of the Projected Burden of the Proposed Regulations on Small Entities (Section 2.C), and examines and considers less burdensome alternatives to the proposed regulations for small entities in the Discussion of Significant Alternatives (Section 2.D). The Department requests comment on the burdens currently faced by small entities in complying with the 2020 amendments and likely changes to that burden as a result of the proposed regulations, including the total number of Title IX investigations conducted each year by small entities and the extent to which the burden assumptions described in the RIA are reasonable for small entities (i.e., whether particular activities are likely to take more or less time or cost more or less than otherwise estimated).

## 2.A.    REASONS FOR REGULATING

The Department's review of the current regulations and of feedback received during and pursuant to the June 2021 Title IX Public Hearing, as well as listening sessions and meetings held in 2022 under Executive Order 12866, suggests that the current regulations do not best fulfill the requirement of Title IX that recipients of Federal financial assistance eliminate

discrimination based on sex in their education programs or activities. The Department has determined that more clarity and greater specificity would better equip recipients to create and maintain school environments free from sex discrimination. This, in turn, will help recipients ensure that all persons have equal access to educational opportunities in accordance with Title IX's nondiscrimination mandate.

The goal of the Department's proposed regulations is to fully effectuate Title IX by clarifying and specifying the scope and application of Title IX protections and recipients' obligation not to discriminate based on sex. Specifically, the proposed regulations focus on ensuring that recipients prevent and address sex discrimination, including but not limited to sex-based harassment, in their education programs or activities; clarifying the scope of Title IX's protection for students and others who are participating or attempting to participate in a recipient's education program or activity; defining important terms related to a recipient's obligations under Title IX; ensuring the provision of supportive measures, as appropriate to restore or preserve a complainant's or respondent's access to the recipient's education program or activity; clarifying a recipient's responsibilities toward students who are pregnant or experiencing pregnancy-related conditions; and clarifying that Title IX's prohibition on sex discrimination encompasses discrimination based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity. In addressing confusion about coverage of sex-based harassment in the current regulations, the Department's proposed regulations also set out requirements that enable recipients to meet their obligations in settings that vary in size, student populations, and administrative structure. The proposed regulatory action would strengthen the current framework, clarify the scope and application of Title IX, and fully align the Title IX regulations with the nondiscrimination mandate of Title IX.

## 2.B.    ESTIMATED NUMBER OF SMALL ENTITIES

As in the 2020 amendments (85 FR at 30026), for purposes of assessing the impacts on small entities, the Department proposes defining a "small IHE" as a two-year IHE with an enrollment of fewer than 500 full time equivalent (FTE) or a four-year IHE with an enrollment of fewer than 1,000 FTE.  The Department also proposes defining a "small LEA" as an LEA with annual revenues of less than $7,000,000.

During the 2020-2021 school year, of the 6,165 Title IV participating IHEs for which sufficient data are available, 2,803 were four-year institutions, 1,644 were two-year institutions, and 1,718 were less-than-two-year institutions.  Of those, 1,226 four-year institutions, 690 two-year institutions, and 1,650 less-than-two-year institutions met the Department's proposed definition of a "small IHE."

TABLE 1. NUMBER OF SMALL IHES, FALL 2020

|  | Four-year | Two-year | Less than two-year | Total |
|---|---|---|---|---|
| Not Small | 1577 | 954 | 68 | 2599 |
| Small | 1226 | 690 | 1650 | 3566 |
| Total | **2803** | **1644** | **1718** | **6165** |

During the 2018-2019 school year, 6,518 of the 17,798 LEAs with available revenue data met the Department's proposed definition of a "small LEA."

The Department does not have comprehensive revenue data for other recipients in order to estimate the number of entities that would meet the applicable SBA size standards.  The Department therefore requests comment on the number of other recipients affected by these proposed regulations that meet these standards.

639

TABLE 2. NUMBER OF SMALL LEAS, FALL 2018

|  | LEAs |
|---|---|
| Not Small | 11280 |
| Small | 6518 |
| Total | **17798** |

## 2.C. ESTIMATE OF THE PROJECTED BURDEN OF THE PROPOSED REGULATIONS ON SMALL ENTITIES

As discussed throughout the RIA, Group A institutions are those most likely to see a net cost increase from the proposed regulations. As such, a Group A IHE would fare worse than an IHE in Group B or Group C. As described in the discussion of Developing the Model (Section 4.B), an IHE in Group A would see a net increase in costs of approximately $8,986 per year. For purposes of assessing the impacts on small entities, the Department proposes defining a "small IHE" as a two-year IHE with an enrollment of less than 500 FTE or a four-year IHE with an enrollment of less than 1,000 FTE, based on official 2020 FTE enrollment. The Department notes that this estimate assumes that each small IHE would conduct the same number of investigations per year, on average, as the total universe of all affected IHEs. The Department believes it is much more likely that small IHEs will conduct fewer investigations per year and therefore, their actual realized costs will be less than those estimated herein. According to data from the Integrated Postsecondary Education Data System (IPEDS), in FY 2019, small IHEs had, on average, total revenues of approximately $10,349,540.[34] Therefore, the Department

---

[34] Based on data reported for FY 2020 for "total revenue and other additions" for public institutions and "total revenues and investment return" for private not-for-profit and private for-profit institutions.

640

estimates that the proposed regulations could generate a net cost for small IHEs equal to approximately 0.08 percent of annual revenue. According to data from IPEDS, approximately 175 IHEs had total reported annual revenues of less than $900,000, for which the costs estimated above would potentially exceed 1 percent of total revenues. Those IHEs enrolled, on average, 36 students in Fall 2020. For institutions of this size, the Department currently believes it would be highly unlikely for the recipient to conduct 6.3 investigations per year, which would represent a rate of investigations approximately 18 times higher than all other institutions, on average. The Department therefore does not anticipate that the proposed regulations would place a substantial burden on small IHEs.

As in the 2020 amendments, for purposes of assessing the impacts on small entities, the Department proposes defining a "small LEA" as one with annual revenues of less than $7,000,000. Based on the model described in the discussion of Developing the Model (Section 4.B), an LEA in Group A would see a net increase in costs of approximately $1,761 per year. The Department notes that these estimates assume small LEAs conduct the same number of investigations per year, on average, as all other LEAs. To the extent that smaller LEAs conduct fewer investigations, on average, than all LEAs, these annual costs will be overestimated for small LEAs. In 2018-2019, small LEAs had an average total revenue of approximately $3,450,911. Therefore, the Department estimates that the proposed regulations could generate a net cost for small LEAs of approximately 0.05 percent of total revenues. According to data from the National Center for Education Statistics, in 2018-2019, 123 LEAs had total revenues of less than $1,760,000, for which the estimated costs would potentially exceed 1 percent of total revenues. Those LEAs enrolled, on average, 35 students each in the 2018-2019 school year. For LEAs of this size, the Department currently believes it would be highly unlikely for the recipient

to conduct 3.6 investigations per year, which would represent a rate of investigations approximately 80 times higher than all other LEAs, on average. The Department, therefore, does not anticipate that these proposed regulations would place a substantial burden on small LEAs.

As described in the discussion of Developing the Model (Section 4.B), an "other" recipient in Group A would see a net increase in costs of approximately $3,090 per year. As explained in the discussion of small IHEs and small LEAs, the Department notes that these estimates assume small other entities would conduct the same number of investigations per year, on average, as all other recipients in this category. To the extent that smaller entities conduct fewer investigations on average than all other recipients, these annual costs will be overestimated for small other recipients. Although the Department does not have revenue data for all other recipients, for purposes of this analysis, the Department will assume that, among other recipients with annual revenues of less than $7,000,000, the average annual revenue is approximately $3,500,000, which assumes that recipient revenues are normally distributed within the range of $0 to $7,000,000. At this level, the estimated cost would constitute approximately 0.09 percent of total revenues. The Department notes that, for estimated costs to exceed 1 percent of total revenues, "other" recipients would need total annual revenues of less than $309,000. The Department believes that very few other recipients would fall into this category, in part, because in FY 2020, among other recipients receiving less than $1,000,000 in grant funds from the Department, the average grantee received approximately $377,000 in Federal grant funds. Among those receiving less than $500,000 in funding from the Department, the average other recipient received approximately $287,000 in grant funds in FY 2020. Even with very small amounts of non-Federal funding, it is unlikely that costs of compliance with these proposed regulations would exceed 1 percent of annual revenues for these recipients. The Department,

642

therefore, does not expect that these proposed regulations would place a substantial burden on small other recipients.

The Department requests comment on any additional burdens for small entities. The Department also requests comment on whether small entities may discontinue their Federal funding due to the impacts of the proposed regulations.

## 2.D.    DISCUSSION OF SIGNIFICANT ALTERNATIVES

The Department also considered alternatives that could potentially reduce the burden for small entities. One alternative would be to extend the effective date of the Title IX regulations for small entities such that they would have additional time to implement key components of the regulations. However, it would be premature for the Department to consider an extension at this juncture because no regulatory compliance date has been set. In addition, an extension of the effective date would delay the efforts of small entities to ensure that their education programs or activities are free from sex discrimination, thereby depriving students, employees, and others of their rights under Title IX. Another alternative would be to waive certain requirements for small entities to help facilitate their compliance with Title IX. The Department declines this approach at this time because the proposed requirements are critical to ensuring that all education programs or activities that receive Federal funding do not discriminate based on sex. In addition, the proposed regulations are more adaptable than the current regulations and would provide greater opportunities for small entities to tailor their compliance efforts to their particular settings. Finally, the Department considered proposing different requirements for smaller-sized recipients than for mid-sized or larger ones. The Department rejects this alternative at this time because the Title IX rights of students, employees, and other members of a recipient's educational community do not depend on the size of a recipient, and the proposed regulations are

643

sufficiently adaptable for small entities to adopt the approach that works best for them. Being subjected to sex discrimination in a recipient's education program or activity can affect an applicant's opportunity to enroll in a recipient's education program or activity, a student's ability to learn and thrive in and outside of the classroom, a prospective or current employee's ability to contribute their talents to the recipient's educational mission, and the opportunity of all participants to benefit, on an equal basis, from the recipient's education program or activity. Thus, permitting a small entity the opportunity to delay implementation of the proposed regulations, waiving certain requirements for smaller entities, or having different requirements for small entities could jeopardize these important civil rights and harm students, employees, and others. The Department requests comment on the extent to which the Department's rationale for not adopting each of the alternatives discussed in this section is reasonable and whether there are additional alternatives for reducing burden on small entities without frustrating the purpose of the proposed regulations.

**Executive Order 12250 on Leadership and Coordination of Nondiscrimination Laws**

Under Executive Order 12250, the Attorney General has the responsibility to "review . . . proposed rules . . . of the Executive agencies" implementing nondiscrimination statutes such as Title IX "in order to identify those which are inadequate, unclear or unnecessarily inconsistent."[35] The Attorney General has delegated that function to the Assistant Attorney General for the Civil Rights Division for purposes of reviewing and approving proposed rules, 28 CFR 0.51, and the Assistant Attorney General has reviewed and approved this proposed rule.

---

[35] *Executive Order on Leadership and Coordination of Nondiscrimination Laws*, Exec. Order. No. 12250, 45 FR 72995 (Nov. 4, 1980), https://tile.loc.gov/storage-services/service/ll/fedreg/fr045/fr045215/fr045215.pdf.

**Paperwork Reduction Act of 1995**

As part of its continuing effort to reduce paperwork and the burden of responding, the Department provides the general public and Federal agencies with an opportunity to comment on proposed and continuing collections of information in accordance with the Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3506(c)(2)(A)). This requirement helps ensure that: (1) the public understands the Department's collection instructions; (2) respondents can provide the requested data in the desired format; (3) reporting burden (time and financial resources) is minimized; (4) collection instruments are clearly understood; and (5) the Department can properly assess the impact of collection requirements on respondents.

As discussed in Cost Estimates (Section 4.C.), the Department estimates that all regulated entities would experience an increased recordkeeping burden under the proposed regulations as a result of the proposed changes to recordkeeping requirements in proposed § 106.8(f). Specifically, in Year 1, the Department estimates that compliance would require an additional 4 hours of recordkeeping burden per LEA, 16 hours per IHE, and 4 hours per other recipient. In total, the Department estimates the Year 1 recordkeeping burden associated with the proposed regulations to be a net increase of 171,788 hours.

In subsequent years, the Department estimates that the proposed regulations would require an additional ongoing burden of 2 hours per LEA, 6 hours per IHE, and 2 hours per other recipient. In total, the Department estimates an ongoing annual recordkeeping burden increase of 72,586 hours. However, the Department's current view is that proposed § 106.8(f) will not result in a change of disclosure requirements. Specifically, there are three main reasons for this assumption: (1) recipients were already required to maintain all records related to sexual harassment under the current regulations; (2) many recipients (based on anecdotal reports) were

645

already conducting and maintaining records related to alternative disciplinary proceedings addressing conduct outside of the coverage area of the current regulations; and (3) based upon anecdotal reports, many recipients were already maintaining their records related to sex discrimination.  As a result, the Department believes that recipients falling within one or more of these categories would experience a de minimis increase in the number of disclosures.

| Regulatory Section | Information Collection | OMB Control Number and estimated change in burden |
| --- | --- | --- |
| 106.8(f) | This regulatory provision requires a recipient to maintain certain documentation related to Title IX activities. | OMB 1870-NEW  Changes would increase burden over the first seven years by $45,712,498 382, 168 hours. |

The Department prepared an Information Collection Request (ICR) for this collection. This proposed collection is identified as proposed collection OMB control number 1870-NEW. If you would like to review and comment on the ICR, please follow the instructions listed below in this section of this notice.  Please note that the Office of Information and Regulatory Affairs (OIRA) and the Department of Education review all comments posted at http://www.regulations.gov.

When commenting on the information collection requirements, the Department considers your comments on these collections of information in—

- Deciding whether the collections are necessary for the proper performance of our functions, including whether the information will have practical use;

- Evaluating the accuracy of our estimate of the burden of the collections, including the validity of our methodology and assumptions;

- Enhancing the quality, usefulness, and clarity of the information the Department collects; and

- Minimizing the burden on those who must respond, which includes exploring the use of appropriate automated, electronic, mechanical, or other technological collection techniques.

Comments submitted in response to this notice should be submitted electronically through the Federal eRulemaking Portal http://www.regulations.gov by selecting Docket ID Number ED 2022-OCR-xxxx. Please specify the Docket ID number and indicate "Information Collection Comments" if your comment(s) relate to the information collection for the proposed regulations. Written requests for information or comments submitted by postal mail or delivery should be addressed to the Strategic Collections and Clearance Director, U.S. Department of Education, 400 Maryland Avenue SW, LBJ Room 6W201, Washington, DC 20202-8240. **FOR FURTHER INFORMATION CONTACT**: Email ICDocketMgr@ed.gov.

Consistent with 5 CFR 1320.8(d), the Department is soliciting comments on the information collection through this document. OMB is required to make a decision concerning the collections of information contained in the proposed regulations between 30 and 60 days after publication of this document in the *Federal Register*. Therefore, to ensure that OMB gives your comments full consideration, it is important that OMB receives your comments by [INSERT DATE 30 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER]. This does not affect the deadline for your comments to us on the proposed regulations.

Intergovernmental Review: This program is not subject to Executive Order 12372 and the

regulations in 34 CFR part 79 because it is not a program or activity of the Department that provides Federal financial assistance.

Assessment of Educational Impact: In accordance with section 411 of the General Education Provisions Act, 20 U.S.C. 1221e-4, the Secretary particularly requests comments on whether the proposed regulations would require transmission of information that any other agency or authority of the United States gathers or makes available.

Federalism: Executive Order 13132 requires the Department to ensure meaningful and timely input by State and local elected officials in the development of regulatory policies that have federalism implications. "Federalism implications" means substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. The proposed regulations, including §§ 106.6, 106.8, 106.31, 106.40, 106.44, 106.45, 106.46, and 106.57 may have federalism implications. The Department encourages State and local elected officials to review and provide comments on the proposed regulations.

Accessible Format: On request to the program contact person listed under FOR FURTHER INFORMATION CONTACT, individuals with disabilities can obtain this document in an accessible format. The Department will provide the requestor with an accessible format that may include Rich Text Format (RTF) or text format (txt), a thumb drive, an MP3 file, braille, large print, audiotape, or compact disc, or other accessible format.

Electronic Access to This Document: The official version of this document is the document published in the *Federal Register*. You may access the official edition of the *Federal Register* and the Code of Federal Regulations at http://www.govinfo.gov. At this site you can view this document, as well as all other documents of this Department published in the *Federal Register*,

in text or Adobe Portable Document Format (PDF).  To use PDF you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the *Federal Register* by using the article search feature at: http://www.federalregister.gov.  Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

List of Subjects in 34 CFR Part 106

Civil rights

Education

Sex discrimination

Youth organizations

Dated:

_____

Miguel A. Cardona,

*Secretary of Education.*

PART 106—NONDISCRIMINATION ON THE BASIS OF SEX IN EDUCATION PROGRAMS OR ACTIVITIES RECEIVING FEDERAL FINANCIAL ASSISTANCE

1. The authority citation for part 106 continues to read as follows:

AUTHORITY: 20 U.S.C. 1681 et seq., unless otherwise noted.

2. Section 106.1 is revised to read as follows:

**106.1 Purpose.**

The purpose of this part is to effectuate Title IX, which is designed to eliminate (with certain exceptions) discrimination on the basis of sex in any education program or activity receiving Federal financial assistance, whether or not such program or activity is offered or sponsored by an educational institution as defined in this part. This part is also intended to effectuate section 844 of the Education Amendments of 1974, Pub. L. 93-380, 88 Stat. 484.

3. Section 106.2 is revised to read as follows:

**106.2 Definitions.**

As used in this part, the term:

*Administrative law judge* means a person appointed by the reviewing authority to preside over a hearing held under § 106.81.

*Administratively separate unit* means a school, department, or college of an educational institution (other than a local educational agency) admission to which is independent of admission to any other component of such institution.

*Admission* means selection for part-time, full-time, special, associate, transfer, exchange, or any other enrollment, membership, or matriculation in or at an education program or activity operated by a recipient.

*Applicant*, as used in the definition of educational institution in this section and as used in

650

§ 106.4, means one who submits an application, request, or plan required to be approved by a Department official, or by a recipient, as a condition to becoming a recipient.

*Assistant Secretary* means the Assistant Secretary for Civil Rights of the Department.

*Complainant* means: (1) a student or employee who is alleged to have been subjected to conduct that could constitute sex discrimination under Title IX; or (2) a person other than a student or employee who is alleged to have been subjected to conduct that could constitute sex discrimination under Title IX and who was participating or attempting to participate in the recipient's education program or activity when the alleged sex discrimination occurred.

*Complaint* means an oral or written request to the recipient to initiate the recipient's grievance procedures as described in § 106.45, and if applicable § 106.46.

*Confidential employee* means: (1) an employee of a recipient whose communications are privileged under Federal or State law associated with their role or duties for the institution; (2) an employee of a recipient whom the recipient has designated as a confidential resource for the purpose of providing services to persons in connection with sex discrimination—but if the employee also has a role or duty not associated with providing these services, the employee's status as confidential is limited to information received about sex discrimination in connection with providing these services; or (3) an employee of a postsecondary institution who is conducting an Institutional Review Board-approved human-subjects research study designed to gather information about sex discrimination—but the employee's confidential status is limited to information received while conducting the study.

*Department* means the Department of Education.

*Disciplinary sanctions* means consequences imposed on a respondent following a determination that the respondent violated the recipient's prohibition on sex discrimination.

Case 3:21-cv-00308-CEA-DCP   Document 83-1   Filed 06/27/22   Page 652 of 701   PageID #: 1885

*Educational institution* means a local educational agency (LEA) as defined by section 8101 of the Elementary and Secondary Education Act of 1965, as amended by the Every Student Succeeds Act (20 U.S.C. 7801(30)), a preschool, a private elementary or secondary school, or an applicant or recipient that is an institution of graduate higher education, an institution of undergraduate higher education, an institution of professional education, or an institution of vocational education.

*Elementary school* means elementary school as defined by section 8101 of the Elementary and Secondary Education Act of 1965, as amended by the Every Student Succeeds Act (20 U.S.C. 7801(19)), and a public or private preschool.

*Federal financial assistance* means any of the following, when authorized or extended under a law administered by the Department:

(1) A grant or loan of Federal financial assistance, including funds made available for:

(i) The acquisition, construction, renovation, restoration, or repair of a building or facility or any portion thereof; and

(ii) Scholarships, loans, grants, wages or other funds extended to any entity for payment to or on behalf of students admitted to that entity, or extended directly to such students for payment to that entity.

(2) A grant of Federal real or personal property or any interest therein, including surplus property, and the proceeds of the sale or transfer of such property, if the Federal share of the fair market value of the property is not, upon such sale or transfer, properly accounted for to the Federal Government.

(3) Provision of the services of Federal personnel.

(4) Sale or lease of Federal property or any interest therein at nominal consideration, or at

652

consideration reduced for the purpose of assisting the recipient or in recognition of public interest to be served thereby, or permission to use Federal property or any interest therein without consideration.

(5) Any other contract, agreement, or arrangement which has as one of its purposes the provision of assistance to any education program or activity, except a contract of insurance or guaranty.

*Institution of graduate higher education* means an institution which:

(1) Offers academic study beyond the bachelor of arts or bachelor of science degree, whether or not leading to a certificate of any higher degree in the liberal arts and sciences; or

(2) Awards any degree in a professional field beyond the first professional degree (regardless of whether the first professional degree in such field is awarded by an institution of undergraduate higher education or professional education); or

(3) Awards no degree and offers no further academic study, but operates ordinarily for the purpose of facilitating research by persons who have received the highest graduate degree in any field of study.

*Institution of undergraduate higher education* means:

(1) An institution offering at least two but less than four years of college level study beyond the high school level, leading to a diploma or an associate degree, or wholly or principally creditable toward a baccalaureate degree; or

(2) An institution offering academic study leading to a baccalaureate degree; or

(3) An agency or body which certifies credentials or offers degrees, but which may or may not offer academic study.

*Institution of professional education* means an institution (except any institution of

653

undergraduate higher education) which offers a program of academic study that leads to a first professional degree in a field for which there is a national specialized accrediting agency recognized by the Secretary.

*Institution of vocational education* means a school or institution (except an institution of professional or graduate or undergraduate higher education) which has as its primary purpose preparation of students to pursue a technical, skilled, or semiskilled occupation or trade, or to pursue study in a technical field, whether or not the school or institution offers certificates, diplomas, or degrees and whether or not it offers fulltime study.

*Parental status,* as used in §§ 106.21(c)(2)(i), 106.37(a)(3), 106.40(a), and 106.57(a)(1), means the status of a person who, with respect to another person who is under the age of 18 or who is 18 or older but is incapable of self-care because of a physical or mental disability, is:

(1) A biological parent;

(2) An adoptive parent;

(3) A foster parent;

(4) A stepparent;

(5) A legal custodian or guardian;

(6) In loco parentis with respect to such a person; or

(7) Actively seeking legal custody, guardianship, visitation, or adoption of such a person.

*Peer retaliation* means retaliation by a student against another student.

*Postsecondary institution* means an institution of graduate higher education, an institution of undergraduate higher education, an institution of professional education, or an institution of vocational education that serves postsecondary school students.

*Pregnancy or related conditions* means:

654

(1) Pregnancy, childbirth, termination of pregnancy, or lactation;

(2) Medical conditions related to pregnancy, childbirth, termination of pregnancy, or lactation; or

(3) Recovery from pregnancy, childbirth, termination of pregnancy, lactation, or their related medical conditions.

*Program or activity* and *program* means all of the operations of –

(1) (i) A department, agency, special purpose district, or other instrumentality of a State or local government; or

(ii) The entity of a State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government;

(2) (i) A college, university, or other postsecondary institution, or a public system of higher education; or

(ii) A local educational agency (as defined in 20 U.S.C. 8801), system of vocational education, or other school system;

(3) (i) An entire corporation, partnership, other private organization, or an entire sole proprietorship -

(A) If assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole; or

(B) Which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation; or

(ii) The entire plant or other comparable, geographically separate facility to which Federal financial assistance is extended, in the case of any other corporation, partnership, private

655

organization, or sole proprietorship; or

(4) Any other entity that is established by two or more of the entities described in paragraph (1), (2), or (3) of this definition, any part of which is extended Federal financial assistance.

*Recipient* means any State or political subdivision thereof, or any instrumentality of a State or political subdivision thereof, any public or private agency, institution, or organization, or other entity, or any person, to whom Federal financial assistance is extended directly or through another recipient and which operates an education program or activity which receives such assistance, including any subunit, successor, assignee, or transferee thereof.

*Relevant* means related to the allegations of sex discrimination under investigation as part of the grievance procedures under § 106.45, and if applicable § 106.46. Questions are relevant when they seek evidence that may aid in showing whether the alleged sex discrimination occurred, and evidence is relevant when it may aid a decisionmaker in determining whether the alleged sex discrimination occurred.

*Remedies* means measures provided, as appropriate, to a complainant or any other person the recipient identifies as having had equal access to the recipient's education program or activity limited or denied by sex discrimination. These measures are provided to restore or preserve that person's access to the recipient's education program or activity after a recipient determines that sex discrimination occurred.

*Respondent* means a person who is alleged to have violated the recipient's prohibition on sex discrimination.

*Retaliation* means intimidation, threats, coercion, or discrimination against any person by a student, employee, person authorized by the recipient to provide aid, benefit, or service under

Case 3:21-cv-00308-CEA-DCP   Document 83-1   Filed 06/27/22   Page 657 of 701   PageID #: 1890

the recipient's education program or activity, or recipient for the purpose of interfering with any right or privilege secured by Title IX or this part, or because the person has reported information, made a complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under this part, including in an informal resolution process under § 106.44(k), in grievance procedures under § 106.45, and if applicable § 106.46, and in any other appropriate steps taken by a recipient in response to sex discrimination under § 106.44(f)(6).

*Reviewing Authority* means that component of the Department delegated authority by the Secretary to appoint, and to review the decisions of, administrative law judges in cases arising under this part.

*Secondary school* means secondary school as defined by section 8101 of the Elementary and Secondary Education Act of 1965, as amended by the Every Student Succeeds Act (20 U.S.C. 7801(45)), and an institution of vocational education that serves secondary school students.

*Secretary* means the Secretary of Education.

*Sex-based harassment* prohibited by this part means sexual harassment, harassment on the bases described in § 106.10, and other conduct on the basis of sex that is:

(1) *Quid pro quo harassment.* An employee, agent, or other person authorized by the recipient to provide an aid, benefit, or service under the recipient's education program or activity explicitly or impliedly conditioning the provision of such an aid, benefit, or service on a person's participation in unwelcome sexual conduct;

(2) *Hostile environment harassment.* Unwelcome sex-based conduct that is sufficiently severe or pervasive, that, based on the totality of the circumstances and evaluated subjectively

and objectively, denies or limits a person's ability to participate in or benefit from the recipient's education program or activity (i.e., creates a hostile environment). Whether a hostile environment has been created is a fact-specific inquiry that includes consideration of the following:

(i) The degree to which the conduct affected the complainant's ability to access the recipient's education program or activity;

(ii) The type, frequency, and duration of the conduct;

(iii) The parties' ages, roles within the recipient's education program or activity, previous interactions, and other factors about each party that may be relevant to evaluating the effects of the alleged unwelcome conduct;

(iv) The location of the conduct, the context in which the conduct occurred, and the control the recipient has over the respondent; and

(v) Other sex-based harassment in the recipient's education program or activity.

(3) *Specific Offenses.* (i) Sexual assault meaning an offense classified as a forcible or nonforcible sex offense under the uniform crime reporting system of the Federal Bureau of Investigation;

(ii) Dating violence meaning violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the victim;

(iii) Domestic violence meaning felony or misdemeanor crimes of violence committed by a person who:

(A) Is a current or former spouse or intimate partner of the victim under the family or domestic violence laws of the jurisdiction of the recipient, or a person similarly situated to a spouse of the victim;

658

(B) Is cohabitating, or has cohabited, with the victim as a spouse or intimate partner;

(C) Shares a child in common with the victim; or

(D) Commits acts against a youth or adult victim who is protected from those acts under the family or domestic violence laws of the jurisdiction; or

(iv) Stalking meaning engaging in a course of conduct directed at a specific person that would cause a reasonable person to:

(A) Fear for the person's safety or the safety of others; or

(B) Suffer substantial emotional distress.

*Student* means a person who has gained admission.

*Student with a disability* means a student who is an individual with a disability as defined in the Rehabilitation Act of 1973, as amended, 29 U.S.C. 705(9)(B), (20)(B), or a child with a disability as defined in the Individuals with Disabilities Education Act, 20 U.S.C. 1401(3).

*Supportive measures* means non-disciplinary, non-punitive individualized measures offered as appropriate, as reasonably available, without unreasonably burdening a party, and without fee or charge to the complainant or respondent to: (i) restore or preserve that party's access to the recipient's education program or activity, including temporary measures that burden a respondent imposed for non-punitive and non-disciplinary reasons and that are designed to protect the safety of the complainant or the recipient's educational environment, or deter the respondent from engaging in sex-based harassment; or (ii) provide support during the recipient's grievance procedures under § 106.45, and if applicable § 106.46, or during the informal resolution process under § 106.44(k).

*Title IX* means Title IX of the Education Amendments of 1972 (Pub. L. 92-318; 20 U.S.C. 1681, 1682, 1683, 1685, 1686, 1687, 1688), as amended.

659

§ 106.3 [Amended]

4. Section 106.3 is amended by removing paragraphs (c) and (d).

5. Section 106.6 is amended by:

a. Revising paragraphs (b), (e), and (g).

b. Removing paragraph (h).

The revisions read as follows:

## 106.8 Designation of coordinator, adoption and publication of nondiscrimination policy and grievance procedures, notice of nondiscrimination, training, and recordkeeping.

(a) *Designation of a Title IX Coordinator.*

(1) *Title IX Coordinator.* Each recipient must designate and authorize at least one employee, referred to herein as the Title IX Coordinator, to coordinate its efforts to comply with its responsibilities under this part.

(2) *Delegation to designees.* As appropriate, the recipient may assign one or more designees to carry out some of the recipient's responsibilities for compliance with this part, but one Title IX Coordinator must retain ultimate oversight over those responsibilities.

(b) *Adoption and publication of nondiscrimination policy and grievance procedures.*

(1) *Nondiscrimination policy.* Each recipient must adopt and publish a policy stating that the recipient does not discriminate on the basis of sex and prohibits sex discrimination in any education program or activity that it operates, as required by Title IX and this part, including in admission (unless subpart C of this part does not apply) and employment.

(2) *Grievance procedures.* A recipient must adopt and publish grievance procedures consistent with the requirements of § 106.45, and if applicable § 106.46, that provide for the prompt and equitable resolution of complaints made by students, employees, or third parties who

660

are participating or attempting to participate in the recipient's education program or activity, or by the Title IX Coordinator, alleging any action that would be prohibited by Title IX and this part.

(c) *Notice of nondiscrimination.* A recipient must provide a notice of nondiscrimination to students; parents, guardians, or other authorized legal representatives of elementary school and secondary school students; employees; applicants for admission and employment; and all unions and professional organizations holding collective bargaining or professional agreements with the recipient.

(1) *Contents of notice of nondiscrimination.* The notice of nondiscrimination must include the following elements:

(i) A statement that the recipient does not discriminate on the basis of sex and prohibits sex discrimination in any education program or activity that it operates, as required by Title IX and this part, including in admission (unless subpart C of this part does not apply) and employment;

(ii) A statement that inquiries about the application of Title IX and this part to the recipient may be referred to the recipient's Title IX Coordinator, to the Office for Civil Rights, or to both;

(iii) The name or title, office address, email address, and telephone number of the recipient's Title IX Coordinator;

(iv) How to locate the recipient's nondiscrimination policy under paragraph (b)(1) of this section; and

(v) How to report information about conduct that may constitute sex discrimination under Title IX, how to make a complaint of sex discrimination under this part, and how to locate the

661

recipient's grievance procedures under paragraph(b)(2) of this section, § 106.45, and if applicable § 106.46.

(2) *Publication of notice of nondiscrimination.*

(i) Each recipient must prominently include all elements of its notice of nondiscrimination set out in paragraphs (c)(1)(i)-(v) of this section on its website and in each handbook, catalog, announcement, bulletin, and application form that it makes available to persons entitled to notice under paragraph (c) of this section, or which are otherwise used in connection with the recruitment of students or employees.

(ii) If necessary, due to the format or size of any publication under paragraph (c)(2) of this section, the recipient may instead comply with paragraph (c)(2) of this section by including in those publications a statement that the recipient prohibits sex discrimination in any education program or activity that it operates and that individuals may report concerns or questions to the Title IX Coordinator, and providing the location of the notice on the recipient's website.

(iii) A recipient must not use or distribute a publication stating that the recipient treats applicants, students, or employees differently on the basis of sex, except as such treatment is permitted by Title IX or this part.

(d) *Training.* The recipient must ensure that the persons described below receive training related to their responsibilities as follows. This training must not rely on sex stereotypes.

(1) *All employees.* All employees must be trained on:

(i) The recipient's obligation to address sex discrimination in its education program or activity;

(ii) The scope of conduct that constitutes sex discrimination under this part, including the definition of sex-based harassment; and

662

(iii) All applicable notification and information requirements under §§ 106.40(b)(2) and 106.44.

(2) *Investigators, decisionmakers, and other persons who are responsible for implementing the recipient's grievance procedures or have the authority to modify or terminate supportive measures.*  In addition to the training requirements in paragraph (d)(1) of this section, all investigators, decisionmakers, and other persons who are responsible for implementing the recipient's grievance procedures or have the authority to modify or terminate supportive measures under § 106.44(g)(4) must be trained on the following topics to the extent related to their responsibilities:

(i) The recipient's obligations under § 106.44;

(ii) The recipient's grievance procedures under § 106.45, and if applicable § 106.46;

(iii) How to serve impartially, including by avoiding prejudgment of the facts at issue, conflicts of interest, and bias; and

(iv) The meaning and application of the term relevant in relation to questions and evidence, and the types of evidence that are impermissible regardless of relevance under § 106.45, and if applicable § 106.46.

(3) *Facilitators of informal resolution process.*  In addition to the training requirements in paragraph (d)(1) of this section, all facilitators of an informal resolution process under § 106.44(k) must be trained on the rules and practices associated with the recipient's informal resolution process and on how to serve impartially, including by avoiding conflicts of interest and bias.

(4) *Title IX Coordinator and designees.*  In addition to the training requirements in paragraphs (d)(1)-(3) of this section, the Title IX Coordinator and any designees under paragraph

Case 3:21-cv-00308-CEA-DCP   Document 83-1   Filed 06/27/22   Page 664 of 701   PageID #: 1897

(a) of this section must be trained on their specific responsibilities under paragraph (a) of this section, § 106.40(b)(3), § 106.44(f), § 106.44(g), the recipient's recordkeeping system and the requirements of paragraph (f) of this section, and any other training necessary to coordinate the recipient's compliance with Title IX.

(e) *Students with disabilities*. If a complainant or respondent is an elementary or secondary student with a disability, the Title IX Coordinator must consult with the student's Individualized Education Program (IEP) team, 34 CFR 300.321, if any, or the group of persons responsible for the student's placement decision under 34 CFR 104.35(c) (Section 504 team), if any, to help ensure that the recipient complies with the requirements of the Individuals with Disabilities Education Act, 20 U.S.C. 1400 et seq., and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794, throughout the recipient's implementation of grievance procedures under § 106.45, and if applicable § 106.46. If a complainant or respondent is a postsecondary student with a disability, the Title IX Coordinator may consult, as appropriate, with the individual or office that the recipient has designated to provide support to students with disabilities to help comply with Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794.

(f) *Recordkeeping*. A recipient must maintain for a period of at least seven years:

(1) For each complaint of sex discrimination, records documenting the informal resolution process under § 106.44(k) or the grievance procedures under § 106.45, and if applicable § 106.46, and the resulting outcome.

(2) For each incident of conduct that may constitute sex discrimination under Title IX of which the Title IX Coordinator was notified, records documenting the actions the recipient took to meet its obligations under § 106.44.

(3) All materials used to provide training under paragraph (d) of this section. A recipient

must make these training materials publicly available on its website, or if the recipient does not maintain a website the recipient must make these materials available upon request for inspection by members of the public.

(4) All records documenting the actions the recipient took to meet its obligations under §§ 106.40 and 106.57.

7. Section 106.10 is added to subpart B to read as follows:

**106.6 Effect of other requirements and preservation of rights.**

* * * * *

(b) *Effect of State or local law or other requirements.* The obligation to comply with this part is not obviated or alleviated by any State or local law or other requirement. Nothing in this part would preempt a State or local law that does not conflict with this part and that provides greater protections against sex discrimination.

* * * * *

(e) *Effect of Section 444 of General Education Provisions Act (GEPA)/ Family Educational Rights and Privacy Act.* The obligation to comply with this part is not obviated or alleviated by the Family Educational Rights and Privacy Act, 20 U.S.C. 1232g, or its implementing regulations, 34 CFR part 99.

* * * * *

(g) *Exercise of rights by parents, guardians, or other authorized legal representatives.* Nothing in this part may be read in derogation of any legal right of a parent, guardian, or other authorized legal representative to act on behalf of a complainant, respondent, or other person, subject to paragraph (e) of this section, including but not limited to making a complaint through the recipient's grievance procedures for complaints of sex discrimination.

665

6. Section 106.8 is revised to read as follows:

**106.10 Scope.**

Discrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity.

8. Section 106.11 is revised to read as follows:

**106.11 Application.**

Except as provided in this subpart, this part applies to every recipient and to all sex discrimination occurring under a recipient's education program or activity in the United States. For purposes of this section, conduct that occurs under a recipient's education program or activity includes but is not limited to conduct that occurs in a building owned or controlled by a student organization that is officially recognized by a postsecondary institution, and conduct that is subject to the recipient's disciplinary authority. A recipient has an obligation to address a sex-based hostile environment under its education program or activity, even if sex-based harassment contributing to the hostile environment occurred outside the recipient's education program or activity or outside the United States.

9. Section 106.15 is amended by revising paragraph (b) to read as follows:

**106.15 Admissions.**

* * * * *

(b) *Administratively separate units.* For purposes only of this section and subpart C, each administratively separate unit shall be deemed to be an educational institution.

* * * * *

§ 106.16 [Removed]

10. Section 106.16 is removed.

666

§ 106.17 [Removed]

11. Section 106.17 is removed.

§ 106.18 [Redesignated as § 106.16]

12. Section 106.18 is redesignated as section 106.16.

13. Section 106.21 is amended by revising paragraphs (a) and (c) to read as follows:

**106.21 Admissions.**

(a) *Status generally.* No person shall, on the basis of sex, be denied admission, or be subjected to discrimination in admission, by any recipient to which this subpart applies.

* * * * *

(c) *Parental, family, or marital status; pregnancy or related conditions.* In determining whether a person satisfies any policy or criterion for admission, or in making any offer of admission, a recipient to which this subpart applies:

(1) Must treat pregnancy or related conditions or any temporary disability resulting therefrom in the same manner and under the same policies as any other temporary disability or physical condition; and

(2) Must not:

(i) Adopt or apply any policy, practice, or procedure concerning the current, potential, or past parental, family, or marital status of a student or applicant that treats persons differently on the basis of sex;

(ii) Discriminate against any person on the basis of current, potential, or past pregnancy or related conditions, or establish or follow any policy, practice, or procedure that so discriminates; and

(iii) Make pre-admission inquiry as to the marital status of an applicant for admission,

including whether such applicant is "Miss or Mrs." A recipient may ask an applicant to self-identify their sex, but only if this question is asked of all applicants and if the response is not used as a basis for discrimination prohibited by this part.

§ 106.30 [Removed]

14. Section 106.30 is removed.

15. Section 106.31 is amended by revising paragraph (a) to read as follows:

**106.31 Education programs or activities.**

(a) *General*.

(1) Except as provided elsewhere in this part, no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient that receives Federal financial assistance.

(2) In the limited circumstances in which Title IX or this part permits different treatment or separation on the basis of sex, a recipient must not carry out such different treatment or separation in a manner that discriminates on the basis of sex by subjecting a person to more than de minimis harm, unless otherwise permitted by Title IX or this part. Adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex.

(3) This subpart does not apply to actions of a recipient in connection with admission of its students to an education program or activity of (i) a recipient to which subpart C does not apply, or (ii) an entity, not a recipient, to which subpart C would not apply if the entity were a recipient.

668

\* \* \* \* \*

16. Section 106.40 is revised to read as follows:

**106.40 Parental, family, or marital status; pregnancy or related conditions.**

(a) *Status generally.*  A recipient must not adopt or apply any policy, practice, or procedure concerning a student's current, potential, or past parental, family, or marital status that treats students differently on the basis of sex.

(b) *Pregnancy or related conditions.*

(1) *Nondiscrimination.*  A recipient must not discriminate in its education program or activity against any student based on the student's current, potential, or past pregnancy or related conditions.  A recipient may permit a student based on pregnancy or related conditions to participate voluntarily in a separate portion of its education program or activity provided the recipient ensures that the separate portion is comparable to that offered to students who are not pregnant and do not have related conditions.

(2) *Requirement for recipient to provide information.*  A recipient must ensure that when any employee is informed of a student's pregnancy or related conditions by the student or a person who has a legal right to act on behalf of the student, the employee promptly informs that person of how the person may notify the Title IX Coordinator of the student's pregnancy or related conditions for assistance and provides contact information for the Title IX Coordinator, unless the employee reasonably believes the Title IX Coordinator has already been notified.

(3) *Specific actions to prevent discrimination and ensure equal access.*  Once a student, or a person who has a legal right to act on behalf of the student, notifies the Title IX Coordinator of the student's pregnancy or related conditions, the Title IX Coordinator must promptly:

(i) Inform the student, and if applicable the person who notified the Title IX Coordinator,

of the recipient's obligations to:

(A) Prohibit sex discrimination under this part, including sex-based harassment;

(B) Provide the student with the option of reasonable modifications to the recipient's policies, practices, or procedures because of pregnancy or related conditions, under paragraphs (b)(3)(ii) and (b)(4) of this section;

(C) Allow access, on a voluntary basis, to any separate and comparable portion of the recipient's education program or activity under paragraph (b)(1) of this section;

(D) Allow a voluntary leave of absence under paragraph (b)(3)(iii) of this section;

(E) Ensure the availability of lactation space under paragraph (b)(3)(iv) of this section; and

(F) Maintain grievance procedures that provide for the prompt and equitable resolution of complaints of sex discrimination, including sex-based harassment, under § 106.45, and if applicable § 106.46.

(ii) Provide the student with voluntary reasonable modifications to the recipient's policies, practices, or procedures because of pregnancy or related conditions, under paragraph (b)(4) of this section.

(iii) Allow the student a voluntary leave of absence from the recipient's education program or activity to cover, at minimum, the period of time deemed medically necessary by the student's physician or other licensed healthcare provider. To the extent that a recipient maintains a leave policy for students that allows a greater period of time than the medically necessary period, the recipient must permit the student to take leave under that policy instead if the student so chooses. Upon the student's return to the recipient's education program or activity, the student must be reinstated to the academic status and, as practicable, to the extracurricular status

670

that the student held when the leave began.

(iv) Ensure the availability of a lactation space, which must be a space other than a bathroom, that is clean, shielded from view, free from intrusion from others, and may be used by a student for expressing breast milk or breastfeeding as needed.

(4) *Reasonable modifications for students because of pregnancy or related conditions.* Reasonable modifications to the recipient's policies, practices, or procedures for a student because of pregnancy or related conditions, for purposes of this section:

(i) Must be provided on an individualized and voluntary basis depending on the student's needs when necessary to prevent discrimination and ensure equal access to the recipient's education program or activity, unless the recipient can demonstrate that making the modification would fundamentally alter the recipient's education program or activity. A fundamental alteration is a change that is so significant that it alters the essential nature of the recipient's education program or activity;

(ii) Must be effectively implemented, coordinated, and documented by the Title IX Coordinator; and

(iii) May include but are not limited to breaks during class to attend to related health needs, expressing breast milk, or breastfeeding; intermittent absences to attend medical appointments; access to online or other homebound education; changes in schedule or course sequence; extension of time for coursework and rescheduling of tests and examinations; counseling; changes in physical space or supplies (for example, access to a larger desk or a footrest); elevator access; or other appropriate changes to policies, practices, or procedures.

(5) *Comparable treatment to temporary disabilities or conditions.* To the extent not otherwise addressed in paragraph (b)(3) of this section, a recipient must treat pregnancy or

671

related conditions or any temporary disability resulting therefrom in the same manner and under the same policies as any other temporary disability or physical condition with respect to any medical or hospital benefit, service, plan, or policy the recipient administers, operates, offers, or participates in with respect to students admitted to the recipient's education program or activity.

(6) *Certification to participate.* A recipient may not require a student who is pregnant or has related conditions to provide certification from a physician or other licensed healthcare provider that the student is physically able to participate in the recipient's class, program, or extracurricular activity unless:

(i) The certified level of physical ability or health is necessary for participation in the class, program, or extracurricular activity;

(ii) The recipient requires such certification of all students participating in the class, program, or extracurricular activity; and

(iii) The information obtained is not used as a basis for discrimination prohibited by this part.

17. Section 106.41 is amended by removing paragraph (d).

18. Section 106.44 is revised to read as follows:

## 106.44 Action by a recipient to operate its education program or activity free from sex discrimination.

(a) *General.* A recipient must take prompt and effective action to end any sex discrimination that has occurred in its education program or activity, prevent its recurrence, and remedy its effects. To ensure that it can satisfy this obligation, a recipient must comply with this section.

(b) *Monitoring.* A recipient must:

672

(1) Require its Title IX Coordinator to monitor the recipient's education program or activity for barriers to reporting information about conduct that may constitute sex discrimination under Title IX; and

(2) Take steps reasonably calculated to address such barriers.

(c) *Notification requirements.*

(1) An elementary school or secondary school recipient must require all of its employees who are not confidential employees to notify the Title IX Coordinator when the employee has information about conduct that may constitute sex discrimination under Title IX.

(2) All other recipients must, at a minimum, require:

(i) Any employee who is not a confidential employee and who has authority to institute corrective measures on behalf of the recipient to notify the Title IX Coordinator when the employee has information about conduct that may constitute sex discrimination under Title IX;

(ii) Any employee who is not a confidential employee and who has responsibility for administrative leadership, teaching, or advising in the recipient's education program or activity to notify the Title IX Coordinator when the employee has information about a student being subjected to conduct that may constitute sex discrimination under Title IX;

(iii) Any employee who is not a confidential employee and who has responsibility for administrative leadership, teaching, or advising in the recipient's education program or activity and has information about an employee being subjected to conduct that may constitute sex discrimination under Title IX to either:

(A) Notify the Title IX Coordinator when the employee has information about an employee being subjected to conduct that may constitute sex discrimination under Title IX; or

(B) Provide the contact information of the Title IX Coordinator and information about

673

how to report sex discrimination to any person who provides the employee with the information; and

(iv) All other employees who are not confidential employees, if any, to either:

(A) Notify the Title IX Coordinator when the employee has information about conduct that may constitute sex discrimination under Title IX; or

(B) Provide the contact information of the Title IX Coordinator and information about how to report sex discrimination to any person who provides the employee with information about conduct that may constitute sex discrimination under Title IX.

(3) A postsecondary institution must make a fact-specific inquiry to determine whether the requirements of paragraph (c)(2) of this section apply to a person who is both a student and an employee of the postsecondary institution. In making this determination, a postsecondary institution must, at a minimum, consider whether the person's primary relationship with the postsecondary institution is to receive an education and whether the person learns of conduct that may constitute sex discrimination under Title IX in the postsecondary institution's education program or activity while performing employment-related work.

(4) The requirements of paragraphs (c)(1) and (c)(2) of this section do not apply when the only employee with information about conduct that may constitute sex discrimination under Title IX is the employee-complainant.

(d) *Confidential employee requirements.*

(1) A recipient must notify all participants in the recipient's education program or activity of the identity of any confidential employee.

(2) A recipient must require a confidential employee to explain their confidential status to any person who informs the confidential employee of conduct that may constitute sex

674

discrimination under Title IX and must provide that person with contact information for the recipient's Title IX Coordinator and explain how to report information about conduct that may constitute sex discrimination under Title IX.

(e) *Public awareness events.* When a postsecondary institution's Title IX Coordinator is notified of information about conduct that may constitute sex-based harassment under Title IX that was provided by a person during a public event held on the postsecondary institution's campus or through an online platform sponsored by a postsecondary institution to raise awareness about sex-based harassment associated with a postsecondary institution's education program or activity, the postsecondary institution is not obligated to act in response to this information under this section, § 106.45, or § 106.46, unless the information reveals an immediate and serious threat to the health or safety of students or other persons in the postsecondary institution's community. However, in all cases the postsecondary institution must use this information to inform its efforts to prevent sex-based harassment, including by providing tailored training to address alleged sex-based harassment in a particular part of its education program or activity or at a specific location when information indicates there may be multiple incidents of sex-based harassment.

(f) *Title IX Coordinator requirements.* A recipient must require its Title IX Coordinator to take the following steps upon being notified of conduct that may constitute sex discrimination under Title IX:

(1) Treat the complainant and respondent equitably;

(2) (i) Notify the complainant of the grievance procedures under § 106.45, and if applicable § 106.46; and

(ii) If a complaint is made, notify the respondent of the applicable grievance procedures

675

and notify the parties of the informal resolution process under this section if available and appropriate;

(3) Offer and coordinate supportive measures under paragraph (g) of this section, as appropriate, to the complainant and respondent to restore or preserve that party's access to the recipient's education program or activity;

(4) In response to a complaint, initiate the grievance procedures or informal resolution process under § 106.45, and if applicable § 106.46;

(5) In the absence of a complaint or informal resolution process, determine whether to initiate a complaint of sex discrimination that complies with the grievance procedures under § 106.45, and if applicable § 106.46, if necessary to address conduct that may constitute sex discrimination under Title IX in the recipient's education program or activity; and

(6) Take other appropriate prompt and effective steps to ensure that sex discrimination does not continue or recur within the recipient's education program or activity, in addition to remedies provided to an individual complainant.

(g) *Supportive measures.*  Upon being notified of conduct that may constitute sex discrimination under Title IX, a Title IX Coordinator must offer supportive measures, as appropriate, to the complainant or respondent to the extent necessary to restore or preserve that party's access to the recipient's education program or activity.  For allegations of sex discrimination, other than sex-based harassment or retaliation, a recipient's provision of supportive measures would not require the recipient, its employee, or other person authorized to provide aid, benefit or services on the recipient's behalf to alter the allegedly discriminatory conduct for the purpose of providing a supportive measure.

(1) Supportive measures may vary depending on what the recipient deems to be available

676

and reasonable.  These measures may include but are not limited to: counseling; extensions of deadlines and other course-related adjustments; campus escort services; increased security and monitoring of certain areas of the campus; restrictions on contact between the parties; leaves of absence; voluntary or involuntary changes in class, work, housing, or extracurricular or any other activity, regardless of whether there is or is not a comparable alternative; and training and education programs related to sex-based harassment.

(2) Supportive measures that burden a respondent may be imposed only during the pendency of a recipient's grievance procedures under § 106.45, and if applicable § 106.46, and must be terminated at the conclusion of those grievance procedures.  These measures must be no more restrictive of the respondent than is necessary to restore or preserve the complainant's access to the recipient's education program or activity.  A recipient may not impose such measures for punitive or disciplinary reasons.

(3) For supportive measures other than those that burden a respondent, a recipient may, as appropriate, modify or terminate supportive measures at the conclusion of the grievance procedures under § 106.45, and if applicable § 106.46, or at the conclusion of the informal resolution process under paragraph (k) of this section, or the recipient may continue them beyond that point.

(4) A recipient must provide a complainant or respondent affected by a decision to provide, deny, modify, or terminate supportive measures with a timely opportunity to seek modification or reversal of the recipient's decision by an appropriate, impartial employee.  The impartial employee must be someone other than the employee who made the decision being challenged and must have authority to modify or reverse the decision, if appropriate.  A recipient must make a fact-specific inquiry to determine what constitutes a timely opportunity for seeking

677

modification or reversal of a supportive measure.  If the supportive measure burdens the respondent, the initial opportunity to seek modification or reversal of the recipient's decision must be provided before the measure is imposed or, if necessary under the circumstances, as soon as possible after the measure has taken effect.  A recipient must also provide a complainant or respondent affected by a supportive measure with the opportunity to seek additional modification or termination of such supportive measure if circumstances change materially.

(5) A recipient must ensure that it does not disclose information about any supportive measures to persons other than the complainant or respondent unless necessary to provide the supportive measure.  A recipient may inform a party of supportive measures provided to or imposed on another party only if necessary to restore or preserve that party's access to the education program or activity.

(6) Under paragraph (f)(3) of this section, the Title IX Coordinator is responsible for offering and coordinating supportive measures.

(7) (i) If the complainant or respondent is an elementary or secondary student with a disability, the Title IX Coordinator must consult with the Individualized Education Program (IEP) team, 34 CFR 300.321, if any, or the group of persons responsible for the student's placement decision under 34 CFR 104.35(c) (Section 504 team), if any, to help ensure the recipient complies with the requirements of the Individuals with Disabilities Education Act, 20 U.S.C. 1400 et seq., and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794, in the implementation of supportive measures.

(ii) If the complainant or respondent is a postsecondary student with a disability, the Title IX Coordinator may consult, as appropriate, with the individual or office that the recipient has designated to provide supports to students with disabilities to help ensure that the recipient

complies with Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794, in the implementation of supportive measures.

(h) *Emergency removal.*  Nothing in this part precludes a recipient from removing a respondent from the recipient's education program or activity on an emergency basis, provided that the recipient undertakes an individualized safety and risk analysis, determines that an immediate and serious threat to the health or safety of students, employees, or other persons arising from the allegations of sex discrimination justifies removal, and provides the respondent with notice and an opportunity to challenge the decision immediately following the removal. This provision must not be construed to modify any rights under the Individuals with Disabilities Education Act, 20 U.S.C. 1400 et seq., Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794, or Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. 12131-12134.

(i) *Administrative leave.*  Nothing in this part precludes a recipient from placing an employee respondent on administrative leave from employment responsibilities during the pendency of the recipient's grievance procedures.  This provision must not be construed to modify any rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794, or Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. 12131-12134.

(j) *Recipient prohibitions.*  When conducting an informal resolution process under paragraph (k) of this section, implementing grievance procedures under § 106.45, and if applicable § 106.46, or requiring a Title IX Coordinator to take other appropriate steps under paragraph (f)(6) of this section, a recipient must not disclose the identity of a party, witness, or other participant except in the following circumstances:

(1) When the party, witness, or other participant has provided prior written consent to disclose their identity;

679

(2) When permitted under the Family Educational Rights and Privacy Act, 20 U.S.C 1232g, or its implementing regulations, 34 CFR part 99;

(3) As required by law; or

(4) To carry out the purposes of this part, including action taken to address conduct that may constitute sex discrimination under Title IX in the recipient's education program or activity.

(k) *Discretion to offer informal resolution in some circumstances.*

(1) At any time prior to determining whether sex discrimination occurred under § 106.45, and if applicable § 106.46, a recipient may offer to a complainant and respondent an informal resolution process, unless there are allegations that an employee engaged in sex discrimination toward a student or such a process would conflict with Federal, State or local law.  A recipient that provides the parties an informal resolution process must, to the extent necessary, also require its Title IX Coordinator to take other appropriate prompt and effective steps to ensure that sex discrimination does not continue or recur within the recipient's education program or activity.

(i) A recipient has discretion to determine whether it is appropriate to offer an informal resolution process when it receives information about conduct that may constitute sex discrimination under Title IX or a complaint of sex discrimination is made, and may decline to offer informal resolution despite one or more of the parties' wishes.

(ii) Circumstances when a recipient may decline to allow informal resolution include but are not limited to when the recipient determines that the alleged conduct would present a future risk of harm to others.

(2) A recipient must not require or pressure the parties to participate in an informal resolution process.  The recipient must obtain the parties' voluntary consent to the informal resolution process and must not require waiver of the right to an investigation and adjudication

680

of a complaint as a condition of enrollment or continuing enrollment, or employment or continuing employment, or exercise of any other right.

(3) Before initiation of an informal resolution process, the recipient must provide to the parties notice that explains:

(i) The allegations;

(ii) The requirements of the informal resolution process;

(iii) That, prior to agreeing to a resolution, any party has the right to withdraw from the informal resolution process and to initiate or resume the recipient's grievance procedures;

(iv) That the parties' agreement to a resolution at the conclusion of the informal resolution process would preclude the parties from initiating or resuming grievance procedures arising from the same allegations;

(v) The potential terms that may be requested or offered in an informal resolution agreement;

(vi) Which records will be maintained and could be shared;

(vii) That if the recipient initiates or resumes its grievance procedures under § 106.45, and if applicable § 106.46, the recipient or a party must not access, consider, disclose, or otherwise use information, including records, obtained solely through an informal resolution process as part of the investigation or determination of the outcome of the complaint; and

(viii) That, when applicable, and if the recipient resumes its grievance procedures, the informal resolution facilitator could serve as a witness for purposes other than providing information obtained solely through the informal resolution process.

(4) The facilitator for the informal resolution process must not be the same person as the investigator or the decisionmaker in the recipient's grievance procedures. Any person

681

designated by a recipient to facilitate an informal resolution process must not have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent.  Any person facilitating informal resolution must receive training under § 106.8(d)(3).

(5) Potential terms that may be included in an informal resolution agreement include but are not limited to:

(i) Restrictions on contact; and

(ii) Restrictions on the respondent's participation in one or more of the recipient's programs or activities or attendance at specific events, including restrictions the recipient could have imposed as remedies or disciplinary sanctions had the recipient determined that sex discrimination occurred under the recipient's grievance procedures.

19. Section 106.45 is revised to read as follows:

**106.45 Grievance procedures for the prompt and equitable resolution of complaints of sex discrimination.**

(a) (1) *General.*  For purposes of addressing complaints of sex discrimination, a recipient's prompt and equitable grievance procedures must be in writing and include provisions that incorporate the requirements of this section.  The requirements related to a respondent apply only to sex discrimination complaints alleging that a person violated the recipient's prohibition on sex discrimination.  When a sex discrimination complaint alleges that a recipient's policy or practice discriminates on the basis of sex, the recipient is not considered a respondent.

(a) (2) *Complaint.*  The following persons have a right to make a complaint of sex discrimination, including complaints of sex-based harassment, requesting that the recipient initiate its grievance procedures:

Case 3:21-cv-00308-CEA-DCP   Document 83-1   Filed 06/27/22   Page 683 of 701   PageID #: 1916

(i) A complainant;

(ii) A person who has a right to make a complaint on behalf of a complainant under § 106.6(g);

(iii) The Title IX Coordinator;

(iv) With respect to complaints of sex discrimination other than sex-based harassment, any student or employee; or third party participating or attempting to participate in the recipient's education program or activity when the alleged sex discrimination occurred.

(b) *Basic requirements for grievance procedures*. A recipient's grievance procedures must:

(1) Treat complainants and respondents equitably;

(2) Require that any person designated as a Title IX Coordinator, investigator, or decisionmaker not have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent. The decisionmaker may be the same person as the Title IX Coordinator or investigator;

(3) Include a presumption that the respondent is not responsible for the alleged conduct until a determination whether sex discrimination occurred is made at the conclusion of the recipient's grievance procedures for complaints of sex discrimination;

(4) Establish reasonably prompt timeframes for the major stages of the grievance procedures, including a process that allows for the reasonable extension of timeframes on a case-by-case basis for good cause with notice to the parties that includes the reason for the delay. Major stages include, for example, evaluation (i.e., the recipient's determination of whether to dismiss or investigate a complaint of sex discrimination); investigation; determination; and appeal, if any;

683

(5) Take reasonable steps to protect the privacy of the parties and witnesses during the pendency of a recipient's grievance procedures, provided that the steps do not restrict the ability of the parties to obtain and present evidence, including by speaking to witnesses, subject to § 106.71; consult with a family member, confidential resource, or advisor; prepare for a hearing, if one is offered; or otherwise defend their interests;

(6) Require an objective evaluation of all relevant evidence, consistent with the definition of relevant in § 106.2—including both inculpatory and exculpatory evidence—and provide that credibility determinations must not be based on a person's status as a complainant, respondent, or witness; and

(7) Exclude the following types of evidence, and questions seeking that evidence, as impermissible (i.e., must not be accessed, considered, disclosed, or otherwise used), regardless of whether they are relevant:

(i) Evidence that is protected under a privilege as recognized by Federal or State law, unless the person holding such privilege has waived the privilege voluntarily in a manner permitted in the recipient's jurisdiction;

(ii) A party's records that are made or maintained by a physician, psychologist, or other recognized professional or paraprofessional in connection with the provision of treatment to the party, unless the recipient obtains that party's voluntary, written consent for use in the recipient's grievance procedures; and

(iii) Evidence that relates to the complainant's sexual interests or prior sexual conduct, unless evidence about the complainant's prior sexual conduct is offered to prove that someone other than the respondent committed the alleged conduct or is offered to prove consent with evidence concerning specific incidents of the complainant's prior sexual conduct with the

684

respondent.  The fact of prior consensual sexual conduct between the complainant and respondent does not demonstrate or imply the complainant's consent to the alleged sex-based harassment or preclude determination that sex-based harassment occurred.

(c) *Notice of allegations.*  Upon initiation of the recipient's grievance procedures, a recipient must provide notice of the allegations to the parties whose identities are known.

(1) The notice must include:

(i) The recipient's grievance procedures under this section, and if applicable § 106.46, and any informal resolution process under § 106.44(k);

(ii) Sufficient information available at the time to allow the parties to respond to the allegations.  Sufficient information includes the identities of the parties involved in the incident, the conduct alleged to constitute sex discrimination under Title IX, and the date and location of the alleged incident, to the extent that information is available to the recipient; and

(iii) A statement that retaliation is prohibited.

(2) If, in the course of an investigation, the recipient decides to investigate additional allegations about the respondent's conduct toward the complainant that are not included in the notice provided under paragraph (c)(1) of this section or that are included in a complaint that is consolidated under paragraph (e) of this section, the recipient must provide notice of the additional allegations to the parties whose identities are known.

(d) *Dismissal of a complaint.*

(1) A recipient may dismiss a complaint of sex discrimination made through its grievance procedures under this section, and if applicable § 106.46, for any of the following reasons:

(i) The recipient is unable to identify the respondent after taking reasonable steps to do so;

685

(ii) The respondent is not participating in the recipient's education program or activity and is not employed by the recipient;

(iii) The complainant voluntarily withdraws any or all of the allegations in the complaint and the recipient determines that without the complainant's withdrawn allegations, the conduct that remains alleged in the complaint, if any, would not constitute sex discrimination under Title IX even if proven; or

(iv) The recipient determines the conduct alleged in the complaint, even if proven, would not constitute sex discrimination under Title IX. Prior to dismissing the complaint under this paragraph, the recipient must make reasonable efforts to clarify the allegations with the complainant.

(2) Upon dismissal, a recipient must promptly notify the complainant of the basis for the dismissal. If the dismissal occurs after the respondent has been notified of the allegations, then the recipient must also notify the respondent of the dismissal and the basis for the dismissal promptly following notification to the complainant, or simultaneously if notification is in writing.

(3) A recipient must notify all parties that a dismissal may be appealed, provide any party with an opportunity to appeal its dismissal of a complaint, and must:

(i) Notify the parties when an appeal is filed and implement appeal procedures equally for the parties;

(ii) Ensure that the decisionmaker for the appeal did not take part in an investigation of the allegations or dismissal of the complaint;

(iii) Ensure that the decisionmaker for the appeal has been trained as set out in § 106.8(d)(2);

(iv) Provide the parties a reasonable and equal opportunity to make a statement in support of, or challenging, the outcome; and

(v) Notify all parties of the result of the appeal and the rationale for the result.

(4) A recipient that dismisses a complaint must, at a minimum:

(i) Offer supportive measures to the complainant as appropriate under § 106.44(g);

(ii) For dismissals under paragraphs (1)(iii) or (1)(iv) of this section in which the respondent has been notified of the allegations, offer supportive measures to the respondent as appropriate under § 106.44(g); and

(iii) Require its Title IX Coordinator to take other appropriate prompt and effective steps to ensure that sex discrimination does not continue or recur within the recipient's education program or activity under § 106.44(f)(6).

(e) *Consolidation of complaints*. A recipient may consolidate complaints of sex discrimination against more than one respondent, or by more than one complainant against one or more respondents, or by one party against another party, when the allegations of sex discrimination arise out of the same facts or circumstances. If one of the complaints to be consolidated is a complaint of sex-based harassment involving a student complainant or student respondent at a postsecondary institution, the grievance procedures for investigating and resolving the consolidated complaint must comply with the requirements of this section and § 106.46. When more than one complainant or more than one respondent is involved, references in this section and in § 106.46 to a party, complainant, or respondent include the plural, as applicable.

(f) *Complaint investigation*. A recipient must provide for adequate, reliable, and impartial investigation of complaints. To do so, the recipient must:

Case 3:21-cv-00308-CEA-DCP   Document 83-1   Filed 06/27/22   Page 688 of 701   PageID #: 1921

(1) Ensure that the burden is on the recipient—not on the parties—to conduct an investigation that gathers sufficient evidence to determine whether sex discrimination occurred;

(2) Provide an equal opportunity for the parties to present relevant fact witnesses and other inculpatory and exculpatory evidence;

(3) Review all evidence gathered through the investigation and determine what evidence is relevant and what evidence is impermissible regardless of relevance, consistent with § 106.2 and with paragraph (b)(7) of this section; and

(4) Provide each party with a description of the evidence that is relevant to the allegations of sex discrimination and not otherwise impermissible, as well as a reasonable opportunity to respond.

(g) *Evaluating allegations and assessing credibility.* A recipient must provide a process that enables the decisionmaker to adequately assess the credibility of the parties and witnesses to the extent credibility is both in dispute and relevant to evaluating one or more allegations of sex discrimination.

(h) *Determination of whether sex discrimination occurred.* Following an investigation and evaluation process under paragraphs (f) and (g) of this section, the recipient must:

(1) Use the preponderance of the evidence standard of proof to determine whether sex discrimination occurred, unless the recipient uses the clear and convincing evidence standard of proof in all other comparable proceedings, including proceedings relating to other discrimination complaints, in which case the recipient may elect to use that standard of proof in determining whether sex discrimination occurred. Both standards of proof require the decisionmaker to evaluate relevant evidence for its persuasiveness; if the decisionmaker is not persuaded under the applicable standard by the evidence that sex discrimination occurred, whatever the quantity of

688

the evidence is, the decisionmaker should not determine that sex discrimination occurred.

(2) Notify the parties of the outcome of the complaint, including the determination of whether sex discrimination occurred under Title IX, and the procedures and permissible bases for the complainant and respondent to appeal, if applicable;

(3) If there is a determination that sex discrimination occurred, as appropriate, require the Title IX Coordinator to provide and implement remedies to a complainant or other person the recipient identifies as having had equal access to the recipient's education program or activity limited or denied by sex discrimination, and require the Title IX Coordinator to take other appropriate prompt and effective steps to ensure that sex discrimination does not continue or recur within the recipient's education program or activity under § 106.44(f)(6);

(4) Comply with this section, and if applicable § 106.46, before the imposition of any disciplinary sanctions against a respondent; and

(5) Not discipline a party, witness, or others participating in a recipient's grievance procedures for making a false statement or for engaging in consensual sexual conduct based solely on the recipient's determination of whether sex discrimination occurred.

(i) *Additional provisions.*  If a recipient adopts additional provisions as part of its grievance procedures for handling complaints of sex discrimination, including sex-based harassment, such additional provisions must apply equally to the parties.

(j) *Informal resolution.*  In lieu of resolving a complaint through the recipient's grievance procedures, the parties may instead elect to participate in an informal resolution process under § 106.44(k) if provided by the recipient consistent with that paragraph.

(k) *Provisions limited to sex-based harassment complaints.*  For complaints alleging sex-based harassment, the grievance procedures must:

(1) Describe the range of supportive measures available to complainants and respondents under § 106.44(g); and

(2) Describe the range of, or list, the possible disciplinary sanctions and remedies that the recipient may impose following a determination that sex-based harassment occurred.

§ 106.46 [Redesignated as § 106.48]

20. Section 106.46 is redesignated as section 106.48 within subpart D.

21. Section 106.46 is added to subpart D to read as follows:

**106.46 Grievance procedures for the prompt and equitable resolution of complaints of sex-based harassment involving student complainants or student respondents at postsecondary institutions.**

(a) *General.*  A postsecondary institution's prompt and equitable written grievance procedures for complaints of sex-based harassment involving a student complainant or student respondent must include provisions that incorporate the requirements of § 106.45 and this section.

(b) *Student employees.*  When a complainant or respondent is both a student and an employee of a postsecondary institution, the postsecondary institution must make a fact-specific inquiry to determine whether the requirements of this section apply.  In making this determination, a postsecondary institution must, at a minimum, consider whether the party's primary relationship with the postsecondary institution is to receive an education and whether the alleged sex-based harassment occurred while the party was performing employment-related work.

(c) *Written notice of allegations*.

(1) Upon the initiation of the postsecondary institution's sex-based harassment grievance procedures under this section, a postsecondary institution must provide written notice to the parties, whose identities are known, of:

(i) All information required under § 106.45(c); and

(ii) Allegations potentially constituting sex-based harassment, including the information required under § 106.45(c)(1)(ii), with sufficient time for the parties to prepare a response before any initial interview.

(2) The written notice must also inform the parties that:

(i) The respondent is presumed not responsible for the alleged conduct until a determination of whether sex-based harassment occurred is made at the conclusion of the grievance procedures under this section and that prior to the determination, the parties will have an opportunity to present relevant evidence to a trained, impartial decisionmaker;

(ii) They may have an advisor of their choice to serve in the role set out in paragraph (e)(2) of this section, and that the advisor may be, but is not required to be, an attorney;

(iii) They are entitled to receive access to relevant evidence or to an investigative report that accurately summarizes this evidence as set out in paragraph (e)(6) of this section; and

(iv) If applicable, any provision in the postsecondary institution's code of conduct prohibits knowingly making false statements or knowingly submitting false information during the grievance procedure.

(3) To the extent the postsecondary institution has legitimate concerns for the safety of any person as a result of providing this notice, the postsecondary institution may reasonably delay providing written notice of the allegations in order to address the safety concern appropriately. Legitimate concerns must be based on individualized safety and risk analysis and

691

not on mere speculation or stereotypes.

(d) *Dismissal of a complaint*.  When dismissing a complaint alleging sex-based harassment and involving a student complainant or a student respondent, a postsecondary institution must:

(1) Provide the parties, simultaneously, with written notice of the dismissal and the basis for the dismissal, if dismissing a complaint under any of the bases in § 106.45(d)(1); and

(2) Obtain the complainant's withdrawal in writing if dismissing a complaint based on the complainant's voluntary withdrawal of the complaint or allegations under § 106.45(d)(1)(iii).

(e) *Complaint investigation*.  When investigating a complaint alleging sex-based harassment and throughout the postsecondary institution's grievance procedures for complaints of sex-based harassment involving a student complainant or a student respondent, a postsecondary institution:

(1) Must provide, to a party whose participation is invited or expected, written notice of the date, time, location, participants, and purpose of all meetings, investigative interviews, or hearings with sufficient time for the party to prepare to participate;

(2) Must provide the parties with the same opportunities to be accompanied to any meeting or proceeding by the advisor of their choice, who may be, but is not required to be, an attorney, and not limit the choice or presence of the advisor for the complainant or respondent in any meeting or grievance proceeding; however, the postsecondary institution may establish restrictions regarding the extent to which the advisor may participate in the grievance procedures, as long as the restrictions apply equally to the parties;

(3) Must provide the parties with the same opportunities, if any, to have persons other than the advisor of the parties' choice present during any meeting or proceeding;

(4) Has discretion to determine whether the parties may present expert witnesses as long as the determination applies equally to the parties;

(5) Must allow for the reasonable extension of timeframes on a case-by-case basis for good cause with written notice to the parties that includes the reason for the delay; and

(6) Must provide each party and the party's advisor, if any, with equitable access to the evidence that is relevant to the allegations of sex-based harassment and not otherwise impermissible, consistent with §§ 106.2 and 106.45(b)(7), in the following manner:

(i) A postsecondary institution must provide either equitable access to the relevant and not otherwise impermissible evidence, or to the same written investigative report that accurately summarizes this evidence. If the postsecondary institution provides an investigative report, it must further provide the parties with equitable access to the relevant and not otherwise impermissible evidence upon the request of any party;

(ii) A postsecondary institution must provide the parties with a reasonable opportunity to review and respond to the evidence as provided under paragraph (6)(i) of this section prior to the determination of whether sex-based harassment occurred. If a postsecondary institution conducts a live hearing as part of its grievance procedures, it must provide this opportunity to review the evidence in advance of the live hearing; it is at the postsecondary institution's discretion whether to provide this opportunity to respond prior to the live hearing, during the live hearing, or both prior to and during the live hearing;

(iii) A postsecondary institution must take reasonable steps to prevent and address the parties' and their advisors' unauthorized disclosure of information and evidence obtained solely through the sex-based harassment grievance procedures; and

(iv) Compliance with paragraph (e)(6) of this section satisfies the requirements of

693

§ 106.45(f)(4).

(f) *Evaluating allegations and assessing credibility.*

(1) *Process for evaluating allegations and assessing credibility.* A postsecondary institution must provide a process as specified in this subpart that enables the decisionmaker to adequately assess the credibility of the parties and witnesses to the extent credibility is both in dispute and relevant to evaluating one or more allegations of sex-based harassment. This assessment of credibility includes either:

(i) Allowing the decisionmaker to ask the parties and witnesses, during individual meetings with the parties or at a live hearing, relevant and not otherwise impermissible questions under §§ 106.2 and 106.45(b)(7) and follow-up questions, including questions challenging credibility, before determining whether sex-based harassment occurred and allowing each party to propose to the decisionmaker or investigator relevant and not otherwise impermissible questions under §§ 106.2 and 106.45(b)(7) and follow-up questions, including questions challenging credibility, that the party wants asked of any party or witness and have those questions asked during individual meetings with the parties or at a live hearing under paragraph (g) of this section subject to the requirements in paragraph (f)(3) of this section; or

(ii) When a postsecondary institution chooses to conduct a live hearing, allowing each party's advisor to ask any party and any witnesses all relevant and not otherwise impermissible questions under §§ 106.2 and 106.45(b)(7) and follow-up questions, including questions challenging credibility, subject to the requirements under paragraph (f)(3) of this section. Such questioning must never be conducted by a party personally. If a postsecondary institution permits advisor-conducted questioning and a party does not have an advisor who can ask questions on their behalf, the postsecondary institution must provide the party with an advisor of

694

the postsecondary institution's choice, without charge to the party, for the purpose of advisor-conducting questioning. The advisor may be, but is not required to be, an attorney.

(2) *Compliance with § 106.45(g).* Compliance with paragraph (f)(1)(i) or (f)(1)(ii) of this section satisfies the requirements of § 106.45(g).

(3) *Procedures for the decisionmaker to evaluate the questions and limitations on questions.* The decisionmaker must determine whether a proposed question is relevant and not otherwise impermissible under §§ 106.2 and 106.45(b)(7), prior to the question being posed, and must explain any decision to exclude a question as not relevant. If a decisionmaker determines that a party's question is relevant and not otherwise impermissible, then it must be asked except that a postsecondary institution must not permit questions that are unclear or harassing of the party being questioned. A postsecondary institution may also impose other reasonable rules regarding decorum, provided they apply equally to the parties.

(4) *Refusal to respond to questions related to credibility.* If a party does not respond to questions related to their credibility, the decisionmaker must not rely on any statement of that party that supports that party's position. The decisionmaker must not draw an inference about whether sex-based harassment occurred based solely on a party's or witness's refusal to respond questions related to their credibility.

(g) *Live hearing procedures.* A postsecondary institution's sex-based harassment grievance procedures may, but need not, provide for a live hearing. If a postsecondary institution chooses to conduct a live hearing, it may conduct the live hearing with the parties physically present in the same geographic location, but at the postsecondary institution's discretion or upon the request of either party, it will conduct the live hearing with the parties physically present in separate locations with technology enabling the decisionmaker and parties to simultaneously see

695

and hear the party or the witness while that person is speaking or communicating in another format. A postsecondary institution must create an audio or audiovisual recording, or transcript, of any live hearing and make it available to the parties for inspection and review.

(h) *Written determination of whether sex-based harassment occurred.* The postsecondary institution must provide the determination whether sex-based harassment occurred in writing to the parties simultaneously.

(1) The written determination must include:

(i) A description of the alleged sex-based harassment;

(ii) Information about the policies and procedures that the postsecondary institution used to evaluate the allegations;

(iii) The decisionmaker's evaluation of the relevant evidence and determination of whether sex-based harassment occurred;

(iv) When the decisionmaker finds that sex-based harassment occurred, any disciplinary sanctions the postsecondary institution will impose on the respondent, and whether remedies other than the imposition of disciplinary sanctions will be provided by the postsecondary institution to the complainant and, to the extent appropriate, other students identified by the postsecondary institution to be experiencing the effects of the sex-based harassment; and

(v) The postsecondary institution's procedures for the complainant and respondent to appeal.

(2) The determination regarding responsibility becomes final either on the date that the postsecondary institution provides the parties with the written determination of the result of the appeal, if an appeal is filed, or if an appeal is not filed, the date on which an appeal would no longer be considered timely.

696

(i) *Appeals.*

(1) A postsecondary institution must offer the parties an appeal from a determination that sex-based harassment occurred, and from a postsecondary institution's dismissal of a complaint or any allegations therein, on the following bases:

(i) Procedural irregularity that would change the determination of whether sex-based harassment occurred in the matter;

(ii) New evidence that would change the outcome of the matter and that was not reasonably available at the time the determination of whether sex-based harassment occurred or dismissal was made; and

(iii) The Title IX Coordinator, investigator, or decisionmaker had a conflict of interest or bias for or against complainants or respondents generally or the individual complainant or respondent that would change the outcome of the matter.

(2) A postsecondary institution may offer an appeal equally to the parties on additional bases, as long as the additional bases are available to all parties.

(3) As to all appeals, the postsecondary institution must comply with the requirements in § 106.45(d)(3)(i), (iv), and (v) in writing.

(j) *Informal resolution.* If a postsecondary institution offers or provides the parties to the grievance procedures under § 106.45 and under this section with an informal resolution process under § 106.44(k), the postsecondary institution must inform the parties in writing of the offer and their rights and responsibilities in the informal resolution process and otherwise comply with the provisions of § 106.44(k)(3) in writing.

22. Section 106.47 is added to subpart D to read as follows:

**106.47 Assistant Secretary review of sex-based harassment complaints.**

The Assistant Secretary will not deem a recipient to have violated this part solely because the Assistant Secretary would have reached a different determination than a recipient reached under § 106.45, and if applicable § 106.46, based on an independent weighing of the evidence in sex-based harassment complaints.

23. Section 106.51 is amended by revising paragraph (b)(6) to read as follows:

**106.51 Employment.**

* * * * *

* * * * * * * *

(6) Granting and return from leaves of absence, leave for pregnancy or related conditions, leave for persons of either sex to care for children or dependents, or any other leave;

* * * * *

24. Section 106.57 is revised to read as follows:

**106.57 Parental, family, or marital status; pregnancy or related conditions.**

(a) *Status generally.* A recipient shall not adopt or apply any policy, practice, or procedure, or take any employment action on the basis of sex:

(1) Concerning the current, potential, or past parental, family, or marital status of an employee or applicant for employment which treats persons differently; or

(2) Which is based upon whether an employee or applicant for employment is the head of household or principal wage earner in such employee's or applicant's family unit.

(b) *Pregnancy or related conditions.* A recipient shall not discriminate against or exclude from employment any employee or applicant for employment on the basis of current, potential, or past pregnancy or related conditions.

698

(c) *Comparable treatment to temporary disabilities or conditions.* A recipient shall treat pregnancy or related conditions or any temporary disability resulting therefrom as any other temporary disability for all job-related purposes, including commencement, duration and extensions of leave, payment of disability income, accrual of seniority and any other benefit or service, and reinstatement, and under any fringe benefit offered to employees by virtue of employment.

(d) *Pregnancy leave.* In the case of a recipient that does not maintain a leave policy for its employees, or in the case of an employee with insufficient leave or accrued employment time to qualify for leave under such a policy, a recipient shall treat pregnancy or related conditions as a justification for a voluntary leave of absence without pay for a reasonable period of time, at the conclusion of which the employee shall be reinstated to the status held when the leave began or to a comparable position, without decrease in rate of compensation or loss of promotional opportunities, or any other right or privilege of employment.

(e) *Lactation time and space.*

(1) A recipient must provide reasonable break time for an employee to express breast milk or breastfeed as needed.

(2) A recipient must ensure the availability of a lactation space, which must be a space other than a bathroom that is clean, shielded from view, free from intrusion from others, and may be used by an employee for expressing breast milk or breastfeeding as needed.

25. Section 106.60 is revised to read as follows:

**106.60 Pre-employment inquiries.**

(a) *Marital status.* A recipient must not make pre-employment inquiry as to the marital status of an applicant for employment, including whether such applicant is "Miss or Mrs."

(b) *Sex*.  A recipient may ask an applicant for employment to self-identify their sex, but only if this question is asked of all applicants and if the response is not used as a basis for discrimination prohibited by this part.

26. Section 106.71 is revised to read as follows:

## 106.71 Retaliation.

A recipient must prohibit retaliation in its education program or activity.  When a recipient receives information about conduct that may constitute retaliation, the recipient is obligated to comply with § 106.44.  A recipient must initiate its grievance procedures upon receiving a complaint alleging retaliation under § 106.45.  As set out in § 106.45(e), if the complaint is consolidated with a complaint of sex-based harassment involving a student complainant or student respondent at a postsecondary institution, the grievance procedures initiated by the consolidated complaint must comply with the requirements of §§ 106.45 and 106.46.  Prohibited retaliation includes but is not limited to:

(a) Initiating a disciplinary process against a person for a code of conduct violation that does not involve sex discrimination but arises out of the same facts and circumstances as a complaint or information reported about possible sex discrimination, for the purpose of interfering with the exercise of any right or privilege secured by Title IX or this part; or

(b) Peer retaliation.

27. Section 106.81 is revised to read as follows:

## 106.81 Procedures.

The procedural provisions applicable to title VI of the Civil Rights Act of 1964 are hereby adopted and incorporated herein by reference.  These procedures may be found at 34 CFR 100.6-100.11 and 34 CFR part 101.

700