# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

| | |
|---|---|
| THE STATE OF TENNESSEE, *et al.*,<br><br>    *Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION, *et al.*,<br><br>    *Defendants*. | ) <br> ) <br> ) <br> )    Case No. 3:21-cv-308 <br> ) <br> )    Judge Atchley <br> ) <br> )    Magistrate Judge Poplin <br> ) <br> ) <br> ) |

## MEMORANDUM OPINION AND ORDER

Before the Court is the Motion for Preliminary Injunction [Doc. 10] filed by Plaintiff States[1] and the Motion to Dismiss [Doc. 49] filed by Defendants United States Department of Education and Miguel Cardona, in his official capacity as Secretary of Education; Equal Employment Opportunity Commission and Charlotte Burrows, in her official capacity as the Chair of the Equal Employment Opportunity Commission; and United States Department of Justice, Merrick Garland, in his official capacity as Attorney General of the United States, and Kristen Clarke, in her official capacity as the Assistant Attorney General for Civil Rights. The relevant issues have been fully briefed, and the Court heard oral argument. These motions are now ripe for review.

For the reasons below, Plaintiffs' Motion for Preliminary Injunction [Doc. 10] is **GRANTED** and Defendants' Motion to Dismiss [Doc. 49] is **DENIED**.

---

[1] Plaintiff States consist of Tennessee, Alabama, Alaska, Arizona, Arkansas, Georgia, Idaho, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Ohio, Oklahoma, South Carolina, South Dakota, and West Virginia.

# I.    BACKGROUND

## A.  *Bostock v. Clayton County*

In *Bostock v. Clayton County*, the Supreme Court of the United States was asked to resolve a discrete legal issue: whether Title VII of the Civil Rights Act of 1964, which prohibits employment discrimination "because of…sex," bars an employer from firing someone simply for being homosexual or transgender. 140 S. Ct. 1731, 1738-39 (2020). The Court answered this question affirmatively.

The Court explained that Title VII's "because of…sex" language incorporates a "but-for" causation standard; so long as "sex" was one "but-for" cause of an employee's termination, that is sufficient to trigger Title VII. *Id.* at 1739. The Court further explained that "sex" refers to the biological distinctions between males and females. *Id.* Taken together, the Court clarified that "[a]n employer violates Title VII when it intentionally fires an individual employee based in part on sex." *Id.* at 1741.

The Court then reasoned that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id.* "[H]omosexuality and transgender status are inextricably bound up with sex" because "to discriminate on these grounds requires an employer to intentionally treat individual employees differently because of their sex." *Id.* at 1742. The Court held that, under Title VII, "employers are prohibited from firing employees on the basis of homosexuality or transgender status." *Id.* at 1753.

The Court was careful to narrow the scope of its holding. *Id.* That is, its holding did not "sweep beyond Title VII to other federal or state laws that prohibit sex discrimination." *Id.* Nor did the Court's decision "purport to address bathrooms, locker rooms, [dress codes] or anything

2

else of the kind." *Id*. The Court expressly declined to "prejudge" any laws or issues not before it, observing instead that "[w]hether policies and practices might or might not qualify as unlawful discrimination or find justifications under other provisions of Title VII are questions for future cases." *Id*.

## B.  Executive Order

On January 20, 2021, the President of the United States signed an "Executive Order on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation." Exec. Order. No. 13988, 86 Fed. Reg. 7023-25 (Jan. 20, 2021) (herein "President's Executive Order"). Under the Supreme Court's reasoning in *Bostock*, the Executive Order declared that "laws that prohibit sex discrimination…prohibit discrimination on the basis of gender identity or sexual orientation." *Id*. (citing *Bostock*, 140 S. Ct. 1731). The President directed federal agencies to "fully implement statutes that prohibit sex discrimination" consistent with the Administration's interpretation. *Id*.

## C.  Agency Response to Executive Order

In response to the President's Executive Order, the Department of Education ("Department") and Equal Employment Opportunity Commission ("EEOC") issued guidance documents providing their interpretations of Title IX of the Education Amendments Act of 1972 ("Title IX") and Title VII of the Civil Rights Act of 1964 ("Title VII"), respectively.

### 1.  *Department of Education*

Defendant United States Department of Education is an executive agency of the federal government responsible for the enforcement and administration of Title IX. [Doc. 1 at ¶ 17] (citing 20 U.S.C. §§ 3411, 3441).

On June 22, 2021, the Department published in the Federal Register an "Interpretation" of Title IX. [Doc. 1-2] ("Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County." 86 Fed. Reg. 32637 (June 22, 2021)). The Interpretation took effect upon publication. [*Id.*]. The Department recognized that the Interpretation represented a change in position, explaining the purpose of the Interpretation was "to make clear that the Department interprets Title IX's prohibition on sex discrimination to encompass discrimination based on sexual orientation and gender identity" in light of the *Bostock* decision. [*Id.*]. The Interpretation states that the Department "will fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity in education programs and activities that receive Federal financial assistance from the Department" and that the Interpretation "will guide the Department in processing complaints and conducting investigations." [*Id.*]. The Interpretation "supersedes and replaces any prior inconsistent statements made by the Department regarding the scope of Title IX's jurisdiction over discrimination based on sexual orientation and gender identity." [*Id.*].

Subsequently, on June 23, 2021, the Department issued a "Dear Educator" letter to directly notify those subject to Title IX of the Department's Interpretation. [Doc. 1-4] ("Letter to Educators on Title IX's 49th Anniversary" (June 23, 2021)).[2] The "Dear Educator" letter reiterates that "Title IX's protection against sex discrimination encompasses discrimination based on sexual orientation and gender identity" and explains that the Department "will fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity." [*Id.*].

---

[2] https://www2.ed.gov/about/offices/list/ocr/correspondence/stakeholders/educator-202106-tix.pdf (last visited July 15, 2022).

The "Dear Educator" letter references an accompanying "Fact Sheet" that expounds on the Department's interpretation of Title IX. [Doc. 1-4] ("U.S. Dep't of Justice & U.S. Dep't of Educ., Confronting Anti-LGBTQI+ Harassment in Schools" (June 2021)).[3] The Fact Sheet explains that "discrimination against students based on their sexual orientation or gender identity is a form of discrimination prohibited by federal law." [*Id.*]. The Fact Sheet also notes that regulated entities "have a responsibility to investigate and address sex discrimination, including sexual harassment, against students because of their perceived or actual sexual orientation or gender identity." [*Id.*]. The Fact Sheet states that the Department "can [] provide information to assist schools in meeting their legal obligations," and offers examples of specific conduct related to sexual orientation and gender identity that the Department can investigate as incidents of discrimination under Title IX. [*Id.*].

### 2. Equal Employment Opportunity Commission

Defendant Equal Employment Opportunity Commission is a federal agency charged with limited enforcement of, among other things, Title VII. [Doc. 1 at ¶ 19] (citing 42 U.S.C. § 2000e-6).

On June 15, 2021, the EEOC issued a "Technical Assistance Document." [Doc. 1-5] ("Protections Against Employment Discrimination Based on Sexual Orientation or Gender Identity" (June 15, 2021)).[4] The Technical Assistance Document "explains what the *Bostock* decision means for LGBTQ+ workers (and all covered workers) and for employers across the country" and "explains the [EEOC's] established legal positions on LGBTQ+ related matters." *Id*.

---

[3] https://www2.ed.gov/about/offices/list/ocr/docs/ocr-factsheet-tix-202106.pdf (last visited July 15, 2022).

[4] https://www.eeoc.gov/laws/guidance/protections-against-employment-discrimination-based-sexual-orientation-or-gender (last visited July 15, 2022).

After summarizing Title VII's general requirements, the Technical Assistance Document provides examples of employer conduct that would constitute discrimination under *Bostock* through a series of questions and answers. *Id.* Specifically, the Technical Assistance Document purports to explain employers' obligations with respect to dress codes, bathrooms, locker rooms, showers, and use of preferred pronouns or names. [*Id.*]. The Technical Assistance Document cautions that it "does not have the force and effect of law and is not meant to bind the public in any way." [*Id.*]. Instead, the Technical Assistance Document is "intended only to provide clarity to the public regarding existing requirements under the law." [*Id.*]. The Technical Assistance Document invites individuals to file a charge of discrimination with the EEOC if they believe their rights under Title VII, as explained within the document, have been violated. [*Id.*].

### D. Current Lawsuit

Plaintiff States are employers subject to the requirements of Title VII, and are home to political subdivisions and other employers subject to the requirements of Title VII. [Doc. 1 at ¶¶ 8-9, 15-16].[5] Plaintiff States also oversee and operate educational institutions and other educational programs and activities that receive federal funding and are thus subject to the requirements of Title IX. [*Id.* at ¶¶ 12, 15].

On August 30, 2021, Plaintiffs filed a Complaint challenging the legality of the guidance documents issued by the Department and the EEOC in response to the President's Executive Order. [*Id.*]. Specifically, Plaintiffs contend that Defendants' guidance documents are procedurally and substantively unlawful under the Administrative Procedure Act ("APA") and the United States

---

[5] For consistency and ease of reference, record citations are to the CM/ECF-stamped document and page number, not to the internal pagination of any filed document. Where possible, citation is made to more specific subdivisions within a document.

Constitution. [*Id.*]. Plaintiffs seek preliminary and permanent injunctive and declaratory relief and a judgment setting aside Defendants' guidance documents. [*Id.* at 33-34].

On September 2, 2021, Plaintiffs filed a Motion for Preliminary Injunction [Doc. 10], requesting the Court to enjoin Defendants from enforcing the challenged guidance documents until this case is resolved on the merits. Defendants then filed a Motion to Dismiss [Doc. 49], seeking dismissal of this action in its entirety. Defendants claim (1) the Court lacks subject matter jurisdiction to consider Plaintiffs' claims and (2) Plaintiffs fail to state plausible claims for relief. [*Id.*].

## II.      STANDARD OF REVIEW

Rule 65 of the Federal Rules of Civil Procedure permits a party to seek injunctive relief to prevent immediate and irreparable injury, loss, or damage. The purpose of a preliminary injunction is to preserve the respective positions of the parties until a trial on the merits can be held. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *Certified Restoration Dry Clean Network, LLC v. Tenke Corp.,* 511 F.3d 535, 542 (6th Cir. 2007).

Whether to issue a preliminary injunction is committed to the sound discretion of the trial court. *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 102 (6th Cir. 1982). A preliminary injunction is an "extraordinary and drastic remedy" that "may only be awarded upon a clear showing that the [moving party] is entitled to such relief." *Fowler v. Benson*, 924 F.3d 247, 256 (6th Cir. 2019) (internal citations omitted). "[T]he party seeking a preliminary injunction bears the burden of justifying such relief." *Am. Civil Liberties Union Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 642 (6th Cir. 2015); *see also* Fed. R. Civ. P. 65(b).

In the United States Court of Appeals for the Sixth Circuit, four factors determine when a court should grant a preliminary injunction: "(1) whether the movant has shown a likelihood of

success on the merits; (2) whether the moving party will be irreparably injured absent an injunction; (3) whether issuing an injunction will harm other parties to the litigation; and (4) whether an injunction is in the public interest." *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)). These four factors are "to be balanced" against one another; they are "not prerequisites that must be met." *Michael v. Futhey*, 2009 WL 4981688, at *17 (6th Cir. Dec. 17, 2009).

Furthermore, "in addition to demonstrating a likelihood of success on the substantive claims, a plaintiff must also show a likelihood of success of establishing jurisdiction." *Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 554 (6th Cir. 2021) (citing *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 256 n.4 (6th Cir. 2018)). "If a plaintiff cannot show a likelihood of jurisdiction, then the court will deny the preliminary injunction." *Id*. (explaining that there is no continuing need for a preliminary injunction when there is not a substantial likelihood that the claims will remain justiciable).

## III.    ANALYSIS

As an initial matter, there is substantial overlap between the pending motions. Defendants contend Plaintiffs are not entitled to a preliminary injunction for the same reasons this action should be dismissed. Because Defendants' arguments in opposition to the requested injunctive relief are identical to their arguments for dismissal, the Court will resolve both motions in the context of determining whether a preliminary injunction is warranted. *Hils v. Davis,* 2022 WL 769509, at *5 (S.D. Ohio Mar. 14, 2022) (collecting cases) ("Because Defendants' position on Plaintiffs' likelihood of success on the merits is identical to their motion to dismiss, the Court will analyze these questions together."); *Austin v. United Auto Workers Intern. Union*, 2004 WL 2112730, at *2-3 (E.D. Mich. June 4, 2004) (holding that plaintiff's failure to demonstrate a

likelihood of success on the merits also signified a failure to state a claim sufficient to survive a motion to dismiss).

### A. Jurisdiction

Plaintiffs maintain that their claims are justiciable, [Doc. 11 at 16-18], while Defendants contend the Court lacks subject matter jurisdiction. [Doc. 48 at 26-34]. Specifically, Defendants argue that Plaintiffs lack standing and their claims are not yet ripe for review. [*Id.*].[6]

#### *1. Standing*

Article III of the United States Constitution limits the jurisdiction of federal courts to actual cases and controversies. U.S. Const. art. III, § 2; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-60 (1992). "Standing is a core component of this 'case or controversy requirement of Article III.'" *Memphis A. Philip Randolph Inst.*, 2 F.4th at 555 (quoting *Lujan*, 504 U.S. at 560). Standing is a "threshold question in every federal case" that asks "whether the plaintiff is [a] proper party to bring [a particular lawsuit]." *Coyne v. American Tobacco Co.*, 183 F.3d 488, 496 (6th Cir. 1999); *Raines v. Byrd*, 521 U.S. 811, 818 (1997). Standing ensures that the plaintiff has a sufficient "personal stake in the outcome of the controversy as to warrant the invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on [their] behalf." *Lugo v. Miller*, 640 F.2d 823, 827 (6th Cir. 1981).

"[T]he presence of one party with standing is sufficient to satisfy Article III's case or controversy requirement." *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 52 n.2

---

[6] Defendants also contend that the Court lacks jurisdiction over Plaintiffs' APA claims because Plaintiffs have an adequate alternative remedy available to them. [Doc. 49-1 at 16-19]. However, "[b]ecause the APA is not a jurisdiction-conferring statute, '[the] elements of a claim under the APA…are not jurisdictional.'" *Haines v. Fed. Motor Carrier Safety Admin.*, 814 F.3d 417, 424 (6th Cir. 2016) (quoting *Jama v. Dep't of Homeland Sec.*, 760 F.3d 490, 494 (6th Cir. 2014)). While there are threshold questions under the APA, such questions speak to the failure to state a claim under Rule 12(b)(6) rather than a lack of subject matter jurisdiction under Rule 12(b)(1). *Id.* at 424-27 ("To state a claim for relief under the APA, a plaintiff must allege that his or her injury stems from a final agency action *for which there is no other adequate remedy in court*.")

(2006); *Phillips v. Snyder*, 836 F.3d 707, 714 n.2 (6th Cir. 2016) (collecting cases). To satisfy Article III's standing requirement, a plaintiff must demonstrate (1) it has suffered an injury in fact; (2) that injury is fairly traceable to the challenged conduct of the defendant; and (3) that the injury will likely be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61; *Spokeo Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (summarizing the standing elements as: (1) injury in fact; (2) traceability; and (3) redressability). To obtain injunctive relief, a plaintiff "must show actual present harm or a significant possibility of future harm." *Grendell v. Ohio Supreme Court*, 252 F.3d 828, 832 (6th Cir. 2001).

As a threshold matter, it is of great significance that Plaintiffs are sovereign States, as States constitute a special class of litigants for federal jurisdictional purposes. *Massachusetts v. EPA*, 127 S. Ct. 1438, 1453-54 (2007). In *Massachusetts*, the Supreme Court noted "[i]t is of considerable relevance that the party seeking review here is a sovereign State and not…a private individual." *Id*. at 1454. "States are not normal litigants for the purposes of invoking federal jurisdiction," thus, Plaintiff States are entitled to "special solicitude" in the Court's standing analysis. *Id*. at 1454-55; *see also Arizona v. Biden,* 2022 WL 2437870, at *5 (6th Cir. July 5, 2022) (*quoting Massachusetts*, 127 S. Ct. 1438) (explaining "States sometimes are entitled to 'special solicitude'…because they may incur 'quasi-sovereign' injuries that private parties cannot."). However, any "special solicitude" afforded to States does not eliminate the core standing requirements of an injury in fact, causation, and redressability. *Id*. at 1455-59; *Arizona*, 2022 WL 2437870 at *5.

Here, the primary dispute centers around the injury in fact requirement. "A plaintiff suffers an 'injury in fact' when [their] legally protected interest has been invaded and the injury is both 'concrete and particularized' and 'actual or imminent;' not 'conjectural or hypothetical.'" *Kiser v. Reitz*, 765 F.3d 601, 607 (6th Cir. 2014) (quoting *Lujan*, 504 U.S. at 560). Plaintiffs

identify several injuries inflicted by the challenged guidance. [Doc. 11 at 17]. During oral argument, Plaintiffs represented that the alleged injury to their sovereign interests is the most direct injury that confers standing. The Court agrees.

It is well-established that "[S]tates have a sovereign interest in 'the power to create and enforce a legal code.'" *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601-02 (1982); *see also Maine v. Taylor*, 477 U.S. 131, 137 (1986) ("[A] State clearly has a legitimate interest in the continued enforceability of its own statutes."). Pursuant to that interest, courts have recognized that States suffer a cognizable injury for purposes of constitutional standing when they allege an intrusion on their ability to enforce their own legal code, whether by way of direct interference or interference analogous to substantial pressure to change state laws. *Id.* [7]

Plaintiffs contend they are presently injured by Defendants' guidance documents, as the guidance directly interferes with Plaintiffs' sovereign authority to enforce state laws. [Doc. 11 at 17]. Plaintiffs claim they have exercised their sovereign authority to enact laws that "arguably

---

[7] *See also Cameron v. EMW Women's Surgical Center, P.S.C.*, 142 S. Ct. 1002, 1004 (2022) (internal citations omitted) ("A State clearly has a legitimate interest in the continued enforceability of its own statutes, and a State's opportunity to defend its laws in federal court should not be lightly cut off."); *Colorado v. Toll*, 268 U.S. 228, 229-30 (1925) (allowing Colorado to challenge federal regulations alleged "to interfere with the sovereign rights of the State"); *Missouri v. Holland*, 252 U.S. 416, 431 (1920) (taking jurisdiction over an action to enjoin enforcement of a federal statute that interfered with Missouri's ability to enforce its regulations on the same subject); *Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*, 766 F.2d 228, 232-33 (6th Cir. 1985) (finding Ohio had standing to challenge a federal agency's regulation that "endangered and rendered uncertain" a state statute); *Texas v. EEOC*, 933 F.3d 433, 446 (5th Cir. 2019) (internal citations omitted) ("[B]eing pressured to change state law constitutes an injury because states have a sovereign interest in the power to create and enforce a legal code."); *Massachusetts v. U.S. Dep't of Educ.*, 340 F. Supp.3d 7, 12 (D.C. Cir. 2018) (citing *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 601-02); *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015) ("In the absence of an actual conflict [between federal action and a state's ability to regulate], courts have also found a cognizable interference where the federal action creates an intrusion…analogous to pressure to change state law."); *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 268 (4th Cir. 2011) ("A federal statute that hinders a state's exercise of this sovereign power to 'create and enforce a legal code' at least arguably inflicts an injury sufficient to provide a state standing to challenge the federal statute."); *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008) (finding that Wyoming had standing to challenge federal agency's interpretation of federal firearms law that undermined Wyoming's ability to enforce its own legal code); *State of Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989) (finding a sufficient injury in fact because federal regulations interfered with the States' sovereign interest in enforcing their own laws); *New York v. Mnuchin*, 408 F. Supp.3d 399, 410 (S.D.N.Y. Sept. 30, 2019) (finding States presented viable grounds for establishing standing based, in part, on pressure to change their tax policies).

conflict" with the guidance documents, identifying specific statutes to bolster their allegations. [Docs. 57 at 11; 1 at ¶¶ 98-99]. Plaintiffs argue that based on Defendants' guidance, conduct required under their state laws constitutes sex discrimination under Titles VII and IX. [Doc. 11 at 18]. Therefore, Plaintiffs claim Defendants' interpretations of Titles VII and IX, as set forth in the challenged guidance, directly interfere with and threaten their ability to enforce their state laws as written. [Docs. 1 at ¶ 108; 11 at 17].

It is well-settled that Plaintiffs have a concrete interest in the continued enforceability of their state laws, and ten Plaintiff States have identified a plausible conflict between their state laws and Defendants' guidance documents. Plaintiffs have enacted, and are currently enforcing, statutes that arguably conflict with Defendants' guidance as to the legality of certain conduct related to sexual orientation and gender identity.

For example, Tennessee has a statute providing "[a] student's gender for purposes of participation in a public middle school or high school interscholastic athletic activity or event must be determined by the student's sex at the time of the student's birth." [*Id.* at ¶ 98].[8] Yet, the Department's Fact Sheet, which purports to explain existing obligations under Title IX, highlights that students should be allowed to participate on a sports team consistent with their gender identity, rather than biological sex. [Doc. 1-4]. Tennessee also has a statute providing public school students, teachers, and employees with a cause of action against a school that "'intentionally allow[s] a member of the opposite sex to enter [a] multi-occupancy restroom or changing facility while other persons [are] present." [*Id.* at ¶ 98].[9] In contrast, the Department's

---

[8] Similarly, Plaintiffs Alabama, Arkansas, Idaho, and Montana have enacted laws providing that designations for school-sponsored athletic activities must be determined by biological sex. [Doc. 1 at ¶ 99].

[9] Similarly, Plaintiffs Nebraska, Oklahoma, and West Virginia have enacted laws that provide for sex-separated facilities in the educational and employment contexts and prohibit members of the opposite sex from using those facilities. [*Id.*].

Fact Sheet notes that students should be allowed to use the bathroom that aligns with their gender identity, and the EEOC's Technical Assistance Document provides that covered employers must allow an individual to access a bathroom, locker room, or shower that corresponds to their gender identity. [Docs. 1-4, 1-5].

At a minimum, Defendants' guidance appears to deem conduct required by Plaintiffs' state laws to be unlawful sex discrimination under federal law. And, because Plaintiffs are subject to Titles VII and IX, and are thus objects of the guidance, Defendants' guidance directly interferes with and threatens Plaintiff States' ability to continue enforcing their state laws. Plaintiffs cannot continue regulating pursuant to their state laws while simultaneously complying with Defendants' guidance.

Additionally, Plaintiffs claim that they are currently injured by Defendants' guidance documents, as the guidance puts substantial pressure on Plaintiffs to change state laws.[10] Plaintiffs have identified a conflict between Defendants' guidance and what their state laws require, and the guidance applies to Plaintiffs. Defendants have vowed to enforce these statues consistent with the challenged guidance, and Defendants do not dispute that an enforcement action puts Plaintiffs at risk of losing substantial federal funding. Defendants have the power and ability to investigate "sex discrimination" and to enforce the guidance against Plaintiffs, and Defendants have not disavowed doing so. Therefore, as it currently stands, Plaintiffs must choose between the threat of legal consequences—enforcement action, civil penalties, and the withholding of federal funding – or altering their state laws to ensure compliance with the guidance and avoid such adverse action. As other courts have recognized, being left to such an untenable choice inflicts substantial pressure on Plaintiffs to change their state laws—an intrusion sufficient to constitute an injury for standing

---

[10] Plaintiffs alleged this injury in their Complaint and further developed their argument regarding this injury during oral argument. [Doc. 1 at ¶¶108-109].

purposes. *Supra* at n.7.

Defendants argue that Plaintiffs' alleged interference with their sovereign authority to create and enforce a legal code cannot be reconciled with the Supreme Court's decision in *Massachusetts v. Mellon*, which explained that Article III jurisdiction cannot be based upon "abstract questions…of sovereignty." [Doc. 48 at 29]. (citing 262 U.S. 477, 485 (1923)). In *Mellon*, the Supreme Court rejected Massachusetts's assertion that a sovereign state has an absolute right to sue on its own behalf. *Id.* at 484-85. Massachusetts sued to challenge the constitutionality of the Maternity Act, arguing the statute was an improper usurpation of power reserved to the states. *Id. Id.* at 480-81. The Court first highlighted that the powers of the states were not actually invaded, as the Act "imposes no obligation but simply extends an option which the state is free to accept or reject." *Id.* at 480-82. The Court then noted that the dispute did not involve "rights of person or property," "rights of dominion over physical domain," or "quasi sovereign rights actually invaded or threatened," but instead involved "abstract questions of political power, of sovereignty, of government." *Id.* at 485. Thus, because "[n]o rights of the state falling within the scope of the judicial power" were presented for adjudication, Massachusetts could not invoke the power of the judiciary to pass judgment on the validity of the Maternity Act. *Id.*

The Sixth Circuit recently expounded on *Mellon*, clarifying that "[t]here is [] no *Mellon* bar against the plaintiff states' suit in their sovereign and quasi-sovereign capacities." *Kentucky v. Biden*, 23 F.4th 585, 597-98 (6th Cir. 2022). So, in other words, when sovereign and quasi-sovereign interests are actually invaded or threatened, a State may sue the United States to vindicate its *own* rights. *Id.* at 596-98 (concluding that "*Mellon* likely does not bar the state plaintiffs' claims to the extent they assert sovereign and quasi-sovereign interests"); *see also*

*Massachusetts*, 127 S. Ct. at 1455, n.17 (2007) (citing *Georgia v. Pennsylvania R. Co.*, 324 U.S. 439, 447 (1945) ("[T]here is a critical difference between allowing a State 'to protect her citizens from the operation of federal statutes' (which is what *Mellon* prohibits) and allowing a State to assert its [own] rights under federal law (which it has standing to do).")

Here, unlike in *Mellon*, Plaintiff States have identified a specific sovereign interest at stake—the power to create and enforce a legal code—and further identified plausible conflicts between Defendants' guidance documents and their own state laws to demonstrate that their sovereign interests are actually invaded or threatened. As such, the Court is asked to resolve a "concrete" controversy, rather than an "abstract question[]…of sovereignty" like Defendants suggest.

Further, Defendants contend Plaintiffs' standing argument is undermined by the Sixth Circuit's decision in *Arizona v. Biden*. [Doc. 78 at 2] (citing 31 F.4th 469 (6th Cir. 2022)). In *Arizona*, the Sixth Circuit determined that three States failed to demonstrate an injury in fact because the challenged guidance did "not directly injure the States. It [did] not regulate the States by telling them what they [could] or [could not] do in their jurisdiction." 31 F.4th at 474. Instead, the guidance merely regulated the actions of third-party federal employees by telling them what to prioritize in enforcing federal immigration law. *Id*. Additionally, the Sixth Circuit noted the States did not allege an injury to a sovereign interest traditionally recognized by courts, such as the "regulation of them as States, or preemption of local lawmaking authority." *Id*. at 476. Instead, the States merely claimed an injury in fact based on "indirect fiscal burdens allegedly flowing from the [guidance]." *Id*.

This case is distinguishable. Unlike in *Arizona*, Plaintiffs are challenging guidance documents that directly apply to them. As employers and operators of educational institutions,

Plaintiffs are subject to the requirements of Titles VII and IX and, thus, are objects of the challenged guidance documents. *Supra* at 12-13. Therefore, the challenged guidance documents "regulate the States by telling them what they can or cannot do" within their jurisdiction with respect to their treatment of individuals based on sexual orientation and gender identity. 31 F.4th at 474. Unlike in *Arizona*, Plaintiffs have asserted an injury to a sovereign interest traditionally recognized by courts—the power to create and enforce a legal code. *Supra* at 11. In light of these distinctions, the Court finds that *Arizona* does not undermine Plaintiffs' standing argument.

For the reasons above, the Court finds that ten Plaintiff States have adequately demonstrated an injury in fact to their sovereign interests.[11] Defendants' guidance documents presently harm Plaintiff States by undermining their sovereign authority to enforce their state laws as written and imposing substantial pressure on Plaintiffs to change their state laws. And Plaintiffs are suffering these injuries now, making them "actual or imminent" injuries, "not conjectural or hypothetical." *Lujan*, 504 U.S. at 560.

Further, the Court finds that Plaintiffs' alleged injuries satisfy the traceability and redressability requirements. The injuries to Plaintiffs' sovereign interests stem directly from Defendants' interpretations of Titles VII and IX as expressed in the challenged guidance documents. That is, Plaintiffs were injured by the mere issuance of the challenged guidance. Defendants' guidance, not Titles VII or IX, directly interferes with Plaintiff States' ability to enforce their own laws and imposes substantial pressure on Plaintiffs to change their laws.

---

[11] Defendants urge the Court to dismiss the other ten Plaintiffs that have not specifically identified state laws that arguably conflict with the challenged guidance documents. [Doc. 49-1 at 13, n.1]. However, "when one party has standing to bring a claim, the identical claims brought by other parties to the same lawsuit are justiciable." *Phillips*, 836 F.3d at 714, n.2. Therefore, as all twenty Plaintiff States bring identical claims, this omission does not impact the Court's ability to reach the ten Plaintiff States that failed to specifically identify conflicting state laws.

Regarding redressability, the requested injunctive and declaratory relief would bar the effect of Defendants' interpretations and reduce the harm alleged. True, as Defendants note, a favorable decision would not prevent private litigants from suing Plaintiffs based on their understanding of Titles VII and IX. However, to satisfy the redressability requirement, Plaintiffs "need not show that a favorable decision will relieve [their] *every* injury." *Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 716 (6th Cir. 2015). If the Court were to enjoin Defendants from enforcing the guidance against Plaintiffs, and ultimately found the challenged guidance to be unlawful, Plaintiffs' sovereign interests would be protected.

In conclusion, the Court finds that Plaintiffs have satisfied Article III's standing requirement. Plaintiff States have demonstrated an injury in fact that is fairly traceable to the challenged agency action and will likely be redressed by a favorable decision.

### 2. *Ripeness*

In addition to standing, Plaintiffs face another jurisdictional challenge—ripeness. "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative polices, and also to protect agencies from judicial interference until [an] administrative decision has been formalized and its effects felt in concrete ways by challenging parties.'" *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49 (1967)). "Ripeness focuses on the timing of the action rather than on the parties who bring suit." *Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 527 (6th Cir. 1998).

Defendants argue that Plaintiffs' claims are not ripe because there is no pending enforcement action. [Doc. 48 at 28-29]. True, the challenged guidance has not yet been

enforced against any Plaintiff State. However, this fact does not require the Court to conclude Plaintiffs' claims are not ripe. Defendants' argument ignores a long line of precedent allowing pre-enforcement judicial review of agency actions. *See Parke, Davis & Co. v. Califano*, 564 F.2d 1200, 1204 (6th Cir. 1977) ("It cannot be argued since *Abbott Laboratories* that district courts are totally without jurisdiction to conduct pre-enforcement review of agency actions."); *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998); *Abbott Laboratories,* 387 U.S. at 153-54; *Toilet Goods Ass'n v. Gardner,* 387 U.S. 158 (1967); *Kiser*, 765 F.3d at 609 (internal citations omitted) ("[A]dministrative action…may give rise to harm sufficient to justify pre-enforcement review."); *Brown & Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165, 1170-71 (6th Cir. 1983) (collecting cases discussing pre-enforcement review of agency action); *U.S. Telecom Ass'n v. F.C.C.*, 825 F.3d 674, 739 (D.C. Cir. 2016) (explaining that agency rules are "typically reviewable without waiting for enforcement.").

"[A]gency action under the Administrative Procedure Act is presumptively reviewable." *Arizona*, 2022 WL 2437870, at *9 (internal citations omitted); 5 U.S.C. §§ 701(a), 702. "Courts confronted with close questions of ripeness are appropriately guided by the presumption of reviewability, especially when the affected person is confronted with the dilemma of choosing between disadvantageous compliance or risking imposition of serious penalties." *Ciba-Geigy Corp. v. U.S.E.P.A.*, 801 F.2d 430, 434 (D.C. Cir. 1986) (citing *Continental Air Lines, Inc. v. C.A.B.*, 522 F.3d 107, 128 (D.C. Cir. 1974)). In analyzing the ripeness of pre-enforcement agency action, courts consider two factors: "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808; *Abbott Laboratories*, 387 U.S. at 149.

a. Fitness for Judicial Decision

The first ripeness factor encompasses several considerations: (1) whether the questions presented are purely legal; (2) whether further factual development would significantly advance the court's ability to deal with the legal issues presented; and (3) whether the agency's action constitutes final agency action. *Nat'l Park Hosp. Ass'n*, 538 U.S. at 804, 812; *Prod. Credit Ass'n of N. Ohio v. Farm Credit Admin.*, 846 F.3d 373, 375 (6th Cir. 1988); *Ciba-Geigy Corp.*, 801 F.2d at 435 (citing *Abbott Laboratories*, 387 U.S. at 149-52).

First, the parties dispute whether this case involves purely legal issues. Plaintiffs maintain that the issues are purely legal, as their claims turn solely on the contents of the guidance documents; thus, no further factual development is required for the Court to adjudicate their claims. [Docs. 57 at 14, 58 at 27]. Defendants disagree, arguing "the question of whether Titles VII or IX have been violated [] is an inherently fact-bound inquiry," thus, "the question of whether any Plaintiff State potentially has violated Title VII or Title IX would necessarily turn on the facts of any given situation." [Doc. 65 at 13-14].

Defendants' argument mischaracterizes the issues in this case. The Court is not tasked with determining whether any Plaintiff has violated Titles VII or IX (which would likely require further factual development). Instead, the Court is asked to decide whether Defendants' guidance, on its face, violates the APA and the Constitution due to alleged procedural and substantive defects. That is, Plaintiffs raise a question as to the procedures Defendants needed to follow before issuing the guidance and challenge the content of the guidance as being unlawful. To resolve these issues, the Court need only consider the procedures Defendants followed in issuing the guidance and the substantive content of the guidance itself in light of the *Bostock* decision. As such, the Court finds this case raises purely legal issues that "would not be clarified

by further factual development." *Abbott Laboratories*, 387 U.S. at 149.

It is not apparent how further factual development would significantly advance the Court's ability to resolve these issues. Defendants only suggest that further factual development is needed because of the "fact-intensive nature of Titles VII and IX violations." [Doc. 65 at 13-14]. But again, the Court is not asked to determine whether any Plaintiff has violated Titles VII or IX. Instead, the Court is asked to resolve facial challenges to Defendants' guidance, and "[f]acial challenges to a regulation are generally ripe the moment the challenged regulation is passed." *Texas v. EEOC*, No. 2:21-cv-194-Z, at 27 (N.D. Tex. May 26, 2022) (citing *Suitum v. Tahoe Reg'l Plan. Agency*, 520 U.S. 725, 736 n.10 (1997)). The Court's ability to resolve Plaintiffs' facial challenges to the guidance itself would not benefit from a concrete factual record. *See Texas*, No. 2:21-cv-194-Z at 28 (finding no need to wait for further factual development where plaintiff merely raised a facial attack to EEOC guidance, as the issues did "not involve a particular enforcement action…but challenge[d] the legality of a generally applicable rule"); *Texas v. United States*, 201 F. Supp. 3d 810, 824 (N.D. Tex. Aug. 21, 2016) (finding further factual development would not significantly advance the courts ability to deal with the legal issues where "Defendants' Guidelines clash with Plaintiffs' state laws and policies in relation to public school facilities and Plaintiffs have called into question the legality of those Guidelines").

Finally, as this Court explains in detail below, the challenged guidance documents constitute final agency action. *Infra* at 25. Defendants' guidance documents "mark the consummation of the [respective] agency's decision-making process" and purport to determine the "rights or obligations" of those subject to Titles VII and IX, including Plaintiffs. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citations omitted).

Based on the foregoing, the issues presented are fit for judicial decision, weighing in favor

of a finding that this case is ripe for adjudication.

b. Hardship

The second ripeness consideration is the hardship imposed on the parties in deferring consideration by the Court. Defendants argue Plaintiffs face no hardship from the withholding of judicial review at this juncture, as Plaintiffs would have a full opportunity to present their claims in any future enforcement proceeding. [Doc. 49-1 at 14]. But "enforcement proceedings…are concerned primarily, if not solely, with the factual issues of compliance" and this case does not concern factual issues of compliance. *Romeo Comm. Sch. v. U.S. Dept. of Health, Educ., and Welfare*, 438 F. Supp. 1021, 1028 (E.D. Mich. 1977). The Court is not persuaded that Plaintiffs face no hardship simply because an enforcement action might provide them an opportunity to assert their claims.

Plaintiffs contend that delaying review would cause them significant hardship, as Defendants would be allowed to use the "fear of future sanctions" to "force immediate compliance" with the challenged guidance. [Doc. 58 at 27] (internal citations omitted). Absent judicial review, Plaintiffs claim they are put to the "choice of [] abandoning enforcement of their laws or risking the loss of their federal [] funding." [Doc. 57 at 14].

In deciding whether delayed review would cause hardship, courts consider whether the agency's action triggers an "immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance." *Sch. Dist. of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 263-64 (6th Cir. 2009) (quoting *Suitum*, 520 U.S. at 743-44); *Abbott Laboratories*, 387 U.S. at 153. Courts consistently find sufficient hardship that warrants prompt judicial review where plaintiffs must choose between compliance with allegedly unlawful agency action at considerable expense and non-compliance at the risk of enforcement that would involve

a risk of substantial penalties. *See Abbott Laboratories*, 387 U.S. at 153-54 (finding hardship where plaintiffs had to choose between compliance with a possibly unlawful regulation and non-compliance at the risk of future enforcement that would entail substantial fines and reputational losses); *S.C. Elec. & Gas Co. v. I.C.C.*, 734 F.3d 1541, 1545 (D.C. Cir. 1984) (collecting cases) ("The requisite 'hardship' may exist if an agency rule, although not yet enforced against the complainant, compels the complainant to choose between compliance, at some present cost, and failure to comply, at the risk of legal penalty.").[12]

As demonstrated above, the harm alleged by Plaintiff States is already occurring—their sovereign power to enforce their own legal code is hampered by the issuance of Defendants' guidance and they face substantial pressure to change their state laws as a result. *Supra* at 12-14. Because Defendants' guidance purports to define the legal obligations of those subject to Titles VII and IX, including Plaintiffs, and because Defendants have pledged to enforce Titles VII and IX consistent with the guidance, Plaintiffs are left in a quandary. *Supra* at 13-14. Plaintiffs must either forgo the enforcement of their conflicting state laws to comply with the allegedly unlawful guidance or violate the guidance and risk significant legal consequences—an enforcement action,

---

[12] *See also Sch. Dist. of Pontiac.*, 584 F.3d at 263-64 (finding hardship where "school district Plaintiffs must decide between drastic budget reallocation to comply with [No Child Left Behind] and serious statutory consequences"); *Nat'l Rifle Assoc. of Am. v. Magaw*, 132 F.3d 272, 287 (6th Cir. 1997) (finding hardship where regulations forced the plaintiffs to either terminate a line of business, make substantial expenditures to comply with the new rules, or willfully violate the statute and risk serious penalties); *Texas*, 2:21-cv-194-Z (finding hardship where guidance forced plaintiff to either change its employment policies to reflect the agency's interpretation of Tile VII or risk civil liability); *Neese v. Becerra*, 2022 WL 1265925, at *10 (N.D. Tex. Apr. 26, 2022) (finding hardship to the parties where "Plaintiffs face[d] the fear of losing federal funds if they d[id] not act according to the interpretation of 'sex' described in the [Department of Health and Human Services] Notification" issued as a result of President's Executive Order); *West Virginia v. U. S. Dep't of Treasury*, 2021 WL 2952863, at *7 (N.D. Ala. July 14, 2021) (finding hardship where plaintiff States either had to revise their laws or budget for possible recoupment of federal funding); *Franciscan All. v. Burwell*, 227 F. Supp. 3d 660, 681 (N.D. Tex. 2016) ("Substantial hardship is typically satisfied when a party is forced to choose between refraining from allegedly lawful activity or engaging in the allegedly lawful activity and risking significant sanctions."); *Philip Morris USA Inc. v. U. S. Food & Drug Admin.*, 202 F. Supp. 3d 31, 48 (D.C. Cir. 2016) ("Plainly, in light of the Guidance, tobacco companies are given a choice: either comply with the FDA's interpretation of the TCA…or risk a possible enforcement action. But, of course, that is no real choice at all. The Guidance thus poses an immediate and significant practical hardship to Plaintiffs.").

civil penalties, and the loss of federal funding.

This is an untenable choice. *Supra* at 14. There are significant stakes involved in a future enforcement action. Plaintiff Tennessee has submitted declarations demonstrating these stakes. During the 2020-2021 fiscal year, the Tennessee Department of Education received $1,544,025,800 in federal funding, and Tennessee's public higher educational institutions received $88,354,400 in federal funding. [Doc. 11-1]. The loss of such critical federal funding would require Tennessee to eliminate certain educational services or seek new funding sources to continue offering the same programs. [Docs. 11-2, 11-3]. Furthermore, as an employer of 42,000 employees, the State of Tennessee faces considerable financial penalties for violating Title VII's prohibition on sex discrimination as defined in the challenged guidance. [Doc. 11-5].

Defendants contend Plaintiffs have "no idea whether or when" an enforcement action will occur, and such uncertainty undermines ripeness. [Doc. 48 at 28] (citing *Warshak v. United States*, 532 F.3d 521, 526 (6th Cir. 2008)). The Court finds that Plaintiffs have shown a credible threat of enforcement. Plaintiffs highlight that private litigants are relying on Defendants' guidance to challenge Plaintiffs' state laws. Indeed, Defendants filed a statement of interest in pending litigation against the State of West Virginia, taking the position that Title IX prohibits the state from "categorically exclud[ing] transgender girls from participating in single-sex sports restricted to girls." [Docs. 11 at 15, n.1, 1 at ¶ 71] (internal citations omitted). Plaintiffs also note that the challenged guidance states Defendants *will* interpret and enforce Titles VII and IX in a manner that conflicts with the laws Plaintiffs are currently enforcing, the guidance documents are aimed at Plaintiffs, and Defendants have not disavowed enforcement. [Doc. 57 at 13]. Based on this showing, the likelihood of an enforcement action is not as speculative as Defendants urge the Court to believe.

Given the stakes of an enforcement action and the credible threat of enforcement, absent judicial review at this juncture, Plaintiffs are left with no real option but to comply with guidance they firmly believe is unlawful. And such compliance would be disadvantageous, as Plaintiffs would be forced to abandon their duly enacted state laws. The Court finds delayed review would cause hardship to Plaintiffs.

For the foregoing reasons, the Court finds that Plaintiffs' claims are ripe for review. The harm alleged by Plaintiffs is happening now, the issues presented are purely legal, and Plaintiffs would suffer significant hardship should they be required to wait to adjudicate their claims.

## B. Reviewability

Defendants challenge whether the guidance is reviewable under the Administrative Procedure Act. [Doc. 49-1 at 16-22]. Specifically, Defendants contend that the Court cannot review Plaintiffs' APA claims because (1) the challenged guidance does not constitute final agency action; (2) Plaintiffs have an adequate alternative remedy; and (3) Plaintiffs must adhere to Title IX's exclusive enforcement scheme. [*Id*.].

The APA limits judicial review to "final agency action for which there is no other adequate remedy in a court." *Bangura v. Hansen*, 434 F.3d 487, 500 (6th Cir. 2006) (citing 5 U.S.C. § 704). Thus, "[w]hether there has been 'agency action' or 'final agency action' within the meaning of the APA are threshold questions; if these requirements are not met, the action is not reviewable." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006). As explained above, "agency action under the Administrative Procedure Act is presumptively reviewable." *Supra* at 18. "Agency positions are never absolutely final. There is always some danger in accelerating the review process, and always some hardship in delaying it….Any doubts [] are resolved by the presumption of reviewability which we have previously

said 'permeates the *Abbott Laboratories* ruling.'" *Continental Air Lines, Inc.*, 522 F.2d at 128 (collecting cases).

## 1. *Final Agency Action*

The parties dispute whether Defendants' guidance documents constitute "final agency action" under the APA. Final agency action is action that (1) "mark[s] the consummation of the agency's decision-making process" and (2) "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 177-78 (internal citations omitted); *Franklin v Massachusetts*, 505 U.S. 788, 797 (1992) ("The core question is whether the agency has completed its decision-making process, and whether the result of that process is one that will directly affect the parties."). The Court must apply the APA's finality requirement in a "flexible" and "pragmatic" way. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1815 (2016); *Abbott Laboratories*, 387 U.S. at 149-50.

The first *Bennett* prong is not contested. That is, Defendants do not dispute that the guidance documents mark the "consummation" of their decision-making processes. [Doc. 49-1 at 19-21]. As explained below, the Court finds that the second *Bennett* prong is also satisfied because the challenged guidance determines the "rights and obligations" of those subject to Titles VII and IX, including Plaintiffs.

In *Arizona v. Biden*, the Sixth Circuit summarized the relevant questions for a court to consider in determining whether agency action is one "by which rights or obligations have been determined, or from which legal consequences will flow":

> Will the agency's action impose liability on a regulated party, create legal rights, or mandate, bind or limit other government actors in the future? And will the agency's action have a sufficiently direct and immediate impact on the aggrieved party and a direct effect on its day-to-day business? If an action maintains officials' independent decisionmaking and can be discretionarily relied on, it likely lacks legal effect. Through it all, we will not overlook whether the agency's action puts

a party to a Catch-22, stuck between heavy compliance costs or feared liability, neither of which can be undone.

2022 WL 2437870, at *7. (internal citations omitted). The Sixth Circuit has also noted that "[j]udicially reviewable agency actions normally affect a regulated party's *possible* legal liability; these consequences tend to expose parties to civil or criminal liability for non-compliance with the agency's view of the law or offer a shelter from liability if the regulated parties comply." *Parsons v. U.S. Dep't. of Just.*, 878 F.3d 162, 167 (6th Cir. 2017) (quoting *Louisiana v. U.S. Army Corps of Engr'rs*, 834 F.3d 574, 583 (5th Cir. 2016) (emphasis added)).

Similarly, in *Ciba-Geigy Corporation*, the United States Court of Appeals for the District of Columbia Circuit, which frequently deals with challenges to agency action, explained that courts must "look primarily to whether the agency's position is 'definitive' and whether it has a 'direct and immediate…effect on the day-to-day business of the parties challenging the action." 801 F.2d at 436 (internal citations omitted). "These indicia of finality are ordinarily controlling because they are highly probative of whether the agency's position is merely tentative or, on the other hand, whether the agency views its deliberative process as sufficiently final to demand compliance with its announced position." *Id*. "Once the agency publicly articulates an unequivocal position, however, and expects regulated entities to alter their primary conduct to conform to that position, the agency has voluntarily relinquished the benefit of postponed judicial review." *Id*.

Defendants contend the challenged guidance documents are non-binding interpretations that "simply inform the public of the agencies' interpretation of Titles VII and IX, without purporting to alter obligations thereunder." [Doc. 49-1 at 19-21]. Defendants highlight that the guidance documents expressly state they do not have the force of law. [Doc. 48 at 37-38]. The Department's Interpretation provides that it "does not itself determine the outcome in any particular case or set of facts" and the EEOC's Technical Assistance Document clarifies the

"contents of [the] document do not have the force and effect of law and are not meant to bind the public in any way." [*Id.*].

However, Defendants' self-serving labels are not controlling. The Sixth Circuit has explained that "the particular label placed upon [guidance] is not necessarily conclusive, for it is the *substance* of what the [agency] has purported to do and has done which is decisive." *Detroit Edison Co. v. EPA*, 496 F.2d 244, 249 (6th Cir. 1974) (internal citations omitted) (emphasis added). The Court must "consider whether the practical effects of an agency's decision make it final agency action, regardless of how it is labeled." *Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1094-95 (9th Cir. 2014); *Arizona*, 2022 WL 2437870, at *9 ("Labels, it is true, do not control the inquiry. Legal effects do."). "[A]n agency's interpretation of its governing statute, with the expectation that regulated parties will conform to and rely on this interpretation, is final agency action fit for review." *Ciba-Geigy Corp.*, 801 F.2d at 438 (collecting cases).

After considering the substance and practical effects of the challenged guidance documents, and the criteria for finality set forth above, the Court concludes that Defendants' guidance determines the "rights or obligations" of those subject to Titles VII and IX and thus constitute final agency action.

The text of the Department's Interpretation indicates that the guidance is final. The Interpretation authoritatively purports to interpret Title IX's "on the basis of sex" language to "encompass [] discrimination based on sexual orientation and gender identity." [Doc. 1-2 at 3-4]. The Interpretation "will guide the Department in processing complaints and conducting investigations" and the Department vows to "fully enforce Title IX" consistent with the Interpretation. [*Id.*]. The Interpretation "supersedes and replaces any prior inconsistent statements made by the Department regarding the scope of Title IX's jurisdiction over discrimination based

27

on sexual orientation or gender identity." [*Id.*].

Additionally, the text of the Dear Educator Letter and Fact Sheet indicates that the Department's guidance is final agency action. The Dear Educator Letter alerts regulated entities that the Department "will fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity" and references an accompanying Fact Sheet for further clarification. [Doc. 1-4]. The Fact Sheet provides "[regulated entities] have a *responsibility* to investigate and address sex discrimination…against students because of their perceived or actual sexual orientation or gender identity" and notes the Department "can [] provide information to assist schools in meeting their *legal obligations*." [*Id.*] (emphasis added).

The Interpretation, Dear Educator Letter, and Fact Sheet bind the Department, and alter the rights and obligations of the regulated entities it oversees. The Interpretation articulates the Department's latest and final position regarding the scope of Title IX's prohibition of discrimination "on the basis of sex" and affirms that Title IX will be "fully enforce[d]" consistent with that position. Because the Interpretation "supersedes and replaces any prior inconsistent statement made by the Department," the Department has spoken definitively on the issue in dispute. The Interpretation dictates how the Department will enforce Title IX going forward and requires the Department to investigate and pursue enforcement action against regulated entities, including Plaintiffs, when discrimination based on sexual orientation and gender identity is alleged.

Further, by expanding the scope of Title IX's prohibition of discrimination "on the basis of sex," the Interpretation broadly determines the rights and obligations of entities that receive federal funding under Title IX, including Plaintiffs. The Interpretation puts limitations on regulated entities' treatment of individuals based on their sexual orientation and gender identity, and the Fact

Sheet emphasizes that regulated entities have a "responsibility" and "legal obligation[]" to protect students from sex discrimination. The Department clearly expects regulated entities to conform to and rely on the guidance, as evidenced by its promise to "fully enforce" Title IX consistent with the Interpretation, as well as the Department's decision to directly alert regulated entities to its understanding of Title IX with the Dear Educator Letter and Fact Sheet.

Similarly, the express language of the EEOC's Technical Assistance Document indicates that the guidance is final agency action. The Technical Assistance Document "provide[s] clarity to the public regarding existing *requirements* under the law" and describes "the EEOC's *established legal positions* on sexual-orientation and gender-identity-related workplace discrimination issues." [Doc. 1-5 at 4] (emphasis added). The Technical Assistance Document purports to speak authoritatively on specific conduct that constitutes discrimination based on sexual orientation and gender identity. [*Id*. at 7-8]. The Technical Assistance Document provides that regulated employers cannot "prohibit[] a transgender person from dressing or presenting consistent with that person's gender identity," "deny an employee equal access to a bathroom, locker room, or shower that corresponds to the employee's gender identity," and "intentionally and repeatedly [use] the wrong name and pronouns to refer to a transgender employee." [*Id*.]. The Technical Assistance Document concludes by informing applicants and employees how to proceed if they believe their rights under Title VII have been violated, and promises that the EEOC "will [then] conduct an investigation to determine if applicable [EEO] laws have been violated." [*Id*. at 8-9].

Though the EEOC maintains that the Technical Assistance Document does not alter employers' obligations under Title VII, it precisely does. The Technical Assistance Document takes firm stances regarding what specific employer conduct constitutes impermissible sex

discrimination under Title VII. The Technical Assistance Document uses mandatory language, thereby imposing obligations on covered employers to permit individuals to dress or present consistent with their gender identity, and to allow individuals to use the bathrooms, locker rooms, and showers consistent with their gender identity. The Technical Assistance Document explains that employers' failure to do so "would constitute sex discrimination" under Title VII. Thus, rather than generally describing best practices for employers, the Technical Assistance Document takes firm positions regarding what Title VII demands of employers.

Further, the Technical Assistance Document invites individuals to contact the EEOC if they believe their rights under Title VII, as defined therein, have been violated; and the EEOC has pledged to "conduct an investigation" when such sex discrimination is alleged. By inviting individuals to file complaints of sex discrimination consistent with the guidance and requiring the EEOC's staff to investigate claims of sex discrimination related to the issues in the guidance, the Technical Assistance Document "opens the field of potential plaintiffs" in a way that carries legal consequences for employers. *Texas*, 933 F.3d at 443-44 (internal citations omitted) (finding EEOC guidance carried legal consequences for employers where it was "to be used by 'individuals who suspect [] they have been denied jobs or promotions, or have been discharged'" in a manner deemed unlawful by the guidance, as it "open[ed] the 'field of potential plaintiffs'"). Applicants and employees are instructed to rely on the Technical Assistance Document in deciding whether to file a sex discrimination claim, and the Technical Assistance Document requires the EEOC's staff to assess sex discrimination claims consistent with the guidance. Thus, in practical effect, the Technical Assistance Document requires employers to comply with its stated positions to avoid liability.

Lastly, an overarching issue with the guidance documents also indicates Plaintiffs are

challenging final agency action. Both the Department and EEOC maintain that their respective guidance documents are required by the *Bostock* decision. However, Defendants ignore the limited reach of *Bostock*. The *Bostock* decision only addressed sex discrimination under Title VII; the Supreme Court expressly declined to "prejudge" how its holding would apply to "other federal or state laws that prohibit sex discrimination" such as Title IX. *Bostock,* 140 S. Ct. at 1753. Similarly, the Supreme Court explicitly refused to decide whether "sex-segregated bathrooms, locker rooms, and dress codes" violate Title VII. *Id. Bostock* does not require Defendants' interpretations of Title VII and IX. Instead, Defendants fail to cabin themselves to *Bostock*'s holding. Defendants' guidance documents advance *new* interpretations of Titles VII and IX and impose *new* legal obligations on regulated entities.[13] Thus, as further explained below, the challenged guidance documents are legislative rules; and "[l]egislative or substantive rules are, by definition, final agency action." *Doe v. U.S. Customs & Border Protection*, 2021 WL 980888, at *9 (D.C. Cir. Mar. 16, 2021) (quoting *Broadgate Inc. v. U.S. Citizenship & Immigration Servs.*, 730 F.Supp.2d 240, 243 (D.C. Cir. 2010)).

Under the Supreme Court's instruction to approach finality in a flexible and pragmatic way, the Court finds that Defendants' guidance documents constitute final agency action subject to judicial review under the APA. As demonstrated above, both *Bennett* prongs for final agency action are satisfied. First, it is undisputed that Defendants' guidance documents "mark the consummation of the agency's decision-making process." *Bennett*, 520 U.S. at 177-78 (internal citations omitted). Second, the guidance documents purport to determine the rights and

---

[13] *Cf. Menominee Indian Tribe of Wisconsin v. EPA*, 947 F.3d 1065, 1070 (7th Cir. 2020) ("Letters restating earlier interpretations likewise do not carry legal consequences for purposes of the 'final agency action' requirement."); *Clayton Cnty., Georgia v. Fed. Aviation Admin.*, 887 F.3d 1262, 1267 (11th Cir. 2018) ("An agency's restatement of an already-existing policy or interpretation does not, on its own, determine any rights or obligations and imposes no legal consequences."); *Gen. Motors Corp. v. EPA*, 363 F.3d 442, 449-51 (D.C. Cir. 2004) (holding that a letter from an agency that reflected "neither a new interpretation nor a new policy" did not "impose new obligations").

obligations of those subject to Titles VII and IX, including Plaintiffs, and Defendants have left no doubt that they intend to enforce their respective governing statutes consistent with the guidance. *Id.*

### 2. Adequate Remedy

Defendants contend that the APA's alternative remedy provision precludes Plaintiffs from bringing this standalone action. [Doc. 48 at 31]. As to the "no other adequate remedy in court" prerequisite, "[t]he essential inquiry is whether another statutory scheme of judicial review exists so as to preclude review under the more general provisions of the APA." *Bangura v. Hansen*, 434 F.3d 487, 501 (6th Cir. 2006). This requirement "[e]nsures that the APA's general grant of jurisdiction to review agency decisions is not duplicative of more specific statutory procedures for judicial review." *Id.* The "adequate remedy" limitation on APA review is interpreted narrowly, such that it should not be "construed to defeat the central purpose of providing a broad spectrum of judicial review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988).

Defendants argue Plaintiffs have an adequate alternative remedy, as their claims can be asserted in defense of any future enforcement action under Titles VII or IX. [Doc. 48 at 31-32]. Plaintiffs disagree, claiming an ability to raise their claims as defenses in a future enforcement action is not the kind of adequate remedy contemplated by the APA. [Doc. 57 at 15]. Plaintiffs cite *Sackett v. EPA*, 566 U.S. 120, 127 (2012), in support of their position. [*Id.*].

In *Sackett*, the Supreme Court allowed a pre-enforcement challenge to an Environmental Protection Agency ("EPA") compliance order even though "judicial review ordinarily comes by way of civil action brought by the EPA." 566 U.S. at 127. The Court held that "APA review" was the only "adequate remedy" because the plaintiffs could not "initiate [an enforcement action]" and, instead, had to "wait for the Agency to drop the hammer" while they accrued potential liability

pursuant to the Clean Water Act. *Id.* at 127, 131; *see also U.S. Army Corps of Eng'rs.*, 578 U.S. at 600 (internal citations omitted) ("Respondents need not assume [the risk of exposure to civil penalties] while waiting for EPA to 'drop the hammer' in order to have their day in court.").[14]

Plaintiffs argue that the same logic applies here; the Court agrees. Defendants' guidance documents impose legal obligations on Plaintiff States; and Plaintiffs are left in a quandary as a result. True, Plaintiffs could raise their same arguments as defenses in a future enforcement proceeding. But also true, and undisputed, Plaintiffs cannot initiate an enforcement proceeding to have their claims heard. Instead, Plaintiffs must "wait for [Defendants] to drop the hammer" by electing to commence enforcement proceedings; and Plaintiffs are exposed to potential liability for failing to comply with their purported legal obligations, as explained in the challenged guidance, in the interim. *Id.* at 127, 131.

Defendants believe *Sackett* is distinguishable, arguing Plaintiffs "face no immediate consequences that would justify raising their arguments in a pre-enforcement challenge." [Doc. 65 at 15]. In *Sackett*, legal consequences flowed from the Government's compliance order, as it exposed the landowners to increased financial penalties in a subsequent civil enforcement proceeding. 566 U.S. at 126-27. Plaintiffs do not face consequences as concrete as those in *Sackett*, as Defendants have not determined whether any Plaintiff State has violated Titles VII or IX. Nevertheless, the challenged guidance documents do impose an immediate hardship on Plaintiffs. That is, Plaintiffs face obligations and consequences as a result of the challenged guidance. As the Court previously explained, the challenged guidance documents purport to

---

[14] Similarly, other courts have declined to find an "adequate remedy" within the meaning of the APA when a plaintiff cannot initiate alternative proceedings against an agency but, instead, must wait for the agency to pursue such proceedings. *Texas*, 2:21-cv-194-Z; *Neese*, 2022 WL 1265925, at *11; *Hyatt v. Off. of Mgmt. & Budget*, 908 F.3d 1165, 1173 (9th Cir. 2018); *Furie Operating Alaska, LLC v. U.S. Dep't of Homeland Sec.*, 2013 WL 1628639, at *6 (D. Alaska Apr. 15, 2013); *Martinez v. Dep't of Homeland Sec.*, 502 F. Supp. 2d 631, 635-36 (E.D. Mich. 2007).

establish legal obligations that conflict with Plaintiffs' state laws and current practices. Thus, Plaintiffs must choose to either: (1) alter their primary conduct and comply with the guidance— against their own interests and policies; or (2) violate the guidance at the risk of incurring significant financial penalties (i.e., lost federal funding and civil fines) while waiting for Defendants to "drop the hammer."

Defendants also direct the Court to two cases from the Sixth Circuit to support their position that a future enforcement action is an adequate remedy for Plaintiffs. In *Quicken Loans Inc. v. United States*, the court found that an enforcement action would adequately provide an opportunity for the plaintiff to be heard on its claims. 152 F. Supp. 3d 938, 950 (E.D. Mich. Dec. 31, 2015). And in *Parke, Davis, & Co. v. Califano*, the Sixth Circuit held the plaintiff had an adequate remedy because "every issue raised in [the present] case…could have been raised in enforcement proceedings." 564 F.2d at 1205-06. But, in both cases, enforcement proceedings were concurrent with the litigation. 152 F. Supp. 3d at 944, 954; 564 F.3d at 1205-06. Unlike Plaintiffs, the injured parties in *Quicken* and *Parke Davis* had a present opportunity to challenge the agency action in ongoing enforcement proceedings; they were not forced to wait for an enforcement proceeding to begin.

The Court finds that Plaintiffs do not have an adequate alternative remedy within the meaning of the APA. As the Supreme Court recognized in both *Sackett* and *U.S. Army Corps of Engineers*, helplessly awaiting the initiation of enforcement proceedings by Defendants and risking potential liability in the interim is not an adequate remedy under the APA. 566 U.S. at 127; 578 U.S. at 600.

### 3. Exclusive Enforcement Scheme

Finally, Defendants contend that this Court's review of Plaintiffs' Title IX claims is precluded because Congress has "provided an elaborate procedural scheme for administrative enforcement proceedings under Title IX that culminates in the opportunity for judicial review." [Doc. 49-1 at 17-18] (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994)).[15] In support of their argument, Defendants rely heavily on *Thunder Basin*, which held that when a statute provides for direct appellate review "of final agency actions, [courts] shall find that Congress has allocated initial review to an administrative body [when] such intent is 'fairly discernible in the statutory scheme.'" *Id.* at 207 (internal citation omitted)).

The right to judicial review under the APA extends to agency actions "except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." *Heckler v. Chaney*, 470 U.S. 821, 828 (1985) (quoting 5 U.S.C. § 701(a)). The "strong presumption" favoring judicial review of agency action "fails when a statute's language or structure demonstrates that Congress wanted an agency to police its own conduct." *Mach Mining, LLC, v. EEOC*, 135 S. Ct. 1645, 1651 (2015). The Court must consider the "statute's language, structure, and purpose, its legislative history, and whether the claims can be afforded meaningful review." *Thunder Basin*, 510 U.S. at 207 (internal citations omitted). Applying this analysis to the relevant review scheme, the Court concludes Title IX does not preclude judicial review of Plaintiffs' pre-enforcement challenge to the Department's guidance documents.

20 U.S.C. § 1682 authorizes the Department to issue "rules, regulations, or orders of general applicability" to effectuate the purposes of Title IX. Additionally, 20 U.S.C. § 1682 authorizes the Department to seek compliance with such rules, regulations, or orders by (1)

---

[15] During oral argument, Defendants acknowledged that this argument is only advanced as to Plaintiffs' Title IX claims.

terminating or refusing to grant federal funding; or (2) any other means authorized by law.[16] 20 U.S.C. § 1683 is the only provision of Title IX that addresses judicial review, providing "[a]ny department or agency action taken pursuant to section 1682 of this title shall be subject to such judicial review as may otherwise be provided by law…" and "[i]n the case of action, not otherwise subject to judicial review…any person aggrieved (including any State or political subdivision thereof…) may obtain judicial review of such action in accordance with chapter 7 of Title 5, and such action shall not be deemed committed to unreviewable agency discretion within the meaning of section 701 of that title…"

As evidenced above, the express language of Title IX does not foreclose all judicial review. Section 1683 only provides for judicial review of any action taken pursuant to § 1682. That is, Congress only expressly provided for judicial review following an administrative decision to terminate or refuse funding or to seek compliance by other lawful means. Here, however, Plaintiffs challenge the issuance of "rules, regulations, or orders of general applicability," and the language in § 1683 does not limit judicial review of such claims. Nothing in the language or structure of Title IX indicates Congress intended to limit judicial review of the Department's issuance of "rules, regulations, or orders of general applicability", or that the Department should be allowed to police its own conduct. Therefore, pursuant to § 1683, such action is "subject to judicial review as…provided by law for similar action." The APA, as the statute establishing procedures and guidelines for agency rulemaking, functions as the vehicle for pre-enforcement challenges to agency rules and regulations. 5 U.S.C. § 702.

---

[16] 34 C.F.R. § 100.8 provides that "other means" may include, but are not limited to, (1) a reference to the DOJ with a recommendation that appropriate proceedings be brought; and (2) any applicable proceeding under State or local law.

Defendants have failed to provide the Court with any binding authority holding that Congress intended to preclude pre-enforcement judicial review of the Department's "rules, regulations, or orders of general applicability" under Title IX. And, as Plaintiffs note, several courts have concluded that Title IX's enforcement scheme does not preclude such review. *See Texas*, 2:21-cv-194-Z at 15-16; *Texas*, 201 F. Supp. 3d at 826-27; *Romeo Cmty. Sch.*, 438 F. Supp. at 1029 (allowing pre-enforcement challenge to regulations because Title IX's "legislative scheme explicitly contemplates a cause of action under the [APA] for redress of unlawful agency action 'not otherwise subject to judicial review'")

"[W]here substantial doubt about [] congressional intent exists, the general presumption favoring judicial review of administrative action is controlling." *Texas v. United States*, 809 F.3d 134, 164 (5th Cir. 2015) (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 351 (1984)). Given the applicable presumption of reviewability and the fact that Title IX contains no explicit or implicit bar to judicial review of the Department's rules, regulations, and orders of general applicability, the Court finds that Plaintiffs' pre-enforcement challenges to the Department's guidance documents are subject to judicial review.

## C. Preliminary Injunction Factors

The Court next evaluates whether a preliminary injunction is appropriate in this case. To do so, the Court must consider: (1) whether Plaintiffs have shown a likelihood of success on the merits; (2) whether Plaintiffs will be irreparably injured absent an injunction; (3) whether issuing an injunction will harm Defendants; and (4) whether an injunction is in the public interest. *Vitolo*, 999 F.3d at 360. For the reasons below, the Court finds that a balance of these factors weighs in favor of a preliminary injunction. The Court understands a "preliminary injunction is an extraordinary remedy." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008).

However, this case presents extraordinary circumstances.

*1. Likelihood of Success on the Merits*

In maintaining that the challenged guidance documents are unlawful, Plaintiffs advance several theories. However, to obtain injunctive relief, Plaintiffs need only demonstrate a likelihood of success on the merits of *one* of their claims. *Hoover Transp. Servs., Inc. v. Frye*, 77 F. App'x 776, 781 (6th Cir. 2003) ("If [the moving party] can show a likelihood of success on the merits of any of the claims, an injunction may issue, subject to consideration of the other factors."); *Planned Parenthood of Great Nw., Hawaii, Alaska, Indiana, & Kentucky, Inc. v. Cameron*, 2022 WL 1597163, at *4 (W.D. Ky. May 19, 2022) (collecting cases) ("The moving party need only show a likelihood of success on the merits of one claim where there are multiple claims at issue in a complaint."); *Woods v. Lynch*, 2016 WL 7192151, at *3 (W.D. Tenn. Dec. 12, 2016) (finding a likelihood of success on the merits of at least one of the moving party's claims was sufficient).

Plaintiffs contend Defendants' guidance documents violate the APA, as they are procedurally and substantively deficient. [Doc. 11]. Plaintiffs argue that Defendants' guidance documents are procedurally invalid because (1) they were adopted without adhering to the required notice and comment procedures and (2) they are arbitrary and capricious. [*Id*.]. Plaintiffs argue Defendants' guidance documents are substantively unlawful, as they are contrary to law. [*Id*.]. Defendants contest each of these claims. [Doc. 48].

The Court begins, and ends, with assessing Plaintiffs' notice and comment claim. "The APA sets different procedural requirements for 'legislative rules' and 'interpretive rules': the former must be promulgated pursuant to notice-and-comment rulemaking; the latter need not." *Tenn. Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1042 (6th Cir. 2018) (citing *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203-04 (2015); 5 U.S.C. § 553(b)(A)). "If an agency attempts to issue a

legislative rule without abiding by the APA's procedural requirements, the rule is invalid." *Id*. (citing *S. Forest Watch, Inc. v. Jewell*, 817 F.3d 965, 972 (6th Cir. 2016)).

When issuing a legislative rule, "[an] agency must publish a notice about the proposed rule, allow the public to comment on the rule, and, after considering the comments, make appropriate changes and include in the final rule a 'concise general statement' of its contents." *Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1142-43 (6th Cir. 2022) (quoting 5 U.S.C. § 553). "Notice and comment gives affected parties fair warning of potential changes in the law and an opportunity to be heard on those changes—and it affords the agency a chance to avoid errors and make a more informed decision." *Id*. (quoting *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1816 (2019)).

Unsurprisingly, Defendants argue that the challenged guidance documents are valid interpretative rules exempt from notice and comment procedures, and Plaintiffs argue that the challenged guidance documents are legislative rules subject to the notice and comment requirements. As the Sixth Circuit recently highlighted, "[t]he distinction between a legislative rule and an interpretive rule can be difficult to discern." *Id*. Nevertheless, relying on binding precedent, the Sixth Circuit explained:

> "[L]egislative rules have the force and effect of law and interpretive rules do not. Thus, a rule that intends to create new law, rights, or duties, is legislative, while a rule that simply states what the administrative agency thinks the statute means, and only reminds affected parties of existing duties is interpretive. Because interpretive rules cannot effect a substantive change in the regulations, a rule that adopts a new position inconsistent with any of the [agency's] existing regulations is necessarily legislative."

*Id*. (internal citations omitted); *see also Gen. Motors Corp v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C. Cir. 1984) ("An interpretative rule simply states what the administrative agency thinks the statute means" in a way that "only *reminds* affected parties of *existing* duties.") (emphasis

added); *NRDC v. Wheeler*, 955 F.3d 68, 83 (D.C. Cir. 2020) ("A legislative rule is one that has legal effect or, alternately, one that an agency promulgates with the intent to exercise its delegated legislative power by speaking with the force of law."). The key question for the Court to consider is whether the action in question simply interprets existing law or results in a substantive change to existing law.

In light of these general principles, the Court finds that Plaintiffs have demonstrated a likelihood of success on the merits of their notice and comment claim. Plaintiffs can establish that Defendants' challenged guidance documents are legislative rules that create new rights and obligations, and Defendants do not contend that they complied with the APA's notice and comment requirements.

In arguing that the challenged guidance documents are not legislative rules, Defendants claim that the guidance documents merely interpret Titles VII and IX consistent with *Bostock*. [Doc. 48 at 37-38]. However, Defendants' guidance documents are not confined to the *Bostock* decision.

Plaintiffs contend that the Department of Education's guidance documents improperly expand the reach of *Bostock*. As the Sixth Circuit recently explained, "the Court in *Bostock* was clear on the narrow reach of its decision and how it was limited only to Title VII itself. The [*Bostock*] Court noted that 'none of' the many laws that might be touched by their decision were before them and that they 'do not prejudge any such question today.'" *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) (quoting *Bostock*, 140 S. Ct. at 1753). Thus, the Sixth Circuit concluded "*Bostock* extends no further than Title VII." *Id.* The Sixth Circuit has also recognized, "it does not follow that principles announced in the Title VII context automatically apply in the Title IX context." *Meriwether v. Hartop*, 922 F.3d 492, 510 n.4 (6th Cir. 2021).

Therefore, in applying *Bostock* to Title IX, the Department overlooked the caveats expressly recognized by the Supreme Court and created new law. The Department's guidance purports to expand the footprint of Title IX's "on the basis of sex" language, takes definitive positions as to "legal obligations" under Title IX, and explains that Title IX will be "fully enforce[d]" accordingly. [Docs. 1-2, 1-4]. Indeed, the Department's challenged guidance documents go beyond putting the public on notice of pre-existing legal obligations and reminding affected parties of their existing duties.

Plaintiffs further contend that the Department's guidance "squarely conflicts with both Title IX itself and its implementing regulations, which expressly permit sex-separated living facilities and athletic teams." [Doc. 57 at 22] (citing 20 U.S.C. § 1686, 34 C.F.R. §§ 106.33, 106.37(c), 106.41(b)). True, Title IX does allow for sex-separation in certain circumstances; and the Department's guidance, specifically the Fact Sheet, appears to suggest such conduct will be investigated as unlawful discrimination. [Doc. 1-4] (explaining Defendants can investigate a principal barring a high school transgender girl (i.e., a biological male) from entering the girls' restroom and a coach turning her away from an all-girls sports tryout as unlawful sex discrimination under Title IX). Thus, Defendants' guidance plausibly "adopt[s] a new position inconsistent with…[the Department's] existing regulations," supporting the conclusion that the Department's guidance is legislative. *Tenn. Hosp. Ass'n.*, 908 F.3d at 1042 (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995)).

Therefore, as explained above, Plaintiffs can show that the Department of Education's guidance creates rights for students and obligations for regulated entities not to discriminate based on sexual orientation or gender identity that appear nowhere in *Bostock*, Title IX, or its implementing regulations. Accordingly, it follows that Plaintiff States can demonstrate the

Department's guidance documents are legislative rules. *See Morton v. Ruiz*, 415 U.S. 199, 232 (1974) (holding that a substantive rule or "a legislative-type rule," is one that "affect[s] individual rights and obligations."); *see also Texas*, 201 F. Supp. 3d at 829-30 (concluding that similar guidance issued by the Department of Education was legislative).

Likewise, the EEOC's Technical Assistance Document goes beyond the holding of *Bostock*. The Supreme Court only held that Title VII prohibits an employer from "fir[ing] someone simply for being homosexual or transgender." *Bostock*, 140 S. Ct. at 1753. The Court expressly declined to "prejudge" other issues that might be implicated by Title VII, such as "sex-segregated bathrooms, locker rooms, and dress codes." *Id*. Interestingly, the Technical Assistance Document recognizes that "[*Bostock*] explicitly reserved some issues for future cases." [Doc. 1-5 at 5]. Yet, the Technical Assistance Document then purports to explain what Title VII requires of covered employers with regard to the exact conduct *Bostock* declined to address (i.e., bathrooms, locker rooms, dress codes). [*Id*. at 7-8]. The EEOC's guidance identifies and creates rights for applicants and employees that have not been established by federal law, and it directs employers to comply with those obligations to avoid liability.[17] *See Bear Creek Bible Church v. Equal Emp. Opportunity Comm'n*, 2021 WL 5449038, at *13 (N.D. Tex. Nov. 22, 2021) (reaching the same conclusion about the EEOC guidance at issue). As such, the Court concludes that Plaintiffs can

---

[17] Defendant EEOC contends the Technical Assistance Document is not legislative, as it is based, in part, on "its previous administrative decisions." [Doc. 65 at 23]. However, the EEOC's prior decisions concerning sexual orientation and gender identity are not binding authority and cannot be considered definitive interpretations of Title VII. *Lee v. City of Columbus, Ohio*, 636 F.3d 245, 256 (6th Cir. 2011); *White v. Burlington Northern & Santa Fe R. Co.*, 364 F.3d 789, 812 (6th Cir. 2004) (Clay, E. concurring); *Young v. Dep't of the Treasury*, 2020 WL 3980796, at *9 (W.D. Tenn. Apr. 9, 2020) (collecting cases) ("Although not binding authority, the EEOC's decisions and regulations are persuasive."); *Brown v. Subway Sandwich Shop of Laurel, Inc.*, 2016 WL 3248457 (S.D. Miss. June 13, 2016) (collecting cases) (explaining that EEOC's prior decisions did not require the court to conclude that discrimination based on sexual orientation is prohibited by Title VII). Therefore, until the Sixth Circuit or the Supreme Court recognizes the opinions expressed in the EEOC's prior decisions (i.e., that Title VII prohibits discrimination based on sexual orientation and gender identity with respect to bathrooms, locker rooms, and dress codes) such rights and obligations have not been established under federal law.

demonstrate the EEOC's Technical Assistance Document is a legislative rule. *Morton*, 415 U.S. at 232.

Thus, Plaintiffs have demonstrated that they are likely to succeed on their claim that Defendants' guidance documents are legislative rules and that the guidance is invalid because Defendants failed to comply with the required notice and comment procedures under the APA. Accordingly, this first preliminary injunction factor weighs in Plaintiffs' favor.

*2. Irreparable Harm*

The second preliminary injunction factor asks whether the movant "is likely to suffer irreparable harm in the absence of preliminary relief." *Platt v. Bd. of Comm'rs on Grievances & Discipline of the Ohio Sup. Ct.*, 769 F.3d 447, 453 (6th Cir. 2014) (quoting *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7 (2008)). "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) (citing *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992)).

Plaintiffs claim "a State 'suffers a form of irreparable injury' any time it is prevented from 'effectuating statutes enacted by representatives of its people.'" [Doc. 11 at 33] (quoting *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020)). However, the Sixth Circuit held that States suffer irreparable harm when *enjoined* from enforcing their laws. *Thompson*, 976 F.3d at 619 (quoting *Maryland v. King*, 567 U.S. 1301 (2012)). Here, no party seeks to enjoin Plaintiff States from enforcing their laws; rather, the States themselves are pursuing injunctive relief against Defendants.

Nevertheless, as a practical matter, the interest in this case is the same. Plaintiffs have sovereign interests in enforcing their duly enacted state laws. *Supra* at 11. Plaintiffs suffered an

immediate injury to their sovereign interests when Defendants issued the challenged guidance, as Defendants' guidance and several of Plaintiffs' statutes conflict. Absent an injunction, Plaintiff States' ability to enforce their conflicting state laws will remain hampered, and Plaintiffs will continue to face substantial pressure to change their state laws in order to avoid material legal consequences.

Therefore, the Court finds that Plaintiffs have carried their burden to show irreparable harm. S*ee Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018) (noting that a state's "inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State"); *Kentucky v. Biden*, 23 F.4th 585, 611 n. 19 (6th Cir. 2022) (explaining that "invasions of state sovereignty…likely cannot be economically qualified, and thus cannot be monetarily redressed"); *Kansas v. United States*, 249 F.3d 1213, 1227-28 (10th Cir. 2001) (finding irreparable harm to the State where federal agency's action "places its sovereign interests and public policies at stake"); *Texas*, 201 F. Supp. at 834-35 (finding irreparable harm under similar circumstances). This second preliminary injunction factor weighs in Plaintiffs' favor.

### 3. Harm to Others

Defendants argue that granting an injunction will impede their ability to eliminate discrimination in the educational and workplace settings, prevent them from explaining their understanding of the requirements imposed by Titles VII and IX, and leave confusion about regulated entities' legal obligations. [Doc. 48 at 50].

There is no question that an injunction will harm Defendants, as they will be prevented from "fully enforc[ing]" the challenged guidance like they vowed to do. However, because Plaintiffs have demonstrated a substantial likelihood of success on the merits of at least one of their claims, it is doubtful that Defendants should be allowed to enforce the challenged

guidance against Plaintiffs in the interim. Defendants do not have a legitimate interest in enforcing the guidance documents that Plaintiffs have shown are likely to be procedurally invalid.

Because the challenged guidance documents affect the sovereign rights of Plaintiff States, and because this case raises substantial questions regarding the validity of that guidance, the Court finds the harm to Plaintiffs outweighs any harm the preliminary injunction might cause Defendants. Therefore, this third factor weighs in favor of a preliminary injunction.

*4. Public Interest*

The Sixth Circuit has made clear that the "public's true interest lies in the correct application of the law." *Kentucky*, 23 F.4th at 612; *Priorities USA v. Nessel*, 860 F. App'x. 419, 422-23 (6th Cir. 2021) (quoting *Coal. to Def. Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006) ("[T]he public interest lies in correct application of the federal constitutional and statutory provisions upon which the claimants have brought this claim.")). Defendants certainly have a public interest in enforcing Titles VII and IX to the fullest extent permissible. Likewise, Plaintiffs undoubtedly have a strong public interest in enforcing their duly enacted state laws and protecting the underlying policies. It is clear these interests conflict. The Court understands that both sides feel strongly about their positions on the relevant legal and social policy questions, and the public's interest in the correct application of the law will be served by maintaining the status quo while the Court resolves these issues.

Furthermore, as this Court has explained, the public has an interest in "agencies promulgating rules that have the effect of law through procedures mandated by Congress through the APA." *CIC Servs., LLC v. Internal Revenue Serv.*, 2021 WL 4481008, at *6 (E.D. Tenn. Sept. 21, 2021); *see also N. Marina Islands v. United States*, 686 F. Supp.2d 7, 21 (D.C. Cir.

2009) ("The public interest is served when administrative agencies comply with their obligations under the APA."). Because there are questions as to Defendants' compliance with the APA, the public would benefit from a preliminary injunction. An injunction will ensure that the agencies are not exceeding their express authority delegated by Congress.

Accordingly, the Court finds that the fourth factor weighs in favor of a preliminary injunction.

## IV.    CONCLUSON

For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction [Doc. 10] is **GRANTED** and Defendants' Motion to Dismiss [Doc. 49] is **DENIED**. Accordingly, it is hereby ordered that Federal Defendants and all their respective officers, agents, employees, attorneys, and persons acting in concert or participation with them are **ENJOINED** and **RESTRAINED** from implementing the Interpretation, Dear Educator Letter, Fact Sheet, and the Technical Assistance Document against Plaintiffs.[18]

This preliminary injunction shall remain in effect pending the final resolution of this matter, or until further orders from this Court, the United States Court of Appeals for the Sixth Circuit, or the Supreme Court of the United States.

It is further **ORDERED** that no security bond shall be required under Federal Rule of Civil Procedure 65(c).

---

[18] Plaintiffs fail to explicitly address the proper scope of the requested preliminary injunction in their briefing. However, Plaintiffs appear to believe this injunction should apply nationwide. In his recent concurrence, the Chief Judge of the Sixth Circuit cautioned against nationwide injunctions. *See Arizona,* 2022 WL 2437870, at *14 ("At a minimum, a district court should think twice—and perhaps twice again—before granting universal anti-enforcement injunctions against the federal government.") The Court is heavily persuaded by this concurrence and concludes that this preliminary injunction should only apply to Plaintiffs. The Court has no way of determining whether the States not before it wish for the challenged guidance documents to be enforced, and a nationwide injunction might "give [those] States victories they did not earn and…they do not want." *Id.* The Court will not burden the States that did not join this litigation.

**SO ORDERED.**

/s/ *Charles E. Atchley Jr.*
**CHARLES E. ATCHLEY JR.**
**UNITED STATES DISTRICT JUDGE**