# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### KNOXVILLE DIVISION

THE STATE OF TENNESSEE; THE
STATE OF ALABAMA; THE STATE OF
ALASKA; THE STATE OF ARIZONA;
THE STATE OF ARKANSAS; THE
STATE OF GEORGIA; THE STATE OF
IDAHO; THE STATE OF INDIANA;
THE STATE OF KANSAS; THE
COMMONWEALTH OF KENTUCKY;
THE STATE OF LOUISIANA; THE
STATE OF MISSISSIPPI; THE STATE
OF MISSOURI; THE STATE OF
MONTANA; THE STATE OF
NEBRASKA; THE STATE OF OHIO;
THE STATE OF OKLAHOMA; THE
STATE OF SOUTH CAROLINA; THE
STATE OF SOUTH DAKOTA; THE
STATE OF WEST VIRGINIA,

                Plaintiffs,

—and—

ASSOCIATION OF CHRISTIAN
SCHOOLS INTERNATIONAL; A.F., a
minor, by Sara Ford, her mother,

          Intervenor-Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
EDUCATION; MIGUEL CARDONA, in
his official capacity as Secretary of
Education; EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION;
CHARLOTTE A. BURROWS, in her
official capacity as Chair of the Equal
Employment Opportunity Commission;
UNITED STATES DEPARTMENT OF
JUSTICE; MERRICK B. GARLAND, in

Case No. 3:21-CV-00308

**INTERVENOR-PLAINTIFFS'
VERIFIED COMPLAINT**

his official capacity as Attorney General of the United States; **KRISTEN CLARKE**, in her official capacity as Assistant Attorney General for Civil Rights at the United States Department of Justice,

Defendants.

## Introduction

1.    Intervenor-Plaintiff Association of Christian Schools International (ACSI) is an association representing thousands of schools nationwide with hundreds of thousands of students, many of whom are female athletes. Intervenor-Plaintiff A.F. is a female athlete in Arkansas who competes in girls' sports like basketball and volleyball.[1] Athletics provides numerous benefits to ACSI member school athletes and A.F.—self-esteem; teamwork; joy in victory and lessons from defeat; opportunities to compete; collegiate recruiting and athletic scholarship options; and more. Fifty years ago, Title IX of the Education Amendments paved the way for these athletes by ensuring that girls and women had the same opportunities to compete in interscholastic athletics as boys and men.[2]

2.    But the U.S. Department of Education will curtail these gains—and reduce the advantages of sports for girls—through its unlawful re-interpretation of Title IX to permit boys who are biologically male to compete in girls' athletic competitions if they claim a female gender identity. In doing so, the government puts girls at a competitive disadvantage, increases their risk of injury, and creates an unfair playing field that deprives girls of the inherent benefits of athletics.

---

[1] Proposed Intervenors A.S. and C.F. are not included in this Verified Complaint because they have now graduated from high school and have elected not to pursue playing college sports.

[2] For clarity, this complaint refers to biological males as "boys," "men," or "males" and biological females as "girls," "women," or "females." This nomenclature reflects that this case concerns the effects of *biological* differences between males and females and Title IX's focus on creating equal opportunities for members of both biological sexes.

3. The Constitution and the Administrative Procedure Act bar unelected bureaucrats from singlehandedly upending longstanding federal law and starting a sea of change in sports and education. The re-interpretation itself is contrary to Title IX because it denies girls athletic opportunities. And the government acted unlawfully when it rewrote Title IX through an arbitrary rule without public participation and oversight.

4. Intervenor-Plaintiffs will suffer irreparable harm if this Court does not enjoin the government's attempted revision of Title IX and declare its interpretation illegal. Intervenor-Plaintiffs need a preliminary and permanent injunction and declaratory relief to ensure that they can continue to enjoy the benefits of athletics and fair competition.

## Jurisdiction and Venue

5. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the U.S. Constitution and federal law.

6. This Court also has jurisdiction under 28 U.S.C. § 1346(a) because this is a civil action against the United States.

7. This Court has jurisdiction under 28 U.S.C. § 1361 to compel an officer of the United States or any federal agency to perform his or her duty.

8. This Court has jurisdiction to review Defendants' unlawful actions and enter appropriate relief under the Administrative Procedure Act (APA), 5 U.S.C. §§ 553, 701–706.

9. This Court has inherent jurisdiction to review and enjoin ultra vires or unconstitutional agency action through an equitable cause of action. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689–71 (1949).

10. This case seeks declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, 5 U.S.C. § 705–706, and Federal Rule of Civil Procedure 57;

injunctive relief under 28 U.S.C. § 1343 and Federal Rule of Civil Procedure 65; costs and attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412; and other relief under this Court's inherent equitable powers.

11.    Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this district, the effects of Defendants' challenged actions are felt in this district, and Defendants can and do perform official duties in this district.

**Intervenor-Plaintiffs**

*A.F.*

12.    A.F. is a ninth-grade female student and basketball and volleyball athlete at Brookland Junior High School in Brookland, Arkansas. Because A.F. is a minor, she brings this action by her mother, Sara Ford.[3]

*Association of Christian Schools International*

13.    ACSI is a Christian educational organization that serves member individuals and schools ranging from early education to colleges and universities. It is the largest Protestant association of Christian schools in the world.

14.    ACSI is a non-profit corporation organized under California law with its principal place of business in Colorado.

15.    ACSI serves member schools in all fifty states, including approximately 2,000 member schools from preschool to high school and more than sixty colleges and universities in the United States.

16.    ACSI member schools serve approximately 500,000 early education through high school students throughout the United States.

17.    ACSI also serves over sixty colleges and universities located in twenty-nine different states.

---

[3] This complaint refers to A.F. as the "individual athlete."

18. ACSI serves more than seventy members in Tennessee, including early education, elementary, middle, and high schools, a college, and a university.

19. ACSI regularly conducts in-person audits of its accredited member schools, including those located in Tennessee.

20. ACSI regularly provides consultation, accreditation, curriculum, and other services for its member schools, including those located in Tennessee.

21. ACSI advertises itself to schools throughout Tennessee.

22. ACSI seeks relief on behalf of itself, its current and future members, and its current and future members' female athletes.

## Defendants

23. Defendant United States Department of Education (Department) is an executive agency of the federal government responsible for enforcing and administrating Title IX. 20 U.S.C. §§ 3411, 3441.

24. Defendant Miguel Cardona is the United States Secretary of Education and is responsible for the operation of the Department and enforcing and administrating Title IX. *Id.* § 3411.

25. Defendant United States Department of Justice (DOJ) is an executive agency of the United States. DOJ also has the authority to enforce Title IX. Exec. Order No. 12,250, 28 C.F.R. part 41, app. A (1980).

26. Defendant Merrick B. Garland is the Attorney General of the United States and is responsible for the operation of the DOJ, including enforcing Title IX.

27. Defendant Kristen Clarke is the Assistant Attorney General for Civil Rights at DOJ. She is responsible for enforcing Title IX. 28 C.F.R. § 42.412.

28. Defendants Cardona, Garland, and Clarke are sued in their official capacities.

5

## Factual Allegations

**Designed to promote equal opportunities for women in education, including school-sponsored sports, Title IX has fostered and protected women's athletics.**

29.     In 1972, Congress enacted Title IX, 20 U.S.C. § 1681, which forbids education programs or activities receiving federal financial assistance from discriminating against persons based on their sex. Title IX provides:

> "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . ." 20 U.S.C. § 1681(a).

30.     Title IX was designed to eliminate discrimination against women in education.

31.     Recognizing that athletics are integral to the educational process, Title IX was also designed to actively promote equal opportunities for women in athletics.

32.     Before Title IX, schools often emphasized boys' athletic programs "to the exclusion of girls' athletic programs." *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 175 (3rd Cir. 1993).

33.     For example, many high schools did not have girls' sports teams, which drastically reduced the number of women who could compete in college. And the average university devoted a mere two percent of its athletic budget to women's sports.

34.     To end this discrimination against women in athletics, Title IX and its implementing regulations have defined "program or activity" to include interscholastic athletics (including high school and intercollegiate athletics). *See* 34 C.F.R. § 106.41(a); 44 Fed. Reg. 71,413–15 (Dec. 11, 1979); *Id.* at 71,417–418.

35.     Title IX and its implementing regulations require that, if an entity subject to Title IX provides athletic programs or opportunities separated by sex, then

6

it must do so in a manner that "provide[s] *equal athletic opportunity* for members of both sexes." 34 C.F.R. § 106.41(c) (emphasis added).

36.     Title IX requires athletic opportunities to "effectively accommodate the interests and abilities" of girls and boys. 34 C.F.R. § 106.41(c).

37.     Title IX also requires that male and female athletes "receive *equivalent treatment*, benefits and opportunities." 44 Fed. Reg. at 71,414 (emphasis added).

38.     Title IX has been strikingly successful towards its intended goals in providing women with opportunities for athletic competition and scholarships.

39.     For example, between 1972 and 2011, girls' participation in high school athletics increased from approximately 250,000 to 3.25 million students. U.S. Dept. of Educ., OCR, *Protecting Civil Rights, Advancing Equity* 33 (2015), https://bit.ly/2VF516Q.

40.     In college, women's numbers have grown almost as steeply, from 30,000 in 1972 to more than 288,000 in 2017-18.

41.     By 2018, forty-four percent of athletes in the NCAA were female student athletes. *National Collegiate Athletic Association, Number of NCAA College Athletes Reaches All-time High* (Oct. 10, 2018), https://bit.ly/3inIG6Z.

42.     These developments have increased the opportunities for women and girls to benefit from being on athletic teams, developing skills associated with competitive sports, attending college on athletic scholarships, and competing in high-level competitions.

43.     In short, Title IX has "enhanced, and will continue to enhance, women's opportunities to enjoy the thrill of victory [and] the agony of defeat." *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 773 (9th Cir. 1999).

**The term "sex" in Title IX refers to biological sex.**

44.  Although Title IX does not define "sex" or "on the basis of sex," these terms clearly refer to biological sex based on Title IX's text, history, and past application.

45.  The dictionary definition of the term "sex" has never meant gender identity, including when Title IX was enacted in 1972.

46.  For decades, Title IX has been understood to allow distinctions by sex, rather than require an androgenous or interchangeable view of the sexes. This is why, for example, the Supreme Court recognized the need to continue separating sex-specific privacy facilities when integrating women into the Virginia Military Institute. *United States v. Virginia*, 518 U.S. 515, 556–58 (1996) (Ginsburg, J.).

47.  Throughout Title IX, the term "sex" is used as a binary concept, containing only male and female.

48.  For example, Title IX contemplates a transition period for schools to change "from being an institution which admits only students of *one sex* to being an institution which admits students of *both sexes*," in certain circumstances. 20 U.S.C. § 1681(a)(2) (emphases added).

49.  In the sports context, Title IX and its implementing regulations similarly make clear that the term "sex" means biological sex.

50.  For example, Title IX and its implementing regulations expressly permit schools to sponsor sex-specific teams "where selection for such teams is based on competitive skill or the activity involved is a contact sport," 34 C.F.R. 106.41(b), and allow "separation of students by sex within physical education classes" for sports whose major activity involves bodily contact, 34 C.F.R. § 106.34(a)(1).

51.  Ignoring the physical differences between the sexes would in many sports make it impossible to, as Title IX requires, "accommodate the . . . abilities" of

girls and women, and to provide athletic opportunities of equal quality to girls and women.

52.     Dr. Bernice Sandler—who is frequently recognized as "the Godmother of Title IX"— testified to the House Subcommittee on Postsecondary Education in support of regulations implementing Title IX in 1975, that ignoring differences in male and female physiology would for many sports "effectively eliminate opportunities for women to participate in organized competitive athletics. For these reasons, such an arrangement would not appear to be in line with the principle of equal opportunity." Statement of Dr. Bernice Sandler, Director, Project on the Status & Education of Women, Ass'n of American Colleges, June 25, 1975, Hearings on Sex Discrimination Regulations at 343.

53.     Dr. Sandler was correct. Permitting males to compete in girls' or women's athletic events doesn't make victory for girls and women more difficult; it makes victory over comparably talented and trained male athletes all but impossible for girls and women in most athletic competitions, because of inherent and biologically dictated differences between the sexes.

**Males have marked performance advantages over women in almost all athletic contests.**

54.     Male puberty quickly increases the levels of circulating testosterone in healthy teen and adult males to levels ten to twenty times higher than the levels that occur in healthy females, and this natural flood of testosterone drives a wide range of physiological changes that give males a powerful physiological athletic advantage over females.

55.     From puberty on, males have large and natural advantages over females that effect boys' and men's muscle gain, bone strength, and cardiovascular and respiratory system, which enhance their strength, speed, and recovery.

56.     Physiological athletic advantages enjoyed over females by similarly fit males after puberty include advantages in the respiratory, cardiovascular, muscular, and other systems which result in faster oxygen uptake, higher short-term and sustained levels of oxygen to transport to the muscles, increased muscle fibers and muscle mass, and the ability to unleash more power (e.g., in vertical jumps), superior protection against stress fractures and fractures from collisions, and taller average heights.

57.     These advantages render females, on average, unable to compete against males in power-based or endurance-based sports.

58.     Meanwhile, female puberty brings distinctive changes to girls and women that impede athletic performance, including increased body fat levels which—while healthy and essential to female fertility—creates increased weight without providing strength, as well as wider hips and different hip-joint orientation that result in decreased hip rotation and running efficiency.

59.     These are inescapable biological facts of the human species, not stereotypes, "social constructs," or relics of past discrimination.

60.     Likewise, no amount of testosterone suppression can eliminate male physiological advantages relevant to performance and safety.

61.     One year (or more) of testosterone suppression does not substantially eliminate male performance advantages, including in the areas of muscle mass and lean body mass, which together contribute to greater average male weight.

62.     After male pubertal growth, testosterone suppression does not materially shrink bones so as to eliminate height, leverage, performance, and weight differences that follow from simply having longer, larger bones, and being taller after male puberty.

63.     Because of these inherent physiological differences between men and women after puberty, male athletes consistently achieve records superior to those of

comparably fit and trained women across almost all athletic events, with wider consistent disparities in long-term endurance and strength events.

64. The physiological differences between males and females after puberty directly result in stark disparities in the athletic record books because boys and men can consistently run faster and jump higher and farther than comparably fit girls and women.

65. For example, in Olympic sport competitions since 1983, men have performed between 5.5% (800-m freestyle, swimming) and 36.8% (weightlifting) better than women.

66. Likewise, Olympic world records indicate that in running events men perform 10.7% better than women and that in jumping events men perform 17.5% better than women.

67. While this gap is clearly pronounced at the elite level, it is equally evident at the high school level, including in Arkansas where the individual athlete and ACSI member schools and their female athletes compete.

68. To illustrate, the tables below show the top five boys' and girls' results in the state of Arkansas in different high school athletic events during the 2021 season. [4]

**Table 1: Best Arkansas High School Outdoor 100m Times in 2021**

| Boy | Time | Girl | Time |
| --- | --- | --- | --- |
| Woyn Chatmon | 10.60 | Takiria Brown | 12.07 |
| Ja'keylen Haney | 10.63 | Raghan Allen | 12.17 |
| Shunderick Powell | 10.70 | Kamaria Russell | 12.30 |
| Jaylen Hopson | 10.70 | Kinleigh Hall | 12.31 |
| Damari Smith | 10.73 | Jalia Bunn | 12.43 |

---

[4] Results listed in this table are publicly available online at AthleticNET: https://bit.ly/3F6i5VY.

**Table 2: Best Arkansas High School Outdoor 400m Times in 2021**

| Boy | Time | Girl | Time |
|---|---|---|---|
| Woyn Chatmon | 48.18 | Kinleigh Hall | 57.25 |
| Adrian Carranco | 49.00 | Grace Lueders | 57.29 |
| Carson Lenser | 49.03 | Anna Woolsey | 58.21 |
| DeAndra Burns Jr. | 49.06 | Joey Babel | 59.65 |
| Patrick Elliott | 49.87 | Joli Ducharme | 59.86 |

**Table 3: Best Arkansas High School Outdoor High Jump Results in 2021**

| Boy | Height | Girl | Height |
|---|---|---|---|
| Sam Hurley | 6' 10 | Sydney Billington | 5' 10 |
| Jaqualen Moore | 6' 10 | Madison Holloway | 5' 7 |
| Trey Haworth | 6' 7 | Carshaila Rozier | 5' 6 |
| Dewayne Ashford | 6' 6 | Rachel Wilson | 5' 6 |
| Jonah Hill | 6' 6 | Brandi Rottman | 5' 6 |

**Table 4: Best Arkansas High School Outdoor Long Jump Results 2021**

| Boy | Distance | Girl | Distance |
|---|---|---|---|
| Sam Hurley | 23' 2 | Madison Holloway | 18' 9.25 |
| Daryl Searcy | 23' 0 | Blakelee Winn | 18' 6.75 |
| Link Lindsey | 22' 10.5 | Ta'Nya Burnett | 17' 11.5 |
| Treyvon Woodard | 22' 9.75 | Essence Flowers | 17' 10.5 |
| Bryson Bailey | 22' 8.75 | Hannah Brewer | 17' 9.5 |

69. Each year, hundreds of high school boys achieve times or results in track and field events better than the world's single best elite woman competitor that year.[5]

70. This reality is evident in the performance of male athletes who have competed as women after undergoing testosterone suppression regimes.

71. For example, CeCe Telfer, a male who ran as Craig Telfer throughout high school and the first two years of college, certified compliance with the NCAA requirement of one year on testosterone-suppressing drugs and began competing in female track events in CeCe's senior collegiate year, for the 2019 indoor and outdoor track and field seasons.

72. CeCe's "personal bests" in events either improved or did not substantially decline following at least one year on testosterone suppressing drugs, as Table 5 demonstrates.

**Table 5: Comparison of "Craig" and "CeCe" Telfer Performance Times Before and After Hormone Suppression**

| Event | "Craig" Telfer | "Cece" Telfer |
|---|---|---|
| Indoor 200 Meter Dash | 24.64s (2017) | 24.45s(2019) |
| Indoor 60 Meter Hurdles | 8.91s (2018) | 8.33s (2019) |
| Outdoor 100 Meter Dash | 12.38s (2017) | 12.24s(2019) |
| Outdoor 400 Meter Hurdles | 1:02.00s (2017) | 57.53s(2019) |

73. In short, when males compete in female events after puberty, gifted and dedicated female athletes are denied the equal athletic opportunity guaranteed by Title IX by being forced to compete against male athletes with inherent, biological, and immutable advantages.

---

5 Doriane Lambelet Coleman, Martina Navratilova, et al., *Pass the Equality Act, But Don't Abandon Title IX*, Washington Post (Apr. 29, 2019), https://wapo.st/2VKlNN1.

13

**The inclusion of males in female "contact" sports creates an enhanced risk of injury for female participants.**

74.    In many women's sports collisions between players, or between players and equipment such as balls or sticks, is a common cause of injury.

75.    For example, in soccer, head injuries occur from collisions with another player's head or body, collision with the goal or ground, or from an unanticipated blow from a kicked ball.

76.    In basketball, players often collide with each other during screens, while diving for a loose ball, or while driving to the basket.

77.    Physiological differences between the biological sexes, combined with basic principles of physics, create enhanced risks of injury—and more severe injuries—for female athletes when competing against male athletes.

78.    For example, males are larger, heavier, and run faster than females, thus bringing more kinetic energy into any collision between athletes. When a collision occurs between male and female athletes, the lighter females will suffer more abrupt deceleration in collisions with male bodies, creating heightened injury risk for impacted females.

79.    Males also hit and kick balls faster, resulting in higher speed collisions between balls and athletes. For example, university-level male soccer players kick the ball on average with 20% greater velocity than university-level female soccer players. A soccer ball kicked by a male, travelling an average 20% faster than a ball kicked by a female, will deliver more energy on head impact, and will thus increase the risk of an impact injury such as concussion.

80.    All other variables being equal, females are more vulnerable to injuries including concussions and ACL tears than are males. Allowing males to participate in female athletics increases the risk to female athletes of sustaining these injuries

14

because of the likelihood of more forceful collisions between male and female athletes than compared to collisions between only female athletes.

81.     In 2020, after an extensive review of the scientific literature, consultation with experts, and modeling of expected injuries, World Rugby published revised rules governing male participation on female teams, along with a detailed explanation of how the new policy was supported by current evidence.[6]

82.     Their analysis found that "the magnitude of known risk factors for head injury are … predicted by the size of the disparity in mass between players," and that the "addition of [male] speed as a biomechanical variable further increases these disparities." They observed an increase of up to 50% in neck and head acceleration that would be experienced in a typical tackle scenario in women's rugby if men were to participate.

83.     While rugby is a contact-heavy sport, females forced to compete against male athletes in any contact sport will face an enhanced risk of injury due to immutable physiological differences between the sexes.

84.     In female team sports, each player is vital to the success of the team and the loss of a single athlete due to injury can reduce the chances for success of the other girls and women on the team.

**Increasing numbers of girls already are losing athletic victories and opportunities to male competitors who identify as females.**

85.     Increasing numbers of boys and men are competing and trying to compete in female sports and depriving girls and women of athletic opportunities and accomplishments.

86.     For example, male athletes seeking to compete against female athletes have challenged laws in Idaho, Indiana, Utah, West Virginia, and Florida that

---

[6] World Rugby Transgender Guidelines, https://bit.ly/3ortlpU (accessed Sept. 21, 2021).

require or permit schools to maintain separation based on sex for school-sponsored athletic teams or sports based on biological sex.

87. Therefore, in Idaho, West Virginia, Indiana, Utah, and Florida, males are actively seeking access to compete in female sports through litigation.

88. In Connecticut, two biological males competing in female athletics won 15 women's state championship titles in girls' high school track and field (titles previously held by nine different girls).

89. At the University of Montana, a National Collegiate Athletic Association (NCAA) Division I school, June Eastwood, a male who previously competed on the men's track and cross-country teams, began competing on the women's track and cross-country teams after being treated for a year with testosterone suppression medication.

90. June Eastwood placed first in the women's mile at the University of Montana's conference championships and won the race by more than 3.5 seconds.

91. Likewise, Craig Telfer ranked 212th and 433rd in the 400-meter hurdles among men's Division II athletes in 2016 and 2017 respectively, yet CeCe Telfer took the Division II national championship in women's 400-meter hurdles in 2019 by almost two seconds.[7] *See supra* ¶¶ 71–72.

92. The Connecticut athletes, June Eastwood, and CeCe Telfer displaced women and prevented women from earning championships.

93. Likewise, in the 2020 Olympics, Laurel Hubbard, a biological male, qualified for and participated in the Tokyo Olympic Games in weightlifting.

94. Rachel McKinnon, a biological male, won a UCI Masters World Track Cycling Championship in the 2018 women's 200-meter sprint record, setting a new world record.

---

[7] Results listed are available online at Track & Field Results Reporting System: https://bit.ly/2YeXM8a (accessed Sept. 21, 2021).

95.     Laurel Hubbard and Rachel McKinnon displaced women and prevented women from competing in or winning championship events.

96.     For example, Hannah Mouncey, a biological male, competed in Australian rules football before being banned from entering the Australian Football League Women's league based on "strength, stamina or physique." *Transgender footballer Hannah Mouncey threatens legal action against AFL*, News.com.au (Jan. 17, 2021), https://bit.ly/3Bb7si0.

97.     The photograph below shows Hannah Mouncey (in red) tackling a female during a match:



98.     In addition to displacement, men competing against women have caused significant injuries to women in athletics.

99.     For example, Fallon Fox, a biological male, competed against females in mixed martial arts.

100.    In a match, Fallon Fox gave a female opponent a concussion and fractured the orbital bone in her skull. The opponent said afterwards, "I have never felt the strength I felt in a fight like that." Richard Presley, *Transgender MMA*

*Fighter Fallon Fox Breaks Opponent's Skull*, ATBK (May 20, 2021), https://bit.ly/39UDnaA.

101.   Meanwhile, multiple sources report that the percentage of children identifying as transgender has multiplied rapidly within just the last few years.

102.   In 2017, a study reported that 3–4 in 100 teens in the United States reported that they are or may be transgender. A more recent 2021 study suggests that the rate of transgender identification among America's youth may be as high as 9 in 100. William Malone, *Time to Hit Pause on 'Pausing' Puberty in Gender-Dysphoric Youth*, Medscape (Sept. 17, 2021), https://wb.md/3D4IVf5. This marked increase has been attributed in part to social and peer pressure, as documented in a 2018 study of "Rapid Onset Gender Dysphoria" conducted by Brown University professor Lisa Littman.

103.   As more males identifying as females compete against females in high school and college, more females will lose competitive opportunities; lose out on varsity spots, playing time, medals, and advancements to regional meets and games, championship titles, and records; lose the experience of fair competition; lose the opportunities for victory and the satisfaction, public recognition, and scholarship opportunities that can come from victory; and lose scholarship opportunities, as well as facing an increased risk of injury in contact sports.

104.   For female athletes who train hard to be the best that they can be, the situation is neither fair nor safe.

**President Biden directs executive agencies to interpret and apply Title IX in light of *Bostock*.**

105.   In *Bostock v. Clayton County*, the U.S. Supreme Court held that terminating an employee "simply for being homosexual or transgender" constitutes discrimination "because of . . . sex" under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2. 140 S. Ct. 1731, 1737–38 (2020).

106. The Court assumed that "sex" in Title VII "refer[s] only to biological distinctions between male and female." *Id*. at 1739.

107. The Court reiterated that "other federal or state laws that prohibit sex discrimination," such as Title IX, were not "before" the Court. *Id*. at 1753. The Court thus expressly declined to "prejudge" whether its decision in *Bostock* would "sweep beyond Title VII" to those other laws. *Id*. at 1737–38.

108. The Court did not consider or decide what Title IX's statutory phrase "on the basis of sex" means. *Id*. at 1737–38.

109. Nor did the Court address Title IX's safe harbor for sex-separated living facilities or any of the other distinctions Title IX makes between the two biological sexes.

110. Even so, in January 2021, President Biden declared that *Bostock*'s analysis changed the meaning of all federal law regarding sex discrimination to include gender identity and sexual orientation discrimination "so long as the laws do not contain sufficient indications to the contrary." Exec. Order No. 13,988, 86 Fed. Reg. 7023–25 (Jan. 20, 2021).

111. Accordingly, President Biden directed federal agencies to "review all existing orders, regulations, guidance documents, policies, programs, or other agency actions" that either "(i) were promulgated or are administered by the agency under Title VII or any other statute or regulation that prohibits sex discrimination, including any that relate to the agency's own compliance with such statutes or regulations" or "(ii) are or may be inconsistent with the policy set forth" in the Executive Order. *Id*.

112. President Biden further directed that the "head of each agency" "consider whether there are additional actions that the agency should take to ensure that it is fully implementing the policy" set forth in the Executive Order. *Id*.

19

113.    Finally, President Biden directed "the head of each agency [to] develop, in consultation with the Attorney General, as appropriate, a plan to carry out actions that the agency has identified" within 100 days of the Executive Order. *Id*.

114.    On February 23, 2021, citing the Executive Order, the Department and the DOJ withdrew the previous administration's litigation position that Title IX does not allow schools to let men compete in women's sports. Dep't of Educ. Office for Civil Rights, Letter to City of Hartford, et al. (Feb. 23, 2021), *available at* https://bit.ly/3uBeJpa (last visited Sept. 30, 2021).

115.    At the top of case documents in which the Department and the DOJ had defended women's sports just the last year, the Department and the DOJ added a red-lettered disclaimer stating, "This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation." Dep't of Educ., Letter to City of Hartford, et al. (Aug. 31, 2020), available at  https://bit.ly/2ZH5ubr (last viewed September 30, 2021).

116.    Two months later, President Biden then issued a second executive order specific to Title IX, with provisions similar to the February 23, 2021 letter. Exec. Order No. 14,021, 86 Fed. Reg. 13,803  (Mar. 8, 2021).

117.    The Title IX executive order stated, that under Title IX, "all students should be guaranteed an educational environment free from discrimination on the basis of sex, including discrimination in the form of sexual harassment, which encompasses sexual violence, and including discrimination on the basis of sexual orientation or gender identity." *Id*. It also provided for a 100-day review period of Department of Education regulations under Title IX. *Id*.

118.    On March 26, 2021, the Civil Rights Division of the DOJ released a memorandum concluding that Title IX "prohibit[s] … discrimination on the basis of gender identity and sexual orientation." U.S. Dep't of Justice, Memorandum

20

Regarding Application of Bostock v. Clayton County to Title IX of the Education Amendments of 1972 (Mar. 26, 2021), https://bit.ly/2WpV5zq.

119.     The Department then held hearings in June 2021 soliciting public input on the correct understanding and enforcement of Title IX, at which a female athlete explained the devastating impact of allowing men to compete on women's teams. U.S. Dep't of Educ., Office of Civil Rights, Transcript, Virtual Public Hearing on Title IX of the Education Amendments of 1972 at 104–07 (June 7 to June 11, 2021) (testimony of Selina Soule).

**The Department of Education re-defines Title IX's definition of "sex."**

120.     The Department of Education has engaged in at least two agency actions to implement President Biden's Executive Order.

*Notice of Interpretation*

121.     *First*, on June 22, 2021, the Department published in the Federal Register its "Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County." 86 Fed. Reg. 32,637 (June 22, 2021) ("Interpretation") (attached as Exhibit A).

122.     In the Interpretation, the Department acknowledged that it previously "stated that Title IX's prohibition on sex discrimination does not encompass discrimination based on sexual orientation and gender identity." *Id.*

123.     Contrary to these pronouncements, *earlier this year*, the Department concluded that *Bostock* did not apply to Title IX or require a different interpretation of Title IX. *See* U.S. Dep't of Educ., Memorandum for Kimberly M. Richey Acting Assistant Secretary of the Office for Civil Rights Re: *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020) (Jan. 8, 2021), https://bit.ly/3mwKI7H.

124. And in 2017, the Department rescinded and withdrew prior statements of policy and guidance on Title IX that had determined that Title IX's "prohibitions on discrimination 'on the basis of sex' … and its implementing regulations require access to sex-segregated facilities based on gender identity." Dear Colleague Letter (Feb. 22, 2017), https://bit.ly/3nSpG47.

125. Now, the Department's current view is that "Title IX Prohibits Discrimination Based on Sexual Orientation and Gender Identity." 86 Fed. Reg. at 32,637 (June 22, 2021).

126. The Interpretation relied heavily on *Bostock*'s analysis of Title VII and applied the analysis to Title IX. *See id.* at 32,637–38.

127. The Department concluded that "[t]here is textual similarity between Title VII and Title IX" and cited decisions from federal courts of appeals that "recognize that Title IX's prohibition on sex discrimination encompasses discrimination based on sexual orientation and gender identity." *Id.* at 32,637–639 (collecting cases).

128. In fact, the texts of Title VII and Title IX are materially different. *Compare* 42 U.S.C. § 2000e-2(a) *with* 20 U.S.C. § 1681(a).

129. The Department failed to cite decisions from federal courts of appeals that recognized that "Title VII differs from Title IX in important respects." *See, e.g.*, *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021).

130. The Department failed to consider that Title IX uses the term "sex" as a binary concept and any contrary reading would lead to inconsistent application, create conflicts within Title IX, and cause other problems in application. *See, e.g.*, 20 U.S.C. § 1686; 20 U.S.C. § 1681(a)(8); 34 C.F.R. § 106.40(b).

131. Nevertheless, the Department concluded that the phrase "on the basis of sex" in Title IX has the same meaning as the phrase "because of . . . sex" in Title

VII and that this interpretation "is most consistent with the purpose of Title IX." 86 Fed. Reg. at 32,638–39.

132. The Department also noted that the DOJ "concluded that *Bostock*'s analysis applies to Title IX." *Id.*

133. The Department failed to mention that the DOJ had reached the exact opposite conclusion about *Bostock* just two months before. U.S. Dep't of Justice, Memorandum for the Civil Rights Division Regarding Application of *Bostock v. Clayton County* 4 (Jan. 17, 2021) ("*Bostock* does not require any changes to . . . sex-specific facilities or policies.") (attached as Exhibit B).

134. Finally, the Department pledged to enforce its Title IX interpretation and declared that it "will fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity in education programs and activities that receive Federal financial assistance from the Department." 86 Fed. Reg. at 32,639.

135. The Department also declared that its Interpretation "will guide the Department in processing complaints and conducting investigations." *Id.*

*Fact Sheet*

136. *Second*, on June 23, 2021, Acting Assistant Secretary Suzanne B. Goldberg issued a "Dear Educator" letter notifying Title IX recipients of the Department's new Interpretation and reiterating that the Department "will fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity." Letter to Educators on Title IX's 49th Anniversary (June 23, 2021), https://bit.ly/3ksLLDj.

137. The Dear Educator letter was accompanied by a "fact sheet" issued by the Civil Rights Division of the DOJ and the Office for Civil Rights ("OCR") at the Department of Education. U.S. Dep't of Justice & U.S. Dep't of Educ., Confronting Anti-LGBTQI+ Harassment in Schools, https://bit.ly/3sQjZnM (together with the Dear Educator Letter, "Fact Sheet") (attached as Exhibit C).

23

138. The Fact Sheet purports to provide examples of what constitutes discrimination under Title IX.

139. For example, the Fact Sheet indicates that preventing a "transgender high school girl" from "try[ing] out for the girls' cheerleading team" would constitute discrimination, notwithstanding that the decision in *Bostock* did not address athletics, and indeed, made clear it was not addressing athletics or other situations outside the narrow factual situation of the case.

140. In fact, *Bostock* did not address any of the examples of purported discrimination identified in the Fact Sheet.

141. The Department also issued guidance on sexual harassment, confirming that it understood any differences in school's codes of conduct or other actions based on sexual orientation or gender identity to fall under this prohibited Title IX rubric, including its procedures for handling complaints on campus. Questions and Answers on the Title IX Regulations on Sexual Harassment 1, 7 (July 2021), https://bit.ly/3zToUWV (last accessed Sept. 30, 2021 ).

**States pass Save Women's Sports laws to protect female athletes.**

142. In response to the increasing number of males trying to compete against and defeat females in athletic competitions, many states have passed laws that protect women by preserving biology-based eligibility standards for participation in female sports.

143. Alabama, Arkansas, Arizona, Florida, Idaho, Indiana, Iowa, Kentucky, Louisiana, Montana, Mississippi, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, and West Virginia have laws providing that sex designations for school-sponsored athletic teams in high school must be based on biological sex. Ala. Code § 16-1-52(b)(2); Ark. Code § 6-1-107(b)-(c); Ariz. Rev. Stat. Ann. § 15-120.02; Fla. Stat. Ann. § 1006.205(3)(a); Idaho Code § 33-6203(1); Ind. Code § 20-33-13(4);

Iowa Code § 261I.2; Ky. Rev. Stat. Ann. § 156.070(g); La. Stat. Ann. § 4:444; 2021 Mont. Laws ch. 405(1); Miss. Code. Ann. § 37-97-1; Okla. Stat. tit. 70, § 27-106; S.C. Code Ann. § 59-1-500; S.D. Codified Laws § 13-67-1; 2021 Tenn. Pub. Acts, c. 40, § 1; Tex. Educ. Code § 33.0834; Utah Code Ann. § 53G-6-902; W. Va. Code Ann. § 18-2-25d.[8]

144.    The laws in Alabama, Arkansas, Arizona, Florida, Idaho, Indiana, Iowa, Kentucky, Louisiana, Mississippi, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, and West Virginia also provide that sex designations for school-sponsored athletic teams in middle school must be based on biological sex. Ala. Code § 16-1-52(b)(2); Ark. Code § 6-1-107(b)-(c); Ariz. Rev. Stat. Ann. § 15-120.02; Fla. Stat. Ann. § 1006.205(3)(a); Idaho Code § 33-6203(1); Ind. Code § 20-33-13(4); Iowa Code § 261I.2; Ky. Rev. Stat. Ann. § 156.070(g); La. Stat. Ann. § 4:444; Miss. Code. Ann. § 37-97-1; Okla. Stat. tit. 70, § 27-106; S.C. Code Ann. § 59-1-500; S.D. Codified Laws § 13-67-1; Tenn. Code Ann. § 49-6-310(a); Tex. Educ. Code § 33.0834; Utah Code Ann. § 53G-6-902; W. Va. Code Ann. § 18-2-25d.

145.    For example, Alabama and Mississippi have laws providing that sex designations for school-sponsored athletic teams that are members of the state high school associations must be based on biological sex. Ala. Code § 16-1-52(b)(1); Miss. Code. Ann. § 37-97-1.

---

[8] This complaint refers to these laws collectively as "Save Women's Sports laws."

146. Moreover, Arkansas, Florida, Idaho, Iowa, Louisiana, Montana, Mississippi, Oklahoma, South Carolina, South Dakota, and West Virginia have laws providing that sex designations for school-sponsored athletic teams in public colleges and universities must be based on biological sex. Ark. Code § 6-1-107(b)-(c); Fla. Stat. Ann. § 1006.205(3)(a); Idaho Code § 33-6203(1); Iowa Code § 261I.2; La. Stat. Ann. § 4:444; 2021 Mont. Laws ch. 405(1); Miss. Code. Ann. § 37-97-1; Okla. Stat. tit. 70, § 27-106; S.C. Code Ann. § 59-1-500; S.D. Codified Laws § 13-67-1; W. Va. Code Ann. § 18-2-25d.

147. But the Interpretation and the Fact Sheet eviscerates these protections for female athletes.

148. The Department and the DOJ are also actively seeking to eliminate these protections.

149. On June 17, 2021, the Department and DOJ filed a statement of interest in which they took the position that Title IX prohibits West Virginia from "categorically exclud[ing] transgender girls from participating in single-sex sports restricted to girls" and that West Virginia's law violates Title IX. Statement of Interest of the United States at 1, 7, *B.P.J. v. W.V. State Bd. of Educ.*, No. 2:21-cv-00316 (S.D. W. Va. June 17, 2021), ECF No. 42 (footnote omitted).

150. Likewise, on June 17, 2021, the DOJ filed a statement of interest in which it took the position that the Equal Protection Clause of the Fourteenth Amendment prohibits Arkansas's law. Statement of Interest of the United States at 6–17, *Brandt v. Rutledge*, No. 21-cv-00450 (E.D. Ark. June 17, 2021), ECF No. 19.

151. By seeking to reverse protections for female athletes in these states, the Department and the DOJ, via their application of the Interpretation and the Fact Sheet, harm the Intervenor-Plaintiffs: the individual athlete (A.F.) who competes in female athletics in Arkansas, and ACSI, its member schools, and their female athletes who compete in states that currently ensure a fair playing field for women.

26

**A.F. is a high school basketball and volleyball athlete.**

152.   A.F. is a ninth-grade female student at Brookland Junior High in Brookland, Arkansas.

153.   A.F. currently plays basketball and volleyball.

154.   Next year, she will be a sophomore at Brookland High School.

155.   Brookland Junior High School is a public junior high school in Arkansas that competes in athletics against other public junior high schools.

156.   Brookland High School is a public high school in Arkansas that competes in athletics against other public high schools.

157.   Brookland High School and Brookland Junior High School are members of the Arkansas Activities Association, Arkansas' primary sanctioning body for interscholastic sports.

158.   Thus, as a student-athlete at Brookland Junior High School, A.F. competes against athletes from other public schools.

159.   A.F. began playing organized sports in kindergarten, started playing basketball in second grade, and started playing volleyball in fifth grade.

160.   Basketball is a physically demanding sport. It often involves physical contact with other players and injuries are common among female athletes.

161.   Basketball and volleyball teams—including A.F.'s teams—only allow a limited number of players on the court at one time.

162.   On A.F.'s teams, those positions are highly coveted and competitive.

163.   Positions on the team are determined during tryouts based on athletic ability and skill.

164.   Athletics have shaped A.F. as a person by giving her an opportunity to exercise and stay healthy, teaching her how to work hard and persevere, giving her self-confidence, and opening opportunities for her including singing at the national anthem at basketball games and local college events.

27

165.   A.F. intends to play basketball and volleyball at Brookland High School, to seek an athletic scholarship in college basketball or volleyball, and to play one of those sports in college.

**The Interpretation and Fact Sheet have a direct effect on ACSI as an organization.**

166.   ACSI was founded in 1978 when several regional U.S. school associations joined together to advance excellence in Christian education.

167.   ACSI's mission is to "strengthen Christian schools and equip Christian educators worldwide as they prepare students academically and inspire them to become devoted followers of Jesus Christ."

168.   ACSI follows a Statement of Faith, which explains some of ACSI's religious beliefs on topics including the Bible, Jesus Christ, and the need for redemption.

169.   The Statement of Faith also explains ACSI's position on biological sex as "believe[ing] that God wonderfully foreordained and immutably created each person as either male or female in conformity with their biological sex. These two distinct yet complementary genders together reflect the image and nature of God (Genesis 1:26–27)."

170.   ACSI promotes Christian education and provides training and resources to Christian member schools and Christian educators by enhancing Christian educators' professional and personal development and providing vital support functions for Christian schools.

171.   ACSI's member schools all affirm ACSI's Statement of Faith, including its position on gender.

172.   ACSI offers several services to its members.

173.   For example, ACSI offers teacher and administrator certifications, credentials educators and administrators, accredits and evaluates schools to ensure

the educational quality and integrity of member schools, offers curriculum and textbook publishing and development, and provides research and resources on how member schools can create communities marked by healthy and productive spiritual, emotional, and cultural characteristics.

174. ACSI also helps member schools gain a better understanding of laws that impact them by holding workshops, providing member schools with guidance on how to develop better policies, procedures, and practices, sending alerts and policy memos to its member schools explaining issues related to religious education, religious freedom and other issues that relate to ACSI's mission, and providing other resources and articles.

175. ACSI submits public comment on regulations that affect its member schools, such as the implementation of the Emergency Assistance to Non-Public Schools, the Small Business Administration's loan and disaster assistance programs, and other regulations that affect charitable entities.

176. ACSI provides advocacy, policy, and other types of advice to its member schools about their athletic programs.

177. ACSI also offers certification services for its member schools' athletic directors.

178. ACSI diverted resources by preparing and submitting a written comment in response to Exec. Order No. 13,988, 86 Fed. Reg. 7023-25 (Jan. 20, 2021), which preceded and resulted in the issuance of the Interpretation and the Fact Sheet.

179. ACSI submitted the written comment on June 10, 2021.

180. ACSI's written comment urged the Office of Civil Rights and the Department "to evaluate … questions of sexual orientation and gender identity [and] how it will ensure – as it must – that faith-informed institutions and their participants of good will are protected and continue to have every means at hand to teach and to live out Christian standards of conduct." P. George Tryfiates, *Written*

*Comment—Title IX Public Hearing, June 7-11, 2021* (June 10, 2021),
https://bit.ly/3A037Ng.

181.    ACSI executive-level officials and staff diverted time from other tasks
by drafting, reviewing, and submitting this written comment.

182.    But the Department never considered ACSI's written comment because
it did not provide a notice and comment period before issuing its Interpretation and
Fact Sheet.

183.    Therefore, ACSI lost the opportunity to use its written comment to
influence the rule making process in a meaningful way.

184.    Likewise, the Department failed to consider an important aspect of the
Interpretation and the Fact Sheet—i.e., how those documents affected religious
organizations and schools—and therefore failed to take those important religious
considerations into account when promulgating the Interpretation and the Fact
Sheet.

185.    The Interpretation and the Fact Sheet also frustrate ACSI's mission
and purpose by requiring it to divert its resources to protect opportunities for
female athletes in an unfair athletic environment created by Interpretation and
Fact Sheet.

186.    The Interpretation and the Fact Sheet also frustrate ACSI's mission
and purpose by announcing and promoting an official governmental preference of a
different and contrary view of gender than that held by ACSI and its member
schools in their Statement of Faith, which places the government as opposing
ACSI's mission and working to discourage public support of ACSI's mission and of
promoting the position that God created each person as either male or female and
equipping its member schools to provide a Christian education to their students.

30

**Because the Interpretation and the Fact Sheet affect all public schools nationwide, it necessarily will harm the many ACSI member schools whose female athletes compete against those public schools.**

187.    Many ACSI member high schools view athletics as a way to further their mission of providing uniquely Christian educations for their students by teaching students how to foster physical development and athletic skills while learning the value of personal discipline, commitment, and promoting team goals over individual aspirations.

188.    The majority of ACSI member high schools, colleges, and universities in the United States provide athletic opportunities for their students.[9]

189.    ACSI member schools offer opportunities for student athletes to compete on separate teams for males and females.

190.    For example, member schools compete in one or a combination of the following sports: basketball, cross country, cheerleading, diving, golf, volleyball, swimming, track and field, tennis, soccer, softball, pom, and water polo.

191.    ACSI member schools promote their athletic teams as a distinct value to the education of their students.

192.    ACSI member high schools, colleges, and universities promote their athletic programs to prospective students as one way to attract those students.

193.    ACSI member colleges and universities also use their existing athletic programs—and the success of those programs—to recruit prospective student-athletes.

---

[9] Throughout the remainder of this complaint "ACSI member schools," "ACSI member high schools," or "ACSI member colleges and universities" denotes a significant number of, but not necessarily all, of ACSI member schools.

194. Many ACSI member high schools, colleges, and universities compete with other public schools regulated by Title IX and its implementing regulations to attract prospective students and to recruit prospective student-athletes.[10]

195. The athletic success of ACSI member schools provides many benefits.

196. For example, ACSI member schools host athletic events on their campuses.

197. This hosting allows them to obtain fees from their athletic programs in the form of ticket sales that support these programs and generally increases awareness of the member schools by allowing members of the public to visit the campus.

198. Athletic programs provide direct support through donations to the athletic programs.

199. ACSI member schools use their athletic programs to help brand their schools, develop campus unity, and offer entertainment and social activities for their prospective students, current students, alums, and the broader community.

200. Athletic programs also help ACSI member schools to develop strong alumni networks and encourage donations.

201. Successful athletic programs contribute to ACSI member schools' reputation and prestige by allowing them to advertise that success to the public and increase name-recognition of the schools in their local community and even on a national level.

202. For ACSI member colleges and universities, athletic success can also lead to increased applications for admission.

---

[10] As used for the remainder of the complaint the use of the adjective "public" to describe a school means that the school receives federal funding and is regulated by Title IX and its implementing regulations, including the Interpretation and the Fact Sheet.

203. For example, one ACSI member university participated in the NCAA's post-season basketball tournament in 2021.

204. Schools that perform well in the NCAA post-season basketball tournament typically receive an increase in public awareness and an increase in applications for enrollment. *See* Hayley Glatter, *The March Madness Application Bump*, The Atlantic, https://bit.ly/39UDeE4.

205. The websites of ACSI member schools have specific pages dedicated to athletics and the athletic achievements of current and past teams and individuals, including information on the number of championships the schools' teams have won and individual and team records.

206. ACSI member high school athletic teams have won state, conference, and district championships and their athletes have won individual titles.

207. ACSI member college and university athletic teams have won national and conference championships and their athletes compete for national individual titles.

208. Students at ACSI member high schools that participated in athletics in high school have earned athletic scholarships to play their sport in colleges and universities affiliated with the NCAA.

209. These athletic scholarships significantly reduce the cost of higher education and provide other benefits including access to medical facilities, health benefits, travel expenses, and gear such as shoes, clothes, and bags.

210. Some former students of ACSI member high schools that participated in athletics are now professional athletes and make their living playing the sport they played while at the ACSI member high school.

211. The Interpretation and the Fact Sheet threaten to reduce substantially the benefits of athletics to ACSI member schools.

33

212. For example, many of ACSI's member high schools, colleges, and universities are in direct competition with other public high schools, colleges, and universities and compete in the same arenas.

213. For example, ACSI member schools compete against public schools in at least the following 35 states: Arizona, Alaska, Alabama, Arkansas, California, Delaware, Florida, Georgia, Hawaii, Idaho, Iowa, Illinois, Indiana, Kansas, Kentucky, Louisiana, Michigan, Minnesota, Mississippi, Missouri, Montana, North Carolina, North Dakota, Nebraska, Ohio, Oklahoma, Oregon, South Carolina, South Dakota, Tennessee, Texas, Virgina, Washington, Wisconsin, and West Virginia.

214. More than 1,300 schools in these states are members of ACSI.

215. Many ACSI member high school sports teams compete against athletic teams from public high schools for state championships, conference championships, and district championships and records.

216. ACSI member college and university school sports teams compete in the NCAA Divisions I, II, and III and the National Association of Intercollegiate Athletics (NAIA) and frequently compete against public colleges and universities' athletic teams for national, regional, and conference championships and records.

217. For example, many ACSI member high schools, colleges, and universities compete against public high schools, colleges, and universities in head-to-head athletic events, where the schools' teams and individual athletes compete against each other and for national, state, conference, and/or district championships.

218. ACSI member high schools, colleges, and universities may compete against public high schools, colleges, and universities for opportunities to host athletic events.

219. ACSI member high schools, colleges, and universities compete against public high schools, colleges, and universities to attract students to their schools based on the reputations of their athletic programs.

220. ACSI member colleges and universities compete against other public colleges and universities to recruit top-tier athletes to their athletic programs.

221. The Interpretation and Fact Sheet illegally impose burdens on ACSI member high schools, colleges, and universities that it does not impose on other public high schools, colleges and universities, which gives ACSI's member schools' competitors a competitive advantage.

222. For example, ACSI member schools only allow females to compete on their female sports teams.

223. But the Interpretation and the Fact Sheet create an uneven playing field for ACSI's member schools' female athletic teams by requiring them to compete against other public schools' female athletic teams that include biological males.

224. ACSI member high schools, colleges, and/or universities compete in the areas listed in paragraphs 212–222 against public schools in states with Save Women's Sports laws. *See supra* ¶¶ 142–146.

225. For example, ACSI member schools in Alabama, Arkansas, Arizona, Florida, Idaho, Indiana, Iowa, Kentucky, Louisiana, Montana, Mississippi, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, and West Virginia compete against public high schools, colleges, and/or universities.

226. Because of the inherent biological and physiological athletic advantages of biological males compared to similarly fit biological females, ACSI member schools' female teams are at a competitive disadvantage and therefore lose opportunities to fairly compete in athletic events by playing against teams with males who identify as females.

227. The Interpretation and the Fact Sheet create a credible threat and substantial risk that the female athletic teams of ACSI member schools will be required to compete against biological males on a more frequent basis.

35

228.    For example, ACSI member schools and their female athletic teams in Alabama, Arkansas, Arizona, Florida, Idaho, Indiana, Iowa, Kentucky, Louisiana, Montana, Mississippi, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, and West Virginia are currently protected from competing against biological males in athletics because of Save Women's Sports laws.

229.    But the Interpretation and the Fact Sheet would eliminate that protection and create a credible threat and substantial risk that ACSI member schools' female athletic teams and their female athletes will be forced to compete against (and lose to) biological males.

230.    For example, males in Florida, Idaho, Indiana, and West Virginia are actively challenging those states' Save Women's Sports laws and are actively seeking to compete against female athletes. *See supra* ¶¶ 86–87.

231.    By forcing ACSI member schools into a competitive disadvantage by requiring their female athletic teams to compete against males, the Interpretation and the Fact Sheet make it more difficult for ACSI member schools' female teams to compete in female athletics, make it easier for public schools that compete against ACSI member schools to have athletic success, and illegally structure an unfair competitive environment in violation of Title IX and other federal law.

232.    The Interpretation and the Fact Sheet also make it harder for ACSI member schools' athletic teams to win games and titles compared to public schools' female athletic teams with males and therefore imposes a reputational harm on ACSI member schools that other public schools do not suffer.

233.    By making it more difficult for ACSI member schools' athletic teams to win games and titles, the Interpretation and the Fact Sheet also harm ACSI member colleges and universities by making it more difficult to recruit top-tier athletes and therefore impedes the success of these programs.

36

234. The Interpretation and the Fact Sheet also deprive ACSI member schools and their female athletes of the benefit of laws that ensure a fair playing field for females by requiring sex designations in school-sponsored athletic teams to be based on biological sex.

235. For example, ACSI has member high schools in Alabama, Arkansas, Arizona, Florida, Idaho, Indiana, Iowa, Kentucky, Louisiana, Montana, Mississippi, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, and West Virginia that field sports teams for girls.

236. ACSI's member high schools and their female athletes compete in athletics against public high schools in these states.

237. ACSI has member high schools in Alabama, Indiana, Iowa, Kentucky, Mississippi, South Dakota, and Texas that field sports teams for girls where Save Women's Sports laws require state high school associations to protect female athletes.

238. ACSI's member high schools and their female athletes are members of state high school associations in Alabama, Indiana, Iowa, Kentucky, Mississippi, South Dakota, and Texas and compete in athletics against public high schools in these associations.

239. ACSI member colleges and/or universities have female athletes who compete in sports against public colleges and universities which would include competing against colleges and universities in or from some if not all of the states of Arkansas, Florida, Idaho, Iowa, Louisiana, Montana, Mississippi, Oklahoma, South Carolina, South Dakota, or West Virginia.

240. The states in paragraph 239 have Save Women's Sports laws that require public colleges and universities to protect female athletes. *See supra* ¶ 146.

241. The female athletic teams of ACSI member schools in paragraphs 235–239 are currently able to compete on an even playing field against other female athletic teams from schools covered by the laws in paragraphs 142–146.

242. The Interpretation and the Fact Sheet deprive ACSI member schools and their female athletes of that protection and benefit and force them to compete against biological males.

243. In fact, the Department and the DOJ are actively trying to eliminate these laws by intervening in pending litigation challenging these laws. *See supra* ¶¶ 149–50.

244. In challenging these laws, the Department and the DOJ rely on the same incorrect interpretation of Title IX as the interpretation taken in the Interpretation and the Fact Sheet. Statement of Interest of the United States at 6–10, *B.P.J. v. W.V. State Bd. of Educ.*, No. 2:21-cv-00316 (S.D. W. Va. June 17, 2021), ECF No. 42.

245. These athletes challenge these laws based on a similarly incorrect interpretation of Title IX and argue—like the Department and the DOJ—that Title IX requires males to compete against females. Compl., *D.N. v. DeSantis*, No. 21-cv-61344 (S.D. Fla. June 29, 2021), ECF No. 1; Compl., *B.P.J. v. West Virginia State Bd. of Educ.*, No. 21-cv-00316 (S.D. W. Va. May 26, 2021), ECF No. 1.

246. Therefore, the Interpretation and the Fact Sheet create a credible threat and substantial risk that ACSI member schools in Idaho, West Virginia, and Florida and their female athletic teams and athletes will be forced to compete against (and lose to) biological males because males in these states are already trying to access women's sports.

247. The Interpretation and the Fact Sheet also require ACSI member schools to evaluate their membership in state-wide athletic associations.

248. The Interpretation and the Fact Sheet apply to high school athletic associations and require those associations to force member schools to allow biological males to compete on female athletic teams.

249. ACSI has member high schools that field sports teams for girls that are members of state high school associations.

250. So ACSI member schools that are members of state high school associations must choose between remaining members of associations that require males to compete against females or leave the associations entirely.

251. For example, one ACSI member school previously decided to leave its athletic conference because of the conference's policies allowing males to compete against females. Samantha Pell, *Maryland High School Leaves Athletic Association over Transgender Policy* (Mar. 22, 2019), *available at* https://wapo.st/3B3uh7k.

252. The Interpretation and the Fact Sheet put ACSI member high schools to the same choice, only nationwide.

253. Therefore, the Interpretation and the Fact Sheet create a credible threat and substantial risk that ACSI member schools will be forced to re-evaluate their membership in state athletic associations, including by leaving those associations.

254. If ACSI member high schools remain members of high school athletic associations to which the Interpretation and the Fact Sheet apply, then their female athletic teams will be forced to compete against member schools who permit males to compete on their female athletic teams.

255. If ACSI member schools leave high school athletic associations, then they will suffer harm by being excluded from state-wide competitions, events, and championships, by suffering reputational harm by being excluded from a state-wide association, and by not being able to offer female student athletes to compete at the highest levels of high school competition.

**The individual athlete and ACSI member schools' female athletes are harmed by the Interpretation and the Fact Sheet.**

256. The individual athlete and ACSI's member schools' female athletes are harmed by the Interpretation and the Fact Sheet.

257. Athletics provides female athletes with countless advantages. *See supra* ¶¶ 29–43.

258. Athletic participation is associated with positive educational outcomes, including better attendance, higher grades, fewer disciplinary issues, a greater desire to go to college, and higher advanced placement enrollment rates.

259. Females who participate in sports are more confident and have higher self-esteem.

260. Participating in high school sports can provide girls with the opportunities for athletic scholarships in college which significantly reduce the cost of education and provide other benefits.

261. For example, participating in a collegiate sport affiliated with the NCAA can include benefits such as access to top-tier coaching, facilities, and equipment; consultation with nutritionists and dieticians; paid travel to games, academic support services; medical and wellness care; access to psychologists; access to the NCAA Student Assistance Fund; team gear and apparel; and the opportunity to make money on their own name, image, and likeness.

262. Women's increased participation in sports creates network effects at all levels of athletic competition so that more women competing means more women pushing each other forward and raising the bar for athletic achievement.

263. For example, many ACSI member schools compete against public schools in at least the following 35 states: Arizona, Alaska, Alabama, Arkansas, California, Delaware, Florida, Georgia, Hawaii, Idaho, Iowa, Illinois, Indiana, Kansas, Kentucky, Louisiana, Michigan, Minnesota, Mississippi, Missouri, Montana, North Carolina, North Dakota, Nebraska, Ohio, Oklahoma, Oregon, South Carolina, South Dakota, Tennessee, Texas, Virgina, Washington, Wisconsin, and West Virginia.

264. These schools have more than 200,000 students in middle school and high school, many thousands of whom are female athletes.

265. The individual athlete and many female athletes at ACSI member high schools, colleges, and universities are currently protected against being forced to compete against males because of state Save Women's Sports laws. *See supra* ¶¶ 143–147.

266. But the Interpretation and the Fact Sheet deprive female athletes of these opportunities and these benefits.

267. Upon information and belief, female athletes at ACSI member schools face an obstacle in asserting their own right to challenge the Interpretation and the Fact Sheet because many of the athletes are minors, value anonymity, and face a financial burden in legal costs associated with such challenges.

268. As a result of the Interpretation and the Fact Sheet, the individual athlete and ACSI's member schools' female athletes will be forced to compete against biological males.

269. But males enjoy performance advantages over females in virtually all athletic contests. *See supra* ¶¶ 54–104.

270. As a result of these advantages and the inherent and biologically dictated differences between the male and female sex, female athletes are unlikely to win when competing against comparably talented and trained male athletes.

271. Consequently, the individual athlete and ACSI's member schools' female athletes are put at a significant disadvantage in competing against males in athletic competitions.

272. The individual athlete and ACSI's member schools' female athletes will also be exposed to heightened risks of injury on the soccer field, basketball court, or any other contact sport when competing against males. Such injuries could range in

severity, but at the extreme end might result in the end of their participation in athletics altogether.

273.    As a result of their biologically dictated performance disadvantage and increased risk for injury, the individual athlete and ACSI's member schools' female athletes will have fewer opportunities to stand on the victory podium, fewer opportunities to participate in post-season elite competition, fewer opportunities for public recognition as champions, and a much smaller chance of setting recognized records.

274.    For example, the Interpretation and the Fact Sheet create a credible threat that the individual athlete will be forced to compete against males for roster spots and positions on the volleyball and basketball teams at Brookland Junior High School and Brookland High School.[11]

275.    The Interpretation and the Fact Sheet create a credible threat that the individual athlete will be forced to compete against males from other teams in volleyball and basketball.

276.    Likewise, the individual athlete and ACSI's member high schools' female athletes will lose opportunities to be noticed by college recruiters for scholarship opportunities and will therefore lose scholarships to compete in athletics at the collegiate level.

277.    The individual athlete is training to compete in a sport in college and to gain an athletic scholarship.

278.    But athletic scholarships are limited and competitive.

279.    For example, NCAA Division I female soccer teams are limited to providing approximately 14 full-tuition scholarships, NCAA Division II female soccer

---

[11] Males will be unable to compete for roster spots on female teams at ACSI member schools.

teams are limited to providing approximately 10 full-tuition scholarships, and NAIA Division I female soccer teams are limited to providing 12 scholarships.

280.    Likewise, NCAA Division I female basketball teams are limited to providing approximately 15 full-tuition scholarships, NCAA Division II female basketball teams are limited to providing approximately 10 full-tuition scholarships, and NAIA Division I female basketball teams are limited to providing 11 scholarships.

281.    Other collegiate sports have other scholarship restrictions.

282.    Collegiate soccer and basketball teams—as well as other athletic teams—also have a limited number of roster spots for non-scholarship athletes.

283.    NCAA and NAIA schools recruit female athletes from a national market.

284.    Therefore, the individual athlete and ACSI member schools' female athletes are competing against a national market for a limited number of available scholarships.

285.    Because the Department and the DOJ open each sports league to new competitors and because it changes the rules of play, including the introduction of new and serious safety risks, the Department's and the DOJ's enforcement actions pose imminent injury to, and thus create competitor standing for, female athletes, colleges, and schools to vindicate their educational, athletic, aesthetic, and recreational interests, protected by law, in competing fairly in single-sex sports.

286.    By allowing biological males to participate in female sports in high school, the Interpretation and the Fact Sheet force the individual athlete and ACSI member schools' female athletes to compete for limited collegiate athletic scholarships and collegiate roster spots against competitors who have inherent physical advantages over them.[12]

---

[12] This holds true at all colleges that accept federal funds and have not claimed a religious exemption under Title IX.

287.    This reduces their chances of earning a college scholarship or making a collegiate team.

288.    ACSI, its members, its members athletes, and the individual athlete have no adequate or speedy remedy at law to correct or redress the deprivation of rights caused by the Interpretation and the Fact Sheet.

289.    Unless the Interpretation and the Fact Sheet is set aside and enjoined, ACSI, its members, its members athletes, and the individual athlete will suffer irreparable injury.

## Claims for Relief

### Claim One
### Agency Action Without Observance of Procedure Required by Law
### (5 U.S.C. § 706)

290.    Intervenor-Plaintiffs repeat and reallege each allegation contained in paragraphs 1–289 of this complaint.

291.    Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

292.    Likewise, a court must "compel agency action unlawfully withheld." 5 U.S.C. § 706(1).

293.    The Department is an "agency" under the APA. *Id.* § 701(b)(1).

294.    The Department has promulgated, and Defendants are enforcing nationwide, a new legislative rule, namely the Interpretation and the Fact Sheet, that uses Title IX and its implementing regulations and agencies to prohibit discrimination on the basis of sexual orientation and gender identity.

295.    The Department's Interpretation and Fact Sheet are "rules" under the APA. *Id.* § 701(b)(2); 5 U.S.C. § 551(4).

44

296.    The Department, through the Interpretation and the Fact Sheet, is unlawfully withholding agency action by refusing to enforce Title IX as applied to sex separation for school-sponsored athletic teams.

297.    Defendants have communicated the Interpretation and the Fact Sheet to covered entities nationwide through public statements and press releases, and to state and local governments and implementing agencies nationwide.

298.    The Interpretation and the Fact Sheet announce a new rule that creates new law, rights, and obligations under Title IX and its implementing regulations.

299.    The Interpretation and the Fact Sheet are final agency actions subject to judicial review. *Id.* § 704.

300.    The Interpretation and the Fact Sheet are definitive in their declaration of what Defendants think that the law requires, and mandatory on entities covered by Title IX and its implementing regulations and on entities subject to Defendants' enforcement.

301.    Legal consequences are required in and already flowing from the Interpretation and the Fact Sheet.

302.    The Interpretation and the Fact Sheet declare themselves to be treated as if they have the full force of law, and Defendants have done so.

303.    The APA requires agencies to engage in "notice and comment" for legislative rules. 5 U.S.C. § 553.

304.    Notice-and-comment requirements mandate that an agency (1) provide notice to the public of the proposed rulemaking, typically by publishing notice in the Federal Register, (2) give interested parties an opportunity to submit written data, views, or arguments on the proposed rule, and consider and respond to significant comments received, and (3) include in the promulgation of the final rule a concise general statement of the rule's basis and purpose. *Id.*

45

305.     Notice-and-comment requirements also mandate that an agency consider all the relevant comments offered during the public-comment period before finally deciding whether to adopt a proposed rule.

306.     The APA also requires that a rule not be made effective until at least 30 days after it was published. *Id.*

307.     The Department failed to provide the public with advance notice and comment before issuing the Interpretation and the Fact Sheet, in violation of the APA.

308.     Because the Interpretation and Fact Sheet are legislative rules that were adopted without the required notice-and-comment procedures, they are unlawful and should be "set aside." 5 U.S.C. § 706(2).

309.     In the alternative, the Interpretation and the Fact Sheet were guidance documents, which, prior to publication, were required to be (but were not) submitted for public notice and an opportunity for comment or to provide a statement of good cause for omitting these procedures under 34 C.F.R. Pt. 9.

310.     The Interpretation and the Fact Sheet must also be enjoined and declared unenforceable under 5 U.S.C. § 705 in order to preserve status and rights pending review of this Court.

311.     The Interpretation and the Fact Sheet must be set aside under 5 U.S.C. § 706.

312.     Under 5 U.S.C. § 701(a), no statute precludes judicial review of the Interpretation or the Fact Sheet, and they are not committed to agency discretion by law.

## Claim Two
## Agency Action That is Arbitrary, Capricious, and an Abuse of Discretion
## (5 U.S.C. § 706)

313.     Intervenor-Plaintiffs repeat and reallege each allegation contained in paragraphs 1–289 of this complaint.

314.     Under the APA, a reviewing Court must "hold unlawful and set aside agency action" if the agency action is "arbitrary," "capricious," or "an abuse of discretion." 5 U.S.C. § 706(2)(A).

315.     Likewise, a court must "compel agency action unlawfully withheld." 5 U.S.C. § 706(1).

316.     The Department is an "agency" under the APA. *Id.* § 701(b)(1).

317.     The Interpretation and the Fact Sheet, and Defendants' enforcement of them, explicitly rely on an interpretation of the Title IX or its implementing regulations and *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020) that is erroneous—that Title IX prohibits discrimination on the basis of sexual orientation and gender identity.

318.     Without reliance on this legal interpretation, the Interpretation and the Fact Sheet would not have been promulgated.

319.     The Department failed adequately to consider important aspects of the issue and to give due consideration to public comments.

320.     The Interpretation and the Fact Sheet contradict the text, structure, legislative history, and historical judicial interpretation of Title IX and its implementing regulations, all of which confirm that "sex" means biological sex—that is, a person's status as male or female as determined by biology—and require that biological sex to be taken into account to ensure women have equal opportunities in athletics.

321.     The Interpretation and the Fact Sheet create inconsistent and confusing standards, allow absurd results, lead to discrimination, and undermine other sex-

47

based classifications because the text, structure, legislative history, and historical judicial interpretation of Title IX and its implementing regulations impose requirements that "sex" means biological sex—that is, a person's status as male or female as determined by biology.

322.    In promulgating the Interpretation and the Fact Sheet, the Department failed to consider their impact on private religious schools, universities, and colleges and the students that attend those schools, universities, and colleges, including their First Amendment interests in freedom of speech, religion, and association; their interests under the Religious Freedom Restoration Act; their other liberty interests; their interests in allowing sex-segregated facilities; and their interests in allowing sex-segregated athletic teams.

323.    In promulgating the Interpretation and the Fact Sheet, the Department failed to consider their impact on the interests of female athletes including their First Amendment interests in freedom of speech, religion, and association; their interests under the Religious Freedom Restoration Act; their other liberty interests, including their privacy interests; and their interests in receiving an equal opportunity to participate in and benefit from interscholastic athletics as part of their education.

324.    In promulgating the Interpretation and the Fact Sheet, the Department failed to consider reliance interests of private religious schools, universities, and colleges in not being subject to a prohibition on discrimination on the basis of sexual orientation or gender identity under Title IX.

325.    In promulgating the Interpretation and the Fact Sheet, the Department failed to consider the inconsistent and confusing standards, absurd result, discrimination, and the effect on other sex-based classifications that are caused by the Interpretation and the Fact Sheet.

326.    The Department also failed to consider the reliance and structural interests of the States and other grant recipients, especially States accepting federal funds contingent on compliance with Title IX.

327.    The Interpretation and the Fact Sheet did not separately consider each component of the policy, let alone articulate a reasoned decision that considers alternatives and that considers legitimate liberty, privacy, and reliance interests, and therefore is inconsistent with the requirements of *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1910–15 (2020).

328.    The Department failed to adequately acknowledge that the Interpretation and the Fact Sheet were a change in position from its existing regulations and initial post-*Bostock* guidance.

329.    The Department failed to consider any alternative policies that respect the interests of private religious schools, universities, and colleges and their students, including their female students and female student-athletes, such as (1) taking no action; (2) creating rules to protect female sports and privacy under the correct understanding of Title IX; (3) grandfathering existing categories of programs and practices covered by Title IX; (4) confirming that religious exemption apply under the Religious Freedom Restoration Act and the First Amendment, even in the context of sexual orientation and gender identity; (5) creating or expanding existing exemptions for those with safety concerns, moral objections or other reliance on past policies.

330.    These failures render the Interpretation and the Fact Sheet arbitrary, capricious, and an abuse of discretion.

331.    The Interpretation's and the Fact Sheet's rationale is contrived for the President's policy convenience, set forth in his sweeping and mandatory Executive Order 13,988, rather than based on law and necessary considerations under the APA. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575–76 (2019).

332. The Department, through the Interpretation and the Fact Sheet, is unlawfully withholding agency action by refusing to enforce Title IX as applied to sex separation for school-sponsored athletic teams.

333. Therefore, the Interpretation and the Fact Sheet must be set aside under 5 U.S.C. § 706.

334. The Interpretation and the Fact Sheet must also be enjoined and declared unenforceable under 5 U.S.C. § 705, in order to preserve status and rights pending review of this Court.

335. Under 5 U.S.C. § 701(a), no statute precludes judicial review of the Interpretation or the Fact Sheet, and they are not committed to agency discretion by law.

## Claim Three
### Agency Action that is Contrary to Law, *Ultra Vires*, Issued in Excess of Statutory Authority, and Contrary to Constitutional Rights
### (5 U.S.C. § 706)

336. Intervenor-Plaintiffs repeat and reallege each allegation contained in paragraphs 1–289 of this complaint.

337. Under the APA, a reviewing Court must "hold unlawful and set aside agency action" if the agency action is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)–(C).

338. Likewise, a court must "compel agency action unlawfully withheld." 5 U.S.C. § 706(1).

339. The Department is an "agency" under the APA. *Id.* § 701(b)(1).

340.    As a federal agency, the Department has no power to act unless Congress confers that power, and actions that are unauthorized by Congress are ultra vires.

341.    Title IX and its regulations do not prohibit discrimination on the basis of sexual orientation or gender identity.

342.    The Interpretation and the Fact Sheet mandate to the contrary exceeds Defendants' authority under Title IX and related regulations.

343.    Congress has not delegated to the Executive Branch any authority to mandate the Interpretation and the Fact Sheet.

344.    This reading of Title IX and its regulations is compelled by the U.S. Constitution's clear-notice rule, a substantive canon of statutory interpretation that applies because the displacement of traditional state police power authority, any implicit abrogation of state sovereign immunity, and the attachment of conditions under Title IX and its regulations to Spending Clause legislation.

345.    The Interpretation and the Fact Sheet violate the major questions doctrine of statutory interpretation because Congress did not, in Title IX, clearly give the Department of Education authority to impose the Interpretation and the Fact Sheet since it vastly changes the rights and obligations set forth in Title IX and the way that student athletics are operated in the country.

346.    Because the Interpretation and the Fact Sheet exceed Defendants' authority under Title IX and its implementing regulations, the Interpretation and Fact Sheet are *ultra vires*, contrary to law, and issued in excess of the Department's authority.

347.    The Interpretation and the Fact Sheet go so far beyond any reasonable reading of the relevant Congressional text and its implementing regulations such that the new rules, regulations, guidance, and interpretations functionally exercise lawmaking power reserved only to Congress. U.S. Const. art. I, § 1.

348. The Department's Interpretation and Fact Sheet are contrary to law and exceed the Department's statutory authority because *Bostock*'s interpretation of Title VII's language is inapplicable to Title IX's materially different language.

349. The Department's Interpretation and Fact Sheet are contrary to law because, properly interpreted, Title IX's prohibition of discrimination "on the basis of sex" does not encompass discrimination based on sexual orientation or gender identity, either as a component of the term sex, on any sex stereotyping theory, or as separate or subsidiary protected classes.

350. The Department's Interpretation and Fact Sheet are contrary to law because Title IX and longstanding Department regulations expressly permit distinctions based on biological sex in certain circumstances.

351. Any application or enforcement of the Title IX and its regulations to discrimination because of sexual orientation or gender identity exceeds Congress's Article I enumerated powers and transgresses on the reserved powers of the State under the federal constitution's structural principles of federalism and the Tenth Amendment, as discussed below in Claim Seven.

352. The Department, through the Interpretation and the Fact Sheet, is unlawfully withholding agency action by refusing to enforce Title IX as applied to sex separation for school-sponsored athletic teams.

353. Therefore, the Interpretation and Fact Sheet must be set aside under 5 U.S.C. § 706 and the Court's inherent equitable power to enjoin *ultra vires* and unconstitutional actions.

354. The Interpretation and Fact Sheet must also be enjoined and declared unenforceable under 5 U.S.C. § 705 in order to preserve status and rights pending review of this Court.

355.    Under 5 U.S.C. § 701(a), no statute precludes judicial review of the Interpretation or the Fact Sheet, and they are not committed to agency discretion by law.

**Claim Four**
**Structural Principles of Federalism and Lack of**
**Enumerated Powers**
**(Constitutional Structure, Spending Clause, and**
**the Tenth Amendment)**

356.    Intervenor-Plaintiffs repeat and reallege each allegation contained in paragraphs 1–289 of this complaint.

357.    Any application or enforcement of Title IX to discrimination because of gender identity or sexual orientation exceeds Congress's Article I enumerated powers and transgresses on the reserved powers of the State under the federal constitution's structural principles of federalism and the Tenth Amendment. U.S. Const. art. I, § 8, cl. 1; *id.* amend. X.

358.    Although protecting the States, these structural principles serve to "protect the individual as well." *Bond v. United States*, 564 U.S. 211, 222 (2011). By providing protections for the sovereignty of the States, the Constitution secures "'the liberties that derive'" to individual citizens "'from the diffusion of sovereign power.'" *New York v. United States*, 505 U.S. 144, 181 (1992) (internal quotation omitted).

359.    Under the U.S. Constitution's structural principles of federalism and the Tenth Amendment, the U.S. Constitution's clear-notice rule governs any interpretation of federal law in this area.

360.    A "clear and manifest" statement is necessary for a statute to preempt "the historic police powers of the States," *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947), to abrogate state sovereign immunity, or to permit an agency to

regulate a matter in "areas of traditional state responsibility," *Bond v. United States*, 134 S. Ct. 2077, 2089–90 (2014).

361. The federal Constitution limits the States and the public's obligations to those requirements "unambiguously" set forth on the face of any Spending Clause statute. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

362. Under the U.S. Constitution's structural principles of federalism and the Tenth Amendment, a clear contemporaneous statement is necessary both to make a statute apply to the States and to show that the statute applies in the particular manner claimed. *Gregory v. Ashcroft,* 501 U.S. 452, 460–70 (1991).

363. This canon resolves ambiguity in the substantive scope of many statutes that preempt traditional state regulation. *Bond*, 572 U.S. at 859.

364. The Supreme Court thus applies this canon to protect private parties when the government "intrudes into an area that is the particular domain of state law" because Congress must "'enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power and the power of the Government over private property.'" *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, No. 21A23, 2021 WL 3783142, at *3 (U.S. Aug. 26, 2021) (citations omitted).

365. This canon applies here because the federal officials seek to displace state authority over education and privacy in education, with a possible abrogation of state sovereignty from suit, and under a statute that is enacted under the Spending Clause, in order to extend federal law to the College's housing.

366. The U.S. Constitution's clear-notice rule governs any interpretation of federal law in this area because the federal officials displaced traditional state authority over education and educational privacy, with a possible abrogation of state sovereignty from suit, and under a statute that is enacted under the Spending Clause, to extend federal law to the Intervenor-Plaintiffs.

367. In the Interpretation and the Fact Sheet, and actions taking to implement those measures, Defendants expressly and impliedly, but improperly, preempt the prerogative of States to safeguard privacy expectations in educational settings.

368. Defendants also subject States to private lawsuits for damages and attorneys' fees on these new theories, even though States did not know of these liabilities and could not have known or consented to this waiver of their sovereign immunity.

369. Title IX does not prohibit, let alone clearly and unmistakably prohibit, discrimination on the basis of gender identity or sexual orientation, and therefore does not support any clear notice to justify the burden the gender identity mandate imposes on Intervenor-Plaintiffs, the public, or the States.

370. The Interpretation and the Fact Sheet are not in accord with the understanding that existed among the public or the courts at the passage of Title IX or when the States chose to begin accepting federal money for educational purposes.

371. No State could unmistakably know or "clearly understand" that Title IX would impose on it the conditions created by the Interpretation and the Fact Sheet.

372. The public and the States thus lacked the constitutionally required clear notice when the Act was passed or the grants were made that the Act would apply in this way. *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

373. Likewise, under the major questions doctrine, Congress must "speak clearly when authorizing an agency to exercise powers of "vast 'economic and political significance." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, No. 21A23, 2021 WL 3783142, at *3 (U.S. Aug. 26, 2021) (citations and quotation marks omitted).

374. The Interpretation and the Fact Sheet fail this test, as Title IX contradicts their requirements, and did not clearly authorize them.

375.   Because Defendants have violated these constitutional standards of clear notice, any application or enforcement of Title IX to discrimination on the basis of gender identity or sexual orientation violates the structural principles of federalism, the Spending Clause, and the Tenth Amendment and effectively coerces or commandeers the States, including in grant conditions and in the States' historical and well-established regulation of healthcare, freedom of speech, conscience protection, and religious freedom. *New York v. United States*, 505 U.S. 144, 162 (1992).

376.   These structural principles protect citizens, not just states. *Bond v. United States*, 564 U.S. 211, 220, 222 (2011).

377.   This Court may review and enjoin ultra vires or unconstitutional agency action. 5 U.S.C. §§ 702–705; *Larson*, 337 U.S. at 689–91.

378.   The Court should therefore declare that the Interpretation and Fact Sheet are unconstitutional and enjoin their application.

## PRAYER FOR RELIEF

Intervenor-Plaintiffs respectfully request that this Court enter judgment against Defendants and provide Intervenor-Plaintiffs in the Plaintiff States, including ACSI's current and future members and their members current and future students, with the following relief:

1.   A declaratory judgment holding unlawful the Department's Interpretation and Fact Sheet;

2.   A declaratory judgment holding that the Department lacked authority to issue the Interpretation and Fact Sheet;

3.   A judgment setting aside and vacating the Interpretation and Fact Sheet.;

4.     A declaratory judgment that Title IX and its implementing regulations do not prohibit the Plaintiff States, Title IX recipients in the Plaintiff States, or Intervenor-Plaintiffs or their members in the Plaintiff States from maintaining athletic teams separated by biological sex or from assigning an individual to a team based on the individual's biological sex;

5.     A preliminary and permanent injunction prohibiting Defendants and their officers, agents, servants, employees, attorneys, and any other persons who are in active concert or participation with those individuals from enforcing the Interpretation and Fact Sheet in the Plaintiff States;

6.     That this Court adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter here in controversy so that such declarations will have the force and effect of final judgment;

7.     That this Court retain jurisdiction of this matter to enforce this Court's order;

8.     That this Court grant to Intervenor-Plaintiffs reasonable costs and expenses of this action, including attorneys' fees in accordance with any applicable federal statute, including 28 U.S.C. § 2412;

9.     That this Court grant the requested injunctive relief without a condition of bond or other security being required of Intervenor-Plaintiffs;

10.     That this Court grant such other and further relief as this Court deems just and proper; and

11.     All other relief to which Intervenor-Plaintiffs are entitled.

Respectfully submitted this 19th day of September, 2022.


W. ANDREW FOX                              s/ *Jonathan A. Scruggs*
BPR No. 017356                             JONATHAN A. SCRUGGS
GILBERT & FOX                              BPR No. 025679

625 S. Gay Street, Suite 540
Knoxville, TN 37902
Telephone: (865) 525-8800
Facsimile: (865) 525-8200
andy@andrewfoxlaw.com



RYAN L. BANGERT*
TX Bar No. 24045446
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
Telephone: (480) 444-0020
Facsimile: (480) 444-0028
jscruggs@ADFlegal.org
rbangert@ADFlegal.org

CHRISTIANA HOLCOMB*
DC Bar No. 196922
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, D.C. 20001
Telephone: (202) 393-8690
Facsimile: (202) 347-3622
cholcomb@ADFlegal.org

*Admitted *Pro hac vice*

*Attorneys for Intervenor-Plaintiffs*

## DECLARATION UNDER PENALTY OF PERJURY

I, David Balik, Ed.D., Vice President of the Association of Christian Schools International, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that paragraphs 13–22, 166–255, 263–264, 286–289, and 291–378 of the foregoing Verified Complaint are true and correct to the best of my knowledge as they relate to ACSI, its member school, and its member school's athletes.

Executed this 16th day of September, 2022, at Trussville, Alabama.

_____
David Balik, Ed.D.

## DECLARATION UNDER PENALTY OF PERJURY

I, A████ H███, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that allegations of the foregoing Verified Complaint are true and correct to the best of my knowledge as they relate to me.

Executed this 16th day of September, 2022, at Jonesboro, Arkansas.



## Certificate of Service

I hereby certify that on the 19th day of September, 2022, I electronically filed the foregoing document with the Clerk of Court and that the foregoing document will be served via the CM/ECF system on all counsel of record.

*s/ Jonathan A. Scruggs*
Jonathan A. Scruggs

*Attorney for Intervenor-Plaintiffs*